FAMTABKC

1    UNITED STATES DISTRICT COURT
     SOUTHERN DISTRICT OF NEW YORK
2    ------------------------------x

3    ABKCO MUSIC, INC., et al.,

4                    Plaintiffs,

5            v.                              15 CV 4025 (ER)

6    WILLIAM SAGAN, et al.,

7                    Defendants.

8    ------------------------------x
                                         New York, N.Y.
9                                        October 22, 2015
                                         11:45 a.m.
10
     Before:
11
                         HON. EDGARDO RAMOS,
12
                                          District Judge
13
                           APPEARANCES
14
     LOEB & LOEB
15        Attorneys for Plaintiffs
     BY:  BARRY SLOTNICK
16        TAL DICKSTEIN
          SARAH SCHACTER
17
     WINSTON & STRAWN
18        Attorneys for Defendants
     BY:  THOMAS LANE
19        DORIAN THOMAS

20

21

22

23

24

25

FAMTABKC

1      (In open court, case called)

2      THE COURT:  Good morning.  We are here at the request

3  of counterclaim defendants for leave to file a motion to

4  dismiss.

5      So let me begin with you, Mr. Lane or Mr. Thomas.

6      MR. LANE:  I will take the argument, your Honor.

7      THE COURT:  Okay.

8      MR. LANE:  So we believe the motion will be pointless

9  if they make it.  We believe that we set forth the essential

10 elements of defamation in the complaint against third-party

11 defendants, those four elements being set forth by the Court of

12 Appeals.  The arguments in favor of a motion to dismiss I don't

13 think hold water, and I don't think the Court should entertain

14 them.  One is with respect to Section 74 of the civil rights

15 section, and the other is with respect to whether or not those

16 statements contained in the press release constitute opinion as

17 opposed to fact.

18      Our position is that press release does not actually

19 speak of allegations in the complaint, but sets forth a variety

20 of things as being factual, which are also defamatory, and that

21 do not appear in the complaint.

22      The complaint has an attachment to it, Exhibit A,

23 which has approximately 600 potential copyrights that were

24 allegedly infringed.  And while I understand the plaintiffs

25 have said that is an exclusive list, what the press release

FAMTABKC

1    does is go far, far beyond that, and I think any reasonable

2    reader, as the courts have set forth, who looks at that would

3    determine that that is a reasonably acceptable defamatory

4    interpretation.  And I will give your Honor some examples from

5    the press release that I don't think are in the complaint and

6    go toward defamation, particularly at this pleading stage where

7    we haven't reached any discovery.

8           In the press release itself, Mr. Israelite as well as

9    the NMPA set forth a variety of statements intended to be taken

10   as facts, such as much of BGA's content was never properly

11   licensed.  The BGA site, as you may have learned during the

12   course of the scheduling conference, and I had an opportunity

13   to take a look at that transcript, has a whole variety of

14   different live recordings, concert recordings, memorabilia,

15   things for sale, and a whole host of different things in its

16   business model.

17          What this press release does is essentially attacks

18   the entire of the business model where Mr. Israelite goes on to

19   to say systematic copyright infringement cannot be a business

20   model, and it is unfortunate that Wolfgang's Vault chose not to

21   compensate all of the creators responsible for their content.

22          So these factual statements set forth as facts are

23   defamatory toward the BGA company, and they are far apart from

24   what I presume is the realm that the plaintiffs are going to

25   seek damages on, because I know, and our argument will be,

FAMTABKC

1    about all of the licenses that we have litigated in the past,

2    whether it was with respect to Led Zeppelin and The Doors, the

3    Grateful Dead, and things like that.

4         So I think that looking at the cases we have cited,

5    Henneberry being one of them, the determination at this stage,

6    of course, is to accept all allegations as being true, to view

7    them in the light most favorable, in this case to third-party

8    plaintiffs, and make a determination as to whether or not the

9    statements are reasonably susceptible to defamatory

10   interpretation, and I think they are at this stage.

11        The other point on this, whether a fair and true

12   report under Section 74 presents some measure of immunity to

13   the press release statement.  We have cited a case called

14   Pisani which states that allegations can be transformed into

15   fact.  In the press release itself, they have not actually set

16   forth that it is an allegation that there is systemic copyright

17   infringement that constitutes my client's business model.

