UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

ABKCO MUSIC, INC., COLGMS-EMI MUSIC,
INC., EMI ALGEE MUSIC CORP., EMI APRIL
MUSIC INC., EMI BLACKWOOD MUSIC, INC.,
EMI CONSORTIUM MUSIC PUBLISHING, INC.
d/b/a EMI FULL KEEL MUSIC, EMI
CONSORTIUM SONGS, INC. d/b/a  EMI
LONGITUDE MUSIC, EMI FEIST CATALOG
INC., EMI ROBBINS CATALOG INC., EMI
UNART CATALOG, INC., JOBETE MUSIC CO.,
INC., SCREEN-GEMS-EMI MUSIC INC.,
STONE AGATE MUSIC, STONE DIAMOND
MUSIC CORP., IMAGEM MUSIC LLC, PEER
INTERNATIONAL CORPORATION, PSO
LIMITED, PEERMUSIC LTD., PEERMUSIC III,
LTD., SONGS OF PEER, LTD., SPIRIT
CATALOG HOLDINGS S.A.R.L., SPIRIT TWO
MUSIC, INC., WARNER-TAMERLANE
PUBLISHING CORP., & WB MUSIC CORP.,

Plaintiffs-Counterclaim Defendants,

– against –

WILLIAM SAGAN, NORTON LLC, BILL
GRAHAM ARCHIVES, LLC d/b/a
WOLFGANG'S VAULT, BILL GRAHAM
ARCHIVES, LLC d/b/a CONCERT VAULT,
BILL GRAHAM ARCHIVES, LLC d/b/a MUSIC
VAULT, & BILL GRAHAM ARCHIVES, LLC
d/b/a DAYTROTTER,

Defendants-Counterclaim Plaintiffs.

WILLIAM SAGAN, NORTON LLC, & BILL
GRAHAM ARCHIVES, LLC,

Third-Party Plaintiffs,

– against –

DAVID ISRAELITE, & THE NATIONAL MUSIC
PUBLISHERS' ASSOCIATION,

Third-Party Defendants.

**OPINION AND ORDER**

15 Civ. 4025 (ER)

Ramos, D.J.:

This motion arises in the context of a suit for federal copyright infringement.  David Israelite and the National Musical Publishers' Association ("NMPA") (together, "Third-Party Defendants") move to dismiss a defamation claim brought against them based on their issuance of a press release (the "press release").  William Sagan, Norton LLC, and the Bill Graham Archives LLC (together, "Third-Party Plaintiffs") are the named defendants in the underlying copyright suit.  Third-Party Defendants issued the press release on the day the suit was filed, and Third-Party Plaintiffs sued for defamation.  Because the press release constitutes a "fair and true report" of the original complaint, Third-Party Defendants' motion to dismiss is GRANTED.

## I.      BACKGROUND

Plaintiffs in the underlying suit (the "Publishers") are music publishers represented by NMPA, and they claim to own or control copyrights in various musical compositions. Complaint ("Compl.") (Doc. 1) ¶ 1.  Third-Party Plaintiffs, the named defendants in the underlying suit, make available thousands of sound and video recordings of live concerts on their websites, and claim to have acquired the rights to reproduce these recordings directly from concert promoters and venues, most prominently the late promoter Bill Graham.  *Id.* at ¶¶ 2–3.

On May 27, 2015, the Publishers commenced their copyright infringement action, claiming ownership of the compositions underlying the sound and video recordings on Third-Party Plaintiffs' websites, and specifically alleging that Bill Graham lacked authority to grant rights to reproduce the recordings.  *Id.* at ¶¶ 4, 93–99.  The Publishers allege that Third-Party Plaintiffs engaged in "massive commercial exploitation of [Publishers'] copyrighted musical compositions."  *Id.* at ¶ 4.  According to the Publishers, the commercial exploitation is evidenced by the nearly 50,000 unique visitors to Third-Party Plaintiffs' websites who have streamed over

2

two billion musical performances, the sales of tens of thousands of recordings for download, and

the selling of CDs and DVDs containing the concert recordings.  *Id.* at ¶¶ 5–6, 8.

