UNITED STATES DISTRICT COURT
                  SOUTHERN DISTRICT OF NEW YORK

In re:                            :

ABKCO MUSIC, INC., et al.,        :   Docket #15cv4025

              Plaintiffs,         :

         - against -              :

SAGAN, et al.,                    :   New York, New York
                                      December 7, 2016
              Defendants.         :

-------------------------------- :

                       PROCEEDINGS BEFORE
                  THE HONORABLE HENRY PITMAN,
           UNITED STATES DISTRICT COURT MAGISTRATE JUDGE

APPEARANCES:

For Plaintiffs:          LOEB & LOEB LLP
                         BY:  BARRY SLOTNICK, ESQ.
                              TAL DICKSTEIN, ESQ.
                              CHRISTOPHER CARBONE, ESQ.
                         345 Park Avenue
                         New York, New York 10154

For Defendants:          WINSTON & STRAWN LLP
                         BY:  MICHAEL S. ELKIN, ESQ.
                              ERIN RANAHAN, ESQ.
                         200 Park Avenue
                         New York, New York 10166




Transcription Service: Carole Ludwig, *Transcription Services*
                       141 East Third Street #3E
                       New York, New York 10009
                       Phone:  (212) 420-0771
                       Fax:  (212) 420-6007

Proceedings recorded by electronic sound recording;
Transcript produced by transcription service

## <u>INDEX</u>

## <u>E X A M I N A T I O N S</u>

| <u>Witness</u> | <u>Direct</u> | <u>Cross</u> | <u>Re-<br>Direct</u> | <u>Re-<br>Cross</u> |
|---|---|---|---|---|
| None | | | | |

## <u>E X H I B I T S</u>

| <u>Exhibit<br>Number</u> | <u>Description</u> | <u>ID</u> | <u>In</u> | <u>Voir<br>Dire</u> |
|---|---|---|---|---|
| None | | | | |

```
 1                                                    3
 2          THE CLERK:   ABKCO Music against Sagan.  Counsel,
 3  please state your name for the record.
 4          MR. BARRY SLOTNICK:   Barry Slotnick, Tal
 5  Dickstein, and Chris Carbone from Loeb & Loeb for
 6  plaintiffs.
 7          MR. MICHAEL ELKIN:   Good afternoon, Your Honor,
 8  Michael Elkin and Erin Ranahan from Winston & Strawn,
 9  counsel for Sagan, et al., defendants.
10          THE COURT:   All right, good afternoon.  We are
11  here to address some discovery disputes concerning
12  depositions and document requests.  Let me just go over the
13  correspondence that I have.  I have Mr. Elkin's letter of
14  November 18.  I'm not cataloguing the attachments, listing
15  the attachments.  Mr. Elkin'S November 19; Mr. Dickstein,
16  November 23; Mr. Elkin, February 5; and Mr. Slotnick – I'm
17  sorry, the last one was Mr. Elkin, December 5, excuse me;
18  and Mr. Slotnick, December 6.  I take it that's the universe
19  of relevant correspondence?
20          MR. ELKIN:   Yes, Your Honor.
21          MR. SLOTNICK:   Yes, Your Honor.
22          THE COURT:   All right.  Why don't I hear from –
23  well, let's talk about the deposition issues first.  Why
24  don't I hear from Mr. Elkin and then I'll hear I guess it's
25  gonna be Mr. Slotnick.  Go ahead.
```

```
 1                                                    4
 2              MR. ELKIN:   Thank you, Your Honor.
 3              THE COURT:   By the way, everybody can remain
 4    seated.  That'll be more comfortable.  Go ahead.
 5              MR. ELKIN:   Your Honor, the depositions that are
 6    at issue in the case relate to certain non-party witnesses,
 7    and I hope it would be helpful to the Court if I just spent
 8    a minute or two on what I think are erroneous references to
 9    the initial conference before the district judge because I
10    think it's --
11              THE COURT:   I just read the transcript of that
12    during lunch.  I re-read it again during lunch, so I don't
13    think you need to.  Go ahead.
14              MR. ELKIN:   If I may, Your Honor, there are three
15    essential facets of our client's business, and I'm referring
16    to it in a collective sense for purposes of this argument,
17    that essentially boil down to two violations under Section
18    106 of the Copyright Statute, the right of reproduction and
19    the right of public performance.  I think also the right of
20    distribution.  It's not clear to me, frankly, whether the
21    right of public performance is at issue, but I'm assuming
22    for purposes of this argument that it may be.
23              Our clients are engaged, among other things, in
24    streaming both linear broadcast and on-demand or streams of
25    audio recordings as well as certain video recordings.  And
```

```
1                                             5
```

that implicates potentially three rights that are at issue

in the case as far as we can discern.  What is, of course,

streaming of the performances from this concert recordings

is something that would trigger the right of public

performance.  The second right that I believe is at issue

here are the downloads of the audio recordings that are

available, and the on-demand streams that are available at

our clients' websites.  And then there is these audio-visual

footage from these concerns, rock and roll concerts that

took place over the years.

          Our defenses with respect to the streaming itself

is the fact that our client has licenses with the three U.S.

performing rights society, SESAC, ASCAP, and BMI.  With

regard to the on-demand streams and the downloads, which I

believe are claimed to be triggering the exclusive right of

reproduction violation, our client is relying on a Section

115 compulsory licenses which take the form of notice of

intent and payment under the statute.  I'll get into in a

moment what's relevant there.

          Then there's the third issue that they're

claiming, which is the so-called synchronization right which

is a species of the right of reproduction under the

Copyright Law, as Your Honor well knows.  And there I gather

what they're claiming is that because there are music

1
2  compositions that are synchronized in the audio-visual

3  recordings that are available on our client's website, and

4  it doesn't have permission or license to be able to use

5  them.

6          With regard to that aspect, the synchronization,

7  that is what is at issue for us, that is to say the

8  defendants, Your Honor, relative to our request to take

9  certain nonparty witness depositions.  First of all, we are

10  taking issue as a matter of law, and this will be something

11  that will have to be decided at some point in the case, is

12  whether our client even needed to have a so-called

13  synchronization license which is typically, as Your Honor

14  well knows, there's a, let's say a video that someone that's

15  going to be exhibited either on television or motion

16  picture, and someone puts audio record to that.  Typically

17  that will involve the requirement to get a synchronization

18  license.

19          Here, you have an actual visual, a footage, live

20  footage that was actually captured, and as an issue, we

21  don't have to debate that today as to whether or not you

22  actually need a so-called synch license for that.  But let's

23  say for purposes of this argument, we do.  Our position,

24  among other things, there are a number of defenses, legal

25  defenses and equitable defenses we've raised.  The Court has

7

1

2  read our papers.  I'm not going to belabor them.  But

3  specifically as it relates to the individuals whose

4  depositions we seek, we believe that consent was given by

5  these artists at the time they actually owned or controlled

6  their --

7          THE COURT:   What's the basis for that belief?

8          MR. ELKIN:   The information that our client has

9  gleaned from (inaudible) that were available at the time.

10  And I will tell Your Honor that there is another case that

11  was brought --

12          THE COURT:   Your Honor, at page 13 of the

13  conference before Judge Ramos on September 23, you stated,

14  quote, page 13, line 13, "This is a case admittedly where

15  neither the plaintiffs nor, frankly, our clients have any of

16  the core knowledge, primary knowledge with regard to what

17  happened ten, twenty, thirty, forty years ago."  So I ask my

18  question again, what's the basis for the belief that right

19  were given contemporaneously with the making of the

20  recordings?

21          MR. ELKIN:   Your Honor, I was about to – I

22  appreciate that.  I made that statement, as Your Honor

23  recounted, and I stand by that.  It is based on

24  communications with the staff and witnesses who were at the

25  concerts at the time that these concerts took place.  And I

8

1  will tell you --

2        THE COURT:  Were most of these concerts at the

3  Fillmore East or West?

4        MR. ELKIN:  Many of them, many of them were.

5        THE COURT:  Were there any written agreements

6  with the performers at those two venues that address the

7  issue of these rights?

8        MR. ELKIN:  To the best of my knowledge, Your

9  Honor, I've not seen any agreement that pertains to it, and

10 I will readily concede that point.  But if I may go on.

11        THE COURT:  Go ahead.

12        MR. ELKIN:  There was a – let me just, for the

13 record, before I say this, I just want to make clear there

14 are many instances with regard to the music compositions in

15 this case where the songwriters in question owned and

16 controlled the music composition copyrights at the time of

17 their performance.  And just to give a few examples, I will

18 explain the relevance of the other case to which I alluded

19 in a moment.

20        Willy Nelson, there are two songs that are at

21 issue in this case.  One is On the Road Again, and a Good

22 Hearted Woman.  Both of them were, one was performed in a

23 concert in 1998, one was performed in a concert in 1983.  He

24 owned the music compositions at the time of those particular

```
 1                                                      9

 2   concerns.  Mick Jagger and Keith Richards, which I'm the

 3   Court I'm sure is well aware, I believe --

 4           THE COURT:   I have a pulse.

 5           MR. ELKIN:   -- Rolling Stones -

 6           (laughter)

 7           THE COURT:   I have a pulse.

 8           MR. ELKIN:   There's a song at issue in this case

 9   called Brown Sugar.  Concerts that are featured on our

10   client's website that are issue in this case were performed

11   in 1973, 1978.  These copyrights --

12           THE COURT:   I'm sorry to interrupt.  One of the

13   overarching concerns I have is with respect to the age of

14   some of the performances and whether or not it's realistic

15   that people are going to have a recollection.  How many of

16   the recordings that are at issue in the lawsuit are, yeah, I

17   guess recordings I guess is the right term, are more than 20

18   years old?

19           MR. ELKIN:   I haven't tallied them up --

20           THE COURT:   Ballpark.

21           MR. ELKIN:   I don't want to get in over my skis,

22   Your Honor.  But let's say that the great majority of them

23   are --

24           THE COURT:   It seems to me highly unlikely that

25   the individuals you identify in footnote 1 of your November
```

```
 1                                                           10
 2   18 letter are gonna have a recollection of who said what to
 3   whom at the time of the performance.
 4           MR. ELKIN:   Your Honor, that's a fair comment,
 5   but I mean --
 6           THE COURT:   Some of these are, you know, the
 7   Fillmore closed in '71.  That's 45 years ago.
 8           MR. ELKIN:   Your Honor, I can completely
 9   appreciate your comment.  If you can indulge me --
10           THE COURT:   Okay.
11           MR. ELKIN:   Let me just make a reference, and I'm
12   not gonna take you through, but I would just inform the
13   Court there are 15 instances of the kind that I just ticked
14   off that exist.
15           There was a case that was brought by the record
16   label counterparts of the music publishers are, that are the
17   denominated plaintiffs in this case.  As Your Honor I'm sure
18   knows, there are three major music companies in the world
19   right now, one are Universal and Sony, and they each have
20   their publishing house counterparts.  The record labels
21   together with certain artists had filed a lawsuit against
22   these very same defendants back in 2007, actually late 2006,
23   and the case went on through 2008.  I know about that
24   because I was lead counsel in the case, and I ended up
25   taking the depositions of Carlos Santana and Robert Plante
```

1
2  and Jimmy Page, and we took the depositions of at least a
3  dozen or so artists.

4         And I can't specifically make references right now
5  to exactly the questions and answer, although my colleague
6  here was with me during the time – she was much younger, and
7  I was a little younger when I took those depositions –
8  because they were restricted material.  But I will represent
9  to the Court and will make a proffer that the witnesses who
10  readily had testified that they were aware of and had
11  consented and not at all opposed them being recorded at the
12  time, and never did they object to it.  And I believe, based
13  on the legal principles --

14         THE COURT:   I'm sorry, and the performances at
15  issue took place when?

16         MR. ELKIN:   The performances in that particular
17  instance, harking back, I would say to some of these into
18  the 19, clearly the 1970's.  I'm trying to remember whether
19  it went back beyond that, but let's I'll represent to the
20  Court somewhere in the 1970's.  And I apologize for not
21  having more precise information.

22         THE COURT:   That's okay.  That's fine.

23         MR. ELKIN:   And our position is, and, look, it's,
24  we may be successful, we may be not successful, but our
25  position is there's a lot at stake in this case.  We are

 1

 2   honing in on the synchronization issue itself.  I know

 3   they've got some problems with respect to the notice of

 4   intent on the reproduction side.  They're claiming that we

 5   were late.  It is true that in many instances we were late

 6   on the 30 days, but the monies were paid on the compulsory

 7   payments, and they were never returned, and we're gonna take

 8   the position and we're gonna argue in those circumstances

 9   that the license existed with respect to those

10   reproductions.

11          On the synchronization issue I'm not gonna address

12   the core legal issue, but in terms of the actual facts, we

13   are going to rely on what the performers, and there are

14   other witnesses that exist that were part of, for example,

15   Bill Graham's entourage who supervised these concerts at the

16   time, witnesses who we have deposed in other cases and who

17   will testify, we believe, as to the custom and practices as

18   to what happened at these particular concerns.

19          Now, that may or may not prevail in this case, but

20   for us not to be able to capture and perpetuate a piece of

21   evidence that I told the district court judge I needed at

22   the beginning I think would put us at a disadvantage.

23          THE COURT:  Well, one of the other issues that

24   the plaintiffs raise is the delay that would be engendered

25   as a result of the depositions that you're seeking.  I mean

1

2  some of the individuals are originally from the United

3  Kingdom.  I don't know if – I don't know where they reside

4  now.  I don't know where Mick Jagger and Keith Richards or

5  Eric Burdon resides or where Peter Townshend resides.  But

6  wouldn't permitting these depositions results in a very

7  substantial delay?

8           MR. ELKIN:   Well, Your Honor, in fact, this was

9  an issue that I had raised with the district court judge at

10  the beginning at the (indiscernible) conference.

