```
 1                    UNITED STATES DISTRICT COURT
                      SOUTHERN DISTRICT OF NEW YORK
 2

 3   ------------------------------------X
                                        :
 4   ABKCO MUSIC, INC., et al.,         :  15-CV-04025 (ER)
                                        :
 5                      Plaintiffs,     :
                  v.                    :
 6                                      :  500 Pearl Street
     SAGAN, et al.,                     :  New York, New York
 7                                      :
                      Defendants.       :  December 20, 2016
 8   ------------------------------------X

 9            TRANSCRIPT OF CIVIL CAUSE FOR HEARING
              BEFORE THE HONORABLE HENRY B. PITMAN
10                 UNITED STATES MAGISTRATE JUDGE

11   APPEARANCES:

12
     For the Plaintiffs:        BARRY I. SLOTNICK, ESQ.
13                              TAL DICKSTEIN, ESQ.
                                Loeb & Loeb LLP
14                              345 Park Avenue
                                New York, New Jersey 10154
15

16   For the Defendants:        MICHAEL S. ELKIN, ESQ.
                                ERIN R. RANAHAN, ESQ.
17                              Winston & Strawn LLP
                                200 Park Avenue
18                              New York, New York 10166

19

20

21   Court Transcriber:         SHARI RIEMER, CET-805
                                TypeWrite Word Processing Service
22                              211 N. Milton Road
                                Saratoga Springs, New York 12866
23

24

25


     Proceedings recorded by electronic sound recording,
     transcript produced by transcription service.
```

2

1   **[Microphones were not working properly.]**

2           THE CLERK:  ABKCO Music v. Sagan.

3           THE COURT:  Thanks.

4           THE CLERK:  Counsel, please state your name for the

5   record.

6           MR. SLOTNICK:  Barry Slotnick and Tal Dickstein for

7   the plaintiffs.

8           THE COURT:  Okay.

9           MR. ELKIN:  Michael Elkin and Erin Ranahan from

10  Winston & Strawn, counsel for defendants.  Good afternoon,

11  Your Honor.

12          THE COURT:  All right.  Good afternoon.  This is a

13  follow up to the discovery conference that we had about two

14  weeks ago or so.  In that regard I received a letter, I think

15  it went up on the ECF.  It was filed yesterday by

16  Mr. Slotnick, a letter dated December 19, 2016.  It's Docket

17  Item 59.  I have not received anything from defendant.  I'm

18  not suggesting anything is necessary.  I just mention that in

19  case you have filed something, I haven't seen it.

20          MS. RANAHAN:  We did, Your Honor.  We filed a letter

21  this morning.  I'm not sure why --

22          THE COURT:  Yeah, do you have a copy of it, please?

23  Thank you.  Just give me one second to take a look at this.

24                  [Pause in proceedings.]

25          THE COURT:  Sorry.

3

1           [Pause in proceedings.]

2           THE COURT:  Mr. Skolnick, when did you get -- I'm

3 sorry, Mr. Slotnick, I apologize -- Mr. Slotnick, when did you

4 get the Winston Strawn letter?

5           MR. SLOTNICK:  This morning.

6           THE COURT:  Okay.  All right.  I mean, I think the

7 motion -- to the extent there's an application for

8 reconsideration, I think I'm going to table that because I

9 really haven't had the time to study the material that's in

10 here.  I've read Mr. Slotnick's letter this morning.  So the

11 material that's responsive to that, I can understand better

12 than the new issue that Winston Strawn raised.

13           Let's turn to the deposition issue first.  Let me

14 start with defendants' counsel.  What evidence does [sic]

15 defendants have that the oral licenses were in fact provided

16 to defendants' predecessor in interest?

17           MS. RANAHAN:  Well, Your Honor, I think that's why

18 we want the depositions.  We --

19           THE COURT:  Well, no -- but I mean you did -- your

20 client did due diligence before it bought the archives, and

21 presumably had some basis to believe it had the rights that

22 it's now claiming to have?

23           MS. RANAHAN:  Right.  And there are -- there are

24 some that it knows -- and I know Mr. Elkin was talking about

25 this last time in prior cases, and the [inaudible] of an

4

1  artists that aren't at issue here.  But based on the facts as

2  developed, what was happening during that time, Bill Graham

3  was openly and notoriously taping these concerts and was

4  getting -- in some instances at least -- some oral approval

5  from the recording artists [inaudible] --

6          THE COURT:  Well, is there any -- is there any

7  evidence in your possession right now that Keith Richards gave

8  the oral license that your client believes was given?

9          MS. RANAHAN:  We don't have written evidence of

10  that, no.

11          THE COURT:  No, but I mean is there a memo to the

12  file somewhere that, you know, that this grant of permission

13  did in fact take place?  I mean did somebody -- in other

14  words, what -- let me put it more directly.  What reason does

15  your client have to believe that its predecessor in interest

16  did in fact get the rights that you believe your predecessor

17  had?

18          MS. RANAHAN:  Sure.  The predecessor in interest,

19  Bill Graham, in particular had a really close relationship

20  with a lot of these artists.  He was actually the manager of

21  some artists that he had concerts for.  And he was so closely

22  involved in the show that he would announce the performers and

23  he would be really involved in the recording of it.  So he was

24  the type of concert promoter that was close to the artists.

25  So to the extent he was having discussions with these artists,

5

1   it's our understanding that there's a real possibility that

2   these recordings were created with his consent and knowledge.

3   　　　　　　　THE COURT:  Well, is there -- Bill Graham has been

4   dead for quite some time.  Is there any -- is there any

5   evidence that Keith Richards specifically gave Bill Graham the

6   permission that you think he gave him?  I mean, is it just a

7   question -- is it just -- is there any specific evidence?  I

8   mean, did he keep any kind of logbook?  Is there some notation

9   somewhere?  Did he tell somebody contemporaneously, geez, we

10  just got this great license from Keith Richards?  I mean --

11  　　　　　　　MS. RANAHAN:  Sure.

12  　　　　　　　THE COURT:  -- is there any reason to -- any

13  specific reason to believe that Keith Richards gave the

14  license that your predecessor claims it had?

15  　　　　　　　MS. RANAHAN:  There's absolutely at least a

16  potential for that.  It's hard [inaudible] --

17  　　　　　　　THE COURT:  Well, there's a potential for anything,

18  I mean --

19  　　　　　　　MS. RANAHAN:  Right.

20  　　　　　　　THE COURT:  I'm not trying to be sarcastic --

21  　　　　　　　MS. RANAHAN:  Right.

22  　　　　　　　THE COURT:  -- but --

23  　　　　　　　MS. RANAHAN:  Right.

24  　　　　　　　THE COURT:  -- you know, there's a potential --

25  　　　　　　　MS. RANAHAN:  Well, Your Honor, as far as Keith

6

1    Richards --

2              THE COURT:  -- for the Chicago Cubs.

3              MS. RANAHAN:  -- as far as Keith Richards, based on

4    the history I mean it's our position at this point that

5    plaintiffs wouldn't necessarily be in a position to help us

6    cooperate with Keith Richards.  We're no longer seeking this

7    Court's permission to take more than ten depositions.

8              So what we're going to do, because Keith Richards

9    does have a very tense history with plaintiffs, we're just

10   going to go the normal subpoena route I believe and not go

11   through plaintiffs, or seek their cooperation, or seek to go

12   beyond the ten.  If we can get him, we can get him.  And it

13   will just be one of our ten.  So I think that's where we're at

14   as far as Keith Richards goes.  [Inaudible] plaintiffs would

15   have any control over him anyway.

16             Mr. Townsend, on the other hand, he is someone who

17   is not located in the United States.  The issue came up --

18   well, as far as Keith Richards, we would like Your Honor to

19   require -- and I know so far plaintiffs have said they'd look

20   into whether there were these agreements, these settlement

21   agreements between --

22             THE COURT:  Let me just stop you for one second.  So

23   you're no longer seeking leave to take more than ten

24   depositions; is that correct?

25             MS. RANAHAN:  At this point, we're not, Your Honor.

7

1          THE COURT:  Okay.

2          MS. RANAHAN:  If something else changes, we'll come

3   back and --

4          THE COURT:  Fine.

5          MS. RANAHAN:  -- but at this point, no.

6          THE COURT:  Okay.

7          MS. RANAHAN:  We're going to try to just fit them

8   all into the ten.

9          THE COURT:  Okay.

10          MS. RANAHAN:  If that means subpoenaing Keith

11   Richards as one of those ten, we'll do that without

12   plaintiffs' --

13          THE COURT:  Okay.

14          MS. RANAHAN:  -- cooperation.

15          THE COURT:  All right.  So right now you're not

16   seeking any relief from me with respect to Keith Richards?

17          MS. RANAHAN:  Correct.

18          THE COURT:  Okay.  Let's talk about Peter Townsend

19   then.  Let me ask the same question about Peter Townsend.

20          MS. RANAHAN:  Your Honor, I'm sorry.  We would like

21   just those documents.  So what we are requesting as part of

22   the Keith Richards investigation is they -- what seems to be

23   some missing publishing rights documents and settlement

24   documents between plaintiffs and Keith Richards [inaudible]

25   these are about songs at issue in this case, and that's the

8

1  Brown Sugar song.

2          From, you know, the third party sources that we've

3  gathered, it does appear that there's at least a real question

4  about whether Keith Richards maintained those publishing

5  rights.  Once we have those documents, it may be that we don't

6  even want to proceed with Mr. Richards.  But at this point, it

7  looks like there is a good chance.

8          So we would request that plaintiffs with respect to

9  Keith Richards and Mick Jagger be provided -- or be required

10 to provide the settlement agreements that took place between

11 plaintiff ABKCO and Keith Richards and Mick Jagger to the

12 extent they cover songs in this action, and we believe Brown

13 Sugar is one of them.

14         THE COURT:  All right.  Have those documents been

15 requested or is it your position they're part of the 26(a)(1)

16 disclosures or something else?

17         MS. RANAHAN:  They've been requested as far as the

18 ownership chain of title documents.  And plaintiffs have -- we

19 just talked about it in fairness for the first time on

20 Saturday.  And they said they'd look into it.  So we just

21 haven't heard back from them.

22         THE COURT:  All right.  Well, let me come to

23 plaintiffs then.

24         With respect -- and I appreciate what I've just been

25 told, the issue was just raised four days ago -- with respect

9

1  to Keith Richards, I guess the issue now is just documents,

2  they're not seeking any relief right now with respect to

3  deposing Mr. Richards.  Does the plaintiff yet have a position

4  with respect to the documents they're requesting concerning

5  Brown Sugar?

6  　　　　　MR. SLOTNICK:  I do, Your Honor.  ABKCO is closed

7  for the holidays starting I guess Monday.  But I was able to

8  speak with ABKCO's --

9  　　　　　THE COURT:  You can remain seated --

10  　　　　　MR. SLOTNICK:  Thank you, Your Honor.

11  　　　　　THE COURT:  -- everybody's more comfortable.

12  　　　　　MR. SLOTNICK:  ABKCO's outside transactional lawyer

13  -- who actually apparently was in the room when at least one

14  of these documents was signed back in the '70s, before I

15  became a lawyer -- the reason the documents were not produced

16  initially, from what I understand, is that they confirmed the

17  ownership of the works in issue and therefore it's not a chain

18  of title document.

19  　　　　　It is, yes -- and ABKCO still owns the rights.  And

20  I believe that, you know -- but I haven't seen the entire

21  documents. I've been told about the documents.  Obviously for

22  a variety of reasons, those documents have, you know, have

23  been and would be confidential.

24  　　　　　We believe that at least part of one of the

25  documents, maybe both of the documents, have to do with

1   recording rights.  And to the extent that the Court would

2   require us to produce anything, we would like to redact

3   anything that has to do with recording rights that have

4   nothing to do with music publishing.  But from what I've been

5   told, that it is crystal clear that the rights to all of the

6   songs in issue, including Brown Sugar, you know, is set forth

7   in those documents.

