1                    UNITED STATES DISTRICT COURT
                    SOUTHERN DISTRICT OF NEW YORK
2

3    ---------------------------------------X
                                            :
4    ABKCO MUSIC, INC., et al.,             :   15-CV-04025 (ER)
                                            :
5                        Plaintiffs,        :
                    v.                      :
6                                           :   500 Pearl Street
     SAGAN, et al.,                         :   New York, New York
7                                           :
                        Defendants.         :   February 14, 2017
8    ---------------------------------------X

9           TRANSCRIPT OF CIVIL CAUSE FOR DISCOVERY HEARING
                 BEFORE THE HONORABLE HENRY B. PITMAN
10                 UNITED STATES MAGISTRATE JUDGE

11
     APPEARANCES:
12

13   For the Plaintiffs:        TAL DICKSTEIN, ESQ.
                                CHRISTIAN CARBONE, ESQ.
14                              Loeb & Loeb LLP
                                345 Park Avenue
15                              New York, New Jersey 10154

16
     For the Defendants:        ERIN R. RANAHAN, ESQ.
17                              Winston & Strawn LLP
                                200 Park Avenue
18                              New York, New York 10166

19

20

21   Court Transcriber:         SHARI RIEMER, CET-805
                                TypeWrite Word Processing Service
22                              211 N. Milton Road
                                Saratoga Springs, New York 12866
23

24

25


     Proceedings recorded by electronic sound recording,
     transcript produced by transcription service.

2

1          THE CLERK:  <u>ABKCO Music v. Sagan</u>.

2          Counsel, please state your name for the record.

3          MR. DICKSTEIN:  Tal Dickstein, Loeb & Loeb with my

4    colleague Chris Carbone also of Loeb & Loeb for all the

5    plaintiffs.

6          MS. RANAHAN:  Erin Ranahan of Winston & Strawn for

7    the defendants.

8          THE COURT:  Good morning.  We are here to address

9    some discovery disputes that have been raised in

10   correspondence that I've gotten over the last several weeks.

11   Let me just go through the correspondence.

12         I have this in chronological order so it goes back

13   and forth.  I have Ms. Ranahan's letter of December 20.  I

14   have Mr. Dickstein's letter of January 6th.  I have Ms.

15   Ranahan's letter of January 17, Mr. Dickstein's letter of

16   January 23, Ms. Ranahan's letter of January 26, Mr.

17   Dickstein's letter of February 3, Ms. Ranahan's letter of

18   February 8, and Mr. Dickstein's letter of February 13.

19         Is that the universe of relevant correspondence?  Do

20   you want me to go over those again?

21         MR. DICKSTEIN:  Just one second.

22         THE COURT:  If I went too fast I'll do it again.

23                    [Pause in proceedings.]

24         THE COURT:  Do you want me to go over it again?

25         MR. DICKSTEIN:  Our understanding is this conference

3

1   was called to address certain document discovery issues that

2   were initially raised in our January 23rd letter and to which

3   Ms. Ranahan responded in the January 26th letter.  Then we

4   have a reply on February 13.  So I think all those letters are

5   among the ones you listed.

6           THE COURT:  All right.  Well, I think -- I'd like

7   to -- I'm not -- who told you it was going to be limited to

8   those issues?

9           There is -- the non party witness subpoenas we have

10  coming up this Thursday but there's a [inaudible] of issues

11  here.  Who told you we're going to be limited to the January

12  23rd letter?

13          MR. DICKSTEIN:  As I recall the docket text from --

14  when this conference was initially scheduled for last Thursday

15  which we had to move because of --

16          THE COURT:  Yes.  I think we tried to schedule once

17  before then too actually.

18          MS. RANAHAN:  Your Honor, it was our understanding

19  that all the subpoena third party issues would be Thursday

20  including Israelite which would be -- that was our under --

21          MR. DICKSTEIN:  That was our understanding as well.

22          MS. RANAHAN:  We've briefed it and we're fine with

23  it if Your Honor would like to go through it now.  I haven't

24  actually seen the February -- that was filed yesterday, the

25  13th?

4

1           MR. DICKSTEIN:  Correct.

2           MS. RANAHAN:  Do you have a copy of it by any

3    chance?  I haven't seen it.

4           MR. DICKSTEIN:  It was filed on ECF.

5           MS. RANAHAN:  I missed it.  Do you have --

6           MR. DICKSTEIN:  Yes, you can have my copy.

7           THE COURT:  Let me -- I've got a list of topics but

8    I haven't broken them out by letter.  Let me go through my

9    topics and see what you're in a position to discuss today.

10          There's an issue in the correspondence regarding the

11   settlement agreement between the Rolling Stones and ABKCO

12   concerning the redactions and the confident -- and the highly

13   confidential designation.  Are you folks in a position to

14   discuss that today?

15          MR. DICKSTEIN:  Yes, we are.

16          MS. RANAHAN:  Yes, Your Honor.

17          THE COURT:  Okay.  Well, all right.  Why don't I

18   hear from -- did you bring a copy of that with you?

19          MR. DICKSTEIN:  I do.  What I have, Your Honor, is

20   an unredacted copy.

21          THE COURT:  Does it show what's redacted?

22          MR. DICKSTEIN:  Yes.

23          THE COURT:  Great.

24          MR. DICKSTEIN:  In red marker it -- in red marker it

25   indicates what's been redacted.  I'll hand this up.

5

1        THE COURT:  Yes, please.

2                [Pause in proceedings.]

3        THE COURT:  There are two agreements here.  Two

4   agreements.

5        MR. DICKSTEIN:  I think there's a total of four

6   documents, Your Honor.  There are two longer agreements and I

7   would be happy if it would help the Court to walk you through

8   how the musical composition rights were handled in these

9   agreements which as far as we understand that's really the

10  only issue as to why these would be relevant.  The rest of it

11  relates to rights to sound recordings, royalties for sound

12  recordings or whole collections of songs, some publishing

13  rights.  There were a number of issues that were live between

14  the band and ABKCO.

15       THE COURT:  Let me ask just -- I'm happy to hear you

16  on that but let me ask one other question at the outset.  As

17  the documents are redacted are they still in your view highly

18  confidential post redaction?

19       MR. DICKSTEIN:  We do think so, Your Honor, because

20  even as to their composition rights there are royalty payments

21  and royalty percentages here that are still in effect.  There

22  are references to other -- to a settlement, to a dispute

23  between the band and ABKCO, the publisher that was resolved.

24       THE COURT:  Why don't I -- let me hear from you

25  first on the redactions, the nature of what you've redacted

6

1   and why and then I'll hear from Mr. Ranahan.  Okay?

2          MR. DICKSTEIN:  Sure, Your Honor.  And I'd be happy

3   to go through this page by page if you would like.  What I can

4   say is that the redactions relate to dollar amounts that were

5   paid to the band members.  Those could be for royalty payments

6   for either composition royalties, publishing royalties on a --

7   not on a per song basis but that relate to a group of songs.

8          There are artist royalties, right, that relate to

9   payments for exploitation of master recordings.  There are

10  advance payments which were made to the band which would then

11  be recouped against royalty earnings.  There are -- there was

12  a transaction whereby I believe ABKCO sold a portion of a

13  company, Mirage Music, to primary band members, Mick Jagger

14  and Keith Richards, and the amount of -- the dollar amount for

15  that payment has been redacted.

16         There is information related to sub publishing

17  rights outside the United States which has no relevance here.

18  That's all been redacted.  There's information related to

19  delivery obligations on the band to provide other records, a

20  new upcoming album which again has no relation to the

21  ownership of the musical compositions here.

22         I think in a nutshell those are the nature of the

23  information that we redacted.

24         THE COURT:  All right.  Why are those redactions

25  inappropriate in defendant's view?

1          MR. DICKSTEIN:  Primarily because they --

2          THE COURT:  No, no, no.

3          MR. DICKSTEIN:  I apologize.

4          MS. RANAHAN:  Thank you.

5          THE COURT:  Maybe --

6          MS. RANAHAN:  He might have some ideas but, Your

7    Honor, there's -- so we cited a lot of authority.  It's

8    just -- it's completely inappropriate for a party to look at a

9    relevant document, a document that they've acknowledged as

10   relevant for ownership or for whatever reason and decide they

11   believe --

12         THE COURT:  Why is that --

13         MS. RANAHAN:  Especially large froths of it are not

14   relevant.  It's --

15         THE COURT:  Why is that any different -- there's a

16   split of authority in the district court decisions on this and

17   I'm not aware of any circuit authority.  I don't think any

18   circuit authority was cited but why is it inappropriate -- why

19   is it any different that a party who's responding -- in the

20   situation that exists when a party responds to a document

21   request and looks through a file of documents or looks through

22   a file cabinet of documents and says these documents are

23   relevant, these documents are irrelevant; I'm producing the

24   relevant, I'm not producing the irrelevant?  I mean why does

25   it make a difference -- why is it inappropriate to excise

8

1   irrelevant portions of a document?

2           MS. RANAHAN:  Well, Your Honor, if you just flip

3   through it -- I mean it is all redacted.  We can't even see --

4   I just heard for the first time it's several agreements.  We

5   can't even understand the context of this agreement with

6   the -- if you flip through -- I mean the first eight pages

7   are -- somehow it's marked highly confidential.

8           THE COURT:  What's the date of the document you're

9   looking at?

10          MS. RANAHAN:  Sure.  Okay.  So this is from our --

11  it's Docket 65.  I believe it's -- actually we didn't actually

12  file it given that it's --

13          THE COURT:  No.  The agreement -- I've got a

14  couple -- I've got four different agreements here.

15          MS. RANAHAN:  Okay.

16          THE COURT:  Is this the October 2, 1974?

17          MS. RANAHAN:  Correct, Your Honor.  That's what the

18  first -- so we have the first paragraph and then the last time

19  it was redacted.  The next page is redacted.  The next page is

20  redacted.  The next page is redacted.  The next page.  There's

21  no -- there's like ten pages of complete black.  For some

22  reason it's still designated highly confidential although

23  there's absolutely nothing on these pages.  I mean it goes on

24  and on.

25          THE COURT:  They probably have a problem showing

1    injury if you disclose the darkened pages.

2            MS. RANAHAN:  The time blocks are going to cause

3    some kind of irreparable damage to plaintiffs but I mean I

4    can't even show these black pages to my client to let him even

5    know what's happening as far as this dispute.

6            So there's -- I mean literally it's 13 pages of

7    black and I cannot imagine that every one of these sentences

8    and paragraphs is completely irrelevant to us understanding

9    what's happening in this document.

