```
 1                    UNITED STATES DISTRICT COURT
                     SOUTHERN DISTRICT OF NEW YORK
 2

 3   -------------------------------------X
                                         :
 4   ABKCO MUSIC, INC., et al.,          :  15-CV-04025 (ER)
                                         :
 5                        Plaintiffs,    :
                    v.                   :
 6                                       :  500 Pearl Street
     SAGAN, et al.,                      :  New York, New York
 7                                       :
                          Defendants.    :  February 16, 2017
 8   -------------------------------------X

 9        TRANSCRIPT OF CIVIL CAUSE FOR HEARING ON SUBPOENAS
                BEFORE THE HONORABLE HENRY B. PITMAN
10                UNITED STATES MAGISTRATE JUDGE

11
     APPEARANCES:
12
     For the Plaintiffs:        TAL DICKSTEIN, ESQ.
13                              BARRY ISAAC SLOTNICK, ESQ.
                                Loeb & Loeb LLP
14                              345 Park Avenue
                                New York, New Jersey 10154
15
     For the Defendants:        ERIN R. RANAHAN, ESQ.
16                              Winston & Strawn LLP
                                200 Park Avenue
17                              New York, New York 10166

18   For Third Party            JOHN J. ROSENBERG, ESQ.
     Witness Richards:          MATTHEW H. GIGER, ESQ.
19                              Rosenberg & Giger, P.C.
                                250 Park Avenue, 12th Floor
20                              New York, New York 10177

21   For Third Party            VICTOR BICHEL, ESQ.
     Witness Byrne:
22

23   Court Transcriber:         SHARI RIEMER, CET-805
                                TypeWrite Word Processing Service
24                              211 N. Milton Road
                                Saratoga Springs, New York 12866
25


     Proceedings recorded by electronic sound recording,
     transcript produced by transcription service.
```

2

1          THE CLERK:  <u>ABKCO Music v. Sagan, et al.</u>

2          Counsel, please state your name for the record.

3          MR. DICKSTEIN:  For plaintiffs, Tal Dickstein with

4     my colleague Barry Slotnick from Loeb & Loeb.

5          THE COURT:  Okay.

6          MS. RANAHAN:  For defendants, Erin Ranahan of

7     Winston & Strawn.

8          MR. ROSENBERG:  Your Honor, John Rosenberg with Matt

9     Giger for third party witness, or perhaps not witness, Keith

10    Richards.

11         MR. BICHEL:  Victor Bichel (phonetic) of Bichel

12    Sylvac (phonetic) for third party or non-party witness David

13    Byrne.

14         THE COURT:  All right.  Good afternoon.  We're here

15    to address some subpoenas to non-parties, specifically

16    subpoenas served on Keith Richards, David Byrne and Mr.

17    Israelite.  I think I'd like to start with Mr. Richards first.

18    All right.  Just one second.  All right.

19         Well, why don't I hear from counsel for Mr. -- it's

20    counsel for Mr. Richards is Mr. Rosenberg.  Why don't I hear

21    from Mr. Rosenberg first and then I'll hear from defendants'

22    counsel and I guess plaintiffs' counsel, if plaintiffs'

23    counsel wants to add anything.  Go ahead.

24         MR. ROSENBERG:  Good afternoon, Your Honor, counsel.

25    As the court's aware, we represent Keith Richards on this

3

1  motion to quash.  I think it's important the outset, Your

2  Honor, that I mention I've been doing this a long time.  This

3  may be the first motion to quash a third party witness I've

4  ever filed.

5          I'm in the same line of work as the plaintiffs'

6  lawyers and the defendants' lawyers and, you know, all of us

7  subpoena third parties and I'm respectful of that, the need

8  for relevant evidence outside of the parties --

9          THE COURT:  Weren't you recently here on another

10  case?

11          MR. ROSENBERG:  Yeah, Iggy Azalea.  We spent --

12          THE COURT:  Yeah.

13          MR. ROSENBERG:  -- we spent quite a bit --

14          THE COURT:  Yeah, yeah, yeah.

15          MR. ROSENBERG:  And interestingly, you mentioned

16  this case I was not involved and the next day I think you sent

17  the energy out, Your Honor.  So the next day I get the call,

18  or within a week.  But it's not my normal practice to move to

19  quash third party depositions because they're often legitimate

20  and most often they seek relevant evidence and -- and by the

21  way I also, because Your Honor mentioned I was here before,

22  this motion isn't filed because Mr. Richards is Keith

23  Richards.

24          The motion is filed because there's absolutely not

25  plausible relevance to this deposition and one has to wonder

4

1   what the true purpose is.

2          THE COURT:  Well, I'm not sure it's a matter of no

3   relevance.  It think he's got no relevant information maybe is

4   a better way to put it.

5          MR. ROSENBERG:  I appreciate the court's refinement.

6   And that's right, he has no relevant information and, you

7   know, I don't need to brief the court who's more familiar than

8   I am with the background to this matter, but it's interesting

9   at the December 7th, 2016 hearing where this deposition, among

10  other artist's deposition, was referenced and Your Honor made

11  two, I think, particular observations that are germane today.

12          You expressed your concern whether these witnesses,

13  including my client, would conceivably have any recollection

14  of these events of what took place 30, 40, 45 years ago at a

15  concert, you know, in the 1970s, but you also more pointedly

16  said that if, in fact, the artist did not own the copyrights

17  at the time that the concerts -- what may or may not have

18  transpired frankly was irrelevant.

19          Mr. Richards did not, but if Mr. Richards didn't own

20  the copyrights which is, in fact -- it doesn't matter what

21  "license" implied, expressed that he gave because he didn't

22  have the right to do it.  So you came up with this

23  constructive, two sample depositions and you entered an order

24  later in December, I think December 19th, yeah, my memory

25  says.

5

1   And your wording was interesting.  You said they can

2  two depositions, the defendants, of artists who

3  unquestionably, that was your words, unquestionably owned the

4  rights.  Well, Mr. Richards unquestionably doesn't own the

5  rights.  So the first issue here -- so they subpoenaed Mr.

6  Richards nonetheless.

7   Interestingly, after Your Honor entered that order

8  on December 19th, which would've limited them to two sample

9  deposition of artists who unquestionably owned the rights,

10  they sort of sidestepped the order.  I'm not going to say they

11  violated it, but they sort of -- what was that famous line?

12   THE COURT:  Well --

13   MR. ROSENBERG:  We didn't retreat.  We advanced in a

14  rearward direction.  They move away from that and they say

15  don't worry, we'll just subpoena who we want.  We're not

16  looking for extra depositions over the 10 witnesses.  They

17  stake out Mr. Richards house arguably on a private road, which

18  is a serious thing.  He's not there.

19   The process servers talking to his wife.  We accept

20  service mainly because Mr. Richards doesn't want to be

21  bothered with people lurking in the -- the sideway there of --

22  off the side of his house.  But we reserved our right to bring

23  this motion.  I made appropriate inquiry, learned what the

24  client knows, or more pointedly doesn't know, read relevant

25  agreements and the like and it was clear that this deposition

6

1   serves no legitimate purpose.

2          I called Mr. Elkin, defendants' counsel, I've known

3   for many years, have a very good relationship with Michael.

4   And I said, "Michael, Keith doesn't remember anything and

5   anyway, he didn't own the rights.  Would you just withdraw the

6   subpoena and, you know, it's not my hunt of you try to get

7   another artist's deposition.  I only represent Mr. Richards,"

8   and Mr. Elkin politely but firmly rejected my request.  And so

9   we're here today on a motion to quash.

10          Now I read with interest the defendants' opposition

11  where they begin by citing these cases, which first I was

12  surprised that it's a huge burden.  You can't quash a

13  subpoena.  Those cases, every one of the six cases in our

14  reply that we served last night, every one of those six cases

15  had to do with a party deposition.  They don't reveal that in

16  their brief.  Well, the standards for a party deposition are,

17  of course, incredibly and significantly different.

18          THE COURT:  Yeah.  No, I appreciate the burden of

19  proof or burden of persuasion is different in a Rule 45 than

20  it is in a 26(c) application for a protective order with

21  respect to a party.

22          MR. ROSENBERG:  And you wrote about that in --

23          THE COURT:  Just one second.  Just one second.  I

24  addressed that issue in a case called *Kingsway Financial*

25  *Services against Price Water Cooper House* (sic) --

7

1   *PricewaterhouseCoopers*, excuse me, 2008 West Law 4452134 at

2   Page 4 that with -- the discussion, there are a number of

3   cases cited but the long and short of it is that with respect

4   to a non-party subpoena, when a motion to quash is made, the

5   burden is on the party who issued the subpoena to demonstrate

6   relevance.

7           So I'm satisfied that that's the law.  It's

8   different than if the -- an application for a protective order

9   with respect to a party where the movant, the party seeking

10  the protective, has the burden of proof under Rule 26(c).  So

11  you don't need to belabor that point.  Go ahead.

12          MR. ROSENBERG:  And I do reference the *Kushner* case

13  also cited in our brief at Page 10 where the court held, the

14  district court held, a subpoena that "pursues material with

15  little apparent or likely relevance to the subject matter,"

16  and the court went on to say is, "likely to be quashed as

17  unreasonable even where the burden of compliance would not be

18  onerous."

19          So the focus, as Your Honor just pointed out, really

20  here is relevance, defendants' burden.  The key issue that

21  they initially requested this deposition on was the implied

22  license.  Not only did Mr. Richards not unquestionably own

23  these copyrights, he unquestionably did not and does not own

24  these copyrights, and did not at the time of any of these

25  concerts.

8

1          And we cited to and presented to the court a -- a

2   1972 agreement with ABKCO, but attaching some 1966 agreements

3   with Gideon, ABKCO's predecessor, that clearly say for a five

4   year term all of the songs Mr. Richards and Mr. Jagger

5   composed belonged to Gideon.  Couldn't be clearer.  Everyone

6   of these songs, by the way, was released -- it had to be

7   written, if it was released on a record, within that time

8   period.

9          1972, there's another agreement which reaffirms the

10  Gideon agreements and confirms that these songs are owned by

11  ABKCO.  That's before any of these concerts.  1974, there's a

12  -- what we call a settlement agreement with a schedule that

13  says these songs belong to ABKCO.  These other songs may come

14  back to the Stones or to Mr. Jagger or Mr. Richards.  Every

15  one of the nine songs at issue in this exercise today are

16  conformed to belong to ABKCO.

17          Defendants' response to that unquestionable, to use

18  the court's words, evidence of ownership in ABKCO is oh, well

19  the settlement agreement's redacted.  Well, Your Honor, we

20  didn't redact it.  That's not our issue.  I was just advised,

21  by the way, that Your Honor apparently has un-redacted --

22          THE COURT:  Yeah.  I --

23          MR. ROSENBERG:  -- copies and my understanding, it

24  would be kind of incredible if there's an agreement that says

25  The Rolling Stones, Keith Richards, Mick Jagger don't own

9

1  these songs and then there's a redacted part says oh, we're

2  just kidding, they really do.

3          They don't own the songs.  Mr. Richards has not

4  owned them since the 60s and that means that the standard that

5  he unquestionably owned them is not -- only not satisfied but

6  it's exactly the opposite that he unquestionably does not own

7  them.  So whatever license he did or didn't give, whatever

8  words he spoke or didn't speak, whatever nod he gave, whatever

9  his awareness or not of cameras and filming is irrelevant.  He

10  can't give a license.

11          But then we move to the second area of the court's

12  expressed concerns back in December, which is, as Your Honor

13  said, I'm not sure that someone like Mr. Richards is going to

14  remember this.  And you asked -- I think it might have been

15  Ranahan, I'm not sure, could've been -- you know, what

16  evidence do you have that Mr. Richards, you know, owns this

17  stuff?  And he said, "There's absolutely," I like this,

18  "absolutely a probability."  And you said, "Well, there's a

19  probability of anything."

20          We have a declaration from Mr. Richards that says,

21  "I don't know anything about any of this.  I didn't -- I don't

22  remember the concerts.  I don't remember talking to anybody.

23  I wouldn't have," now we did focus on Bill Graham, because we

24  believed, we're new to this case, that that was the focus of

25  these concerts.

1          But Mr. Richards' declaration goes further than just

2   Bill Graham.  He said, "I wouldn't have given authority to any

3   concert promoter" --

4          THE COURT:  Yeah.

5          MR. ROSENBERG:  -- "at any concert."  So he has no

6   recollection.  He didn't own the songs.  He has no

7   recollection of the concerts.  He said it was his

8   understanding that he didn't own the songs, which he says is

9   another reason why I would not have done this.  And he says,

10  "I have lawyers.  I have managers.  I don't handle this sort

11  of stuff."

12         So you now have a witness who did not own the songs

13  who quite credibly, since some of these concerts are 44 years

14  ago, says, "I don't know anything about this.  So now for the

15  first time the other night, we get the new theories, never

16  before raised, about why they need Mr. Richards' deposition

17  because it's relevant to LACHES, estoppel, mitigation, offset,

18  statutory damages.

19         They're conflating or purposely confusing Mr.

20  Richards with the plaintiffs.  There is nothing Mr. Richards

21  can do that limits or diminishes ABKCO's rights.  He's not

22  their agent.  He's a contractual counterparty -- by the way,

23  defendants' brief says that there's some acrimony between

24  them.  It may or may not be true.  There's disputes.  He can't

25  bind them.

1          So let's assume, and it's not correct, that Mr.

2    Richards is sitting at his home somewhere listening to all of

3    these tapes on Wolfgang's Vault and doesn't file a lawsuit,

4    that has nothing to do with ABKCO whether there's LACHES

5    against ABKCO.  It has nothing to do -- how could Mr. Richards

6    estop ABKCO from doing or not doing what it wants to do.

7          Mitigation?  They claim the amount of royalties that

8    Mr. Richard (sic) -- that Mr. Richards was paid goes to

9    mitigation?  No, the --

10          THE COURT:  Well, that -- I'm going to Ranahan about

11    that.  I mean that's something I don't understand.  I would

12    think they know what royalties they've paid.  They don't need

13    Mr. Richards -- defendant doesn't need Mr. Richards to

14    establish what royalties defendants paid.

15          MR. ROSENBERG:  And how would he know?  I mean how

16    would he know what defendants paid.  To be honest, Your Honor,

17    Mr. Richards would not even know how much royalties he was

18    paid from these particular works from ABKCO.  His accountants

19    would, his business managers would.

20          But I read the brief and at first I thought, to

21    compliment Ms. Ranahan, it was very well written.  But then

22    I'm like, it must be late because I don't understand the

23    argument so I read it again and I actually understood it less.

24    Statutory damages?  The value of the copyrights?

25          If Mr. Richards was questioned, what are they going

1   to ask him?  Do you think "Brown Sugar" is a good song?  Yeah,

2   it's a great song.  Does it have value?  Yeah, I think it has

3   -- that's not what statutory damages goes to.  They say maybe

4   Mr. Richards had some imagined conversation with the

5   defendants where they discussed all this.  Well, first of all

6   --

7           THE COURT:  With the defendants or with the --

8           MR. ROSENBERG:  I'm sorry.  With the plaintiffs.

9   I'm sorry.  With the plaintiffs.  It's real simple.  Send an

10  interrogatory to the plaintiffs and say did you ever have any

11  conversations with Mr. Richards about these issues?  Do a Rule

12  30(b)(6) deposition.

13         Now Mr. Richards doesn't handle these matters, Your

14  Honor.  He knows nothing about this and he knew nothing about

15  any of this, frankly.  His affidavit and declaration confirmed

16  that.  These belated raised "topics of relevance" are not

17  relevant and it leads me to believe -- and, you know, like I

18  said.

19         I'm in the same line of work as plaintiffs' counsel

20  and defendants' counsel.  What the motive really is.  I know

21  Mr. Elkin too well to think he really believes he's going to

22  get relevant evidence here.  Does he think that Mr. Richards

23  and his representatives are going to get annoyed and call up

24  ABKCO and say, you know, get rid of this case?  I don't know

25  what it is, but it's not to obtain relevant evidence.

1        Under the standard, Your Honor, announced in the

2   cited cases and also the *Fears against Wilhelmina Models*

3   cases, similar thing, the -- the *Kushner* case that we cited,

4   whether Mr. Richards is on tour now or not on tour, that's not

5   the issue.  The issue is whether there is significant

6   relevance not to the topics but to his testimony based on the

7   uncontroverted fact that he does not and did not own the

8   copyrights, that he had no recollection, that these defenses

9   are nothing that he would have information about and that

10  there are other witnesses.

