```
                  UNITED STATES DISTRICT COURT
                 SOUTHERN DISTRICT OF NEW YORK

In re:                              :

ABKCO MUSIC, INC., et al.,          :   Docket #15cv4025

              Plaintiffs,           :

        - against -                 :

SAGAN, et al.,                      :   New York, New York
                                        May 2, 2017
              Defendants.           :

-------------------------------- :

                        PROCEEDINGS BEFORE
                   THE HONORABLE HENRY PITMAN,
           UNITED STATES DISTRICT COURT MAGISTRATE JUDGE

APPEARANCES:

For Plaintiffs:          LOEB & LOEB LLP
                         BY:  TAL DICKSTEIN, ESQ.
                              BARRY SLOTNICK, ESQ.
                              CHRISTOPHER CARBONE, ESQ.
                         345 Park Avenue
                         New York, New York 10154

For Defendants:          WINSTON & STRAWN LLP
                         BY:  ERIN RANAHAN, ESQ.
                         200 Park Avenue
                         New York, New York 10166




Transcription Service: Carole Ludwig, *Transcription Services*
                       141 East Third Street #3E
                       New York, New York 10009
                       Phone:  (212) 420-0771
                       Fax:  (212) 420-6007

Proceedings recorded by electronic sound recording;
Transcript produced by transcription service
```

<u>INDEX</u>

**E X A M I N A T I O N S**

| <u>Witness</u> | <u>Direct</u> | <u>Cross</u> | Re-<br><u>Direct</u> | Re-<br><u>Cross</u> |
|---|---|---|---|---|
| None | | | | |

**E X H I B I T S**

| Exhibit<br><u>Number</u> | <u>Description</u> | <u>ID</u> | <u>In</u> | Voir<br><u>Dire</u> |
|---|---|---|---|---|
| None | | | | |

```
 1                                                         3
 2            THE CLERK:   ABKCO Music against Sagan, et al.
 3   Counsel, please state your name for the record.
 4            MR. TAL DICKSTEIN:  Tal Dickstein, with my
 5   colleagues Barry Slotnick and Christian Carbone of Loeb &
 6   Loeb for all plaintiffs.
 7            THE COURT:   Good morning.
 8            MR. BARRY SLOTNICK:   Good morning.
 9            MR. CHRISTIAN CARBONE:   Good morning.
10            MS. ERIN RANAHAN:   Good morning, Your Honor, Erin
11   Ranahan for all defendants.
12            THE COURT:   All right, good morning.  This matter
13   is here as a result of several letters I've gotten
14   concerning discovery disputes.  Let me just go through the
15   correspondence to make sure I have everything.
16            I have a letter from plaintiff - these are in
17   chronological order.  Plaintiff's letter of March 22.
18   Defendant's letter of March 29.  Plaintiff's letter of April
19   7.  Defendant's letter of April 17.  Defendant's letter of
20   April 28.  And there was a letter from plaintiff dated May
21   1.  Is that the universe of relevant correspondence?  I can
22   do through those again if you want me to.
23            MR. DICKSTEIN:   Your Honor, I think the only
24   issue, instead of an April 17 letter, I have an April 14
25   letter.
```

```
 1                                                         4
 2              THE COURT:  Hold on.
 3              MR. DICKSTEIN:  That's from defendants.
 4              THE COURT:  One second.
 5              (pause in proceeding)
 6              MR. DICKSTEIN:  You're correct, it's defendant's
 7    April 14.  You're correct.  My notes have the wrong date on
 8    it, you're correct.
 9              THE COURT:  Okay.  All right, I would like to try
10    to address the issues in the order in which they're raised
11    in the correspondence.  The first issue raised by plaintiffs
12    in the March 22 letter is whether or not the production
13    concerning the additional concert recordings is complete,
14    and there are a number, I think there are seven categories,
15    there's even categories that plaintiffs claim are missing.
16    There are representations from defendants that they've
17    produced, that they have now produced everything concerning
18    those additional recordings.  Is there still – let me turn
19    to plaintiffs first and ask them if there's still an issue
20    with respect to the production concerning the additional
21    concert recordings.
22              MR. DICKSTEIN:  Sure, Your Honor, I think we've
23    made a lot of progress in that regard.  Defendants have
24    updated a number of spreadsheets that relate to their
25    exploitation of these additional recordings:  dates of
```

```
 1                                            5
 2   download, dates of streaming, etc.  And we've also learned
 3   that these additional recordings implicate five additional
 4   acquisitions of physical concert recordings.  As Your Honor
 5   may recall, the defendants' business is to purchase concert
 6   recordings from various venues and other providers, and as a
 7   result of the additional recordings that we've recently
 8   discovered, there are five additional acquisitions,
 9   collections of acquisitions, and defendants have produced
10   the agreements for those acquisitions.  What we don't have
11   are any communications related to those.
12         And we've had discussions, Miss Ranahan and I have
13   had a phone call about this issue.  I believe the
14   representation was that they searched their own files and
15   outside counsel's files, but, frankly, we haven't seen any
16   communication especially as to two acquisitions that were
17   just disclosed a couple of weeks ago, April 16.  We don't
18   have any communications about that acquisition.  All we have
19   is the final agreement.
20         So I'd just like to confirm, you know, have their
21   files been checked, have outside counsel's files been
22   checked for communications?  Obviously, we're not looking
23   for privileged materials.
24         THE COURT:   Right.  All right, so you're just
25   looking for confirmation that they've checked for
```

6

1

2   communications regarding these acquisitions and that no non-

3   privileged communications exist?

4           MR. DICKSTEIN:   Correct, Your Honor.

5           MS. RANAHAN:   Yes, Your Honor, and I've explained

6   this to Mr. Dickstein.  So we have – a lot of these

7   acquisitions are very old.  They go back many years.  And to

8   the extent we still have communications that are not

9   privileged, we have searched for them.  So we have now

10  updated the spreadsheet several times since Your Honor's

11  February order.  So in addition to adding in all the

12  additional recordings that plaintiffs have identified, we've

13  identified hundreds of more that contain the recordings and

14  updated the spreadsheets to reflect that.  We've produced

15  every agreement that's implicated and every other document

16  under those categories that has not already been produced in

17  the prior productions.

18          THE COURT:   All right, and you've checked all

19  reasonable repositories for communications, and there are no

20  communications regarding the acquisitions, is that right?

21          MS. RANAHAN:   Yes, Your Honor.

22          THE COURT:   All right, does that take care of it?

23          MR. DICKSTEIN:   Would that include outside

24  counsel?  I would just ask the defendants.

25          MS. RANAHAN:   The outside counsel that are still

7

1

2  within our control or that we still talk to or have some

3  kind of relationship with, yes.

4          THE COURT:   Well, even if you don't have a

5  relationship with them, if – I mean let's assume when your

6  client used XYZ law firm and subsequently broke with XYZ law

7  firm for whatever reason, I mean why would you not be

8  obligated to contact XYZ law firm?

9          MS. RANAHAN:   We have contacted them, Your Honor.

10 To the extent we have contacted and not received a response

11 back from one, we haven't received a response, and we can't

12 get a hold of him.  We don't even know where he is.  So this

13 was from a decade ago --

14          THE COURT:   I see.

15          MS. RANAHAN:   -- but we have made efforts in good

16 faith to try to reach out to these and find appropriate

17 communications.  But there's one counsel who, this is the

18 third litigation this has come up, we have been unable to

19 track this one particular prior counsel.

20          THE COURT:   Can we identify who that counsel is?

21          MS. RANAHAN:   I can't remember off the top of my

22 head.  I can let Mr. Dickstein know later if he'd like to

23 know that.  I just don't want to misrepresent it on the

24 record.

25          THE COURT:   All right.  Mr. Dickstein, does that

8

1

2  - if she identifies who this one non-communicative counsel

3  is, does that take care of this matter, this aspect of the

4  discovery issues?

5            MR. DICKSTEIN:   I think it would, Your Honor.

6  We'll follow up if we have to with that counsel directly.  I

7  would just note for the record I think there is one

8  spreadsheet that we've, in the past several days, asked

9  defendants to update.  They've indicated they will.  So it's

10 not something Your Honor has to deal with.  But aside from

11 that I believe that issue we'll deal with between counsel.

12           THE COURT:   All right.  I think then the next

13 issue is the second issue raised in defendants' March 29

14 letter regarding the redactions.

15           I mean we've talked about this in the past.

16 There's a split of authority on whether redactions on the

17 records of relevance are appropriate, and for the life of me

18 I don't see why redactions on the grounds of irrelevance are

19 inappropriate.  You know, I don't think, you know, you

20 wouldn't - I party is not under an obligation to produce

21 irrelevant documents.  I'm not sure why the parties should

22 be under an obligation to produce irrelevant parts of

23 documents.  If the issue was whether a particular party was

24 in Boston on a particular date, the party would probably be

25 obligated to produce the American, his American Express or

1

2  credit card statement showing that he was in Boston on that

3  date, that he was in a hotel in Boston on that date, but I'm

4  not sure that there'd be any reason to have him produce

5  purchases he made before or after that date, you know,

6  wherever they were.

7         MS. RANAHAN:   If I could, Your Honor.

8         THE COURT:   Go ahead.

9         MS. RANAHAN:   So it's not – we don't know the

10 basis of the redactions because --

11        THE COURT:   You don't know the basis of the

12 documents withheld on – you know don't the nature of the

13 documents withheld on the grounds of irrelevance.

14        MS. RANAHAN:   Well, Your Honor, for the ABKO one,

15 we knew the pages were redacted because they were stamped

16 that way.  In this case – and plaintiffs have actually since

17 agreed to update their redaction log to reflect.  All we're

18 asking for, we're not asking for Your Honor to make the

19 determination that they should be produced unredacted.  All

20 we're asking for is what plaintiffs have, I believe, agreed

21 to do, which is give us, so that we know when things are

22 redacted so we can look at it, make an assessment whether

23 there's anything further to do.  And that's really the stage

24 we're at.  We're not asking for Your Honor to look at

25 anything in camera and produce it.

1

2          THE COURT:   I think that's a fair point.  One of

3   the issues that defendants raised in their letter is that

4   with respect to some documents they couldn't tell – if I

5   understand their issue correctly, that they couldn't tell

6   whether the document was redacted or not.  And that I think

7   is a fair objection.  I mean is there – have the plaintiffs

8   indicated – usually when documents are produced and

9   redacted, there's a stamp on it that says redacted.  What's

10  the status of at least identifying the documents that have

11  been redacted from plaintiffs' side?

12          MR. DICKSTEIN:   Right, I fully understand that

13  point, Your Honor, and we've discussions about this, and

14  what we've told defendants that we're gonna do and that

15  we're doing is we're gonna re-collect the documents from our

16  client.  If there's revenue information, royalty percentages

17  that are confidential, not relevant, and shouldn't be

18  produced, those will be clearly redacted.

19          THE COURT:   All right, so you'll identify the

20  documents that are redacted?

21          MR. DICKSTEIN:   By indicating redaction in the

22  document, I think it'll be clear to defendants' counsel what

23  has been redacted, unless there's some other type of

24  identification they're looking for.

25          THE COURT:   I just want to make sure I'm

11

understanding.  Let's assume there's a letter and there's a

paragraph redacted or an email or some other document

there's a paragraph redacted, a non-spreadsheet document, is

there gonna be - how is the defendant gonna know that that

document's been redacted?

          MR. DICKSTEIN:   There'll be a big black box that

says redacted.

          THE COURT:   Okay.

          MR. DICKSTEIN:   We can also put together a list

for defendants if they like.

          THE COURT:   So are you gonna reproduce all the

redacted documents and mark them redacted, is that what

you're suggesting?

          MR. DICKSTEIN:   So, Your Honor, I think what

we're actually talking about is a limited universe of

documents where Miss Ranahan is correct.  There were a few

paragraphs or sections that were whited out because they

were not relevant.  Either they didn't relate to the songs

at issue, they were not related to chain of title.  All

these documents do relate to our client's chain of title,

the various transfers and to copyrights.

          So wherever those paragraphs were omitted, we will

produce them in, we'll produce new versions of these

documents with that material.  If there are financial

1

2 information in there or royalty percentages that we believe

3 should be redacted, we're gonna mark those clearly with the

4 redacted box.

5          THE COURT:   Okay.  When is that gonna be

6 completed by?

7          MR. DICKSTEIN:   So I just spoke with the client.

8 We anticipate two weeks' time we'll be able to produce that.

9          MS. RANAHAN:   And, Your Honor, just to clarify,

10 so far it's not been limited to just financials.  There's,

11 for instance, definitions from agreements that are missing

12 that we would want to be able to read to understand relevant

13 clauses in the agreement.  And so I understand what

14 plaintiffs are gonna do is take another look to make sure –

15 what happened was during the deposition the witness said she

16 had taken the initiative to decide what to redact, and what

17 I believe plaintiffs have agreed to do is go back, take a

18 fresh look to see if there's anything less that they should

19 redact on this next round, including things like definitions

20 that allow us to put the agreement in context, that don't

21 fall into the revenue or irrelevance category.

22          But to the extent it's something beyond that, if

23 it's privileged, we would just request that it be on a

24 privilege log so we can just assess the basis for the nature

25 of it.  If it's, you know, what Your Honor believes it to be

13

1

2  fair game, which is that they're redacting out revenue

3  information that's not relevant, then we understand that

4  because plaintiffs say they'll, if there's a dollar sign,

5  they'll redact things besides the dollar so that you can

6  tell that it was financial information.  But there are other

7  items we noticed during the depositions, like definitions.

8          THE COURT:   All right.  Well, to the extent that

9  the defendants are seeking a log of the redactions, I don't

10 think that that's called for by the Federal Rules, so I'm

11 going to deny that.

12          One of the other lurking issues here is the

13 settlement agreement between the Rolling Stones and ABKO,

14 and I've looked at those again, and I think the redactions

15 are appropriate.  So I'm not gonna order further production

16 of the settlement agreements.  All right.