18        I think that's a key distinction among other

19   statements that they make in the press release, such as the

20   Wolfgang's Vault websites have profited in large part because

21   of the significant use of unlicensed music, primarily concert

22   footage, available on their sites.  They're not drawing

23   specific allegations from the complaint related to those

24   plaintiffs they represent here.  It's a wholesale indictment of

25   the company.  And words matter.

FAMTABKC

1    THE COURT:  But doesn't that language, or the sum and

2    substance of that language, appear in the complaint?

3    MR. LANE:  No, your Honor, what they have done is

4    cherry picked, for example, bits and pieces of words throughout

5    the complaint.

6    For example, they will take the word "massive" and say

7    the word "massive" appears in paragraph 67 or 71, I forget the

8    number, and they will take another word and say that word

9    appears on such and such a page.  But I don't believe under the

10   case law and the intent of Section 74 this press release is

11   covered by that.  Because I think statements such as systematic

12   copyright infringement cannot be a business model, that is not

13   contained in the complaint.  It's not a quote from the

14   allegations of the complaint, and I think it goes beyond what

15   they have said they're complaining about.

16   There is no question that they have got broad language

17   at the very beginning of the complaint, as in an opening

18   statement, but any reasonable viewer or reader of the press

19   release itself I don't know would reach the conclusion that

20   this is necessarily coming from a lawsuit.  A lawsuit is

21   mentioned, but it's not -- this is not phrased the lawsuit

22   alleges X or the lawsuit alleges Y, that is not contained in

23   this press release.

24   THE COURT:  But a lawsuit is more than mentioned.  The

25   whole purported purpose of the press release is to announce the

FAMTABKC

1    lawsuit.  No?

2         MR. LANE:  My view of the purported purpose of the

3    press release is to defame my client, but I agree with you the

4    lawsuit is mentioned.  However, the defamatory statements, it

5    is not said that those are from the lawsuit.

6         And what happened with this press release, your Honor,

7    is that it was picked up by another 14 different web sites and

8    over 400,000 Twitter users who were not accessing the lawsuit,

9    they were accessing the statements that are contained in here

10   that are not directly taken from the lawsuit.  And I think that

11   even looking as a reasonable reader under both the Court of

12   Appeals cases that we cited to you as well as the Second

13   Circuit, a reasonable reader would view this as factual.

14        I think the argument that this is simply granted

15   immunity by Section 74 is flawed in that I think the press

16   release itself has statements as I read to the Court which are

17   not directly tied to the lawsuit.  There's nothing about the

18   lawsuit that is intended to prove that my client's entire

19   business model is based on systematic copyright infringement.

20        THE COURT:  Is the NMPA a plaintiff in this case?

21        MR. LANE:  No, sir.

22        THE COURT:  So what should I make the opening line of

23   the press release, that the National Music Publishers

24   Association, on behalf of, today filed a copy infringement

25   lawsuit.

FAMTABKC

1          MR. LANE:  Well, I think neither the NMPA nor

2     Mr. Israelite, who is named as an individual third-party

3     defendant by us, are named.  There's a section of 74, which is

4     the last line of the statute itself, which says this section

5     does not apply to a libel contained in any other matter added

6     by any person concerning the publication or the report of

7     anything said or done at the time and place of such proceeding

8     which was not a part thereof.

9          I can't tell you standing here today whether that has

10    some application to the NMPA making these statements or

11    Mr. Israelite making the statements.  I don't believe that

12    they're given any additional immunity outside of Section 74.

13    What I want them to do, and I haven't had an opportunity to do

14    it yet, is to look at the legislative history to explain that

15    sentence, because it's not, I think, clear on its face.  But I

16    still think, whether they were initial plaintiffs or simply

17    folks commenting on the lawsuit, it is clear that the NMPA

18    gathered together these music publishers to get the lawsuit

19    started and are likely funding it.

20         THE COURT:  And I guess the question really is did the

21    NMPA seek to cloak itself in immunity by posing itself as a

22    plaintiff in the lawsuit.

23         MR. LANE:  And I think we need discovery with respect

24    to that.  I think just on the four corners of the claim we set

25    forth the elements that are required under New York law, and I

FAMTABKC

1   think there is some ambiguity under that section of the

2   statute, which, as our legislature sometimes does, it's hard to

3   determine just what's in the black and white words that are

4   there.

5          But no, the NMPA is not a plaintiff, and we had to

6   bring them in with respect to the defamation claim.