On May 27, 2015, the same day the original complaint (the "Publishers' Complaint") was

filed, NMPA[1] published on its website a six paragraph press release entitled "NMPA Files

Lawsuit Against [Third-Party Plaintiffs] for Massive Copyright Infringement," which included a

quotation from David Israelite, President and CEO of NMPA.  *See* Declaration of Tal E.

Dickstein (Doc. 31), Ex. 1 ("Press Release").[2]  The press release reads as follows:

> The National Music Publishers' Association (NMPA), on behalf of several music
> publisher members, today filed a copyright infringement lawsuit in the U.S.
> District Court for the Southern District of New York against "Wolfgang's Vault,"
> which disseminates concert videos and audio recordings through multiple
> websites including ConcertVault.com, Daytrotter.com and MusicVault.com, as
> well as YouTube.
>
> Wolfgang's Vault calls itself the "largest collection of live audio and video
> recordings online" and the "world's largest collection of live music," and values
> just a portion of its music collection at over a $100 million, however much of its
> content was never properly licensed.  This lawsuit not only intends to stop these
> entities use of unlicensed works, but also to pay back those whose material has
> been exploited.
>
> The infringing websites offer tens of thousands of hours of concert footage as on-
> demand streams, digital downloads, CDs, DVDs and vinyl recordings which
> generate revenue for Wolfgang's Vault through subscriptions and advertising.
> They attract approximately 50,000 visitors per day – and all without properly
> paying the songwriters and music publishers whose creative content underlies the
> collection.
>
> "The Wolfgang's Vault websites have profited in large part because of the
> significant use of unlicensed music, primarily concert footage, available on their
> sites," said David Israelite, President & CEO of NMPA.  "Systematic copyright
> infringement cannot be a business model, and it is unfortunate that Wolfgang's
> Vault chose not to compensate all of the creators responsible for their content.

---

[1] NMPA is are a trade organization that represents nearly 800 music publishers, including all of the named plaintiffs
in the original lawsuit.  *See* Counterclaims and Third-Party Complaint (Doc. 12) ¶ 54.

[2] The Court may consider the press release on this motion because the third-party complaint incorporates it by
reference.  *See Roth v. Jennings*, 489 F.3d 499, 509 (2d Cir. 2007).

Hopefully, this lawsuit will bring publishers and many iconic songwriters the revenue they deserve for the use of their music."

The lawsuit is part of NMPA's continuing effort to ensure songwriters and their music publishing partners are compensated fairly and that their rights are protected.  Members of NMPA have settled claims of copyright infringement with Maker Studios and Fullscreen, both large Multi-Channel Networks on YouTube. These settlements enabled music publishers and songwriters to be compensated for past copyright infringements and license works going forward.

About the NMPA:

Founded in 1917, the National Music Publishers' Association (NMPA) is the trade association representing all American music publishers and their songwriting partners.  The NMPA's mandate is to protect and advance the interests of music publishers and songwriters in matters relating to domestic and global protection of music copyrights.  Learn more at www.nmpa.org.

Press Release.

On August 4, 2015, Third-Party Plaintiffs asserted a cause of action for defamation (the "Third-Party Complaint") against Third-Party Defendants.  Counterclaims and Third-Party Complaint ("Third-Party Compl.") (Doc. 12) ¶¶ 80–92.[3]  Third-Party Plaintiffs allege that the press release constitutes defamation *per se* under New York law.  *Id.* at ¶ 81.

On November 11, 2015, Third-Party Defendants filed a motion to dismiss the defamation claim for failure to state a claim upon which relief can be granted, pursuant to Federal Rule of Civil Procedure 12(b)(6).  (Doc. 29).