11  Originally, Mr. Slotnick had asked for a staged discovery.

12  I know Your Honor read the transcript.  And I had made the

13  point that I felt the most salient depositions, at least in

14  our point of view, were the nonparty witnesses, and we

15  agreed for them to be taken in tandem.  It wasn't until very

16  recently that document production was complete the judge

17  asked, and I'm sure you read this in the transcript, Your

18  Honor, judge asked me whether it would be okay, I didn't

19  want to initially, but would it be okay if we completed

20  document production before the depositions commenced.  And I

21  said fine or okay.

22           And we raised the issue just as document

23  production was nearly final and we had been rebuffed by the

24  other side who now claims that they're unnecessary for the

25  very reasons that they articulate in their papers.  I get

                                                                    14

it, I understand it.  We're not groupies, Your Honor, we

don't want to do this just to have fun and meet old rock and

roll stars.  And if Your Honor were to see fit to permit

these depositions to proceed, we're happy to abide by

whatever contours or collars are imposed.

          But at the end of the day, the, you know, we'll do

whatever we need to do.  We asked the other side for

addresses as opposed to just simply traipsing through, you

know, the telephone directories and trying to figure this

out.  And if we can't, of course, we'll have private

investigators assist us.

          Will it delay the proceedings?  Your Honor, I

can't say that it won't.  I can't say that it won't.

          THE COURT:   If there are witnesses in the U.K.,

you're talking about probably a better part of the year if

not longer.

          MR. ELKIN:   Your Honor, I can't disagree with

that.  We both know that sometimes the time delays

associated with compliance with the Convention, and if

that's gonna govern the day, I don't know what I can say.

What I can say is that I agreed to abide by the notion that

document production would be complete.  We raised the issue

as soon as it was nearing completion, and we are where we

are, and I respect the Court's observations.

```
 1                                                        15
 2            THE COURT:   All right.  Maybe there's some other
 3   points you want to make.  I didn't mean to cut you off with
 4   my questions.  If there are other points you wanted to make,
 5   go ahead.
 6            MR. ELKIN:   No, the points I'd rather make are
 7   the ones that are important to Your Honor because I think
 8   the ones that we made are reflected there.  I just - if it
 9   would be helpful, I'll just make the following
10   representations as to the artists that so far we identified
11   that control their music compositions prior to the actual
12   concerts, I've mentioned Willy Nelson and Mick Jagger and
13   Keith Richards.  There's Billie Joe Armstrong, Jay Edwin
14   Wright, they're the composers for the songs in Green Day.
15   David Byrne and Jeremiah Harrison, Talking Heads.  I'm
16   messing up the pronunciation here, the Court will forgive
17   me.  Steve Alaimo from the Allman Brothers.  Christopher
18   Mark Robinson of the Black Crows.  Carole King, Smokey
19   Robinson, Ziggy Marley, Peter Townshend, Michael Stipe,
20   William Thomas Berry of R.E.M., Van Morrison.  We actually
21   had an agreement with Van Morrison.  They dispute the bona
22   fides of it.  Tito Puente --
23            THE COURT:   Tito Puente's no longer with us.
24            (interposing)
25            MR. ELKIN:   -- Oye Como Va.
```

1

2          THE COURT:   I know.

3          MR. ELKIN:   And he had the copyright.

4          THE COURT:   At any rate, the Sunnyside Garden in

5    Queens.

6          MR. ELKIN:   I think the other points, I'm not

7    gonna belabor the points that are in our papers.  Those are

8    some of the thoughts that I thought I would share with the

9    Court.

10          THE COURT:   Well, let me ask you this, how many

11    of the recordings – how many of the recordings are of

12    concerts that took place in the last 20 years?  You have a

13    ballpark figure on that?

14          MR. ELKIN:   Your Honor, I would say a fairly

15    minimal amount.  There's some that took place in the 1990's,

16    but nothing of recent vintage.

17          THE COURT:   All right.  Anything else you want to

18    add?

19          MR. ELKIN:   No, Your Honor, appreciate the

20    opportunity – I understand that your question is directed

21    with regard to the depositions, and I, of course --

22          THE COURT:   Yeah, we're just talking about the

23    depositions right now.

24          MR. ELKIN:   -- to respond to whatever plaintiff's

25    counsel (inaudible).

```
 1                                                    17
 2              THE COURT:   All right.  Mr. Slotnick.
 3              MR. SLOTNICK:   Thank you, Your Honor.
 4              MR. ELKIN:   One thing I would say, Mr. Ranahan
 5   reminded me, I'm sorry, Mr. Slotnick, I apologize.
 6              THE COURT:   Go ahead, go ahead.
 7              MR. SLOTNICK:   No problem.
 8              MR. ELKIN:   If the Court will permit.  There are
 9   a lot of parties here.  There are 23 plaintiffs that were
10   grouped in six categories.  This is a pretty significant
11   case from our client's point of view, and we're up against
12   pretty high stakes here.
13              THE COURT:   Okay.
14              MR. SLOTNICK:   Thank you, Your Honor.  First of
15   all, let me try to address some of the things that Mr. Elkin
16   has said about sort of timeframes that the artists own the
17   copyrights with respect to these works at the time the
18   concerts were given and these ostensibly implied agreements
19   were entered into.
20              I did look at a couple of these yesterday.  I know
21   that On the Road Again I think was a, I think Mr. Elkin
22   mentioned 1998.  I know that the agreement in which Willy
23   Nelson transferred his rights to another publisher occurred
24   in 1990.  I just happen to be looking at it.  None of this
25   is mentioned in any of the defendants' prior correspondence.
```

1
2   But we submit to you that if you look at the documents we've
3   provided, and we've provided every agreement, every
4   assignment, every copyright registration identifying the
5   owners and the transfers of owners, you could put together a
6   list which would match the date of the concert with the
7   dates of the transfers, and we could establish that, I would
8   think, a handful at best were situations in which the
9   artists actually owned the rights at the time of this
10  ostensible implied agreement that may have happened anytime
11  in the last 40 years.
12          You know, so I think the easy way to go through
13  this is to say, okay, nobody can take a deposition of
14  anybody where the rights were no longer held.  Mr. Elkin
15  mentions the record label litigation, and I understand why.
16  He was very successful, and I would keep referring back to
17  it too.  Except that's not this case, and you can try to,
18  you know, paint all of the plaintiffs with the brush of
19  major labels, but Universal, which is one of the major
20  labels, does not a publishing company entity that's in this
21  case.  Sony is only jointly owned by Sony, Sony/ATV, the
22  publishing company.  And, yes, Warner Brothers is in the
23  case.  The other publishers are independent publishing
24  companies that would be offended if they were tied in any
25  way to a major label under any circumstances.

19

Mr. Elkin also seemed to suggest that there are numerous witnesses who he could much more easily take the deposition of.  He talked about the staff people, the people at the concerts, the people that are ostensibly either under defendants' control or people who worked for the predecessor Bill Graham and the other companies.

THE COURT:  I think --

MR. SLOTNICK:   Why not take them first?

THE COURT:   I think what Mr. Elkin was saying though is that those individuals could testify to the standard practice or what they understood to be the standard practice, but I think the limitation was they couldn't say whether or not a particular concert, a particular artist said X, Y, and Z.  I mean --

MR. SLOTNICK:   That's not my understanding --

THE COURT:   That's what I thought Mr. Elkin was describing.

MR. ELKIN:   That's correct, Your Honor.

THE COURT:   Yeah, go ahead.

MR. SLOTNICK:   Your Honor, you know, I too have a pulse, and I had been backstage at concerts, and I can tell you that it would astonish me if Mr. Jagger, whether this concert was in 1967 or 2007, had any recollection of having any conversation with anybody before a concert.  That's not

1                                                          20

2  what happens backstage at a rock and roll show.  And I

3  wasn't there in the 60's, but I hear tell the likelihood of

4  Mr. Jagger remembering anything from those days is probably

5  very slim.

6           Your Honor, this is a very different case than the

7  case that Mr. Elkin keeps referring to.  This is a case

8  about musical compositions --

9           THE COURT:  Let me just come back to the point

10  you just made though.

11           MR. SLOTNICK:  Sure.

12           THE COURT:  Some of the performers in the

13  footnote 1 to the November 18 letter are clearly artists who

14  had their, well, who were maybe more prominent in the 60's

15  and the 70's than they are today, but some of them are more

16  recent.  I mean Green Day is a more recent - I know from my

17  son that Green Day is a more recent entrant into the field

18  of popular music than say the Band was.  I mean is it - and

19  the issue of fading memories may be more of an issue with

20  respect to performers from the 60's and the 70's than Green

21  Day.  I mean is it reasonable to assume - is the inference

22  or is the assumption of lack of memory as strong with

23  respect to the Green Day artists as it is with respect to,

24  say, Mr. Robbie Robertson?

25           MR. SLOTNICK:  I think it is, Your Honor.  I

21

 1   think obviously as someone who is no longer at the age of

 2   Mr. Armstrong and closer to the age of Mr. Jagger, yeah, I

 3   understand that there is obviously a change in recollection.

 4   But what we are suggesting here is still Mr. Armstrong or

 5   any of the other relatively younger people being able to

 6   recall an event, and I use the word event advisedly, that

 7   happened in the 1990's.  This is not like there was a

 8   concert four years ago or two years ago.

 9        And, you know, for all of these sort of good humor

10   about what goes on backstage, these are all professional

11   musicians who are preparing to go to work, and what Mr.

12   Elkin seems to be suggesting is that whether it's 40 years

13   ago or 20 years ago somebody's gonna have a recollection not

14   of a document but of a, either a conversation or, seemingly

15   more strongly, an implication that by a wink and a nod these

16   artists granted someone consent to record the concert.  And

17   not just record the concert; it's okay, I see you there, out

18   there, and I give you the consent to not only record it but

19   to commercially exploit that work forever and not pay me a

20   penny.

21        Now, if that's what the testimony's gonna be, I

22   mean I think I can testify for what these people are gonna

23   say.  But the fact is that's what he's seemingly suggesting.

24   It is, as I said in my letter, this is a Hail Mary, you

22

know, let's try to take all these depositions and let's see
if anybody remembers anything and has fond memories of Bill
Graham.  There is nothing.  There hasn't been any suggestion
from Mr. Elkin or from any of the staff people or witnesses
as to what the custom and usage of or any other aspect of
what goes on at a rock and roll concert.  I've been to a lot
of rock and roll concerts; I've never see anybody record
anything.  Except illegally.  I see that all over the place.
It's easier now.

          MR. ELKIN:   Your Honor, may I respond briefly?

          THE COURT:   Have you finished, Mr. Slotnick?

          MR. SLOTNICK:   Your Honor, again, I mean I don't
want to belabor the point about the fact that these are
musical compositions.  They are owned by someone other than
these artists.  They are owned in many instances by entities
other than affiliates of major labels.  You know, these are
companies that have their own exclusive right under
copyright and are seeking to enforce those.  And what Mr.
Elkin is suggesting is that someone who is a stranger to the
ownership of those rights, and in many instances by 40
years, can remember a conversation or less than a
conversation in which they may or may not have owned
anything at the time, gave approval or tacit assent to a
practice which was never authorized by the lawful owners of

23

the copyrights in the musical works.

THE COURT:   All right.  Mr. Elkin, how many
recordings, again, ballpark are within the last ten years?

MR. ELKIN:   Your Honor, I can't represent to the
Court that there have been any, although I'm sure there are
a handful.

THE COURT:   Well, let me ask you this, would a
reasonable starting point be for you to depose the staff
first or take the affidavit to the staff first?  I think you
referred to them as Bill Graham's entourage.

MR. ELKIN:   The answer is that, of course, if
that's what Your Honor asks, then we'll do that.  But could
I just have 60 seconds to respond to points --

THE COURT:   You can have more than 60 seconds.
Go ahead.

MR. ELKIN:   -- Mr. Slotnick raised because I –
what he said on his face seems awfully seductive if you
accept the premise.  But the fatal flaw here is, not his
fault, he wasn't there as he readily admits, but I could
represent to the Court, again, based on sworn testimony of
some of the very same artists, that the way it worked isn't
exactly as Mr. Slotnick would ask you to believe how it
would work if it actually occurred.

What we believe the witnesses will testify, and

1                                                                    24

2     this is just with respect to the so-called Bill Graham

3     concert, Presents concerts.  We can talk about King Biscuit

4     Flower Hour and some of the other recordings if the Court

5     wants to indulge us in those discussions.

6              But what would happen in terms of the regular

7     occurrence is that you would have the performers and they

8     would be situated like let's say (indiscernible) on the

9     stand, and Mr. Hampton would be where he is, and he would

10    have a camera which is fairly close to the stage.  And Mr.

11    Hampton and his entourage in this proverbial example would

12    be videotaping the entire concert.

13             What happened, whether it was Fillmore East or

14    Fillmore West or the Winterland, is that you would have the

15    artist, you know, Mr. Slotnick made the example, what

16    happens when these artists are about to go onstage, what

17    they would have is a closed circuit TV where they see the

18    actual visual images of the concerts that are taking place

19    and the performers that are actually going up in advance.

20    There's no way that these artists could have been aware, and

21    we haven't had one yet that denied the fact that they knew

22    that they were being videotaped.  And the synchronization is

23    not for now and forever; it's whether or not they consent at

24    that particular moment in time.

25             In terms of the actual dates --

25

THE COURT:  I'm having a hard time concluding that knowledge, that an artist's knowledge that he or she is being recorded conveys a license to commercially exploit, a royalty-free license to commercially exploit the recording of the performance.

MR. ELKIN:  It's a fair observation, and that was the very same issue that was presented in the other case that Mr. Slotnick referred to.  And it's a fair issue, and I think he can argue that, and maybe he'll be successful or maybe he won't.