8           THE COURT:  Well, what I'm understanding you to say,

9   and maybe it's a misunderstanding, you're willing to produce

10  it -- you're willing to produce the documents redacting the

11  information regarding recording rights?  Is that what I'm --

12  is that what you're saying?

13          MR. SLOTNICK:  Yeah.  We produced all of the chain

14  of title documents.  This is merely confirming that the chain

15  of title remains unbroken.

16          THE COURT:  All right.  So --

17          MR. SLOTNICK:  We would be willing to produce those.

18  I have yet to receive those documents, Your Honor.  And, you

19  know, I think that we won't be able to receive anything until

20  after the holidays when ABKCO comes back to work.

21          THE COURT:  All right.  Can you do that by the

22  Monday -- well, hold on one second.

23          MR. SLOTNICK:  The 9th?

24          THE COURT:  The 9th?

25          MR. SLOTNICK:  We can try.  I mean if there's a

1  problem with that, we'll let --

2          THE COURT:  Okay.

3          MR. SLOTNICK:  -- you know.

4          THE COURT:  All right.

5          MR. SLOTNICK:  And we'll let defense counsel know as

6  well --

7          THE COURT:  All right.  Great.  All right.

8          MR. ELKIN:  Your Honor --

9          MR. SLOTNICK:  Presumably, if the documents say what

10  we believe they say, then we would submit that there's no

11  reason to take Mr. Richards' deposition.

12          THE COURT:  Well, until they serve a subpoena on

13  Mr. Richards, I'm not sure there's any issue.  I mean you

14  don't -- do you represent Mr. Richards?

15          MR. SLOTNICK:  No.

16          THE COURT:  Yeah.  Well, until they serve a

17  subpoena, I'm not sure there's any issue there.

18          All right.  We're going to hear from defendants on

19  Peter Townsend.

20          MS. RANAHAN:  Thank you, Your Honor.  So we

21  understand Mr. Townsend is in fact a foreign resident.

22  Mr. Townsend became significant when we realized his --

23          THE COURT:  What's the date -- I'm sorry to

24  interrupt you -- what's the date of the most recent

25  performance by The Who that's at -- you're talking about -- I

12

1   take it the performances are all performances of The Who, not

2   Townsend individually?

3           MS. RANAHAN:  Right, they are --

4           THE COURT:  Okay.  And what's the most recent

5   performance by The Who that's in issue?

6           MS. RANAHAN:  Do you happen to know that?  I believe

7   that's not [inaudible] issue today?

8           MR. SLOTNICK:  Well, I say '82.  Something in -- The

9   Who in '82.  Mr. Townsend in '93.

10          THE COURT:  They've had several farewell tours.

11          MR. SLOTNICK:  And will keep doing it.

12          MS. RANAHAN:  So, Mr. Townsend, he became

13  significant once we realized how --

14          THE COURT:  But let me come back to my question.

15  I'm trying to find out what the -- I'm trying to determine --

16          MS. RANAHAN:  Okay.

17          THE COURT:  -- what the most recent performance in

18  issue is.  I looked through the chart.  I saw some in the

19  '80s.  I don't recall seeing anything --

20          MR. SLOTNICK:  The Who shows were in the '80s --

21          THE COURT:  I see '80 -- [inaudible] I'm looking.

22  I'm going backwards [inaudible] -- I see '82 --

23          MR. DICKSTEIN:  I see some in 1995, Your Honor.

24          MR. SLOTNICK:  There's a Pete Townsend -- there's a

25  Pete Townsend in 1993, I see.

13

1          THE COURT:  All right.  Now, you saw one from '95?

2          MR. DICKSTEIN:  Yeah --

3          THE COURT:  Okay.

4          MR. DICKSTEIN:  -- in the exhibit to the complaint.

5          THE COURT:  All right.  So 20 years ago.  Well, go

6   ahead.

7          MS. RANAHAN:  Thank you.  So with respect to

8   Mr. Townsend, while he is from another -- he is a foreign

9   resident, he has such a major stake in that there's 70 songs,

10  potentially up to $10 million, that we proposed that as our

11  first two -- one of the first two options to plaintiffs to see

12  if perhaps we could get around the hang, if plaintiffs were,

13  you know, representing him or had a connection with him given

14  how huge his stake is, whether they agree to produce him.

15          In doing that, we also noticed that there's no

16  copyright registration for him at all, which basically

17  eliminates the possibility of seeking sanctions [inaudible].

18  So his stake of actual damages is significant, $10 million.

19  If plaintiffs say he's not willing to come here without the

20  hangups, that's, you know -- then we'll move on.

21          There's another eight that we propose.  And we've

22  basically gone back on one round as far as trying to agree to,

23  you know, one or two.  And again at this point, Your Honor,

24  we're not seeking leave to take additional ones.  So I don't

25  know that it's necessary for you to spend much time on this

1    issue.  We're going to try to fit our depositions into the ten

2    that we're allowed for now, and we'll come back if we need any

3    further relief.  But for this [inaudible] --

4              THE COURT:  Let me come back to the question I was

5    asking before about Mr. Richards.  Is there any affirmative

6    evidence that either your client or your clients' predecessor

7    in interest has that Peter Townsend did in fact confer the

8    rights on your predecessor that your predecessor says it had?

9              MS. RANAHAN:  Again, Your Honor, [inaudible] --

10             THE COURT:  I mean is there someone who says, yeah,

11   I remember on such and such a date, before such and such a

12   show, Peter Townsend said XYZ?

13             MS. RANAHAN:  No, we don't know that, Your Honor.

14             THE COURT:  I mean, what's the reason to believe

15   that this grant of rights then occurred?  I mean --

16             MS. RANAHAN:  Well, I think [inaudible] --

17             THE COURT:  -- beyond the mere possibility which,

18   you know, anything is possible --

19             MS. RANAHAN:  Right.

20             THE COURT:  -- but what's the reason to believe that

21   this grant of rights occurred?

22             MR. ELKIN:  It is based on the experience in other

23   cases, and granted on other songs and other artists.  But just

24   the songs [inaudible] —

25             THE COURT:  I mean, is there experience in other

15

1  cases regarding Pete Townsend?

2       MS. RANAHAN:  No.  But we presume here --

3       THE COURT:  Let's assume even -- let's assume even

4  that artist X conferred the rights on your predecessor that

5  your predecessor claims, you know, artist X has no connection

6  with Pete Townsend.  What's the reason to believe that Pete

7  Townsend did the same thing?

8       MS. RANAHAN:  Well, just again, Your Honor, the way

9  that Bill Graham was very close to the artist who performed in

10 the show [inaudible].  Again, I'm not seeking any, at this

11 point, additional beyond the ten.  So if plaintiffs don't want

12 to cooperate, at this point we just want the plaintiffs to

13 produce any -- I guess they don't have any registrations, but

14 they said they'd look into it.

15      So we really determined the two documents production

16 issues our first two options.  And we provided the other

17 confidential list of the other eight, and then who [inaudible]

18 it, or you know --

19      THE COURT:  Well, let me -- I mean, what relief are

20 you seeking with respect to Pete Townsend?

21      MS. RANAHAN:  At this point, we're willing to just

22 try to work within the ten.  We would just like that for the

23 two -- plaintiffs continue to meet and confer with us about

24 whether they can make available two including, you know, the

25 eight we've provided information for that might own the

16

1    publishing rights, which is consistent with your last order so

2    that if there are one or two more then we would like to take

3    plaintiffs', you know -- cooperate as far as providing us

4    their contact information and making them available.

5            THE COURT:  Well, I'm still a little confused.

6    What, if anything -- let's assume that you convince me that

7    you should get whatever relief it is that you're seeking here

8    -- what does the order after today's conference say with

9    respect to Pete Townsend?  What do you want me to do with

10   respect to Pete Townsend?  Maybe you don't want me to do

11   anything with respect to him.  I'm not sure what you're

12   seeking here.

13           MR. ELKIN:  Your Honor, if I may?  I --

14           THE COURT:  Yeah.

15           MR. ELKIN:  -- I apologize.  I was going to try to

16   restrain myself.  The circumstance is Ms. Ranahan has -- I

17   handled virtually all of the work with regard to the meeting

18   and conferring, and preparing the correspondence.

19           This does not go directly to your question, but I

20   would be remiss unless I mentioned it.  Part of what we also

21   want to get out of the songwriters in the depositions is to

22   get them to admit and confront them with the fact that these

23   recordings that the plaintiffs claim constitutes a copyright

24   infringement has been openly and notoriously published for

25   many, many years, that they were aware of it, and they never

1    once complained.

2          We can argue about the legal effect of it, and that

3    doesn't go directly to the issue that Your Honor addressed in

4    terms of what happened, but I just would -- I didn't want

5    gloss over that point.  That has legal significance for us in

6    terms of what we want to argue, but it doesn't go directly to

7    the issue that you addressed to us.

8          THE COURT:  Okay.  Well, let me come back to the

9    issue that I addressed.  I'm just not sure what it is you're

10   seeking with respect to Pete Townsend.  I mean with respect to

11   Keith Richards, it's been reduced to a document request at

12   this point.  I understand that.  I'm not sure what you want me

13   to do with respect to Pete Townsend, if you want me to do

14   anything?

15         MS. RANAHAN:  Right.  No, Your Honor.  I think what

16   we're trying to do here is just let you know that we are

17   underway and attempting to come up with the two.  Plaintiffs

18   have rejected, you know, every one of them.  We're still

19   trying.

20         If Pete Townsend isn't one of the two, he's not one

21   of the two, I mean we've now come to this other issue with

22   Pete Townsend, which is there's no registration.  So if it's

23   not Pete Townsend it's not Pete Townsend.  We would just like

24   to get to continue our efforts to meet and confer in coming up

25   with, you know --

1      THE COURT:  Okay.

2      MS. RANAHAN:  -- [inaudible] more.  But it's not --

3  and we don't need you to order anything --

4      THE COURT:  Okay.

5      MS. RANAHAN:  -- because we're not seeking the extra

6  depositions, which was the whole original premise upon which

7  we came [inaudible] --

8      THE COURT:  Right.  All right.  So what I'm

9  understanding you to say -- and again I'm not trying to put

10 words in anybody's mouth, and please correct me if I'm wrong

11 -- what I'm understanding you to say, is you're not seeking

12 any relief right now with respect to the depositions of the

13 recording artists that were the subject of our conference

14 about two weeks ago; am I correct?

15     MS. RANAHAN:  Yes.

16     THE COURT:  Okay.  So I don't think there's anything

17 for you to respond to right now then on that.

18     MR. SLOTNICK:  Your Honor, the only thing I would

19 respond to has to do with the registrations.  And first of

20 all, I apologize.  I thought registrations had been produced.

21 When Ms. Ranahan mentioned that there were none --

22     THE COURT:  These were for Pete of The Who --

23     MR. SLOTNICK:  Pete Townsend.

24     THE COURT:  Yeah.

25     MR. SLOTNICK:  You know, we looked through the file

1    and she's correct.  They were not produced.  It doesn't mean

2    that there are none.  What we were able to do yesterday, just

3    by going through the copyright office online search is we've

4    identified -- I think there's about 70 pages worth of

5    registrations.  We are ordering the registrations.

6              So as soon as we have those, which should be

7    sometime in the middle of next month, we will produce those as

8    well.  I can proffer a copy of this which doesn't just limit

9    it to the Pete Townsend songs in issue, but these were

10   publically available.  It's not all of them.  It is the vast

11   majority of them.