10            As far as royalties, Your Honor, why -- I mean

11   royalties show a value.  They can argue it's not relevant

12   because it's so long ago but by the same token, Your Honor,

13   why would there be any competitive harm about how royalties

14   were calculated in 1974.  I mean what -- if they're still in

15   effect then they should go to value and that should go to our

16   analysis of statutory damages.  They can absolutely argue

17   materiality on these things but we don't even have a chance to

18   understand the nature of this at all.  It's -- I've never seen

19   actions of this nature.  I understand if it's a privilege.

20   There's no claim of privilege.

21            Redactions may -- it's as if we don't have a

22   protective order governing this case.  We absolutely do.

23            THE COURT:  No, but I mean the -- the scope of

24   discovery is still limited to material that's relevant.

25            MS. RANAHAN:  It's relevant and proportional to the

1    needs of the case.  What is the -- what's the burden with them

2    just lifting these black things and letting us review it?

3                THE COURT:  Well, if it's irrelevant you're not

4    entitled to it.

5                MS. RANAHAN:  But how do I know?

6                THE COURT:  Let me give you the following

7    hypothetical.  If you had a Title 7 action where the plaintiff

8    was claiming that the plaintiff was fired for illegal

9    discriminatory reasons and you had a performance review

10   document that reviewed the performance of plaintiff and

11   reviewed the performance of four other individuals, I mean I'm

12   not sure why the -- why it would be inappropriate to redact

13   the performance review of the other individuals.

14               MS. RANAHAN:  Absolutely not.  If it was three other

15   bands at issue here and values of songs that weren't, that

16   would be one thing but these are --

17               THE COURT:  I think that we agree on the principle

18   that redaction of irrelevant information is not inherently

19   inappropriate.

20               MS. RANAHAN:  I agree with that, Your Honor, but I'm

21   not convinced that this is irrelevant and I don't think it's

22   appropriate for -- the call to be made by plaintiff's counsel

23   because --

24               THE COURT:  But the producing party always makes the

25   initial call on relevance.

1          MS. RANAHAN:  Right.  When it gets -- if you look at

2    the cases we cited, Your Honor, it's not appropriate.  Once

3    the document itself has been deemed to be responsive and

4    relevant it's not appropriate to then -- and you're right,

5    that maybe -- what's the difference but the cases have found a

6    difference.  We've cited --

7          THE COURT:  Well, the cases are split on that.

8          MS. RANAHAN:  I haven't seen any cases, Your Honor,

9    that hold it is appropriate to just selectively decide large

10   swaths of a document are irrelevant.  We're not convinced it's

11   irrelevant.  We don't understand why the value of royalties

12   calculated for these songs would be irrelevant to this dispute

13   altogether.

14         THE COURT:  Let me ask you this.  What -- the

15   agreements between the Rolling Stones and ABKCO are relevant

16   to what issue from your point of view?

17         MS. RANAHAN:  They're relevant to several issues,

18   Your Honor.  Ownership, how these songs -- how these rights

19   have been allocated over the years.  If you recall, they only

20   came to ask for this agreement because we found it on

21   Wikipedia and they hadn't produced it as part of our

22   ownership.  So this wasn't something that was voluntarily

23   produced.  We dug it up from a public reference.  It should

24   have been part of the ownership production because it

25   absolutely impacts the songs and the rights that are at issue

12

1   in this action and the way these rights are split.

2          It came about because related to the artist

3   depositions plaintiffs were resisting those and saying they

4   could have never had any rights.  Then we look on --

5          THE COURT:  You said it's relevant to ownership of

6   rights.  What --

7          MS. RANAHAN:  Ownership of rights.  It's relevant to

8   the -- [inaudible] we still believe for all the reasons we're

9   still trying to get on reconsideration before Your Honor those

10  four internet agreements.  The way that they calculate the

11  value is relevant to our burden to rebut a high end of

12  statutory damages.  I understand they're not required if

13  they're not seeking actual damages to establish actual damages

14  but we as defendants are absolutely entitled to present

15  evidence why it should be on the lower end because there

16  were --

17         THE COURT:  Let me tell you why I'm asking these

18  questions.  I think I'm going to review these in camera,

19  review the redacted material in camera and I'm trying to

20  under -- I want to get a list of what issues you believe these

21  licensing agreements are relevant to and I want to determine

22  whether or not any of the redacted material relates to the

23  issues that you think are relevant.

24         So you tell me ownership, value of the -- value of

25  the songs.  What else?

13

1          MS. RANAHAN:  Just as far as the -- a lot of these
2    cases are about how it's generally -- I'm quoting from some of
3    these cases.  It's unwise to do certain portions because you
4    don't have the context of the agreement.  I can't tell what
5    this is.  I have a paragraph, I have 15 redacted pages.  So
6    the point shouldn't be that they have to only redact
7    irrelevant stuff.  Not that we have to guess what's in these
8    black pages and justify relying --
9          THE COURT:  No, but that always exists in discovery.
10   I mean you never know what your adversary is withholding on
11   the grounds of relevance.
12         MS. RANAHAN:  We would hope to know in some sense or
13   at least trust the judgment calls, absolutely.  But, Your
14   Honor, what I'm saying is just because they don't like -- I
15   mean I -- I cannot imagine that all 15 of these pages are
16   incredibly irrelevant.  I mean if it's just innocuous stuff we
17   should just be able to see it to understand what this is.  We
18   can't make sense of this.
19         THE COURT:  It's not -- the Rule 26 standard is not
20   innocuous or whatever the opposite of innocuous is.  The Rule
21   26 standard is primarily relevance and non privileged and
22   proportional.  So --
23         MS. RANAHAN:  Right.  Well, proportional --
24         THE COURT:  It's not a question of whether it hurts
25   them or not.  It's --

14

1          MS. RANAHAN:  Right.  Absolutely.  But it's

2    proportional as far as there's no burden.  I mean I think we

3    can --

4          THE COURT:  Let me come back to my question.  The

5    agreements would be relevant to ownership, to value of the

6    compositions.  What else would it be relevant to?

7          MS. RANAHAN:  Definitely those two and then I just

8    think that we want to understand what this is.  I didn't know

9    it was four agreements.  All I see is one paragraph and a

10   couple of attachments.  Everything is redacted.  We're just --

11   we would just like only to be redacted things that Your Honor

12   agrees are absolutely not relevant instead of the reverse

13   which is we're getting just tiny little pieces of what they

14   claim is relevant and we can't figure out how this fits into

15   the scope of this agreement.  I don't know -- it doesn't tell

16   me this is a settlement, this is four agreements or -- I just

17   can't make out what this is.  I don't -- you'll have the

18   agreements, Your Honor, and I trust once you look at these

19   you'll be able to tell if any of this would shed any light but

20   from our perspective this is not a meaningful production.

21   This is we found a relevant document but we're going to -- we

22   don't want you to really know what's going on so we're going

23   to redact most of it.  It just doesn't --

24         THE COURT:  Are there any specific -- any other

25   specific issues that you think the documents may be relevant

15

1  to?  You told me ownership of the rights and value of the

2  composition.

3        MS. RANAHAN:  Right.  Well, I'll just say -- right.

4  So for value, statutory damages it's not just value but we can

5  really -- anything that's relevant to how damages would be

6  justly calculated in this case are relevant.  We can't -- I

7  would love to be able to tell you why I think what I can't see

8  is relevant.  Unfortunately I can't see what this is.  So if

9  something was in here that raised another lightbulb and I said

10 wow, we could use this for this issue in this case I would be

11 happy to do that but unfortunately I don't get that luxury.

12 Your Honor will get to see if there -- but I don't expect Your

13 Honor to try to figure out our best defenses and what we can

14 use this document for.

15       But I do think ownership, the rights at issue, the

16 value, statutory damages is a very broad category and it

17 doesn't just have to be value.  I mean the factors are endless

18 that a jury could consider if they want to find what's just in

19 that case.

20       THE COURT:  All right.

21       MR. DICKSTEIN:  Judge, if I might be heard on a

22 couple of those points.

23       THE COURT:  Yes.  There's one thing I'd like you --

24 I'm happy to hear you on anything but maybe one thing you can

25 address at the outset is if this is produced on eyes -- on an

1   eyes of counsel only basis, is there any harm to plaintiffs?

2           MR. DICKSTEIN:  I think there is.  You're saying

3   harm of designated as vanilla confidential?  Is that what the

4   Court --

5           THE COURT:  I'm sorry.  If it was produced as highly

6   confidential, eyes of counsel only --

7           MR. DICKSTEIN:  Right.

8           THE COURT:  -- is there some risk -- is there some

9   injury to plaintiffs?

10          MR. DICKSTEIN:  Of the redacted material?

11          THE COURT:  Yes, it was produced -- let me refine

12  the question.  If it -- if I ordered that it be produced in

13  unredacted form but on eyes of counsel basis only, is there

14  some prejudice to plaintiffs?

15          MR. DICKSTEIN:  I think there would, Your Honor.  I

16  mean these are incredibly sensitive documents.  This is

17  ABKCO's premiere band that they've been working with for

18  decades.

19          THE COURT:  Is there a confidentiality provision in

20  these agreements?

21          MR. DICKSTEIN:  I don't know that there is.  I know

22  it relates to settlement of a confidential arbitration which

23  was had been the band and the publishers.  So I think --

24          THE COURT:  No, but I mean if they're incredibly

25  sensitive as I think you characterized them, one would expect

1   to see a confidentiality provision.

2            MR. DICKSTEIN:  Your Honor, they may not at this

3   time and the '70s have had the foresight to see what the

4   Stones would become and what their --

5            THE COURT:  They were pretty big by the 1970.  I

6   don't know if you were around then but I was.

7            MR. DICKSTEIN:  Just for a few months, Your Honor.

8            MS. RANAHAN:  I had a few years, Your Honor.

9            THE COURT:  They were pretty big by then.

10           MR. DICKSTEIN:  The other point I guess I would

11  make.  At the outset Your Honor asked is there any Second

12  Circuit authority on this.  We actually did cite a Second

13  Circuit case on Page 5 of our January 24 letter.  <u>New York</u>

14  <u>Times versus</u> -- <u>New York Times Co. v. Gonzalez</u>, 459 F.3rd --

15           THE COURT:  I think you have the better of the

16  argument on whether or not you have the right to redact

17  irrelevant material but I'm concerned about -- my question is

18  if it's produced on the eyes of counsel basis only is there

19  injury.  I mean one of the points that your adversary made

20  which I think has some weight is that obviously counsel are

21  far more familiar with the case than I am and I may look

22  through what you've redacted and conclude that it's irrelevant

23  but maybe there is some length to an argument that defendant

24  is contemplating that Ms. Ranahan might recognize that I might

25  not.  I can try to read it standing in defendant's shoes but

18

1  I'm not going to have all the knowledge about the case that

2  defendant's counsel is going to have.  Go ahead.