11       If they want to find out who talked to whom, what

12  royalties were paid, there are other witnesses other than Mr.

13  Richards.  So unless the court has any questions of me --

14       THE COURT:  Yeah.

15       MR. ROSENBERG:  -- I'd submit.

16       THE COURT:  I've got one question for you, and I'm

17  going to ask the same question of Ms. Ranahan.  One thing, I

18  had a similar issue a number of years ago in a case where a

19  third party, a non-party witness, claimed to have no knowledge

20  of the relevant events and the non-party witness put in an

21  affidavit roughly similar to Mr. Richards' affidavit denying

22  knowledge of -- of the events in issue.

23       And it was a case called *Bouchard against New York*

24  *Archdiocese*, 2007 West Law 2728666, 2007 West Law 2728666.

25  And what I did in that case, out of concern that allowing an

1  affidavit to defeat a deposition may set the bar too low, I

2  allowed the parties seeking the deposition to serve 25 written

3  questions on the non-party witness, it was actually Cardinal

4  Egan in that case, to probe the claim that of no recollection

5  of no knowledge with -- on the thought that look, if you ask

6  25 questions and -- and you get something, maybe we'll revisit

7  the issue of a deposition.

8          If you give 25 questions and -- and the witness

9  knows nothing, you know, I think everything's been -- I think

10  all reasonable avenues have been exhausted.  Would that be an

11  appropriate course here?  And if so, why?  And if not, why

12  not?

13          MR. ROSENBERG:  I must admit my smile at the

14  juxtaposition of Cardinal Egan and Keith Richards in the same

15  context.

16          THE COURT:  There's a reason why the statute in the

17  lobby is blindfolded.

18          (Laughter.)

19          MR. ROSENBERG:  Touche, Your Honor.  I think because

20  of the --

21          THE COURT:  All God's children anyway, so go ahead.

22          (Laughter.)

23          MR. ROSENBERG:  Because of the uncontroverted

24  evidence that he didn't own the copyrights, I'm not sure that

25  it's necessary but I will say this.  While I prefer that the

1   motion to quash, of course, be granted, I would far prefer if

2   -- if that's where the court is going, that we have this

3   exercise and Mr. Richards will answer the questions I assume

4   under oath and I think they'll confirmatory of this.

5           Again, I'd prefer that the motion be granted.  If

6   not, I think that's a far better measure than having Mr.

7   Richards have to go through this.  We do have a request for

8   fees.  And again, I don't think I've ever moved to quash.

9           I generally don't request fees.  But there's

10  something else going on here, Your Honor, that does not have

11  to do with relevant evidence and we do stand on that request,

12  but of course are far more focused on our request that the

13  subpoena be quashed.  Thank you, Your Honor.

14          THE COURT:  All right.  Ms. Ranahan, let me start by

15  asking you.  In light of Mr. Richards' affidavit, why do you

16  want his testimony.  If anything, his affidavit -- or his

17  declaration, I guess more properly.  His declaration seems to

18  hurt your defenses and seems to further the plaintiffs'

19  position.  I mean how does he help you?  And if he doesn't

20  help you, why do you want to depose him?

21          MS. RANAHAN:  Thank you, Your Honor.  So Mr.

22  Richards' declaration was in the prior context of our focus on

23  the Bill Graham recordings.  I realize he included that he

24  doesn't recall giving permission to any --

25          THE COURT:  Yeah.

16

1          MS. RANAHAN:  -- promoters, but there are several

2   other issues that we'd like to ask him about, including his

3   discussions with plaintiffs over the years.  The recordings at

4   issue, your --

5          THE COURT:  What difference --

6          MS. RANAHAN:  -- one of Your Honor's concerns --

7          THE COURT:  What difference does it make what he

8   discussed with plaintiffs over the years?

9          MS. RANAHAN:  Well, that relates our LACHES

10  defenses, our implied license, our estoppel, the motivation

11  for the lawsuit, which we've --

12         THE COURT:  Well, let me take the point that your

13  adversary raised.  How does his conduct bind the plaintiffs?

14         MS. RANAHAN:  Well, it will give it --

15         THE COURT:  Take LACHES for --

16         MS. RANAHAN:  Right.

17         THE COURT:  Take LACHES for example.  Let's assume

18  every day he's --

19         MS. RANAHAN:  Yeah.

20         THE COURT:  -- downloading one of your client's

21  recorded concerts.

22         MS. RANAHAN:  Right.

23         THE COURT:  So what?

24         MS. RANAHAN:  Well, if he's discussing with

25  plaintiffs, and we've asked plaintiffs for this discovery and

1   they've refused it, so we don't have another avenue for it,

2   but to know that --

3          THE COURT:  But why don't you -- isn't the issue

4   there, why don't you ask the question of plaintiff when did

5   you first learn of defendants' online videos?

6          MS. RANAHAN:  If we've ask -- I mean we haven't

7   gotten any information about that because they're refused to

8   provide us communications with the artists.  They've -- they

9   haven't provided --

10          THE COURT:  No.  But it doesn't, with respect to

11   LACHES, it doesn't matter, you know, assuming LACHES is a

12   valid defense here.  But let's assume for purposes of argument

13   it does -- it is.  I mean it doesn't matter whether they

14   learned about your client's recordings from Keith Richards or

15   from the man -- you know, Joe Blow.  It doesn't matter --

16          MS. RANAHAN:  -- well --

17          THE COURT:  -- who they learned about it from and I

18   would think the more significant question is when did you

19   plaintiffs first learn of defendants recordings, not when did

20   you first learn of them from a particular source.

21          MS. RANAHAN:  Right.  We're looking for

22   conversations with people who they discussed about these

23   recordings.  We would assume Keith Richards would be one of

24   them or other artists.  And it's not about what -- who they

25   learned it from.  It's about when and what kinds --

18

1          THE COURT:  Yeah.

2          MS. RANAHAN:  -- of discussions they had.  I mean

3    there's several other grounds.  But if I could just go back.

4    One of Your Honor's first concerns was that these were old.

5    These were old concerts.  These were from the 60s and 70s.

6          THE COURT:  Yeah.

7          MS. RANAHAN:  And even when we mentioned Green Day

8    you thought, you know, 90s, that's a little closer of a call.

9    We actually have concerts through 2003 for Mr. Richards and

10   Mr. Richards has not said anything about the other two

11   acquisitions, Mr. Hewitt and the -- the other two acquisitions

12   with which we've obtained recordings involving Keith Richards

13   or The Rolling Stones.

14          So while his declaration disclaims any knowledge

15   about Bill Graham and we, you know -- we understand that's his

16   position, we don't know his position on the other two

17   specifically.  They obviously haven't been brought to his

18   attention because they were, understandably, only included in

19   our opposition a couple nights ago and I doubt, you know,

20   they've been raised with him.  But there's also just several

21   other --

22          THE COURT:  Well, it's probably a pretty safe bet

23   that his answers with respect to the others is going to be the

24   same and you also have the problem though of his prior

25   assignment to ABKCO.

19

1          MS. RANAHAN:  Well, that's another thing, Your

2     Honor.  I don't -- if you look at the redacted -- well, the

3     parts that I can see.  I know that you've seen more.  Everyone

4     else in this room has probably seen more than I have, but for

5     if you look at the page that I can see, which is, you know,

6     Page 18, it grants right -- I mean it basically does grant

7     rights to Rolling Stones and Keith Richards and then it refers

8     to an exhibit I -- that I can't see.

9          So I don't understand how this is an unquestionable

10    issue with co-publishing.  And, you know, again, on Wikipedia,

11    this is how we ended up getting to this agreement.  It

12    announced that "Brown Sugar" was a co-publishing arrangement.

13    This agreement, again, 15 pages of redacted -- or redactions

14    and a bunch of comments and handwritten notes that we don't

15    know who made them, which, you know, I don't know if this

16    ABKCO or --

17          THE COURT:  Well, I'm not sure that changes it

18    because we have Mr. Richards' representation that it was his

19    understanding that ABKCO had the rights and that, therefore,

20    he couldn't make the assignment that you're claiming.  And

21    even if Mr. Richards is -- is incorrect about what ABKCO had,

22    he is saying he would not have made the assignment because it

23    was his understanding that he didn't have them to give.

24          So I mean even if he's mistaken about the effect of

25    the contract, it doesn't change his understanding.

20

1      MS. RANAHAN:  Your Honor, I appreciate that but that

2  -- this is, again, in one declaration involving narrow subset

3  of the recordings that are at issue.  I mean nine of them,

4  none of the 160 come from the Bill Graham collection.  The

5  amount of statutory damages --

6      THE COURT:  No, but the assignment cuts -- I mean

7  his issue or his statement concerning the assignment cuts

8  across all your alleged assignors.

9      MS. RANAHAN:  Well, I don't know if he's even seen

10  this.  I mean I know he, you know -- he made a declaration he

11  doesn't want to come to deposition.  I understand that.  I

12  don't know if is his counsel showed him this agreement,

13  reminded him of the settlement.

14      I don't know that he's, you know, been refreshed on

15  what, guess what, maybe you do have more rights than you think

16  you had.  Maybe you could've remembered something different

17  once he's seen this agreement.  I don't know that he's

18  actually evaluated this, again, agreement that I,

19  unfortunately, don't have the luxury of actually reading.

20      But the parts that I have seen, I don't see how this

21  is unquestionable that they didn't have the rights.  I don't

22  know why, if Wikipedia's wrong, they should send a note to

23  Wikipedia and update that thing because it's out there in the

24  universe that he has a co-publishing right to "Brown Sugar"

25  and he --

21

1          THE COURT:  Well --

2          MS. RANAHAN:  -- released it that way and this --

3   this agreement looks like that's true.

4          THE COURT:  I'm not sure Wikipedia entries are

5   reviewed by anybody so --

6          MS. RANAHAN:  Right.  No, they are.  That's --

7   they're made, Your Honor, with all due respect -- they're made

8   by the public informing them about the truth.  I mean that's

9   how they create their data.

10         THE COURT:  Informing them about the truth?

11         MS. RANAHAN:  Yeah.

12         THE COURT:  Oh, I see.

13         MS. RANAHAN:  So you can keep updating --

14         THE COURT:  Well, perhaps.

15         MS. RANAHAN:  -- like you can -- if you're concerned

16  about a misrepresentation on Wikipedia, you guys are free to

17  correct it.

18         THE COURT:  Well, and they're free but they're not

19  obligated.

20         MS. RANAHAN:  They're not obligated.

21         THE COURT:  So --

22         MS. RANAHAN:  But they let it --

23         THE COURT:  -- but I mean anyone --

24         MS. RANAHAN:  -- we wouldn't have --

25         THE COURT:  -- my understanding is anyone can post

22

1   almost anything on Wikipedia.

2           MS. RANAHAN:  But it gets vetted out once more

3   people dispute it.

4           THE COURT:  By whom?

5           MS. RANAHAN:  We would've even had this agreement,

6   Your Honor, if that note wasn't on that Wikipedia.  This

7   agreement was buried from us until this came up, so whatever

8   Wikipedia people put that in there, I appreciate it.  I --

9           THE COURT:  But regardless of what's on Wikipedia

10  and regardless of whether it's correct or incorrect, I mean

11  you've got a statement from Mr. Richards saying it's his

12  understanding that the nine songs in issue, the rights to the

13  nine songs in issue, were transferred to ABKCO or its

14  predecessor.

15          MS. RANAHAN:  Well, that's right but --

16          THE COURT:  So I mean it's his -- you know, and he

17  says I would not have made -- I don't, number one, I don't

18  remember the conversation.  I have no recollection of having

19  the conversations in which I made these punitive assignments

20  and I wouldn't have done it anyway because it was my

21  understanding I didn't have the rights to give.

22          MS. RANAHAN:  Right.  But if I show him this

23  agreement that contradicts that understanding, perhaps he

24  would think differently.  I mean I believe we're free to show

25  him evidence that contradicts what he's potentially saying or

23

1  what he believes --

2          THE COURT:  Well, it doesn't contradict what he's

3  saying.  He's talking about his understanding.

4          MS. RANAHAN:  Right.

5          THE COURT:  So it doesn't contradict his

6  understanding.

7          MS. RANAHAN:  His understanding.  Right.  But I

8  think we're entitled to ask him what he understands about what

9  this agreement is, the parts that I'm allowed to, you know,

10  would be allowed to actually read and show him.  But that's

11  just, Your Honor, again, that relates to the Bill Graham, what

12  we were talking about earlier.

13          There's many recent concerts, all the way as recent

14  as 2003 that are at issue, so we'd certainly like to ask him

15  about his understanding of the rights that Mr. Hewitt had,

16  King Biscuit had, what he recalls about them, his relationship

17  with them.

18          The bulk of the recordings here are not Bill Graham,

19  and that was what his declaration's about.  That's what our

20  prior discussions were about and I do think they focused on

21  that because Mr. Elkin had made a representation about some

22  prior Bill Graham related acquisition depositions, but it

23  turns out upon further investigation, most of the, you know,

24  recordings at issue are not Bill Graham at all, nine.

25          And it's a third of the songs at issue in this case.

24

1        THE COURT:  Let me ask you this.  Do you have any

2   evidence?  I mean is there a note to the file?  Is there a

3   living witness that you have?  Do you have a scintilla of

4   evidence that at some point before one of these concerts Mr.

5   Richards spoke to one of your assignors or an assignor of one

6   of your assignors and orally provided the license that you're

7   asserting here?

8        MS. RANAHAN:  Well, we have Mr. Hewitt's testimony,

9   Your Honor, where he testified that all the, you know, the

10  artists consented the recordings.  So that's --

11       THE COURT:  Well, consenting to the recording and

12  giving a license to exploit the recording commercially are two

13  different things.

14       MS. RANAHAN:  Right.  But for joint work rights,

15  Your Honor --

16       THE COURT:  But is there -- come back to my

17  question.  Is there any evidence, either documentary or

18  testimonial, that Mr. Richards gave someone the rights that

19  you're claiming that he gave?

20       MS. RANAHAN:  There's no specific testimony about

21  Mr. Richards' statement and that's one of the reasons we need

22  his deposition even more, because we would like to know if he

23  recalls conversations regarding the Dennis -- you know, the

24  David Hewitt recordings with the King Biscuit recordings.  We

25  know his position on Bill Graham.  I appreciate that --

25

1          THE COURT:  Well, Mr. Hewitt was a recording

2     engineer, wasn't he?

3          MS. RANAHAN:  He was -- right.  He was the engineer

4     but he --

5          THE COURT:  So he would -- he was there to make

6     recordings?

7          MS. RANAHAN:  He was there and I'm sure there was a

8     team of people and maybe, perhaps, Mr. Richards once -- I

9     don't know if his counsel has yet discussed the fact that

10    actually most of them are from the David Hewitt collection.  I

11    don't know if that's been raised with Mr. Richards.  You can

12    ask counsel.

13         But I don't know that he's even, you know, guess

14    what, Mr. Richards?  They weren't actually from Bill Graham.

15    What do you think about these two?  Perhaps he does have

16    different recollections.  I don't know.  I don't know if

17    anyone's asked him.

18         We would like to ask him.  We would like the

19    opportunity to ask him about the acquisitions that make up the

20    bulk of the recordings that we've got.  I mean this -- the

21    idea that we're doing this to harass a rock star, our client

22    was sued about songs that involved this rock star

23    unfortunately.

24         Our client would prefer not to be here.  The idea

25    that he has this nefarious motive to just drag a rock star

1    into this case, plaintiffs dragged this rock star into this

2    case, Your Honor.  This is about Rolling Stones and Keith

3    Richards --

4              THE COURT:  Well, no, but I mean your defense seems

5    to be based on conversations and oral assignments of which you

6    have absolutely no evidence.

7              MS. RANAHAN:  That's why we're trying to take his

8    deposition, Your Honor.

9              THE COURT:  Well, no.  But I mean ordinarily you had

10   -- you research -- ordinarily, counsel researches the factual

11   basis for their assertions before they make the assertions.

12             MS. RANAHAN:  Well, we have --

13             THE COURT:  I think you may need --

14             MS. RANAHAN:  Okay.

15             THE COURT:  -- to do that under Rule 11.  I don't

16   think you can -- I don't think an attorney can assert defenses

17   without some factual basis and then just hope that something

18   --

19             MS. RANAHAN:  Well, Your Honor --

20             THE COURT:  -- comes out that something will develop

21   down the road.