17          The next issue that's raised in the

18 correspondence, this, again, is the defendants' March 29

19 letter, is a contention that Levy was not appropriately

20 prepared.  One of the problems I had in trying to review the

21 material concerning Mr. Levy was that he didn't have the

22 30(b)(6) notice.  You know, the gauge by which a 30(b)(6)

23 witness has to be prepared is the topics that are reasonably

24 identified in the notice.  I looked through the material

25 again yesterday; I didn't see the notice to Spirit.  If I've

1
2    overlooked it, I'm happy to have you call it to my
3    attention.
4            MS. RANAHAN:   Your Honor, let's see.
5            THE COURT:   There was a 30(b)(6) to some other
6    entities, but I don't think --
7            (interposing)
8            MS. RANAHAN:   Right --
9            THE COURT:   -- to Spirit.
10           MS. RANAHAN:   -- they're identical.  They are
11   identical.  So to the extent - and I don't know if
12   plaintiffs --
13           THE COURT:   No, I don't think that was stated
14   anywhere that they were identical.
15           MS. RANAHAN:   Okay, well, they are identical.  I
16   mean the issue is Mr. Levy, and it did not, it was not the
17   same for the Warner I will say.  The Warner representative,
18   he knew the spreadsheets, he knew what went into them, he
19   knew - we went through them, he could explain them.  The
20   situation with Mr. Levy was he testified that he had no idea
21   how they were created, what went into making them --
22           THE COURT:   They tell me they were spreadsheets
23   prepared by Harry Fox, as I recall.
24           MS. RANAHAN:   No, these were spreadsheets
25   prepared by plaintiffs and produced by plaintiffs --

1                                                                    15

2              THE COURT:   Prepared by Spirit?

3         MS. RANAHAN:   Several of them, yes.   They were

4    prepared by Spirit, and he didn't – the person who had

5    created them was no longer with the company, so he had left.

6    And he hadn't reached out or tried to figure out what had

7    gone into these spreadsheets.   And I actually did have a

8    conversation with Mr. Carbone who was at the deposition that

9    day who recognized, as soon as he was finished with his

10   deposition, he says you are entitled to someone who can

11   explain what these are.   And so I understood we were gonna

12   be working something out.   Mr. Dickstein said something

13   similar to me.   But then their position in the letter briefs

14   is very different from that.

15             It's not the same for Warner.   So this is not an

16   issue that we're just taking up every time we have a witness

17   --

18             THE COURT:   No, I understand.   You told me in

19   your letters, one of the letters that the other witnesses,

20   other 30(b)(6)s did better than Mr. Levy.

21        MS. RANAHAN:   That's correct, Your Honor.   On

22   these spreadsheets, nothing personal, it's just that he

23   didn't have the familiarity with them.   He admitted he

24   didn't have the familiarity.   The person that did had left,

25   and he had made no effort to get up to speed on what they

                                                                16

1    were or how they were created.

2              THE COURT:   All right.

3              MR. CARBONE:   Judge, Chris Carbone.   I

4    represented Mr. Levy at his deposition.  I think the one

5    thing that I think we've learned, and I don't know if this

6    covers your time in private practice, there's Excel

7    spreadsheets and depositions pose a difficulty always.  And

8    what happened, and I sympathize with Miss Ranahan on this,

9    is that she printed out copies that were vastly different

10   because they weren't native, and she knew this was an issue

11   because she brought a projector because in a lot of these

12   depositions, we've actually done this.  We projected the

13   spreadsheets on the screen so people can understand.  The

14   copy she printed out, putting aside the Harry Fox one, which

15   the witness didn't, the client didn't create, were --

16             THE COURT:   I thought there was one colloquy

17   though where there was a discussion about the format in

18   which they were presented to the witness --

19             MR. CARBONE:   Precisely --

20             THE COURT:   -- the witness said it wouldn't make

21   a difference, or somebody said it wouldn't make a

22   difference.  I --

23             MR. CARBONE:   That's not my recollection, Judge.

24             THE COURT:   Well, you go ahead.

1

2          MR. CARBONE:   Miss Ranahan had the technology

3    available, and to show it in the native format.  Now, look,

4    an A+ level witness would've seen the difference, but I can

5    tell you that when we looked at the spreadsheet that she

6    printed out, they were confusing.  And I did talk to her

7    about that on a break.  I suggested that she find another

8    way to do it, and she declined to do so.  These are – at the

9    end of the day, Judge, these are charges that contain pretty

10   straightforward information about, you know, the songs, the

11   amount of money.  Mr. Levy doesn't have a specific

12   understanding of every single item in there, but he was

13   familiar enough that day to talk about the charge that they

14   were showing in a proper format.

15          THE COURT:   Uh huh.  Let me ask you this

16   question, Miss Ranahan, what substantive information were

17   you seeking from Mr. Levy that you didn't get?

18          MS. RANAHAN:   So we wanted to understand, because

19   Your Honor will remember we originally attempted to compel

20   the license agreements themselves, the underlying synch

21   licenses, the underlying licenses that lend themselves to

22   the internet agreements, amounts that they were able to earn

23   over the relevant time period.  And what plaintiffs

24   represented was that they put all this spreadsheets so there

25   was no need for us to actually view the underlying

18

1
2    agreements.  They were totaled up.  We may not get to see

3    each individual transaction, but that they were certainly

4    well represented in those spreadsheets and that once we were

5    able to question our 30(b)(6) witnesses, we would have a

6    full understanding of how those were created, and that

7    should suffice.

8              I will say that that's --

9              THE COURT:  Can you give me an example of one of

10   these spreadsheets?  I'm trying to - I'm trying to - there

11   are a couple of things I'm trying to think of.  One is a

12   potential remedy here.  I'm trying to understand what

13   information you wanted from Levy that you didn't get.

14             MS. RANAHAN:  Right, so and that's --

15             THE COURT:  And specifics.  In terms of specifics

16   here.

17             MS. RANAHAN:  Right, so the specifics are what

18   went into the totals, how they calculated and what

19   agreements went into the synch and what went into the

20   internet totals that they - those are the issues relevant

21   here are the royalties that come in from internet and synch.

22             THE COURT:  So the spreadsheet would have a song

23   and then it would have --

24             MS. RANAHAN:  Totals.

25             THE COURT:  The total royalties received from the

19

1 │ various licenses.

2 │        MS. RANAHAN:   Yes, Your Honor.  And so --

3 │        THE COURT:   And what – what would be the question

4 │ that you wanted to ask that you weren't able to ask.

5 │        MS. RANAHAN:   So what went into creating this,

6 │ how, you know, what licenses did you look at, what documents

7 │ did you use to make this.  And regardless of format I showed

8 │ the witness, he was very clear that he had nothing to do

9 │ with making the spreadsheets.  He had no idea how any of the

10 │ spreadsheets were made or what went into them.  And, again,

11 │ after the deposition, Mr. Carbone said we should get more.

12 │        So there is – the problem is what the remedy is,

13 │ what we can do to try to resolve this given that they don't

14 │ have a witness at Spirit anymore that knows how they were

15 │ created.  I know one of the suggestions was to track down

16 │ Ryan, the person who created the spreadsheets and worked on

17 │ the spreadsheets, who's now I believe at another company,

18 │ maybe (indiscernible) or something.

19 │        THE COURT:   What do plaintiffs say?

20 │        MR. CARBONE:   So I want to address the one, the

21 │ misunderstanding Miss Ranahan has about me acknowledging

22 │ purportedly that she was entitled to another deposition.

23 │ That's obviously inconsistent with the position we take, and

24 │ I think she must've just misunderstood our discussion.

1

2          The issue – Mr. Levy, of course, as a 30(b)(6) did

3 not, is not obligated to know about things that no one knew

4 about.  We had these spreadsheets, they were business

5 records --

6          THE COURT:   Well.

7          MR. CARBONE:   He could talk about them.  He could

8 talk about the revenue if he was asked the proper questions.

9 He just wasn't asked the questions.  I don't think it's an

10 issue, Judge, in terms of authenticating these documents or

11 knowing that there's not gonna be a problem with Miss

12 Ranahan there, but she has everything she needs.

13          MS. RANAHAN:   And just to clarify, I didn't

14 suggest that Mr. Carbone said he would put Ryan up for a

15 deposition.  That's not what I meant.  What he said was that

16 we had to get more information to understand how these were

17 created, that the witness wasn't able to do that.  I know

18 how to go through the native ones because I did it for the

19 other witnesses, but this witness was very clear that he had

20 nothing to do with it.  So it seemed to be a futile exercise

21 that the witness agreed it would be.  So I don't – the idea

22 – I don't know what the suggestion is that we had our chance

23 to ask the witness who doesn't know how they were made and

24 that's it or we call him back in and show him spreadsheets

25 he never created.  I mean those don't seem like worthy

```
 1                                                          21
 2   endeavors.
 3          So what we wanted was either --
 4          THE COURT:   Can you give me an example from Mr.
 5   Levy's deposition of some of the questions he was unable to
 6   answer here?
 7          MS. RANAHAN:   Well, he, across the board, Your
 8   Honor, did not know how the spreadsheets were created or
 9   what went into them, and that's the main gist.  And there's
10   no question about that.  Like he, so matter what question I
11   asked about the spreadsheet, he disclaimed any knowledge
12   about how they were created, and plaintiffs I don't think
13   would dispute that.
14          MR. CARBONE:   Well --
15          THE COURT:   Hold on a second.  I mean from - is
16   it evident from the spreadsheets what went into them?
17          MS. RANAHAN:   No.  Some of them are very, I can't
18   even, I don't know what the columns are.
19          MR. CARBONE:   Judge, may I?
20          THE COURT:   Yeah.
21          MR. CARBONE:   Two things.  One is that certainly
22   the 30(b)(6), and it's not an issue on that, she had asked,
23   the defendants had asked for information about licensing.
24   Mr. Levy was prepared to talk about that.  There was
25   certainly no 30(b)(6) topic on the origination of every
```

22

1

2    spreadsheet that was created.  That wasn't a topic.  But the

3    other – that's the main point.

4         But the specific question in terms of what

5    questions he couldn't answer, he wasn't, as Miss Ranahan

6    (indiscernible), she asked him how was the spreadsheet

7    created.  I agree, he didn't know, he didn't have a clear

8    understanding of that.  But he certainly understood the

9    information on it, but he wasn't given the opportunity to

10   look at them in their native format.

11        MR. DICKSTEIN:   And, Judge, I would just add that

12   if you do look at these spreadsheets in native format, I

13   think it is fairly clear what the topics are.  In fact, you

14   may know Excel has multiple tabs.

15        THE COURT:   Uh huh.

16        MR. DICKSTEIN:   So on the licensing spreadsheet

17   there was a tab that said synch, the synchronization

18   license.  Another one said macro mechanical.  So I think had

19   Mr. Levy been shown that Excel in native format or had Miss

20   Ranahan or probably anyone in her firm looked at it in

21   native format, it would be readily apparent what information

22   is in there.

23        The one possible exception is the spreadsheet that

24   originated with Harry Fox, and I do recall Mr. Levy did

25   testify that his former colleague Ryan had created that.  I

1
2  think that was just a mistake.  I think that's because Ryan
3  had requested that spreadsheet from Harry Fox and then
4  provided it to Mr. Levy.  That's why Mr. Levy thought Ryan,
5  who's last name, Ryan I believe had created it, but, in
6  fact, it's a Harry Fox spreadsheet.  There have been other
7  spreadsheets just like that have been produced to
8  defendants.  We've told them that format of spreadsheet
9  comes from Harry Fox.  So I'm not sure there's anything else
10 for Spirit to provide there.
11        THE COURT:  Well, Miss Ranahan, are you looking
12 for where the numbers on the spreadsheets came from --
13        MS. RANAHAN:  Yes.
14        THE COURT:  -- and who did the compilation?
15        MS. RANAHAN:  Yes.
16        THE COURT:  And about how many questions
17 concerning the spreadsheets do you have?  I mean I presume
18 the method of compilation is gonna be the same for all the
19 musical compositions.
20        MS. RANAHAN:  I don't know, Your Honor.  We don't
21 know how they were created.  So my concern is if we – I
22 don't know how without Ryan assisting them or whoever was
23 involved in creating them, I don't know how we'd get the
24 information without either looking at the agreements or
25 having – I don't know what the solution is.  I just know

```
 1                                                        24
 2   that we want the agreements.  I know that Your Honor's
 3   reluctant to give us the underlying --
 4           THE COURT:   Yeah, well, I think now you're
 5   seeking reconsideration which is --
 6           MS. RANAHAN:   Right --
 7           THE COURT:   I'm not sure, you know, there's sort
 8   of a disconnect though between the contention that Levy was
 9   an improperly prepared 30(b)(6) witness and your getting the
10   licenses.  I think there's --
11           MS. RANAHAN:   Well, if there's --
12           THE COURT:   -- there's a lack of connection
13   there.  I mean if Levy was improperly prepared, it would
14   seem to me the remedy is either you get another 30(b)(6) or
15   maybe you get interrogatories.  But I don't see how that
16   changes the ruling with respect to the licensing agreements.
17           MS. RANAHAN:   Okay, so the concern we have is
18   just who do they have that could respond to interrogatories
19   if the person that created them is no longer associated with
20   the company and who would be a better 30(b)(6) witness when
21   the one person that they put up wasn't able to speak to it.
22   So I don't know, perhaps he has a conversation with Ryan and
23   then comes back.  If there's a more creative solution, Your
24   Honor, it's just that we are now left with a spreadsheet
25   that no one can explain how it was made, and we're supposed
```

                                                                    25

1

2    to take that as the evidence.  And it applies to all the

3    spreadsheets that were – all the Excel sheets that were

4    supposed to reflect the revenues and the licensing.  That

5    was the basis for Your Honor deciding we had enough and not

6    get the licenses.

7             So it is to that extent we believe it's connected

8    because it was supposed to be a compilation of those

9    licenses.  We just can't --

10             (interposing)

11             THE COURT:   Yeah, but I mean the licenses aren't

12   gonna give you what was actually received.

13             MS. RANAHAN:   Right, but – so we could do our own

14   analysis because nobody at Spirit apparently has been able

15   to do that.

16             THE COURT:   What are plaintiffs' thoughts?

17             MR. DICKSTEIN:   Your Honor, the spreadsheets are

18   fairly self-explanatory.  They do – and the issue here that

19   keeps getting inflated is the record that Miss Ranahan made

20   was not I'm showing you the exhibits that you produced in

21   discovery.  It was I produced these printouts that we've

22   done here, again, Excel, it happens, I've dealt with it

23   myself repeatedly.  And so she didn't make the record about

24   that.  And I know it's a missed opportunity for her, I

25   understand, but all she was going to get was, yes, this is

1  the number, this is - you know, song X was licensed to party

2  Y on this date for this amount of money.  Those are what

3  those things are.

4

5          THE COURT:   No, but I mean I guess her question

6  was how did the number wind up on the spreadsheet?  How did

7  that number get there?  Did someone --

8          MR. DICKSTEIN:   That wasn't a 30(b)(6) topic.

9          MS. RANAHAN:   And, of course, Your Honor, if

10 we're asking about revenues and value, of course,

11 understanding the spreadsheets they're holding up to justify

12 not producing the underlying information, of course, that's

13 gonna be part of the 30(b)(6) topic on these issues.  Of

14 course it is.  I don't even understand what that means.