7          THE COURT:  Okay, thank you.

8          Mr. Slotnick.

9          MR. SLOTNICK:  Yes, your Honor, this is clearly a

10  press release.  It says at least five times that it is dealing

11  with and announcing a lawsuit.  The headline is NMPA Files

12  Lawsuit Against Wolfgang's Vault for Massive Copyright

13  Infringement.

14         THE COURT:  Let me ask you about that.  I don't know

15  that this is a big deal, but NMPA did not bring this lawsuit,

16  correct?

17         MR. SLOTNICK:  NMPA is the trade association for the

18  plaintiffs, amongst other publishers, and it supervises and

19  administers litigation, including this one.

20         THE COURT:  But it is not a plaintiff.

21         MR. SLOTNICK:  It is not a plaintiff.

22         THE COURT:  Okay.

23         MR. SLOTNICK:  Your Honor, Mr. Lane is I think

24  quibbling about what is or is not massive and/or systematic.

25  He makes reference to the exhibit to the complaint, which is a

1   76-page exhibit identifying infringements.  As far as I'm

2   concerned, that's massive.  It may also be systematic and

3   systemic to the defendants' business model.  Whether this

4   should be a 760-page exhibit covering every song and every

5   infringement in Wolfgang's Vault web site is largely irrelevant

6   to this task.  There is a fair reporting privilege, it is not

7   restricted to parties to litigation, and this is a fair

8   analysis of what the complaint says.  It's a five-paragraph

9   press release that distills the 21-page complaint and the

10  76-page exhibit.

11          THE COURT:  But it's structured -- well, at least the

12  paragraph that has been highlighted -- not as a, to use the

13  words from case law, a fair and true quotation or citation of

14  the complaint, it's structured in a form of statements by

15  Mr. Israelite.  What are the parameters of what constitutes

16  fair and true?  This isn't Mr. Israelite quoting the complaint,

17  this is him making a statement.

18          MR. SLOTNICK:  Well, the first paragraph identifies

19  the lawsuit, the second paragraph quotes from the complaint,

20  the third paragraph paraphrases the complaint, the fifth

21  paragraph identifies what NMPA is and does, and in the fourth

22  paragraph, which the one that is seemingly is troublesome to

23  the defendants, Wolfgang's Vault's web sites have profited in

24  part because of significant use of unlicensed music, primarily

25  concert footage, et cetera.

FAMTABKC

1          If one looks at the defendant's own answer and

2     affirmative defenses, there are I think 29 affirmative

3     defenses, only one of those 29 affirmative defenses even makes

4     reference to license.  And they qualify that by saying well,

5     there's also consent or acquiescence.  The remaining bulk of

6     the defendants' affirmative defenses are well, we were

7     innocent, or somebody else did it, or it was -- plaintiffs are

8     barred by statute of limitations or latches.

9          They're not saying they're licensed, they're saying we

10    may not have been licensed or the guys we got the rights from

11    may not have been licensed, but it doesn't matter anymore

12    because that happened too long ago and it happened by somebody

13    else.  So in fact they are unlicensed.  They may not be

14    infringers, I suspect that will be what this case will be

15    about, but in point of truth, there are no licenses, and they

16    have commented on that.

17         Our complaint is, for all intents and purposes, a

18    series of opinions.  It is our opinion that they are

19    infringers.  Their answer has been oh, no, we're not, which is

20    also an opinion.  And the only one who will ever be able to

21    determine what the fact is is your Honor when your Honor

22    renders an opinion which determines whether or not they're

23    infringers or not.  But the question to whether or not they're

24    unlicensed is exactly the subject matter of the complaint and

25    it's exactly what Mr. Israelite was commenting on.

1          THE COURT:  Except I think it's slightly different.

2    It's not they're unlicensed, period, it's they're unlicensed

3    and therefore illegally using these materials.

4          MR. SLOTNICK:  And that is exactly what the complaint

5    says, that they are unlicensed and therefore infringers.

6    That's what he said.

7          The other comment, the systemic copyright infringement

8    cannot be a business model, first of all, it doesn't make

9    specific reference to the defendants, although obviously it

10   ties the defendant to that, and I think we can all agree that,

11   A, is an opinion, and probably is true, that illegal conduct

12   cannot be a legitimate business model.  That's clearly an

13   opinion.