## II.    LEGAL STANDARD

### A.    Motion to Dismiss

When ruling on a motion to dismiss pursuant to Rule 12(b)(6), the Court must accept all factual allegations in the complaint as true and draw all reasonable inferences in the plaintiff's

---

[3] Third-Party Plaintiffs also asserted two counterclaims for declaratory judgment against the music publishers, but those claims are not currently at issue.

favor.  *Koch v. Christie's Int'l PLC*, 699 F.3d 141, 145 (2d Cir. 2012); *see also, e.g.*, *Ruotolo v. City of New York*, 514 F.3d 184, 188 (2d Cir. 2008).  However, the Court is not required to credit "mere conclusory statements" or "threadbare recitals of the elements of a cause of action." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citing *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007)); *see also id.* at 681 (citing *Twombly*, 550 U.S. at 551).  "To survive a motion to dismiss, a complaint must contain sufficient factual matter…to 'state a claim to relief that is plausible on its face.'"  *Id.* at 678 (quoting *Twombly*, 550 U.S. at 570).  A claim is facially plausible "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."  *Id.* (citing *Twombly*, 550 U.S. at 556).  If the plaintiff has not "nudged [his] claims across the line from conceivable to plausible, [the] complaint must be dismissed."  *Twombly*, 550 U.S. at 570

## B.    Defamation and "Fair and True" Reporting Privilege

"Defamation is the injury to one's reputation either by written expression, which is libel, or by oral expression, which is slander."  *Biro v. Conde Nast*, 883 F. Supp. 2d 441, 456 (S.D.N.Y. 2012) (quoting *Idema v. Wagner*, 120 F. Supp. 2d 361, 365 (S.D.N.Y. 2000)).  "Under New York law, a plaintiff must establish five elements to recover in libel:  (1) a written defamatory statement of fact concerning the plaintiff; (2) publication to a third party [without authorization or privilege]; (3) fault (either negligence or actual malice depending on the status of the libeled party); (4) falsity of the defamatory statement; and (5) special damages or *per se* actionability (defamatory on its face)."  *Id.* (quoting *Celle v. Filipino Reporter Enters. Inc.*, 209 F.3d 163, 176 (2d Cir. 2000)); *see also Fuji Photo Film U.S.A., Inc. v. McNulty*, 669 F. Supp. 2d 405, 411 (S.D.N.Y. 2009).[4]

---

[4] A statement is *per se* defamatory when it "tend[s] to injure another in his or her trade, business or profession." *Stern v. Cosby*, 645 F. Supp. 2d 258, 273 (S.D.N.Y. 2009) (citation omitted).

A defamatory statement "exposes an individual 'to public hatred, shame, obloquy, contumely, odium, contempt, ridicule, aversion, ostracism, degradation, or disgrace, or…induces an evil opinion of one in the mind of right thinking persons, and…deprives one of…confidence and friendly intercourse in society." *Celle v*, 209 F.3d at 177 (quoting *Kimmerle v. N.Y. Evening Journal*, 262 N.Y. 99, 186 (N.Y. 1933). On a motion to dismiss a claim of defamation, the court must decide whether the statements alleged to have caused plaintiff injury are "reasonably susceptible" to the defamatory meaning imputed to them." *Dworin v. Deutsch*, No. 06 Civ. 13265 (PKC), 2008 WL 508019, at *3 (S.D.N.Y. Feb. 22, 2008).

A statement is not defamatory if it is privileged or authorized. *See Fuji Photo*, 669 F. Supp. 2d at 411. Section 74 of the New York Civil Rights Law provides in pertinent part that a privilege exists for "the publication of a fair and true report of any judicial proceeding." N.Y. Civ. Rights L. § 74. "Out-of-court statements such as press releases…are privileged," but "only to the extent that they represent fair and true reports of what occurred in the proceeding…." *Long v. Marubeni Am. Corp.*, 406 F. Supp. 2d 285, 294 (S.D.N.Y. 2005).