As it relates to the copyright ownership, we took the copyright ownership of the individuals.  They had to provide the chain of ownership, as Your Honor well knows, in terms of whoever's gonna be the claimant to the copyright, and Miss Ranahan over the last 24 hours actually took the information from their copyright registrations and their chain of ownership information.  So I don't know what information Mr. Slotnick has with respect to On the Road Again or any of these others, but we're relying on the information, the chain of ownership that they actually provided to us in a case.  They actually did do that, and that's how we were able to decipher the timeline.

MR. SLOTNICK:  Your Honor, if I may.

THE COURT:  Well, hold on a second.  Why would

1
2    not a reasonable starting point be for you to depose or

3    submit affidavits – let me back up a second, let me back up

4    a second.  When your client acquired the recordings that are

5    in issue here, were any representations made by the vendor?

6              MR. ELKIN:   So this is what happened.  Fair

7    question.  Number one, the vendor, let's just take the

8    example that we've been referring to in this case, because

9    there have been multiple acquisitions.  The Bill Graham,

10   what we refer to as the Bill Graham archives.  This was a

11   transaction that took place I think in or about 2002, 2003

12   from Clear Channel, which held the rights to the Bill Graham

13   Presents, the concert series part, and they were hiving off

14   the copyright related part of the business.

15             It is fair to say that our client acquired the

16   physical property and whatever rights it had with regard to

17   any property rights.  There wasn't any --

18             (interposing)

19             THE COURT:   That's a quit claim deed, I don't

20   know what I have, but whatever I have I'm giving to you.

21             MR. ELKIN:   Yeah, I would say, yeah, in the

22   nature of the quit claim deed.  So what our client did at

23   that time, it contacted people, and this goes back now 13

24   years, 14 years, a certain period of time, and it conducted

25   due diligence.  There were a number of people who were

27

 1  formally associated with the Bill Graham Presents who were

 2  active at the time.  A number of these concerts actually

 3  took place.  Some of those representatives actually were

 4  either working for Clear Channel or who had been acting as a

 5  consultant for Clear Channel.  And so there was extensive

 6  due diligence done, and there were representations, and our

 7  client, you know, obviously, like any business person, takes

 8  certain risks based upon the due diligence that was

 9  conducted and the representations and warranties in an asset

10  purchase agreement.

11        And so I certainly am not surprised by what we,

12  what the client was represented at the time, but would it

13  have been better had these performers actually provide

14  written agreements?  Absolutely.  But contrary to what I

15  think has been stated, I think we've informed the Court in

16  the very beginning that we would need these performer

17  depositions in order to help substantiate that particular

18  point.

19        Even if I were to take depositions of some of the

20  staff at the time, all they would be able to do is say, yes,

21  it was the custom and practice of Bill Graham to videotape

22  all the concerts.  Yes, the videotaping was in the clear

23  presence of the performers.  Yes, there was a closed circuit

24  TV that was in the anteroom of where the performers were

28

1
2  being housed before they went out on stage.  They could talk
3  about – they're not gonna be able to say yes, I own the
4  right to this particular moment in time.  I didn't object, I
5  knew I was being recorded, and the kinds of things that I
6  think would be important if I'm gonna present credible proof
7  to try to put on a case or a defense.  I can't do it, then I
8  have to obviously live with whatever defenses and facts I
9  have, but I think that's an essential point of what I
10  thought we would try to prove in the case from the very
11  beginning.
12       MR. SLOTNICK:   Your Honor, if I may.  First of
13  all, none of the people who Mr. Elkin is referring to now
14  generically have been identified on the list of witnesses in
15  the initial disclosures.  They would be useful people I
16  think even if only to establish one side of the perspective
17  of this rather than wasting an extraordinary amount of time
18  and money on running around the world taking depositions of
19  people who I'm gonna assume don't want to have their
20  depositions taken.
21       I think that the distinction between this case,
22  again, and the other case is that in this case, and I will
23  go out on a limb and say by and large, and I think virtually
24  all if not all of the 206 songs were owned by the plaintiffs
25  prior to any ostensible implied license, were owned by the

29

plaintiffs.  In Mr. Elkin's other case which was brought by

record companies, those record companies did not have a

copyright interests in the recordings made by Mr. Graham.

They had contracts with artists that may have limited the

artists' rights to do certain things, but they didn't have a

copyright in those.  They didn't own the film footage that

Bill Graham took.  That's very different.

            If the artist wants to agree to something, and I'm

still not sure I comprehend what an artist would've agreed

to under the circumstances Mr. Elkin identifies, so be it

for whatever rights the artist has.  But if the artist

doesn't have rights to the underlying song anymore, then the

artist doesn't have the right to explicitly or implicitly

grant a license.

            So if everything worked out exactly the way Mr.

Elkin would like for I believe 95 percent of the works in

issue, the artist --

            (interposing)

            MR. SLOTNICK:   -- I didn't have the rights.

            THE COURT:   The artist wouldn't have the rights

to --

            MR. SLOTNICK:   Yeah, so who cares what, you know,

what he said if he said anything or knew that there was a

camera.

 1

 2         While I can't testify to or represent what

 3  happened in these depositions because we haven't seen them,

 4  I've been doing this for a long time and I used to be a

 5  transactional lawyer and I did deals for artists with King

 6  Biscuit, and I can make a representation that whatever

 7  rights were granted, the rights that Mr. Elkin is talking

 8  about, at least with respect to my clients, none of my

 9  artist clients would've been in a position to grant the

10  rights or would've granted them for any period of time that

11  would last to 2016.

12         THE COURT:  Let me ask you a question.  I mean I

13  presume if I deny – you know, I don't know what these

14  individuals would say.  I suppose it's theoretically

15  possible that they might testify in a manner that supports

16  the defendant's position.  They might testify in a manner

17  that supports your position.  They might get on the stand

18  and say I never gave anybody rights to do anything.  It was

19  a live performance, there was a camera there.  I didn't know

20  if it was recording or if it was just a live feed to a

21  control room.  But I certainly didn't give rights to anybody

22  to exploit a recording of the performance.  They may give

23  testimony that might be very helpful to you.

24         I mean I presume though if I denied Mr. Elkin's

25  relief, you're not gonna offer testimony from any of these

31

individuals.  Is that right?

            MR. SLOTNICK:   I think that's correct, yeah.   I
mean there's no --

            THE COURT:   Well, you'd be precluded I think.   I
mean you can't, yeah, you can't say he can't take the
deposition, and you offer the individual as a witness.

            MR. SLOTNICK:   I think that's right.   I think
that, again, you know, if the artist owned the rights at the
time, that might be a different category, but I don't think
he did.   You know, I think that none of this is particularly
relevant to anything, at least insofar as the way that Mr.
Elkin is explaining this.   If he wants to make his motion,
we would oppose the motion.

            And by the way, Your Honor, I agree with you.   I
have a suspicion that if these depositions went forward over
the course of the next year, I'd be happier with the result
than Mr. Elkin would.   But I don't think that my clients
would be happy with the delay of a year and the expense of
running around the country.   I know Mr. Elkin said it's a
three-hour depositions.   It's a three-hour deposition after
a nine-hour flight each direction, and there is some
preparation.   And if he takes those people, they make some
comments like, you know, I didn't really deal with that.   My
manager did or my road manager or the other guys in the band

32

1
2   did.  And now we're off to the races with three more

3   depositions.

4           THE COURT:   Uh huh.  Uh huh.

5           MR. SLOTNICK:   Your Honor, if there were two

6   people and they were all located on the lower east side, you

7   know, I would be thrilled.  But there's not two.  There's

8   24, and they didn't own any rights to these songs at the

9   time.

10          THE COURT:   All right.

11          MR. ELKIN:   Briefly.

12          THE COURT:   Yeah, go ahead.

13          MR. ELKIN:   First of all, I think there are a

14  number of rights at issue that are getting conflated here,

15  which is a danger that I sought to prevent when I took the

16  Court through initially the different types of exploitations

17  our client had in the panoply of rights that we thought it

18  availed itself of.  It's one thing to have an issue about

19  consenting to the synchronization of the music in

20  opposition.  We get that, that's why we're here with regard

21  to these particular depositions.

22          With regard to the other activities, Your Honor,

23  the so-called on-demands streams and the linear broadcast

24  streams and all of that is covered by issues that have

25  nothing to do with this particular aspect of it.  So the

33

notion that somehow an artist who controls the music

composition that he or she is performing is agreeing or not

agreeing as to what's gonna happen down the road is

entirely, respectfully, and this is out view and our

position, irrelevant because there are other rights and

issues and legal effect with regard to all of that.  The

issue is what happened at the time the initial

synchronization took place.  We --

(interposing)

THE COURT:  One of the points, let me ask you a

question --

(interposing)

THE COURT:  Let me ask you one quick question.

One of the points that Mr. Slotnick made in his letter of

yesterday thought was that without the rights to the

composition, without the license with respect to the

composition copyright, as I understand it, none of the other

rights matter.

MR. ELKIN:  They actually do matter in the

following respect because there are different things that

they're complaining about.  One of the things they complain

about are the - most of this case has to do with the audio

portion not the audio-visual portion.  The so-called

synchronization issue has nothing to do with audio only.

34

That's covered by either, that's all essentially subject to compulsory licensing.  As Your Honor is well aware, about 70 percent of the music publishing business is all subject to compulsory licensing, either under Section 115 to the extent that it applies, as it does in this particular case, we claim, the reproductions, or public performance, ASCAP, BMI are operating under consent decrees, SESAC, of course, not so.  But there's no issue – there are issues that they claim, they're just not relevant to this particular part of it.

With regard to the – Mr. Slotnick just mentioned a few moments ago, Your Honor, and I'm sure it wasn't lost on the Court, that he readily conceded that if, in fact, these particular performers own the music composition, if they own the music composition, then it would be relevant because they themselves actually control the music composition that they're actually performing.  The individuals whose names I picked off, and this is just a list that's illustrative, are 13 performers who we know control the compositions based on the copyright registrations and chain of copyright material they provided to us in discovery.  So I just don't understand.

MR. SLOTNICK:   Your Honor, first of all, let me assure Mr. Elkin that the one thing I agree with him about

1
2   is that we're here today dealing with the synchronization

3   issue.  We're not dealing with the other issues, and to the

4   extent that we have – I mean I don't think you can get past

5   not having a synchronization license to deal with the

6   others.  But we're not talking about mechanical rights

7   today, we're not talking about public performance rights

8   today.  We're talking about the right to synchronize

9   something, and we're saying that the artists do not, did not

10  have the rights at the time.

11          And if Mr. Elkin wants to enlighten us, you know,

12  it doesn't have to be today, about which ones he believes

13  would have owned it, we may take a different position with

14  respect to that.  But I don't believe he's gonna find any or

15  very many of those.  And if there are – I mean I've looked

16  at the documents too, although probably not as recently as

17  Miss Ranahan has, and my recollection is that the artists

18  who are writers who granted licenses or granted assignments

19  to the publishers, who are either the plaintiffs or the

20  predecessors to the plaintiffs, did that long before any of

21  these concerts took place.

22          If I'm mistaken about that factually, then we

23  would have to reassess our position with respect to those

24  artists.

25          MR. ELKIN:   Well --

1

2          THE COURT:   Let me, just one second, let me just

3   ask Mr. Slotnick a few questions here.  Mr. Slotnick, one of

4   the things I'm thinking about is whether or not to try this

5   no a sample basis with perhaps maybe one or two of the

6   individuals listed in the November 18 letter.  I'm not sure

7   that this has to be an all or nothing proposition.  And

8   admitting, I mean sampling is imperfect, but, you know, I

9   appreciate that both sides have arguments here which I don't

10  think are trivial.

11         With respect to, I mean the artist that I

12  recognize as being of recent note are Mr. Armstrong or Mr.

13  Wright from Green Day.  Just a few questions.  Do you know

14  where they reside?

15         MR. SLOTNICK:   I do not, Your Honor.  I think

16  it's California, but I'm not sure.

17         THE COURT:   And the Green Day concerts that are

18  in issue here or the recordings of the Green Day concerts

19  that are in issue, do you know whether or not those concerts

20  took place after the owners of the copyright and the

21  composition assigned those rights?

22         MR. SLOTNICK:   I believe so, Your Honor, but I

23  don't have that information in front of me.

24         THE COURT:   I see.

25         MR. ELKIN:   Your Honor --

1

2          THE COURT:    I interrupted you.  Mr. Slotnick

3   actually was in the middle of making some other points.

4          MR. SLOTNICK:    Again, I think that, number one,

5   we think that the synchronization right, if you don't have

6   the synchronization right, the other rights fall apart.  I

7   do understand that Mr. Elkin has different arguments with

8   respect to that.  I understand that, I respect that.  And

9   that's not why we're here today.  We're here today solely to

10  deal with the question of synchronization which is

11  ostensibly the only thing the artists can talk about, to the

12  extent they can talk about anything.

13          In terms of a sampling, I guess anything is better

14  than 24.  Whether or not they own the rights or not, it

15  would seem to me that we were gonna even do a sample, we

16  would have to weed this down between those who actually

17  might have owned the rights at the time --

18          THE COURT:    We're on the same page.

19          MR. SLOTNICK:    Okay.

20          THE COURT:    That's why I asked the question about

21  the folks from Green Day.  If they transferred the rights

22  before the date of the concert, what they said at the

23  concert's probably immaterial, if they said anything.

24          MR. SLOTNICK:    Right.

25          THE COURT:    Yeah.  All right.  Do you want to say

38

1   something else, Mr. Elkin?

2       MR. ELKIN:   I was just gonna say I think it's

3   actually certainly fair to look at the artists as to which

4   there's no really serious dispute as to whether or not they

5   control the music composition.  What I would just – the

6   thing that I worry about with regard to starting with

7   someone like Green Day to the exclusion of some of these

8   others --

9       THE COURT:   Well, the reason I mentioned Green

10  Day is that the Green Days concerts will be relatively

11  recent, and that's which I think you might have the greatest

12  chance of getting something beyond I don't remember.