12             The copyright office maintains an online registry,

13   if you will, only going back as far as 1978.  So anything that

14   would have been registered before that, which would have been

15   a certain number of The Who, Pete Townsend compositions, might

16   not find its way on here.  But I believe that there's over 50

17   of the 70 contained in this, and, you know, I'll provide this

18   to Ms. Ranahan and Mr. Elkin --

19             THE COURT:  Okay.

20             MR. SLOTNICK:  -- at the end of the -- at the end of

21   the conference.

22             THE COURT:  Okay.  All right.  All right.  I think

23   that takes us then to Roman numeral II on Page 2 of

24   Mr. Slotnick's letter which are the documents concerning the

25   Graham-Sult Clainos -- Graham-Sult v. Clainos.  I read the

20

1   letter from Ms. Ranahan just a few moments ago.

2           Did I understand your letter to say that you

3   reviewed all the documents from that litigation?

4           MS. RANAHAN:  I was very involved in that litigation

5   as far as defending.  I was there for almost every deposition

6   and if I wasn't there, I read the transcript in connection

7   with summary judgment.  So, I'm very --

8           THE COURT:  But that was some years ago?

9           MS. RANAHAN:  No, it's ongoing.  We just recently

10  won summary judgment.  It went on from 2009 until the present.

11  And we just within the last year -- it's now up on the Ninth

12  Circuit Court appeal.  Just a few months ago, we won a fees

13  award, we won summary judgment, and it's here.  So I'm very

14  familiar with the case.  I can tell you anything about it that

15  you ask me, but it has nothing to do with recording.

16          THE COURT:  Well, I mean, the statement that your

17  adversary cite in the Clainos declaration seems to be relevant

18  to this litigation.

19          "While Graham was alive, BGE did not generally

20      financially exploit the archives primarily due to

21      concerns regarding artists' rights, e.g., if a

22      concert was recorded, a question arises whether the

23      companies can exploit that recording financially

24      without the artists' consent."

25          MS. RANAHAN:  Right.

1          THE COURT:  "The companies financially exploited the

2     archives only with the artists' consent on a limited basis."

3          MS. RANAHAN:  So, that --

4          THE COURT:  That seems to support --

5          MS. RANAHAN:  Well, this, as a question arises, if

6     it can be without their consent.  It's not talking about any

7     recording.  [Inaudible] --

8          THE COURT:  No, it's not dispositive.  But I think

9     it --

10          MS. RANAHAN:  [Inaudible] --

11          THE COURT:  -- weighs more in their favor than your

12     favor.

13          MS. RANAHAN:  Okay.  I mean, I'm just telling you

14     that the -- there's nothing to do with the recording.

15     Plaintiffs' claims have nothing to do with recording.  It's

16     about certain items in the archives and it's a trademark.

17     It's poster copyrights.  It's --

18          THE COURT:  No, I understand all that, but if --

19          MS. RANAHAN:  Right.

20          THE COURT:  -- in the course of that -- I understand

21     what you're saying that the thrust of that litigation didn't

22     deal with the issues that are front and center in this

23     litigation.  I understand --

24          MS. RANAHAN:  Right [inaudible] --

25          THE COURT:  -- I understand that.  But nevertheless,

22

1   even if the issues in the case were different, if somebody

2   with firsthand knowledge or claiming firsthand knowledge makes

3   a statement concerning a transfer or the transfer or

4   non-transfer, the issue of whether or not the Bill Graham

5   archive had the rights, isn't that relevant here?

6           MS. RANAHAN:  Well for this statement, absolutely.

7   They can use that --

8           THE COURT:  Yeah.

9           MS. RANAHAN:  -- statement from the declaration.

10  They're taking Mr. Clainos's deposition.  They've already

11  noticed --

12          THE COURT:  Yeah.

13          MS. RANAHAN:  -- his deposition.  What they're

14  asking for though is for every underlying deposition

15  transcript, everything that has to do with that case.  And

16  that case was not going to these issues at all is what

17  [inaudible] -- Mr. Clainos --

18          THE COURT:  Are they subject to a -- are the

19  documents -- are the materials subject to a protective order?

20          MS. RANAHAN:  Yes.

21          THE COURT:  Everything is subject to a protective

22  order?

23          MS. RANAHAN:  Yes.  Every deposition is.

24          THE COURT:  How many depositions were there in that

25  case?

1          MS. RANAHAN:  Over ten.  I want to say there were

2   maybe 15.

3          THE COURT:  I mean not counting --

4          MS. RANAHAN:  I can literally tell you what every

5   one of them said though, and it wasn't about recording.  This

6   was a -- I mean, this was a public declaration that they had,

7   and I didn't ask about.  But look at the -- if you look at the

8   bulk of this declaration, it's very lengthy and --

9          THE COURT:  Yeah.

10         MS. RANAHAN:  -- and every other pleading -- they

11  can look at years of dockets for this case, and see the

12  recordings were just not at issue.  There's no -- nothing to

13  do with recordings.  Their archives did contain the

14  recordings, but that's not what this case is about.

15         THE COURT:  No, I understand that.  But --

16         MS. RANAHAN:  And there's not --

17         THE COURT:  -- even if that's not what the case is

18  about, if somebody --

19         MS. RANAHAN:  Right.

20         THE COURT:  -- with firsthand knowledge makes a

21  statement that's relevant, it really doesn't --

22         MS. RANAHAN:  Right.

23         THE COURT:  -- you know, that gives -- by definition

24  -- that gives the statement of relevance.

25         MS. RANAHAN:  Well, I'm not saying that they can't

24

1  Mr. Clainos anything. I mean Mr. Clainos -- they're taking

2  his deposition, Your Honor. They've already issued a subpoena

3  to him. And so I'm telling you any one in that case with

4  relevant knowledge about the recording, is Mr. Clainos. And

5  they're taking him. His underlying declaration -- or

6  deposition transcript in this case, which I believe lasted two

7  days, with nothing to do with recordings.

8       Once again, it was about personal items in the

9  archives, how he decided he was a fiduciary to both plaintiffs

10 and he also was running the company. So he had a dual hat.

11 And the question was whether certain personal items including

12 a personal scrapbook [inaudible] in one way or the other, and

13 whether he concealed poster copyrights for plaintiffs. The

14 plaintiffs in that case were not seeking anything regarding

15 the recordings. And Mr. Clainos doesn't know any testimony

16 about the recordings.

17      THE COURT: Well, except at least Paragraph 20 of

18 the declaration.

19      MS. RANAHAN: [Inaudible]. And I think that was

20 just an example. I mean an e.g. to show when they would want

21 artists [inaudible]. I mean, this quote -- actually the fact

22 that a question arises an artists' consent would be necessary

23 is exactly why we want the artists' deposition. Again, this

24 is not speaking specifically to any recording without that

25 consent.

1          THE COURT:  Well --

2          MS. RANAHAN:  -- I mean, there was question that

3     arises.

4          THE COURT:  Well no, I mean -- well, what the

5     statement means is going to be for the fact finder.  So I'm

6     not going to -- we're not going to get into a debate of what

7     this means but -- why don't I hear what -- share plaintiffs'

8     thoughts on this.

9          MR. SLOTNICK:  Sure, Your Honor.  And Ms. Ranahan

10     may be right that the primary thrust of that litigation was

11     about posters and maybe other non-recording assets.  But it's

12     clear as Your Honor pointed out, there were statements made in

13     that litigation.  It may not have been in Paragraph 1 or

14     Paragraph 2 of the declaration.  But there are statements that

15     were made that clearly relate to the way the recordings were

16     made, what rights there were granted, if any, with respect to

17     them.

18          And, you know, I understand why defense counsel

19     wants to minimize the importance of it.  To us, this came as

20     quite a surprise, not the least of which is because

21     Mr. Clainos was not identified in interrogatory responses that

22     defendants served, nor were any other individuals associated

23     with the Bill Graham companies or any of the other people that

24     they claim to have done due diligence from with respect to any

25     of the archives that they acquired over the years, some of

26

1  which were acquired as recently as 2011 and 2012.

2          So this concerns us on a number of levels.  One is

3  the identification as I mentioned of witnesses, individuals,

4  who may have knowledge of the circumstances of these

5  recordings.  Two are production of any statements they may

6  have made, this declaration being a prime example of them.

7          THE COURT:  Have you looked at the docket sheet in

8  the Clainos' litigation?

9          MR. SLOTNICK:  We have, Your Honor, and it -- it is

10  lengthy; right?  So, I haven't read every --

11          THE COURT:  Yeah.

12          MR. SLOTNICK:  -- entry.  But --

13          THE COURT:  Are the documents filed in connection

14  with the motions, the affidavits and such, are they under

15  seal?

16          MR. SLOTNICK:  I don't know if there are any that we

17  tried to click on that we could not open.  I'm not certain of

18  that.  But clearly, Your Honor, to the extent those documents

19  are publically available from the Court's website, you know,

20  we're not asking defendants to produce them.  Our concern is

21  that there may be other statements.  I just heard that there

22  were ten or 15 depositions taken.

23          THE COURT:  Ten depositions.

24          MR. SLOTNICK:  Maybe I"m wrong.  I thought she said

25  it could be as many as 15.

1          MS. RANAHAN:  At least ten --

2          THE COURT:  At least ten?

3          MS. RANAHAN:  -- [inaudible] maybe 15.

4          THE COURT:  All right.  Ten to 15.

5          Okay.  Go ahead.

6          MR. SLOTNICK:  So our concern is we certainly

7  haven't seen that number of deposition transcripts.  And I

8  don't think counsel can make a representation that there were

9  -- sitting here that there were no statements regarding the

10 recordings of these concerts.

11          I mean that litigation -- while I don't have

12 familiarity with it as Ms. Ranahan does -- it clearly involved

13 the circumstances of the Bill Graham companies, how they were

14 operated.  And, you know, one of the primary businesses was

15 putting on concerts.  And apparently these concerts were being

16 recorded as well.

17          So, you know, we would ask that any statements

18 related in any way to recordings of the concerts from that

19 litigation that are not publically available on the Court's

20 website be produced.  You know, we have a protective order

21 here that we can -- that should be able to address any

22 concerns Ms. Ranahan has.  And --

23          THE COURT:  Let me ask Ms. Ranahan a question.

24          Of the ten to 15 depositions, how many were

25 designated confidential by your clients?

1          MS. RANAHAN:  I don't know that, Your Honor.

2          THE COURT:  Well, I mean, with respect to the ones

3  that are designated confidential by your clients, I'm not sure

4  what the obstacle is to production?

5          MS. RANAHAN:  Well, they don't -- I mean, what is

6  the relevance, or the don't mention -- you know, they all

7  mention recordings.  And I'm happy to go through --

8          THE COURT:  Well --

9          MS. RANAHAN:  -- the transcript and search for the

10  recording, and if they discuss them.  But this case is a

11  probate case, Your Honor.  This is a --

12          THE COURT:  No, I understand that.  We've talked

13  about that --

14          MS. RANAHAN:  Yes.

15          THE COURT:  -- several times.  And the fact -- you

16  know, I'll say it again -- that the fact that the main thrust

17  of the Graham-Sult litigation was something other than the

18  issues here, doesn't necessarily mean that the statements are

19  irrelevant.  Paragraph 20 is proof of that.

20          MS. RANAHAN:  Well, I think the [inaudible] --

21          THE COURT:  But let me --

22          MS. RANAHAN:  Oh, I'm sorry --

23          THE COURT:  -- do we know who the -- maybe one way

24  to slice into this is, who was deposed?

25          MS. RANAHAN:  Right.  So there are [inaudible] --

1          THE COURT:  Do we know who the names of the

2    witnesses --

3          MS. RANAHAN:  Yes.

4          THE COURT:  -- and what their roles and the history

5    of --

6          MS. RANAHAN:  Yes.

7          THE COURT:  -- Bill Graham's work was?

8          MS. RANAHAN:  So there's [inaudible] and Peaches

9    O'Reilly.

10          THE COURT:  Peaches O'Reilly?

11          MS. RANAHAN:  She was hired by Bill Graham to make

12   scrapbooks; that was her role.  There's the son.  There's

13   plaintiffs, Alex and David Graham, who were the plaintiffs who

14   are seeking the certain assets, and had no involvement in the

15   creation of any recordings, and obviously no testimony to

16   provide.