3  　　　　　　MR. DICKSTEIN:  Well, I think she's correct that she

4  identified two areas where these documents are potentially

5  relevant.  Ownership, but ownership of what?  What we're suing

6  on here are musical compositions and I think it's Page 14 of

7  that document that we were just looking at which has a

8  paragraph entitled musical compositions I believe.

9  　　　　　　THE COURT:  This is the 1972 document?

10  　　　　　　MR. DICKSTEIN:  I think we were looking at the '74

11  document and it -- right, it's Page 14.

12  　　　　　　THE COURT:  One second.  Let me get to it.

13  　　　　　　　　　　　　[Pause in proceedings.]

14  　　　　　　THE COURT:  Page 14 is an unredacted VI music

15  publishing copyrights.

16  　　　　　　MR. DICKSTEIN:  Correct.

17  　　　　　　THE COURT:  Go ahead.

18  　　　　　　MR. DICKSTEIN:  If you follow the language there it

19  essentially says that any songs that are listed in Exhibit G

20  to that document and that are not crossed out the ownership

21  remains with ABKCO or its affiliate ABKCO Music AMI.  And that

22  follows on an earlier agreement which we've provided, you

23  know, redacting the irrelevant portions, from 1972 where the

24  songwriters Mick Jagger and Keith Richards agreed that

25  pursuant to an earlier agreement ABKCO's predecessor is the

1    owner of the composition. That's Paragraph 3 of the '72

2    agreement. And that earlier exclusive songwriter agreement

3    which I just referred to was September '66 which we've

4    produced and it expressly says that Mick Jagger and Keith

5    Richards assigned to Gideon, which is ABKCO's predecessor, all

6    musical works which have been written, composed, created or

7    conceived in whole or in part by the writers or which may be

8    created within five years thereafter.

9            So in terms of tracing the ownership of rights I'm

10   happy to go through that again. I know it's a number of

11   pieces of paper you have to shuffle around but all that

12   information has been provided in unredacted, completely

13   unredacted form except for maybe some dollar figures that

14   relate to a number of songs.

15           And actually that brings me to the second point

16   which Ms. Ranahan raises, potential grounds for relevance is

17   the value. None of the dollar figures here, none of the

18   material that's been redacted relates to specific

19   compositions. This is the same issue that I think Your Honor

20   may hear on these blanket internet licenses which maybe we'll

21   get to later today. But there were payments made for whole

22   collections, whole numbers of songs here. There's really

23   nothing in these documents that would let you apportion those

24   to the value of any particular song and that's what we're

25   suing on here. We're suing on a handful of Rolling Stones

20

1   songs.  So I think with the benefit of reviewing these

2   documents in camera I hope and I think that the Court will see

3   that the -- whatever relevance is to be gleamed --

4         THE COURT:  Are any of the collections -- I just was

5   handed these a few moments ago and I haven't really looked at

6   them but are any of the collections of songs for which numbers

7   are quoted, are any of those entire collections the subject of

8   this action?

9         MR. DICKSTEIN:  No.  There are other Stones songs

10  that are not the subject of this action.

11        THE COURT:  Okay.  All right.

12        MS. RANAHAN:  Your Honor --

13        THE COURT:  Anything else you want to tell me on

14  this issue?

15        MR. DICKSTEIN:  No, nothing else, Your Honor.

16        THE COURT:  Go ahead.

17        MS. RANAHAN:  Your Honor, so the argument that

18  plaintiff's counsel made on the internet agreements was that

19  they applied to --

20        THE COURT:  Go ahead.  Go ahead.

21        MS. RANAHAN:  -- not just particular songs that were

22  at issue in this case but the whole -- all of their songs.

23        THE COURT:  Right.

24        MS. RANAHAN:  These are values that actually go to

25  songs in this case.  While I understand perhaps it includes

21

1  some other Rolling Stones songs, I mean this is a real narrow

2  window into what they've now told us still apply today which

3  is the justification for why this is so confidentially

4  sensitive even though they're I mean literally 40 years ago

5  agreements.  Under the protective order the only basis for

6  them to desig -- I am absolutely fine with Your Honor's

7  suggestion that perhaps they just produce it to the attorneys

8  highly confidential although I'm incredibly suspect about how

9  there's confidential harm from agreements 40 years ago that

10  have no confidentiality provision and that we were able to

11  find out about from Wikipedia instead of their production.

12         The Wikipedia basically set forth the terms that

13  guess what, Brown Sugar is actually part of a co-publishing

14  settlement agreement.  That's how we found out this existed.

15  But the idea that plaintiffs on the one hand want to suggest

16  oh, it's confidentially sensitive because actually these

17  values and royalties still apply today, these 40 year old

18  royalty agreements.  We can't see them although they're

19  actually applicable to specific songs that are at issue in

20  this case.

21         I appreciate that plaintiffs have brought a case

22  that implicates a lot of very popular musicians and songs and

23  want to protect them but unfortunately they're part of this

24  case.  We cannot be bootstrapped from understanding the value

25  of the very songs that are at issue in this case.

22

1          Your Honor, I'm actually -- I couldn't even tell --

2   when you guys were talking about how this is for -- I mean

3   four different documents, from the redactions, Your Honor, and

4   I would just ask you to -- while you're reviewing the red

5   highlights look back at what they gave us because it's the

6   first ten pages are -- the first 13 pages are all black.  I

7   can't tell that this is four documents.  It looks to me like

8   one document.  We're going to go into a deposition of the

9   ABKCO representative and ask him about what, what is -- I

10  cannot tell what this is.

11          So I would just, Your Honor, ask that you -- your

12  suggestion that perhaps we review it highly confidential,

13  although again I don't agree with that designation at all but

14  that would be a compromise then we could at least review it

15  and look to see if there's anything else this can be relevant

16  to including value, including statutory damages, including

17  just a basic context of what this is which is really -- the

18  case is -- I appreciate Your Honor's concern that what's the

19  difference if counsel is making calls about holding this whole

20  thing back just because it appears in a document that's

21  somewhat relevant why shouldn't some of it be redacted and I

22  appreciate that.

23          But the concerns that have been expressed are once

24  you have found a document that is in part relevant to just

25  decide that you're going to take away the ability to review

23

1  the context, understand what you're looking at, be able to ask

2  a person at a deposition let's look at these four agreements

3  which I can't do with what I have right now.  I have let's

4  look at this paragraph.  I'm going to imagine the person

5  reviewing it is going to say I can't tell what this is and my

6  questions are going to be quite limited.

7          If we're going to go to the ABKCO CEO and have this

8  document we should certainly be -- the attorney to be allowed

9  to ask the ABKCO CEO about this agreement and they can object

10  later to the district court if they think something should not

11  be brought into trial but the idea that we're going to be not

12  able to ask their own ABKCO designee about this agreement with

13  any meaningful ability to ask about the context it doesn't

14  seem right, Your Honor.

15          So I would request that at least so that we can ask

16  their ABKCO CEO who has definitely seen this agreement -- I'm

17  sure he's familiar with it -- why we shouldn't be able to show

18  that to him and review it and ask the relevant questions.

19          THE COURT:  Just let me just ask plaintiff's counsel

20  another question.  This may have come -- there are -- I'm not

21  sure if things here have gotten unclipped or unstapled.  I've

22  gotten -- I've got a multi page document dated May 3, 1972.

23          MR. DICKSTEIN:  Correct.

24          THE COURT:  I've got another multi page document

25  dated October 2, 1974.

24

1          MR. DICKSTEIN:  Correct.

2          THE COURT:  I have two letter agreements dated May

3   3, 1972 for --

4          MR. DICKSTEIN:  Those are stapled together I

5   believe.

6          THE COURT:  Yes, it's four pages total.

7          MR. DICKSTEIN:  Right.  Those are just two copies of

8   the same --

9          THE COURT:  Those are two copies of the same thing.

10  They look like two copies of the same thing.

11         MR. DICKSTEIN:  But different.

12         THE COURT:  I have two pages that are loose and I

13  just want to make sure -- maybe I -- one is entitled ABKCO

14  Music, Inc., Rolling Stones writer earnings March 31, 1972.

15  The second page is entitled ABKCO Music, Inc., summarization

16  of settlement with Mick Jagger and Keith Richards.

17         MR. DICKSTEIN:  Correct, Your Honor, and --

18         THE COURT:  Is that part of something else?

19         MR. DICKSTEIN:  I believe these are referenced in

20  some of the larger agreements that you referred to earlier.

21  That's why -- I don't believe these two loose documents you

22  just referred to have any independent significance to --

23         THE COURT:  No.  But should they be attached to one

24  of the other documents?

25         MR. DICKSTEIN:  They were not.  I think they were

25

1    referenced in --

2              THE COURT:  Okay.

3              MR. DICKSTEIN:  -- the '74 agreement I believe.

4              THE COURT:  Is there another agreement that I should

5    have?

6              MR. DICKSTEIN:  No, Your Honor.  Maybe this will

7    help to clarify.  What I said earlier that there were four

8    agreements I think I said -- what I was just simply referring

9    to was that there were multiple documents that we've submitted

10   to Your Honor and we produced all of them in redacted form to

11   defendant's counsel.  So in total I guess there are two

12   somewhat lengthy agreements, the letter, the 1972 letter

13   agreement you referred to and then two loose documents which

14   basically have financial information.  So that's the totality

15   of the documents we're talking about.

16             THE COURT:  All right.  I'm going to review these in

17   camera to see if there's anything in the redacted material

18   that relates to the issues that Ms. Ranahan has identified.

19             MS. RANAHAN:  Your Honor, that raises another point

20   which is that if there's references to other documents in

21   these redacted portions we -- I couldn't see what part you

22   were just referring to because it's a black box for me but I

23   would believe we're entitled to try to understand the

24   connection between this and the existing documents they've

25   produced and again, Your Honor --

1          THE COURT:  It may -- the issue you're raising

2    sounds like it's somewhat premature.  Maybe we should decide

3    first whether or not you get the material that's been redacted

4    and then if you think that leads you to get some other

5    documents we can cross that bridge if as and when we get to

6    it.

7          MS. RANAHAN:  Thank you, Your Honor.  I mean we

8    would just --

9          THE COURT:  Is I think what you were saying.

10          MS. RANAHAN:  We would just like to be able to ask

11    their designee about this, the ABKCO designee in deposition.