22             MS. RANAHAN:  Well, the agreements, when we acquire

23   these recordings, make it clear that all of the permissions

24   and the -- and the rights were transferred.  And I'm not --

25   I'm talking about the two, you know -- the Hewitt and the King

1   Biscuit that are issue here.  I mean those --

2         THE COURT:  Well, yeah, but an assignor can't assign

3   more than he or she or it has.

4         MS. RANAHAN:  Right.  I understand that.

5         THE COURT:  I mean is there a representation in your

6   assignor statements that they have these rights?

7         MS. RANAHAN:  Yes.

8         THE COURT:  All right.

9         MS. RANAHAN:  Yes, there is.

10        THE COURT:  And there's -- is there due diligence

11  filed that explores their -- the basis for their

12  representations that they have these rights?

13        MS. RANAHAN:  There is due diligence that was

14  conducted.  We turned over all of it that we had.  There's not

15  a specific reference in there to Keith Richards, but that's

16  why we want to explore this, Your Honor, further.  And if -- I

17  mean if it turns out not to be helpful for us, the plaintiffs

18  should be happy about that.

19        I mean this is -- all we're trying to do is get

20  relevant information.  I think Your Honor made a comment that

21  perhaps there is some relevance, it's just that he may not

22  have relevant knowledge.  We want to test that, Your Honor.

23  We want the opportunity to test that.  We're being sued for

24  tens of millions of dollars.

25        We're being, you know -- all we're trying to do is

28

1   get relevant evidence.  There's other -- you know, of course

2   we laid out many other grounds but counsel made a comment

3   about statutory damages, and we've raised this over and over

4   with Your Honor, but statutory damages, it's a wide range of

5   factors that a jury can consider and so we do believe that he

6   could have testimony relevant to that.

7          And this is a third of the songs at issue, Your

8   Honor.  And his receipt of payments, well, yes, we have

9   records of what we paid to the third parties who are supposed

10  to administer these rights.  What Mr. Richards knows that he

11  actually received would be relevant to an offset or what

12  plaintiffs know that they received and I --

13         THE COURT:  Well, the plaintiffs what received --

14         MS. RANAHAN:  -- and I don't know why we're not

15  entitled to --

16         THE COURT:  -- but how is what Mr. Richards received

17  relevant?

18         MS. RANAHAN:  Well, that would also go to the

19  offset.  If he had a co-publishing right --

20         THE COURT:  Would go to what?

21         MS. RANAHAN:  -- and he receives something, the

22  plaintiffs didn't because of however this mysterious agreement

23  might actually be structured, which I mean you can see it.  I

24  can't see it, but I know you guys have.  But if you note,

25  there was a co-publishing arrangement and perhaps Mr. Richards

29

1  gets half and plaintiffs get half.  I mean how do we -- how do

2  we explore that, Your Honor?  We're really being --

3          THE COURT:  But isn't the issue what -- isn't the

4  issue with respect to royalties what your client paid and

5  whether the payment was made in good faith and what happened

6  to the check or the proceeds of the check after the check was

7  cashed?  Does that effect anything?

8          MS. RANAHAN:  Well, I do believe it effects the

9  implied license argument and --

10         THE COURT:  No, but what your client paid may effect

11  the implied license argument but where the check went, I don't

12  see how that -- how that bears on anything.

13         MS. RANAHAN:  Well, Your Honor, also your --

14         THE COURT:  I mean if your client made a payment and

15  there was a dishonest bookkeeper who took the money and -- and

16  ran or there was an honest bookkeeper who parsed the money out

17  to wherever it was supposed to be parsed out, does that effect

18  your -- the quality of your client's payment at all?

19         MS. RANAHAN:  Well, as far as what he received, and

20  I appreciate your point, Your Honor, that the amounts, I don't

21  think we're going to get, you know, the accounting from Mr.

22  Richards and I don't expect to get the exact amounts he

23  received.  What we'd like to ask him about is when do you

24  recall first receiving a payment regarding these uses?

25             When did you know about that?  This relates to our

30

1   LACHES defense, which I know you're suspect about, but the

2   idea that they've been accepting payments --

3            THE COURT:  No, but isn't the relevant inquiry when

4   your client made the payment and how much your client paid,

5   not when Mr. Richards saw it?

6            MS. RANAHAN:  Well, I do believe that it relates --

7   the comments in the press release when this lawsuit came out

8   was this was all to collect money to return to the rightful

9   rock stars who have been deprived.

10           THE COURT:  And that's not Mr. Richards' statement.

11           MS. RANAHAN:  That's not Mr. Richards' statement,

12   but if it turns out Mr. Richards has actually been being paid

13   or isn't, I believe that relates to the whole entire motive.

14   And, Your Honor, we are entitled to investigate the motive of

15   the lawsuit under Rule 11.  I mean under Rule 11 --

16           THE COURT:  Mr. Richards didn't bring the lawsuit

17   though.

18           MS. RANAHAN:  I know.  I know, Your Honor, but --

19           THE COURT:  I don't know what he could offer that

20   bears -- even if motive is relevant, and I still have great

21   circumspection with respect to that point, but even if motive

22   is relevant, Mr. Richards didn't bring the lawsuit.

23           MS. RANAHAN:  Right.  But his conversations with

24   plaintiff about this matter, about this lawsuit, which we --

25           THE COURT:  Of which there is absolutely no

31

1   evidence.

2         MS. RANAHAN:  That's what we're trying to get, Your

3   Honor.  I don't know how --

4         THE COURT:  You bear the burden here.

5         MS. RANAHAN:  Well, we have to try to explore and

6   investigate to try to get the evidence.  That's what discovery

7   is all about, Your Honor, and we're --

8         THE COURT:  Well, no, but I mean I'm not sure why

9   Mr. Richards is more of an appropriate deposition target here

10  then the gentleman in the lobby who runs the newsstand.

11        MS. RANAHAN:  Well, Your Honor, the gentleman in the

12  lobby that runs the newsstand doesn't have a 160 songs at

13  issue for millions and millions of dollars.  So the idea that

14  Mr. Richards, whose name is on this co-ownership agreement

15  that I can't even read, who is -- has a third of the songs at

16  issue has -- we've been paying royalties that may or may not

17  have gotten to him.

18        The idea that the newsstand man is anywhere

19  equivalent is just -- I mean that's just not a fair

20  comparison.

21        THE COURT:  Well, I'm not sure there's any reason to

22  believe that Mr. Richards had the conversations that you're

23  suggesting.

24        MS. RANAHAN:  How do we know, Your Honor, if we

25  can't ask him, if we don't have the ability to even ask.  And

1  again, there is a burden.  Once we've shown some relevance,

2  and I understand you don't think he might have relevant

3  knowledge, though there's perhaps relevant subject matter,

4  once we've shown some relevance, it's up to them to argue why

5  is this burdensome?

6          What's the problem?  What's inconvenient?  Mr.

7  Richards, as far as we can tell, hasn't been on tour since

8  2016, October.  I don't -- we've been willing to say we'll go

9  anywhere, anytime, any day.  There's no real inconvenience

10 here.  This isn't an Apex deposition of a high corporate

11 executive who has 10 meetings a day.

12         I would imagine he has flexibility in his schedule

13 to let us ask him questions for a few hours.  There's been

14 zero -- he submitted a declaration and provided not one

15 sentence about why he couldn't appear or had no time to appear

16 for this.  And there's just -- I appreciate, Your Honor,

17 wanting to respect the time of these musicians and we all

18 appreciate what they've done for us and we love their songs

19 and thank you for that, but they're --

20         THE COURT:  I respect --

21         MS. RANAHAN:  -- but they're not immune.

22         THE COURT:  I respect the time and the rights of all

23 non-party witnesses.

24         MS. RANAHAN:  Right.  I understand that, but as just

25 because he's a famous musician he's not immune from the

33

1  typical federal procedures that we all have to abide by.

2          THE COURT:  I'm not suggesting that he is.

3          MS. RANAHAN:  Okay.  Well, this -- there are so many

4  different areas we'd like to ask him about, and the idea that

5  we're getting foreclosed we, you know -- Your Honor, we did

6  come to you asking for 24 extra depositions and that was the

7  context of the whole first discussions.  We then walked it

8  back.  Your Honor said try two.

9          Now we're here discussing two that arguably do have

10  the co-publishing rights.  I realize it's not as

11  unquestionable because they're disputing what this -- what I

12  read from what they read, but these -- these are two artists

13  today that do have -- and Byrne has a co-publishing agreement.

14  We can talk about that momentarily.

15          But Mr. Richards does arguably have potential

16  publishing rights and there's many, many other basis that we

17  would like to ask him about.  It's a third of the songs in

18  this -- in this case.  We're not trying to inconvenience him.

19  We're not trying to drag him out and spend 12 hours.

20          We're trying to do a short, efficient deposition

21  test of knowledge, find out what he may have known about the

22  other acquisitions which make up the majority of what's at

23  issue, and we've heard nothing from him about that.  I don't

24  even know if he knows that that's what this case is about.  I

25  don't know.  I mean --

34

1          THE COURT:  If you could wrap up in the next three

2   or four minutes, I'd appreciate it.  Go ahead.

3          MS. RANAHAN:  I mean unless you have questions, Your

4   Honor, I mean we laid several -- it's not just about the

5   implied license period, though we do want to still ask about

6   the joint consent.

7          And it's not about -- also it goes to wilfulness.  I

8   mean there's an issue of, you know, if our client believed

9   that he got the rights from these acquisitions and Mr.

10  Richards didn't dispute those, that could relate to -- to

11  willfulness.  If he doesn't remember anything, that's actually

12  potentially helpful too if he doesn't remember.

13         THE COURT:  Was Mr. Richards consulted when your

14  client got the rights from its assignors?

15         MS. RANAHAN:  I don't know.  I would love to ask

16  him.

17         THE COURT:  Well, that's something your client

18  should know.

19         MS. RANAHAN:  Your Honor, if --

20         THE COURT:  That's what the --

21         MS. RANAHAN:  -- if Mr. Richards was consulted?

22         THE COURT:  Well, did your clients check with Mr.

23  Richards and say, you know, our assignor is saying that he got

24  certain rights from you, Mr. Richards, is that right?

25         MS. RANAHAN:  I mean, Your Honor, can you see how

35

1   hard it is for us to try to reach out to Mr. Richards.  I mean

2   this is --

3        THE COURT:  Well, no, but I mean whether or not Mr.

4   Richards is aware of your client's acquisitions is something

5   you get from your client.

6        MS. RANAHAN:  Well, Your Honor, again, we -- we

7   tried to cooperate with plaintiffs to set this up.  I just --

8   if I can make one comment about the service.  I mean we tried

9   to --

10       THE COURT:  Service --

11       MS. RANAHAN:  -- cooperate --

12       THE COURT:  -- service is a non-issue.

13       MS. RANAHAN:  Okay.  Well, Your Honor, I mean at one

14  point you did -- even when we were doing it in the context of

15  the 24 and even when it was only about Bill Graham, you

16  contemplating allowing us to and, you know, these two would be

17  a perfect two to start with.  I mean we have no indication

18  there's a real burden from anyone.

19       There's a huge number of recordings we'd like to ask

20  him about that he hasn't submitted an affidavit about.  We

21  won't make it long.  We'll make it as convenient as possible.

22  We now have all of March to work with.  If, you know, if Your

23  Honor wants to just perhaps use these as the two.  We have

24  counsel here.

25       One of your other concerns was whether we could

36

1   serve them in the United States, and we've served them.

2   They're here.  All we want to do is the opportunity to ask

3   them questions.  If they know nothing, we've wasted two of our

4   depositions and we can move on.

5          But I, you know, we're just trying to explore our

6   defenses.  We're being sued for millions and millions of

7   dollars.  We're not doing this because we want to.  We're the

8   defendants in this lawsuit.  We'd prefer not to be here.

9          THE COURT:  Does plaintiff want to add anything?

10          MR. SLOTNICK:  I think Ms. Ranahan is being, to be

11   kind, disingenuous.  She makes reference to the David Hewitt

12   tapes.  Mr. Hewitt's deposition took place a couple of weeks

13   ago.  They had a chance to cross-examine Mr. Hewitt.  They

14   didn't.

15          Mr. Hewitt was very clear about the fact very self-

16   deprecating individual said, "There are rock stars up at the

17   top and then there's the guys in the truck down at the bottom

18   and we don't see those guys.  Occasionally somebody will stop

19   by the truck, but it's rare."  He didn't mention Mr. Richards.

20   He didn't mention Mr. Byrne.

21          He didn't mention Mr. Armstrong.  He didn't mention

22   Mr. Morrison or any of the others that the -- that the

23   defendants have tried to serve.  This is a wild goose chase

24   bordering on a witch-hunt.  They want to make this expensive.

25          They want to make this difficult in the futile hope

37

1   that this is going to dissuade our clients from pursuing

2   rights that they know we have because we've given them I think

3   over 1,000 pages of documents showing the chain of title not a

4   fictitious chain of title that Ms. Ranahan thinks exists

5   because she can only read the part that has to do with music

6   publishing.

7            I mean this is absurd, Your Honor.  I'll let Mr.

8   Rosenberg finish off.  I'm sure there's something else to say.

9            MR. ROSENBERG:  Thank you, Your Honor.  This concept

10  that co-publishing was used, Mr. Richards has rights, it's not

11  true.  Do you think that Mr. Richards, who has lawyers,

12  managers, business managers, accountants since 1966, has

13  allowed ABKCO to exploit these songs, collect the royalties on

14  these songs, keep a huge amount of it even though he owns

15  rights in the songs?

16           Now I've been advised, without going into

17  attorney/client privilege, that ABKCO owns the rights, but

18  there are ABKCO representatives here, Your Honor, who have the

19  un-redacted agreement.  Your Honor has it.  I am advised,

20  that's all I can tell, that the un-redacted agreement does not

21  take back the grant that the -- you know, that the parts that

22  aren't redacted say ABKCO owns this.  It's like the redacted

23  part says oh, we were just kidding.  You own it.

24           Mr. Richards, to his knowledge, to his

25  representatives' knowledge, to ABKCO's knowledge, to Mr.

1   Slotnick's knowledge does not own the songs.  Mr. Ranahan's

2   saying oh, there's redactions so I need to ask -- you're going

3   to ask Keith Richards about a 1966 agreement that's redacted?

4   Please, Your Honor.  It's absurd.

5          The concept about these other fellows I didn't even

6   know about, this recording engineer, that's why our affidavit,

7   we read the complaint, the transcripts.  We focused on what we

8   thought.  I assure the court, to the best of my knowledge, Mr.

9   Richards' declaration testimony would be consistent.  He

10  didn't deal with these things.

11         And Mr. Slotnick clarified something I didn't know,

12  because I'm not part of this case, that this fellow's

13  deposition, this recording engineer, was taken.  Why didn't

14  they say to him did you speak to Keith Richards?  What did he

15  tell you?  Did you show him the recording equipment?

16         This is what we're talking about.  They don't want

17  the answers.  They want it for reasons again, and I'm

18  repeating myself so I'll sit down, for reasons that I don't

19  quite understand, whether it is the protraction of these

20  proceedings leading to unnecessary expenses so that my

21  client's representatives will call ABKCO?  I don't know what

22  it is.

23         They had their chance apparently two weeks ago to

24  ask these questions and they didn't.  Don't make my client

25  come in who will have less information than a fellow who

39

1  actually recorded it to continue this sort of, I don't know if

2  it's a witch-hunt but it's a stranger exercise, Your Honor.

3        Concert in 2003, yeah, there was on in 2003.  All of

4  the other concerts took place decades and decades and decades

5  ago.  Mr. Richards doesn't own the songs.  The concept that

6  he's going to testify about when he got a royalty check?  The

7  royalty checks don't go to Mr. Richards.  They go to his

8  business manager.

9        Your Honor, there's no basis for this and I say this

10  respectfully that Ms. Ranahan's presentation leads me to

11  rethink when I said, you know, it might make sense, if the

12  court's inclined, to offer these written questions to Mr.

13  Richards.

14        There's no point in it, Your Honor, in fairness.

15  There's no point in his deposition.  I'd ask the court to

16  grant the motion.

17

18        THE COURT:  Well, all right.

19        MS. RANAHAN:  Your Honor, if I could just respond

20  briefly to a couple of those points --

21        THE COURT:  Very briefly.

22        MS. RANAHAN:  -- they just raised.  First of all,

23  Mr. Hewitt's deposition was taken by plaintiffs.  We, you

24  know, we'll have him submit a declaration.  We didn't take his

25  deposition because we weren't taking it.  That was plaintiffs'

40

1   deposition.