15         MR. DICKSTEIN:   Just by comparison, Your Honor,

16 in one of our 30(b)(6) notices, I believe I did list

17 specific spreadsheets that we wanted the deponent to testify

18 to.

19         THE COURT:   Uh huh.

20         (interposing)

21         THE COURT:   Just one question.

22         MS. RANAHAN:   I'm sorry.

23         THE COURT:   The 30(b)(6) notice that you say is

24 identical to the one served on Levy, where is that?

25         MS. RANAHAN:   So --

```
 1                                                 27
 2             THE COURT:   Just what exhibit is that --
 3             MS. RANAHAN:   There was one, Your Honor, that was
 4   just from the most recent filing that I found.
 5             THE COURT:   The April 28 letter?
 6             MS. RANAHAN:   Yeah, so there's one – let me find
 7   which exhibit it is.  I just saw it.
 8             (pause in proceeding)
 9             THE COURT:   Is this exhibit 3?
10             MS. RANAHAN:   Oh, this is the, so this is the
11   responses and objections to the topics.  So this has the
12   topics on it.
13             THE COURT:   Hold on a second.  Where is – there
14   was a 30(b)(6) that you said was identical to the one served
15   on Levy, and is that exhibit 3 to the April 28 letter?
16             MS. RANAHAN:   Let's see.  No, that was an
17   individual one.
18             THE COURT:   No, that's 30(b)(6).
19             MS. RANAHAN:   Oh, let's see.  Oh, exhibit 3.
20   Yes.
21             THE COURT:   Exhibit 3 is identical to the one
22   served --
23             MS. RANAHAN:   On all the --
24             THE COURT:   -- on Spirit --
25             MS. RANAHAN:   Yes.  Spirit and Warner.
```

```
 1                                                    28
 2              THE COURT:   And what's the topic?
 3              MS. RANAHAN:   So topics 8, 9 - the Spirit witness
 4  was designated for every topic on here.
 5              THE COURT:   Okay, but, no, the topics --
 6              MS. RANAHAN:   Right, right, so the topics --
 7              THE COURT:   -- that you say that he was
 8  improperly prepared on were 8, 9, and 10?
 9              MS. RANAHAN:   8, 9, and 10 - let's see - 11, 12 -
10  -
11              (pause in proceeding)
12              THE COURT:   All right, and there was a response
13  on that from, there were objections to that by the
14  plaintiffs?
15              MR. DICKSTEIN:   Yes, Your Honor.
16              THE COURT:   Is that an exhibit to one of these
17  letters?
18              MR. DICKSTEIN:   The 30(b)(6) wasn't put in, so I
19  don't think our objections to it were.
20              THE COURT:   All right.
21              MR. DICKSTEIN:   I can certainly respond to it in
22  a general way, Judge, I mean I'm familiar with the topics.
23              MS. RANAHAN:   There are some other objections,
24  Your Honor, that we - it's to EMI, but I imagine they're
25  similar, if you want to look at it.  It's exhibit E to what
```

```
 1                                                    29
 2   we just submitted, or they just submitted.  What you just
 3   submitted, exhibit E.
 4            (pause in proceeding)
 5            THE COURT:   Miss Ranahan, if the deposition were
 6   reconvened, can you give me an example of two or three of
 7   the questions you would like to ask?
 8            MS. RANAHAN:   Right, so I don't know that -
 9   unless Mr. Levy does some diligence and investigation, I
10   don't know that he would be worth doing again.  But we would
11   just want to understand how they were, how the spreadsheets
12   were created.  Same questions we asked the Warner
13   representative.  So they have outline or they know what
14   we're going for.  We're just trying to understand what the
15   columns mean --
16            THE COURT:   How the spreadsheets were created,
17   what else?
18            MS. RANAHAN:   What the columns mean, what went
19   into creating them, what they looked at, what type of
20   databases they looked at internally.  So just a basic
21   understanding of how these came together and what went into
22   them.
23            THE COURT:   And why could that not be done by way
24   of interrogatory?
25            MS. RANAHAN:   I don't know that it can't be.  I
```

30

1

2    just don't know who they're gonna - I don't want the

3    attorneys to guess.  I want there to be a witness --

4            MR. DICKSTEIN:   Judge, I - it's under oath.

5    We're gonna do the diligence that needs to be done.

6            THE COURT:   Yeah, I mean I'm not - I'm not sure

7    any attorney just answers interrogatories and takes a guess,

8    not if they want to keep their license.

9            MR. DICKSTEIN:   At least not in your courtroom,

10   Judge.

11           THE COURT:   Well, I'm not, you know, it's a very

12   dangerous thing to do.  I mean it seems - like I understand,

13   I think I understand your point, Miss Ranahan.  It seems to

14   me - you know, and there's really very little difference

15   between what a 30(b)(6) witness testifies to and an

16   interrogatory answer.  They're both answers on behalf of the

17   entity and not the individual witness.  And --

18           MS. RANAHAN:   I suppose one challenge with the

19   interrogatory, Your Honor, is what they mentioned which was

20   the native, the need to see these spreadsheets in native

21   form, and so attaching them to an interrogatory or a hard

22   copy form may make that more difficult.

23           THE COURT:   Well, aren't these spreadsheets,

24   don't they have Bates numbers?

25           MS. RANAHAN:   They have one Bates number, but it

31

1

2  applies to thousands of different tabs and pages.  And so

3  it's like one designated thing, if you print it out, it'd be

4  10,000 pages.  I mean that's an exaggeration, but that's how

5  --

6            MR. DICKSTEIN:   I'm confident that --

7            THE COURT:   Hold on, let me just get an

8  understanding what these spreadsheets depict.  In the left-

9  hand column are there songs?

10           MS. RANAHAN:   So there's several different ones,

11 and some of them may have a song and then they'll have --

12           (interposing)

13           THE COURT:   And then different kinds of royalties

14 --

15           MS. RANAHAN:   -- several columns with acronyms

16 and codes, and some of them look like gibberish to us.  Like

17 we have no idea what they mean.  I'm sure someone knew and

18 they created them.  But - so that's the challenge, Your

19 Honor, is that we just can't tell what they are.  We have no

20 witness that has explained it to us.  We are not sure which

21 witness they have to do that given the state of Ryan having

22 created them and left, which is I understand happens.  It's

23 nobody's fault.

24           THE COURT:   No, but could you not ask in

25 interrogatory asking what is the source of the numbers in

1

2  the column labeled XYZ on spreadsheet, you know, whatever

3  the Bates number of the spreadsheet is?

4          MS. RANAHAN:   I mean we could.  It's just that it

5  could get very, very tedious.  There's a lot of columns, and

6  there's a lot of different songs at issue.  So each time

7  you're asking, yeah, I mean --

8          THE COURT:   I mean I presume, you know, I

9  presume, you know, let's assume that a plaintiff has 400

10 songs, I presume the method by which they compile the

11 mechanical royalties is gonna be the same for all 400.

12         MS. RANAHAN:   We would assume so, Your Honor --

13         THE COURT:   So I'm not sure it's --

14         MS. RANAHAN:   -- but we just haven't been able to

15 figure it out --

16         THE COURT:   I'm not sure you need a specific

17 answer as to each box on the spreadsheet.  I would think

18 that, you know, it would be unreasonable for I think a

19 publisher to use different methods for different songs.

20 It's possible, but it seems unreasonable.

21         MR. DICKSTEIN:   Judge, if I may, the issue with

22 the mechanical royalties, for example, those are reports

23 generated by the Harry Fox Agency and received by Spirit and

24 others.  Those aren't reports that are generated.  That was

25 one of the issues that Miss Ranahan --

```
 1                                                   33
 2              THE COURT:   Right, so that would be the answer.
 3              MR. DICKSTEIN:   It's the report we received.
 4              THE COURT:   Yeah.  You know, and beyond that you
 5   don't know what goes into it beyond, you know, prior to
 6   that.  I mean how many interrogatories would you need to
 7   probe these areas, Miss Ranahan?
 8              MS. RANAHAN:   I don't know, Your Honor, because I
 9   haven't thought of it in the context of interrogatories.
10              THE COURT:   I mean it's a question.  An
11   interrogatory's a question.  Whether you ask it at a
12   deposition or ask it in the form of interrogatory, it's --
13              MS. RANAHAN:   Yeah, I mean I suppose --
14              THE COURT:   -- you know, it's --
15              MS. RANAHAN:   Well, so, you know, under the
16   Federal Rules they're not supposed to be compound.  I
17   suppose if we were given some leeway in making them
18   compounds, in other words, if we ask, you know, explain each
19   of the columns on this spreadsheet and they could do that in
20   one interrogatory instead of objecting, that's now 27
21   interrogatories and we've exceeded our limit.  So I haven't
22   thought of it in this light.  I wasn't sure what the
23   solution that Your Honor would be comfortable with.  But I
24   would be reluctant to agree to agree to a hard 25 stop given
25   how complex these spreadsheets are.
```

                                                                34

1

2          MR. DICKSTEIN:   Your Honor, we're certainly

3    prepared to commit to not hold Miss Ranahan to that, to the

4    extent that she's asking questions that are identifying and

5    explaining what these documents are and how they were

6    compiled.   It's a reasonable solution.

7          THE COURT:   Well, let me ask you this.   I think

8    she's entitled to probe this a little bit more, either by

9    way of interrogatory or by way of deposition.   Do you have

10   any thoughts on which is preferable?

11         MR. DICKSTEIN:   I think we could start with the

12   interrogatory, Judge.   I'd just point – they're entitled to

13   probe it more.   She didn't really probe it at all was the

14   issue.   She – the examination was not – she had the ability

15   at that time while Mr. Levy was there to show him these

16   documents in the way they were produced and didn't do that.

17   So I understand she didn't get the information she wants,

18   but I think that she has a fair amount of culpability for

19   that.

20         THE COURT:   Well, no, but it sounds like other

21   witnesses were able to answer the question.

22         MR. DICKSTEIN:   Spirit is a small independent

23   publisher, Judge, so they don't have the sophis – I mean

24   there was no one in there who'd even been deposed before.

25   So it was a --

```
 1                                                    35
 2            THE COURT:  Well, yeah, but I mean -
 3            MR. DICKSTEIN:  And it didn't --
 4            THE COURT:   -- the Federal Rules is the same
 5   whether it's General Motors or Ma's Chile.
 6            MR. DICKSTEIN:  Understood.  Understood.
 7            MS. RANAHAN:  And Mr. Levy was an attorney, Your
 8   Honor, so he was not, you know, an unsophisticated witness.
 9            THE COURT:  All right.
10            MR. DICKSTEIN:  Not a litigator, if you presume
11   litigators are sophisticated, I don't know.
12            THE COURT:  Well, don't law schools still teach
13   the Federal Rules of Civil Procedure or is that passé now?
14   It's a brave new world.  All right.  How many spreadsheets
15   are at issue?  How many do you want?
16            MS. RANAHAN:  A handful --
17            THE COURT:  How many is a hand?
18            MS. RANAHAN:  I mean basically his testimony was
19   he was involved in creating none of them.  So that's - he
20   was involved in creating none.
21            THE COURT:  How many spreadsheets are we talking
22   about?
23            MS. RANAHAN:  I believe there was four or five.
24            MR. DICKSTEIN:  That's my rough understanding
25   too.
```

```
 1                                                  36

 2              MS. RANAHAN:   And, Your Honor, if we are gonna do

 3    the interrogatories, I mean there were other topics, that we

 4    put them in a big footnote that are not squarely at issue.

 5    So I don't know if they could just be limited to topics he

 6    was unprepared for.

 7              THE COURT:   What other areas did you want to ask

 8    him about?

 9              MS. RANAHAN:   And he wasn't sure – one of the

10    issues was communications with artists and other plaintiffs.

11    He didn't know anything about that.

12              MR. DICKSTEIN:   That's– that was not accurate.  I

13    think in the record it reflected that he was aware that, I

14    think it was Mr. Townsend was informed that his deposition

15    may be sought, and that was all he was aware of.

16              THE COURT:   I'm not sure how that's --

17              MS. RANAHAN:   Well, that's not the --

18              THE COURT:   I'm not sure how that's irrelevant in

19    any event.

20              MS. RANAHAN:   Well, right, we're trying to – we –

21    so what – the big issue in this case is that we were paying

22    them the whole, our clients have been paying under licenses

23    --

24              THE COURT:   No, but hold on a second.  I'm

25    looking at footnote 1 at page 5 of your March 29 letter,
```

1   Spirit's communications with artists and other plaintiffs,

2   and you quote, "Mr. Levy, I am unaware of any communications

3   dealing with this suit generally.  What I am thinking of is

4   that someone in our office informed Pete Townsend that he

5   might be called to be deposed" – I mean --

6

7             MS. RANAHAN:   Right, so that's not --

8             THE COURT:   -- what does that have to do with

9   anything?

10            MS. RANAHAN:   When he was informed he was deposed

11  was not something we were looking at.  What we're trying to

12  --

13            THE COURT:   I'm trying to get a handle – let's

14  just try to stick with this issue here.  You said there were

15  other issues besides the spreadsheets that Mr. Levy was not

16  properly prepared on.  What are those other issues?

17            MS. RANAHAN:   Right, so when I say

18  communications, one of the big issues for us is the payments

19  that we've been making.  It's not a direct payment though.

20  We pay it to a third party who then pays it to plaintiffs

21  who then pay it to the artists.  So it's for us to

22  understand if there's been communications about payments

23  from our clients.  That's the communications that we're

24  interested in, not, you know --

25            THE COURT:   Communications between Spirit and

                                                              38

 1  whom?

 2          MS. RANAHAN:   And the artists about payments from

 3  us.

 4          THE COURT:   Well --

 5          MS. RANAHAN:   Or payments of us through the

 6  third-party intermediary.

 7          THE COURT:   And what difference does it make

 8  whether Spirit communicated with the artist or not?  I mean

 9  if you pay, if your client paid royalties to the third party

10  --

11          MS. RANAHAN:   We're trying to trace it.

12          THE COURT:   -- what difference does it make, what

13  difference does it make whether Spirit spoke with the

14  artists or not?

15          MS. RANAHAN:   Well, so we're trying to

16  understand, we paid them to a third party.  We want to know,

17  we're trying to figure out if they all made it to the right

18  place.  So that impacts our licenses.