14         The first comment make reference to fact that these

15   are unlicensed works.  All of the cases say that you have to

16   look at these comments in context.  You don't look at them, as

17   defendant's letter suggests, at face value.  You have to look

18   at the context.  This in the context of announcing a copyright

19   infringement lawsuit in which the plaintiffs claim

20   infringement.  It is a reference to the fact that the complaint

21   does talk about unlicensed works, and that, because of that,

22   these works are infringements.  The cases all talk about the

23   fact that you're not limited to simply quoting from a

24   complaint, you're allowed to speak fairly and truthfully

25   without merely mimicking what's in the complaint.

1            In every case, including some of the cases that the

2     defendants cite, even in <u>Henneberry</u>, literal meaning does not

3     always coincide with meaning in a grander setting.  Isn't that

4     what we're talking about here?  There is nothing that one would

5     read from this press release that would cast the defendants in

6     a false light.  There is nothing that says that they're evil

7     people.  There's nothing that says that they committed other

8     wrongdoings.

9            Now frankly, the way Mr. Lane now suggests is if we

10    were not allowed to make this motion, if this claim goes

11    forward, that opens up the door, based on what defendants have

12    said, to discovery not only of the 206 infringements and the 76

13    pages of exhibits, it opens it up to everything.  Because if

14    they had, I don't know, 800 copyrights involved on their web

15    sites, the only way for to us prove the truth of that is to

16    look at all 800 or 8,000, and now we're talking about a very

17    different case where a very small tail is wagging what we still

18    believe is a very large dog.

19           THE COURT:  I guess I see it slightly differently at

20    this point, and it's not -- because arguably from your

21    perspective you are saying they are evil people here, they are

22    taking money and keeping money that rightfully belonged to

23    members of the NMPA.  And I guess the question I have:  Does it

24    paint them in a worse light than what the complaint does?

25           MR. SLOTNICK:  Well, your Honor, as a copyright

1   lawyer, I can think of no crime worse than copyright

2   infringement, but I will recognize that there are other people

3   who might think that there are grander evils than copyright

4   infringement.  I'm not one of them.

5           But the fact of the matter is you have a 21-page

6   complaint which identifies Wolfgang's Vault as an infringer.

7   You have a press release that says there is a 21-page complaint

8   that identifies them as infringers.  There's nothing within the

9   confines of this press release that says anything wrong except

10  perhaps the defendants' only guilty conscious by what they have

11  done.

12          If this is not fair and accurate reporting, then what

13  the Court is saying is no one can ever report on a litigation

14  by saying anything other than putting everything in quotes.

15  And that seems to be -- we're now back to a writ system that if

16  you don't say the exact words in the exact order, your claim

17  gets thrown out.  That's not what this should be.  This is a

18  press release.  It says exactly what happened, which is NMPA or

19  its publishers filed a lawsuit, and we don't see --

20          THE COURT:  I think that's probably too easy a

21  description.  It says more than that.  It says they filed a

22  lawsuit and their business model is based on improper

23  infringing.

24          But let me hear from Mr. Lane.

25          MR. LANE:  Thank you, your Honor, just a few quick

1   points.  Mr. Slotnick said one thing on licenses and we have

2   all these affirmative defenses and only mentioned it once.

3         Well, actually at page 21 and 22 of the counterclaims

4   and third party complaint, paragraph four:  Importantly, all of

5   the recordings which make up defendants' collection were

6   created and have been exploited with permission and proper

7   legal consent from the various artists who controlled the

8   copyrights and the musical compositions they performed.

9         Page 22, paragraph 11:  In particular, defendants

10  possess all of the appropriate performance rights and

11  mechanical and compulsory licenses necessary to conduct their

12  business lawfully, and have at all relevant times remitted

13  royalties as prescribed by law.

14        Second point, he said we should look at the press

15  release in context.  Well, the context in which my clients and

16  their companies look at it, one of the contextual aspects is

17  damages.  And after this press release was sent out and picked

18  up by 14 different web sites and over 400,000 Twitter users and

19  Facebook users, revenue at my companies dropped in double

20  digits.  That's part of the context we're dealing with.

21        Point three, he said this doesn't show Wolfgang's

22  Vault as being evil people.  Of course it does.  It essentially

23  indicts the entirety of the company, each of the web sites they

24  cite in the complaint.  But it's broader in this press release.

25  In this press release it's that all of the web sites have

1    profited in large part because of the significant use of

2    unlicensed music, primarily concert footage available on their

3    sites.  They are saying these things as facts, and they are

4    defamatory facts, and it's beyond what is contained in the

5    complaint.