"For a report to be categorized as 'fair and true' within the meaning of the statute, thus immunizing its publisher from a civil suit sounding in libel, it is enough that the substance of the article be substantially accurate." *Holy Spirit Ass'n for Unification of World Christianity v. N.Y. Times Co.*, 399 N.E.2d 1185, 1187 (N.Y. 1979). "The report is not required to use the same words as the pleadings to convey the substance of the judicial proceeding and 'the challenged language…should not be dissected and analyzed with a lexicographer's precision.'" *D'Annunzio v. Ayken, Inc.*, 876 F. Supp. 2d 211, 217 (E.D.N.Y. 2012) (quoting *Idema*, 120 F. Supp. 2d at 369). "It is sufficient that the plaintiff's complaint or documents referred to therein form the

basis for each of the contested statements." *Id.* at 217–18 (citing *McRedmond v. Sutton Place Rest. & Bar, Inc.*, 48 A.D.3d 258, 259 (N.Y. App. Div 2008)).

A report is not substantially accurate "if it would have a 'different effect' on the mind of the recipient than the 'actual truth.' In other words, Section 74 does not afford protection if the specific statements at issue, considered in their context, 'suggest[ ] more serious conduct than that actually suggested in the official proceeding.'" *Karedes v. Ackerley Grp., Inc.*, 423 F.3d 107, 119 (2d Cir. 2003) (quoting *Calvin Klein Trademark Trust v. Wachner*, 129 F. Supp. 2d 248, 253 (S.D.N.Y. 2001)). Similarly, a report is not "fair and true" if it transforms allegations into facts. *See Pisani v. Staten Island Univ. Hosp.*, 440 F. Supp. 2d 168, 178 (E.D.N.Y. 2006).

"It is for the Court to determine as a matter of law if a publication is a 'fair and true' report under section 74, unless the Court determines that an issue of fact remains." *Test Masters Educ. Servs., Inc. v. NYP Holdings, Inc.*, No. 06 Civ. 11407 (BSJ), 2007 WL 4820968, at *3 (S.D.N.Y. Sept. 18, 2007) (citing *Karp v. Hill & Knowlton, Inc.*, 631 F. Supp. 360, 363 (S.D.N.Y.1986)). "In the latter instance, the question becomes one for the jury." *Id.* Since the parties do not identify any issues of fact and only contest whether the undisputed content of the press release qualifies as a "fair and true report" of the undisputed content of the Publishers' Complaint, the Court can resolve the dispute as a matter of law on the instant motion. *See, e.g.*, *Lan Sang v. Ming Hai*, 951 F. Supp. 2d 504, 524 (S.D.N.Y. 2013) (granting a motion to dismiss in part after concluding the "fair and true" report privilege applied to one of the allegedly defamatory statements); *Fuji Photo*, 669 F. Supp. 2d at 414–15 (same).

### III.     DISCUSSION

Third-Party Plaintiffs maintain that the press release is not a "fair and true report" of the Publishers' Complaint and therefore is not privileged.  Specifically, they argue that the statements in the press release "suggest far more serious, extensive, and pervasive conduct than that actually alleged in the official proceeding, and [that] such statements improperly transform allegations into facts."  Third-Party Pls.' Mem. of Law in Opp'n to Mot. to Dismiss ("Mem. in Opp'n") (Doc. 34) at 10–11.

### A.     More Serious Conduct than Actually Alleged

Third-Party Plaintiffs first argue that the press release wrongly states or implies that NMPA brought the original copyright suit as plaintiff on behalf of every music publisher that the organization represents.  *Id.* at 11–12.  Specifically, the press release's headline explicitly and inaccurately credits NMPA with filing the original lawsuit,[5] and the release itself identifies NMPA as the representative for "all American music publishers."  *Id.* at 12; Press Release at ¶ 6.  According to Third-Party Plaintiffs, crediting NMPA with filing the lawsuit provides the lawsuit greater legitimacy because the average reader would interpret the lawsuit as an effort by "all American music publishers."  Mem. in Opp'n at 12; *see also* Third-Party Compl. at ¶ 67.