13      MR. ELKIN:   That's completely logical, and,

14  again, that would be something that would resonate with me

15  instantly if I didn't know something I'm about to tell the

16  Court.  Which I believe that Bill Graham died in 1991 in a

17  helicopter crash.  And I believe that many of these concerts

18  that took place before his death, I know there's a certain

19  way in which those concerts actually took place, and I'm not

20  as confident actually that the Billy Joe Armstrong, the

21  Green Day, was actually – I could be wrong, I don't have the

22  information in front of me so I don't want to get in over my

23  skis – this may or may not have been a Bill Graham Presents.

24  It could've been a King Biscuit, it could've been something

1

2 else.  We're mixing and matching different types of things.

3         So what I would suggest, if Your Honor would

4 permit this, is to maybe give counsel an opportunity to see

5 if we can agree – if the Court is going down the road with

6 regard to potentially entertaining a sample, if we could

7 confer among ourselves with regard to a list that we can at

8 least agree upon as to who owned the publishing, then that

9 would be something that maybe we could do before having Your

10 Honor actually rule on this.

11         THE COURT:   I mean I'll tell you what my thoughts

12 are.  My thoughts are maybe two of the artists, and two of

13 the artists who reside in the United States, so we're not

14 dealing with Hague Convention issues.  And I guess the other

15 limitation is if Mr. Slotnick – it would have to be two

16 artists who owned the rights to the composition at the time

17 of the concert that's in issue or the time of the recoding

18 that's in issue.  I take Mr. Slotnick's point, if the rights

19 were assigned on January 1 of 1995 and the concert took

20 place on February 1, 1995, it really doesn't matter what the

21 artist said in February.  I think that's a fair point.

22         I mean do you think – I mean I appreciate that Mr.

23 Slotnick objects to any of these depositions, but I think

24 that maybe a sampling is a good place to start and see what

25 they say.  And, again, you know, be careful of what you wish

1

2  for.  It may turn out we do a sampling, Mr. Elkin, and the

3  testimony from the sample witnesses is squarely in favor of

4  plaintiffs here, and maybe in a month or so maybe the

5  parties will be taking reverse positions.  I don't know what

6  the witness would say and I guess nobody does.

7          But do you think you could confer and see if you

8  can come up with two witnesses or two of these individuals

9  who reside in the United States who unquestionably retained

10 the rights at the time of the concert in issue?

11         MR. ELKIN:   Sure, Your Honor, we'd be willing to

12 do that.

13         MR. SLOTNICK:   Obviously, we couldn't do it

14 today, but yes.

15         THE COURT:   Right.

16         MR. SLOTNICK:   Look, I'm not sure if we will

17 change sides on taking depositions.  My own personal belief

18 is the first person to subpoena Mick Jagger loses in the

19 grander scheme of things. But I do think that we should take

20 a look at this.

21         THE COURT:   I think you may have a problem

22 getting Mick Jagger or Keith Richards, but all right.  So

23 let's see if you can work something out to take two as a

24 sample and see what they say.

25         MR. ELKIN:   I was going to suggest, Your Honor,

41

that we actually bring them here to 500 Pearl Street, but I guess that's not in the offing.

THE COURT:  I would probably get some phone calls from the Chief Judge if we did that.  Let's turn to the documents.  Everybody okay to keep going?  Anybody need a five-minute break?

MR. SLOTNICK:  I'm turning the mantel over to Mr. Dickstein.  So I'm fine.

MR. ELKIN:  We're fine if you are, Your Honor.

THE COURT:  Okay.  All right.  I think the documents that defendant is seeking here I think come down to three categories.  Documents regarding damages, documents regarding communications with the artists regarding the Bill Graham archive and the lawsuit, and documents regarding plaintiff's use of defendant's website.  Those are the three categories that that are set out in Mr. Elkin's November 18 letter.

Let's start with damages, and maybe a good place to start, maybe plaintiffs, with respect to damages, maybe plaintiffs can start by telling me what you have produced so far on damages.

MR. DICKSTEIN:  Sure, Your Honor, and just to give you some context, when we talk about the issue of damages, I think what we're getting at is obviously a

1

2  plaintiff in the Copyright Act can elect either statutory

3  damages --

4          THE COURT:   Right, right.

5          MR. DICKSTEIN:   -- or actual damages, but either

6  way, like the courts have said, the value of the plaintiff's

7  work in some way is relevant to that.  There's also

8  obviously the issue of disgorgement of a defendant's profits

9  which is different issue that actually we have some concerns

10  with their documents, with the documents they've produced,

11  but we're not talking about that right now.

12          So in terms of establishing the value of the

13  plaintiff's --

14          THE COURT:   What have you produced so far?

15  There's no mystery.  I'm trying to get a handle on what you

16  have produced, and then I'm gonna ask Mr. Elkin why isn't

17  that enough.  So, okay, go ahead.

18          MR. DICKSTEIN:   Absolutely.  So what we've done

19  we've gone to each of our publisher clients, and we said

20  give us information on the revenues that you've generated

21  through licensing these musical compositions over the past

22  three years, because that's essentially what our client's

23  business is, and for each of the publishers we've produced

24  Excel spreadsheets which come directly from the databases

25  they maintain in the regular course of business would show

43

1   for each category of license that has been granted, the

2   amount of money, and I believe it's broken down by each

3   composition.  So in some cases these very lengthy

4   spreadsheets.  And you can calculate the total revenues that

5   have been generated for each song over that period.  So

6   that's what we've given them on the revenue side.

7   In terms of the licenses which I know is an issue

8   that the defendants are keenly interested in, we've

9   produced, again, very, very extensive spreadsheets that

10  contain really all of the essential information in any of

11  the licenses that our clients have issued.  Now --

12  THE COURT:  Are the spreadsheets prepared in the

13  ordinary course of business or were they prepared for this

14  litigation or something else?

15  MR. DICKSTEIN:  So, Your Honor, they were

16  extracted from databases that our clients maintain.

17  THE COURT:  That are maintained in the ordinary

18  course of business.

19  MR. DICKSTEIN:  Correct.  They were extracted for

20  purposes of this litigation.  And actually just this

21  morning, Your Honor --

22  THE COURT:  Do you have a sample of one of these?

23  MR. DICKSTEIN:  I printed out, I was only able to

24  print out one set because of the heft or these.  But this is

1

2  --

3          THE COURT:   I probably just need to see one page,

4  something as a sample.

5          MR. DICKSTEIN:   Sure.

6          THE COURT:   Just show it to Mr. Elkin so he knows

7  what you're showing me.

8              (pause in proceeding)

9          THE COURT:   Thank you.  Is one of these, each

10  page is a separate record?  I mean, in other words, one page

11  doesn't - the information on one page doesn't continue onto

12  page 2.

13          MR. DICKSTEIN:   It's a little confusing, Your

14  Honor.  Because of the number, the amount of columns in that

15  spreadsheet that exists, we couldn't fit all the columns on

16  one page.  So you'll see, if you flip a few pages, you'll

17  see the same columns.  But then if you flip a few pages

18  more, you'll start to see different columns.  And I'm gonna

19  pretend that this is easy to follow at the spur of the

20  moment, but if you take a look at all the different column

21  headings, I think Your Honor will see the level of detailed

22  information that we provided.  And I should --

23          THE COURT:   Give me one second.

24          MR. DICKSTEIN:   Sure, go ahead.

25          THE COURT:   All right, there's a first group I

45

1    guess of maybe ten or fifteen pages.  The columns are

2    labeled license type, product, song ID, song title, writers.

3    Then about 15 pages in there are different labels:  current

4    term status, exclusivity, customer, territory, terms, start,

5    end.  So would line 1 on page 1 line up with line 1 on the

6    page that has the different labels?

7           MR. DICKSTEIN:   That's right, Your Honor.

8           THE COURT:   I see.

9           MR. DICKSTEIN:   If you flip even further, you're

10   gonna see another set of headings, including the dollar

11   amount which I showed Mr. Elkin just before I handed it up.

12          THE COURT:   Okay.

13          MR. DICKSTEIN:   And I just want to also be clear,

14   Your Honor, that's a sample, that's a representative sample

15   of the type of document produced from one of the publishers.

16   There are others like it.

17          THE COURT:   All right, and I see one of the

18   sheets here, this I guess is the third set of columns, it

19   says term, fee, EMI share, net fee, NPS, term timing, term

20   use, publisher.  And these are fully paid up licenses,

21   they're paid up at the front end?

22          MR. DICKSTEIN:   I don't know the answer to that,

23   Your Honor.  I think the answer is yes because if it's

24   showing NPS, that's a net publisher share, so that's the

46

amount the publishers keep after paying royalties to their

artists, songwriters I should say.

THE COURT:   So, in other words, the licensee pays

a fee at the front end as opposed to paying a fee every time

the composition is used?

MR. SLOTNICK:   Your Honor, if I may, it depends

on the nature of the deal.  In some instances, it would be

an advance paid at the beginning or a guarantee paid at the

beginning.  In other instances, there might be a quarterly

payment based on what the terms of the agreement are.  If it

were public performance monies, it would be quarterly coming

in from the various PRO's.

THE COURT:   But in any event, the income from the

songs has been produced in one form or another --

MR. SLOTNICK:   Yes.

MR. DICKSTEIN:   Absolutely, Your Honor.

THE COURT:   Okay.  All right, is there anything

else you've produced on damages that I should know about

before I ask Mr. Elkin why this is insufficient?

MR. DICKSTEIN:   Just other spreadsheets of that

nature related to other types of licenses that our clients

have issued, but along the same lines.

THE COURT:   Okay.  All right, Mr. Elkin, why is

insufficient?

47

 1

 2        MR. ELKIN:  Well, we appreciate the fact that

 3 that was provided, of course.  If this case is as easily

 4 proven as Mr. Slotnick indicated it would be, then the

 5 potential here for exposure is fairly significant.  And as

 6 the Court well knows and as the case authorities set forth

 7 and the papers reflect, the jury would be permitted to

 8 examine a whole host of factors related to the copyright,

 9 the value of the copyright, how much money was lost in

10 respect of the activities that they're complaining of with

11 regard to our client, what the value of their copyrights are

12 as reflected in the activities they claim --

13        THE COURT:  Well, I've got the Bryant Media list

14 in front of me.

15        MR. ELKIN:  Okay.  So here, number one, we don't

16 have – first of all, we have a limitation.  We have a

17 limitation over our objection that went back three years

18 only.  Now, the reason why three years was chosen, as I

19 understand it, was because it coincided with the statute of

20 limitations with respect to the claims.  These claims, of

21 course, they've known about this – I don't want to jump

22 ahead to the communications and how, you know, when they

23 first went up on our website, but this activity's gone on

24 for nine years or so, and we're not saying that they're

25 preempted from filing this, but to go back and to have an

48

1   arbitrary cutoff of three years, especially when you take

2   into account that licenses before three years that would've

3   been paid up would not have been included, that's one issue.

4

5            The second issue, you know, is that --

6            THE COURT:   But then the other side of that coin

7   though is you're getting licenses that were entered into

8   last year that are going to go past the date of the trial,

9   or may go past the date of the trial.

10           MR. ELKIN:   And that's fair.  What I'm suggesting

11  only is that I think documentation related to the

12  exploitation of works that are at issue in this case in

13  terms of the value, you know, having a cutoff at three years

14  if it were material, we don't know what exists and doesn't

15  exist.  If it's reasonably calculated to lead to admissible

16  evidence, we think it's an arbitrary period of time that's

17  insufficient.  So that's one of the gripes that we have.

18  I'm just trying to be faithful to the question.

19           THE COURT:   Well, I understand that, but I think

20  there has to be some time limit and why isn't, you know, in

21  terms of what the current value is or what the current value

22  I guess of the compositions is, why isn't three years a good

23  yardstick?  I mean the popularity of songs waxes and wanes.

24           MR. ELKIN:   Correct.  And, frankly, it may be

25  helpful or not helpful, but if you were to go back at least

49

1   to the time that they claim that our clients first

2   originally exploited their works, it would be well beyond

3   three years and probably closer to a decade.

4          But let me just move on if I may --

5          THE COURT:   Go ahead.

6          MR. ELKIN:   I just mention that up front because

7   it was an easy point to raise.  Secondly, and there's no

8   dispute about this, these are documents that, extracts that

9   they maintain in their system, which I understand.  It's a

10  good company, and that's what they do to be able to extract

11  information that they believe is important from a business

12  perspective.

13         But our perspective in looking at this from a

14  damages point of view would be that we would look at other

15  types of provisions that we think may have a bearing on this

16  issue.  For example, in a publishing agreement or a co-

17  publishing agreement or an administration agreement that

18  covers the exploitation of this copyright, to what extent

19  are the exploitations for streaming and on-demand streams

20  or, you know, whatever types of exploitation are referable

21  in a license agreement, they're not spelled out in this

22  particular spreadsheet at all.  All of that is relevant to

23  the issue of damages.

24         We don't know the extent to which the co-

 1
 2   publishers, the songwriters, who all may or may not have a
 3   chance to co-publish, you know, reserve rights to themselves
 4   to ostensibly license the compositions to others.  We have
 5   not seen the underlying agreements.  We asked for them; they
 6   have flatly refused.  And we believe that those documents
 7   have a bearing.
 8        The third issue, Your Honor, has to do with
 9   internet services.  I'm sure it's not lost on the Court that
10   all of the recordings here in one way, shape, or another are
11   ones that our clients are accused or alleged to have
12   committed wrongdoing based on online distribution or
13   streaming.  We've asked for various agreements that we know
14   that they have, and they include such companies as YouTube,
15   Vivo, Daily Motion, and a company by the name of Kello, K-E-
16   L-L-O.  These are all companies that I'm sure they have
17   agreements with.  Unless they have excluded our clients'
18   specific works, they should turn them over.  They've not
19   given them to us.  We have no understanding as to how they
20   actually value, view the actual activities in this
21   particular case itself.
22        The last thing I would say, and it relates to the
23   nature of the copyright violations that have been asserted
24   in this case.  They have asserted not only have our clients
25   committed copyright infringement, Your Honor, but they've

1                                                                  51

2   said it's willful copyright infringement.  And that brings

3   up reactive potential factors that a jury's gonna have to

4   consider.  You know, to what extent are they damaged by

5   pirated works, by works that they claim are unauthorized in

6   the area of streaming, in the area of downloading, in the

7   area of synchronization, or whatever else they're claiming

8   in this case?  There are a number of requests that are laid

9   out in our letter that are reflected in this document --

10          THE COURT:   Well, no, but I mean they're seeking

11  statutory damages, so they don't need to show lost profits.