17          THE COURT:  So they were not present backstage at

18   the concert venues in issue?

19          MS. RANAHAN:  I don't believe so, Your Honor.  One

20   of them was very young at the time.  He was ten.  He may have,

21   you know, perhaps, but he didn't talk about that.  He didn't

22   talk about [inaudible].

23          THE COURT:  All right.

24          MS. RANAHAN:  So that was the two plaintiffs.

25   Mr. Clainos was deposed.

30

1          THE COURT:  And they're deposing Mr. Clainos?

2          MS. RANAHAN:  Yes.

3          THE COURT:  Okay.  Go ahead.

4          MS. RANAHAN:  There was the person who was

5     responsible for creating the copyright registrations, a lot of

6     them for the posters; not for the recordings but the posters.

7     And I'm just blanking out [inaudible].

8                    [Pause in proceedings.]

9          MS. RANAHAN:  You had two days, you had two short

10    days.

11         THE COURT:  All right.  So this individual made the

12    copyright registrations and the posters --

13         MS. RANAHAN:  Yes, he made the copyright

14    registrations.  There was Mr. Clainos's -- I'm sorry, Alex

15    Graham's mother.

16         Was she deposed?

17         She may have been deposed.  She was on the list.

18    She may have been cut [inaudible].  There was Bill Sagan.

19    There were [inaudible] --

20         THE COURT:  And Sagan was designated confidential by

21    you?

22         MS. RANAHAN:  Yes.

23         THE COURT:  Okay.  I mean by your side, not you

24    personally.  Go ahead.

25         MS. RANAHAN:  He had, I believe, a 30(b)(6)

31

1  deposition and a regular deposition.

2          THE COURT:  All right.  Who else?

3          MS. RANAHAN:  There are other -- there were

4  Katherine York, who was a woman who was the lead archivist;

5  meaning, she sorted the posters, she wrote descriptions for

6  the posters and the --

7          THE COURT:  So, she was the archivist of printed

8  material?

9          MS. RANAHAN:  Yes.

10          THE COURT:  Go ahead.

11          MS. RANAHAN:  Right.  She actually started working

12  -- so she worked for BG after Bill Graham died.  And then she

13  began working for Wolfgang's Vault for a while, then no longer

14  worked there, the attorney.

15          Mr. Greene.  Yeah, Mr. Greene was formerly a

16  defendant in that action; he was being sued originally

17  [inaudible].  Richard Greene.  He was being sued essentially

18  on a suit on a malpractice theory that plaintiff rejected on

19  the [inaudible] stage.  But he provided -- after he was

20  dismissed, he actually was -- he sat for deposition about

21  whether his advice on trademarks was --

22          THE COURT:  He was sued for malpractice in

23  connection with trademark work?

24          MS. RANAHAN:  Essentially, yes.

25          THE COURT:  Okay.

1        MS. RANAHAN:  Because what -- one of the major

2  things that -- this didn't affect our clients, but it affected

3  Mr. Clainos.  That was one of the claims they brought --

4  Mr. Clainos was a defendant in the case.

5        THE COURT:  Yes.

6        MS. RANAHAN:  So one of the claims they brought

7  against Mr. Clainos was concealing and misappropriating the

8  trademark, concealing it from plaintiffs; the trademarks for

9  the Filmore.

10        MR. SLOTNICK:  I'm sorry.  To the what?

11        THE COURT:  Filmore --

12        MR. ELKIN:  Filmore --

13        MR. SLOTNICK:  Filmore?

14        THE COURT:  The Filmore trademark.

15        MS. RANAHAN:  The Filmore trademark.

16        MR. SLOTNICK:  Got it.

17        THE COURT:  Who else?

18        MS. RANAHAN:  Greg Orloff, someone named Greg

19  Orloff, and he was someone who worked on the archives.  And he

20  had -- [inaudible] but I think there's someone -- it starts

21  with an O.  I may be saying his last name wrong

22        THE COURT:  All right.

23        MS. RANAHAN:  But I'm thinking of the person who, he

24  worked also on the archives.

25        THE COURT:  All right.

33

1          [Pause in proceedings.]

2          THE COURT:  Look, is the only objection here --

3          MS. RANAHAN:  Relevance.

4          THE COURT:  -- relevance and the protective order?

5   I mean, if you're --

6          MS. RANAHAN:  No, there's --

7          THE COURT:  -- if what you're saying is true, if

8   they're irrelevant -- you know, look, I appreciate Rule 26

9   limits discovery to relevant evidence, but there's at least

10  one statement here by Mr. Clainos in his declaration that's

11  relevant.  If they want to --

12          MS. RANAHAN:  [Inaudible] --

13          THE COURT:  -- if the plaintiffs want to have

14  someone read through the depositions, is there any downside to

15  defendants here?

16          MS. RANAHAN:  We can look through Mr. Clainos's

17  transcript to see if recordings were discussed, and then if

18  so [inaudible] --

19          THE COURT:  Well, is there any doubt -- I mean apart

20  from the protective order with respect to materials that were

21  designated confidential by --

22          MS. RANAHAN:  Right.

23          THE COURT:  -- parties other than your clients, are

24  you prejudiced by production of the deposition transcripts?

25          MS. RANAHAN:  No, it's just a burden -- it's a

34

1   burdensome, Your Honor.  It's not proportional to the needs of

2   the case.  I mean, every [inaudible] --

3            THE COURT:  Aren't these in electronic form?

4            MS. RANAHAN:  Yes, they're in electronic form.

5            THE COURT:  So isn't --

6            MS. RANAHAN:  Well, we would have to reach out to

7   everyone that [inaudible] --

8            THE COURT:  Well, no.  I think if I grant

9   plaintiffs' application,  I think that burden falls on them.

10  I think all you'd have to do is identify the party or firm

11  that's designated them as confidential, and then they can

12  negotiate with the designator as to whether or not the can get

13  them.  Because that's not your fight, that's the designating

14  parties' fight.

15           MS. RANAHAN:  Well, we can [inaudible] --

16           THE COURT:  But I mean in terms of burden, isn't it

17  just a matter of attaching them to an email and transmitting

18  them to your adversary?

19           MS. RANAHAN:  Well, no.  You have to review

20  [inaudible].

21           THE COURT:  Review them for what?

22           MS. RANAHAN:  Well, to see if there's a privilege or

23  anything that we need to redact.

24           THE COURT:  It's a deposition.

25           MS. RANAHAN:  Correct.

1          THE COURT:  What could be privileged in a

2   deposition?

3          MS. RANAHAN:  Well, I'm sorry.  I'm not talking

4   [inaudible].  I mean, we would have to review --

5          THE COURT:  No, no.  Let me back up.  Maybe I'm not

6   communicating effectively.  With respect to material that's

7   designated confidential by you, there's a protective order in

8   place here; correct?

9          MS. RANAHAN:  Yes.

10         THE COURT:  So if you designated it confidential

11  here, I don't see what the impediment is to producing

12  depositions from the Clainos' action that were designated as

13  confidential by your parties.

14         MS. RANAHAN:  Okay.

15         THE COURT:  Okay.  With respect to material that's

16  designated confidential by someone other than your client, I

17  think all you'd have to do is identify the witness and

18  identify who designated it as confidential, and let

19  Mr. Slotnick take up the issue at that point.

20         MS. RANAHAN:  Okay.

21         THE COURT:  Okay.

22         MS. RANAHAN:  Okay.

23         THE COURT:  But I mean in terms of the burden, I'm

24  not sure what there is -- what there is to review.

25         MR. ELKIN:  Your Honor, let me see if I could be

1   helpful here.

2              THE COURT:  Go ahead.

3              MR. ELKIN:  What if we -- subject to whatever court

4   rules require, in terms of addressing the issue of

5   confidentiality -- we produce the Clainos' testimony.  That is

6   the one witness whose testimony at least in the declaration

7   form, they think is relevant.  And the Court seems to think

8   [inaudible] of what's important here.

9              And if they see something in that deposition that

10  gives them the reason to need to examine other transcripts,

11  then they can come back to the Court with regard to that.

12  There doesn't seem to be based on the proffer that Ms. Ranahan

13  has made, and given the fact that they've identified this only

14  witness in the case, that would seem to be more of a

15  proportionate outcome.

16             MR. SLOTNICK:  Your Honor --

17             THE COURT:  I'm just not sure how proportionality

18  figures into this, given the fact that we're talking about a

19  couple of keystrokes.

20             MR. ELKIN:  Well, it's --

21             THE COURT:  In the world of electronic media,

22  production of deposition transcripts is not the same issue

23  that it was 35 years ago.

24             MR. ELKIN:  There's no question that it's a few

25  keystrokes.  But I don't know that simply -- if that's the,

1   you know, the acid test, then of course many issues with

2   regard to the need to produce wouldn't even be an issue.  We

3   had discussions two weeks ago in this courtroom with regard to

4   whether something was burdensome or not.  We didn't really

5   pass through the electronic transfer prism of those particular

6   requests.

7          And I think it can't be just a sheer fishing

8   expedition.  You know, if Your Honor orders it, of course

9   we'll comply with it.  But they haven't made any showing at

10  all other than potentially -- a statement of Mr. Clainos's

11  declaration to go beyond that.  And sure, I guess you could

12  take up the issue of depositions in every single case in

13  which, you know, [inaudible] archives appears as a party.  And

14  that could be the test as well.  I just think it's too far

15  abridge.

16          MR. SLOTNICK:  Your Honor, if I may?

17          THE COURT:  Go ahead.

18          MR. SLOTNICK:  I mean, what Mr. Elkin is suggesting

19  is a false equivalent here.  Frankly, Ms. Ranahan's proffer

20  now comes several months late after not designating, or

21  producing, or identifying Mr. Clainos.

22          So if, you know, if somebody is going to get the

23  work product wrong for the plaintiffs' case, I just assume it

24  was us.  I'm not going to take their word for any of this.  If

25  they want to take our word that all of the copyrights in this

38

case are owned by the plaintiffs, you know, then maybe we can

talk about, you know, about equivalence but they're not going

to trust us after we produced thousands of documents

identifying the chain of title of these works.

         And now we have a witness who was unidentified by

the defendants, who clearly had something to say about this in

this other case, and now they don't want us to look at those

depositions.  You know, it's either going to be a waste of our

time or they're hiding something.  And I'm prepared to waste

Mr. Dickstein's time.

         MR. ELKIN:  That is completely [inaudible].

         THE COURT:  I'm sorry.  Go ahead.

         MR. ELKIN:  First of all, nobody hid anything.

Those witnesses did not testify with regard to the issues in

this case about which the matters that are responsive at all.

         THE COURT:  No, well let me say something,

Mr. Elkin, just so we're all on the same page.  I mean, my --

although I think the statement in Paragraph 20 of

Mr. Clainos's declaration that's annexed as Exhibit B to

plaintiffs' letter, although the statements in that paragraph

I think are relevant, you know, I quite understand why he

would not have been identified or not have been produced.

         This is such a -- it sounds like to me like it's

sort of a needle in the haystack of the Clainos' litigation.

So I can understand probably why it was overlooked.  And I'm

1  willing to assume at this point that it was overlooked because

2  it is sort of the needle in the haystack of the litigation.

3  But, you know, someone ferreted it out.  And we now know that

4  this statement was made and the statement is relevant to this

5  litigation.

6       I'm not suggesting any bad faith.  Again, it's sort

7  of a needle in the haystack.  But they found the needle, and

8  if they want to look to see if there are some other needles in

9  the haystack, and, you know, it's a couple of keystrokes on

10  your side I'm not sure why the deposition transcript should

11  not be produced.