12    I don't -- unredacted.  If it needs to be highly confidential

13    which again I mean I'm happy to address that again.  We don't

14    agree with that designation given the length and date of it

15    but if it's relevant material still because of the royalties

16    that are still in effect I do believe we should be able to at

17    least ask.  At least ask.  They can certainly raise later that

18    they don't think this is admissible for whatever reason but

19    the idea that we can't even ask their designee about this

20    agreement between them and the songwriters that are both at

21    issue in this case about songs at issue in this case seems --

22    I get it for what their argument -- I disagree with their

23    internet agreement argument but the idea that now they're

24    extending these same concepts to an agreement between

25    plaintiffs and the artists about songs at issue in this case

27

1  it's over the top.

2          MR. DICKSTEIN:  Judge, if I could just --

3          THE COURT:  Let me just -- to make my life a little

4  bit easier when I go through this, can you just identify the

5  songs that -- the Rolling Stones songs that are the subject of

6  this litigation?  I've got the complaint if you can just run

7  through them it will save me from having to go through the

8  complaint.

9          MR. DICKSTEIN:  No problem.  It's Brown Sugar, Give

10  Me Shelter, Honky Tonk Woman.

11          THE COURT:  One second.  Brown Sugar.

12                    [Pause in proceedings.]

13          THE COURT:  Go ahead.  What else?

14          MR. DICKSTEIN:  Brown Sugar, Give Me Shelter, Honky

15  Tonk Woman, Jumpin' Jack Flash, Let it Bleed, Let's Spend the

16  Night Together, Sympathy for the Devil.

17          THE COURT:  What's after Sympathy for the Devil?

18          MR. DICKSTEIN:  After that is Under My Thumb and the

19  last one You Can't Always Get What You Want.

20          THE COURT:  Okay.

21          MR. DICKSTEIN:  Judge, if I could just be heard very

22  quickly.  To crystalize this issue, if ABKCO had a recording

23  agreement with the Rolling Stones was part of a separate

24  document there would be no argument that defendant's counsel

25  would be entitled to review that.  So simply the fact that

1  that happens to be part of an agreement that also discusses
2  ownership of copyrights I don't think entitles them to review
3  provisions about master recording rights.
4          THE COURT:  There are nine Rolling Stones songs that
5  are in issue.  Let me just go through them again to make sure
6  I got them all.  Brown Sugar, Give Me Shelter, Honky Tonk
7  Woman, Jumpin' Jack Flash, Let it Bleed, Let's Spend the Night
8  Together, Sympathy for the Devil, Under my Thumb, and You
9  Can't Always Get What You Want.  Right?
10         MR. DICKSTEIN:  That's it.
11         THE COURT:  Okay.
12         MS. RANAHAN:  One last point, Your Honor.  The fact
13  that we're even -- well, that's fine.  Your Honor, it's fine.
14  I think we're --
15         THE COURT:  One of the other things, I think you
16  were asked to bring were the blanket internet licenses.
17         MR. DICKSTEIN:  Correct, Your Honor.  After
18  consulting with our clients what they have is our agreements
19  with You Tube was one of the four internet companies I believe
20  that defense counsel identified.  There are no agreements
21  between our clients and the other three entities that
22  defendant's counsel identified.  But I do have --
23         THE COURT:  There's only one internet, one blanket
24  internet license.
25         MR. DICKSTEIN:  Each of the six publishers that are

29

1  plaintiffs, six groups of publishers that are plaintiffs in

2  this action have a blanket agreement with You Tube.

3          THE COURT:  I see.  But --

4          MR. DICKSTEIN:  So there are six separate agreements

5  but there are -- none of the -- our publisher plaintiffs have

6  agreements with the other three internet companies that

7  defendants have identified.

8          THE COURT:  Are all six licenses identical?

9          MR. DICKSTEIN:  They're not.  Some of them, the

10 independent publishers, the licenses are a little bit more

11 similar but certainly when you get to Sony ATV which

12 administers the EMI music publishing catalog as well as Warner

13 Music Publishing they differ dramatically.  There's -- well,

14 if Your Honor is going to review them you'll see this but

15 there are minimum advance payments, all of which are

16 incredibly sensitive.  I'm happy to get into that if you --

17         THE COURT:  All right.  If you want to give those to

18 me I'll review those also.

19                  [Pause in proceedings.]

20         MS. RANAHAN:  Your Honor, just one last point that I

21 do want to raise about the redaction issue.  You asked

22 counsel --

23         THE COURT:  Hold on just one second.

24         MS. RANAHAN:  I'm sorry.

25                  [Pause in proceedings.]

30

1          THE COURT:  Go ahead.

2          MS. RANAHAN:  You asked plaintiff's counsel what is

3    the harm if we see it, the attorney see it and they really

4    didn't have anything and I just would again just request that

5    and on this issue, Your Honor, last time we were here -- we've

6    been trying to get these four internet agreements for months

7    as Your Honor knows and the representation was that counsel

8    had looked at the agreements, they're not -- or at least

9    looked at some of them or understood they were all the same.

10   This is the very first time I've heard guess what, three of

11   those agreements don't even exist.  Why have we been -- we

12   were at least were told they existed and that they were the

13   same.  Now we're finding out today that guess what, three out

14   of the four entities that we've been wasting our time trying

15   to get before Your Honor to reconsider don't even exist.  That

16   could have been -- if there would have been just some basic --

17          THE COURT:  It didn't change the issue --

18          MS. RANAHAN:  We still have the one.  We still have

19   the --

20          THE COURT:  We dealt with all of them as a block.

21          MS. RANAHAN:  I appreciate that.

22          THE COURT:  So that really didn't change.

23          MS. RANAHAN:  I appreciate that but I would just --

24   the fact that they had looked at this and looked at the

25   agreements and didn't think that they were relevant, I mean

1   they don't exist.  So I appreciate it.  I'm glad we're at

2   least now having the one that is still in play before you but

3   I just wish we had known there was one.

4            THE COURT:  As I say, I don't think it would have

5   changed anything because we dealt with all four as a block.

6            MS. RANAHAN:  That's right.  That's right.

7            MR. DICKSTEIN:  Just if I might respond to counsel's

8   statement.  I don't believe I ever represented or my

9   colleagues ever represented that all the agreements were

10  identical.  They're all blanket licenses.  I believe that was

11  the critical fact.

12           THE COURT:  I think that's correct.  All right.

13           MS. RANAHAN:  I didn't suggest they're identical,

14  Your Honor.  I just thought that they existed.  That's all.

15           THE COURT:  Again, I've got a list of topics here

16  but they're not broken out by -- not broken out by letter.

17           MR. DICKSTEIN:  Actually, Your Honor, are we moving

18  beyond the internet licenses?

19           THE COURT:  Yes.

20           MR. DICKSTEIN:  I did want to add something.  Our

21  clients are incredibly -- feel that these are incredibly

22  sensitive documents.  Not only from one publisher to the next,

23  right, we were competitors, but also from other third parties

24  that could conceivably get a hold of these.  There are as I

25  mentioned earlier minimum guaranteed royalty payment, dollar

32

1  figures in the high six and seven, seven and eight figures I

2  believe which would be incredibly damaging if this was to

3  become public.

4           I just want to also note for the record that while

5  I'm not impugning the integrity of defendant's counsel I just

6  would note that they do represent a number of these internet

7  companies, Amazon, Veo, et cetera, and in some cases it could

8  be hard to unring the bell.  Once you see an agreement you

9  understand how they work, what the general numbers are, I

10 believe there's an inherent danger, a competitive danger to

11 our clients of producing these and on top of that we don't

12 believe they're relevant because as Your Honor will see

13 they're entirely blanket license agreements that don't

14 reference the songs at issue in this case.

15           THE COURT:  All right.

16           MS. RANAHAN:  Your Honor, can I respond to that?

17           THE COURT:  Go ahead.

18           MS. RANAHAN:  The notion that there's some inherent

19 danger and that we don't have a protective order, we have a

20 protective order in this case.  There's absolutely no

21 indication that we as a law firm, our counsel would somehow

22 take what we know from this case and apply it to other

23 clients.  I take offense to the accusation.

24           THE COURT:  I'm not sure how you unring the bell

25 given the obligation that you have to -- you got the same

1  obligation to represent all your clients zealously.

2          MS. RANAHAN:  Absolutely but we --

3          THE COURT:  It's difficult -- I mean if you -- a

4  lawyer is in a difficult position if he learns something with

5  respect, or she learns something with respect to client A

6  that's subject to a confidentiality provision and is then

7  advising client B and this information may help or hurt client

8  B.  I mean it's easy for the lawyer not to explicitly pass the

9  information on to client B.  I don't think that's the issue.

10 But what is I think more tricky for a lawyer to make sure that

11 he or she is insulating in his or her own mental processes

12 what they've learned from client A.

13         MS. RANAHAN:  Your Honor --

14         THE COURT:  That I think -- even when the -- I'm not

15 suggesting a lawyer acting in bad faith but it's difficult --

16 it is difficult to parse out from your psyche what you've

17 learned in the past.

18         MS. RANAHAN:  Your Honor, we're litigators. I don't

19 do transactions and I'm not trying to take any terms to give

20 my client some advantage.  We're litigators.  We deal with the

21 facts after they happened.  How we're going to -- the idea

22 that we cannot now get information to defend our clients

23 because we may have represented Veo who is now a defunct

24 entity ten years ago is the most -- I mean this -- there's no

25 authority to support this notion.  We have a protective order

34

1   in place.  We can't even get discovery now because there's

2   some paranoid threats that we're going to potentially --

3                  THE COURT:  No, no, no.

4                  MS. RANAHAN:  Your Honor, there's no -- there's no

5   support for this notion that we cannot review relevant

6   documents because --

7                  THE COURT:  The issue really is relevance and I'm

8   going to take a look at them to see if they are as they were

9   represented to me but if they are as they were represented to

10  me in the past I'm not sure that they're going to be relevant

11  or helpful or will illuminate any issue in the case.  So I'm

12  going to look at them but if they are the blanket kind of

13  licenses that were described previously I'm still not sure

14  they're going to get you anywhere.

15                 MS. RANAHAN:  I would just request that you review

16  our briefing on value -- and it's not just value but what is

17  relevant to statutory damages and why -- even if it's a

18  blanket amount why we shouldn't be able to investigate that

19  and show that to our expert.

20                 THE COURT:  All right.  I'm not trying to cut you

21  off.