2          THE COURT:  Well, no --

3          MS. RANAHAN:  They didn't ask him about --

4          THE COURT:  You were there and you had the right to

5   cross-examine.

6          MS. RANAHAN:  We had the right to but we didn't need

7   to.  We can also have him submit a declaration for this case.

8   Also, they didn't ask him about Mr. Richards or anyone

9   specifically in that deposition, so I --

10         THE COURT:  It was you had identified by you is it

11  -- in your 26(a)(1) material?

12         MS. RANAHAN:  I don't have that right in front of

13  me, but I -- he was named in the -- everything they've

14  produced is about that agreement.  There's no secret --

15         THE COURT:  No.  Was he identified as a witness you

16  would call in support of your defenses and was the substance

17  of his testimony disclosed as is required by Rule 26(a)(1)?

18         MS. RANAHAN:  I would be -- I would expect, so I

19  don't have it here, so I think so.  If not, we're happy to

20  amend but I don't --

21         MR. SLOTNICK:  Your Honor, it's my understanding

22  that he was not.

23         THE COURT:  Yeah.  Okay.  Go ahead.

24         MS. RANAHAN:  Okay.  But just about -- so counsel

25  just confirmed that he has not discussed with him the other

41

1  two transactions because he didn't know about it until

2  recently he just said.  So that's nice that he believes that

3  the -- that Mr. Richards' recollection would be consistent,

4  but we don't know that, Your Honor, and counsel can't speak

5  for him without having even discussed it or raised these

6  transactions with him.

7      THE COURT:  No.  But you still bear the burden on

8  this though.

9      MS. RANAHAN:  But how do I -- how can I bring

10  forward Mr. Richards' knowledge about things that I obviously

11  haven't had an opportunity to discuss with him?

12     THE COURT:  Well, because if the conversations that

13  you think took place did take place, your assignors would know

14  about them and presumably you could submit a declaration from

15  Mr. Hewitt saying on such and such a date at such and such a

16  place I spoke to Mr. Richards and Mr. Richards told me X, Y

17  and Z, you know, and there's nothing like that from any of

18  your assignors.

19     MS. RANAHAN:  But it's not just about specific

20  conversations.  It's also just his knowledge about what these

21  recordings were, if he was aware of them, if he objected to

22  them --

23     THE COURT:  Well --

24     MS. RANAHAN:  -- if he had --

25     THE COURT:  -- Mr. Hewitt, as I -- I don't know that

1   much about it but my understanding is Mr. Hewitt's a recording

2   engineer, so if Mr. Hewitt is not making recordings, I don't

3   know why he's spending time with The Rolling Stones.

4              MS. RANAHAN:  Your Honor --

5              THE COURT:  He's a recording engineer.

6              MS. RANAHAN:  -- that's what I'm telling you, that

7   it could've been anyone involved in those recordings, but the

8   recordings exist.  We purchased them.  The agreement stated

9   that we had -- they had the intellectual property rights.

10             There's two other huge transactions that nobody's

11  asked Mr. Richards about and I don't know how we can just

12  assume that he doesn't have any knowledge when no one's even

13  mentioned these two transactions to him and they make up 150

14  plus of the recordings.

15             Again, the Bill Graham was nine.  They asked him

16  about Bill Graham.  What about the other 150 plus recordings,

17  which is a third of the case.

18             MR. ROSENBERG:  Your Honor, I can answer that by

19  saying my client, as I'm advised without waiving any

20  privilege, has no knowledge about any of this.  That's the

21  point.  He doesn't know.  He doesn't remember and that's the

22  end of it.

23             THE COURT:  All right.

24             MS. RANAHAN:  But there's also this agreement, the

25  redacted ones, it's giving rights to the Stones, so I don't

43

1  know how I'm supposed to read this and say there's no

2  publishing rights potentially to the Stones.

3          It says "music publishing copyrights, AMI transfers

4  and assigns to the Stones everything on Exhibit I," and then I

5  can't see Exhibit I.  So I don't --

6          MR. ROSENBERG:  We have that and it was filed.

7          THE COURT:  All right.  All right.

8          MR. ROSENBERG:  We filed it.

9          THE COURT:  I think I've heard enough.

10         MR. ROSENBERG:  I think so.

11         THE COURT:  All right.  Well, I think I'm going to

12  follow here what I did in the *Bouchard* case, which is allow --

13  allow the defendants to serve 25 written questions on Mr.

14  Richards for Mr. Richards to answer under oath.  I appreciate

15  that I think it's highly unlikely -- well, let me rephrase it.

16         I think it's highly unlikely that Mr. Richards is

17  going to be able to -- to add anything that's going to support

18  the defendants' theories here, but I think the defendants are

19  entitled to a little bit more than just the affidavit.  And if

20  they want to ask leading questions to try to prompt his

21  recollection or if they want to attach exhibits to try to

22  prompt his recollection, they're free to do so.

23         You know, at the same time, I'm not -- I don't think

24  that there's a terrible burden on Mr. Richards to doing that

25  and I think it's an appropriate resolution of the conflicting

44

1  interests here, all right?  So the defendant can serve 25

2  written questions on Mr. Richards exploring whatever issues

3  they want to explore.  Subparts are going to call -- are going

4  to count as a separate question.

5        If the answers to these questions indicate that Mr.

6  Richards has knowledge relevant to the claims or defenses in

7  the lawsuit, we can revisit the question of whether or not an

8  oral deposition should be permitted.  But at this point, I

9  think that's -- that's the appropriate resolution with respect

10  to Mr. Richards.

11        MS. RANAHAN:  Thank you, Your Honor.

12        THE COURT:  All right.

13        MR. ROSENBERG:  Thank you, Your Honor.

14        THE COURT:  You're free to stay or free to go,

15  whatever your pleasure is.

16        MR. ROSENBERG:  All right.

17        MS. RANAHAN:  Can I just one thing, Your Honor?

18        MR. ROSENBERG:  Thank you.

19        MS. RANAHAN:  Could we --

20        MR. ROSENBERG:  If we do leave, that's not

21  considered disrespectful?

22        THE COURT:  Not at all.  Just hold on one second.  I

23  don't know if Ms. Ranahan's question relates to the --

24        MS. RANAHAN:  Oh, yeah.  It does relate.  Well, not

25  really.

45

1          MR. ROSENBERG:  Do you need me to stay or --

2          MS. RANAHAN:  No, I actually don't need you to stay.

3     It's really just about we would love to be able to ask the un-

4     redacted version to Mr. Richards about some of these 25

5     questions, so if, you know, Your Honor, I don't know how Your

6     Honor's leaning on that issue, if you've had the chance to

7     even review the un-redacted --

8          THE COURT:  I have --

9          MS. RANAHAN:  -- in chambers, but, you know, as far

10    as the 25 questions, that would be incredibly helpful for us

11    to actually to be able to read this, because it's --

12         THE COURT:  -- well --

13         MS. RANAHAN:  -- even when I read it, it's

14    completely inconsistent with what they're representing it to

15    be, so I may be missing something, but thank you.

16         THE COURT:  Okay.

17         MR. ROSENBERG:  It's --

18         THE COURT:  All right.  Let's move on to Mr. Byrne,

19    okay?

20         [Mr. Bichel is too close to a microphone so there's

21    some distortion.]

22         MR. BICHEL:  Good afternoon, Your Honor.  Victor

23    Bichel.  I represent David Byrne.  We've been at this for an

24    hour and much of the issues that I would discuss or elaborate

25    on really have been hashed out already, so I don't want to

46

1   just simply monopolize more of the court's time.

2          THE COURT:  Well, I guess one of the differences

3   though with respect to Mr. Byrne is I don't have an affidavit

4   from him similar to the affidavit that I have for Mr.

5   Richards.  So I don't -- you know, at this point I really have

6   no basis for making -- for drawing any conclusion as to what,

7   if anything, he may recall about any oral assignments or

8   anything like that.

9          MR. BICHEL:  Yeah.  So the best I would have on that

10  regard is obviously my statements, which are what they are.

11  But the danger in submitting, and this is my -- my decision.

12  The danger in submitting an affidavit or a declaration is

13  exactly what happens in -- was exactly what was discussed.

14         As soon as you submit a declaration, it just ends up

15  opening up the question, you know, someone has a right to

16  cross on that declaration, someone has a right to make further

17  inquiry.  The point remains the same, which is what --

18         THE COURT:  Yeah, but I think there's less of a

19  basis though for inferring that Mr. Byrne has no knowledge

20  then there is -- then there was with respect to Mr. Richards.

21         MR. BICHEL:  Well, in fact --

22         THE COURT:  I've got, you know, no record at all.

23  You know, maybe he went home and -- maybe the conversations

24  the defendant is suggesting took place, maybe he went home and

25  made extensive diary entries.  I think it's unlikely but --

1           MR. BICHEL:  Yeah.  I start -- so that is correct.

2     There is, you know, from my understanding and, you know,

3     without getting into attorney/client privilege, as well, it's

4     certainly the case that he has no recollection of what

5     happened back state or any time 40 years ago relating to some

6     sort of oral or implied license that was given to defendants.

7           I mean the absurdity of that proposition applies to

8     every single of the significant artists that are being

9     requested for a deposition, all of who are non-parties.  And

10    from an intellectual standpoint, the fact is that the -- the

11    protocol or the analysis remains the same and there is

12    absolutely no showing.

13          You know, on non-party, as Your Honor referenced in

14    non-party situation for a deposition, the burden actually

15    shifts to the other side to the person seeking the deposition

16    to make some sort of showing that that the deposition is

17    required.  What Mr. Richards was saying, his lawyer was

18    saying, applies equally and obviously, to David Byrne.

19          Only David Byrne, in fact, the entire world of songs

20    that apply to David Byrne is 40 years ago.  We don't have

21    anything recent.  The eight songs that are referenced in the

22    complaint go back to '79 and '80.  The fact of the matter is,

23    the Defendants have not submitted an affidavit.

24          They haven't submitted a declaration.  They haven't

25    submitted a scintilla of evidence that he ever gave the so-

48

1  called oral license, which is just a -- an oral license in

2  perpetuity for free of his greatest songs to defendants, if

3  this is honestly their defense, I mean you couldn't have

4  anything that speaks louder as to what their case is about.

5      If they're relying on these significant artists to

6  have given out in the middle of a concert rights in perpetuity

7  for free to significant songs, I mean the proposition is

8  absurd.  The one document that they rely on or that they

9  submitted, which I had no seen before but it's sort of the

10  heard of their response is their Exhibit Number 12.

11      THE COURT:  Which is unsigned.

12      MR. BICHEL:  Is -- yeah.  I mean when I first looked

13  at it, I did a whoa.  And then I looked at it again.  Not only

14  is it unsigned, it's dated April 16th -- April 2016.  They're

15  not even talking about a document that would go back to when

16  it was.

17      What they submitted as example of an assignment if

18  this personal license where he allegedly acknowledges,

19  acknowledges.  They're trying to put the cat in the back in a

20  bag.  I mean this is just --

21      THE COURT:  Well, if it's unsigned, I think it's,

22  you know -- it has no more evidentiary weight than the

23  appearance sheet, counsel.

24      MR. BICHEL:  Yeah.  And I could say that we never

25  received it.  Never assigned it and it was never sent.  So the

49

1  suggestion, and this is troublesome.  The suggestion, the

2  declaration, that this was the personal license is -- I didn't

3  ask for --

4           THE COURT:  I don't think that's what said in the

5  declaration.  I think the declaration just says this is a

6  document that defendants produced in discovery.  Let me just

7  -- yeah --

8           MR. BICHEL:  She said --

9           THE COURT:  -- Paragraph 13 on March 18, 2016,

10 defendants produced to plaintiff the personal use license

11 agreement between -- this is odd too.  It says on "March 18,

12 2016, they produced it.  And it says, "This agreement dated as

13 of April blank 2016.  So they don't purport to authenticate it

14 -- is a genuine agreement.

15          MR. BICHEL:  -- well --

16          THE COURT:  They just say it was produced in

17 discovery.

18          MR. BICHEL:  Yeah, except I think if you tie it

19 back, you know, just without leaving it sitting in a vacuum.

20 What they actual argue was that this is the personal license,

21 but there's nothing there and it was never sent and they had

22 no record, and they don't give in evidence and they don't give

23 an affidavit or a declaration.

24          There is nothing in the record that points to David

25 Byrne, that they have produced doing any of the things they

1 said.  And I won't believer the points about the LACHES.  They

2 all apply equally with David Byrne.  And so, you know, the

3 questions is whether I should have put in a declaration, but I

4 don't know if that ever really -- I've been through enough

5 litigations.

6           I don't know that I've ever honestly advances the

7 ball, especially when the other side will simply claim their

8 entitled to depose him and it's their obligation, as Your

9 Honor pointed out, to come forth with the basic evidence that

10 would suggest that that deposition is warranted, especially

11 one so remote and likely to offer little in weigh of relevance

12 to ths case.

13           But, you know, again, I know you've been at it for

14 an hour, so I don't have a lot to say.

15           [Mr. Slotnick is not near a microphone and did not

16 identify himself.]

17           MR. SLOTNICK:  Your Honor, may I be heard just for a

18 moment?  In furtherance of this, in docket -- Document Number

19 83, which is defendants' opposition to the motion to quash, it

20 says, "Here, Mr. Byrne entered into an agreement with CGA that

21 appear" --

22           THE COURT:  What?  Is this the memorandum of law

23 that you're -- oh, this --

24           MR. SLOTNICK:  This is in defendants' opposition to

25 David Byrne's (indiscernible).

51

1          THE COURT:  Okay.  What page are you on please?

2          MR. SLOTNICK:  I'm on page 12 of 21.  This is

3   Document Number 83.

4          MR. BICHEL:  Page eight on the bottom, Judge.

5          MR. SLOTNICK:  Yes, Page 8 on the bottom.

6          THE COURT:  Okay.  I've got -- I don't have the ECF

7   version.  Your page begins "asserted on numerous occasions"?

8          MR. SLOTNICK:  The page begins, "Defendants are

9   therefore entitled to" --

10          THE COURT:  Hold on one second.  Let me just get on

11   the -- what's the page number at the bottom?

12          MR. SLOTNICK:  Eight.

13          THE COURT:  Eight?  Hold on.  Defendants are

14   therefore -- I'm on the same page.  Where are we on the page?

15          MR. SLOTNICK:  First line of the first full

16   paragraph, "Here, Mr. Byrne" --

17          THE COURT:  Okay.

18          MR. SLOTNICK:  -- "entered into an agreement" --

19          THE COURT:  Yeah.  I saw that.  Yeah.

20          MR. SLOTNICK:  I don't know what entering into an

21   agreement means, although I suppose it means you have to

22   actually send it to the other party and they have to sign.

23          Now apparently, Mr. Sagan's deposition was taken

24   recently, and he had no recollection of this and counsel

25   submits an unsigned document from 40 years later, which

52

1  essentially is trying to say we know we've been sued, but

2  we're going to go through a back door or a back alley to undue

3  the lawsuit by getting a settlement with Mr. Byrne without

4  disclosing anything about the lawsuit.

5         And by the way, even if any of that were true and it

6  really happened, it would violate the Second Circuit

7  prohibition against this in *Davis versus Blige.*  So, Your

8  Honor, again --

9         THE COURT:  Right.

10        MR. SLOTNICK:  -- I don't know what this is and I

11 don't know what defendants are trying to pull, but this is

12 absurd.

13        MS. RANAHAN:  Your Honor, first of all --

14        THE COURT:  What is Exhibit 12?

15        MS. RANAHAN:  -- it's -- yeah, so, Your Honor, as

16 far as that, that was in our production.  I didn't actually

17 notice it wasn't signed either until last night, and I

18 apologize.  I actually --

19        THE COURT:  How could you not notice it's signed.

20        MS. RANAHAN:  Your Honor, all I --

21        THE COURT:  You're an attorney.

22        MS. RANAHAN:  -- I had -- I know.

23        THE COURT:  How could you not notice --

24        MS. RANAHAN:  I know, Your Honor.

25        THE COURT:  -- a document (indiscernible) personal

53

1   use license is --

2           MS. RANAHAN:  Yeah.

3           THE COURT:  -- not signed.

4           MS. RANAHAN:  From my --

5           THE COURT:  That doesn't pass the laugh.

6           MS. RANAHAN:  -- that --

7           THE COURT:  Come on.

8           MS. RANAHAN:  My associate had pulled it.  She said,

9   "I have an agreement in the record that is David Byrne."  I

10  looked at it last night after we had filed.  I said, "This

11  looks like it's not signed."  She said, "Oh, let me look to

12  see if we have a signed version.