19          THE COURT:   Well, if they made it to the

20  publishing company, isn't that the right place?

21          MS. RANAHAN:   We didn't think so, but then the

22  artists are supposed to be getting certain cuts of it too.

23          THE COURT:   No, but if - with respect to your

24  client's potential liability, I'm not sure if it makes a

39

1
2  difference whether it went beyond the third party or not.  I

3  mean if the third – if your client was paying licensing

4  fees, is your client's – and let's assume the third party

5  pocketed it either through negligence or through malfeasance

6  or the third party for whatever reason didn't forward it to

7  the publishing company, does that affect your client's

8  liability?

9       MS. RANAHAN:   We would hope not, Your Honor.  We

10  would hope not.  But it also affects their knowledge when

11  they brought this lawsuit --

12       THE COURT:   Whose knowledge?

13       MS. RANAHAN:   Plaintiffs, in what they knew, you

14  know, that they had been accepting these payments, whether

15  they have to do an offset if there's any ultimate liability

16  determined or – and I think what they've actually --

17       THE COURT:   Well, the communications with the

18  client though really seems kinda far --

19       MS. RANAHAN:   Okay.

20       THE COURT:   The conversations with the artists

21  seem pretty far afield.

22       MS. RANAHAN:   Okay, Your Honor.

23       THE COURT:   What else did you want to ask Levy

24  about that he didn't know?

25       MS. RANAHAN:   The damages that they're seeking.

                                                            40

1   I mean he was under the impression they were seeking actual

2   damages which --

3          MR. DICKSTEIN:   They're not.

4          THE COURT:   All right.  What else?

5          MS. RANAHAN:   Let's see.  The value of the

6   compositions, I mean any assessment of what the value would

7   be.  He said he would have to get an expert, and we had

8   expert designations and there were no experts that were

9   identified.  So --

10         MR. DICKSTEIN:   Judge - I'm sorry.  Judge, so the

11  Spirit catalogue at issue relates mostly to Pete Townsend,

12  Who songs.  There's an acquisition agreement in the file

13  unredacted with a pretty massive purchase price.  There's

14  certainly - beyond that I don't think Mr. Levy or anyone

15  else at Spirit would be able to talk about the value of what

16  they paid for them, which was a lot, a few years back.

17         THE COURT:   Uh huh.

18         MS. RANAHAN:   And then the last issue, Your

19  Honor, just relates to what we were just touching on which

20  is just the amount that Spirit has collected from our

21  clients.  We don't know, and that is consistent across all

22  of the 30(b)(6) witnesses so far, and there's an issue with

23  (indiscernible) I'm sure we'll get to.

24         THE COURT:   Well, let's - well, doesn't your

41

1  client know what's paid?

2

3          MS. RANAHAN:   We know what we've paid to the

4  third party, Your Honor, and then we know what reports we

5  were able to get from t third party.  But we also would like

6  to know what plaintiffs actually received.  For all we can

7  tell, they were still collecting all the monies we were

8  paying well after this lawsuit was filed for all the

9  amounts, but we want to know if their records are consistent

10 with that, if there's some kind of, you know, other holdup

11 between us and – if there were direct payments, Your Honor,

12 I would agree that if we were paying, writing checks to

13 plaintiffs, there wouldn't be this issue, but we paid them

14 to a third party who then distributes them to plaintiffs.

15 And plaintiffs so far have disclaimed knowledge about how

16 much actually came from our clients.  And they've given us

17 these spreadsheets like, Your Honor, we are discussing that

18 shows the total revenues, but they're not always, with few

19 exceptions, they're not broken down to show that they come

20 from our clients.

21          THE COURT:   Well, my understanding is that there

22 are third parties that act as collection agencies and that

23 get royalties from multiple sources --

24          MS. RANAHAN:   That's right.

25          THE COURT:   -- and then the third party forwards

1                                                          42

2   the check to the publishing company.  And it doesn't say we

3   got --

4           MS. RANAHAN:   Well, they give reports --

5           THE COURT:   -- $50 from X, $70 from Y, $100 from

6   Z.

7           MS. RANAHAN:   From what we can tell, they do.

8   They give reports that break down who the payment come from,

9   and then we want those from what plaintiffs have gotten.

10          MR. DICKSTEIN:   Judge, if I may respond to that.

11          THE COURT:   Yeah.

12          MR. DICKSTEIN:   I think the third party that Miss

13  Ranahan is discussing is a company called Media Net, and

14  that's not a typical copyright clearinghouse independent

15  party that Your Honor might be thinking of.  This is

16  essentially a servicing organization which the defendants

17  have a service agreement with.  So they're essentially

18  defendants' agent.  And, in fact, they produced a number of

19  documents, communications back and forth with Media Net.  I

20  believe there were statements that Media Net did send to

21  some of the publishers.  Those have been produced actually

22  by both sides.  So Miss Ranahan already has the information

23  I think that she's asking about.

24          THE COURT:   All right.  Look, with respect to Mr.

25  Levy, I think the resolution is as follows, is to allow the

43

1    defendants to serve interrogatories concerning the

2    spreadsheets.  Can you do that in 50 interrogatories?

3

4             MS. RANAHAN:   Yes, Your Honor.

5             THE COURT:   Okay.

6             MR. DICKSTEIN:   I apologize, I didn't hear the

7    number, Judge.

8             THE COURT:   Five zero.  Fifty interrogatories

9    regarding the spreadsheets only.

10            MR. DICKSTEIN:   Okay.

11            THE COURT:   And I'm gonna direct defendant to

12   respond to those within 30 – plaintiff to respond within 30

13   days of getting them.  Can you serve those within two weeks,

14   Miss Ranahan?

15            MS. RANAHAN:   Yes.

16            THE COURT:   Okay.  All right, the next issue in

17   the correspondence relates to the purported attempt by

18   defendants to reserve the right to depose David Israelite,

19   Keith Richards, and David Burns, depending upon Judge Ramos'

20   rulings to defendants' objections to my ruling.  I'm really

21   – Miss Ranahan, I'm really a little surprised that you

22   somehow construed that as not being subject to the fact

23   discovery cutoff.

24            MS. RANAHAN:   Well, Your Honor, what we were

25   given was the right to issue the interrogatories, but there

```
 1                                                       44
 2   was no deadline imposed.
 3          THE COURT:   Well, isn't that fact discovery?
 4          MS. RANAHAN:   Fact discovery (indiscernible).   We
 5   had an interrogatory, or, sorry, a request for admission
 6   deadline Friday.   So that was 30 days later.   We still have
 7   experts ongoing.
 8          THE COURT:   Wasn't the fact discovery cutoff
 9   March 31?
10          MS. RANAHAN:   It was deposition cutoff was March
11   31.   Long before that we appealed the rulings, or not
12   appealed, but, you know, objected with Judge Ramos long
13   before that.   So it's not that we're trying to do something
14   after.   We've tried to raise it timely.   All we're doing
15   here is, in addition to the other depositions --
16          THE COURT:   Why didn't you serve the written
17   questions in February?
18          MS. RANAHAN:   Well, there was no deadline.   Our
19   thinking was we'd prefer to have their depositions.   There
20   was no deadline in the order.   We wanted to - we'd prefer to
21   have depositions.   That's the whole basis of our objections.
22   So we didn't expect it to take this long, Your Honor.   We
23   thought we would know very quickly and then serve the 30, or
24   the 25 interrogatories --
25          THE COURT:   I'm just at a loss to understand how
```

45

1
2  you couldn't, how you wouldn't think this was subject to the
3  March 31 cutoff.
4         MS. RANAHAN:   Well, there wasn't – the March 31
5  cutoff was fact depositions, not interrogatories Your Honor
6  ordered --
7         THE COURT:   Right, interrogatories were in lieu
8  of the depositions you were seeking.
9         MS. RANAHAN:   Right, but there was no order in
10 the – we filed this before to get clarity on it.  We're
11 hoping to have some guidance from Judge Ramos.  The point of
12 us waiting, Your Honor, was that we, what we'd prefer to ask
13 live rather than give the attorneys the preview of exactly,
14 and the ability --
15        THE COURT:   I mean the basis for you deposing
16 these folks has not been a, has not been a mystery.
17        MS. RANAHAN:   Right.
18        THE COURT:   I mean the basis for depose – the
19 reasons why you want to depose these folks is something that
20 we've spoken about on numerous occasions.  So I'm not sure
21 that there's anything, you know, in terms of a confidential
22 work product.  I'm not sure there's anything left.
23        MS. RANAHAN:   Well, it's just the fact of going
24 for each of the 25 questions with an attorney before they
25 give, you know, just provide a factual answer that we would

```
 1                                              46
 2  prefer and our client would prefer, and we didn't have a
 3  deadline, Your Honor, so we --
 4          THE COURT:   Well --
 5          MS. RANAHAN:    -- and we were --
 6          THE COURT:   -- you think you didn't have a
 7  deadline.  I'm not sure your conclusion there is right.  But
 8  go ahead.
 9          MS. RANAHAN:   Our understanding was the order
10  didn't set a deadline.  Like I know Your Honor just
11  requested that we do these in two weeks.  We didn't have
12  that, what we thought was the deadline that applied to
13  these.  We filed this before the 31 cutoff, so that Your
14  Honor would see if.  If you disagreed, we would've served
15  them by - and we had an answer --
16          THE COURT:   This was in your March 29 letter.
17          MS. RANAHAN:   Right.
18          THE COURT:   So I'm not --
19          MS. RANAHAN:   Right, and so we - right, and we
20  had made this position clear.  We didn't know plaintiffs
21  were objecting until right before that.  We had never
22  discussed the timing with plaintiffs.  It wasn't until right
23  before this that they indicated that they would object if we
24  tried to do it later.  But our - we explained the basis for
25  why we were waiting to do it.  We didn't expect it to take
```

1    this long.  If anything we thought, you know, Judge Ramos

2    would have ruled far in advance of the March 31 deadline.

3    But we're happy to just take the, you know, two weeks from

4    today which Your Honor set and hope that Judge Ramos rules,

5    but the whole point was to try to get a ruling before we did

6    it so that it wouldn't be futile.  If we did get to do the

7    depositions, we didn't then hand over the, what we would

8    still consider to be work product questions.

9            THE COURT:   No, but I mean – well, all right.

10           MR. DICKSTEIN:   Judge, if I --

11           THE COURT:   Go ahead.

12           MR. DICKSTEIN:   One point on that.  I think that

13   Your Honor's order, and I apologize, I don't have it handy,

14   not in terms of the schedule which clearly had a March 31

15   fact deposition cutoff and then an April 28 interrogatory

16   deadline.  So regardless of how you characterize it, one or

17   the other, the time has passed.  But Your Honor's original

18   order I believe which allowed, permitted defendants to serve

19   25 questions spoke in terms of deposition by written

20   question.  And to us it pretty clearly was a form of fact

21   deposition, which the deadline for that has passed.

22           THE COURT:   One second, let me take a look at the

23   order.

24           (pause in proceeding)

48

1

2          MR. DICKSTEIN:   It might be docket 95, Your

3    Honor.

4          THE COURT:   That would be helpful, I mean --

5          MR. DICKSTEIN:   February 16 order.

6          (pause in proceeding)

7          THE COURT:   Okay.  "Conference having been held

8    in this matter on February 16, 2017, during which I heard

9    oral argument concerning the motions of Keith Richards,

10   David Burn, and David Israelite to quash subpoenas seeking

11   deposition testimony, after hearing counsel, after hearing

12   from counsel for all sides, for the reasons stated on the

13   record in open court, it is hereby ordered that the non-

14   parties' motion to quash the subpoenas for deposition

15   testimony are granted, to the extent that any questioning of

16   them shall be done by written questions and shall be limited

17   to a total of 25 questions to be answered under oath or an

18   affirmation pursuant to 28 U.S.C. 1746.  Subpart

19   (indiscernible) separate questions, the non-parties shall

20   have 30 days to answer," should be or object to the

21   questions.  "Questions to which valid objections are made

22   will count against the 25 question limit.  This order is

23   without prejudice to a further application to defendants to

24   conduct oral examination of the non-party witnesses if the

25   answers to the written questions demonstrate that discovery

```
 1                                                    49
 2  is appropriate, that such discovery is appropriate."
 3          I mean I didn't use the term interrogatory, and I
 4  thought this was, I think plaintiffs' construction is more
 5  reasonable that this was interrogatory, a deposition by
 6  written questions.
 7          MS. RANAHAN:   But, Your Honor, there's no
 8  deadline in there, and we --
 9          THE COURT:   Well, there's the overarching fact
10  discovery deadline in the scheduling order.
11          MS. RANAHAN:   What you ran through, I mean we
12  started doing - served on us 1,300 requests for admissions
13  on April 28.  So by the time we got this order, we then
14  immediately, within the seven to fourteen-day deadline,
15  appealed it.  We thought we'd get resolution on it.  We've
16  just been granted leave to do more deposition, or, sorry,
17  more interrogatories for this other issue.  I think given
18  that, I mean we read this order many, many times.  I triple-
19  checked the docket to make sure there's no deadline listed
20  here.  We certainly did not interpret it to be --
21          THE COURT:   Well, no, but it related to a
22  discovery issue.  So to think that this was somehow outside
23  of the scheduling order really doesn't seem reasonable.  I
24  mean it was a discovery issue and it was an order with
25  respect to a discovery issue.  So to think that this somehow
```

```
 1                                                              50
 2   was an exception to the scheduling order seems unreasonable.
 3           MS. RANAHAN:   Your Honor, we understood that your
 4   orders would trump the, you know, scheduling order just like
 5   the one today that you're giving --
 6           THE COURT:   I think I issued the scheduling
 7   order.
 8           MS. RANAHAN:   Right, right, but --
 9           THE COURT:   So --
10           MS. RANAHAN:   Right, to the extent you're giving
11   an order that doesn't, like the order today you're giving us
12   leave to take the interrogatories after the fact discovery
13   cutoff because these were issues pending long before – I
14   mean these are not, this isn't an issue that we tried to
15   raise after the cutoff.  These were issues that we fought
16   for months and months and months for.  We then had to have
17   third parties come in to, you know, to seek to quash it, and
18   we immediately appealed it.  So we've done everything we can
19   to get these results in a more efficient, quicker way.
20           All we would request is that – we were hoping
21   still to have Judge Ramos weigh in before we issued them,
22   but we're willing to let that go if Your Honor will just
23   give us the leave to do it within a certain, you know, the
24   two weeks that you just gave us on the others or even sooner
25   if you'd prefer.  But we did not understand it to be --
```

```
1                                                    51
2            THE COURT:   That's something I'm not quite sure -
3  you said you were willing to let something go.  I mean --
4            MS. RANAHAN:   Right, the hope that we could have
5  Judge Ramos decide in case we could get the depositions as
6  opposed to the questions.  That's what the whole point, it
7  wasn't that we were just sitting on these.  We were hoping -
8  -
9            THE COURT:   So, wait, wait, wait, wait.  I'm not
10 understanding what you're saying.  I'm trying to understand
11 you.
12           MS. RANAHAN:   Yeah.
13           THE COURT:   So you're saying, you weren't saying
14 you were withdrawing your objections to my ruling regarding
15 written questions.  You were not saying that, is that
16 correct?
17           MS. RANAHAN:   Right.  We're withdrawing the
18 objections.  We're, we want to either, we don't want to miss
19 our chance to do it at all.  Our hope was that we would get
20 some clarity and get to take especially Mr. Israelite's
21 deposition before we gave the questions.  But if we don't
22 get that, we would still like to have the opportunity to
23 take the interrogatories that you ordered.  Those were the
24 subject of many motions and many hearings, and, you know, we
25 did not understand there to be a deadline on those, and
```

```
 1                                                    52
 2   that's why we, just to get clarity, we filed that before the
 3   deadline in case we had a misunderstanding.  But - oh, we
 4   didn't know plaintiffs were gonna insist on there being a
 5   deadline until just before we filed that letter.  So that
 6   was the reason we did it on March 29, but we did try to do
 7   it before the cutoff in case there was an issue with that.
 8            MR. DICKSTEIN:   Your Honor, I think we've heard
 9   Miss Ranahan acknowledge multiple times that these
10   questions, whether they're depositions or whether they're
11   interrogatories, there were deadlines for them in the case
12   management order that Your Honor signed.
13            MS. RANAHAN:   I mean these are also third
14   parties.
15            THE COURT:   No, let him finish.
16            MR. DICKSTEIN:   Thank you.
17            THE COURT:   Go ahead.
18            MR. DICKSTEIN:   So, you know, if the defendants
19   wanted to preserve their rights, the thing to do was to
20   serve these written questions and then continue to pursue
21   their appeal to Judge Ramos.  And if that gets overturned,
22   then maybe they'll get an opportunity for live testimony.
23   But, you know, I think they knew the deadlines were coming,
24   there's no doubt about that, and they chose not to pursue
25   it.  You know, I think the opportunity's passed.
```