6              I point your Honor to a case called <u>Samson</u> that we

7    cited in New York, a statement about a corporation is

8    defamatory per se when it relates to business as to affect the

9    confidence of the public.  We directly see this press release

10   affecting the confidence of the public in how our revenues went

11   down by double digits.

12             These comments by Mr. Israelite are separate and apart

13   from the complaint.  I'm not suggesting that each and every

14   time everything needs to be in quotes, but there needs to be a

15   connection that is more than what exists here, and this is

16   above and beyond, and it is defamatory saying that our entire

17   business model is based on systematic copyright infringement.

18             THE COURT:  Let me ask you a question as I continue to

19   educate myself about this case.  How long has your client been

20   around?

21             MR. LANE:  They've been in business for approximately

22   two decades.

23             THE COURT:  I take it this issue has come up before;

24   not the defamation issue, the infringing issue.

25             MR. LANE:  Yes.

FAMTABKC

1          THE COURT:  What's the case law?

2          MR. LANE:  Nothing has gone to trial.  The largest

3  matter was a matter pending in the Northern District of

4  California which my firm represented the companies with Led

5  Zeppelin, The Doors, Carlos Santana, The Grateful Dead and a

6  variety of other artists, and it was resolved favorably by both

7  sides.

8          THE COURT:  So they have been settled, these cases.

9          MR. LANE:  Yes.  Some smaller matters have been

10  dismissed on summary judgment and our motion related to

11  licenses, but the largest one has been that one, and that one

12  was settled.

13          THE COURT:  Okay.  Mr. Slotnick, I don't know if you

14  wanted to respond.

15          MR. SLOTNICK:  Your Honor, just briefly.  Mr. Lane

16  mentioned the Pisani case which he cited, and again, there's

17  nothing within this that suggests more serious conduct than

18  copyright infringement.  If people perceive copyright

19  infringement to be an evil, then they perceive it to be an

20  evil, but this doesn't talk about anything else.

21          What Mr. Lane's and defendants' argument boils down to

22  is that 206 infringing works, 76 pages worth of alleged

23  infringing acts is not systematic.  It seems to me like a

24  pretty large number, and if it's not systematic, then what this

25  issue will come down to is how many works were there and how

FAMTABKC

 1    many of them constitute a system of infringement or a system of

 2    unlicensed use.

 3            If that's the quibble, then that has no place in

 4    dealing with fair and accurate reporting or an opinion.  If

 5    we're talking about 206 works being infringed less than

 6    systematic, more than systematic or systematic, isn't that

 7    really the definition of someone's opinion?

 8            THE COURT:  Why is this 206 works?

 9            MR. SLOTNICK:  I think we have 206 different

10    copyrights involved in the lawsuit and 76 pages worth of

11    infringing activities because they have been infringed in

12    multiple arenas in different ways.

13            THE COURT:  Okay.

14            MR. LANE:  Just one thing, if I may, whether he's

15    talking about 260 or 600, there are over 5,000 recordings

16    available on the web site, so when there's an indictment of the

17    entirety of the web site and the business model, it's

18    implicating a lot more than 260 or 600 when we have more than

19    5,000 individual copyrights just I believe with respect to

20    recordings, not counting poster art and everything else.

21            THE COURT:  Okay.  I think that there's at the very

22    least a colorable basis for the motion, so can you file it.

23    How much time do you want?

24            MR. SLOTNICK:  Your Honor, could we have three weeks

25    to file?

FAMTABKC

1           THE COURT:  Very well.

2           And to respond, Mr. Lane?

3           MR. LANE:  Could I have the same, your Honor?

4           THE COURT:  Okay.  And two weeks to reply.  So three,

5    three and two.

6           DEPUTY CLERK:  The motion is due on November 5, 2015,

7    the opposition is due November 30, 2015, and the reply is due

8    December 4, 2015.

9           THE COURT:  You have those dates.  And discovery is

10   otherwise proceeding apace?

11          MR. SLOTNICK:  Yes.

12          THE COURT:  Anything further?

13          MR. LANE:  Judge, I just want to put on the record

14   today we have in the courtroom the misfortune of shadowing me

15   as an attorney, Jean-Luc Fournier, who has a doctorate in law

16   from France and is the chief expert in the highest court in

17   France on financial matters.  I wanted to introduce him.

18          THE COURT:  You're very welcome, welcome here.  And we

19   are adjourned.

20                              o0o

21

22

23

24

25