As a trade association for music publishers, NMPA represents all of the plaintiffs in the original lawsuit, and Third-Party Plaintiffs themselves describe the suit as a "transparent money grab by the NMPA" and allege that NMPA "masterminded the present litigation."  Third-Party Compl. at ¶¶ 1, 57.  Thus, although the headline is inaccurate, the statement that NMPA "file[d]" the lawsuit does not, in the Court's view, add legitimacy or imply any more serious conduct than alleged, given that NMPA was admittedly "masterminding" the lawsuit.

---

[5] NMPA was not a named party in the original lawsuit—only individual music publishers were named plaintiffs.

Moreover, the very first sentence of the press release states that the lawsuit was filed "on behalf of *several* music publisher members." Press Release at ¶ 1 (emphasis added). An average reader would not think that every single music publisher was a plaintiff after reading that sentence; the reader would just think that the NMPA is suing on behalf of all publishers who actually own the works allegedly copied and distributed on the websites, which is in essence what has occurred. *See id.* at ¶ 2 ("This lawsuit not only intends to stop these entities use of unlicensed works, but also to pay back *those whose material has been exploited*.") (emphasis added). And even if there were a colorable argument that the press release implies a larger number of publisher-plaintiffs than there actually are, it is the number of alleged copyright violations that is most relevant to the seriousness of the alleged conduct, not the particular number of separate publishers who happen to own the allegedly infringed works. Thus, despite inaccurately attributing the lawsuit's filing to NMPA, the press release does not report conduct that is more serious than actually alleged in the Publishers' Complaint.

Third-Party Plaintiffs next argue that the press release describes more serious conduct than actually alleged because the press release states or implies that their *entire* catalog of recordings is unlicensed and infringing, whereas the Publishers' Complaint specifically lists only 206 infringed copyrights and 800 separate acts of infringement. Third-Party Plaintiffs hone in on the following two quotations from the press release: (1) "[The infringing websites] attract approximately 50,000 visitors per day—and *all* without properly paying the songwriters and music publishers whose creative content underlies the collection." Press Release at ¶ 3 (emphasis added); (2) "Systematic copyright infringement cannot be a business model, and it is unfortunate that [Third-Party Plaintiffs] chose not to compensate *all* of the creators responsible for their content." *Id.* at ¶ 4 (emphasis added). Third-Party Plaintiffs argue that the average

reader could "*only* understand such statements to mean that the *entirety* of [Third-Party Plaintiffs'] business…was predicated on infringement at the expense of *all* of the artists whose music appears on [Third-Party Plaintiffs'] website."  Mem. in Opp'n at 12.

The Court does not agree.  Other language in the press release makes it clear that the lawsuit addresses only a portion available recordings on the websites at issue.  *See* Press Release ¶¶ 2–4 ("*much* of [Third-Party Plaintiffs'] content was never properly licensed…[Third-Party Plaintiffs' websites] have profited *in large part* because of the *significant* use of unlicensed music") (emphasis added); *cf. Celle*, 209 F.3d at 177 ("[The New York] Court of Appeals has repeatedly instructed that courts must give the disputed language a fair reading in the context of the *publication as a whole.*  Challenged statements are not to be read in isolation, but must be perused as the average reader would against the whole apparent scope and intent of the writing.") (citations and internal quotation marks omitted).