12          MR. ELKIN:   Well, with regard to --

13          THE COURT:   You started by talking about

14  willfulness.  I mean what in in the licensing agreements is

15  going to illuminate the nature of your client's alleged

16  infringement as to whether it was willful or not?

17          MR. ELKIN:   I apologize.  I moved on from license

18  agreements and I moved on to a different category of

19  documents which relate to damages.

20          THE COURT:   All right, go ahead.

21          MR. ELKIN:   With regard to - so let me just

22  repeat some of what I said, maybe I went too fast, because I

23  want to make sure the Court tracks at least the points that

24  our side is attempting to make.

25             One is with regard to the license agreements.  I

1                                                    52

2   think I discussed or attempted to articulate some of the

3   issues that we think would be reflected in the agreements.

4   Not one has been turned over.

5          THE COURT:   Well, what is it in the license - you

6   talked about a couple of things in the licensing agreements

7   that are not in the spreadsheets, you know, whether or not

8   the license or there's some reservation of rights.  Well --

9          MR. ELKIN:   Streaming.

10          THE COURT:   To what extent does the license cover

11  streaming?

12          MR. ELKIN:   On-demand streams.  Downloads.  How

13  they account for that, you know, what are the - we know that

14  there is a different - we expect, and based upon what we

15  have understood to be in other agreements, that there would

16  be a delineation with regard to how they actually value the

17  things that are not actually fungible, and they're claiming

18  exploitations in a number of different respects.  None of

19  that is broken down.  We don't know how they licensed.  They

20  are coming to court seeking to, for a damages award which

21  could exceed $30 million, and they're not turning over any

22  one physical agreement that even gives us any inkling at all

23  as to how they actually exploit these properties themselves.

24          THE COURT:   Well, how many license - do you know

25  how many licenses are at issue?  Has someone counted the

53

lines on the spreadsheets?

MR. ELKIN:   And my under – sorry, Your Honor?

THE COURT:   Do we know how many licenses we're talking about?

MR. DICKSTEIN:   I think that one exceeds a thousand, Your Honor, if I'm not mistaken.

THE COURT:   And this is a sample?

MR. DICKSTEIN:   That's from one publisher, correct.  And one type of license.  I believe that's the synch license chart.

MR. ELKIN:   And one of the things, just to give you a sense, Your Honor --

THE COURT:   I'm gonna get back to you one second. Do we know overall how many licenses we're talking about?

MR. DICKSTEIN:   Of all (indiscernible) mechanical synch performance, no, Your Honor.

THE COURT:   Tens of thousands?

MR. DICKSTEIN:   Fair to say if not hundreds.

MR. SLOTNICK:   At least.

THE COURT:   All right, go ahead, Mr. Elkin.

MR. ELKIN:   They've excluded reports, they excluded from the reports revenues that basically provide for internet exploitation.  You know why?  Because it's actually not done on a per song basis.  We think that's

```
 1                                              54
 2  arbitrary.  I don't understand how we can be expected --
 3          THE COURT:   I'm not sure I - maybe you want to
 4  explain that point.  I'm not sure I understand you.  You
 5  said they've exploited revenue for internet exploit --
 6          MR. ELKIN:   Well, there are a number of
 7  agreements that we know they've entered into that they have
 8  refused to turn over.  And some of those agreements, I think
 9  if you take a look on page 9 of my November 18, 2016 letter
10  --
11          THE COURT:   One second, let me get there.  All
12  right, page 9 of November 18.  Go ahead.
13          MR. ELKIN:   Right, it's the first paragraph, Your
14  Honor, where we make reference to the fact that there are
15  three agreements or arrangements they have with YouTube,
16  Vivo, Daily Motion, and Kello, Q-E-L-L-O.  And we believe
17  these agreements permit the exploitation of plaintiffs'
18  music compositions over the internet in whatever forms those
19  arrangements actually envisage, and they have refused to
20  produce them because ostensibly they do not specifically the
21  songs at issue, even though they clearly would extend and
22  apply to the songs.
23          We say that because of the fact that there's, in
24  any of these internet deals, I would say the vast majority
25  of them, they're either full catalogue deals or they're
```

55

portions of catalogues.  Now if they have licensed these

internet services with part of their repertoire that

excludes our clients' works, okay, fine, we get that.  But

if it's not excluded, why would it be permitted to actually

look at the terms of the various agreements that envisage

the very same exploitation they're claiming our clients

engage in in this case.

MR. SLOTNICK:   Your Honor, if I may.

THE COURT:   Go ahead.

MR. SLOTNICK:   What Mr. Elkin is referring to, as

he said, is a full catalogue or a blanket license.

THE COURT:   Those are the licenses you have with

YouTube, Vivo, Daily Motion, and Qello?

MR. SLOTNICK:   Yes.  I can't give you statistics

for each of the plaintiffs, but there are 206 songs total in

this complaint, which seems like a lot until you consider

that Sony/ATV alone has 2 million songs in its catalogue.

Warner/Chappell has a million songs in its catalogue, and we

have four other defendants smaller but still significant.

So we are talking about probably in excess 3.3, 3.4, maybe 4

million songs, and what Mr. Elkin wants to do is see an

agreement that does not identify any one song in order to, I

mean I'm not even sure if he's really looking for the needle

in the haystack here, but 206 songs, while admittedly a lot

1

2    of songs in an infringement case, is nothing compared to the

3    3 ½ million or 4 million songs that the plaintiffs own and

4    are being compensated on.

5             And ultimately whether they're being compensated,

6    you know, a dollar or not a dollar, all of the revenue

7    numbers are still being identified in the spreadsheets that

8    we've given.  And Mr. Elkin mentioned --

9             THE COURT:  So the revenue from the internet

10   exploitation is covered in these spreadsheets for the songs

11   --

12            MR. DICKSTEIN:  That's correct, because it gets

13   broken down to the song level --

14            THE COURT:  I see.

15            MR. DICKSTEIN:  -- the revenue, and that's

16   reflected in the spreadsheets.  Not the one we handed up,

17   but in spreadsheets --

18            THE COURT:  Right, fair enough.

19            MR. SLOTNICK:  Yes.

20            THE COURT:  And from looking – and, again, I know

21   this is a sample, it doesn't, may not cover the internet

22   exploitation, but from looking at the spreadsheets, could

23   you tell whether or not it's internet exploitation, is the

24   licensee identified?

25            MR. DICKSTEIN:  In the revenue spreadsheets, I

                                                                57

don't believe it breaks it down for every license.  I think

it does have categories, and I think internet is one of the

categories.  I don't have that one in front of me, Your

Honor.

          THE COURT:  All right.  So it sounds like the

information Mr. Elkin is talking about is derivable from

these spreadsheets.

          MR. DICKSTEIN:  In terms of the amount of

revenues.

          THE COURT:  For the internet.

          MR. SLOTNICK:  And certainly in the context of

damages, and, again, you know, the maximum we can go for,

should we chose statutory damages, is $150,000 for each

song, which is around $30 million.  It's my understanding

that these songs in the last three years, all 206 of them,

have generated income of approximately $90 million.  So if

Mr. Elkin's question is whether these songs have some sort

of intrinsic value, I think the past three years shows that.

If we want to show that they have a value beyond that, you

know, if you look at – being someone more familiar with the

Rolling Stones than Green Day – you know, I suspect that the

Rolling Stones catalogue that's part of this, you know,

there's no one who is familiar with the music business who

wouldn't think that that is an extraordinarily valuable

58

thing and virtually any one of those songs would be valued
well in excess of $150,000.  If I tried to sell Satisfaction
tomorrow, I think I could get my $30 million from that,
although that might be a little high.  Maybe not.

THE COURT:   Yeah.

MR. ELKIN:   May I respond?

THE COURT:   Well, I mean, Mr. Elkin, this is the
problem I'm having.  I mean there are factors that are
considered in assessing statutory damages, but it's not
mathematical calculation.  That's why it's, I'm sorry, I
think I said (indiscernible) statutory.  That's why it's
statutory damages and not actual damages.  I mean why – I'm
not sure the fine, the narrow pieces of information you're
seeking are really that probative here.  Given the cost of
retrieving the licenses and the number of licenses, you
know, I'm not sure it's worth the candle.  But having said
that, go ahead.

MR. ELKIN:   Thank you.  First, let's examine the
factors that a jury has to be charged with in this circuit.
For willful copyright infringement, there's general
deterrence, there's special deterrence, there is value of a
copyright, lost profits, benefits gained, mitigating
circumstances, a whole plethora of different factors that a
jury is gonna be presumably instructed to consider as to

1                                                              59

2  where on the continuum a statutory damages award and

3  (indiscernible) are at issue in the case (indiscernible).

4  It's very nice to say it's $150,000 a work, but when you

5  multiple that by the sheer number of works in this case, you

6  know, I complained about it, it could be a very significant

7  number.

8          Now, I appreciate it's a lot of work and I don't

9  come to this point lightly, either on this occasion or other

10 occasions, asking for documents beyond which I think we are

11 entitled.  This is a case, they decided to bring it and they

12 have a right to bring it, clearly have a right to bring it,

13 but it is a case nonetheless that's brought by the National

14 Music Publishers Association, 23 plaintiffs brought this

15 case, and they've asserted claims for all of these works.

16 And they can't even produce, they can't even produce four

17 agreements, four, and, frankly, I don't even know whether or

18 not those spreadsheets actually reflect, you know, the

19 internet.  It does matter, it does matter.  Because they're

20 claiming on-demand streams and rights of reproduction and

21 all these things, and I realize it's a lot of work and if

22 they want to work with us to try to cut down some of it, I'm

23 amenable, open for business to have those discussions.

24         But for them to say, you know what, we have a big

25 business, we've given you what we think is right based upon

60

what we think works because it would be too much of a
burden, I don't think that's fair to our side, I really
don't.  you know, I respect the Court's views and will abide
by what Your Honor decides, but I have to say, given the
stakes here and given the wide range of factors that are at
issue in deciding statutory damages, I think that their
production on damage documents should be a little more
fulsome.

THE COURT:  Well, no, but I mean my understanding
though, Mr. Elkin, is that the licenses with YouTube, Vivo,
Daily Motion, and Qello are blanket licenses that aren't
gonna tell you anything about the value of your recordings.

MR. ELKIN:  See, they're making a representation
that it's a blanket license.  I haven't even seen it.  How
am I supposed to depose their witnesses on it?

THE COURT:  Well, I'm not sure anyone would come
to court, I mean I don't think any of the counsel at the
table here are gonna come to court and make a
misrepresentation in that regard.  And I don't think anyone,
you know, you're all attorneys with very well-established
firms, very well-regarded firms.  I'm not sure people are
gonna – I don't think people are talking off the top of
their head or talking without a basis in fact.

MR. ELKIN:  So let's say some representative from

61

the (indiscernible) or ABCO, that's a bad example because

they may not have actually been a signatory to this

agreement, one of their major, let's say EMI Music

Publishing, which is owned by Universal --

MR. SLOTNICK:   Sony.

MR. ELKIN:   Sony/ATV, and Sony uses a different

entity, but let's say one of their major music publisher

representatives is being deposed, and I want to examine him

or her about their licensing of music compositions that they

claim our clients exploited that are covered by an agreement

they have with YouTube.  I'm gonna be there asking questions

about an agreement I don't even have a copy of.  How could

that be, in a major copyright infringement case where

they're seeking $30 million in damages, I don't have one of

the four agreements that exist in the case that relate to

the specific exploitation that's at issue?

THE COURT:   Well, it doesn't relate to the – my

understanding is, based on what Mr. Slotnick just said, it

doesn't relate to the specific song.  It relates to all

compositions.

MR. ELKIN:   Of course it does, but --

(interposing)

THE COURT:   So how does that tell you – how does

that tell you what the value of your recordings is or how

                                                          62

does that illuminate the value of your recordings?

          MR. ELKIN:   I can see, based on the number of

sets per track, if, in fact, that's how it's denominated, it

may be denominated in some other way.  How do we know on the

basis of the spreadsheet that counsel presented to Your

Honor how that is broken down?  How would anybody know that?

          THE COURT:   Well, I mean maybe the answer to that

is for you to send a letter or send an email to plaintiff

and ask what, how do I identify a line on the chart as being

a license agreement for internet streaming or revenue

generated from a license for internet streaming?

          MR. ELKIN:   I will do whatever the Court asks,

but I just don't understand the burden of producing four

agreements, honestly.  It's hard for me to fathom how

onerous that could be.

          THE COURT:   Well, I mean let me come back to

plaintiffs for a minute.  With respect to the agreements –

tell me about the format of the agreements with YouTube,

Vivo, Daily Motion, and Qello.  I mean do you know whether

or not it's royalties are paid on a, every time someone

views the song on YouTube or is it a blanket payment or

something else?

          MR. DICKSTEIN:   My understanding, Your Honor, is

that the payments ultimately filter through and they're

63

assigned to the particular work.  So someone watches a video

on YouTube that contains Satisfaction in it – I'm just using

this as an example --

            THE COURT:   Fair enough.