12       MR. ELKIN:  Your Honor, I'm not here -- I don't want

13  to belabor it.  I think you heard the essential arguments.  I

14  would ask Ms. Ranahan if she has anything else of substance to

15  articulate.  I --

16       THE COURT:  All right.

17       MR. ELKIN:  We did look through that case.  And it

18  is difficult for us to stand or sit before you and have any

19  thought that somehow the issues and testimony that was adduced

20  in that case bear any relationship here.  It doesn't mean that

21  [inaudible] some examination.  I would [inaudible] for it to

22  be --

23       THE COURT:  One second, one second.

24       MR. ELKIN:  [Inaudible] --

25       THE COURT:  Bruce, do you know what's going on with

40

1  the sound effects here?

2          MR. ELKIN:  I'm not next to -- I'm too far away.

3          THE CLERK:  This happened before you were here.  We

4  can't blame the attorneys.

5          MR. ELKIN:  All right.

6          THE COURT:  Maybe it's the ghost of Bill Graham, who

7  knows.

8          Go ahead.

9          MS. RANAHAN:  No, Your Honor.  I mean, I understand

10  and this does relate.  I know you want to table the

11  reconsideration.  But we really were seeking four and an

12  agreement.  And that's obviously in consideration of these

13  four agreements that do bear some relevance.  And so to the

14  extent is that you're suggesting this is [inaudible] --

15          THE COURT:  Well, the reconsideration, I really --

16  you know, I just got your -- I didn't see your letter this

17  morning.  I just saw it when you handed it up before the

18  conference.  And I don't think Mr. Skolnick has had a --

19  Mr. Slotnick, I apologize -- has had a chance to respond,

20  so --

21          MS. RANAHAN:  I understand.

22          THE COURT:  -- that's why I want to defer

23  consideration on that.

24          MS. RANAHAN:  I understand, Your Honor.  I would

25  just hope that the same principle --

41

1          THE COURT:  But --

2          MS. RANAHAN:  -- will be applied throughout

3    [inaudible] --

4          THE COURT:  -- all right.

5          MS. RANAHAN:  And that's all I have [inaudible] --

6          THE COURT:  All right.

7          MS. RANAHAN:  And, you're right.  I mean I just

8    don't -- because again I lived through it.  I've been dealing

9    with that case since 2009.  The first time Mr. Dickstein and I

10   discussed this was Saturday.  You know, I laid out for him

11   everything that happened in this case.  He said okay, that's

12   your representation.  You know, I'll take that.

13         So I didn't even expect this to be in the letter

14   that we got last night.  We had already said that Mr. Clainos

15   would absolutely do that.  I mean, to the extent we're not

16   violating any confidentiality Mr. Clainos's counsel, we would

17   produce Mr. Clainos's [inaudible].

18         I think that the rest of them, if they want to go on

19   that fishing expedition, and you're going to allow it, then

20   we'll, you know, comply.  But we don't think that anyone's

21   time, Mr. Slotnick thinks it's worth to defend [inaudible], so

22   [inaudible].

23         THE COURT:  All right.  Let me go off the record for

24   one second.

25         Bruce, can you just stop the recording and go back

42

1   90 seconds and just make sure we're getting a recording here.

2                    [Pause in proceedings.]

3           THE COURT:  Okay.  We're recording again?

4           THE CLERK:  Yes.

5           THE COURT:  Okay.  Do you want to say -- did you

6   want to say anything --

7           MR. ELKIN:  We --

8           THE COURT:  -- else on the depositions --

9           MR. ELKIN:  Yes.  Your Honor, we understand you're

10  going to reserve judgment with regard to the motion for

11  reconsideration.  We respect that.  Thank you for that.  You

12  know, the circumstances, I think we've made our arguments with

13  regard to the Clainos' transcripts.  And if it's Your Honor's

14  order to have us produce them, then we'll produce them.

15          THE COURT:  All right.  Look, with respect to the

16  deposition transcripts in the Graham-Sult litigation, I'm

17  going to direct that defendants produce the deposition

18  transcripts that were designated confidential by the

19  defendants here -- by the defendants in this action.  With

20  respect to the remaining deposition transcripts, I'm going to

21  direct that defendants identify the witnesses and the identity

22  of the attorneys who designated them confidential.

23          All right.  And plaintiffs' counsel here can decide

24  whether they want to seek relief from the parties who

25  designated them confidential.  Okay?

43

1          MR. SLOTNICK:  Thanks, Your Honor.  Could I ask for

2     a clarification?  Would that also apply to any affidavits or

3     declarations that were --

4          THE COURT:  Well, I think you told me before that

5     there were none that you couldn't click on.  There were none

6     that you couldn't open.  So --

7          MR. SLOTNICK:  There may have been some produced or

8     some written statements produced that didn't make their way

9     onto the docket.

10          MR. ELKIN:  So, is it -- Your Honor, let me suggest

11     that --

12          THE COURT:  Well, hold --

13          MR. SLOTNICK:  And I'm willing to limit that to

14     anything that was related at all to the recordings.  We're not

15     looking for information about post --

16          THE COURT:  Well, I think, you know, you've got the

17     net as it's being cast now is a pretty broad net.  I mean, if

18     it's not a statement on the record --

19          MR. SLOTNICK:  Okay.

20          THE COURT:  You know, number one, I'm not sure if

21     there's anything else out there that exists besides attorneys

22     notes, which you couldn't get anyway.  You know, I think as it

23     is now, it's a fairly broad net.  And as I said before, I

24     think that -- you know, look, the thing you -- the paragraph

25     you found in the Clainos' deposition is relevant, but it

44

1   really is sort of a needle in the haystack, and it's certainly

2   not a dispositive needle.  It weighs in your favor, but it's

3   not a smoking gun for either side.

4          MR. SLOTNICK:  We'll limit our requests to the

5   depositions and go from there.

6          THE COURT:  All right.  All right.  The next issue

7   is Roman III on Page 3 of plaintiffs' letter.

8          MR. SLOTNICK:  And, Your Honor, and I think this

9   sort of dovetails with the issues that we've been discussing.

10  You know, as Your Honor may recall at the last conference,

11  when Your Honor asked what's the basis for defendant's belief

12  that any rights were granted, there were representations made,

13  well, this is based on Bill Graham's entourage, staff and

14  employees.

15         Now, there may be some overlap or a great deal of

16  overlap between those people and the people that we've just

17  heard were deposed in the Clainos' litigation.  But I'm not

18  certain of that.  None of those people have been identified to

19  us.  So, we would like that to happen.  And relatedly -- I'm

20  just skipping ahead a bit --

21         THE COURT:  Go ahead.

22         MR. SLOTNICK:  -- defendants have, you know, made

23  representations that there are no longer any due diligence

24  materials related from their acquisitions.  I mean, these were

25  by defendants' own account tens of millions of dollars of

45

1   archives they were acquiring; some of which were acquired as

2   recently as 2011 and 2012.

3          You know, I have a hard time believing that there's

4   no documents from that that exist.  But if that's defendants'

5   representation, then I guess we'll have to deal with that in

6   another way.

7          THE COURT:  Well, I mean, if there are no due

8   diligence documents, doesn't that help you?

9          MR. SLOTNICK:  Unless the due diligence showed up

10  something that defendants didn't like, and they went ahead

11  anyway.

12         THE COURT:  What are defendants' thoughts?

13         MS. RANAHAN:  Your Honor, about the -- well, as far

14  as the due diligence, what the due diligence was, was they

15  spent weeks, and weeks, and weeks looking through the

16  archives, and cataloging information.  But there wasn't any,

17  you know, memos or any issues like that that would have any --

18  there just aren't any.

19         There weren't any that exists now.  There could have

20  been maybe in 2002, but I know -- because this issue's come up

21  in more than one case -- and there just aren't any more files.

22  There could be files in different attorneys [sic], but we've

23  checked for those attorneys too, and we haven't been able to

24  uncover them.  So, there's no due diligence files to produce.

25         That doesn't mean that Mr. Sagan didn't do --

46

1          THE COURT:  Hold on a second --

2          MS. RANAHAN:  -- extensive [inaudible] --

3          THE COURT:  -- hold on a second, though.  But is the

4    material that was reviewed in performing the due diligence,

5    has that been produced?

6          MS. RANAHAN:  Yes.  As far as the agreements, the

7    underlying -- I'm sorry, what are you --

8          THE COURT:  If --

9          MS. RANAHAN:  -- if there is anything left, we've

10   produced it.  But to the extent there's no longer -- our

11   client's moved several times, and he doesn't keep everything

12   for decades.  So, some of this happened 15 years ago, and he

13   hasn't kept every piece of paper that he looked at during that

14   time.  He looked through the archives, which is --

15         THE COURT:  But whatever was reviewed in the course

16   of performing the due diligence investigation, that's been

17   produced?

18         MS. RANAHAN:  Well, that's millions of items in the

19   archives, Your Honor.  Part of the diligence was going through

20   every item in the archive and cataloging, and so -- there is

21   no way to produce millions of archived items.  I mean, this is

22   -- I'm talking now about the physical items.  So, that was

23   what the due diligence involved, was looking through --

24         THE COURT:  Well, let me try to come at it a

25   different way, a little more focused way then.  Has all the

1 material that was reviewed during the due diligence search

2 concerning the transfer of the rights in issue, has all that

3 material, to the extent it exists, been produced?

4          MS. RANAHAN:  Yes.

5          THE COURT:  All right.  And with respect to the

6 identification of concert staff and employees, I think the

7 term that was used at the last conferences was the entourage,

8 have they been identified?

9          MS. RANAHAN:  So, our client is not in a position to

10 identify who Bill Graham's entire entourage was.  I mean,

11 we've --

12          THE COURT:  No, it's not a question of who his

13 entire entourage was.  We're not talking about who made his

14 sandwiches and coffee.  But to the extent that there were

15 individuals who were going to support this -- the contention

16 that Bill Graham was close to the artists, and Bill Graham got

17 these rights before the concerts, the individuals who are

18 going to testify to that version of events, have they been

19 identified?

20          MS. RANAHAN:  To the extent, yes, we're planning to

21 rely on any individual that have been disclosed -- or know of

22 any individual who, you know, would provide that testimony,

23 and they've been disclosed.  There's no one that we're not

24 disclosing.  So, I'm not exactly sure what plaintiffs are --

25          THE COURT:  All right.  I mean, you realize if you

48

1    don't disclose somebody, you can't call --

2             MS. RANAHAN:  Of course, yes.

3             MR. DICKSTEIN:  Judge, I would just make an

4    observation --

5             THE COURT:  Go ahead.

6             MR. DICKSTEIN:  -- it's not just the 26(a)

7    disclosures, which I agree are limited to people they intend

8    to rely on.  But we also served interrogatories seeking

9    identity of anyone who had knowledge of the performance, or

10   reproduction, or acquisition of these recordings.

11            So, even if defendants don't plan to rely on them,

12   those could be people we want to, you know, depose or talk to.

13   So, I would ask that -- I don't think any of those people have

14   been identified in response to our interrogatories.

15            THE COURT:  Well, fair enough.  I mean, is there

16   anyone else who has -- that you're aware of -- who has

17   knowledge or you have reason to believe would have knowledge

18   concerning the transfer of rights that's at issue here,

19   whether it helps you or hurts you?

20            MS. RANAHAN:  No, Your Honor.

21            THE COURT:  Is there any -- with respect to the due

22   diligence -- is there anything that defendant is looking for

23   -- I'm sorry, plaintiff is looking for?  Is there something in

24   particular you think hasn't been produced?

25            MR. DICKSTEIN:  Well, there were -- and defense

1  counsel's right, that the actual transfer agreements -- the

2  final asset transfer agreements have been produced.  And

3  there's been no other materials related to those transfers

4  produced, as far as I'm aware based on my review.  Those

5  agreements -- a couple of them do reference -- one references

6  a disclosure letter, that's the Bill Graham transfer

7  agreement.