22                 MS. RANAHAN:  Also, I mean, Your Honor --

23                 THE COURT:  We're getting a little repetitive with

24  arguments --

25                 MS. RANAHAN:  Right.  I understand.

35

1         THE COURT:  -- over the last month or so -- the last

2    two months.

3         MS. RANAHAN:  I understand, Your Honor.  But we --

4         THE COURT:  Let's wrap up --

5         MS. RANAHAN:  If you recall there was 15 transcripts

6    to depositions that we produced to them that were not

7    "relevant" but because they found one sentence and one

8    declaration Your Honor allowed those to be produced.  This

9    idea that one -- now it's down to one, not even four.  No

10   burden.  You have the agreement before you.  They've now at

11   least looked to see if they had them.  They've now finally

12   investigated to see whether they actually even have these

13   agreements.  The idea that we can't now see this one agreement

14   because of competitive confidentiality concerns, I mean we

15   have a protective order.

16        It's as if we do not have a protective order and

17   that we are some shop that's going to be using this for

18   improper reasons.  I can -- I am just offended by the

19   suggestion that we can't unring the bell.  Of course we're

20   always held to the standard of if we are given information for

21   one case we can't go using it to advantage our other clients.

22   That's -- this is basic.  The idea that we now have our boot

23   strapped from representing zealously our own client in this

24   case because of some threat --

25        THE COURT:  That's not the issue.  That's really

1   not the issue here.

2          MS. RANAHAN:  Okay.  Well, Your Honor, again, I

3   would just request that you look at our briefing on this issue

4   because the relevance to statutory damages is real and a jury

5   can't consider nearly anything and if these are the rates that

6   apply to these songs at issue whether it also applies to other

7   songs is still relevant.

8          THE COURT:  Well, I'm not -- there were a lot of

9   songs that were around in the '60s that may be covered by

10  these licenses that if I were to give you their titles you

11  would have never heard of them, and if it's a license

12  agreement that encompasses royalties for a song like Snoopy

13  Versus the Red Baron, and there was such a song in '66 or '67,

14  and something like Satisfaction, I'm not sure how relevant it

15  really is or whether it really illuminates what the statutory

16  damages should be for an infringement of Satisfaction, if

17  there was an infringement of Satisfaction.

18         MS. RANAHAN:  Well, that information can certainly

19  [inaudible] our experts to make a calculation about high end

20  songs, low end songs and their expert can dispute it and say

21  look, this is what exactly Your Honor is suggesting but it's

22  not appropriate to limit discovery on that basis that you --

23         THE COURT:  It does -- look, I appreciate that

24  relevance is a continuum and that it's not a black and white

25  matter but there does -- there does come a point where the

37

1  relevance is so attenuated it's not even discoverable, and I

2  appreciate that relevance for discovery is a broader concept

3  than relevance for admissibility at trial even after the

4  December 15 amendments to the federal rules.  But there still

5  comes a point where the relevance is so thin that it's not

6  discoverable but I will take a look at the license agreements

7  to see what they provide.

8          MR. DICKSTEIN:  Just to add, Your Honor, because I

9  think you may have been under a misconception.  The

10  agreements, they don't just relate to songs from the '70s,

11  even obscure ones like Your Honor mentioned.  These are

12  catalog wide agreements which are in some cases for some

13  publishers millions of songs.

14          MS. RANAHAN:  It's a valid agreement.  It would

15  cover every song at issue in this case.  It would cover every

16  song.

17          THE COURT:  Enough.  I've heard enough on this.

18  Okay.  We've argued this before and we just argued it again.

19  I think the issues have been ventilated.

20          Again, I've got -- one of the issues here is a

21  request by plaintiff to depose Klanos and a request for the

22  Klanos [Ph.] documents.  Are you in a position to address

23  that?

24          MR. DICKSTEIN:  I don't believe that's a live issue,

25  Your Honor.  We've already been speaking with Mr. Klanos's

38

1  counsel.  We're setting a date for a deposition.

2      THE COURT:  Okay.  Fine.  There was another issue in

3  the correspondence as to due diligence files from defendant's

4  transactional counsel.

5      MR. DICKSTEIN:  Yes, Your Honor, that is an issue

6  and I'm prepared to address that.

7      THE COURT:  That was because there were three or

8  four additional documents that were produced.

9      MR. DICKSTEIN:  And when those documents were

10  produced I believe the representation was made they were found

11  in offsite storage of one of their transactional counsels and

12  we're simply asking them to look at any other files.  I think

13  there are half a dozen concert recording acquisitions that

14  occurred here.  That's what makes up defendant's collection as

15  it pertains to the songs that are relevant.  We're just asking

16  them to go look at those documents.  I think they have an

17  obligation to do that under Rule 26 and to produce any

18  responsive documents.

19      MS. RANAHAN:  Your Honor, we told them -- okay.

20      THE COURT:  Have you finished?

21      MR. DICKSTEIN:  And just to drive that point home.

22  What I think it's relevant to is the issue of willfulness.

23  We've already discovered documents and we've -- these were

24  subject of questioning of defendant's president last week that

25  defendants had reason to believe that they lacked certain

1  rights to these compositions -- to these recordings that they

2  acquired.  Certainly to the compositions.

3          So we do have a reason to think that further

4  discovery as to what their transactional counsel knew at the

5  time, what documents are being exchanged with the vendors of

6  these recordings.  Certainly we're not seeking privileged

7  communications with defendants but to the extent these types

8  of marketing materials or other communications were exchanged

9  which would illuminate what defendants knew about the nature

10  of the rights they were acquiring in these recordings, I think

11  that's going to be highly relevant to the issue.

12          THE COURT:  Well, presumably I mean if there were

13  such documents it would be in defendant's interest to produce

14  them.

15          MR. DICKSTEIN:  Well, Your Honor --

16          THE COURT:  If there were documents saying that they

17  had -- that they were receiving the rights to do X, Y and Z I

18  would think they would be very interested in producing them

19  and using them.  I'm not sure why there would be an

20  interest --

21          MR. DICKSTEIN:  That may be right, Your Honor, but

22  what we've discovered is actually the documents say the

23  opposite.  They say that it's likely the vendors do not own

24  the rights.

25          THE COURT:  Let me -- the issue here really is I

40

1    guess what repositories have been searched.

2           Ms. Ranahan, have --

3           MS. RANAHAN:   Thank you.

4           THE COURT:   Has the defendant reviewed the files --

5           MS. RANAHAN:   Yes.

6           THE COURT:   -- of transactional counsel?

7           MS. RANAHAN:   Yes.   In fact, when we located these

8    three which were based on a specific request by plaintiff's

9    counsel our transactional counsel did search his whole files

10   and I've told plaintiff's counsel multiple times that he in

11   discovering these hard copy things that were offsite and

12   somehow didn't make it into his electronic records he dug out,

13   found a hard copy.   I actually told plaintiff's counsel this.

14   To think he would actually appreciate the extra effort we had

15   gone to.   Instead I got a barrage of accusations that we

16   hadn't done diligence because we hadn't searched the facility

17   before.

18          When our transactional counsel located this he did

19   search the facility and I since updated plaintiff's counsel to

20   clarify that, that this wasn't some run in, grab one file and

21   leave.   He actually then surveyed because as Your Honor

22   recognizes it's in our interest to have anything relating to

23   diligence produced.   Our client did extensive diligence.   It's

24   just not the type that plaintiff's counsel is imagining

25   happened.

1          So we have done extensive searches on top of

2   searches on top of searches and this offsite storage facility

3   has been exhaustively searched.  I've told plaintiff's counsel

4   that.  This issue keeps coming up every hearing we are before

5   you, Your Honor.  This is the fourth time we talked to you

6   about diligence files and the fourth time I've told you we

7   have done everything we can to search every diligence file and

8   turn anything over we can locate.  This was a very specific --

9          THE COURT:  This was with respect to all

10  transactional counsel?

11         MS. RANAHAN:  Yes.  Right.  Exactly, Your Honor,

12  yes.

13         THE COURT:  Mr. Dickstein, that sounds sufficient.

14         MR. DICKSTEIN:  I think that's the first time I've

15  heard the representation made that they've searched the files

16  of all transactional counsel for all of these, and if that's

17  the case and nothing responsive was located then I don't think

18  there's anything to discuss at this point.

19         THE COURT:  I think I agree with you.

20         There was a request by plaintiff for artist

21  deposition transcripts from other actions.

22         MR. DICKSTEIN:  That's been resolved.

23         THE COURT:  There was an issue about the defendant's

24  production of documents reflecting the date of the first

25  downloads and defendants represented that they did not have

42

1  documents reflecting the date of the first downloads.

2  　　　　MR. DICKSTEIN:  We're going to pursue that issue in

3  discovery, the depositions, but it's not a live issue before

4  Your Honor.

5  　　　　MS. RANAHAN:  I think Your Honor dealt with that at

6  the last hearing.

7  　　　　THE COURT:  Well, it's raised in the correspondence

8  subsequent to December 20th.

9  　　　　There's an issue that's raised in several of the

10  letters regarding new website, wolfgangs.com.  Essentially

11  what it does -- they used to have wolfgangsvault.com and now

12  that redirects if you type in wolfgangsvault.com you'll get

13  sent over to wolfgangs.com.  So what we were seeking was an

14  agreement that that new domain is part of this litigation.

15  Defendant's counsel refused.  So what we're prepared to do is

16  file a motion to supplement.  We can probably get that on file

17  today or this week for sure.

18  　　　　We don't think it's really a dispute here.  In fact,

19  defendant's principal explained that Wolfgangs is Wolfgangs

20  Vault or something to that effect, that it's merely a new

21  iteration of the website they've had from the beginning.  So I

22  don't know why we're being put to the burden of preparing a

23  formal motion to supplement our pleading.

24  　　　　THE COURT:  You're going to make a motion to amend

25  to add it?

43

1          MR. DICKSTEIN:  It would be a supplementation I

2    believe because it's something that happened after the filing

3    of the initial complaint.  So that's the issue with the new

4    website or new domain.

5          Separately, there's an issue that I believe was in

6    December late last year we discovered that were hundreds of

7    new concert recordings.  I shouldn't say new.  These are old

8    recordings but they were newly added to all of defendant's

9    websites, or I should say at least the new wolfgangs.com

10   website as well as the Concert Vault website which they've had

11   in use since the beginning of this lawsuit.

12         We've asked several times for updated discovery,

13   supplemental discovery with respect to those other concert

14   recordings.  I don't think it's disputed that there has not as

15   a matter of fact been any discovery provided as to those

16   additional recordings.  Defendants are taking the position

17   that they don't have to.  I don't want to speak for them but I

18   believe they're taking the position they don't have to provide

19   discovery simply because we didn't identify those specific

20   concerts in the exhibit to our complaint.