13          So I take full responsibility for not having checked

14  every exhibit.  I've been here twice this week and had another

15  hearing and Your Honor, we, you know, normally would've have

16  had a week to respond to this, but I -- I take full

17  responsibility for that mistake and I --

18          THE COURT:  But we agree this is nothing.  It has no

19  evidentiary --

20          MS. RANAHAN:  -- Your Honor --

21          THE COURT:  -- weight at all.

22          MS. RANAHAN:  -- I don't know what it is.  I would,

23  you know, like to ask him if he received it.  It looks like

24  from the agreement he reached out to us to use something,

25  which has happened from time to time.  I don't know the

54

1   circumstances of it.

2          I don't know if we have a signed version.  I haven't

3   followed up because I just noticed it at midnight last night

4   that it wasn't signed.

5          MR. BICHEL:  Judge, can I be heard for a quick

6   second.

7          THE COURT:  No, no, no, no, no.  Let Ms. Ranahan --

8          MS. RANAHAN:  I noticed --

9          THE COURT:  -- finish up, give you your chance to be

10  heard after.

11         MS. RANAHAN:  I noticed last night after it had been

12  filed that it wasn't signed.  I asked the associate, "Do we

13  have a signed version of this in the file -- in the system?"

14  She hadn't see it, so I -- you know, I take responsibility if

15  there's not a signed version somewhere.

16         I don't know if there is.  It looks like that is was

17  in response to a request from Mr. Byrne.  I don't know if

18  that's true.  I don't know enough about this, Your Honor, but

19  I apologize for that.  I do have another agreement I would

20  like to raise with the court though, and this is a co-

21  publishing agreement that David has entered with plaintiffs.

22         So the issues about unquestionable, you know,

23  rights, this is a -- this is something that plaintiffs

24  produced in 1982, which is the co-publishing agreement with

25  David Byrne and The Talking Heads.  So I have copies of it.  I

55

1  don't know if anyone -- plaintiffs will have produced this and

2  I raised this in prior briefing, but they own the publishing

3  right in this agreement.  They do.

4          MR. BICHEL:  So, Your Honor, even if -- yeah.

5          THE COURT:  (Indiscernible.)

6          MS. RANAHAN:  I'm sorry?

7          THE COURT:  Is there anything else you want to tell

8  me?

9          MS. RANAHAN:  Just about do you want to see a copy

10  of this (indicating)?

11          THE COURT:  No.

12          MS. RANAHAN:  Okay.

13          THE COURT:  All right.  What did you want to say?

14          MR. BICHEL:  Can I?  Yeah, Judge.  Just with respect

15  to the -- this unsigned personal use license, I deposed

16  defendants' president, Mr. Sagan, I think it was last week or

17  two weeks ago in San Francisco.  Ms. Ranahan was there.  I

18  marked this exhibit, this document, this unsigned personal use

19  license as Exhibit 38 to Mr. Sagan's deposition.

20          He had not recollect -- I said, "Have you signed

21  this?  Has Mr. Byrne signed this?"  He said, "I don't know.  I

22  don't recall this."  And Ms. Ranahan was there for that

23  deposition.  That's what I wanted to add --

24          MS. RANAHAN:  Your Honor, if I can --

25          MR. BICHEL:  -- to the record, Your Honor.

1        MS. RANAHAN:  -- if I can respond to that?  I wasn't

2    (indiscernible) deposition.  I was in and out of that, but if

3    that happened during that deposition and he said I don't know,

4    he may not have been the person to accept.  And I, again, I

5    don't know the circumstances.  I don't know that they know the

6    circumstances of why or what this agreement means, whether it

7    was produced --

8        THE COURT:  But we do know it's unsigned.

9        MS. RANAHAN:  It's unsigned.  It's unsigned, but I

10   don't now that we don't have a signed version somewhere.  I

11   don't know if there could, often, turns out to be a great one

12   so that --

13       THE COURT:  You had a signed version of it, it

14   would've been front and center in your 26(a)(1) disclosures.

15   It would be malpractice not to have it from and center in your

16   26(a)(1) disclosures.  Come on.  You know that.

17       MS. RANAHAN:  Well, again, Your Honor, I apologize.

18   That was an oversight and -- it was just a -- it was a filing

19   that we got out knowing they had just set this hearing last

20   week on Thursday.  We had another, you know, three oppositions

21   due.  We were here Tuesday.  I had a summary judgment motion

22   Monday.

23      I didn't check every exhibit like I wish I would have

24   before it was filed and I apologize for that.  But I didn't

25   know that it wasn't signed or I may have obviously

57

1   characterized it differently in the brief.  I had a message

2   from my associate saying we have a personal use agreement in

3   our production from Byrne.  I assume that meant it was signed,

4   but I don't know the circumstances and I apologize for that,

5   Your Honor.

6         But that was not intentionally misleading and I'm

7   hear to, you know, let you know how that happened.

8         THE COURT:  All right.

9         MS. RANAHAN:  But that is not the basis upon which

10  we're seeking his declaration -- or sorry, his deposition.  We

11  still have no declaration from Mr. Byrne about his knowledge

12  or lack of knowledge.

13        He does have a co-publishing right, so there's

14  several differences between him and Mr. Richards

15  notwithstanding this, you know, personal use license, whether

16  he's seen it or he signed it somewhere else or it could be

17  that it was sent to him and it was orally agreed to and

18  nobody, you know, actually physically sent the scanned copy,

19  and that certainly happens in this day and age.

20        THE COURT:  But I take it it's the same situation

21  with Mr. Byrne as existed with Mr. Richard that there is no

22  testimonial or documentary evidence that Mr. Byrne gave your

23  assignors the right that you claim that your assignors gave --

24  gave your assignors the rights that you believe you -- your

25  client received from your assignors?

58

 1          MS. RANAHAN:  Well, again, we have this

 2  representations in the assignors.  This does not involve Bill

 3  Graham at all.  It's a totally different --

 4          THE COURT:  No, but it's the same --

 5          MS. RANAHAN:  Right.  Well, we have representations

 6  that all the consents were obtained.  We have full co-

 7  publishing rights, so this is -- when Your Honor said, you

 8  know, find that unquestionably have publishing rights, this is

 9  one of them.

10          THE COURT:  When your assignor represented that all

11  the consents have been obtained, did anyone say show me --

12          MS. RANAHAN:  Well, I think the idea --

13          THE COURT:  -- before they --

14          MS. RANAHAN:  -- was that they're oral.

15          THE COURT:  -- before they parted with millions of

16  dollars?

17          MS. RANAHAN:  Yeah, I mean they -- what he

18  understood was that they were oral agreements and that's --

19  there was nothing -- if there's something in writing, we had

20  produced it, Your Honor, for sure.  But to the extent --

21          THE COURT:  So your assignor's representation was --

22  your assignor's representations were they received the rights

23  orally?

24          MS. RANAHAN:  Your Honor, it's not a license to use

25  it.  These are joint works created that make a co-copyright

59

1    interest, so you don't need to have a written transfer or

2    assignment.  This is something that --

3           THE COURT:  No, but no --

4           MS. RANAHAN:  -- if you're both consenting.

5           THE COURT:  No.  But if your assignors are telling

6    you that we got an oral royalty free license to use these

7    recordings in perpetuity, your client said sounds good to me

8    and wrote the checks --

9           MS. RANAHAN:  No.  Our clients --

10          THE COURT:  -- for  millions of dollars?

11          MS. RANAHAN:  Our clients purchased the masters and

12   they said they created these with consent, so we're

13   investigating the consent.  All that's required for the joint

14   work doctrine is consent, Your Honor.  We discussed this

15   exhaustively with you before when you suggested the two.

16          The condition was find someone you can serve in the

17   US and find someone who has publishing rights.  Mr. Byrne is

18   one of those people.  There's no declaration.  There's no --

19   any indication that he knows nothing besides counsel's

20   representation.

21          I don't know that -- because, again, we just filed

22   our opposition within the last 48 hours, I don't know that

23   he's discussed the scope of the transactions with him.  I

24   don't know that he is aware that it's not Bill Graham because,

25   you know, that was the -- the misconception I believe that

60

1  this was all based on what Bill Graham had obtained and it's

2  -- it turns out it's a lot broader.  There's a lot more

3  transactions at issue.  There's a lot more to ask about.

4          THE COURT:  All right.  Anything else plaintiff

5  wants to add?

6          MR. SLOTNICK:  Your Honor, several things about

7  counsel's representations.  Frankly, anything that Ms. Ranahan

8  has to say today just has to be given more than a grain of

9  salt.

10          You know, she said that the personal use license was

11  an oversight and she learned about it last night.  If I want

12  to step back and be kindly and believe that, and then fly off

13  to Neverland, what I think the first thing that Ms. Ranahan

14  should've done when she came in here today is say we made a

15  mistake about that license.  It wasn't entered.  It's

16  unsigned.  And oh yeah, I knew about it a week and a half ago

17  when my client's deposition was taken and he had no knowledge

18  of it and it was put in front of me as part of the exhibits.

19  She walked in and out of the room?

20          Okay.  You know, I'll be kindly and believe some of

21  that.  The fact of the matter is that they don't own anything.

22  Their authors, their assignors are not joint authors.  I'm not

23  going to give Ms. Ranahan a tutorial on copyright law today.

24  We'll have our opportunity to do that another time.

25          But this is absurd.  They didn't take -- they didn't

61

1 serve people, as she suggested.  They tried to serve four.

2 They slapped one on Van Morrison's limousine coming out of a

3 concert --

4    THE COURT:  Well, let's stick with Mr. Byrne.

5    MR. SLOTNICK:  Okay.

6    THE COURT:  Okay?  That's what's before.

7    MR. SLOTNICK:  The fact is, Your Honor, I mean I --

8 look, it's not for me to suggest this for -- for Mr. Bichel or

9 Mr. Byrne, but they're not entitled to a deposition.  There is

10 nothing that Ms. Ranahan has said today that would give any

11 indication of any reason for them to take the deposition of

12 any artist, much less David Byrne.

13    You know, Your Honor, if you want to impose a 25,

14 you know, question, you know, limit on -- on Mr. Byrne, you

15 know, obviously that's -- that's a way to deal with this.  But

16 frankly, it's just wasting everybody's time and money just

17 because they don't have a defense to this case and they are

18 trying desperately to come up with every non-sensical way to

19 make this case cost more money and take more time.

20    MS. RANAHAN:  Your Honor --

21    THE COURT:  Mr. Bichel, do you want to add anything?

22    MR. BICHEL:  I don't have anything of significance

23 to add.  I would say that when she -- we were discussing the

24 deposition at that time, she said she needed around three

25 hours, which I thought was absurd and we discussed that too.

62

1          THE COURT:  What did you want to say?

2          MS. RANAHAN:  Your Honor, I said we would -- if he

3    would agree to sit, we would go no more than two hours --

4    three hours, but that's -- again, there's a lot of reasons and

5    hopefully it would be quicker but that was, you know, neither

6    here nor there.

7          As far as the issue that we're grasping and making

8    this crazy defense, Your Honor, the sync license argument, we

9    don't believe it's necessary to even get a sync license given

10   that what this was was a live performance, video that is

11   actually already synced.  It's not something that's like a

12   movie master track where you have to actually sync them up

13   together.

14         So this all relates to one of the arguments they're

15   making that we believe we have a legal argument against, which

16   is the sync wasn't required, but in the -- because we paid all

17   other licenses that were required.

18         But in the event a sync license was required, then

19   one of the defenses to that is the joint consent or joint

20   recording or joint authorship and that's what we're exploring

21   here.  It has to do with an argument that they're making that

22   we have other, of course, arguments against, Your Honor.

23         But the idea that we know we have no defense to this

24   lawsuit, I mean that is complexly out of bounds.  It's not at

25   all the case and, you know, I could -- as far as his

63

1  suggestions I can't be trusted now because I made -- I

2  attached an unsigned contract, I mean we attached the

3  contract, Your Honor.

4         Everyone could see that it wasn't signed.  It wasn't

5  like we hid it and pretended like we had a secret signed

6  thing.  I noticed it, again, last night.  If I had my phone, I

7  could show you the email of the associate where I said, "Do we

8  have a signed version?  Why is this unsigned version in?"

9         So I, again, apologize and throw myself at the mercy

10 of the court for that.  It was not intentional.  I understood

11 there to be an agreement in the -- in the production that was

12 with David Byrne.  It's not signed.  I don't know the

13 circumstances.  It says that it was through him contacting us,

14 so I -- like Your Honor knows the date discrepancy --

15        THE COURT:  What says it was through him contacting

16 you?

17        MS. RANAHAN:  The first paragraph of it, Your Honor.

18 I don't know that that's true.  I don't -- again, I don't know

19 about the circumstances of what this --

20        THE COURT:  The footer at the bottom at the left

21 side active 396868, et cetera, is that -- and then there's a

22 date 4/18/2016.  Is that something that's --

23        MS. RANAHAN:  That was probably when we -- perhaps

24 when we printed it.  I don't know.  I don't -- again, I'm not

25 -- I don't know enough about this agreement.

64

1          THE COURT:  So this came out of a printer at your

2   law firm?

3          MS. RANAHAN:  I don't know.  This was produced by us

4   but I don't know how -- if this came from the client or if

5   this came from our law firm.  All I know is that in the

6   production it came up when the, you know, the associates were

7   searching everything Byrne related and got thrown in as I

8   would've certainly mentioned that it was unsigned.

9          It's still something that we'd want to ask him

10  about, if he received it and what he knew about it, but it's

11  unsigned.  It's not a secret that it's unsigned.  Everyone can

12  see that it's unsigned.  So to the extent that it has, you

13  know, less weight or if it's not fully executed, that's, you

14  know, fine.  We can still --

15         THE COURT:  I'm not sure it even makes -- as of

16  April 2016, your client had allegedly acquired the rights from

17  the Bill Graham archives, had it not?

18         MS. RANAHAN:  Right.  This looks -- for the Bill

19  Graham, right, but I don't --

20         THE COURT:  So how could there be this agreement --

21         MS. RANAHAN:  It looks like there's a date -- like

22  Your Honor knows, there's a huge date discrepancy.  So I don't

23  know.  I don't know the circumstances of this, if he ever saw

24  it, if -- and that's why I'm telling you that, you know, if --

25  I didn't know this was going to be something that was, you

1  know, I didn't walk in and -- and talk about it because we

2  were talking other deponents parts, but I'm telling you that

3  it was a mistake.  I apologize for it.  I still --

4           THE COURT:  Do we know who --

5           MS. RANAHAN:  -- probably would've included --

6           THE COURT:  -- generated this document?

7           MS. RANAHAN:  I'm sorry?

8           THE COURT:  Do we know who generated this document?

9           MS. RANAHAN:  It looks something that our -- it

10  looks like something our client would've generated but it says

11  in the opening paragraph that it was based on contact from the

12  artist, so I don't know the circumstances of why it was

13  generated.

14           I'm certainly going to find out and I will be happy

15  to report back to Mr. Bichel about what -- what this -- Bichel

16  about what this is, and if there's any further basis.  But

17  that's not the primary reason we want to take Mr. Byrne's

18  deposition.

19           And if there's no reason to ask -- if it's something

20  that we generated on our own and never gave to Mr. Byrne,

21  we're not going to waste his time asking about it.  I'll, of

22  course, find out about that and dig into this before.

23           As far as me going in and out of -- I didn't defend

24  Mr. Sagan's deposition and, you know, Mr. Dickstein knows I

25  was, you know, in and out of that deposition, so the

1  suggestion that that's not true, I mean we have an eyewitness

2  here that can testify to that, but it was certainly just an

3  oversight, Your Honor, as far as how we represented it in the

4  memorandum.  I don't think there's anything about the

5  declaration like you noticed it was inaccurate, but the

6  memorandum.

7         THE COURT:  In the memorandum you say, "Here" --

8         MS. RANAHAN:  Right.

9         THE COURT:  -- "Mr. Byrne entered into an agreement

10  with BGA that appears to fully corroborate defendants' claim

11  of rightful ownership of the concert recordings in issue."