53

1

2          You know, overarching point, there have been six

3  or seven party depositions thus far in the last month prior

4  to the deadline.  We've had three or four third-party

5  depositions, you know, I think these issues have been very

6  well ventilated.  Discovery has come to a close.  The

7  deadline has already been extended at least twice I think.

8  The parties have worked very diligently to complete

9  discovery by that time period, and the period has now

10  passed.

11          MS. RANAHAN:  Your Honor, that's the parties,

12  these are third parties that were, you know, represented all

13  by separate counsel, some were from out of state --

14          THE COURT:  No, but why would you think - I mean,

15  Miss Ranahan, I'm a little perplexed here.  I mean why would

16  you think that there was a different fact discovery cutoff

17  for non-parties?

18          MS. RANAHAN:  Well, the cutoff --

19          THE COURT:  That sounds irrational.  I've never

20  seen a court set one discovery schedule for parties and a

21  separate discovery schedule for non-parties, and I've never

22  heard an attorney argue that the fact discovery cutoff

23  somehow only applied to parties but not non-party witnesses.

24          MS. RANAHAN:  Your Honor, we didn't - the cutoff

25  of March 31 was fact depositions.  It wasn't fact discovery.

```
 1                                                        54
 2   We still had requests for admission deadline a month later
 3   which I understand to be fact discovery.  So the idea that
 4   all fact discovery had to be completed by March 31 was not
 5   my understanding.  They literally just served on us over
 6   1,000 requests for admission that are gonna be due in 30
 7   days.  There's been absolutely no indication about how this
 8   would prejudice them to have third parties respond to
 9   interrogatories on the same timeframe as both parties have
10   just served requests for admissions.  We now have these new
11   interrogatories.  I mean we also had, you know, Your Honor
12   just decided a motion for leave to supplement where we
13   understood the deadline for leave to amend would have
14   applied, but Your Honor gave them the benefit of the doubt.
15           THE COURT:  No, but that was with respect to a
16   deposition that was taken before the fact discovery
17   deadline.  So that's what distinguishes the situation from
18   Mr. Levy and Spirit from Messrs. Israelite, Richards, and
19   Burn.
20           MS. RANAHAN:  Well, we certainly moved to compel,
21   I mean we had, we tried to get those - Your Honor, we were
22   here before you in February trying to get those depositions.
23   And originally you were gonna give us two as a sampling and
24   then ultimately decided we could just get these questions.
25   What we have pending before Ramos is, assuming that is the
```

1                                                                55

2  order, we're gonna get the opportunity to at least ask those

3  questions.  If you're not taking that away on a, because

4  you're --

5           THE COURT:  Well, let me just interrupt you for

6  one second and ask you a question.  Is this issue ripe until

7  a notice of deposition is served or until interrogatories

8  are, until written questions are served to these three

9  witnesses?

10          MR. DICKSTEIN:  I think Your Honor may be right.

11  Defendants have I think jumped the gun a bit perhaps and

12  said they want to preserve their rights.  Our view certainly

13  is those rights have expired.  The deadline's clearly for

14  non-expert depositions in the order was March 31, and for

15  any further interrogatories was April 28, and RFA is

16  requests for admissions which, and the RFA's that we did

17  serve were prior to the deadline.

18          THE COURT:  Have you taken a position before

19  Judge Ramos that the objections are now moot?

20          MR. DICKSTEIN:  Is that question posed to

21  plaintiffs --

22          THE COURT:  To you, yeah.

23          MR. DICKSTEIN:  -- or defendants?

24          THE COURT:  To plaintiffs.

25          MR. DICKSTEIN:  I think we'll consider it now.

```
 1                                                   56
 2              THE COURT:   Well, you know, look, I am troubled
 3   by defendants' construction here of the scheduling order and
 4   the notion that somehow these written questions are outside
 5   the March 31 deadline.  But I think this issue may be
 6   premature until the notice of deposition is served, and I
 7   certainly don't want to do anything that might restrict
 8   Judge Ramos' ruling on defendants' objections.  As I said,
 9   I'm troubled by the defendants' construction here, but I
10   think the issue may be premature until either written
11   questions or a notice of deposition is served on these three
12   individuals.  So I think I'm not going to – I think the
13   issue is not ripe at this point.
14              ABKO, you know, the issue with respect to ABKO may
15   stand on the same footing.  Until there's a notice of
16   deposition served, I'm not sure – I'm not sure what I'm
17   ruling on.
18              MR. DICKSTEIN:   But, Judge, for that – I'm sorry.
19   For that one there was a notice --
20              THE COURT:   There was a notice?
21              MR. DICKSTEIN:   -- served on Mr. Klein
22   individually.  They chose not to do a 30(b)(6).
23              MS. RANAHAN:   Your Honor, the reason for that one
24   was that we were still waiting for Your Honor to decide
25   formally the settlement agreement issue that's been pending
```

```
 1                                                        57
 2   for several months.  So, again, we've been trying to bring
 3   these issues to the Court's attention to get them so that we
 4   can either object --
 5            THE COURT:   Didn't I suggest to you in March that
 6   you depose Mr. Klein because it didn't look good on your
 7   getting the licensing agreements?
 8            MS. RANAHAN:   On the settlement agreement?
 9            THE COURT:   Settlement agreements, excuse me.
10            MS. RANAHAN:   I don't know that you suggested
11   that we depose him, but our hope was, again, to get Judge
12   Ramos to look at that issue.  We had three issues we wanted
13   to bring to Judge Ramos:  the depositions, the redactions,
14   and the settlement agreement.  We still – I understand Your
15   Honor now is gonna be ruling on that, but we've been waiting
16   for a ruling on that for several months.  So that's the – we
17   had him scheduled, we'd prefer to take him with that
18   agreement unredacted, and I understand Your Honor's not
19   gonna open it up, but we would like to ask Judge Ramos to
20   look at it as well.
21            So the point of all of this was that we were
22   trying to get our objections resolved so that we could
23   something about them, if, in fact, they were resolved in
24   defendants' favor.  If they're not, then we would return to
25   the status quo.  But we filed these with plenty of time to
```

                                                                    58

1

2    ideally have them resolved.  I understand the Court's

3    dockets are full, and these aren't, you know, at the top of

4    anyone's --

5            THE COURT:   Well, I mean these issues were raised

6    in your March 29 letter.  So --

7            MS. RANAHAN:   That was just to preserve, and we

8    had objected to Ramos --

9            THE COURT:   Assuming you had something to

10   preserve.

11           MS. RANAHAN:   Right, I mean this was just to make

12   Your Honor aware that we were still waiting on those rulings

13   and that we had viewed those rulings to be --

14           THE COURT:   No, you don't even wanna go ahead

15   with Mr. Klein at this time.  You want to wait – you want to

16   object – you want to file objections to Judge Ramos

17   regarding the settlement agreement, regarding the redactions

18   to the Rolling Stones/ABKO settlement agreement, and wait

19   for Judge Ramos to rule on that before --

20           MS. RANAHAN:   If we can get that.

21           THE COURT:   Please let me finish the question

22   before you try to answer it.  And wait for Judge Ramos to

23   rule on that before you seek Jody Klein's depositions, is

24   that --

25           MS. RANAHAN:   Or we won't take it at all.  We

59

1   only want his deposition if we can ask him questions about

2   that settlement agreement.

3          THE COURT:   So if Judge Ramos affirms me with

4   respect to the redactions, the issue of Klein's deposition

5   goes away?

6          MS. RANAHAN:   Yeah.  Yes.

7          THE COURT:   Well, then maybe this gets the same

8   result right now as the Israelite, Richards, and Burn's

9   depositions.  Maybe there's no there there, or maybe there

10  won't be any there there.  All right.

11         All right.  All right, the next issue in the

12  correspondence is the date of the first downloads from the

13  defendants' websites.  There was prior representations from

14  counsel that they were not available prior to 2012, but then

15  there was testimony from Mr. Lundberg that says they were

16  available.  The dates of the first downloads prior to 2012.

17  But then I thought the defendants subsequently said that

18  they were producing that information.  Is there still an

19  information regarding pre-2012 downloads?

20         MR. DICKSTEIN:   I believe they produced it.

21         THE COURT:   Okay, so that's resolved.  All right,

22  the statements regarding additional recordings we've talked

23  about.  One of the other issues raised by plaintiffs in the

24  April 7, in their April 7 letter is there was testimony from

                                                                    60

1

2    Lundberg that plaintiffs construed as suggesting that

3    defendants had not done a thorough search for documents.

4    Where do things stand on that?

5         MR. DICKSTEIN:   Your Honor, my understanding is

6    that after that testimony, after that came to light, they

7    went back and they searched for any other recordings of the

8    musical works that plaintiffs are suing on, and those have

9    subsequently been included in updated spreadsheets, subject

10   to one that I mentioned earlier which we're still working

11   out with defendants.  I don't think that's alive issue for

12   Your Honor.

13        THE COURT:   Okay.  I think – and the other issues

14   that are discussed in plaintiffs' April 7 letter I think

15   we've already discussed.  Levy and the redactions are the

16   other issues discussed in plaintiffs' April 7 letter, which

17   I think we've already discussed.  Is anything else from

18   plaintiffs' April 7 that we haven't already addressed that

19   we should address?

20        MR. DICKSTEIN:   I don't believe so, Your Honor.

21        THE COURT:   Okay.  So the next thing is

22   defendants' April 14 letter.  The 2012 downloads we've

23   discussed.  The redactions we've discussed.  All right, let

24   me ask Miss Ranahan, is there anything else in your April 14

25   letter that we haven't discussed that we should discuss?

```
 1                                                      61

 2              MS. RANAHAN:   No, Your Honor.

 3              THE COURT:   Okay, and that takes us to April 28

 4    and the May 1 response.  What - I just saw plaintiffs'

 5    response to the April 28 letter this morning.  Well, why

 6    don't I hear from defendant first with respect to Mr. Adabal

 7    (phonetic), and then let me hear from plaintiffs with

 8    respect to Mr. Adabal --

 9              MR. DICKSTEIN:   Abikbal (phonetic).

10              THE COURT:   Abikbal.  Why don't I hear from Miss

11    Ranahan first --

12              MS. RANAHAN:   Thank you, Your Honor.

13              THE COURT:   -- with respect to Abikbal.

14              MS. RANAHAN:   So we were given around February 22

15    a proposed day of March 6 --

16              THE COURT:   Right.

17              MS. RANAHAN:   -- that we originally thought would

18    work --

19              THE COURT:   That was for less than all the

20    30(b)(6) topics --

21              MS. RANAHAN:   That --

22              THE COURT:   -- half a dozen 30(b)(6) topics --

23              MS. RANAHAN:   9, that's when it was 9.  So at

24    that point, we thought that could work, and we were also

25    scheduling a host of other depositions.  We responded within
```

```
 1                                                    62
 2   five days saying actually that won't work.  We're still
 3   waiting --
 4           THE COURT:   When did you say it wouldn't work?
 5           MS. RANAHAN:   28th of February, February 28.  We
 6   said could you give us an alternate date beyond March 6.  We
 7   would like one after the, I think, I believe it was the
 8   March 10 mediation before Your Honor because we had a bunch
 9   of depositions that were already scheduled and we wanted to
10   push that one until after mediation.  Plaintiffs would not
11   give us a date.
12           At that point, we were back and forth about when
13   we could reschedule him.  He said March 6 is the only day.
14   Then subsequent --
15           THE COURT:   What was the problem with March 6?
16           MS. RANAHAN:   We had a conflict.  We had both of
17   our counsels were in trial that were gonna be in New York.
18   I couldn't do it.  And we had another one scheduled, and we
19   wanted to move it to - also, there were substantive issues
20   too, Your Honor.  We were waiting for some discovery
21   responses to be updated.  They ended up revising a
22   spreadsheet on April 7 that related to his deposition.  They
23   designated him for topics on March 16 and March 20 --
24           THE COURT:   Let me stick with March 6 for a
25   minute.
```

```
 1                                                    63
 2              MS. RANAHAN:   Okay.
 3              THE COURT:   And the problem with March 6 is you
 4   were on trial somewhere else?
 5              MS. RANAHAN:   Tom Lane and Michael Elkin were on
 6   trial in the Amazon case, and I wasn't able to make it.  I
 7   had a – I was, Your Honor, I'd flown out here six times over
 8   the last couple of months, but that day I had another
 9   obligation and wasn't able to do March 6.  I originally
10   thought that Tom was free on that day, (indiscernible), but
11   it turned out they were not.
12              In addition to that, we had substantive problems
13   with it, and we wanted – we were hopeful there was a chance
14   that we'd resolve this case.
15              THE COURT:   There was nobody else from Winston &
16   Strawn who could've done it?
17              MS. RANAHAN:   No, Your Honor.  It was actually
18   our partner conference on top of it, it was our partner
19   conference weekend.  So we couldn't rep in someone else
20   either.
21              THE COURT:   No, but was the partner conference
22   scheduled before February 28?  I mean prior to February 28
23   you confirmed Abikbal for the 6th, right?
24              MS. RANAHAN:   We did – for a very short time
25   there was a day, and then we responded the next day never
```

64

1    mind, we can't make it.  And at the same time they were

2    changing dates too.  We were all moving dates around.  This

3    was not an isolated incident.  They had moved dates, and we

4    cooperated.  They took off Audrey Ashby the last minute,

5    moved her from February to April, or, sorry, February to

6    March before we had the extension of discovery into March,

7    and we agreed.  And the same with (indiscernible), so this

8    was not a foreign practice for us to say actually that date

9    doesn't work.  We're dealing with a lot of different dates

10   here.  Let's move it to after this date.