Additionally, the quotation from the third paragraph of the press release is faithful to the allegation in the Publishers' Complaint that Third-Party Plaintiffs have streamed over two billion performances and sold tens of thousands of recordings "all without obtaining a proper license required for such downloads and reproductions."  Compl. at ¶ 8.  Third-Party Plaintiffs also misconstrue the fourth paragraph of the press release by arguing that it speaks of a failure to compensate *any* creator of *any* musical work hosted on the websites; the more natural reading is that Third-Party Plaintiffs have not compensated *all* creators, *i.e.*, some may have been properly compensated, but some were not.  That fourth paragraph, even its use of the phrase "systematic copyright infringement," is consistent with the Publishers' Complaint's repeated invocation of "massive commercial exploitation," "massive infringement," and "illicit business."  *Id.* at ¶¶ 4–6. It is also an accurate portrayal of the Publishers' Complaint because that pleading (i) alleges that

10

*none* of the various concert venues and promoters from whom concert recordings were acquired, including most prominently the late concert promoter Bill Graham, had the right to authorize reproductions of those works, *id.* at ¶¶ 48–55 (quantifying these works as "thousands of physical recordings"), and (ii) describes the list of 206 specific copyrights attached to the Publishers' Complaint as only a "partial, non-exhaustive" list, alleging that Third-Party Plaintiffs "have committed many additional acts of infringement beyond those identified" in the list, *id.* at ¶ 44.

Third-Party Plaintiffs' reliance on *Karedes v. Ackerley Grp., Inc.*, 423 F.3d 107 (2d Cir. 2003), does not alter the Court's conclusion. *Karedes* involved a newspaper's report on a government audit detailing the source of funding of a local construction project. The Second Circuit held that the article could be fairly read as reporting that the audit accused a local official of improperly authorizing the locality to pay public funds for portions of the project that should have been paid for by a private entity. 423 F.3d at 117–18. What the article omitted, however, were certain statements from the auditor at a public meeting announcing the audit: These statements plainly asserted that the audit found only that the locality paid for bills that were addressed to the private entity but arguably should have been addressed to the locality, and made clear that the audit was *not* levying accusations that the locality wrongly dispensed funds that it should not have. *Id.* at 118. *Karedes* is thus distinguishable in two ways from the present case. First and most importantly, unlike the facially wrong representations made in the *Karedes* article, the press release here does not in fact describe the lawsuit as brought on behalf of all music publishers, or as an attack on every single recording made available on the websites. Second, even if the press release included such an implication, it would constitute an exaggeration only of degree, not of kind, sweeping in more allegedly infringing works than listed in the Publishers' Complaint, and thus arguably (though not definitely) remaining within the ambit of the Section

11

74 protection.  The same cannot be said for the inaccuracy in *Karedes*, which unequivocally accused a local official of a fire-able offense that he was not actually alleged to have committed, and directly contradicted the official proceeding it purported to report on, falling well outside of what constitutes a "fair and true" report.  *See Karedes*, 423 F. 3d at 119.

In sum, the press release does not allege more serious conduct than the Publishers' Complaint, both because the press release does not in fact represent that all music publishers are suing or that every single recording hosted on the websites at issue are alleged to infringe copyright, and because the Publishers' Complaint itself levies accusations of a high volume of copyright violations, which can fairly be described as alleging "systematic" infringement.  *See Sang*, 951 F. Supp. 2d at 521 ("Comments that essentially summarize or restate the allegations of a pleading filed in an action are the type of statements that fall within § 74's privilege.") (citation omitted).

### B.    Facts Transformed into Allegations

Third-Party Plaintiffs further aver that the press release is not a "fair and true" report of the Publishers' Complaint "because it improperly transforms allegations into facts, publically vilifying [Third-Party Plaintiffs] without adequately communicating that the infringements it references are nothing more than unproven allegations."  Mem. in Opp'n at 13.  Third-Party Plaintiffs specifically take issue with the second, third, and fourth paragraphs of the press release,[6] arguing that the average reader "would have no idea that liability has yet to be established" and "could *only*…conclude that the reported infringement had already been proved."  *Id.* at 14–15.

---

[6] "[M]uch of [Third-Party Plaintiffs'] content was never properly licensed[.]"  Press Release at ¶ 2.  Third-Party Plaintiffs operate "without properly paying the songwriters and music publishers whose creative content underlies [its] collection."  *Id.* at ¶ 3.  Third-Party Plaintiffs' "websites have profited in large part because of the significant use of unlicensed music…available on their sites."  *Id.* at ¶ 4.