            MR. DICKSTEIN:   -- not what actually applies –

that ultimately the reporting will come through and show,

yeah, here is --

            (interposing)

            THE COURT:   Someone viewed the Satisfaction video

--

            MR. DICKSTEIN:   Right.  The agreement doesn't say

anything about Satisfaction.  The agreement just says, you

know, and with respect, I haven't seen that specific one,

but it is a blanket license, as Mr. Elkin acknowledged.  So

it says whenever anything in your catalogue that you've

claimed is played, we pay you some amount.

            THE COURT:   Again, I've never seen these

agreements.  I'm just trying to think what they might look

like.  It's a flat fee per all songs in the catalogue.

There's not like preferred, middle, and crummy songs.

            MR. DICKSTEIN:   That's my understanding, Your

Honor.

            MR. SLOTNICK:   There may be different categories

depending on the nature of the use.  To use an imperfect

64

analogy, you know, on an ASCAP statement, the value that is
attributed to something that is played on primetime
television, no matter what the song is, is greater than the
value of something played on local television in
Poughkeepsie at 4 o'clock in the morning.

THE COURT:   Right, but that's not particular to
the song.   It's particular --

MR. SLOTNICK:   It's not particular to the song.
And in any event, all of that is still reflected as revenue.
So if the revenue number, if there is revenue that's
attributable to the song, then it's reflected in the books
and records of the publisher which is reflected in the
spreadsheet.

THE COURT:   Just so I'm clear.   So the licenses
with the four internet entities, the YouTube, Vivo, Daily
Motion, and Qello, assuming the same use, it would be the
same royalty whether it's Satisfaction or Tiny Tim singing
Tip Toe Through the Tulips.

MR. SLOTNICK:   I believe that's correct.   I was
privy to I think one of the original independent music
publisher, why get licenses with YouTube, and certainly
there was no reference whatsoever to any song.   You know,
you couldn't do a deal that way.   It would make no sense for
anybody.

```
1                                                        65

2            THE COURT:   I mean with that information, Mr.

3   Elkin, I'm not sure how to, I mean if the rate is based on

4   all the songs in the catalogue, I'm not sure how it tells

5   you anything about the recordings at issue.

6            MR. ELKIN:   Judge, respectfully, they haven't

7   even looked at the agreement.  They're making

8   representations in court, and I respect each of these

9   lawyers.  I've known Mr. Slotnick for almost three decades.

10  But I will tell you that they, for them to just make a

11  representation as to what's in an agreement they haven't

12  even looked at, something that we think is highly probative,

13  and they haven't even elected statutory damages.  We're

14  talking as if, that they've made the election.  Right now --

15           THE COURT:   I think they have by virtue of these

16  --

17           MR. ELKIN:   You can ask them.

18           THE COURT:   Are the plaintiffs seeking actual

19  damages?

20           MR. SLOTNICK:   Your Honor, while I'm not

21  committing to anything, I think it would be highly unlikely

22  that we would seek actual damages under these circumstances.

23           THE COURT:   Well, I think you may need to because

24  I think the scope of discovery may change if it's actual

25  versus statutory.
```

1

2          MR. SLOTNICK:   That would be something that I

3  would have to confer with our clients about, but my

4  recommendation would certainly be to go for statutory

5  damages.

6          THE COURT:   Let me ask one other question.  I

7  mean I'm not sure this is gonna get Mr. Elkin what he wants,

8  but how burdensome is it to produce the licenses with

9  YouTube, Vivo, Daily Motion, and Qello?

10         MR. SLOTNICK:   I don't know, Your Honor, I'd have

11 to find out.  There are apparently some confidentiality

12 concerns with regard to those documents because of who the

13 licensees are.  These are, you know, we're in a very

14 interesting world these days, and the documents are

15 confidential not just between the parties but between the –

16 obviously we would be very concerned about turning these

17 over to Mr. Elkin's client, but if publishers do individual

18 deals, blanket deals, I'm pretty certain that no one

19 publisher, whether a plaintiff in this case or not, would

20 want another publisher to have access or privy to a document

21 that's supposed to be confidential for obvious reasons.

22         The reason that Sony or Warner's or Peer or any of

23 the others license their entire catalogues individually is

24 to get hopefully a large sum of money.  If one company's

25 large sum of money is different from another company's large

67

sum of money, there's gonna be some 'splaining to do at some

level.  And, frankly, I think that the flame here isn't

worth the candle.

Mr. Elkin knows what an internet license looks

like, he knows what a blanket license looks like.  For the

same reason, you know, I suspect that he doesn't really care

that these songs are licensed through ASCAP, BMI, and SESAC,

and he's not asking for their specific agreements with ABC

TV or with any other content provider.  None of it's

relevant to what the bottom line is, and this is a

discussion about damages.  The songs have generated $90

million worth of income in the last three years.  That's

treble what the damages could be, and --

THE COURT:  And that 90 million is reflected in

the spreadsheets that have been produced.

MR. DICKSTEIN:  Correct.

MR. SLOTNICK:  Yes.

MR. DICKSTEIN:  If you add them all up.

MR. ELKIN:  We have no idea --

THE COURT:  Go ahead.

MR. ELKIN:  -- first of all, how that's derived.

I should've started out by saying there is a protective

order issued in this case.  If the nature of the material is

highly confident, Mr. Slotnick and his team know how to

68

1
2 designate that, for attorney's eyes only.  This is something
3 that can be privy to outside counsel and our experts.  Not
4 to have this because of the fact that they're confidential,
5 there are confidential documents --
6          THE COURT:   Let me come back to the global
7 questions.  I think maybe we're getting lost in the weeds a
8 little bit here.  You're getting statements or you've gotten
9 statements which reflect the annual, which reflect for the
10 last three years the actual income generated to plaintiffs
11 by the songs, by the compositions in issue.  Why isn't that
12 the best evidence as to the value of the copyrights?
13          MR. ELKIN:   Judge, it's completely meaningless.
14 They could've received $25 million for I Ain't Got No
15 Satisfaction in connection with a Pepsi commercial.  We
16 don't know whether it's synchronization income versus
17 digital downloads versus public performance.  It's – and by
18 what means?  And what are the agreements?  They don't
19 dispute the fact that, first of all, compensatory damages
20 are still in the case, and even if they were, the nature of
21 the harm that they claim is important.
22          A category of documents that we've asked for or
23 that we haven't discussed yet, and I don't want to tax Your
24 Honor's patience, this has gone on for a while --
25          THE COURT:   You're not taxing my patience.

69

1

2         MR. ELKIN:    -- is the extent to which they should

3    produce documents with regard to claims as to the negative

4    effect on your business that piracy has caused.  They're

5    gonna claim, they'll have someone that's on the witness

6    that's gonna be talking about, you know, how unauthorized

7    use of music has hurt their business, and they've lost X

8    millions of dollars a year based on this.  We've asked for

9    those documents.  They haven't produced those documents.

10   They refuse to produce those documents.  We don't have those

11   documents, we don't have four internet agreements, we don't

12   have any of the, all of the agreements that they have with

13   the songwriters and the publishers.  We don't have anything

14   that reflects the exploitation or anything broken down at

15   all.

16         We have those spreadsheets, and that's fine.  They

17   can come to court with their 23 plaintiffs to seek $30

18   million without even turning over four internet agreements.

19         MR. SLOTNICK:    Your Honor --

20         (interposing)

21         THE COURT:   Hold on one second.

22         (interposing)

23         THE COURT:   Hold on one second.  I'm looking at

24   the first page on the spreadsheet here, and the first column

25   in license type, and there's TV, merchandise, karaoke, video

1
2    stage, commercial, corporate, multimedia.  Are there a

3    discrete number of forms of licenses the plaintiffs use?

4         MR. SLOTNICK:   I think in some instances it's

5    dependent upon what the plaintiffs use.  In some instances

6    it's what the licensees would use.

7         THE COURT:   So in other words, license type

8    doesn't denote a form of standard contract.

9         MR. SLOTNICK:   It denotes a category.  I think

10   multimedia is I think is a catchall that includes the

11   internet.  You know, commercial would presumably be a

12   commercial synch license.  You know, again, I'm not sure

13   what the significance of it is.  Again, if we're only

14   talking about damages, you know, what, you know, what

15   difference does the document mean if someone gives you a

16   check for $25,000 for a commercial use of the song?  The key

17   from a damages perspective is here's $25,000, and it's

18   reflected.  Our clients have represented to us that every

19   number on there reflects all of the revenue for each of

20   these songs for the last three years, and it adds up again

21   to $90 million.

22        You know, Mr. Elkin went off on I guess a phantom

23   expert that we're gonna have the injury due to piracy and

24   unauthorized duplication.  I don't know if we would have

25   such an expert.  We certainly don't have one at the moment.

```
 1                                                      71
 2   And when we have one, he's certainly free to see the report
 3   and examine and cross-examine that witness.
 4            You know, I mean I don't think it requires an
 5   expert to acknowledge that when somebody steals from you,
 6   and I'm not accusing his client of stealing, but when
 7   somebody steals from you, you make less money than when
 8   somebody doesn't.  So, yes, of course --
 9            THE COURT:   It depends on what they --
10            MR. SLOTNICK:   Well, yes, it does.  But, you know
11   --
12            THE COURT:   I used to do some trademark work, and
13   that was always one of the big debates, I mean the person
14   who buys the Rolex in Battery Park, is that really a
15   diverted sale from Rolex?  Probably not.
16            MR. SLOTNICK:   It's probably not, Your Honor, and
17   I mean I started as an anti-piracy lawyer at the Recording
18   Industry Association, and I agree with you, the person who
19   bought the 50 cent 8-track tape at the gas station wasn't
20   about to spend the $4 it cost back then to buy the album.
21   On the other hand, when you multiple that by millions of
22   people on the internet, yeah, then it starts to become a
23   real number.  I think back in the day when I was doing this
24   exclusively for a living, it was probably more public
25   relations.  Now it's real money.
```

1                                                                    72

2              THE COURT:   I mean, Mr. Elkin, I'll hear you one

3    more time, but I really think that the spreadsheets, you

4    know, I think that in the very near future I think the

5    plaintiff needs to commit to statutory damages.  But unless

6    the plaintiff changes track and seeks actual damages, I'm

7    really hard-pressed to see why the actual revenue generated

8    by the songs is not the best evidence here.

9              MR. ELKIN:   I think we're – Your Honor, I

10   appreciate being heard one last time, but I – they have made

11   representations about what they think the agreement is.

12   They haven't even seen the agreement, and the argument

13   that's being presented is --

14             THE COURT:   You're talking now about the four

15   with the internet?

16             MR. ELKIN:   Yes, I'm referring to those, but,

17   frankly, all of the agreements that we've asked for.  They

18   had one stack of paper from their database.  Their

19   representations that I take counsel is making, and I have no

20   reason to doubt what they're saying, that their clients have

21   informed them of that, but that's a far cry from looking at

22   their files to come up with documents that are responsive to

23   our request that can lead to admissible evidence.  How in

24   the way in which they have licensed their music for internet

25   distribution is something that is fundamental and part of

73

1    this case.  If I can't examine the court documents with four

2    major distributors, it's hard for me to understand what a

3    license would possibly look at if, in fact, our client had

4    actually entered into an agreement with them.

5         It's unfathomable to me that I can't have access

6    to it if that's the Court's ruling.  I just – I feel that we

7    are at a tremendous disadvantage in defending this case.

8         MR. SLOTNICK:   Your Honor, we're not talking

9    about the equating of the defendants who have a nice

10   business with YouTube who have a very, very nice business.

11   Mr. Elkin's client, if they were of a mind to license, could

12   license based on specified works for which they have a

13   physical embodiment.  The internet where even the internet

14   companies don't have physical or non-physical embodiments of

15   anything because every one of us can put something up on

16   YouTube tomorrow.

17        What the terms of the license mean vis-à-vis

18   damages is irrelevant to what the revenue generated is, and

19   we are making the representation that the revenue is

20   identified.  And he has those documents and he will be able

21   to examine a witness, and the witness will be able to

22   testify with great knowledge as to what the, what those

23   numbers mean and where they come from.  And if he finds that

24   lacking at some point, then I suppose he has recourse to the

```
 1                                                        74
 2   Court.
 3           But at this point to talk about a document that
 4   has no reference to a specific song, has no reference to
 5   distinguishing between one song and another in terms of the
 6   more amorphous concern about valuation.  The internet
 7   doesn't care if it's Tip Toe Throw the Tulips or
 8   Satisfaction.
 9           MR. ELKIN:  I beg to disagree, and I hope the
10   irony's not lost on the Court, that they can sit up here and
11   wave a $90 million figure and talk about how, you know, they
12   don't really need to, the other side, meaning us, doesn't
13   need to know how it was all, all of the constituent
14   elements, but at the same time say, oh, by the way, you
15   shouldn't even try to compare yourself to YouTube because
16   you guys, it's like comparing apples to pears.  They can't
17   have it both ways.
18           MR. SLOTNICK:  Yeah, I don't think --
19           THE COURT:  All right, I've heard enough.  Look,
20   with respect to the licenses, at this point – with respect
21   to the damages documents, the request for additional
22   documents concerning damages, and I think these are the –
23   defendant has identified the document requests 11, 12, 28,
24   29, 39, 40, 46, 47, and 48.  Those are the document requests
25   that are discussed at the relevant pages of defendant's
```

75

November 18 letter.

I think the spreadsheets that have been produced are sufficient at this point.  If something changes in the future, Mr. Elkin, I'm willing to revisit the issue.  But, you know, it seems to me that the actual revenue generated by the songs in issue is probably the best evidence of the value of the copyright.

The problem I have with the licenses for the four internet entities, YouTube, Vivo, Daily Motion, and Qello, is the representation has been made by counsel, and I'm sure if counsel's incorrect, I am 100 percent sure they're gonna correct it in short order.  But I credit the representation made by plaintiff as I credit the representations made by defendants.  Is that those licenses don't relate to specific songs.  They relate to all the songs in the license holder's catalogue and they charge a standard rate for all the songs in the license holder's catalogue.