8          There was another agreement that references an

9  earlier agreement in the same chain of ownership for these

10  recordings.  In some cases, defendants didn't acquire the

11  recordings directly from the people who made them.  They were

12  purchased by other investors or other people.  And I can

13  probably get the reference.

14          MS. RANAHAN:  Your Honor, we've produced every

15  transfer document we have from any transaction.  So, there's

16  nothing that we're withholding in that regard.

17          THE COURT:  Are there specific documents that you

18  want, Mr. Dickstein, that you've spoken about with defendants'

19  counsel?

20          MR. DICKSTEIN:  I'm over on the --

21          THE COURT:  No --

22          MR. DICKSTEIN:  -- oh, I'm sorry.

23          THE COURT:  -- I mean, it sounds like they're

24  willing to produce documents concerning the acquisition -- or

25  the alleged acquisition of rights to the acquisition of the

50

1  archives.   I mean, are there specifics that you've requested

2  from defendants' counsel --

3          MR. DICKSTEIN:  Yeah --

4          THE COURT:  -- that they're reluctant to produce?

5          MR. DICKSTEIN:  Well, I think the state of the play

6  is that we had an email exchange last week, where we asked

7  generally for due diligence materials, but then also

8  identified two that we're aware of -- or what we would

9  consider due diligence materials; this disclosure letter and

10  then another agreement.

11          I think it was in connection with the acquisition

12  from Plainfield Music.  There's (sic) references in that

13  agreement to prior agreements transferring the same

14  recordings.  And I think when we spoke on Saturday,

15  Ms. Ranahan said she would look into producing those.

16          MS. RANAHAN:  I've looked to see if I already have

17  them.  There's been several times, Your Honor, where

18  Mr. Dickstein's identified certain attachments or certain

19  emails that he says are missing.  And I've in every instance

20  gone back and produced those to him.

21          He just now Saturday asked me for these two.  And I

22  said I'd once again go with my client and see if we have them.

23  Anything in my clients' possession, we've been willing to

24  produce and have produced.  So, this is not a live issue

25  before Your Honor.  We're absolutely going to --

51

1          THE COURT:  I mean, it doesn't --

2          MS. RANAHAN:  -- look into that.

3          THE COURT:  -- it sounds -- you know, look, I

4   appreciate that you wanted to get in front of me because we

5   had this conference scheduled for today, but it sounds like

6   they're willing to produce these materials.  I mean, it sounds

7   like it's still --

8          MR. SLOTNICK:  Yeah.

9          THE COURT:  -- that's an active negotiation between

10  the parties.

11         MR. SLOTNICK:  Well, we're getting I guess two

12  messages.  On one hand, we're hearing that there are maybe

13  some documents referenced in the agreements, that they're

14  willing to go back and look at.  And then we're hearing that

15  well, but there's no general due diligence materials.

16         So, I agree, I appreciate counsel's

17  representation --

18         MS. RANAHAN:  Well --

19         MR. SLOTNICK:  -- we'll have to see what they have,

20  and we'll go, you know, we'll go from there.  So --

21         MR. ELKIN:  We --

22         MR. SLOTNICK:  -- I agree, there may be nothing else

23  for Your Honor to decide now --

24         MR. ELKIN:  We're not imposing any objection to

25  this.  We're going to produce everything that they've asked

52

1  for.  If it doesn't exist, we have informed them or will

2  inform them.  If they want to do something because they don't

3  believe that that's the case, then we can --

4          THE COURT:  Okay.

5          MR. ELKIN:  -- come back before Your Honor.

6          THE COURT:  Okay.  All right.

7          MR. SLOTNICK:  I think there's one other category

8  within that Roman III, I believe.

9          THE COURT:  Go ahead.

10         MR. SLOTNICK:  Which is the -- these are the artists

11 -- the deposition transcripts of the artists from the -- I

12 think what we've been calling "the record-label litigation."

13 I think it was actually Grateful Dead who was the named

14 plaintiff, if I'm not mistaken.

15         THE COURT:  What litigation, and what did this

16 litigation involve?

17         MR. SLOTNICK:  It involved claims -- my

18 understanding, we were not involved in that litigation -- but

19 it involved claims by record labels that they owned the

20 recordings or the copyrights and the recordings that

21 defendants are exploiting.  And defense counsel was involved

22 in that case, so they may be able to speak to it better than I

23 can.

24         The reason I'm raising it now, is because at the

25 last conference, Your Honor may recall, Mr. Elkin referenced

53

1   those deposition transcripts in support of their argument that

2   these artists likely transferred rights to Bill Graham at the

3   time.  So, you know, I'd like to see them to see if that's the

4   case.  Or if that's not the case, they seem to be relying on a

5   common-practice argument.

6          So, that if, you know, maybe if one -- if there's

7   evidence that one artist granted rights, then they're going to

8   argue that, well, that raises some sort of presumption that

9   other artists did.  You know, I don't agree with that, but to

10  the extent they're making that argument, I think we're

11  entitled to see the artists' deposition transcripts.  And

12  these are depositions that already occurred.  We're not

13  obviously seeking to depose new artists there.

14          THE COURT:  Okay.

15          MR. SLOTNICK:  So, I think that's been objected to,

16  unless I'm mistaken.

17          MR. ELKIN:  I made a comment in response to the

18  questions that the Court asked at the last conference.  And I

19  didn't pull out any deposition transcripts.  I was trying to

20  make a fair representation as to what I understood to be the

21  potential rationale for the depositions of the non-party

22  witnesses, whose depositions we wanted in a case.

23          This is not the subject, first of all, of any

24  document demand.  They queued off on something I said in an

25  argument, which is fine by the way.  If they want to have any

54

1  document demand, we can look at it.  But this is like, you

2  know, why don't we just take a look at every single case

3  that's ever been filed against Bill Graham archives and Bill

4  Sagan, and Norton over the past 20 years, and produce all the

5  deposition transcripts.

6          They've taken the position repeatedly in this case

7  that what happened in the -- and they said it last -- two

8  weeks ago before Your Honor -- what happened in that case is

9  completely irrelevant, because that had to do with record

10  labels and music recording, and nothing to do with music

11  compositions.

12          So, because of a comment that I made, they now want

13  to go back and ask for voluminous materials that hasn't even

14  been reduced to any document demand.  So, I think it's

15  premature.  If they want to serve a document demand, they can;

16  we'll respond to it.  But this cropped up in the last --

17  within the last week.

18          THE COURT:  All right.

19          MS. RANAHAN:  Your Honor --

20          THE COURT:  I'm going to come back and I'm going to

21  ask Mr. Dickstein one or two more questions.  But before I do

22  that, what was the issue in the litigation in which these

23  artists were deposed.

24          MR. ELKIN:  First of all, in the case itself, which

25  goes back some ten years.

55

 1          THE COURT:  Uh-huh.

 2          MR. ELKIN:  It was an action brought by a couple of

 3   record labels and a number of artists.  I think it included

 4   Carlos Santana, the legacy members of the Grateful Dead, the

 5   legacy members of The Doors, the estate of Janice Joplin, and

 6   maybe some other parties.  And what they sought was, among

 7   other things, I think there were claims for declaratory relief

 8   and then there were claims for --

 9          MS. RANAHAN:  Right of publicity.

10          MR. ELKIN:  Evasions of right of publicity, other

11   types of torts.  And honestly, Your Honor, I just don't

12   remember.  But some of the issues in the case did impinge on

13   certain of the sound recording rights.  We weren't talking

14   about any issues related to synchronization, because at that

15   point, the archive of the client had not exploited any

16   archival video material.  That's my recollection.

17          So, the purpose obviously that I intended -- that I

18   walked Your Honor through a couple of weeks ago -- is whether

19   or not to the extent a synchronization consent was required --

20   and we take issue with that in the circumstances -- we were

21   relying on a number of equitable principles and facts in terms

22   of the fact that these recordings have been openly and

23   notoriously exploited over the years with the knowledge -- the

24   copyright owners' rights, together with the songwriters'.

25          But we've also taken the position that we believed

1    -- at least in the case of Bill Graham, and we understand the

2    case was the same with regard to King Biscuit Flower Hour and

3    some of the other entities from whom our clients had purchased

4    these archival recordings -- that the performing artist who

5    may have controlled the music compositions at the time

6    willingly permitted their performance to be recorded by

7    videotape.

8            What I had said frankly was that based on certain

9    depositions that I recall having taken in that other case,

10   that at least with respect to Bill Graham, there was a

11   situation where -- as I recall -- generally, the practice was

12   that Bill Graham had a closed-circuit TV and the anteroom

13   where the artists were hurled up before they actually went out

14   to perform, and were they were to return when they weren't

15   performing, and that the videotaping equipment was in fairly

16   close proximity to where they were performing.

17           And in those circumstances, it would be beyond

18   Corventure that somehow that they were not aware of what was

19   going on.  I mentioned all of that, because I was trying to

20   respond to Your Honor's question as to how and what way they

21   could possibly had given their consent.

22           I don't know what happened here.  I'm not going to

23   make a representation as to what happened with regard to the

24   individuals here.  But I was trying to be responsive to the

25   Court's invitation to make a proffer.  I don't remember what

57

1   was in those testimony -- I can tell you that was sealed.  I

2   can tell you after the case, we were required to destroy

3   everything.  But this is not even subject of a document

4   demand.

5              MR. DICKSTEIN:  Your Honor --

6              MS. RANAHAN:  Your Honor --

7              MR. DICKSTEIN:  -- I could point out it actually is.

8   I mean, this is Exhibit D to Mr. Slotnick's -- excuse me --

9   December 19 letter, Request No. 7, Page 9 of that exhibit:

10             "All documents concerning the initial recording

11         and subsequent editing if any of any audio footage

12         or video footage embodying any of the musical works

13         by any individual or entity including without

14         limitation Bill Graham."

15             MR. ELKIN:  Oh, come on --

16             MR. DICKSTEIN:  -- "Bill Graham presents" --

17             THE COURT:  Hold on a second --

18             MR. ELKIN:  -- come on, seriously --

19             THE COURT:  -- hold on -- counsel, counsel, just --

20             MR. DICKSTEIN:  [Inaudible] --

21             THE COURT:  -- hold on.  But I mean, isn't your

22   position here inconsistent with your response to defendants'

23   application at the prior deposition to depose all the

24   recording artists?

25             MR. DICKSTEIN:  I think there's a difference between

58

1 seeking to depose -- to inconvenience the artists and get them

2 from wherever they may be around the world and ask them for

3 production of artists' deposition transcripts that already

4 exist.

5         MS. RANAHAN: Your Honor --

6         THE COURT: Do we know whether or not they exist?

7         This is to Mr. Elkin, I guess.

8         MR. ELKIN: I'm going to defer to Ms. Ranahan,

9 because when the case was over with, I moved on to my next

10 matter.

11         MS. RANAHAN: Your Honor, they were ordered to all

12 be destroyed pursuant to the settlement agreement. So, it's

13 my understanding that no artists' deposition transcripts

14 remain in existence today. And additionally, Your Honor, none

15 of them have anything to do with the artists of the songs at

16 issue. And meanwhile, plaintiffs are objecting to our right

17 to take the artists' depositions regarding songs and

18 plaintiffs at issue.

19         THE COURT: Before we get too far down the road over

20 something where there may be no there there, maybe the initial

21 issue is to find out whether any of these deposition

22 transcripts exist, number one. And if they still exist, who

23 was the deponent? If the transcripts no longer exist in the

24 defendants' possession, custody or control, there's no issue.

25 And if any exist with respect to recording artists who are not

59

1  the subject of this litigation, there's no issue.