21         But if Your Honor looks at the complaint and looks

22   at the document requests, everything in this case is focused

23   on any exploitations of our musical compositions that are at

24   issue in the lawsuit.

25         THE COURT:  Well, I'll hear from Ms. Ranahan but I

1   mean I looked at the complaint this morning and Paragraph 65,

2   a non exhaustive list of the web links to defendant's

3   infringing website Concert Vault that contain unauthorized

4   uses of plaintiff's musical works is included in Column 4 of

5   Exhibit A.

6          Paragraph 69 says pretty much the same thing.

7   Paragraph 74 says the same thing.  Paragraph 82, Paragraph 89.

8   I mean the complaint repeatedly says the list of accused web

9   links is a non -- is a non exclusive list.

10         But having said that, go ahead.

11         MS. RANAHAN:  Thank you, Your Honor.  So what

12   actually happened was that our client hasn't added any new

13   concerts.  These are concerts that have always been up on

14   Concert Vaults since the outside of this litigation in 2015.

15   What happened was our client amended the -- if you can sort of

16   switch out your domain so it becomes a new website.  He did it

17   so it became a shorter website but if -- it's basically like

18   if you went to Concert Vault it takes you to a new place.  So

19   it's not -- they didn't launch a new website.  They shortened

20   their domain name.  So anyone that already had it or was

21   already part of the Wolfgang network would just be directed to

22   that new shorter domain.

23         That new -- so the reason that that -- so they're

24   plaintiffs because they hadn't noticed since 2015 200 of the

25   concerts that they're claiming are at issue are now trying to

45

1  use the domain name change as a reason of this new launch

2  which is not true.  Our clients haven't launched anything new

3  since this lawsuit as far as new concerts with the songs at

4  issue.

5          So because plaintiffs hadn't discovered for whatever

6  reason these 200 concerts in 2015 and when they amended their

7  complaint in 2016 they're now using the domain name switch as

8  some justification to say there's 200 new recordings that were

9  added.

10          Our position, Your Honor, is that -- I appreciate

11 what the complaint from 2015 says, non exhaustive list, but

12 there's absolutely no reason that these 200 concerts couldn't

13 have been originally included including 2016.  We're now in

14 2017 and we're going to add 200 new concerts, expand the

15 potential liability.  The statute of limitations for copyright

16 goes back three years.  Are we going to be going back now five

17 years to the exploitation of these songs because the complaint

18 was filed two years ago and it took two years for plaintiffs

19 to identify these recordings?

20          THE COURT:  The alternative though is I guess they

21 file a new complaint.

22          MS. RANAHAN:  Absolutely.  That's what we want.  We

23 want the -- we don't want that.  We would rather them stop

24 filing lawsuits.  Our client isn't infringing anything.  But

25 to the extent that they're going to now try to expand

46

1  liability by a third because they didn't sign these --

2        THE COURT:  Well, there's nothing that would

3  preclude them from filing a new complaint.

4        MS. RANAHAN:  Of course not.  We don't argue that

5  there is but to try to pump up --

6        THE COURT:  Why is that a better situation?

7        MS. RANAHAN:  Your Honor, because obviously we're

8  hopeful we can resolve this one on what's before us now and

9  that that won't ever be necessary.  I realize --

10        THE COURT:  It's the same issue.  I mean if -- let's

11  assume you prevail.  Don't you -- based on the current record

12  I suppose if -- would those new recordings be covered by a

13  resolution in this case?

14        MS. RANAHAN:  If we settle this case I would

15  certainly hope so, that we would -- we would settle the

16  issues.  Whatever rights were disputed would be --

17        THE COURT:  Let's -- I'm not sure if you mean

18  settle, settle or settle by agreement or something else but if

19  there's a summary judgment motion and you prevail with respect

20  to what's in the complaint in 15-CV-4025, is it going to cover

21  those other recordings?

22        MS. RANAHAN:  Well, I would think it would be at

23  least persuasive authority or instructive on what happened

24  with the rest.

25        THE COURT:  If they're included in this action then

47

1    they're clearly covered by whatever disposition you get here.

2              MS. RANAHAN:  Right.

3              THE COURT:  If you prevail then your client never

4    gets bothered again with respect to those other recordings.

5    I'm not sure why it doesn't make sense to include those

6    recordings here.

7              MS. RANAHAN:  I appreciate it, Your Honor.  I mean

8    we weighed the benefits and the drawbacks before our client

9    and our client is not interested in expanding the scope of

10   this case.  If that means plaintiffs are able to amend with

11   the district court that's fine.  If it means a new lawsuit

12   that's fine but I understand the pros and the cons.  We raised

13   those with our client and that's the position that we're

14   taking that -- at this juncture in this case when we're trying

15   to end discovery, not expand it to 200 new concerts and

16   finding all sorts of -- I mean, you have to keep in mind, Your

17   Honor, these acquisitions were not just one source.  I mean

18   they came from many different sources.  These downloads

19   require a lot of work to try to get up to speed on all of

20   these discovery obligations to now go back to 200 more

21   concerts.  It's from our perspective too late.  There's no

22   reason for the delay.  These were up since 2015.  Plaintiffs

23   could have easily --

24             THE COURT:  The question is do you do it in this

25   action or you do it in another action.

48

1          MS. RANAHAN:  Right.  And I understand that.

2          THE COURT:  It's not --

3          MS. RANAHAN:  I understand that.

4          THE COURT:  -- the headache for your client goes

5     away.

6          MS. RANAHAN:  I understand.  If I could convince my

7     client of that, Your Honor, we'd be in a different position

8     here but it's not the route we're going to go and that's -- I

9     realize that it might not be the most -- what Your Honor would

10    choose or maybe even what I would choose but that's what we're

11    left with based on what our client wants to do.

12         MR. DICKSTEIN:  Judge, if I could address that.

13         THE COURT:  Hold on one second.

14              [Pause in proceedings.]

15         THE COURT:  I just want to double check the scope of

16    the reference here.

17              [Pause in proceedings.]

18         THE COURT:  I've got it for general pretrial.  It's

19    not just discovery.  It's for general pretrial.  So if you

20    want to make a motion to amend or to supplement you can make

21    it in front of me.  It should be made in front of me.

22         MR. DICKSTEIN:  I appreciate that, Your Honor.

23    Again, I think we're sort of conflating two issues.  We do

24    intend to add the new domain.  Ms. Ranahan says it's just a

25    shortening.  Fine.  Whatever.  They went from Wolfgang's Vault

49

1  to Wolfgang, fine.  There's an entirely separate issue.  This

2  is a core discovery issue as to whether they have to provide

3  discovery as to concerts that include our musical works that

4  are listed in our complaint.

5         This is not expanding the scope of the claims.  It's

6  simply asking that defendants fulfill their discovery

7  obligations.  The complaint is drafted with respect to musical

8  compositions.  Any performance of those musical compositions.

9  The discovery --

10        THE COURT:  The discovery requests in issue -- I

11 mean I'm not sure this would be 26(a)(1) material because

12 their 26(a)(1) obligation extends to documents they produce in

13 support of a defense, not documents that support your claims.

14        What is the discovery request -- the discovery

15 request that you believe requires supplementation, what does

16 it provide?

17        MR. DICKSTEIN:  It may take me just a second to

18 locate that, Your Honor.

19        THE COURT:  Sure.

20                  [Pause in proceedings.]

21        THE COURT:  Is it attached to one of the letters?

22        MR. DICKSTEIN:  It is, Your Honor.  I'm trying to

23 find that among the --

24        THE COURT:  If you can -- sure.

25                  [Pause in proceedings.]

50

1          MR. DICKSTEIN:  I think it's an attachment to our

2     January 23 letter, Docket 69.

3          THE COURT:  One second.  Let me get there.

4          MR. DICKSTEIN:  Sure.

5               [Pause in proceedings.]

6          THE COURT:  It's Exhibit C?

7          MR. DICKSTEIN:  Correct.

8          THE COURT:  Which request you believe captures these

9     other recordings?

10         MR. DICKSTEIN:  I'll go through those, Your Honor,

11    but I would note that virtually every request includes the

12    term audio footage or video footage which in the definitions

13    on Page 6 it means any audio or audio/visual in the case of

14    video recording of any nature regardless of the median in

15    which the recordings contain --

16         THE COURT:  Which definition are you --

17         MR. DICKSTEIN:  I'm sorry.  It's V and W on the

18    bottom of Page 6 of Exhibit C to our January 23rd letter.

19         THE COURT:  You got the January 23rd letter?

20         MS. RANAHAN:  I'm just pulling it up right now, Your

21    Honor.

22               [Pause in proceedings.]

23         MR. DICKSTEIN:  If Your Honor is there I can go on.

24         THE COURT:  Yes, go ahead.

25         MR. DICKSTEIN:  Sure.  So those definitions I just

51

1   read from V and W on the bottom of Page 6 for audio footage

2   and video footage, it's essentially any recording of any

3   nature and if you look at the request -- so, for example --

4           THE COURT:  Musical works is defined where?

5           MR. DICKSTEIN:  Correct.  So that's T, definition T

6   on Page 6.

7           THE COURT:  Okay.  Go ahead.

8           MR. DICKSTEIN:  It says the musical compositions

9   identified in Exhibit A to the complaint and any of them.  It

10  doesn't reference specific concert performances or specific

11  web links.  It's any musical works.

12          So I could probably point out a dozen requests in

13  this document request but just to start with No. 6 on the

14  bottom of Page 7.  All documents and communications concerning

15  the creation of any audio footage and/or video footage

16  containing or embodying any of the musical works.  There's --

17  if you go up one there's a request concerning the sequence or

18  chain of title of any such audio or video footage containing

19  or embodying any of the musical works.

20          No. 7, all documents and communications concerning

21  any reproductions of any audio footage and/or video footage

22  containing or embodying any of the musical works.  I can go on

23  and on frankly.

24          MS. RANAHAN:  Your Honor, we didn't limit our

25  electronic searches by any means based on the 200 that they

1   hadn't identified or the rest.  The only items that they're

2   now asking for really are revenue information so that they can

3   expand what they claim to be the actual damages that they're

4   trying to establish their disgorgement.