12         MS. RANAHAN:  Right.  That's what I wish I could

13  take back, Your Honor, because I don't have a signed agreement

14  yet, so I don't, you know -- but I apologize.  That's my

15  mistake, but it was not intentional and, again, I didn't

16  notice the unsignedness until I was preparing for this last

17  night with this massive binder.  And, again, these were just

18  set.  This hearing was just set by Your Honor on short notice.

19         THE COURT:  All right.  With respect to Mr. Byrne,

20  I'm going to do the same thing that I did with respect to Mr.

21  Richards and permit the defendants to serve 25 written

22  questions on Mr. Byrne to be answered under oath.  I think

23  it's unlikely that it's going to yield anything, but to ensure

24  that they have the right to make some inquiry, I think that's

25  an appropriate balance of the competing interests.

1          All right.  All right.  Is there anything else with

2   respect to Mr. Byrne that we need to discuss or can Mr. Bichel

3   leave?

4          MR. DICKSTEIN:  Nothing from my end, Your Honor.

5          THE COURT:  Okay.  All right.  All right.  Okay, Mr.

6   Bichel, you're free to leave, you're free to stay, whatever

7   your pleasure is.

8          MR. BICHEL:  Thank you, Your Honor.

9          THE COURT:  All right.  And that takes us to Mr.

10  Israelite.

11         MR. DICKSTEIN:  Sorry.  Yes, Your Honor, if you're

12  ready to proceed.

13         THE COURT:  Yeah.  Let me -- look, I re-read Judge

14  Ramos' decision this morning and, you know, I think Judge

15  Ramos held -- I read Judge Ramos' decision to hold that the

16  press release is privileged with (indiscernible) what is it,

17  Section 74 of a New York statute.

18         But I'm not -- I don't know -- I didn't see where he

19  determined that the press release was effectively a statement

20  that Mr. Israelite had no knowledge.  And, indeed, at one

21  point in the press release, this is in the next to last

22  paragraph, the lawsuit is part of NMPA's continuing effort to

23  ensure songwriters and their music publishing partners are

24  compensated fairly, et cetera, which suggested NMPA has --

25  that the lawsuit is part of NMPA's effort.

1        Why is this not an indication that Mr. Israelite has

2   some knowledge here?

3        MR. DICKSTEIN:  Well, a couple things, Your Honor.

4   I think the section of Judge Ramos' order I think is most

5   pertinent here, and I don't have it.  I have the quotation

6   that I put in my letter from yesterday was on Page 13, he

7   says, "The court thus concludes that the press release could

8   only be construed as announcing the filing of a lawsuit based

9   on alleged conduct, the culpability of which is still to be

10  adjudicated."

11       So essentially what the press release is, is Mr.

12  Israelite, you know, looking at the complaint --

13       THE COURT:  No, but not -- he's not their commenting

14  on what Mr. Israelite knows or doesn't know.

15       MR. DICKSTEIN:  That's true, Your Honor, but --

16       THE COURT:  He's talking about how he's interpreting

17  the press release, that document.

18       MR. DICKSTEIN:  That's correct, Your Honor, and in

19  terms of what Mr. Israelite knows or doesn't know, I think

20  it's plain -- excuse me -- defendant's burden, you know, as

21  the proponent of this subpoena, now the second subpoena

22  they've attempted to serve on --

23       THE COURT:  No.  I think the --

24       MR. DICKSTEIN:  -- Mr. Israelite.

25       THE COURT:  -- press release gives us some

69

1    indication that he has knowledge.

2            MR. DICKSTEIN:  Well --

3            THE COURT:  He has some knowledge.  The lawsuit's

4    part of NMPA's continuing effort.

5            MR. DICKSTEIN:  Because it's part -- because it's

6    from the complaint.  The complaint is the named parties, they

7    are the music publishers.  Those are the plaintiffs in this

8    action.  It's not NMPA.  It's not Mr. Israelite.  He was a

9    party --

10            THE COURT:  It was part of NMPA's continuing effort.

11            MR. DICKSTEIN:  And, Your Honor, you're correct.  As

12   I think my colleague at an earlier conference explained to

13   Judge Ramos, NMPA organizes lawsuits on behalf of its clients

14   -- on behalf of its members I should say.  These are music

15   publishers, United States music publishers, that are members

16   of NMPA who bring lawsuits in their own names.

17            The music publishers own the copyrights here, right?

18   They grant licenses, et cetera.  So Mr. Israelite is

19   essentially the mouthpiece of their advocacy organization,

20   right, of -- of their trade association.  There's no

21   suggestion beyond, you know, the statements in the press

22   release, which of course he made, you know, based on the

23   filing of the lawsuit.  I think that's essentially what Judge

24   Ramos' holding was.  There's nothing beyond those statements

25   paraphrasing the complaint that indicated Mr. Israelite has

70

1  relevant knowledge.

2        But what I'd like to do, Your Honor, I tried to

3  distill down the three categories of information that I see

4  defendants' trying to obtain for Mr. Israelite.  And the one

5  in particular that relates to the press release is there are

6  various questions related to knowledge of the infringement,

7  okay?

8        But I think what we have to ask is a similar

9  question we asked with respect to the third party artist

10 depositions.  Whose knowledge is relevant here?  So

11 plaintiffs' knowledge potentially is relevant to limitations

12 issues, LACHES if -- if defendants intend to raise that.

13       So and they've served 30(b)(6) depositions notices

14 on plaintiffs.  We've identified, I think, five witnesses who

15 are going to be put up to -- to speak to those issues.  The

16 fact, the suggestion that -- the suggestion that Mr.

17 Israelite's knowledge of the infringement is somehow relevant,

18 they're just -- I don't believe there's any support for that

19 here.

20       THE COURT:  Well, why, if he has knowledge of the

21 infringement, why would that not be relevant?

22       MR. DICKSTEIN:  What knowledge?

23       THE COURT:  I don't know.

24       MR. DICKSTEIN:  Right.

25       THE COURT:  I mean he makes statements here which

1   Judge Ramos found was a fair characterization of the

2   complaint.  I don't know if has knowledge that goes beyond

3   that or not.

4           MR. DICKSTEIN:  There's no indication that he does

5   and there's --

6           THE COURT:  Well, except --

7           MR. DICKSTEIN:  -- no reason to think he would

8   and --

9           THE COURT:  -- except the connection between the

10  lawsuit and NMPA.

11          MR. DICKSTEIN:  Correct, from the lawsuit.  From the

12  lawsuit being filed.  And your question was why, if he has

13  knowledge, why isn't that relevant.  What defense -- I mean

14  he's not a plaintiff, so I could see arguably that plaintiffs'

15  knowledge, the music publisher --

16          THE COURT:  (Indiscernible) party though to have

17  relevant knowledge.

18          MR. DICKSTEIN:  But to what ultimate issue would

19  that knowledge be relevant?

20          THE COURT:  I don't know what he knows, if he knows

21  anything.

22          MR. DICKSTEIN:  Fair.  So let's just assume for the

23  moment he knows something about, you know, he went on

24  Wolfgangs.com or ConcertVault.com, he saw something, I don't -

25  - how does that ever become relevant until the information is

72

1    passed on to the plaintiffs.

2           I think that was the same issue that Your Honor was

3    exploring with the third party artists, right?  If Keith

4    Richards went on Wolfgangs.com, we were exploring the same

5    hypothetical, it doesn't become relevant until the plaintiffs

6    learn of that, if they ever learn of that.

7           So, again, defendants are going to be taking

8    depositions of plaintiffs' Rule 30(b)(6) designees.  We've

9    provided written discovery, and I wanted to also mention clear

10   -- clarify the record, Ms. Ranahan mentioned I think that the

11   plaintiffs' had not provided documents showing when they

12   learned of defendants' infringements, that's not the case.

13          At one of the conferences before Your Honor, we

14   explained that we've done an exhaustive search of our clients'

15   files for any documents referencing Wolfgang's Vault,

16   ConcertVault, any of the defendants various websites and we

17   turn that all over, and I vividly recall, I believe it was Mr.

18   Elkin sitting here saying okay, I think that's the first time

19   I heard the representation, so we'll accept that.  So to say

20   that we have not provided those documents is just not -- is

21   just not accurate.

22          A couple other categories that defendants seem to be

23   trying to get at with this proposed deposition of Mr.

24   Israelite go, you know, to the alleged improper motive or

25   improper purpose of filing this lawsuit, and this is something

73

1   that, you know, as Your Honor probably recalls was discussed

2   that I think both of the conferences last year and Your Honor

3   posed the question to Mr. Elkin, defense lead counsel, "Well,

4   are you asserting that they've violated Rule 11?  And Mr.

5   Elkin un-categorically -- excuse me -- categorically said,

6   "No, he's not."

7          I don't think there's any dispute that plaintiffs

8   have a good faith copyright infringement claim.  You know, we

9   provided thousands of documents showing our ownership.  The

10  defendants use of this material is not -- is not disputed.

11  They have questions of whether they have the proper licenses

12  and that -- that will be hashed out, but how the plaintiffs'

13  motive could somehow have an improper motive in all of this is

14  beyond me.

15         And on top of that, how Mr. Israelite might have

16  knowledge that would support that is just not explained by the

17  defendants.  Relatedly, they --

18         THE COURT:  So they're -- well, let me not go -- I

19  don't -- I still don't see how motive is relevant, but the

20  press release asserts some connection between the lawsuit and

21  NMPA.

22         MR. DICKSTEIN:  Your Honor, the NMPA organizes the

23  lawsuit.  They say all right, here's a member.  Hey, do you

24  want to get together, file a lawsuit?  Do you have -- do you

25  own copyrights that these people are infringing?  And then

74

1  plaintiffs say okay, yeah, you know what?  We'll do that.  So

2  you could see --

3          THE COURT:  Maybe that's the case.  I don't know.  I

4  mean I don't have an --

5          MR. DICKSTEIN:  -- but --

6          THE COURT:  -- affidavit to that.  In fact, I don't

7  have anything from Mr. Israelite to that effect.

8          MR. DICKSTEIN:  Right.  But I don't think the press

9  release, which Your Honor is rightfully looking at, suggests

10  anything beyond that and I -- and maybe, you know, maybe it'll

11  be that defendants depose plaintiffs witnesses and they say --

12          THE COURT:  Well --

13          MR. DICKSTEIN:  -- oh, I learned from Mr. --

14          THE COURT:  -- the lawsuit is part of NMPA's

15  continuing effort would suggest that NMPA has some role in the

16  commencement of the lawsuit. I don't know what that role is --

17          MR. DICKSTEIN:  Yeah.

18          THE COURT:  -- but it's, you know, part of NMPA's

19  continuing effort.

20          MR. DICKSTEIN:  Yeah.  I think Judge Ramos sort of

21  addressed that where he said, you know, that's not exactly

22  accurate.  Obviously, the plaintiffs filed the lawsuit, so I

23  don't know that it --

24          THE COURT:  But again, I'm -- it shows some

25  connection though between NMPA and the lawsuit.  Beyond that,

1 I'm not sure what it shows but there's some -- some connection

2 is --

3          MR. DICKSTEIN:  Right.

4          THE COURT:  -- is asserted there.

5          MR. DICKSTEIN:  Understood, Your Honor, but I guess

6 I'm having a hard time thinking of what the ultimate issue

7 that could be relevant to in this case, right?  Again, if

8 defendants, I understand they have -- they have asserted

9 defenses of LACHES, limitations, estoppel, et cetera, none of

10 that comes into play based on Mr. Israelite's knowledge.

11          You know, he doesn't own copyrights.  He doesn't

12 write songs.  He doesn't license copyrights.  That's all true

13 for the NMPA, as well.  Let them question the plaintiffs here

14 who are asserting their -- their copyright infringement

15 claims.

16          I think this is a little bit related to their --

17 their defense of copyrighted misuse.  I think that's the legal

18 hook they try to use to say well, maybe some of this -- the

19 purpose of this lawsuit is relevant, but there's very narrow

20 case law and that --

21          THE COURT:  And, you know, copyright misuse is a --

22 is very narrow, but I don't even see how copyright misuse

23 comes in here because, as I understand it, the plaintiff and

24 the defendant are not competitors.

25          MR. DICKSTEIN:  That's generally correct, Your

76

1  Honor.

2          THE COURT:  I mean in my understanding --

3          MR. DICKSTEIN:  I think the way --

4          THE COURT:  -- none of the plaintiffs are putting up

5  -- are directly marketing recordings, either visual or audio

6  recordings.

7          MR. DICKSTEIN:  That's right.

8          THE COURT:  (Indiscernible.)

9          MR. DICKSTEIN:  We're music publishers.  We license

10  the rights, the --

11          THE COURT:  Yeah.

12          MR. DICKSTEIN:  -- the compositions to --

13          THE COURT:  So you're --

14          MR. DICKSTEIN:  -- third parties.

15          THE COURT:  -- not competitors.

16          MR. DICKSTEIN:  That's right.  No, that's right,

17  Your Honor.

18          THE COURT:  Which is usually --

19          MR. DICKSTEIN:  I think --

20          THE COURT:  -- where the cases that talk about

21  copyright misuse, it's usually in the context of -- of

22  competitors.

23          MR. DICKSTEIN:  Some anti-trust component --

24          THE COURT:  Yeah.

25          MR. DICKSTEIN:  -- to it.  I think that's right.  I

77

1   think there were a couple cases out of the Ninth Circuit where

2   the defendant -- or I guess the plaintiff tried or forced one

3   of the licensees to sign an additional agreement that they

4   would only license or, you know, materials or works from --

5   from them.

6           So you're essentially using, you know, the copyright

7   in an anti-competitive way, which, you know, there's just none

8   of that here.  That's just not the case, so --

9           THE COURT:  Yeah.

10          MR. DICKSTEIN:  -- and I think we've addressed this.

11  We sighted those cases in our papers.  So moving off from the

12  improper motive or purpose point, the other issue that

13  defendants raise is well, there were these "administrative

14  issues" at a company called The Harry Fox Agency, right?

15          And it's true that up until September of 2015, The

16  Harry Fox Agency was a subsidiary of NMPA, separate entity,

17  okay?  They're distinct companies.  So the idea that -- first

18  of all, the idea that Mr. Israelite would necessarily have

19  knowledge of something happening at HFA, there's just no

20  support for that.

21          In fact, I questioned Mr. Sagan about that very

22  issue.  I said, you know, "Aside from the fact that NMPA is

23  the -- or was the parent company of HFA, what basis do you

24  have to think that any -- these "administrative issues" at HFA

25  are the responsibility of NMPA?"

1      And he couldn't offer anything else.  He just said,

2  "Well, you know, every parent company essentially has to be

3  responsible for what its subsidiary does."  I'm paraphrasing,

4  but that essentially was his answer.

5      And then let's talk about what -- what are these

6  administrative issues that defendants seem to claim HFA was --

7  was suffering under.  As best as I can tell, the plaintiff --

8  the defendants realized they don't have licenses through Harry

9  Fox Agency and so they went to Harry Fox, said hey, you know,

10  give me copies of these licenses which we think we may have

11  had years ago, maybe through one of the companies that we

12  acquired.  I think it was King Biscuit may have had an HFA

13  account years ago.  And they say, well, we've been having

14  difficulty getting that documentation from HFA.

15      The defense have served deposition subpoenas on a

16  slew of third parties -- excuse me, I misspoke -- document

17  subpoenas.  They've also served deposition subpoenas as we've

18  heard earlier today.  But they served document subpoenas on a

19  slew of third parties, including Harry Fox Agency, seeking

20  precisely that type of information, whatever licenses may have

21  been issued through Harry Fox, payment information.

22      So, you know, let the pursue that and whatever

23  licenses there -- there are or there -- if they're not, we'll

24  learn that.  I just see no conceivable basis for Mr. Israelite

25  to have any knowledge with that -- in that respect.  And,

1  Judge, I think actually we've covered the three topics that,

2  as far as I can tell, questioning Mr. Israelite.

3        So I think just in sum, he's -- he's really far

4  removed from the actual claims and defenses here, right, of is

5  there infringement?  Who owns these works?  Are defendants

6  using it?  Do they have a license?  Do they have a license?

7  Do they need to?  He's a stranger to all of that.  There's no

8  reason to think he would have relevant knowledge in that

9  regard at all.  And so, you know, we do think that there's --

10        THE COURT:  Do you know whether he has -- and maybe

11  you don't know the answer to this, but do we know whether he

12  has knowledge of the defendants' alleged -- of whether or not

13  the defendants are infringing beyond what's in the complaint?