11           But they resisted in giving us another date on

12   that one, on Abikbal, and then subsequently continued to

13   designate him for more and more topics but never gave us a

14   date.  By the time they designated him for the final four on

15   March 20 or the final – it was March 16 to Mach 20 was five

16   more.  We had depositions every single day, I mean scheduled

17   throughout the rest of March.  So – I mean virtually every

18   single day.  We had impacted schedule the last couple of

19   weeks of March.  So as of March 20 we just never got another

20   date.  I asked them for another date, Your Honor, to move it

21   after the mediation; we just never got a date.

22           So the suggestion that we just didn't ask for a

23   date is just wrong because we asked for another date, and we

24   asked for that on February 28.  They just never gave it to

1

2  us.  And continued to designate him, and produced the

3  spreadsheet that relates to his testimony on April 7.

4         THE COURT:   All right.  Well, (indiscernible).

5         MR. DICKSTEIN:    Sure.  Your Honor, well, first of

6  all, this is the first I'm hearing of the defendants being

7  on trial in any time period around the March 6 date.   In

8  fact, the reason that they stated in their letter why they

9  wanted to push off the March 6 date, which both sides had

10  agreed to.  There are emails to that effect and the letter

11  that we submitted yesterday or handed up to Your Honor this

12  morning.  The stated reason why they wanted to adjourn that

13  was an email that Miss Ranahan had sent on February 22 with

14  various discovery issues, mostly document issues, some

15  spreadsheets they couldn't access, some things they weren't

16  clear on.  Many of those issues actually related to parties

17  other than the EMI plaintiffs for whom Mr. Abikbal is a

18  representative.

19         In any event, I responded to that February 22

20  email on March 1, so that's five days before Mr. Abikbal's

21  March 6 scheduled deposition.  It shouldn't have impacted it

22  at all.  And I'm also – Miss Ranahan may have more

23  familiarity with this than I do, but the trial, the Amazon

24  trial that she's mentioning I have some tangential awareness

25  of it, and I believe that actually started on March 8.  So I

```
 1                                                          66

 2   don't know that that would've impacted anyone's ability to

 3   depose Mr. Abikbal on March 6, certainly not Miss Ranahan

 4   who was not a part of that other trial.

 5           Miss Ranahan mentioned a spreadsheet that we

 6   updated on April 7.  That was a licensing spreadsheet which

 7   Miss Ranahan then marked as an exhibit at the deposition of

 8   Michael Riggs, another 30(b)(6) designee of the EMI

 9   plaintiff.  So she's had a full opportunity to question EMI

10   plaintiffs about that, and there were about ten pages

11   actually of deposition testimony that we attached to our

12   March 1 letter showing that.

13           You know, as far as the additional topics that she

14   indicates we designated Mr. Abikbal for, you know, those are

15   topics that we really asserted an objection to almost

16   entirely in response to the 30(b)(6) notice.  These were

17   things like defendants, plaintiffs' knowledge of defendants'

18   willfulness, and how we would have knowledge of that I think

19   is unclear at best.  There were other topics such as

20   disputes concerning plaintiffs' ownership --

21           THE COURT:  Well, if you were objecting to the

22   topics, I mean why are you desig - it does seem sort of

23   sharp, to say the least, to be deposing a witness for topics

24   after you've already said it's too late to depose that

25   witness.
```

1                                                                     67

2              MR. DICKSTEIN:   Your Honor, that's a fair point.

3   I think, as Miss Ranahan indicated, it was March 16 and

4   March 20 that we indicated Mr. Abikbal would be the person

5   to speak to certain issues, if there was anybody at the EMI

6   plaintiffs.  She didn't come back and say, well, let's

7   depose him.  When are we gonna do it?  We've got ten days

8   left, let's figure out a date.  It wasn't – the email chain

9   goes completely silent until April 14, two weeks after the

10  deposition deadline when she raises this Friday evening

11  email and says, oh, can we get dates for Mr. Abikbal.

12             THE COURT:   Was there any – I'm looking at

13  exhibit A to your May 1 letter.  Exhibit 1 is an email

14  chain, and the first email, I guess the most recent, is your

15  March 2 email to Miss Ranahan, and there was no response to

16  that March 2 letter concerning the Abikbal deposition?

17             MR. DICKSTEIN:   I don't believe so, not until

18  after the fact deposition cutoff.  If I'm wrong, I'm sure

19  Miss Ranahan will correct it, but I don't believe so.

20             THE COURT:   You're objecting to all the other –

21  well, let me rephrase that.  There are a number of topics

22  that you designated Abikbal for before March 6.  With

23  respect to the topics that were not designated before March

24  6, are you objecting to all of those topics?

25             MR. DICKSTEIN:   We are, Your Honor, because he

```
 1                                                    68
 2  was designated for all topics for which --
 3           THE COURT:   No, no, I'm not saying objecting to
 4  the deposition.  Are you objecting to all topics in the
 5  30(b)(6) other than the topics for which Abikbal was
 6  designated prior to March 6?
 7           MR. DICKSTEIN:   We asserted objections to all of
 8  them.  We did say that we would provide a witness --
 9           THE COURT:   Okay.
10           MR. DICKSTEIN:   -- in response to those topics.
11  As I've indicated in the correspondence, for most of those,
12  there's really nothing for that witness to say.  I mean, for
13  example, disputes as to ownership of copyrights, we've
14  informed defendants numerous times that we have no such
15  information.  We're just simply not aware of any.  But, you
16  know, we didn't want to just say, well, we object, you know,
17  we'll say, look, here's a person who would know about that,
18  but the fact is there's no information responsive.
19           MS. RANAHAN:   Your Honor, the reason we asked
20  them again about these topics is because we have been asking
21  since January for witnesses for the topics they had not
22  objected to.  So these were topics that were not objected to
23  in their objections.  We didn't even ask for witnesses for
24  the topics that they objected to.  These are topics that
25  they did not object to in their formal --
```

```
 1                                                          69
 2            THE COURT:   Well, with respect to the topics for
 3   which they designated Abikbal after March 6, did you ever
 4   seek to take his deposition on those topics or any topics?
 5   Did you ever seek to take Abikbal after they designated him
 6   for these additional topics?
 7            MS. RANAHAN:   Well, we tried to take Abikbal – we
 8   were asking about him, you know, as of February 28, we
 9   wanted another date.  They just never gave it to us.  And
10   then they continued to designated him suggesting to me they
11   were not taking issue that we were eventually gonna take his
12   deposition.  I mean --
13            THE COURT:   No, but after they designated him for
14   these additional topics, did you call Mr. Dickstein or send
15   an email to Mr. Dickstein saying we'd like to take Abikbal
16   on such and such a date?
17            MS. RANAHAN:   Well, we were actually seeing each
18   other quite regularly, almost, you know --
19            THE COURT:   Fair enough, did you ever ask him
20   then --
21            MS. RANAHAN:   -- every week for depositions.
22            THE COURT:   -- when you saw him at another
23   deposition or some other matter, did you ever ask him or
24   raise with him the subject of scheduling the Abikbal --
25            MS. RANAHAN:   Of Abikbal, I don't recall if we
```

```
 1                                                  70
 2   talked – I'm sure we may have, I just don't recall a
 3   specific conversation.  We had asked them for a date, they
 4   said no.  They then kept designating him --
 5            THE COURT:   When did you ask them, you said you
 6   asked them for a date and they said no --
 7            MS. RANAHAN:   February – we asked them originally
 8   February 28 for a date after March 10.
 9            THE COURT:   Did you ask them for a date after –
10   after you got this March 2 email from Mr. Dickstein, the
11   email that's exhibit A to his May 1 letter, did you raise
12   the schedule of the Abikbal deposition after you got that
13   March 2 email?
14            MS. RANAHAN:   I did raise it with, obviously in
15   April, but I was not under the impression they were gonna be
16   resisting based on timing given that they had just
17   designated him, you know, in March 16 or March 20 for new
18   topics.  So how would I think that they were then gonna say
19   but you can't take him because we're not giving you a date?
20   I mean this is – so their position is we gave you one date,
21   March 6.  They designate him to topics they had not objected
22   to.  So we're assuming we're cooperating here.  I had no
23   idea, Your Honor, when I emailed him in April can we get the
24   day for Abikbal.  We had already moved one witness to April.
25   That was due to plaintiffs wanting to take him in New York,
```

71

1

2   and then there was a snowstorm, so we moved it to April

3   without – we cooperated.  We originally wanted to take that

4   one in Nashville, and we wouldn't have had the issue with

5   the snowstorm.

6            But we didn't – because we were scheduling a

7   couple of things in April and things that had been talked

8   about and agreed to prior, I had no idea that they were

9   gonna take this position that there was no time to do this.

10  And we were in the meantime taking depositions all the way

11  throughout March.  So by the time on March 20 they had

12  designated him, the calendars were impacted with all these

13  depositions, and there was gonna be no time.  But we had

14  been trying for months, Your Honor, since January to get

15  these dates.  I mean if you look at the correspondence I

16  attached to our April 28 letter, we had been trying since

17  January to get dates for these depositions of the 30(b)(6)

18  designees.  We didn't know that he was gonna be – and it's

19  not just willful, Your Honor, it's --

20            THE COURT:   Well, I'm trying to understand the

21  chronology here.  After – I'm looking at your letter of

22  April 28, page 4 of your April 28 letter.  I guess it's the

23  --

24            MS. RANAHAN:   We took Mr. Riggs on April --

25            THE COURT:    -- the third full paragraph on page

                                                                72

4.   "The parties have agreed to hold other depositions after

the March 31 cutoff when they were rescheduled per

plaintiffs' request including Mr. Riggs.  When Mr. Dickstein

informed me that Mr. Abikbal would be attending Mr. Riggs'

April 20 deposition, I offered to take Mr. Abikbal's

deposition the same day as Mr. Riggs," and you cite to an

email.  "The EMI plaintiffs refused," and you cite to

another email.

          Between – just one second.

          (pause in proceeding)

          THE COURT:   There's an email that's attached as

exhibit 11 to your April 28 letter.  It's an email from you,

Miss Ranahan, dated April 14 talking about scheduling

Abikbal --

          MS. RANAHAN:   And this is before --

          THE COURT:   Is that – is that – and you say you

raised Abikbal orally with Mr. Dickstein after the March 2

email?

          MS. RANAHAN:   I believe so, Your Honor, but I

don't have a specific conversation in mind.  When I sent

this email, Your Honor, exhibit 11, this was before Riggs,

Mr. Riggs proceeded.  So at this point I'm not thinking

we're way too weeks deep outside of the territory where we

could possibly something that they've just designated on.  I

73

1

2   actually was gonna be in New York these days already, on the

3   24th, I was gonna be in New York for Mr. Riggs' deposition.

4   I asked them if they could do it tomorrow or yesterday since

5   we're here again, but Mr., I believe Mr. Abikbal was not

6   available.  He was supposed to come to be counsel for Mr.

7   Riggs, but then when I suggested we could take his, they

8   didn't end up having him show up in case we tried to ambush

9   him or something.  We wouldn't have done that.

10        So the question of whether this is like prejudice

11   or it's impacting the litigation, I mean this was a witness

12   that we've been trying to get a date for since January.

13   Yes, they offered one date, March 6, it wasn't gonna work

14   for various reasons, including substance, which we were

15   still — even Mr. Dickstein admits I sent an email on

16   February 22 about these discovery issues, and he responded

17   on March 1 which was five days before the March 6 date.  So

18   at that point, we don't believe that the March 1 resolved

19   those issues.  We still have many issues flowing from that,

20   including the spreadsheet update we got on April 7.

21        So there were updates that kept coming in after —

22   including also they dropped one of their songs.  Ziggy

23   Marley Tomorrow people, they dropped one of the songs which

24   would impact the scope of the deposition.  So things were

25   happening long after March 6, Your Honor, that makes the

74

1    notion that we were stuck with March 6 forever just unfair

2    to me, especially in light of their designations.  And the

3    topics, if you look at page 3 and 4, sorry, page 3 of my

4    letter, lists – it's not just about willfulness, Your Honor.

5    There's four other topics there that they designated him

6    for, and if they were – they could've said we would have, I

7    mean if they were serious about objecting on timeliness,

8    they could've said we would have designated Mr. Abikbal for

9    these topics, but your opportunity to take him has passed.

10   They didn't say that, Your Honor.  They said to me, oh,

11   he'll be the one that can speak to that, he'll be the one,

12   and then they just refused to give me a date, and I'm

13   supposed to – and that's our fault?