This argument is unpersuasive.  The headline of the press release explicitly states only that a lawsuit has been filed.  The body of the press release repeatedly makes reference to the *filing* of the lawsuit and casts the purpose of that lawsuit in aspirational terms, which does not suggest any sort of foregone liability.  *See* Press Release at ¶¶ 1, 2, 4 ("*filed* a copyright infringement *lawsuit* in the U.S. District Court for the Southern District of New York…the lawsuit *intends* to stop these entities use of unlicensed work…*hopefully*, this lawsuit will bring publishers and many iconic songwriters the revenue they deserve for  the use of their music….") (emphasis added).  Third-Party Plaintiffs' argument is further belied by various web and print reports that they themselves cite, Third-Party Compl. at ¶ 70, which consistently use conditional language such as "asserts," "maintains," "claims," "going to be," and "alleging," *i.e.*, they consistently fail to interpret the press release as reporting facts instead of allegations, or reporting that liability has already been established.  *See* Reply Dickstein Decl. (Doc. 36) Exs. 1–5.  Finally, to the extent Third-Party Plaintiffs implicitly contend that the press release's failure to use the word "alleged" removes it from the protection of Section 74, New York courts have explicitly rejected this argument, and instead adhere to the principle that Section 74 protection "is to be determined by the substance of the report, not its precise language."  *Klig v Harper's Mag. Found.*, No. 600899/10, 2011 N.Y. Misc. LEXIS 2098, at *16 (N.Y. Sup. Ct. Apr. 26, 2011) (rejecting as "entirely unavailing" an argument based on magazine column's failure to use "alleged" or "allegedly") (citing *Holy Spirit Ass'n*, 399 N.E.2d at 1187).  The Court thus concludes that the press release could only be construed as announcing the filing of a lawsuit based on alleged conduct, the culpability of which was still to be adjudicated.[7]

---

[7] Third-Party Plaintiffs' reliance on *Pisani v. Staten Island University Hospital* is unavailing.  440 F. Supp. 2d 168 (E.D.N.Y. 2006).  *Pisani* centered on a press release announcing an agreement between New York State and Staten Island University Hospital ("SIUH") to settle a claim for Medicaid fraud.  *Id.* at 170.  The press release included a quotation attributed to SIUH's trustees, expressing that they "deeply regret and are embarrassed by the misconduct

IV.    **CONCLUSION**

The Court concludes that the press release constitutes a "fair and true" report of judicial proceedings and a substantially accurate rendition of the allegations found in the Publishers' Complaint.  The press release is thus protected under Section 74 of the New York Civil Rights Law, and cannot serve as the basis for a defamation claim under New York law.

NMPA's motion to dismiss is GRANTED.  The Clerk of the Court is respectfully directed to terminate the motion, Doc. 29.

It is SO ORDERED.

Dated:    May 6, 2016
          New York, New York

                                              Edgardo Ramos, U.S.D.J.

---

carried out by former executives of the Hospital that led to this settlement." *Id.* Plaintiff was a former executive of SIUH, and while he was not a named defendant in the underlying fraud suit, the complaint in that suit described some of his conduct related to the alleged fraud.  Nevertheless, the settlement agreement explicitly denied the allegations set forth in the complaint.  Thus, as the district court held, a reasonable juror could have found that the statement in the press release about "misconduct carried out by former executives" turned the allegations from the complaint, explicitly denied by the settlement agreement, into facts that actually transpired. *Id.* at 177–78.  Here, to the extent Third-Party Defendants' press release can be said to include "facts," it does so only to describe the basis for the filed lawsuit.  And the instant press release, unlike the *Pisani* release, does not contain any statements implying the veracity of allegations about a non-party that were explicitly denied elsewhere.  Furthermore, there is nothing in the instant press release that contradicts the judicial proceeding on which it reports, unlike the *Pisani* press release's reproduction of an allegation that was expressly denied by the settlement agreement.