So it really doesn't tell you anything about the value of the compositions that are performed on the recordings that defendant has.  It sounds as if the rate is an amalgam or an estimated value based on all the songs in the catalogue which can total millions of songs.  So it really doesn't tell us how much – it doesn't bear at all on the songs that are performed on defendants' recordings here.

1                                                            76

2              So I think that, you know, look, I'm willing to

3     revisit if things change in the future, but I think the

4     spreadsheets are sufficient.  But I am gonna direct, I think

5     plaintiff does need to make an election here as to statutory

6     versus actual because then that may be something that would

7     warrant revisiting damages discovery here.  Can you do that

8     in the next week?

9              MR. SLOTNICK:   I'll try, certainly.

10             THE COURT:   All right, so that'll be by the 14th.

11    All right.  The next category the plaintiff, the defendant

12    identified, excuse me, are communications with the artists

13    regarding the Bill Graham archive and the lawsuit.  And I

14    thought that non-privileged communications with the artists

15    concerning defendant's website have been produced.

16             MR. DICKSTEIN:   That's right, Your Honor.  My

17    understanding is that the defendants are asking for any

18    communications between the plaintiff, our clients, and the

19    artists related to any of the songs regardless of whether

20    they mention these defendants or their websites.  That's the

21    way I understand the request.  That's the way I understand

22    the request.  And in our discovery response that we served a

23    year ago, we told them we were not gonna produce that.  We

24    would just look for communications that mention the

25    defendants or their websites.  And, in fact, we produced

1

2   several of those.

3          Defendants say in their letter that none have been

4   produced.  In fact, you know, just quickly looking, we found

5   a few, and I pulled them out, I have them with me here today

6   just examples.  So we have produced communications with

7   artists that reference the defendants or their websites, to

8   the extent they're not privileged.

9          THE COURT:  All right, Mr. Elkin.  I think I may

10  have mischaracterized what you're seeking.  It looks like

11  you are seeking correspondence between the plaintiffs and

12  the artists about all the songs at issue?

13         MR. ELKIN:  Yes, that's correct.

14         THE COURT:  You want to address that?

15         MR. ELKIN:  I think I – if they're making a

16  representation that they have produced everything in

17  connection with that response, that was not my

18  understanding.

19         THE COURT:  I think what they have – well, let me

20  not try to paraphrase.  Why don't you --

21         MR. ELKIN:  Oh, I --

22         THE COURT:  Let me ask plaintiffs to describe

23  what they have produced.

24         MR. DICKSTEIN:  Sure, Your Honor, we've produced

25  any communications with artists, between our clients and

1   
2   artists that reference any of the defendants or their

3   websites, and we went through an exercise almost a year ago

4   of setting out search terms that we'd use, which are not

5   surprisingly the names of defendants' websites, including

6   Concert Vault, Wolfgang's Vault, Bill Graham I think even

7   was a name we put in.  And we collected our clients'

8   electronic records, conducted a good faith search.  We then

9   ran the search terms against those records, and we produced

10  any non-privileged documents that we found as a result of

11  those efforts.

12          And they do happen to include some communications

13  with artists or their representatives, and we produced

14  those.  I don't know that there's a great number, but there

15  are several, and we've produced those.

16          MR. ELKIN:  If that's the representation, Your

17  Honor, I can't ask for something that they believe they have

18  produced.

19          THE COURT:  Okay.

20          MR. ELKIN:  We find it a little incredulous that

21  the little that has been presented, but it's something we'll

22  have to address in another way.

23          THE COURT:  Well, all right.  And the last

24  category, use of defendants' websites, requests 29 through

25  33.  I'm not sure what you're looking for there.  When you

1
2  say their use of your websites, I'm not sure what you mean.

3        MR. ELKIN:   Your Honor, may we go back to

4  communications because I think that Your Honor did correctly

5  identify one of the requests that we had called out.

6        THE COURT:   Go ahead.

7        MR. ELKIN:   There were other requests as well I

8  believe related to communications (inaudible).

9        THE COURT:   All right, go ahead.

10        MR. ELKIN:   So I think it's, take a look at page

11  9 of the November 18, 2016 letter.   The requests I think we

12  identified were 56, 57, 58, and 60.   And in a nutshell, it's

13  very difficult to raise the subject matter without coming

14  off as being charged.   So I'm just gonna state as a matter

15  of fact what the background is and the documents that are

16  sought.

17        One of the defenses that we've asserted is that

18  this particular case was brought for an improper purpose.

19  Clearly, they are suing ostensibly for copyright

20  infringement, but we believe that there was a concerted

21  action at the behest of the National Music Publishers

22  Association and certain of its constituent members to drive

23  our client out of business for a number of reasons.   And

24  there are communications that we believe were had of a non-

25  privileged nature among certain people, including David

80

Israelite who is the head of the trade association.

THE COURT:   He's the what?

MR. ELKIN:   Issued a --

THE COURT:   Did you say pet?  He's the what of the trade association?

MR. SLOTNICK:   Head.

MR. ELKIN:   He's the head.

THE COURT:   Oh, the head.

MR. ELKIN:   President, CEO, I forget nomenclature.

THE COURT:   Okay.  All right, go ahead.  Go ahead.  I just didn't hear you at all.

MR. ELKIN:   He's the top guy.

THE COURT:   Okay.

MR. ELKIN:   And other individuals that act on behalf of at least one of the major music publishers, Alasdair McMullan.  Mr. McMullan has claimed in a case not to be involved in the publishing side but on the sound recording side, but we know for a fact that he was directly in touch with our clients' representatives many months before the case and ostensibly sought information related to various activities complained of in the case and in the furtherance of self-potential business transaction when obviously it wasn't the situation at all.

81

2          Initially, in response to our document demands,

3   there was no objection that was interposed.  Now there's

4   been a decision not to produce them because there's a claim

5   that we only agree to associate the plaintiffs to produce

6   these documents while there was a, one of the counterclaims

7   that he (inaudible) was for defamation against Mr. Israelite

8   who issued a press release and made some quotes that our

9   client thought was defamatory.  Now that --

10          THE COURT:   Right, I know that that got dismissed

11   by Judge Ramos.

12          MR. ELKIN:   The complaint got dismissed --

13          THE COURT:   Yeah.

14          MR. ELKIN:   That were received in an amendment in

15   regard to their response.  And they've taken the position, I

16   guess when we pressed them most recently, that they're not

17   gonna produce those documents.

18          The claim as to defamation is not the, that's been

19   dismissed, is not the basis --

20          THE COURT:   Let me interrupt you for one second

21   and ask you a question.  You started by talking about

22   there's a theory, one of the defense is that the case was

23   brought for an improper purpose, namely, to drive the

24   defendant out of business.  I mean my understanding is the

25   website sells things like tee-shirts and tangible items

1

2 beyond the recordings of the performances, is that right, or

3 did I look at the wrong website?

4        MR. ELKIN:   There are a number of different

5 websites.  One of the websites definitely makes physical

6 items --

7        THE COURT:   Posters, tee-shirts, yeah.  But I

8 mean to the extent that you're claiming you're infringing,

9 why is driving your infringement business out of existence

10 an improper purpose?

11        MR. ELKIN:   I think --

12        THE COURT:   If someone's, you know, if I write  a

13 novel and someone's business is to reprint copies of my

14 novel and sell it on the street, why is driving him out of

15 business an improper purpose?

16        MR. ELKIN:   Constituents of their clients are not

17 on the defendants' side but on the major side actually tried

18 to do the same thing ten years ago in another case that was

19 withdrawn eventually.  They realized they couldn't do that,

20 so they're going after the things now that they believe that

21 they can.  So they learned from their mistakes and they're

22 going after things that are currently untested.

23        THE COURT:   Well, but, in any event, why don't

24 you get back to the communications that you're seeking here

25 and tell me why they're appropriate.

1

2          MR. ELKIN:   We believe they're communications of

3   a non-privileged nature between Mr. Israelite and others,

4   other parties to this case related to bringing of this case

5   and issues related specifically, not simply with regard to

6   that, but of a business nature related to the various

7   defendants that we represent similarly with regard to the

8   representative of UMG.

9          THE COURT:   And how does that bear on whether or

10   not there's an infringement?

11          MR. ELKIN:   It doesn't bear on the issue as to

12   whether there's infringement; it bears on whether or not one

13   of our defenses to this case is, you know, we have evidence

14   that is in the possession of the other side that we can use

15   to support our defense.

16          THE COURT:   Well, this is a defense of improper

17   motive or improper purpose?

18          MR. ELKIN:   Correct.

19          THE COURT:   I'm hard-pressed to see how that's a

20   defense to the extent they're alleging infringement.

21          MR. ELKIN:   Well --

22          (interposing)

23          THE COURT:   Why is terminating - if you got a

24   defendant that the plaintiff believes in good faith and in

25   compliance with Rule 11 has a part of its business that is

84

infringing plaintiff's copyrights, why is not driving that

part of the business out of existence an improper purpose?

MR. ELKIN:   We believe it's a copyright misuse.

In fact, there's evidence in the other case, I know Your

Honor - certainly Mr. Slotnick doesn't want to hear about

it, there's evidence in the other case that was precisely

what those, many of those plaintiffs in that case wanted to

do because of the fact that they wanted to own the

recordings, they were unhappy that these old vintage concert

recordings were proliferating on the internet, and it was a

problem for them, and this was a way to sort of drive him

out of business, by bringing on a case like this, suing $30

million and trying to basically kick him out.

THE COURT:   I'm still hard-pressed - look, I mean

if it is  -- if your client is infringing or part of your

client's business is infringing, why is - I still don't

understand why driving the infringing business out of

existence is an improper purpose?

MR. ELKIN:   First of all, let me just say at the

outset we are not infringing, we are --

THE COURT:   No, I understand you deny the

infringement.  I'm not suggesting that you are or you

aren't.  But if you're not infringing, you're not gonna be

driven out of business, or that part of your client's

85

business isn't gonna cease to exist.  But why – if there is

infringement, why is not terminating – why is terminating or

seeking to terminate the infringement an improper purpose?

          MR. ELKIN:   We believe that if you bring on a

case with the goal of driving someone out of business is

inequitable defense.  They may – they had a chance to get

that defense dismissed if they wanted to.  It's alive in the

case.  We're entitled to, we believe, seek discovery with

regard to it, and that's pertinent evidence that we don't

have that we want.

          MR. SLOTNICK:   Your Honor, Mr. Elkin keeps saying

that I don't want to hear about the other case.  I actually

would love to hear about the other case, preferably not here

and today, but would be fascinated to hear about it.  But,

again, let me distinguish the two cases briefly.

          THE COURT:   Well, let me ask you, before you get

in –

          MR. SLOTNICK:   Okay.

          THE COURT:   Is driving an infringer out of

business an improper purpose?

          MR. SLOTNICK:   No, and, first of all, I mean, you

know, I'm pretty sure that amongst our remedies that we've

asked for are damages and injunction.  We've asked for

damages, the Court may award us $30 million, the Court may

86

1
2  award us $30,000.  I don't know.  You know, that's something
3  that we all have to consider.  Two hundred and six songs out
4  of whatever the defendants have eliminates 206 songs.  It
5  doesn't eliminate everything else that they own and control.
6  And so I can't speak to what would drive them out of
7  business or not.  But clearly any time a copyright owner
8  sues somebody for copyright infringement, the goal is to get
9  the infringer to stop.  And if they, you know, and if
10  stopping means that they can't be in business anymore, you
11  know, then so be it.  That's not improper.  That's not what
12  misuse of copyright is.  Never has and presumably never will
13  be.

14        You know, and the thought that a record company
15  lawsuit, which happened many years ago, by people who did
16  not own copyrights to anything is in any way indicative of
17  the rationale for bringing this case.  It's just, it's
18  ludicrous.

19        There are independent publishers here who don't
20  talk to major labels.  There are major publishers here who
21  don't talk to their sister labels.  You know, they compete
22  for things.  So it just is – knowing what I know, the
23  allegation is ludicrous.  Know that what Mr. Elkin is
24  looking for are communications between somebody who was a
25  defendant and no longer is and someone who, whether he

87

1    represents in-house record companies or publishers, neither

2    the record company nor the publisher is part of this

3    lawsuit.

4

5              THE COURT:   Go ahead.

6              MR. ELKIN:   Well, it is, abuse of copyright is a

7    defense.   It's an equitable defense (inaudible) copyright

8    infringement.   And the --

9              THE COURT:   What the abuse here, what's the abuse

10   you believe is taking place?

11             MR. ELKIN:   The abuse is that they brought this

12   lawsuit not to ostensibly remedy any copyright infringement.

13   They knew that we had licenses with the performing rights

14   societies.   They knew we had licenses under Section 115 of a

15   compulsory nature.   They knew that the synchronization, the

16   so-called synchronization is something that was not required

17   at the time and, if so, was already provided, and the

18   passage of time, statute of limitations, all kinds of other

19   equitable defenses.   And they decided to do this.

20             Bringing on a lawsuit for a small company for $30

21   million is enough to drive them out of business.   They know

22   it, and we certainly feel it.   And the other case certainly

23   did have copyright infringement implications, and it had to

24   do with the audio recordings, the counterpart to these music

25   compositions, so that's simply wrong.

1

2                MR. SLOTNICK:   Your --

3                THE COURT:   All right, all right.  Are you saying

4     that the complaint was filed in violation of Rule 11?