2          MS. RANAHAN:  Thank you, Your Honor.

3          THE COURT:  So, maybe those two threshold questions

4  should be answered before we find out --

5          MS. RANAHAN:  I can tell you who the artists were --

6          THE COURT:  -- whether there's any way of finding

7  out -- whether we're arguing about anything here.  Okay.

8          MR. DICKSTEIN:  All right.

9          THE COURT:  All right.  All right.  The next issue

10  is Roman IV in plaintiffs' letter.  I mean, I don't recall

11  specifically what the complaint says here.  But does the

12  complaint identify specific recordings?

13          MR. DICKSTEIN:  Your Honor, the complaint identifies

14  the works --

15          THE COURT:  Specifically?

16          MR. DICKSTEIN:  -- compositions.  And it also -- and

17  it also identifies the links, right Internet links to the

18  places you could download certain of these -- certain of the

19  recordings of those compositions.  That's what we were able to

20  find at that time.  As you can imagine, we spent a lot of

21  times -- a lot of time and our paralegals spent a lot of time

22  looking through defendants' website prior to filing the

23  lawsuit.

24          Since then, actually just a couple weeks ago, we

25  realized that there are hundreds of new concert recordings on

60

1  the defendants' website that we had not seen before.  And

2  we've put those all in a spreadsheet that we sent to

3  defendants last week, I believe, this is Exhibit C to our

4  December 19 letter.  And we're just, you know -- frankly, I

5  think it's defendants' obligation to supplement their

6  discovery responses in the normal course.  We're pointing out

7  that they haven't done that.

8          THE COURT:  But these are not recordings of concerts

9  that were the subject of the complaint; is that right?

10          MR. DICKSTEIN:  No, I'm sorry, Your Honor.  These

11  are the same songs.  These are different performances of the

12  same songs.

13          THE COURT:  Do you have a copy of your complaint --

14  of the complaint?

15          MR. DICKSTEIN:  I'm not sure I have a clean one.

16          Can I just take a look at that for one second,

17  please?

18          I'm going to ignore any handwritten notations.  I

19  probably won't be able to read them anyway.

20          THE COURT:  All right.  And the complaint identifies

21  specific links to the infringing -- to what the allege

22  infringements?

23          MR. DICKSTEIN:  That's right.  There's an exhibit, a

24  lengthy spreadsheet attached, yeah.

25          THE COURT:  Yeah.  Well, why is defendant incorrect

1  that to get this discovery, you've got to amend your

2  complaint?

3          MR. DICKSTEIN:  I'm sorry?  I didn't understand the

4  question.

5          THE COURT:  Oh, sure.  If I understand the

6  defendants' position correctly, they're saying before you can

7  get this discovery, you've got to amend the complaint to add

8  these infringements.  Why are they incorrect in that regard?

9          MR. DICKSTEIN:  Well, because the -- as I think

10  you'll see, the complaint is written in a way that we allege

11  infringements of certain musical works.  And if there are

12  multiple instances of those musical works, then they're all at

13  issue.

14          These are on websites owned and controlled by

15  defendants.  They're apparently during the lawsuit.  They have

16  no qualms about putting up new recordings that embody these

17  same musical works.  There's been quite a bit of discovery the

18  defendants have produced concerning when recordings are put up

19  on their website, when they were downloaded.

20          We have some issues with that, which maybe we'll get

21  to today.  But we have none of that information with respect

22  to these 250 new concert recordings that have been put up.

23  And, you know, Your Honor, we could either seek to amend our

24  complaint or file a new lawsuit to allege these.  That seems

25  to be uneconomical.  I think in accordance with defendants,

1  you know, obligation under the federal rules, they should just

2  supplement their discovery responses.

3        THE COURT:  And what do defendants say?

4        MS. RANAHAN:  Your Honor, we just received this list

5  mid last week.  Our position is, these were not infringing

6  concerts at issue in the complaint or listed in the complaint.

7  There were specific concerts put into the complaint, and

8  that's what we've based this whole case around, and all of our

9  discovery, and discovery for the last -- almost a year now.

10        It's very late in the case.  If they feel the need

11  to seek to amend, or --

12        THE COURT:  Well --

13        MS. RANAHAN:  -- filing a new lawsuit, then that's

14  fine.  But it's not -- this isn't the right venue to try to

15  try to expand the scope of their action through this discovery

16  request.

17        THE COURT:  Well, the complaint -- I'm just looking

18  at the complaint here -- and it does refer to Exhibit A as a

19  non-exhaustive list.  For example, Paragraph 9, a

20  non-exhaustive list of web links to defendants' infringing

21  website Music Vault that contain unauthorized uses of

22  plaintiffs' musicals works as included in Column 4 of

23  Exhibit A.  And there are similar statements of

24  non-exclusivity in Paragraphs 74, 82, and 89.

25        MS. RANAHAN:  Your Honor, we're not even clear --

63

1          THE COURT:  I mean, I'm not sure what the more

2    efficient vehicle is here.  I mean --

3          MS. RANAHAN:  Well, we're not -- I'm not even clear

4    what website these came from.  If it's the new website that

5    plaintiffs are trying to now add to the case.  And I've asked

6    plaintiff that.  And I'm happy to continue to meet and confer

7    with them.  We again, got this late last week for the first

8    time, 200 works that got, you know, shoved into this discovery

9    hearing.

10          We haven't had the time to thoroughly go through

11   this with our client.  At this point, we're not prepared today

12   to stipulate to allow all these, or willing to agree that all

13   of these are appropriate.  We don't know enough at this point.

14          THE COURT:  I mean, Mr. Dickstein, it looks like

15   your email was sent Friday at 12:30?

16          MR. DICKSTEIN:  That's right, Your Honor.

17          MR. SLOTNICK:  Yeah.

18          MR. DICKSTEIN:  And I would just point out, I did

19   note in that email where we found these additional concert

20   recordings.  It was on the wolfgangs.com website, which

21   Ms. Ranahan alluded to is a new website that they've launched

22   I think during the last month, as well as the concert

23   vault.com website, which is something they've been operating

24   since the beginning of the case.

25          THE COURT:  Well --

64

1          MS. RANAHAN:  So then, it does sound like --

2          THE COURT:  -- look, I mean --

3          MR. ELKIN:  Your Honor, if I may be heard --

4          THE COURT:  -- did you try --

5          MR. ELKIN:  -- let me interrupt for one second.

6   With respect to the new recordings, it sounds like the parties

7   need to meet and confer on that some more.  I mean, it sounds

8   like the matter was just raised a few days ago.  And from what

9   I'm hearing Ms. Ranahan say is, that they want -- defendant

10  wants to confer with their client about these 250 -- or

11  whatever the number is -- recordings.  Which given the

12  shortness of time between when the issue was raised and today,

13  seems like a reasonable response.

14         MR. DICKSTEIN:  Understood, Your Honor.

15         THE COURT:  Okay.

16         MR. SLOTNICK:  Your Honor, if I may just put some of

17  this in context?

18         THE COURT:  Yeah, go ahead.

19         MR. SLOTNICK:  On the one hand, there is a pleading

20  issue, and on the other hand there is I think a legitimate

21  discovery issue right here.  We could I suppose bring a new

22  lawsuit with these same songs, and these new concerts.  But if

23  we were to do that, we would be entitled to statutory damages

24  on the same songs for these new concerts.

25         Defendants were concerned the other day about a

1  $30-million verdict.  Now, they seem to be okay with us going

2  $150,000 times another 80.  We're trying to avoid that.  You

3  know, we think that as long as it's in this lawsuit, it's

4  probably subject to this same one claim, one infringement.

5  But we think it's also relevant here to show willfulness.

6  Because if the defendants continued to utilize plaintiffs'

7  songs with knowing full well that there were claims against

8  them and a litigation against them, we think that would be --

9  it would go far towards proving, you know, our claim of

10  willfulness.

11          THE COURT:  All right.  Hold on --

12          MR. SLOTNICK:  And let me --

13          THE COURT:  Go ahead, go ahead.

14          MR. SLOTNICK:  -- let me just -- okay.

15          THE COURT:  Go ahead.

16          MR. SLOTNICK:  Okay.  One further aspect of this is

17  if the plaintiffs were to prevail in this lawsuit, and prove

18  infringement, presumably that would require the defendants to

19  pull down or take off of their sites, not only the concerts

20  that were identified, but any other concerts that utilized

21  these words.  I mean, we would think that would be a given.

22          What we're trying to do is combine everything in one

23  place.  It's more economical.  It may be less advantageous on

24  a damage level for us.  You know, we can start, you know, a

25  separate lawsuit for each song for each different concert.

66

1    But that would seem to be a waste of everybody's time and

2    problematic.  What we're trying to do here is be efficient.

3    If defendants need to confer with their clients about this, we

4    totally understand.  But we do want to understand, you know --

5    them to understand where we're coming from on this.  We're not

6    trying to be difficult, we're trying to be economical.

7              MS. RANAHAN:  And I appreciate Mister --

8              THE COURT:  Let me cut to the chase -- and I'm not

9    trying to cut you off, Ms. Ranahan, but I have a -- my

10   proposal is something that I think makes sense, I'm not sure

11   anyone will object to it.  How long do you need to confer with

12   your client to give a firm answer with respect to, do you want

13   to -- with respect to whether or not you want to provide

14   discovery with respect to the additional concert recordings

15   without an amendment to the pleading?

16             MR. ELKIN:  Two weeks, Your Honor.

17             THE COURT:  All right.  All right.  So, that's going

18   to be January 3rd.

19             MR. ELKIN:  Can we get to the end of that week?  I

20   didn't --

21             THE COURT:  All right.

22             MR. ELKIN:  -- look at my calendar --

23             THE COURT:  January 6th.  Okay.

24             MR. ELKIN:  Thank you.

25             THE COURT:  And can you also by January 6th, give an

1  answer -- give a response with respect to the artists'

2  depositions, whether they still exist; and if they still

3  exist, which artists' depositions you still have?

4          MR. ELKIN:  Certainly, Your Honor.

5          THE COURT:  Okay.  So, January 6th, with respect to

6  the -- for response concerning the depositions and the new

7  concert recordings.

8          And does that -- did you want to say something else,

9  Mr. Elkin?

10         MR. ELKIN:  I just want to say I appreciate

11 Mr. Slotnick looking out for us.  But the reality is that, he

12 knew -- he knows -- or we know, the American people know, that

13 if he -- this was not squarely the case already, he wouldn't

14 even be coming before you with regard to this, he'd be making

15 an application for sanctions.

16         The bottom line here is that they are presuming as

17 if there have been infringements in this case.  We have

18 complied with the copyright laws, period.  And issues of

19 willfulness and copyright infringement, that's all remained to

20 be seen.  We have adequate defenses.  And the good Lord

21 willing, we will prevail on those defenses.

22         THE COURT:  All right.  We have a few more issues to

23 discuss here.

24         MR. DICKSTEIN:  Yeah, I think -- Your Honor, I think

25 we're up to V --

68

1        THE COURT:  Yeah.

2        MR. DICKSTEIN:  -- of our letter that, you know,

3  defendants did produce some information related to the

4  corporate entities' profits and expenses.  They didn't produce

5  anything with respect to Mr. Sagan's profits, revenues from

6  the infringement.  He's alleged to be the owner and controller

7  of the companies which run the various websites.

8        And in particular, you know, one concern we have is,

9  there's a very large expense entry in the corporate

10  defendants' profit and loss statements, several million

11  dollars that relates to a "other" category, as well as I think

12  it's personnel or payroll, something like that.

13        To the extent a large chunk of that is going to Mr.

14  Sagan and the defendants are going to seek to deduct from

15  disgorgement of profits, I think we're entitled to recover

16  that, you know, on that other end from Mr. Sagan.  So, we just

17  don't have any information into his finances derived from

18  these companies.