5           So this isn't -- it's not a huge -- this isn't a

6   bunch of communications or anything.  It's really just we were

7   teed off.  We looked at the recordings that they identified in

8   the complaint because that's what we believe them to be moving

9   on.  I mean we had obtained a lot of --

10          THE COURT:  I mean V and W -- the complaint

11  repeatedly says that the websites referred to in there,

12  referred to in the complaint --

13          MS. RANAHAN:  Non exhaustive.

14          THE COURT:  -- is a non exclusive list.  And V and W

15  define audio footage and video footage independently of the

16  websites that are in Exhibit A to the complaint.

17          MS. RANAHAN:  Right.  Your Honor --

18          THE COURT:  I think they have the better argument

19  here but go ahead.

20          MS. RANAHAN:  I mean we're on notice of the

21  recordings we believe they're complaining about from their

22  complaint in 2015.  We teed all our discovery off of those

23  recordings.  We've obtained recordings from many different

24  sources and assumed those that they hadn't identified were not

25  ones that they were taking issue with.

53

1          So now when we have a month left in discovery all of

2     a sudden --

3          THE COURT:  They were recordings that contained or

4     recordings that contained the same songs that they were suing

5     on, why would you assume that they were giving a pass to those

6     recordings?

7          MS. RANAHAN:  What I'm saying is we didn't limit our

8     discovery in any way except for when we gave them the specific

9     revenue information that they asked for about the recordings

10    that they had identified.  So to the extent it covered

11    communications or agreements that were relevant to diligence,

12    we produced it.  To the -- I don't know exactly what they

13    think is missing except for every spreadsheet that we created

14    which is many that included information that went back three

15    years based on the statute of limitations.  They're now asking

16    us to go back and redo every spreadsheet we've made in this

17    case.  Again, many, many spreadsheets with -- we're in our

18    last month of discovery.  We have all the depositions

19    scheduled.  Literally we had five scheduled this week that we

20    just moved because of all the hearings.

21          We're now supposed to go back and redo every

22    spreadsheet?  I mean it's a lot of work.

23          THE COURT:  I guess the question I have though is

24    look, if one of the songs that they're suing on is Brown Sugar

25    and you have a concert recording -- you have a recording of a

54

1  concert that took place -- I'm pulling dates out of the air.

2  May 1, 1985 that's identified in the complaint.

3          MS. RANAHAN:  Yes.

4          THE COURT:  And you have the recording of a concert

5  that took place on May 5, 1985 which is not identified in the

6  complaint, why would you assume that they were -- and given

7  that the complaint repeatedly says it's a non exclusive list,

8  why would you assume that they're giving a pass with respect

9  to the May 5th concert when they're asserting their right,

10  plaintiff's rights with respect to the May 1 concert?

11          MS. RANAHAN:  Well, based on the complaint, Your

12  Honor, we assumed that they had -- there was no reason they

13  couldn't have found the 200 that they didn't find until two

14  years later.  The same --

15          THE COURT:  No, but -- is it rational to assume that

16  they would be giving a pass with respect to a concert four

17  days later that involved the same songs?

18          MS. RANAHAN:  There are different acquisitions.

19  There are different rights.  Plaintiffs might not claim rights

20  to certain concerts or might not be claiming certain

21  acquisitions.  So yes, I mean we assumed they had done their

22  full diligence and every --

23          THE COURT:  No, but I mean they're asserting claims

24  based on the compositions.

25          MS. RANAHAN:  Yes.

1          THE COURT:  Based on the songs.

2          MS. RANAHAN:  Right.  But if they --

3          THE COURT:  If the Rolling Stones were performing

4  for five nights at Madison Square Garden in 1985 from May 1 to

5  May 5th let's assume, and they're suing with respect to a

6  reporting of the May 1 concert and they're doing the same set

7  on May 5th that they did on May 1, is it rational to assume

8  that somehow they're excluding the recording of the May 5th

9  concert?

10          MS. RANAHAN:  When we had discovery discussions

11  about what they wanted for all these spreadsheets it was

12  narrowed to the concerts identified in Exhibit A.  So that's

13  what we based all of our discovery on.  It was never also

14  make --

15          THE COURT:  Was that agreement memorialized

16  somewhere?

17          MS. RANAHAN:  I mean these were extensive

18  discussions that happened for two years and --

19          MR. DICKSTEIN:  Your Honor, that agreement never

20  took place.

21          THE COURT:  Is --

22          MS. RANAHAN:  I don't have a --

23          THE COURT:  Hold on.  Hold on.  Hold on.  Let me ask

24  my question before you try to answer it.  Is there an email or

25  a letter where -- that memorializes an agreement between the

1  parties to limit production to the videos -- to the recordings

2  identified in the complaint?

3          MS. RANAHAN:  That was the understanding from --

4  based on Exhibit A and what we were asked to do for the

5  spreadsheets because these were spreadsheets that were created

6  based on existing data for this lawsuit based on business

7  records.

8          THE COURT:  Is there a document that memorializes

9  the under -- an understanding between the parties as to the

10 scope of the defendant's production obligation?  That is, is

11 there docu -- is there documentary evidence, is there

12 documentary evidence that memorializes an understanding that

13 defendant only has to produce information with respect to the

14 concert recordings identified in the complaint?

15         MS. RANAHAN:  I would have to check, Your Honor.

16 I'm not exactly sure about that sitting here today.

17         THE COURT:  Unless --

18         MR. DICKSTEIN:  Actually --

19         THE COURT:  Unless there's documentary evidence

20 memorializing such an agreement it seems to me that the

21 plaintiff has the better argument here as to the scope of

22 what's covered by their -- by the discovery request that's

23 annexed as Exhibit C to the January 23rd letter.

24         Unless there's an explicit agreement sort of the

25 notion that they're seeking information with respect to one

1   particular concert recording that has a song in which they're
2   claiming ownership rights in that they'd be seeking that with
3   respect to one concert recording but not seeking it with
4   respect to another concert recording doesn't seem reasonable.
5          MS. RANAHAN:  Well, because of the way that our
6   client acquires these he doesn't assume that he needs to -- if
7   they're all identified or mentioned or discussed he didn't
8   think that every acquisition was on the table.  There's just
9   some that perhaps plaintiffs weren't taking issue with.  I
10  don't -- we have no idea why the 200 it took two years to
11  bring up and when we have one month left in discovery or two
12  months when they first raised it why now all of a sudden -- I
13  don't know why this couldn't have been raised two years ago, a
14  year and a half ago.  Now we're here at the last month of
15  discovery and we're going to go back and redo I don't know
16  what.  I mean I don't even know exactly what plaintiffs want
17  us to do.  It's just been here's 200.  Are we supposed to
18  start over?  Are we starting all discovery over?  I don't know
19  what exactly is being sought by this.
20         MR. DICKSTEIN:  Defendants are still producing
21  spreadsheets as recently as the night -- midnight before I
22  took a deposition of their president.  They continued --
23         THE COURT:  I'm not sure if Ms. Ranahan was in mid
24  sentence or not.
25         MR. DICKSTEIN:  My apologies.  I thought she had

58

1   finished.

2          THE COURT:  I'm not sure.  Had you finished?

3          MS. RANAHAN:  I don't even know, Your Honor.  It's

4   fine.  Go ahead.  Maybe.

5          MR. DICKSTEIN:  A couple of points, Your Honor.

6   Discovery is not over.  They're still producing documents

7   essentially on a rolling basis still but -- and she asked why

8   didn't we raise this earlier.  We don't believe these

9   recordings were on their websites when we filed the lawsuit.

10  We had a number of paralegals scouring their websites to look

11  for to see what performances of these musical works we're

12  claiming are up on the websites.  What we found we put in the

13  complaint.

14          A number of months go by, maybe a year goes by.  We

15  are looking again and we say oh, wait a minute, there's more

16  stuff there.  I think the next day or two I sent an email.  I

17  think it was December 16th I sent an email to Ms. Ranahan and

18  defendant's counsel saying hey, we've identified about 250 new

19  recordings.  It doesn't appear you produced any discovery on

20  this.  We assumed all along that we had everything.  As soon

21  as we found that out we raised it with defendant's counsel.

22          MS. RANAHAN:  Again, Your Honor, these weren't new.

23  They were up all along.  They were up all along.  I mean the

24  idea -- the paralegals just didn't find them.  So we assumed

25  they weren't at issue.  Now they're apparently at issue.  So

1   we'll do what Your Honor requires us to do but this is really

2   late in the game to be adding 200 recordings when the original

3   complaint only identified a few hundred.

4           THE COURT:  Wait.  Look, you finish up.

5           MS. RANAHAN:  To the extent Your Honor orders

6   anything we're just going to -- I imagine then we'll just be

7   keeping the same statute of limitations period which is the

8   time the complaint was filed to three years prior instead of

9   now a five year -- because of the two year delay in

10  identifying these we're not going to turn this into a five

11  year statute of limitations for what they can reach back to.

12          THE COURT:  That is going to be a -- is not a

13  question for today.  Today we're talking about discovery

14  issues but the complaint is drafted not in terms of a complete

15  list of infringing websites.  The complaint is listed in terms

16  of compositions to which the plaintiffs are claiming rights

17  and the complaint repeatedly says that the list of websites is

18  a non exclusive list of websites.

19          The way the request for production of documents is

20  drafted it reaches all recordings -- let me just get to the

21  definition.  It does reach all recordings containing the

22  musical works in issue and it does not limit it to the

23  recordings that are identified in the complaint.

24          As I said in my questioning, I mean the notion that

25  the plaintiffs would be asserting the rights they're claiming

60

1  with respect to a concert that took place on a particular date

2  but not asserting those rights with respect to a concert in

3  which the same song was performed on a different date seems

4  unreasonable.

5         So to the extent that the -- is there some place

6  where you identified these additional recordings?

7         MR. DICKSTEIN:  So if you look at our December 19th

8  letter, it's Docket 59.

9         THE COURT:  One second.  Let me get there.

10                   [Pause in proceedings.]

11        THE COURT:  The December 19th I don't think I have

12  here.

13        MR. DICKSTEIN:  I can --

14        THE COURT:  One second.  One second.  Maybe I have

15  it over here.  Hold on.

16                   [Pause in proceedings.]

17        THE COURT:  I've got December 19, Docket 59.  Go

18  ahead.

19        MR. DICKSTEIN:  Exhibit C to that letter.

20        THE COURT:  Okay.

21        MR. DICKSTEIN:  That's a list of -- it's an email I

22  sent to Ms. Ranahan and her co-counsel on December 16th of

23  last year and it includes in that email a spreadsheet of I

24  think it's about 250 concert recordings that we were able to

25  identify that we believe defendants have added.  Now, maybe

61

1  they were there from the beginning and we missed them.  I find

2  that hard to believe but in any event --

3          THE COURT:  It starts with a Good Hearted Woman,

4  6/15/84.