14        MR. DICKSTEIN:  I have no reason to think that, Your

15  Honor.

16        THE COURT:  Well, unless you ask you really don't

17  know.

18        MR. SLOTNICK:  Your Honor, I can make a

19  representation that other than what's in the complaint, Mr.

20  Israelite doesn't know anything beyond that.

21        THE COURT:  That his only source of information

22  about the alleged infringement is what's in the complaint?

23        MR. SLOTNICK:  To my understanding, yes, Your Honor.

24        THE COURT:  All right.  Has he been asked?

25        MR. SLOTNICK:  I'm sorry.

1          THE COURT:  You said to your understanding and, you

2   know, your understanding has greater weight if you ask the

3   question and --

4          MR. SLOTNICK:  Well, I mean --

5          THE COURT:  -- has lesser weight if you --

6          MR. SLOTNICK:  -- it does, and given the fact that

7   Mr. Israelite is a client, I'm a little reluctant to go

8   into --

9          THE COURT:  Okay.

10          MR. SLOTNICK:  -- the specific conversation.

11          THE COURT:  All right.

12          MR. SLOTNICK:  But my -- I'm comfortable with my

13   representation, Your Honor.

14          THE COURT:  All right.  Anything else you gentleman

15   want to tell me?

16          MR. DICKSTEIN:  Just, again, Your Honor, this is the

17   second time that we've gone through this.  Your Honor

18   previously denied defendants' motion --

19          THE COURT:  Yeah, that was largely for technical

20   reasons though I think.

21          MR. DICKSTEIN:  Right.  Actually, what I was getting

22   to was that there was a document request, if Your Honor

23   recalls, last year that they -- they were seeking

24   communications with Israelite and Your Honor denied that.  So

25   I think to some degree these issues have been addressed.

1          You know, I do think it's appropriate that we ask to

2   recover Mr. Israelite's fees here and, you know, for those

3   reasons and everything I just stated earlier, we ask that the

4   -- the motion to quash be granted.

5          MR. SLOTNICK:  Your Honor, just one, just to put a

6   pin in all this.  Assuming all of the things that the

7   defendants believe Mr. Israelite knew, unless he told that to

8   the plaintiff -- to the plaintiffs, the actual copyright

9   holders, what does it matter?  If Mr. Israelite --

10         THE COURT:  Well --

11         MR. SLOTNICK:  -- was a -- well, if Mr. Israelite

12   was a rebel rouser and he was rousing up the publishers to

13   bring this lawsuit, which certainly has, at the very least, a

14   colorable basis since the plaintiffs owned copyrights and the

15   defendants used them without what we believe to be licenses,

16   then there's no misuse, there's no improper purpose.

17         And at some point, even if all of this was

18   communicated to the plaintiffs, isn't the appropriate starting

19   point for this to be with the plaintiffs?  Did you talk to Mr.

20   Israelite?  What did he tell you?  What did he tell you that

21   you didn't know?  When did he tell it to you?  And what does

22   this have to do with anything?  Do you still own copyrights?

23         THE COURT:  Well, I guess, you know, I thought about

24   that when I was reading the papers and I guess the question I

25   have is, if Mr. Israelite had independent knowledge or

82

knowledge independent of plaintiff as to why defendant was
infringing, why would that not at least be potentially
relevant here on the question of whether or not the defendants
are infringing?

I mean it's not just a question of whether
plaintiffs know they're infringing.  It's a question of
whether or not they are, in fact, infringing.

MR. SLOTNICK:  Your Honor, I guess the question is
what makes Mr. Israelite different from anybody else who
happens to know a music publisher?  If I'm surfing the web or
the internet and I come across Wolfgang's Vault and I look at
all these concerts and I have a friend who works at -- at
ABKCO and I call them up and say hey, do you know about these
guys and are they licensed, does that make me a suitable
witness in a case of this nature?  I don't think it does.

THE COURT:  Probably not if you're just repeating
what your friend at ABKCO tells you, but if you have knowledge
from an -- let's take this same hypothetical and let's assume
-- you know, we can play with the facts here but let's assume
you're in a restaurant and you happen to be sitting next to
people who work at Wolfgang's Vault and they make admissions,
why would that not be independently admissible?

Even though you're not the publisher, but it's
admissible on the substantive issue of whether or there's
infringement.

1          MR. SLOTNICK:  Your Honor, if the question is if a

2     third party, you know, heard an admission from the defendants

3     that they were infringing as opposed to my -- my hypothetical,

4     then I suppose that would be relevant because then the

5     question would be to the plaintiff.

6          How did you find out about Wolfgang's Vault?  Oh, my

7     friend Slotnick told me that he was sitting down next to Bill

8     Sagan and Bill Sagan admitted that he was a willful infringer.

9          THE COURT:  No, but it's not just a question of what

10    the plaintiffs knew, it's a question of whether -- the core

11    question of the case is whether the defendants are, in fact,

12    infringing.

13         MR. SLOTNICK:  Well, but that's not --

14         THE COURT:  Right?

15         MR. SLOTNICK:  -- going to be -- there are only two

16    questions in a copyright case.  One, did you won the

17    copyrights, plaintiff own the copyrights, which is not

18    something that is within the unique knowledge of Mr. Israelite

19    or any third party, and, B, did the defendant infringe in some

20    way, which would also not be within the purview of any third

21    party, whether he's the head of a trade association or not.

22         Either they have rights or they don't.  And whether

23    Mr. Israelite believes that they did or didn't -- frankly,

24    whether the plaintiffs believed that they did or they didn't

25    is somewhat irrelevant.  The court's going to make a

84

1   determination.

2           Now the one that the plaintiffs can add that Mr.

3   Israelite can't is we looked through our records and we have

4   no licenses with -- with Wolfgang's Vault.  Now are there

5   other defenses?  Presumably.  But the ones that are mentioned

6   in -- in Ms. Ranahan's letter are not unique to or

7   identifiable through any third party, much less Mr. Israelite.

8           THE COURT:  Well, I'm not sure they need to be

9   uniquely in his knowledge to be discoverable.

10          MR. SLOTNICK:  Well --

11          THE COURT:  I don't know that you need to show that

12  a third party has unique knowledge to depose the third party.

13          MR. SLOTNICK:  But he has to have some knowledge.

14          THE COURT:  Uh-hum.  Yes.

15          MR. SLOTNICK:  And there is no -- I mean how would

16  he have knowledge of ownership?  He wouldn't.  I guess you

17  could do a search of every copyright in the copyright office.

18  And how would he have knowledge of what the -- you know, of

19  what Mr. Sagan does or doesn't own.

20          I think the one thing that's safe to say is that Mr.

21  Israelite is not on --

22          THE COURT:  (Indiscernible) --

23          MR. SLOTNICK:  -- Mr. Sagan's Christmas card list.

24          THE COURT:  -- what his history in the industry is

25  or what Mr. Sagan's history in the industry is.  You know,

85

1   there's just a lot of things here, a lot of facts that we

2   don't have any information on one way or the other.

3          MR. SLOTNICK:  Mr. Israelite, until he had this job

4   at NMPA, was I think deputy chief of staff to the Attorney

5   General of the United States.  I have a feeling Wolfgang's

6   Vault did not cross his desk, at least I hope not.

7          THE COURT:  Ms. Ranahan?

8          MS. RANAHAN:  Thank you, Your Honor.  So --

9          THE COURT:  Does anybody need a 10 minute break?

10  We've been going for about a little more than -- more than an

11  hour and a half.  Does anybody need a 10 minute break if we're

12  -- you're okay?  Okay.  Go ahead.

13         MS. RANAHAN:  So, again, Mr. Ramos -- as you

14  correctly noted, Mr. Ramos' decision was about a much narrow

15  issue.  It was about whether we could pursue a defamation

16  claim based on the press release.  And what was found that

17  that certain section was confidential, the section we claimed

18  was a false statement of fact.

19         This, I mean the idea that he made -- he made a lot

20  of statements.  It was put up on his behalf.  He claimed the

21  lawsuit was on his behalf.  He claimed we hadn't licensed

22  certain things.  There's so many factual statements in that

23  press release.

24         He obviously knows something.  And, in fact, our

25  indications show that he was actually, you know, the

1   mastermind behind this lawsuit and had been gathering all the

2   facts to pursue this.  And so I can't imagine now that, Your

3   Honor, we have noticed 10 depositions.  We're now going to be

4   doing, you know, for the artists questions.

5           We cannot now even take the deposition of the person

6   who put out the original state press release, was the

7   mastermind of the lawsuit, also happened to own -- I mean the

8   NMPA represents all plaintiffs -- but also owned the HFA

9   during the relevant time period.  The situation about the HFA

10  is significant, Your Honor, because what plaintiffs are

11  claiming is that we didn't have the proper administrative

12  license for the HFA during that time.

13          The evidence in the record of us attempting to

14  actually continue on the King Biscuit license through HFA, and

15  there's well documented administrative errors.  And the idea

16  that Mr. Sagan didn't talk about this in his deposition is

17  just false.

18          THE COURT:  Let me ask you this question.  I mean if

19  your client had licenses from Harry Fox, why doesn't your --

20  why don't you have license copies in your files?

21          MS. RANAHAN:  We have certain -- we've made payments

22  through whatever way we could, but there was a lapse, Your

23  Honor, and there was the -- there's well documented

24  administrative problems with the HFA that is involve --

25  there's a case where it was documented.  There's articles

1    about it.

2           And Mr. Israelite was running or was -- owned the

3    HFA at the time.  So we want to ask him about that.  I mean we

4    want to ask him about the --

5           THE COURT:  But I mean if there's a document that

6    constitutes the license, ordinarily I would think the licensee

7    would have a copy of it.

8           MS. RANAHAN:  Right.  It's --

9           THE COURT:  Why doesn't your --

10          MS. RANAHAN:  -- there is a lapse period.

11          THE COURT:  -- why doesn't your own client --

12          MS. RANAHAN:  Right.

13          THE COURT:  -- have copies of the license?

14          MS. RANAHAN:  So because there was these -- there

15   was no one.  There was a whole period where it was a black box

16   vacuum trying to get in touch with the HFA and they were not

17   responding, and this is well documented.  It's not just our

18   client, Your Honor, and my client testified about this and we

19   have emails to prove this.

20          And it was when the NMPA, for a brief period of

21   time, owned and was running the HFA and it was just completely

22   non-responsive.  There was just periods of time where attempts

23   to pay things weren't going through.  There was a lot of chaos

24   and administrative problems at HFA.

25          It was the time when David Israelite happened to be

1   running or owned HFA.  We want to ask him about that.  It's an

2   issue that's been relevant to this case.  He testified about

3   our lack of license.  In that press release --

4        THE COURT:  Your client doesn't have a documentary

5   license, a document that constitutes a license.  What's the

6   reason to believe that HFA is going to have one?

7        MS. RANAHAN:  It's not about -- it's about the

8   reasons for our difficulty.  We eventually did back up and pay

9   everything we were owed.  There was just a lapse period where

10  we were attempting to make right and we were getting no

11  response or push back from HFA.

12        We have produced emails about that.  That just

13  happens to overlap with the relevant time period here in 2015

14  -- 2014 where the NMPA was running HFA.  There was

15  administrative issues.  That's just one of the many issues.

16  We want to ask him about everything in the press release, Your

17  Honor.

18        We want to ask him about, you know -- we went

19  through all this in the letter, but this -- our understanding

20  is that he was the one that wanted to bring this lawsuit when

21  he did.  We're entitled, whether Your Honor believes that our

22  LACHES defense has legs, Justice Ginsberg, in the Supreme

23  Court decision, made it very clear that you're still entitled

24  to investigate the delay and why -- why plaintiffs delayed.

25        And if this was the mastermind behind the lawsuit,

89

1  we -- we did try to get emails, Your Honor, and we -- we

2  couldn't even get the emails.  We would love to have had

3  emails to be able to look to see if there was communications

4  between plaintiffs and Mr. Israelite about, you know, why they

5  brought it when they did, why they delayed, but we couldn't

6  get those.

7         So now we're just at least trying to ask him some

8  questions, Your Honor.  I think there's clearly relevance here

9  with Mr. Israelite.  He claimed to be bringing the lawsuit

10  essentially in the -- in the press release.  So the idea that

11  he doesn't have any knowledge beyond the four corners of the

12  complaint is -- I can't believe that that's true.

13         MR. SLOTNICK:  Your Honor, just to finish up.

14         THE COURT:  Go ahead.

15         MR. SLOTNICK:  First of all, any knowledge of that

16  the plaintiffs had should first be explored through the

17  30(b)(6) depositions of the plaintiffs.  Number two, while I'm

18  sure Mr. Israelite will be thrilled to be -- to be known as a

19  mastermind, I think, you know, in -- in my old neighborhood in

20  the Bronx, Ms. Ranahan is making her point the hard way.

21         The fact of the matter is that if they want to know

22  why HFA wasn't working, you don't ask the CEO of the parent

23  company.  That's like me wanting to take Jeff Bezos'

24  deposition because Amazon didn't delivery my book today.  I am

25  sure that Mr. Bezos would be very concerned and I'm sure that

90

1   he would be just as vigorously in this court seeking to quash

2   the deposition.

3              HFA has hundreds of employees, some of whom actually

4   have something to do with the concerns that Ms. Ranahan wants

5   to deal with.  But does she want to deal with that through

6   those people who actually know something?  No.  This is not a

7   30(b)(6) of HFA.  It's not a 30(b)(6) of NMPA.

8              It is a personal attack and a personal subpoena on

9   Mr. Israelite, who runs a trade association.  He doesn't -- I

10  probably shouldn't say this on the record, but I'm sure he

11  doesn't have any idea of the day to day operations of the

12  Harry Fox Agency worked when he owned the company, when NMPA

13  owed the company and how licenses were or weren't granted.

14             There are people who do.  Have the defendants sought

15  any of those people?  No.

16             MS. RANAHAN:  Your Honor, another thing --

17             THE COURT:  Let me ask you this.  Is there some

18  reason to believe that Mr. Israelite has knowledge of this

19  action beyond the complaint?  I mean did he have independent

20  dealings with the defendants at some point?

21             MS. RANAHAN:  Well, Your Honor, yes.  I'll say yes.

22  I can't --

23             THE COURT:  What independent --

24             MS. RANAHAN:  -- get into all of those.

25             THE COURT:  -- well, tell me --

1          MS. RANAHAN:  -- I can't get into all --

2          THE COURT:  -- tell me what independent -- what

3    dealings he had with the defendants independent of this

4    lawsuit?

5          MS. RANAHAN:  Oh, independent of this lawsuit?

6          THE COURT:  Yeah.

7          MS. RANAHAN:  I don't know about that, Your Honor.

8    I know that as part of dealing --

9          THE COURT:  Let me --

10         MS. RANAHAN:  -- with this lawsuit --

11         THE COURT:  -- ask the question again.

12         MS. RANAHAN:  -- I mean I know he was involved --

13         THE COURT:  Let me ask the question again.  Did he

14   have dealings with the defendants independent of this lawsuit?

15         MS. RANAHAN:  I don't know if he directly did.  I

16   don't know.

17         THE COURT:  Okay.

18         MS. RANAHAN:  I haven't been investigating

19   independent of this lawsuit, you know, exhaustively.  I can

20   certainly find out.  But he definitely has knowledge of this

21   lawsuit.  And we know that from beyond even what we can even

22   say in the papers, but he certainly knows more than anyone --

23         THE COURT:  Well, having knowledge of the lawsuit is

24   not --

25         MS. RANAHAN:  But the facts about why they brought

92

1   it when they did, about why they decided to bring who they did

2   involved, about which recordings they went after.  We believe

3   he does have very specific factual knowledge.  Unfortunately,

4   we haven't been able to get his emails, Your Honor, though

5   we've tried.

6           So we have -- the idea that we can know everything

7   he knows without even seeing a document or asking him

8   questions, he put out a press release claiming ownership of

9   this lawsuit, claiming to be the beneficiary's lawsuit.  I do

10  not believe Judge Ramos intended that we were foreclosed from

11  ever taking any discovery from him --

12          THE COURT:  Well, I'm don't --

13          MS. RANAHAN:  -- because he was not a defendant.

14          THE COURT:  I'm not sure it was an issue that was

15  before Judge Ramos, but I mean Judge Ramos was not dealing

16  with whether or not he could be deposed.

17          MS. RANAHAN:  Right.  And I totally agree with that,

18  but I don't think he intended his order to be construed as

19  such either.  I don't -- I know that he hasn't had that before

20  him.