14           MR. DICKSTEIN:   Judge, those emails are sent I

15   believe March 15 and March 20 was the most recent one.   At

16   no time between that time and the expiration of the fact

17   discovery deadline did defendants make any attempt to

18   schedule, reschedule a deposition of Mr. Abikbal, after we

19   made it abundantly clear, as Your Honor saw in my March 2

20   email to Miss Ranahan, that March 2 was the day.   We

21   couldn't agree to go beyond that.  We were very clear that –

22   –

23           THE COURT:   Well, it's bizarre, but it is bizarre

24   though that then you're designating him for additional

```
 1                                                        75
 2   topics after that.
 3            MR. DICKSTEIN:   And, Your Honor, if defendants
 4   thought --
 5            THE COURT:   That's really kind of an odd thing to
 6   do.  I mean if you're taking the position that March 6 was
 7   the drop-dead date and he's designated for topics, you know,
 8   1 through 9, then after the drop-dead date you're
 9   designating him for additional topics --
10            MR. DICKSTEIN:   No, Your Honor, understood, but
11   the drop-dead date that I'm referring to is March 31, the
12   deadline for fact depositions.  So fair enough, if we had
13   written to Miss, if I had written to Miss Ranahan and said,
14   oh, you know, for these additional topics we don't really
15   think anyone at EMI is gonna know anything, but if it is
16   gonna be somebody, it's gonna be Mr. Abikbal, and she came
17   back and said, okay, when can we depose him, that's not what
18   happened here.
19            THE COURT:   Didn't she ask you for dates after
20   March 10?
21            MR. DICKSTEIN:   No, Your Honor, until April 14,
22   that email came in.
23            THE COURT:   There were no face - when you were at
24   depositions or at other proceedings, she never --
25            MS. RANAHAN:   I mean I --
```

```
 1                                                          76
 2              THE COURT:   My question's to Mr. Dickstein.
 3              MS. RANAHAN:   Sorry.
 4              THE COURT:   Did she ever raise with you, not in
 5    writing but orally, deposing Mr. Abikbal after March - did
 6    she ever raise that with you after March 10?
 7              MR. DICKSTEIN:   I have no recollection of that
 8    happening.
 9              MS. RANAHAN:   I had seen all three of them --
10              THE COURT:   Well, let me - one second.
11              MS. RANAHAN:   Sorry.
12              THE COURT:   And why is Mr. Abikbal on a different
13    footing than Mr. Riggs?  It sounds like Riggs was deposed
14    after March 31.
15              MR. DICKSTEIN:   The reason, Your Honor, was a
16    snowstorm.  Mr. Riggs had been scheduled for the middle of
17    March and we had an unexpected snowstorm.  He had to fly in
18    from Nashville.  Of course, if the deposition was in
19    Nashville, then we wouldn't have been able to fly into New
20    York, either way.  So we said, you know, we said, look,
21    we'll - because of this unforeseen event that's impacting
22    our schedule, we'll agree to offer him after the deadline.
23              And that was the only witness for whom we agreed
24    to do that, you know, we've been very clear I think all
25    along that we view discovery is winding down here, fact
```

1  discovery is ending, and we want to move on.

2

3          MS. RANAHAN:   It's winding down, Your Honor, but

4  we tried to schedule it – and it's winding down, but we

5  tried to schedule it the same week as Riggs.  We tried to

6  schedule it all of April.  I definitely – I was in the room

7  with all three of them at different times over March with

8  three different depositions, and we were constantly having

9  scheduling discussions.  So the notion that they designate

10 him and then don't offer, I mean why wouldn't they say

11 here's our witness and offer us a date.  Of course, we want

12 to take it because we're asking specifically for the

13 30(b)(6) designee for these topics.  Of course, we want to

14 take the deposition for these topics.  We wouldn't have been

15 pressing them.

16          But the real thing is that we were delayed in

17 getting anyone designated on these topics until late March

18 even though we'd been asking since January.  So --

19          THE COURT:   I'm looking at your – again, I'm

20 looking at your April 28 letter, and Abikbal was designated

21 for some topics and Riggs for the other topics?

22          MR. DICKSTEIN:   Correct, Your Honor, and also a

23 third EMI representative defendants deposed.

24          THE COURT:   All right.

25          MS. RANAHAN:   And, Your Honor, we've asked if

78

1   there's any – what is prejudice in just proceeding with this

2   one deposition that, you know, they were designating topics

3   on through March 20, and we haven't heard anything.  I mean

4   I understand we all want to move on and get past discovery,

5   but there are these issues that were raised before the

6   cutoff, long before the cutoff, and the fact that they

7   weren't completely resolved I don't think that's a fair

8   reason to prevent us from taking this.  We've been prevented

9   from taking many of the depositions we had hoped to take,

10  and we were continually told you'll take the 30(b)(6)'s,

11  you'll take the 30(b)(6)'s.  Now the main EMI 30(b)(6)

12  witness we're being told, you know, by plaintiffs that we

13  can't even take his, and that is nothing that we thought we

14  were gonna be doing, especially given that we were – when

15  they wanted to reschedule one on unilateral grounds, and I

16  understand there was a snowstorm, but there was also Audrey

17  Ashby who they, I don't know why they rescheduled it, but

18  they, at the end of February, when we still had a February

19  cutoff, said we have to move Audrey to March.

20          THE COURT:   March 31 cutoff.

21          MS. RANAHAN:   At the time it was February.  We

22  moved it back a month.  At the time they unilaterally moved

23  Audrey Ashby to March for I have no idea what the reason is

24  and I never asked.  We just cooperated and rescheduled it.

79

But they said we're gonna have to move Audrey to March.  We

didn't kick up a fuss.  I thought we were all being

cooperative with these depositions that we had agreed to.

That had been when they had wanted to move something or had

a scheduling issue, we cooperated.

This was the one deposition that we tried to move,

and they resisted giving us a date even though I asked them

for an alternate date to March 6 on February 28, and they

never gave me a date, and yet continued to lead me down the

road thinking, of course, they're gonna give me a date,

they're designating him for things on March 16 and March 20.

How could they then come back and say too late even when we

were spilling into April on isolated ones that we had tried

to get done earlier but couldn't?  And that's - I mean this

is - we didn't even - originally we came in trying to take

all, you know, the August depositions and Israelite and

third parties; we didn't get to take any of those.  Now

we're just trying to take the three 30(b)(6)'s.

THE COURT:  No, but I'm not sure that the

artists' depositions bear on this at all, I mean --

MS. RANAHAN:  Right, Your Honor, but the

representative was you'll take the 30(b)(6) --

THE COURT:  You can ask - please don't speak over

me.

```
 1                                                         80
 2              MS. RANAHAN:   Sorry, Your Honor.
 3              THE COURT:   You know, some of those, I really
 4    think some of those applications were not well grounded, and
 5    the fact that you don't get depositions to which you're not
 6    entitled to doesn't really bear on whether or not you're
 7    entitled to Abikbal.
 8              MR. DICKSTEIN:   Judge, if I might, two reasons
 9    why, I don't know that this deadline should come as a
10    surprise.  One is the order.  I mean Miss Ranahan is
11    suggesting that we somehow led her to believe that there
12    would be depositions after the fact deposition cutoff.
13    Well, I mean your order is an order, and that means
14    something.
15              THE COURT:   I understand that, but --
16              MR. DICKSTEIN:   And it's interesting to note that
17    they sought, before the expiration of the March 31 deadline,
18    they sought leave or they - you're suggesting they're
19    reserving their rights to depose these artists and Mr.
20    Israelite.  There was no mention of Mr. Abikbal in that
21    application.
22              MS. RANAHAN:   Your Honor --
23              THE COURT:   One second.  Let me just see
24    something here, hold on one second.
25                  (pause in proceeding)
```

1                                                            81

2              THE COURT:   How many depositions were taken after

3  March 31?

4              MR. DICKSTEIN:   One.  Mr. Riggs, because of the

5  snowstorm.

6              THE COURT:   Is that your understanding, Miss

7  Ranahan?

8              MS. RANAHAN:   One was taken after, but there was

9  --

10             THE COURT:   That's all I'm asking is how many

11 were taken after March 31.  Just one.  Right?

12             MS. RANAHAN:   One was taken, yes.

13             THE COURT:   All right.

14             MS. RANAHAN:   But, Your Honor, if I could, I will

15 say that we agreed to let them move Ashby into March before

16 we got an official March extension at their request.  So

17 that's what we understood --

18             THE COURT:   All right.  Well --

19             MS. RANAHAN:   -- the scheduling of these would

20 be.  And I would understand, Your Honor, if we just came for

21 the first time to them after April and tried to get this

22 deposition, but we've been trying since January.  We've been

23 trying, they didn't give us --

24             THE COURT:   Well, after – I mean, look, after

25 they sent you the March 16 email designating Abikbal for

82

1

2    additional topics, it looks like, at least from the

3    documentary record, the last time, the next time you raised

4    the Abikbal deposition was April 14, almost a month later.

5              MS. RANAHAN:   Well, they also designated him for

6    four more topics on March 20.  I had no idea this was gonna

7    be an issue.

8              THE COURT:   Wait, four more topics on March 20?

9              MS. RANAHAN:   Yes.  Or it may have been four and

10   then one but the final topic --

11             THE COURT:   Hold on, hold on --

12             MS. RANAHAN:   -- they designated --

13             THE COURT:   -- hold on, hold on, hold on.  Well,

14   even so, that's three and a half weeks later.  Even looking

15   at the March 20 date, okay, I see the March 20 day for Mr.

16   Dickstein to you where he offers Abikbal for some additional

17   topics --

18             MS. RANAHAN:   And then --

19             THE COURT:   -- then it's three and a half weeks

20   before you raise the scheduling of his depositions.

21             MS. RANAHAN:   We had seen each other in person

22   throughout that period, Your Honor, probably five to six

23   times.  We had three depositions the next week, we then had

24   - and we were discussing scheduling generally, so we had

25   Lundberg's deposition, we have plaintiffs' deposition, we

                                                                    83

1

2    had --

3            THE COURT:   No, but it's three and a half weeks

4    until you raise Abikbal.

5            MS. RANAHAN:   Right, but before Riggs went

6    because I was trying to coordinate him around Riggs.  I

7    figured we could – because we had Riggs scheduled in late

8    April, I figured we could move him around there.

9            THE COURT:   Well, you know, I appreciate that in

10   some cases the parties have almost a course of dealing to

11   take depositions after the deadline, and most judges, if the

12   parties are okay with taking the deposition after the

13   deadline, the judge is not going to interfere with the

14   parties' agreement.  But it doesn't seem like that's the

15   case here.  It seems like there was only one deposition that

16   was taken after March 31.  So I'm not – it doesn't seem to

17   me that there was a basis that defendants had for assuming

18   that Abikbal would be dealt with like a number of other

19   depositions because there was only one that post-dated the

20   March 31 deposition cutoff.

21           It looks like Abikbal was most recently designated

22   as a 30(b)(6) witness on March 20, and it wasn't until about

23   three and a half weeks later that defendants raised any

24   issue concerning the Abikbal deposition.

25           MS. RANAHAN:   Well, in the emails, Your Honor --

1

2          THE COURT:   Please, please.  It seems to me that

3    the effort to - the application to take Abikbal's deposition

4    here comes too late.  There should've been a request to set

5    up a date between March 20, when he was most, when he was

6    finally designated as a 30(b)(6) witness on certain topics,

7    and the end of the discovery cutoff.  It doesn't seem like

8    there's any documentary evidence that there were requests

9    prior to April 14.  So I conclude that the application to

10   take the Abikbal deposition is denied.

11          All right.  And the last issue raised in the April

12   28 letter is defendants' contention that 30(b)(6) witnesses

13   produced on behalf of Spirit, Warner, and EMI were not

14   properly prepared to discuss royalties paid to those

15   entities.  Why don't I hear from Miss Ranahan first?  Then

16   I'll hear from plaintiffs on that issue.

17          MS. RANAHAN:   Well, we did touch on this earlier,

18   Your Honor.  We just - none of them knew - well, now I won't

19   ever take Abikbal, but as far as - so I don't know from EMI

20   if they knew.  But as far as the Warner and Spirit

21   plaintiffs, when we asked them about whether defendants had

22   paid them any monies, they didn't know, and they hadn't

23   investigated it, and they weren't able to testify about it.

24   And this is obviously a critical issue to this case to know

25   what amounts of licensing monies they've collected from the

85

very uses that they're complaining about.

THE COURT:   Well, isn't that information that's best gonna come from the defendants themselves?

MS. RANAHAN:   Again, Your Honor, we pay it to a third-party service, so we're trying to get an understanding of what plaintiffs knew they were paid when they filed this lawsuit, what plaintiffs have been paid, what uses they've actually cashed in on.

THE COURT:   Wouldn't the third party then be the best source as to what was paid to the plaintiffs?

MS. RANAHAN:   We've got all we can from them, but to the extent that plaintiffs have that information, which they do, because the witnesses that we were able to take --

THE COURT:   The third party here is Media Net?

MS. RANAHAN:   In some cases, yes, but there's other third parties.

THE COURT:   Who are the third parties, Media Net and who else?

MS. RANAHAN:   Media Net, there was a prior company called Rights Flow.  There are a bunch of other --

THE COURT:   Rights Flow?

MS. RANAHAN:   Yeah, Rights Flow.  That was from an earlier era.  Now it's the current one is Media Net. There are other royalty companies.  The whole thing, paying

86

1

2  everyone from, you know, all the different — there's a bunch

3  of different third-party societies that pay these things.

4  So plaintiffs have in their records who they've gotten

5  payments from and whose behalf.  We just don't have that.

6  And they have — the two witnesses I was able to take said

7  there's someone in their companies that would be more

8  appropriate to ask them about.  They just don't know.

9          THE COURT:   I'm sorry, say that again.  I just

10  didn't hear the beginning of what you said.

11          MS. RANAHAN:    There are witnesses that I was able

12  to question said that they did have people that would know

13  what defendants' payments were.  It just wasn't them.

14          THE COURT:   All right --

15          MR. DICKSTEIN:   Judge — sorry.

16          THE COURT:   Go ahead.

17          MR. DICKSTEIN:   Judge, I think part of the reason

18  that that's the case is that defendants' 30(b)(6) notices

19  said nothing specifically about payments from defendants.

20  There was a topic that spoke about royalties or revenues

21  that you received, and we understood that to relate to the

22  spreadsheets that we produced which do indicate, you know,

23  all the income that has been received for these various

24  songs.