5                MR. ELKIN:   No.

6                THE COURT:   Well, if it wasn't - all right.

7     Well, I mean I'm gonna - to the extent that - this I guess

8     is, are requests 56 and 60, and I'm gonna deny the motion to

9     compel with respect to 56 and 60.  It seems to me that the

10    information is just not relevant.  I don't see how bringing

11    an infringement action that, unless there's a Rule 11

12    violation, I don't see how bringing an infringement action

13    to terminate the alleged infringer's infringing activities,

14    if the defendant is infringing, is somehow misuse of a

15    copyright.

16                MR. ELKIN:   I respect and accept Your Honor's

17    decision.  I just want to point out that I - Rule 11 is,

18    from our point of view, the diligence that the facts that

19    are set forth in the complaint and the legal principles

20    applicable have been done with due diligence and a bona fide

21    way, I don't think that the issue of whether it is being

22    brought for an improper purpose is necessarily reflected

23    within the four corners of the complaint.  I realize that

24    Your Honor may not agree with that, but I just wanted to

25    make sure I made that point.

1                                                          89

2              THE COURT:   All right.  I think now we're to the

3    last category of documents, defendants – plaintiffs' use of

4    defendants' websites.  I'm not sure what you mean there, Mr.

5    Elkin, with respect to their use of your website.  What do

6    you mean – what does use of your website mean in the

7    document request?

8              MR. ELKIN:   Well, let me just make a point, and

9    I'll try to describe it if I can.  We believe that there are

10   certain defenses, at least in mitigation, not going to an

11   equitable nature, that arise from the fact that our clients

12   have allegedly been doing the very things that they claim

13   are infringing activity for a number of years.  They're

14   going to come to court and try to seek, if they're

15   successful on liability, the good Lord willing they won't

16   be, but if they, they'll be seeking damages.  One of the

17   things that we'd like to be in a position to do is to be

18   able to make a showing that, hey, look, if you believe you

19   are being damaged so much, you would've taken action at an

20   earlier time.  It's really hard for you to come to court and

21   complain about the degree to which you've been damaged --

22             THE COURT:   This sounds like laches.

23             MR. ELKIN:   -- if you knew – no, laches is

24   different.  I'm going to the heart of damages, not referring

25   to – laches is where I'm asking, where I'd be asking the

1
2    court to find no liability based on the passage of time.

3    And I understand that (indiscernible) case Your Honor does

4    as well, and I'm not suggesting that laches, that this

5    evidence is being sought to promote a defense of laches.

6              But part of the showing that I suspect is gonna be

7    made in a case for copyright infringement is that what was

8    done here was so repugnant, so egregious, so heinous in a

9    relative sense, and we need to counteract that.  It goes to

10   some of our equitable defenses to be sure, but it also goes

11   to the issue of willfulness, it goes to the issue of damages

12   associated with it, and specifically the documents and

13   information and evidence that we're seeking in connection

14   with these categories would permit us to say, would

15   basically go to the fact that there were representatives of

16   the plaintiff, if not the plaintiffs themselves, that

17   visited the websites which feature these allegedly

18   infringing compositions that are embedded in the recordings

19   that folks could either download or stream and time went on

20   and did nothing with regard to that until they finally

21   decided to bring a case that brings us all here today.

22             THE COURT:  All right.

23             MR. ELKIN:  That is what we're seeking.

24             THE COURT:  Mr. Dickstein tells me in his

25   November 23 letter, and I quote, "Plaintiffs agreed to and

91

have searched their electronic records for any non-

privileged documents or communications that reference any of

defendants or their websites.  The search yielded thousands

of responsive non-privileged documents, the vast majority of

which plaintiffs produced this past July, almost four months

ago."  Is he wrong?

MR. ELKIN:  So my understanding is that they made

a representation with respect to their search terms, but

their representation seems to be, seems to contradict their

written response they would not actually produce documents.

If they sit here, if they stand up and they make a

representation that they have withdrawn that objection and

that they actually did conduct a diligent search and there

are no documents, then I would remove this for the Court's

consideration.

THE COURT:  Well, no, this is not just them

standing up here and making an oral representation.  This is

in Mr. Dickstein's November 23 letter.  It's filed as docket

item 53.  I'm looking at page 6 of that letter.

MR. ELKIN:  Hold on one second, Your Honor.

THE COURT:  Sure.

MR. ELKIN:  I'll just get on the same page.

THE COURT:  Sure.

MR. ELKIN:  (inaudible) I apologize.

92

1
2          THE COURT:   November 23, page 6.

3          MR. ELKIN:   Item C?

4          THE COURT:   Yes.

5          (pause in proceeding)

6          MR. ELKIN:   So I guess the point here, the

7   question that remains from our point of view, Your Honor, I

8   appreciate the diligence (inaudible) sort of digest what was

9   presented and I had read it before, but --

10          THE COURT:   It's a lot of material to cover.

11          MR. ELKIN:   Is that they seem to have represented

12   that they've actually searched for these documents.   They

13   don't represent that they have agreed to turn over any

14   documents that have been yielded from that search.

15          THE COURT:   No, they said they've already

16   produced them is their representation.

17          MR. ELKIN:   But we're taking this I gather as a

18   representation that they produced everything they have.

19          THE COURT:   Well, they produced the non-

20   privilege.

21          MR. ELKIN:   That's non-privileged.

22          THE COURT:   I think the language here is pretty

23   plain.

24          MR. ELKIN:   Okay.

25          THE COURT:   The plaintiffs state, quote,

93

1

2   "Plaintiffs agree to and have searched their electronic

3   records for any non-privileged documents or communications

4   that reference any of defendants or their websites.  The

5   search yielded thousands of responsive non-privileged

6   documents, the vast majority of which plaintiffs produced

7   this past July, almost four months ago."  Now I guess

8   there's some wiggle in the representation, the vast majority

9   of which, I guess that suggests maybe there are some that

10  have not yet been produced.

11          MR. DICKSTEIN:  I can clarify that, Your Honor.

12  That was just meant to refer to the fact that there had been

13  some small supplemental productions in July and some of them

14  were privileged.  So they would've been listed in our log.

15          THE COURT:  Okay.  So everything that referenced,

16  every non-privileged document that referenced defendants or

17  their websites has now been produced?

18          MR. DICKSTEIN:  Correct.

19          THE COURT:  Mr. Elkin.

20          MR. ELKIN:  Okay, then we accept counsel's

21  representation.

22          THE COURT:  Okay.  All right.  It sounds like the

23  issues that plaintiffs may have with defendants' production

24  still need to be the subject of a meet and confer.

25          MR. DICKSTEIN:  That might be right, Your Honor.

94

1

2 We've been getting productions as recently as late last

3 night, which may contain some material, although I don't

4 think all of it.

5           THE COURT:   Well, if you just got it last night,

6 you have to look at it before you know, you gotta look at it

7 and then have the conversation with --

8           MR. DICKSTEIN:   Well, actually, Your Honor, I did

9 look through it this morning, and there do appear to be a

10 few categories that are still outstanding.

11          THE COURT:   Maybe the documents don't exist.   I

12 think you need - have you had the meet and confer with

13 defendants' counsel?

14          MR. DICKSTEIN:   Not since we've gotten the most

15 recent batch, but I don't think they actually address the

16 issues.

17          THE COURT:   All right.   Well, I'm not sure that

18 issue is ripe for today.

19          MR. ELKIN:   Your Honor, may I put one more thing

20 on Your Honor's docket for a request.

21          THE COURT:   Yeah, go ahead.   Go ahead.

22          MR. ELKIN:   We had made a request in the

23 circumstances where we still have ongoing discovery, and I

24 think there's still more documents that we are producing I

25 would say.   We had depositions that haven't yet been

1

2  scheduled.  We will meet and confer with regard to that, and

3  we have this other issue now with regard to identifying the

4  sample of depositions constrained by Your Honor's order.  We

5  would respectfully request an extension of fact witnesses

6  through February 28, 2017.

7         THE COURT:  Is there any objection to that?

8         MR. SLOTNICK:  No, Your Honor, we think that

9  makes sense.  So we're not all trying to take people's

10  depositions on Christmas Eve.

11         MR. DICKSTEIN:  Judge, I would also add, if you

12  don't mind, we had put a request in that if that date for

13  fact depositions are gonna be extended, we also extend the

14  other dates.  There may be some impact on expert discovery

15  or requests that are made, what not.

16         THE COURT:  I'm gonna grant the extension of fact

17  discovery to February 28.  Can counsel submit a proposed

18  order that provides for a commensurate extension with

19  respect to the other operative dates?

20         MR. DICKSTEIN:  We'll work with defense counsel

21  and submit that.

22         THE COURT:  Okay.  All right, that shouldn't be a

23  matter of disagreement.  Do you want to schedule a date now

24  to discuss issues you may have with defendants' document

25  production?

1

2          MR. DICKSTEIN:   I think that's a good idea, Your

3    Honor.

4          THE COURT:   How much time do you need – are you

5    still producing documents, Mr. Elkin?

6          MR. ELKIN:   Yes, the answer is that I thought we

7    were not, but based on things that came to our attention

8    late last night, the answer is yes.

9          THE COURT:   When are you going to complete your

10   production?

11         MR. ELKIN:   I turn to Miss Ranahan.  She's got a

12   frontline response for us.

13         MS. RANAHAN:   We had hoped to produce all this

14   week (inaudible).

15         THE COURT:   Well, I'm thinking about, I'm trying

16   to get the terminal date for your production and then give

17   you time to have a meet and confer, and then we schedule

18   another discussion to discuss plaintiff's issues with your

19   production.  So when do you think you're gonna be done?

20         MS. RANAHAN:   We can be done by this month.

21         THE COURT:   December 31?

22         MS. RANAHAN:   Yes.

23         MR. DICKSTEIN:   And, Judge, I understand, you

24   know, counsel is pulling together document on an ongoing

25   basis.  My only concern with that is how that might affect

97

1   depositions, although even if we're gonna go into February,

2   if we get stuff end of this month and then we have to meet

3   and confer about what might be missing, come before Your

4   Honor, and then --

5          THE COURT:   Yeah.

6          MR. SLOTNICK:   Your Honor, perhaps I can offer a

7   solution.

8          THE COURT:   Go ahead.

9          MR. SLOTNICK:   Or at least something that may

10  work.  I think whenever we have the next session with Your

11  Honor it should cover not only whatever document issues

12  there are, but by then presumably we will be able to meet

13  and confer with defense counsel about these two depositions

14  and who they are and see if we can try to figure out when

15  then may be, and then perhaps the February 28 date may be a

16  little bit more fluid than we're prepared to acknowledge at

17  the moment.

18         THE COURT:   Well, give me one second.  We can

19  probably squeeze something in either the week of the 19th

20  and I think I've got one day the following week, and then

21  I've got criminal duty the first week in January which

22  really makes it impossible to do anything in the first week

23  in January.  I think I've got Wednesday – what does

24  Wednesday the following week look like?  I think I've got

97

1   depositions, although even if we're gonna go into February,

2   if we get stuff end of this month and then we have to meet

3   and confer about what might be missing, come before Your

4   Honor, and then --

5   Honor, and then --

6          THE COURT:   Yeah.

7          MR. SLOTNICK:   Your Honor, perhaps I can offer a

8   solution.

9          THE COURT:   Go ahead.

10         MR. SLOTNICK:   Or at least something that may

11  work.  I think whenever we have the next session with Your

12  Honor it should cover not only whatever document issues

13  there are, but by then presumably we will be able to meet

14  and confer with defense counsel about these two depositions

15  and who they are and see if we can try to figure out when

16  then may be, and then perhaps the February 28 date may be a

17  little bit more fluid than we're prepared to acknowledge at

18  the moment.

19         THE COURT:   Well, give me one second.  We can

20  probably squeeze something in either the week of the 19th

21  and I think I've got one day the following week, and then

22  I've got criminal duty the first week in January which

23  really makes it impossible to do anything in the first week

24  in January.  I think I've got Wednesday – what does

25  Wednesday the following week look like?  I think I've got

98

something on that day?

THE CLERK:    (inaudible)

THE COURT:    No, no, no, Wednesday, the week between Christmas and New Year's.

MR. SLOTNICK:    Your Honor, my preference would be the week of the 19th.

THE COURT:    Yeah, what does the preceding week look like?  No, the preceding.  Do you want to do the 20th in the afternoon?

MR. SLOTNICK:    It'll work for me.

MR. ELKIN:    I don't have my calendar.  It's with my phone downstairs, but if I can't be here, I'll make sure someone is.

THE COURT:    All right.  We'll say 12/20 at 2:30. All right?  You know, maybe, you know, you can discuss document issues before then.  It would certainly be helpful. Maybe the defendants are just gonna have a few dribs and drabs that're still gonna be outstanding.  If 90 percent of the production is complete on or before the 20th, maybe you can start having a meet and confer before that.  Because after the 20th I'm really out of pocket until the second week in January.  And if you can get me a letter, get me letters hopefully two days before, that'd be wonderful. Okay?  All right.

99

1

2          MR. ELKIN:   Thank you for your time, Your Honor.

3          THE COURT:   My pleasure.   Anything else --

4          MR. SLOTNICK:   Thank you, Your Honor.

5          THE COURT:   Anything else from plaintiffs?

6          MR. DICKSTEIN:   I'm sorry?

7          THE COURT:   Anything else from plaintiffs?

8          MR. DICKSTEIN:   I don't believe so.

9          THE COURT:   Okay, anything else from defendants?

10         MR. ELKIN:   No, Your Honor, thank you very much.

11         THE COURT:   Okay, thank you all.

12              (Whereupon the matter is convened to Tuesday,

13         December 20, 2016 at 2:30 p.m.)

14

15

16

17

18

19

20

21

22

23

24

25

100

C E R T I F I C A T E

          I, Carole Ludwig, certify that the foregoing

transcript of proceedings in the United States District

Court, Southern District of New York, ABKCO MUSIC, et al. v.

SAGAN, et al., 15cv4025, was prepared using digital

electronic transcription equipment and is a true and

accurate record of the proceedings.

Signature_____

Date:  December 11, 2016