19        MS. RANAHAN:  Your Honor, to the extent we're

20  intending to deduct any of those other expenses we're planning

21  to produce additional documents before the end of the month to

22  substantiate those.  So, this is again an issue raised very

23  recently.  It has no -- Mr. Sagan's individual finances really

24  has no bearing on disgorgement of profits.  But we will, if we

25  plan to deduct those from disgorgement, we will demonstrate

69

1  what those other expenses are.

2          THE COURT:  All right.  And you're going to -- you

3  said by the end of the month.  That's 12/30, 12/30 I guess,

4  December 30th?

5          MS. RANAHAN:  Yes, Your Honor.

6          MR. ELKIN:  And I thought, Your Honor, we were

7  before you two weeks ago.  There's an issue about whether

8  they're going to elect statutory damages or compensatory

9  damages --

10          THE COURT:  Yeah.

11          MR. ELKIN:  Compensatory damages clearly has within

12  its purview the issue of disgorgement or however they're

13  characterizing that.  Well, it's not before you today, because

14  you were going to take it either under advisement or have

15  another argument with regard to our motion for

16  reconsideration.  But I thought the Court was fairly clear in

17  the last hearing with respect to the election.  They refuse to

18  make the election.

19          MR. DICKSTEIN:  Yeah, Your Honor, if we could be

20  heard?  I think at the last conference the concern was, I

21  think that Your Honor had -- if I'm saying this correctly --

22  was that some of defendants' document requests could

23  potentially -- with respect to licenses, and revenues -- could

24  potentially be relevant if plaintiff were seeking to recover

25  their actual damages, in terms of plaintiffs' losses.  We've

1  notified defense --

2          THE COURT:  I mean, my concern was whether or not --

3  whether or not you were seeking statutories or actuals?

4          MR. DICKSTEIN:  Well, so --

5          THE COURT:  And in Footnote 4 of your letter, you

6  really don't answer that question.

7          MR. DICKSTEIN:  Well, I think the issue is, in part

8  of actual -- in the comparative act -- actual damages consist

9  of plaintiffs' losses, but also disgorgement of defendants'

10 profits.  So --

11         THE COURT:  Yeah.

12         MR. DICKSTEIN:  -- we would still --

13         THE COURT:  And what I want -- and what I was hoping

14 for was an election as to whether or not you were going to

15 seek statutory or you wanted to keep the door open to

16 something else?

17         MR. SLOTNICK:  Your Honor, if I may?

18         THE COURT:  Go ahead.

19         MR. SLOTNICK:  Once Ms. Ranahan advised us of the

20 lack of registrations for some of the songs, and it eliminate

21 -- would eliminate statutory damages potentially, then at

22 least with respect to those works, we would like to leave the

23 door open to disgorgement of plaintiffs' profits --

24 defendants' profits.

25         To the extent that, you know, we're looking at these

71

1  registrations -- and I think we should have all of them

2  hopefully within the month -- you know, that may become a moot

3  issue as well.  So --

4           THE COURT:  All right.

5           MR. SLOTNICK:  -- well defer to that if you don't

6  mind?

7           THE COURT:  All right.

8           MS. RANAHAN:  Your Honor, we would just request that

9  you keep that in mind when reconsidering our issue on the four

10 Internet agreements.

11          THE COURT:  Okay.

12          MS. RANAHAN:  Thank you.

13          THE COURT:  Roman VI.

14          MR. DICKSTEIN:  Right, Your Honor.  As I mentioned

15 earlier, defendants had produced voluminous spreadsheets that

16 relate to various data about the recordings that are up on

17 their website.  One of those spreadsheets is the date when

18 each recording was downloaded.  And I --

19          THE COURT:  And I understand the issue here in --

20          MR. DICKSTEIN:  Okay.

21          THE COURT:  -- Section 115.

22          MR. DICKSTEIN:  Right.

23          THE COURT:  Their representation is that they have

24 no documents.

25          MR. DICKSTEIN:  Your Honor, I have to say it's hard

72

1   to believe that just coincidentally they have this data that

2   goes up to exactly three years before the lawsuit was filed.

3        THE COURT:  Well, I'm not sure that's what they're

4   saying.  Or maybe it is.  Let me look at the letter again.

5        "The parties have discussed this" -- this is defendants'

6   letter:

7        "The parties have discussed this multiple

8        times, and plaintiffs simply refuse to accept that

9        defendants have  no documents to reflect this

10       information.  It is unclear why plaintiffs even need

11       this information as they already represented to the

12       Court in their letter of December 6th, that

13       documents produced in discovery reveal that in

14       virtually every instance, defendants reproduced and

15       exploited the concert recordings more than 30 days

16       before sending applicable NOI.

17       Based on this representation, plaintiffs

18       apparently have all the information they need to

19       make the point they intend to make with this

20       information.  In any event, as defendants have

21       explained, they do not have information about the

22       date of first download for the recordings that go

23       passed three years.  While defendants preserved such

24       data when this lawsuit was filed, there is no

25       information that would satisfy this request that

73

1          remains in defendants' possession, custody or

2          control.  And defendants are not obligated to create

3          new documents that do no exists, especially

4          documents that precede the dates upon which

5          plaintiffs' damages are limited by the three-year

6          statute of limitations."

7               So, am I understanding the defendants to say that

8    the document preservation order that was issued when the

9    action was commenced, went back precisely three years before

10   the commencement date?

11              MS. RANAHAN:  Well, what we have is the revenue

12   information from that time.  We don't have date of first

13   downloads.  We don't -- we have it for recent times.  We have

14   revenue information.  But we don't what they've asked for,

15   which is a date of first download.  We just don't have it.  To

16   the extent that happened more recently, and that was reflected

17   in what we have produced, we have that.  We just don't have it

18   going passed three years.

19              THE COURT:  All right.

20              MR. DICKSTEIN:  Maybe it would just help, Your

21   Honor --

22              THE COURT:  I mean, there's case law that says when

23   -- you know, we're on the record here as the sign on your

24   tables indicate -- and there's representation not only on the

25   record here, but there's also the representation in the letter

1  from defendants of today, Docket Item 60, that the documents

2  don't exist and are not in their possession, custody or

3  control.  You know, unless you have evidence that that

4  representation is inaccurate, the representation by counsel,

5  the documents don't exist ordinarily ends the issues.

6         This sort of suspicion that there's got to be

7  something out there, is not enough to warrant an order to

8  compel production.  There's --

9         MR. DICKSTEIN:  I understand that, Your Honor.

10        THE COURT:  -- case law --

11        MR. DICKSTEIN:  -- and maybe we'll have to go at

12  this another way.  I would just point out that one of the

13  spreadsheets that defendants produced has this order date,

14  which is the date when the applicable recording was

15  downloaded, which starts on 5/27/2012 and it goes on for

16  thousands of line after that.

17        But if defendants are representing that everything

18  before that was destroyed before there was anticipation of

19  litigation, then we'll have to deal with this in another

20  manner.

21        THE COURT:  All right.  Okay.  Look, you know, the

22  Court -- the next issue concerns a refusal to enter into a

23  stipulation.  I mean, the Court can't issue an order directing

24  someone to stipulate to something.

25        MR. DICKSTEIN:  I understand that, Your Honor.  I

1  thought maybe as part of discussions here, we could all agree

2  that this stipulation would be the most efficient way to

3  proceed.  But if we need to move to supplement, well, that's

4  what we'll do.

5  　　　　　THE COURT:  Well, yeah.  And the witness -- the

6  scheduling issue is still an issue?  I thought the letter from

7  today --

8  　　　　　MS. RANAHAN:  Your Honor, when I spoke to

9  Mr. Dickstein on Saturday, we were with the agreement that

10  we'd schedule defendants' depositions in late January, early

11  February.  I'm not sure why this made it into the letter.

12  　　　　　MR. DICKSTEIN:  Well, that's fine.  But I think we

13  should start talking about dates now.  I don't want to wait

14  until that time.

15  　　　　　MR. ELKIN:  I don't think we --

16  　　　　　THE COURT:  Well, you can do that without my

17  presence.  And if you can't come to an agreement, I'll dictate

18  dates.  You know, you don't need me to mediate the discussion

19  between the two of you concerning deposition dates.

20  　　　　　Ordinarily, you know, in 99 percent of the cases,

21  counsel agree on deposition dates.  If you can't, I will

22  dictate a date, and that date will be it; unless someone's got

23  surgery or something of similar magnitude scheduled.

24  　　　　　MR. DICKSTEIN:  I appreciate that, Your Honor.

25  We've been trying to talk with them since October, but we'll

76

1  continue to do so.

2          THE COURT:  All right.  Well, if there's a failure

3  to talk about this, you can raise it.  But it sounds like

4  they're willing to talk about it.

5          MR. ELKIN:  I do, Your Honor --

6          THE COURT:  Let me --

7          MR. ELKIN:  -- I'm happy to personally participate

8  in discussions --

9          THE COURT:  Okay.

10          MR. ELKIN:  -- with counsel.  The one thing I would

11  point out that gives me some pause -- at least with respect to

12  where it's relevant -- one-third of the subject matter of

13  their complaint now is potentially subject to these

14  registrations that Mr. Slotnick says is going to be produced.

15  So, we're going to schedule depositions, but I just caution

16  the parties, when we do have that, that we need to get some

17  comfort around that, so we don't -- so it would be efficient.

18          THE COURT:  All right.

19          MR. DICKSTEIN:  Your Honor, I have the list here.

20  I'll give it to them as we're leaving.

21          THE COURT:  All right.  Let me go off the record for

22  a minute.

23          THE CLERK:  Sure.

24          THE COURT:  For a second?

25

1          [Pause in proceedings.]

2          THE COURT:  Okay.  We're back on the record.  Yeah,

3  we just had an off-the-record discussion.  I've asked counsel

4  to maybe get back to me some time in early January as to

5  whether or not a settlement conference before me makes sense.

6  They're going to talk to their clients and to each other, and

7  see what we can do.  All right.

8          Anything else we should be considering from

9  plaintiffs' point of view today?

10          MR. DICKSTEIN:  No, Your Honor.

11          THE COURT:  Oh, one other thing, when do you want to

12  respond to defendants' motion for reconsideration?  Since you

13  just got it this morning, I wasn't going to -- and I really

14  haven't had a chance to study it -- I didn't want to discuss

15  it today.  But maybe you want to put something in?

16          MR. SLOTNICK:  Some time early next week, Your

17  Honor?

18          THE COURT:  Well, do it the week after, because I'm

19  not going to be here for much of next week, so.

20          MR. SLOTNICK:  Better yet.

21          THE COURT:  Do it the week after.

22          MR. SLOTNICK:  Thank you.

23          THE COURT:  And, you know, any time the week after,

24  I'm not trying to ruin Mr. Dickstein's holidays.  So, it

25  doesn't have to be the Monday after New Year's.  If it's

78

1  toward the end of that week, that's absolutely fine.

2        MR. DICKSTEIN:  Thank you, Your Honor.

3        MR. SLOTNICK:  Thank you, Your Honor.

4        THE COURT:  Okay.  All right.

5        Anything else from defendants?

6        MR. ELKIN:  No, Your Honor.

7        THE COURT:  Okay.

8        MR. ELKIN:  Happy holidays.

9        THE COURT:  Thank you, all.  Same to you all.  I

10 hope you all have a great New Year -- a great holiday season

11 and a great New Year.

12        MR. ELKIN:  Thank you.

13        THE COURT:  These go back to Mr. Dickstein.  Okay.

14        MR. DICKSTEIN:  Thank you.

15 [End of recording.]

16

17

18

19

20

21

22

23

24

25

79

1      I certify that the foregoing is a court transcript from

2   an electronic sound recording of the proceedings in the above-

3   entitled matter.

4

5   _____

6                              Shari Riemer, CET-805

7   Dated:   December 22, 2016

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25