5          MR. DICKSTEIN:  Correct.  And I would just say these

6  are the ones we've been able to locate.  So I think the

7  purpose of discovery is if we have a good faith belief that

8  defendants are infringing they've got to provide us

9  information as to any concert performances of these

10  compositions.

11          I would also note it's not just revenue information

12  that we're seeking.  These are some pretty basic information

13  that we're seeking with respect to all these recordings.  When

14  they were -- from whom they were acquired, when they were put

15  on defendant's websites, the number of downloads, how much

16  money they made from downloads, streaming history, et cetera.

17  I think Ms. Ranahan knows the various spreadsheets that --

18          THE COURT:  On this issue I'm going to direct that

19  defendants supplement their discovery with respect to the

20  recordings identified in Exhibit C of plaintiff's 12/19/16

21  letter.

22          MR. DICKSTEIN:  Judge, if I might.  I just want to

23  make sure Your Honor is clear.  This is a list of additional

24  recordings of our compositions that we were able to identify.

25  To the extent there are others, I do think it's defendant's

62

1   burden to produce discovery with respect to those.  Maybe this

2   is it.

3          THE COURT:  I don't know if there are any others.

4          MR. DICKSTEIN:  Neither -- well, neither do we.

5   Maybe it's -- ten days ago but I think it's --

6          THE COURT:  Having received this ruling I would

7   think that -- I'm sure that Ms. Ranahan is going to explain to

8   her client what it means and it's in her client's interest to

9   do a universal search and to try to search for documents with

10  as few iterations -- a few go rounds as possible.

11         There was an issue in the correspondence about

12  Sagan's personal financial information.  Is that still an

13  issue?

14         MS. RANAHAN:  That was dealt with at the last

15  hearing.

16         MR. DICKSTEIN:  It's not a live issue right now.

17         THE COURT:  Deposition -- is there an issue

18  regarding cooperation concerning deposition scheduling?

19         MS. RANAHAN:  No.

20         MR. DICKSTEIN:  I don't believe so, Your Honor.  We

21  had scheduled depositions this month but for a number of

22  reasons, including the multiple court conferences this week,

23  we've reached an agreement with defendant's counsel to adjourn

24  those.

25         We do have a proposed revised scheduling order we'd

63

1   like to submit to Your Honor.

2           THE COURT:  We'll get to that at the end.

3           MR. DICKSTEIN:  Sure.

4           THE COURT:  There was an issue raised in the

5   correspondence regarding exhibits from other -- deposition

6   exhibits from other actions that were designated as

7   confidential by other parties and the defendant's response in

8   substance was that it's identified -- the designating party

9   has identified the judges and basically said the ball is in

10  your court to seek relief from either the judge who entered

11  the protective order or from the party who designated the

12  material confidential.  Is that still a live issue?

13          MR. DICKSTEIN:  It's not a live issue, Your Honor.

14          THE COURT:  In defendant's January 23rd letter there

15  was an issue concerning four deposition exhibits that

16  plaintiff was seeking.

17          MR. DICKSTEIN:  I think similarly -- we're going to

18  continue to pursue that with defendants.  I don't think it's

19  ripe for Your Honor at this point.

20          THE COURT:  Okay.  Israelite you want it put off

21  until Thursday?

22          MR. DICKSTEIN:  I think we would like to do that,

23  Your Honor.

24          THE COURT:  Okay.  All right.  That's my -- that

25  covers all the issues I could identify in the correspondence.

64

1  Are there other issues that -- are there other issues I've

2  overlooked from plaintiff's point of view?

3          MR. DICKSTEIN:  I don't believe so, Your Honor.

4  Just the updated schedule.

5          THE COURT:  Any other discovery issues that I've

6  overlooked from defendant's point of view?

7          MS. RANAHAN:  No, Your Honor.

8          THE COURT:  Talk to me about scheduling.

9          MR. DICKSTEIN:  So what we've proposed, and I can

10  hand up a proposed second revised civil case discovery plan.

11  Why don't I also hand up a copy of the current schedule.

12          THE COURT:  Thank you.

13          MR. DICKSTEIN:  As Your Honor may recall in August

14  we amended the schedule.  Then I believe in December Your

15  Honor entered an order that all discovery is extended until

16  the end of February.  So several of the dates in that August

17  order have not been updated.

18          In addition, just because of the discovery issues

19  we're handling and deposition scheduling issues we've already

20  agreed with defendants as I mentioned to continue depositions

21  through March.  So that's what we're proposing to do and then

22  expert discovery would come afterwards.

23          THE COURT:  This is on consent?

24          MR. DICKSTEIN:  Yes, I believe.

25          MS. RANAHAN:  Yes, Your Honor.

65

1          THE COURT:  Are you changing any dates before Judge

2   Ramos?

3          MR. DICKSTEIN:  No, Your Honor.  I believe there's a

4   conference scheduled for March 8th which we're keeping.

5          THE COURT:  Okay.  I will approve the revised

6   schedule to which the parties have agreed.

7          MR. DICKSTEIN:  Thank you, Your Honor.

8          THE COURT:  Let me go off the record for a minute.

9                     [Off the record.]

10         THE COURT:  We're back on the record.  I've asked

11  counsel to let me know either Thursday or sometime thereafter

12  whether or not they think a settlement conference makes sense

13  here.

14         Anything else we should be considering today from

15  plaintiff's point of view?

16         MR. DICKSTEIN:  No, Your Honor.  I was wondering if

17  maybe the Court could list the motions it intends to address

18  on the Thursday conference.  I know that the docket entry said

19  motions to quash.  So I --

20         THE COURT:  We have Israelite, David Burn and Keith

21  Richards.

22         MR. DICKSTEIN:  I believe maybe it hasn't hit the

23  docket yet, Michael Stipe, REM lead singer, had filed a

24  motion in Georgia which was -- an order was entered

25  transferring it to this Court but maybe it hasn't made its

66

1   way.

2          THE COURT:  I don't think -- as of yesterday -- can

3   you check the docket?  As of yesterday I don't think the

4   papers had arrived here.

5                    [Pause in proceedings.]

6          THE COURT:  As of -- well, Mr. Hampton is looking at

7   the docket sheet right now.  I don't have any papers on that

8   yet.  So I really am not in a position to address it because I

9   don't have anything yet.  Does he have New York counsel?

10         MR. DICKSTEIN:  I'm sorry?

11         THE COURT:  Does he have New York counsel?

12         MR. DICKSTEIN:  He has Georgia case who I believe

13   has been in touch with chambers and trying to figure out a way

14   to get that motion facilitated to be transferred here.

15         THE COURT:  If it's been transferred by the court in

16   Georgia I mean what's done has to be done but I -- I don't

17   know what he wants to do.  I don't know if he wants to have

18   Georgia counsel come up or wants to retain local counsel but I

19   don't have any papers on it yet at all so I'm really not in a

20   position to address it at this point.  I don't have anything

21   yet.

22         MR. DICKSTEIN:  We're in touch with his counsel so

23   we'll let him know that status, that fact.

24         I also just wanted to inform the Court that --

25         THE COURT:  If you're going to talk to him I'm also

67

1  amenable doing it telephonically if there are no documents I

2  need to look at.  If it will save him the trip for a half hour

3  argument or an hour argument save him a trip from Atlanta I'm

4  happy to do it telephonically too.

5          MR. DICKSTEIN:  I'm sure he'll appreciate that.

6          THE COURT:  If everybody is okay with that.

7          MR. DICKSTEIN:  I'll relay that.

8          The other thing I just wanted to bring to the

9  Court's attention.  Van Morrison has filed a motion to quash

10  in the Northern District of California.

11          THE COURT:  I saw something that says he lives in

12  Belfast.

13          MR. DICKSTEIN:  That's one of the grounds I think on

14  which he's moving to quash is that he was not properly served.

15  I think that motion to quash was just filed earlier this week

16  or possibly late last week.  So I'm sure it hasn't made its

17  way up.  I just wanted to let the Court know.

18          THE COURT:  We don't -- no papers have hit the

19  docket yet regarding either Mr. Stipe or Mr. Morrison.

20          MS. RANAHAN:  A few things, Your Honor, on those

21  issues if I could.  We're filing oppositions today to the two

22  for Thursday for -- we've already done Israelite as you may

23  have seen.

24          THE COURT:  You've already what?

25          MS. RANAHAN:  We've already filed the one for

68

1   Israelite but we'll be doing the Keith Richards and the Burn

2   today.  If you're not going to hear the Stipe one we'll --

3   maybe we'll do that a little later because you don't have it

4   yet before you.

5            Then as far as Van Morrison goes, Your Honor, he

6   actually has a residence in Menlo Park and we served him in

7   California.  So that's why it's in the Northern District of

8   California and I understand their position is that he actually

9   resides more in Belfast.  So that's one of the issues that

10  would be either before the court in Northern California or

11  before Your Honor if it makes its way here.  But in the

12  meantime --

13           THE COURT:  Is he Irish originally?

14           MS. RANAHAN:  I don't think so.  Is he?

15           THE COURT:  -- Belfast?

16           MS. RANAHAN:  Northern Ireland or something.

17           MR. DICKSTEIN:  I think that's right.  Just to

18  complete that, Your Honor.  On the Israelite motion we're

19  going to put in a very short reply either later today or

20  tomorrow if that's okay with the Court.

21           THE COURT:  All right.

22           MS. RANAHAN:  One more thing, Your Honor.  Something

23  that we're filing today for the Keith Richards is under --

24  it's something that should be under seal but as far as the

25  third parties go they're not necessarily part of the

69

1    protective order yet.  So I'm just wondering if we can follow

2    the normal protective order sealing procedures for filing a

3    couple under seal things for the Keith Richards opposition.

4            THE COURT:  Yes.  The protective order allows you to

5    file things under seal, does it not?

6            MS. RANAHAN:  Yes.

7            THE COURT:  So you should be okay with that.

8            MS. RANAHAN:  Thank you, Your Honor.

9            THE COURT:  Last time around.  Anything else from

10   either side?

11           MS. RANAHAN:  No.  Thank you, Your Honor.  We'll see

12   you Thursday.

13           THE COURT:  Thank you all.  See you Thursday.

14                        * * * * *

15

16

17

18

19

20

21

22

23

24

25

70

1        I certify that the foregoing is a court transcript from

2   an electronic sound recording of the proceedings in the above-

3   entitled matter.

4                              _____

5

6                                    Shari Riemer, CET-805

7   Dated:   February 17, 2017

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25