21          THE COURT:  I don't think he had any intention one

22  way or the other.  I just think it wasn't an issue before him.

23          MS. RANAHAN:  Okay.

24          THE COURT:  I mean I don't -- I can't read anything

25  -- I've read Judge Ramos' decision again this morning, as I

93

1   said.  I don't see anything in there that -- that suggests an

2   intention on Judge Ramos' part one way or the other.

3            MS. RANAHAN:  Okay.

4            THE COURT:  It really just doesn't address that.

5            MS. RANAHAN:  Your Honor, I just -- this is a

6   declaration -- I'm sorry -- deposition about someone who he

7   inserted himself into this lawsuit by issuing a press release

8   -- a press release on behalf of NMPA about this lawsuit.  I

9   mean the idea that you can claim ownership, go on public and

10  then say wait, I have nothing -- I know nothing.  I know

11  nothing.

12           That belies everything he said in the press release.

13  He talks about what our licensing was, what we've been doing

14  for years, our business strategy, which he --

15           THE COURT:  Well --

16           MS. RANAHAN:  -- he claims to know about our long-

17  term business strategy.  If you look at the lines in that

18  press release, he claims to know a lot, Your Honor, and that's

19  not plaintiffs' statements, which we've, you know --

20           THE COURT:  Hold on a second.  "National Music

21  Publishers Association (NMPA), on behalf of several music

22  publisher members, today filed a copyright infringement

23  lawsuit in the United States District Court for the Southern

24  District of New York against "Wolfgang's Vault," which

25  disseminates concert videos and audio recordings through

94

 1  multiple websites, including ConcertVault.com, Daytrotter.com,

 2  MusicVault.com, as well as YouTube.

 3         Wolfgang's Vault calls itself the "largest

 4  collection of live audio and video recordings online" and the

 5  "world's largest collection of live music," and values just a

 6  portion of its music collection at over a $100 million,

 7  however much of its content was never properly licensed.  This

 8  lawsuit not only intends to stop these entities use of

 9  unlicensed works, but also to pay back those whose material

10  has been exploited.

11         The infringing websites offer tens of thousands of

12  hours of concert footage as online" -- demand digital --

13  "online demand streams, digital downloads, CDs, DVDs and vinyl

14  recordings which generate revenue for Wolfgang's Vault through

15  subscriptions and advertising.  They attract approximately

16  50,000 visitors per day all without properly paying the

17  songwriters and music publishers whose creative content

18  underlies the collection."

19         Where do you say he talks about your clients'

20  business plans?

21         MS. RANAHAN:  Just the -- I mean he's talking about

22  what we do, our business strategy, you know, as a --

23         THE COURT:  Where does he talk --

24         MS. RANAHAN:  -- general matter.

25         THE COURT:  -- about your client's business

1  strategy?

2          MS. RANAHAN:  Well, that we make money off of not

3  licensing proper works.  I mean that's not true at all, Your

4  Honor.  But the fact that he's talking about how many views we

5  have a day.  I mean what is -- I don't know where he's getting

6  any of this.  I think we're entitled to ask him.

7          These are facts that he put out into the public that

8  supposedly comprise the basis for why this lawsuit was filed.

9  There's a lot of facts in that, Your Honor.  It's --

10         THE COURT:  Well, is he -- let me ask this question,

11  I mean is he designated by plaintiffs as under 26(a)(1) as a

12  witness plaintiffs are going to call?

13         MR. DICKSTEIN:  No, Your Honor.

14         MR. SLOTNICK:  No, Your Honor.

15         MR. DICKSTEIN:  And I would also point out --

16         THE COURT:  Well, let me come back to Ms. Ranahan.

17  I'll hear from you in a second.  I mean what does it matter

18  then if they're not going to call him?

19         MS. RANAHAN:  Well, it matters because it's relevant

20  to a lot of our defenses, including implied license and all

21  the equitable defenses that we have.  It's --

22         THE COURT:  What he does he know that's going to

23  support your implied --

24         MS. RANAHAN:  We would love to know that.  We tried

25  to get his emails.  We're trying to question him.

1           THE COURT:  No.  Let me ask the question before you

2     try to answer it.  You've talked over me several times and --

3           MS. RANAHAN:  Sorry, Your Honor.

4           THE COURT:  -- it's really a habit you should stop.

5     But what does have -- what is there in this press release that

6     suggests to you he's going to have information that's going to

7     support your implied license defense?

8           MS. RANAHAN:  Implied license?

9           THE COURT:  Yeah.

10          MS. RANAHAN:  Well, you're right, Your Honor.  We're

11    trying to support our implied license defense and he's --

12          THE COURT:  Right.  And what do you -- what in this

13    press release leaves you to conclude that Mr. Israelite is

14    going to provide ammunition for your implied license defense?

15          MS. RANAHAN:  Your Honor, it's not necessarily that

16    he has to provide ammunition, but if he has evidence they're

17    going to use to try to cut against it, we're entitled to --

18          THE COURT:  Well, they're not going to --

19          MS. RANAHAN:  -- investigate that.

20          THE COURT:  -- call him.  They're not going to call

21    him.

22          MS. RANAHAN:  Right.  But we want --

23          THE COURT:  So we don't have to diffuse his

24    testimony.  They're not going to call him.  And if he's not

25    going to support your defense, why do you want to blow one of

1   your 10 depositions on him?

2          MS. RANAHAN:  Your Honor, he has a lot of factual

3   knowledge that he talks about in there.  We understand him to

4   be the mastermind to deciding when they filed, why they waited

5   10 years to file this lawsuit, which does relate to our LACHES

6   and does relate to statutory damages and mitigation and why

7   they waited this long and decided to bring it when they did.

8          There's absolutely plenty of fertile ground to ask

9   Mr. Israelite about.  I mean there's --

10         THE COURT:  Is there anything in the press release

11  that suggests to you he has -- he's going to give you

12  testimony that helps you?

13         MS. RANAHAN:  Well, yeah.  We would like to know why

14  the defendant bring when they did.  That's absolutely critical

15  to our LACHES investigations.  So he knows.  He's the one that

16  knows and we haven't been able to find the emails but --

17         THE COURT:  How has your client changed its

18  position?  Let's assume there is undue delay here.  How's your

19  client changed its position?

20         MS. RANAHAN:  I'm sorry?  Changed its -- you mean --

21         THE COURT:  Yeah.  I mean usually --

22         MS. RANAHAN:  Oh.

23         THE COURT:  -- an element of LACHES is undue --

24         MS. RANAHAN:  Of course.

25         THE COURT:  -- delay in some change of position --

98

1          MS. RANAHAN:  Right.

2          THE COURT:  -- on the part of the defendants --

3          MS. RANAHAN:  Right.  So well --

4          THE COURT:  -- to the defendants' prejudice.

5     Usually it's the loss of evidence or something like that.

6          MS. RANAHAN:  Right.  So what we did --

7          THE COURT:  But how is -- let me finish the

8     question.  How has your client changed its position?

9          MS. RANAHAN:  Our client, in reliance on believing

10    that we had been paying licenses to all the artists and

11    everyone we were supposed to for years, continued to invest

12    and acquire more and more acquisitions in reliance on thinking

13    everything was kosher.

14          I mean we literally had lawsuits in 2007 with three

15    of the major plaintiff record labels that are involved in this

16    case where -- and those agreements, everyone acknowledged our

17    copyrights and we moved on.  We had a settlement.  Now we're

18    here 10 years later.

19          We're trying to understand why all of a sudden 10

20    years later there would be this concerted effort to try to

21    bring our client down.  You know we've produced in this -- in

22    this case three agreements with plaintiffs where they

23    acknowledge a joint copyright interest.

24          We've litigated against many of the plaintiffs

25    before and there was an agreement, there was an absolute

99

1   agreement that we would move on, be in peace.  In the

2   meantime, our client continues to acquire several more

3   transactions, several more acquisitions, several more

4   collections, builds up his website, spends a lot more

5   resources digitizing and making available new songs and all

6   along paying the requisite statutory licenses you're supposed

7   to pay.

8           Ten years later, we get this new lawsuit.  We are

9   entitled to understand what the motivation was and I know Your

10  Honor, there's been comments about Rule 11.  Under Rule 11,

11  there's absolutely a right to bring a Rule 11 claim if only

12  for improper motive alone.

13          It doesn't matter if there's a -- what Mr. Elkin

14  testified about, and I was here, was you asked him whether,

15  you know, based on the four corners --

16          THE COURT:  Even the defendants' search here for

17  evidence to support its defendant -- it's defenses, I would be

18  very reluctant to start citing Rule 11.

19          MS. RANAHAN:  I'm sorry, Your Honor?

20          THE COURT:  Given what is increasingly becoming the

21  defendants' search for a scintilla of evidence that will

22  support some of the defendants -- some of the defenses, excuse

23  me, some of the defendants (sic) defendants have asserted, I

24  would be very reluctant to be citing Rule 11 with respect to

25  plaintiffs.

1          MS. RANAHAN:  Okay.  Well, an improper --

2          THE COURT:  Especially --

3          MS. RANAHAN:  -- Your Honor --

4          THE COURT:  Especially given the discussion we had

5   about an hour ago with respect to Exhibit 12.

6          MS. RANAHAN:  Well, Your Honor, again, I apologized

7   for that.  I would hope that that wouldn't, you know, impede

8   into all these other decisions that you're making, but the

9   idea that we can't get any relevant evidence and then we get,

10  you know, this is why we can't establish evidence to prove

11  these defenses, we have a good faith to believe in every one

12  of the affirmative defenses that we've asserted.  I can go

13  through --

14         THE COURT:  Yeah, but you need --

15         MS. RANAHAN:  -- every one of them.

16         THE COURT:  --  you need to have a basis for that

17  belief as --

18         MS. RANAHAN:  And we're absolutely trying to --

19         THE COURT:  00 I understand Rule 11.

20         MS. RANAHAN:  -- get evidence and everything we've

21  tried to get from you, Your Honor --

22         THE COURT:  All right.

23         MS. RANAHAN:  -- has been found to not be relevant.

24  So this is an -- this is a witness that put out a specific

25  press release about the specific lawsuit making numerous

1   factual statements in it and now we're trying to take his

2   deposition.

3           We've already been denied, you know, now several

4   depositions and we're trying to take one person who we know

5   knows a lot about this lawsuit.  That is it.  There's several

6   grounds.  He claimed to know about our licensing.  He claimed

7   to know about how many hits we have a day.

8           THE COURT:  Why aren't you serving 30(b)(6)s on the

9   plaintiffs?

10          MS. RANAHAN:  We have.  You know, we have those set

11  up, Your Honor.

12          THE COURT:  All right.

13          MS. RANAHAN:  We absolutely are doing that.

14          THE COURT:  So this isn't the only deposition you're

15  taking?

16          MS. RANAHAN:  But those 30(b)(6)s are people they

17  select.  They get to pick who they --

18          THE COURT:  Right.  And they've got to prepare them

19  with respect to the topics you identify --

20          MS. RANAHAN:  Right.

21          THE COURT:  -- to testify on behalf of the entity.

22          MS. RANAHAN:  Yeah.  But those aren't the only

23  witnesses we want to take, Your Honor.  We're not -- there's

24  no rule that we're limited to the 30(b)(6)s --

25          THE COURT:  No.

1          MS. RANAHAN:  We have two individuals --

2          THE COURT:  There isn't.

3          MS. RANAHAN:  -- two individuals associated with

4    plaintiffs besides the artists that we want to take and Mr.

5    Israelite is one of them.

6          MR. DICKSTEIN:  Judge, you asked where does Mr.

7    Israelite get the knowledge in the press release.  I'm looking

8    at the complaint.  I mean Paragraph 3 says, it quotes some of

9    defendants' own public statements where they call themselves

10   the largest collection of live audio and video recordings

11   online and their value exceeds $100 million.

12         Paragraph 15 cites defendants again, their own

13   public statements, which state that they've attracted some

14   50,000 unique visitors a day.  And I think that does get to

15   the essence -- essence of Judge Ramos' order as to why -- the

16   press release is merely paraphrasing the complaint.

17         And I do have to cite -- I do have correct

18   something.  Maybe Ms. Ranahan misspoke, but none of the

19   plaintiffs here have granted licenses to the defendants.  The

20   record label litigation she referred to involved different

21   parties.

22         I think she said that there were three of the

23   parties in this lawsuit.  That's not correct.  So maybe that's

24   something else she wants to apologize for, but I -- I do feel

25   the need to correct that statement.

1          THE COURT:  All right.  Look, after hearing

2   extensive oral argument I think it seems very questionable as

3   to whether or not Mr. Israelite is going to have any relevant

4   knowledge here.  The press release makes it a little bit, I

5   think, of a closer case, and the circumstances and Mr.

6   Israelite's position, makes it a  little case than it was with

7   respect to Mr. Byrne and Mr. Richards.

8          But on balance, I think the resolution with respect

9   to Mr. Israelite is probably -- the best balance is probably

10   the same resolution that I reached with respect to Mr.

11   Richards and Mr. -- Mr. Byrne.

12          Twenty-five written questions to Mr. Israelite on

13   any relevant topic that -- that you want. If it turns out Mr.

14   Israelite has relevant knowledge here, maybe we can revisit

15   the question of whether or not there should be a deposition.

16   The defendant -- I'm sorry, Mr. Israelite obviously can assert

17   any objection that he wants to object and there's a problem

18   with the objections, I'll resolve them.  But I think that's

19   the same resolution with respect to Mr. Israelite that -- that

20   balances the conflicting interest here the best.

21          Okay?  All right.  Let me -- there's one

22   housekeeping matter I wanted to raise with -- with plaintiffs.

23   I started looking through the licensing agreements that were

24   provided on Tuesday for in camera review and there's an

25   exhibit -- I'm looking at the -- and I'm sure this is not at

1  your fingertips, but let me just identify the issue and maybe

2  you can research it and let me know what the resolution is.

3          The 1972 agreement references in Exhibit H

4  specifically -- there are a number of attachments here and I

5  just -- specifically Page 3 at paragraph three references an

6  Exhibit H, and I didn't see an exhibit.

7          I go up to G and I don't see an Exhibit H and maybe

8  you can research that when you get back to your office and see

9  if maybe there is no Exhibit H or what the -- what the story

10 is, but I'm trying to --

11          MS. RANAHAN:  Do you have --

12          MR. DICKSTEIN:  Your Honor --

13          MS. RANAHAN:  -- an Exhibit I, Your Honor, in yours?

14          THE COURT:  Pardon?

15          MS. RANAHAN:  I don't have an Exhibit I either.  Do

16 you have an Exhibit I?

17          THE COURT:  We're talking about the 1972 agreement?

18          MS. RANAHAN:  I can't see the years on any of them,

19 but --

20          THE COURT:  No.  This one is not redacted on Page 1

21 I don't think.  There's no indication in red that it's

22 redacted.

23          MS. RANAHAN:  Do you have the -- do you happen to

24 have the Bates number or anything?

25          THE COURT:  No.  I don't have -- my copies don't

1   have Bates numbers.  Hold on.

2            (Court and clerk confer.)

3            THE COURT:  "This agreement dated May 3rd, 1972 by

4   and among".  In any event, look, I don't expect you to -- to

5   be able to answer this right now, but I didn't -- is there a

6   reference -- I don't think there's a reference to an I.  In

7   any event, if -- if you can maybe find out what the answer to

8   that is, that would be great.

9            MR. DICKSTEIN:  Judge, we'll investigate that.

10           MR. SLOTNICK:  We'll look at it.

11           THE COURT:  Okay.

12           MR. DICKSTEIN:  Thank you.

13           THE COURT:  If there is an -- yeah, okay.  All

14  right.  Anything else from plaintiffs' side?

15           MR. SLOTNICK:  No, Your Honor.  Thank you.

16           THE COURT:  Okay.  Anything else from the defendant?

17           MS. RANAHAN:  No, Your Honor.

18           THE COURT:  Okay.  Thank you all.

19                  [Pause in the proceedings.]

20           THE COURT:  Go ahead.

21           MR. SLOTNICK:  You had asked I think at the last

22  session about settlement conference for --

23           THE COURT:  Yeah.  Let's go off the record.  I'm

24  sorry.  We went back on.  Let's go off.

25  [End of recording.]

106

1       I certify that the foregoing is a court transcript from

2   an electronic sound recording of the proceedings in the above-

3   entitled matter.

4

5   _____

6                                   Shari Riemer, CET-805

7   Dated:   February 21, 2017