25          THE COURT:   Do we have the 30(b)(6) notice?

87

```
 1        Yeah, this is exhibit E to your May 1 letter.
 2                 MR. DICKSTEIN:   Right, let me see if that
 3        includes it.  Yep, it's number 11, you're right, Your Honor.
 4                 THE COURT:   One sec.
 5                 (pause in proceeding)
 6                 THE COURT:   Okay, Miss Ranahan, when you asked
 7        the witnesses about what they - what was the question that
 8        you asked the witness that they couldn't answer?
 9                 MS. RANAHAN:   How much money have defendants paid
10        you for the uses that you're complaining about in this case?
11        They didn't know.  But people within their organization
12        knew.  They hadn't looked into it.
13                 THE COURT:   Did they know in the aggregate how
14        much they'd received --
15                 MS. RANAHAN:   No.
16                 THE COURT:   -- for the musical works?
17                 MS. RANAHAN:   In the aggregate?  They knew for
18        the --
19                 THE COURT:   Really you should wait till the judge
20        finishes asking the question before you try to answer it.
21                 MS. RANAHAN:   Sorry, Your Honor.
22                 THE COURT:   Did they know in the aggregate how
23        much was paid in royalties for the musical works?
24                 MS. RANAHAN:   Did they know in the aggregate for
```

1   each --

2           THE COURT:   In other words, without knowing how

3   much each licensee paid, did they know how much in total

4   they received for the musical works?

5           MS. RANAHAN:   They had the spreadsheets which

6   purport to have that information.

7           THE COURT:   Right.

8           MS. RANAHAN:   But - so, yeah, to the extent they

9   relied on the spreadsheets, yes.  But we don't know how much

10  or what portion of that was defendants or how many of the

11  uses that are at issue in this case have been paid for by

12  our clients from their perspective.

13          THE COURT:   Is there a 30(b)(6) topic that's

14  segregated out how much each, how much your clients paid?

15          MS. RANAHAN:   Well, Your Honor --

16          THE COURT:   I'm looking at number 11, and number

17  11 asks for a witness "on the subject of all facts within

18  your knowledge, possession, custody, or control or to which

19  you reasonably have access concerning all monies received by

20  you in relation to the music works, including, but not

21  limited to, all royalties or similar payments."

22          MS. RANAHAN:   Right, so the musical works,

23  meaning the ones at issue in this case --

24          THE COURT:   Yeah.

```
1                                                         89
2             MS. RANAHAN:   -- and, of course, the defendants'
3    payments would be relevant to this.  The fact that they're
4    gonna read it broader to re-out (phonetic) their obligation
5    to obtain the most relevant evidence for this case --
6             THE COURT:   Well, it's not a question of their
7    revisiting the topic to get the evidence most relevant.
8    It's a question of their preparing a witness with respect to
9    the topic that you've identified.  And your topic doesn't
10   ask, you know, your topic asks in the aggregate, asks for
11   how much they've received in royalties or similar payments
12   in the aggregate and isn't seeking how much the defendants
13   paid.
14             MS. RANAHAN:   Well, the other aspect of our
15   request, Your Honor, if you believe this topic shouldn't
16   require them to get up to speed on that, is just the
17   documents that reflect that.  We have one document or very
18   limited documents but not a comprehensive set of documents
19   to show what they've actually received from us.  And so we
20   just believe that there's - it doesn't seem that the
21   witnesses too much interest in it.  They hadn't bothered to
22   check, I mean this is a significant issue to us because
23   we've been paying, Your Honor, for --
24             THE COURT:   I understand --
25             MS. RANAHAN:   -- well beyond three years.
```

1                                                                  90

2              THE COURT:   -- it's a significant issue, but, you

3    know, their obligation under Rule 30(b)(6) is to prepare a

4    witness with respect to the topics you've identified.  I

5    understand what you're saying, but it would've been very –

6    let me put it this way, why didn't defendants, if you were

7    interested in a 30(b)(6) on how much the plaintiff received

8    from the defendants, why didn't you make that a 30(b)(6)

9    topic?

10             MS. RANAHAN:   Well, we believed that 11 would

11   cover it, Your Honor, but I understand that that's not how –

12   -

13             THE COURT:   Well, I mean 11 is not – it's

14   certainly not asking for the constituent parts of the

15   royalties or payments received, and certainly not asking for

16   how much defendants paid.

17             MS. RANAHAN:   We believe that to be encompassed

18   by the question, and it's not asking for an aggregate

19   either.  We're asking for all monies --

20             THE COURT:   Yeah.

21             MS. RANAHAN:   -- for the musical works defined as

22   the ones in this case.

23             THE COURT:   Yeah, all monies from whatever

24   source.

25             MS. RANAHAN:   Well, Your Honor, there's the

1

2  question of the documents as well because we did request

3  documents requesting this.

4       MR. DICKSTEIN:   Judge --

5       THE COURT:   I'm sorry, where's – documents are

6  reflected where?  I'm not sure – is there a document request

7  now that you're raising?

8       MS. RANAHAN:   Well, we believe that we should at

9  least be able to see the documents reflecting the payments

10 that they know we've made to them regarding the very same

11 uses that they're suing on.

12      THE COURT:   Well, is there a document request to

13 which you're – you're saying that their response to the

14 document request was inadequate?

15      MS. RANAHAN:   We haven't – all we've been given

16 is one sheet that doesn't show any --

17      THE COURT:   Well, you – yeah, you've raised this

18 though as a 30(b)(6) issue.

19      MS. RANAHAN:   No, actually, Your Honor, if you

20 look at page 5 of our April 20 letter, request 42 --

21      THE COURT:   Where, stand by.  Page 5.  "Moreover,

22 the information plaintiffs have produced does not reflect

23 which payments and revenues came from the defendants, even

24 though defendants have requested such information, and

25 plaintiffs agreed to produce responsive documents."  Right?

92

And I think there's a response to that in Mr. Dickstein's

letter of today.  Yeah, Mr. Dickstein's letter.  I saw Mr.

Dickstein's letter for the first time this morning, so I'm

not as up on it as I'm on some of the other letters.

Page 3 of Mr. Dickstein's letter, the last

paragraph.  "In any event, more than a year ago plaintiffs

did produce numerous statements of accounts sent to them on

defendants' behalf that purport to show modest payments made

by defendants."  And they cite exhibit G.  "Once again, in

the more than 12 months since those documents were produced,

plaintiffs have not raised any issue as to the sufficiency

of that production."  Is exhibit G the totality of the

documents showing payments on behalf of the defendants?

MR. DICKSTEIN:   No, absolutely not, Your Honor.

THE COURT:   It's a sample.

MR. DICKSTEIN:   It's a sample, Your Honor, that's

correct.

THE COURT:   Okay.

MR. DICKSTEIN:   And actually, in preparing for

this conference, I noted that Miss Ranahan uses an exhibit,

a similar statement of account in her questioning of Mr.

Levy I believe.  So defendants are aware of these documents.

THE COURT:   I mean, you know, with respect to the

30(b)(6) issue, it really seems like that's, you're seeking

93

1

2  a level of specificity which could not reasonably be

3  inferred from the topic as drafted.  I mean topic 11 is

4  drafted very broadly, and to ask for the constituent part of

5  how much the defendants paid I don't think that topic is

6  fairly identified within topic 11.  And it would've been

7  very easy to draft a topic specifically identifying how much

8  the defendants paid, or how much the plaintiffs received in

9  royalty payments on behalf of the defendants.

10          So I don't think that element, that constituent

11  part, how much the defendants paid is fairly encompassed

12  within topic 11.  So to the extent there's a 30(b)(6) issue,

13  I think the - the application to compel plaintiffs, or to

14  compel Spirit, Warner, and EMI to produce a 30(b)(6) witness

15  with respect to the royalties paid on behalf of the

16  defendants is denied.

17          MS. RANAHAN:  Okay, Your Honor, then we would

18  just request that plaintiffs take another look at request 42

19  and make sure that they've produced everything that they

20  have responsive to that request because --

21          THE COURT:  Is there reason to believe that they

22  haven't?

23          MS. RANAHAN:  Well, it's - yes, because what we

24  have is a lot, far greater than what they produced as far as

25  the payment we've made to them over the last five years.  So

1                                                                      94

2    yes.  But those, again, are payment we pay to a third party,

3    so we're trying to understand what they knew that they've

4    been paid, and it doesn't seem comprehensive.  It seems,

5    like plaintiffs said, a very modest amount.  While there are

6    modest amounts that are owed under the statutory schemes and

7    the amounts, it's not modest by any means what we've

8    actually paid to defendants, or sorry, paid to plaintiffs

9    over the years going back even before the three-year statute

10   of limitations.

11            So, yes, we have reason to believe that what

12   they've produced is a small sampling but not a comprehensive

13   search.  And, again, Your Honor, every time they're asked us

14   to look for something or research for something, we have

15   done it.  We have done it so many different (indiscernible)

16   searches, and --

17            THE COURT:  Maybe what you're raising is an

18   honest – is there any objection to double-checking to make

19   sure that you've produced all documents responsive to number

20   42, I think it is?

21            MR. DICKSTEIN:  Yeah, well, Judge, if you look at

22   the language of 42, which is on page 5 of Miss Ranahan's

23   April 28 letter, it's the same language as the 30(b)(6),

24   "all documents concerning all monies received by you."

25            MS. RANAHAN:   And no, it says --

```
 1                                              95
 2          MR. DICKSTEIN:   Can I finish?
 3          MS. RANAHAN:   -- at issue in this action.  Okay,
 4   I'm just --
 5          THE COURT:   Okay, hold on one second.  Page 5 of
 6   her letter?
 7          MR. DICKSTEIN:   Yeah.  It doesn't ask for a
 8   breakdown for monies received by defendants is my point.
 9          MS. RANAHAN:   What it does is at issue.
10          THE COURT:   Whoa, whoa, whoa, hold on, hold on,
11   hold.
12          (pause in proceeding)
13          THE COURT:   Well, yeah, but I mean if you've
14   already - are you now reconstruing it?
15          MR. DICKSTEIN:   No, Your Honor, and --
16          THE COURT:   I mean if the meaning in that
17   document, if exhibit G to your letter were responsive to 42,
18   which is the position you've taken.
19          MR. DICKSTEIN:   Actually, Your Honor, our
20   position would be they're responsive to other requests for
21   documents concerning defendants, communications concerning
22   defendants.  So where, you know --
23          THE COURT:   Whoa, whoa, hold on, hold on, hold
24   on, hold on, hold on.
25              (pause in proceeding)
```

```
 1                                                     96
 2              THE COURT:   The document I'm looking at, your
 3   page 3 of your May 1 letter, Mr. Dickstein.
 4              MR. DICKSTEIN:   Uh huh.
 5              THE COURT:   The document request cited in
 6   defendants' April 28 letter at page 5 similarly sought,
 7   quote, "all documents concerning all monies received by you
 8   in relation to the musical compositions and/or sound
 9   recordings at issue in this action but did not specifically
10   seek documents concerning payments that defendants made to
11   plaintiffs," and then you have a cite to Rule 34.  Indeed,
12   plaintiffs objected to that request back in November 2015
13   and agreed to produce documents sufficient to show the
14   revenue they have received from exploiting the musical works
15   at issue in this action, which documents plaintiffs produced
16   more than a year ago.  At no time during the 18 months since
17   plaintiffs served their discovery requests or during a
18   lengthy fact discovery period in this action did defendants
19   raise an issue as to the discovery response.  Moreover, it
20   is unclear why defendants seek information from plaintiffs
21   concerning payments that were allegedly made by defendants
22   when that information is presumably already in defendants'
23   possession.
24              In any event, more than a year ago plaintiffs did
25   produce numerous statements of account sent to them on
```

1  defendants' behalf that purport to show modest payments made

2  by defendants.  Once again, in the more than 12 months since

3  those documents were produced, defendants have not raised

4  any issue as to the sufficiency of that production nor did

5  defendants question any of plaintiffs' witnesses about the

6  statements that plaintiffs produced which further undermines

7  defendants' claim that they need additional depositions on

8  that issue.

9        MR. DICKSTEIN:  So as I indicated --

10       THE COURT:  Well --

11       MR. DICKSTEIN:  -- a moment ago, Miss Ranahan did

12  question one of the plaintiffs' witnesses about those.

13       THE COURT:  Well --

14       MS. RANAHAN:  And I would've questioned him --

15       THE COURT:  Hold on, hold on.  I mean, look, the

16  production of documents should be complete, it should go

17  without saying.  I mean is there an objection to double-

18  checking to make sure that the payments made on behalf of

19  the defendants, the document production concerning payments

20  made on behalf of the defendants is complete?

21       MR. DICKSTEIN:  No, Your Honor, we'll look at

22  that.

23       THE COURT:  Okay.  All right.  I think those are

24  all the issues in the correspondence.  Have I overlooked

                                                                    98

1   anything from plaintiffs' point of view?

2           MR. DICKSTEIN:   I'm sorry, just one second, Your

3   Honor.

4           THE COURT:   Yeah.

5           MR. DICKSTEIN:   No, Your Honor.

6           THE COURT:   Okay.  Miss Ranahan, have I

7   overlooked anything from your point of view?

8           MS. RANAHAN:   No, Your Honor, could we just get a

9   deadline for that last item?

10          THE COURT:   Can you do that in two weeks?

11          MR. DICKSTEIN:   Frankly, I don't know that, Your

12  Honor.

13          THE COURT:   Three weeks?

14          MR. DICKSTEIN:   I could get back to Miss Ranahan

15  if that's not gonna be possible.  I just need to communicate

16  with the clients, you know, there's six different groups of

17  music publishers.  They store documents in different ways.

18          THE COURT:   All right, well, let's tentatively

19  set it for May 22 which would be, I think that's two weeks,

20  three weeks from today.  May 23, excuse me, May 23.  All

21  right, I mean presumably, or hopefully the response is gonna

22  be there's nothing else.

23          MR. DICKSTEIN:   That may be the case, Your Honor.

24          THE COURT:   So, you know, it's not – I don't

99

1

2    think it's gonna lead to additional issues hopefully.  Okay,

3    so May 23.  If there's a problem with that, if you can't

4    work it out with Miss Ranahan, let me know.  Okay?  All

5    right.  Anything else from either side?

6             MR. DICKSTEIN:   No, Your Honor.

7             THE COURT:   Okay, thank you all.

8             MR. DICKSTEIN:   Thank you, Your Honor.

9             THE COURT:   Is there a – what's the dispositive

10   motion deadline?

11            MR. DICKSTEIN:   I believe by default it's 30 days

12   after the close of all fact discovery, so the end of June.

13            THE COURT:   Okay.  All right.  Okay, thank you

14   all very much.

15            (Whereupon the matter is adjourned.)

16

17

18

19

20

21

22

23

24

25

C E R T I F I C A T E

    I, Carole Ludwig, certify that the foregoing transcript of proceedings in the United States District Court, Southern District of New York, ABKCO MUSIC, et al. v. SAGAN, et al., 15cv4025, was prepared using digital electronic transcription equipment and is a true and accurate record of the proceedings.

Signature_____ *Carole Ludwig*

Date:  May 4, 2017