**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

------------------------------------------------------------ X

ABKCO MUSIC, INC., COLGEMS-EMI MUSIC
INC., EMI ALGEE MUSIC CORP., EMI APRIL
MUSIC INC., EMI BLACKWOOD MUSIC INC.,
EMI CONSORTIUM MUSIC PUBLISHING, INC.
d/b/a EMI FULL KEEL MUSIC, EMI
CONSORTIUM SONGS, INC. d/b/a EMI
LONGITUDE MUSIC, EMI FEIST CATALOG
INC., EMI ROBBINS CATALOG INC., EMI
UNART CATALOG INC., JOBETE MUSIC CO.,
INC., SCREEN-GEMS-EMI MUSIC INC., STONE
AGATE MUSIC, STONE DIAMOND MUSIC
CORP., IMAGEM MUSIC LLC, PEER
INTERNATIONAL CORPORATION, PSO
LIMITED, PEERMUSIC LTD., PEERMUSIC III,
LTD., SONGS OF PEER, LTD., SPIRIT
CATALOG HOLDINGS S.A.R.L., SPIRIT TWO
MUSIC, INC., WARNER-TAMERLANE
PUBLISHING CORP. and WB MUSIC CORP.,

　　　　　　　Plaintiffs/Counterclaim-
　　　　　　　Defendants,

　　　　v.

WILLIAM SAGAN, NORTON LLC, BILL
GRAHAM ARCHIVES, LLC d/b/a
WOLFGANG'S VAULT, BILL GRAHAM
ARCHIVES, LLC d/b/a CONCERT VAULT, BILL
GRAHAM ARCHIVES, LLC d/b/a MUSIC
VAULT and BILL GRAHAM ARCHIVES, LLC
d/b/a DAYTROTTER.

　　　　　　　Defendants/Counterclaim-
　　　　　　　Plaintiffs.

------------------------------------------------------------ X

Case No. 15 Civ. 04025 (ER) (HBP)

Hon. Edgardo Ramos

**MEMORANDUM OF LAW IN
SUPPORT OF DEFENDANTS'
MOTION FOR SUMMARY
JUDGMENT AND/OR SUMMARY
ADJUDICATION**

**TABLE OF CONTENTS**

I. INTRODUCTION ................................................................................................. 1

II. FACTUAL BACKGROUND .............................................................................. 3

    A. The WV Defendants' Business ................................................................. 3

        1. The WV Defendants Entered Joint Exploitation Agreements With UMG Recordings Inc., Warner Music, Inc., and Sony Music Entertainment that Further Validate Defendants' Copyright Ownership ............................................................................... 4

    B. The WV Defendants Obtained Licenses to Exploit the Compositions at Issue Beginning in 2007 .......................................................................... 5

        1. The WV Defendants Paid Plaintiffs Under Mechanical Licenses ............. 6

            (a) The WV Defendants' HFA Licenses ............................................... 6

            (b) The WV Defendants Hired Industry Expert Rightsflow Inc. to Manage the Licensing of the Musical Compositions at Issue ......... 7

            (c) The WV Defendants Later Hired Another Industry Expert, MediaNet, to Manage the Licensing of the Musical Compositions at Issue ............................................................................................. 8

        2. The WV Defendants Also Paid Licenses To Songwriters And Publishers Through Performance Rights Organizations ........................... 10

    C. This Lawsuit ........................................................................................... 11

III. ARGUMENT ..................................................................................................... 12

    A. Legal Standard ....................................................................................... 12

IV. DEFENDANTS DID NOT INFRINGE PLAINTIFFS' COPYRIGHTS ......................... 13

    A. The WV Defendants Had Valid Licenses for Their Use of the Compositions at Issue .......................................................................... 13

    B. The WV Defendants Do Not Need Synchronization Licenses for Their Use of the Compositions at Issue in Audiovisual Recordings .............................. 15

    C. Additional Defenses Bar Plaintiffs' Claims Because Plaintiffs Accepted The Licensing Arrangement for These Compositions Through Their Continuous Acceptance of the WV Defendants' Payments .................. 18

1.     Plaintiffs Granted the WV Defendants an Implied License to
       Exploit the Compositions in the Recordings at Issue ............................... 18

2.     Plaintiffs are Estopped from Avoiding the Licenses ............................... 21

3.     The Statute Of Limitations Bars Plaintiffs from Avoiding the
       License ................................................................................................. 24

V.     INDIVIDUAL DEFENDANT WILLIAM SAGAN IS ENTITLED TO SUMMARY
       JUDGMENT ON ALL CLAIMS AGAINST HIM ........................................................ 24

VI.    CONCLUSION ............................................................................................................. 25

# TABLE OF AUTHORITIES

**Page(s)**

## Cases

*A/S Domino Mobler v. Braverman*,
  669 F. Supp. 592 (S.D.N.Y. 1987)........................................................25

*Agee v. Paramount Commc'ns, Inc.*,
  59 F.3d 317 (2d Cir. 1995).............................................................15, 16

*Anderson v. Liberty Lobby, Inc.*,
  477 U.S. 242 (1986)......................................................................13

*Broadcast Music, Inc. v. Hearst/ABC Viacom Ent. Services, Inc.*,
  746 F. Supp. 320 (S.D.N.Y. 1990)......................................................21

*Buffalo Broad. Co. v. Am. Soc. of Composers, Authors & Publishers*,
  744 F.2d 917 (2d Cir. 1984)............................................................16

*Design Options, Inc. v. BellePointe, Inc.*,
  940 F. Supp. 86 (S.D.N.Y. 1996)......................................................19

*Effects Assocs., Inc. v. Cohen*,
  908 F.2d 555 (9th Cir. 1990) .........................................................19

*Encyclopedia Brown Prods. v. Home Box Office, Inc.*,
  No. 91 CIV. 4092 (PKL), 1998 WL 734355 (S.D.N.Y. Oct. 15, 1998)............21, 22

*Freeplay Music, Inc. v. Cox Radio, Inc.*
  404 F. Supp. 2d 548 (S.D.N.Y. 2005)..................................................16

*Gartner v. Snyder*,
  607 F.2d 582 (2d Cir. 1979)............................................................25

*Glus v. Brooklyn Eastern Dist. Terminal*,
  359 U.S. 231 (1959).....................................................................21

*HarperCollins Publishers LLC v. Open Rd. Integrated Media, LLP*,
  7 F. Supp. 3d 363 (S.D.N.Y. 2014).....................................................13

*I.A.E., Inc. v. Shaver*,
  74 F.3d 768 (7th Cir. 1996) ...........................................................19

*Keane Dealer Servs., Inc. v. Harts*,
  968 F. Supp. 944 (S.D.N.Y. 1997)....................................13, 18, 19, 21, 22, 23

*Ladas v. Potpourri Press, Inc.*,

846 F. Supp. 221 (E.D.N.Y. 1994) ........................................................................19

*Lottie Joplin Thomas Trust v. Crown Publishers, Inc.*,
456 F. Supp. 531 (S.D.N.Y. 1977)........................................................................21

*Love v. Kwitny*,
706 F. Supp. 1123 (S.D.N.Y. 1989)......................................................................22

*Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*,
475 U.S. 574 (1986)..............................................................................................13

*Merchant v. Lymon*,
828 F. Supp. 1048 (S.D.N.Y. 1993)......................................................................21

*Pearson Educ., Inc. v. Arora*,
717 F. Supp. 2d 374 (S.D.N.Y. 2010), aff'd, 448 F. App'x 163 (2d Cir. 2012).....................13

*Psihoyos v. Pearson Educ., Inc.*,
855 F. Supp. 2d 103 (S.D.N.Y. 2012)..............................................................18, 19

*Rogers v. Koons*,
960 F.2d 301 (2d Cir. 1992)..................................................................................13

*Simmons v. Stanberry*,
810 F.3d 114 (2d Cir. 2016)..................................................................................24

*Smith v. Mikki More, LLC*,
59 F. Supp. 3d 595 (S.D.N.Y. 2014)......................................................................13

*Ulloa v. Universal Music and Video Distrib. Corp.*,
303 F. Supp. 2d 409 (S.D.N.Y. 2004)....................................................................19

*Walkovszky v. Carlton*,
18 N.Y.2d 414 (1966) ............................................................................................25

*William Wrigley Jr. Co. v. Waters*,
890 F.2d 594 (2d Cir. 1989)..................................................................................24

**Statutes**

17 USC § 507(b) ..........................................................................................................24

1909 Copyright Act........................................................................................6, 7, 8, 11, 12

**Rules**

Fᴇᴅ. R. Cɪᴠ. P. 56(a)..................................................................................................1, 3, 4

Fed. R. Civ. P. 56(c)....................................................................................................13

Fed. R. Civ. P. 56(e) ...................................................................................................13

**Other Authorities**

Theodore Z. Wyman, Enforceability of Synchronization Rights and
    Licenses in Copyrighted Music, 84 A.L.R. Fed. 2d 345 (2014)...........................................15

*Copyright Law Revision: Hearing on H.R. 2223 before the Subcomm. on Courts,*
    *Civil Liberties, and the Admin. of Justice of the H. Common on the Judiciary*,
    94th Cong. 927 (1976) ...........................................................................................17

**MEMORANDUM OF LAW**

Pursuant to Federal Rule of Civil Procedure 56(a), Defendants/Counterclaim-Plaintiffs Bill Graham Archives, LLC d/b/a/ Wolfgang's Vault, Norton, LLC (the "WV Defendants") and William Sagan (collectively, "Defendants") submit this Memorandum of Law in support of their Motion for Summary Judgment and/or Summary Adjudication in favor of Defendants and against Plaintiffs[1] on Plaintiffs' claims of copyright infringement against Defendants on the grounds that: the WV Defendants have licenses and have paid Plaintiffs for all amounts owed for the uses at issue; there is no requirement for the WV Defendants to have obtained any synchronization licenses for the uses at issue; and the claims against Defendant Mr. William Sagan as an individual are without basis.

## I.  INTRODUCTION

Despite the fact that the WV Defendants have licenses for all of the compositions at issue in this case, and after years of collecting licensing payments from the WV Defendants for the very same uses of these compositions, Plaintiffs brought this lawsuit alleging copyright infringement against Defendants. Apparently dissatisfied with the statutory royalty schemes that govern the rates owed to copyright owners for mechanical licenses, Plaintiffs' lawsuit quite conveniently ignores the existence of the licenses held by the WV Defendants and payments Plaintiffs have accepted from the WV Defendants pursuant to these licenses, which render the WV Defendants' uses lawful and not the proper subject of claims of copyright infringement. Not only do the valid

---

[1] Plaintiffs are six groups of music publishers, comprised of: (1) ABKCO Music, Inc., (2) Colgems-EMI Music Inc., EMI Algee Music Corp., EMI April Music Inc., EMI Blackwood Music Inc., EMI Consortium Music Publishing, Inc. d/b/a EMI Full Keel Music, EMI Consortium Songs, Inc. d/b/a EMI Longitude Music, EMI Feist Catalog Inc., EMI Robbins Catalog Inc., EMI Unart Catalog Inc., Jobete Music Co., Inc., Screen-Gems- EMI Music Inc., Stone Agate Music, Stone Diamond Music Corp.; (3) Imagem Music LLC; (4) Peer International Corporation, PSO Limited, Peermusic Ltd., Peermusic III, Ltd., Songs Of Peer, Ltd.; (5) Spirit Catalog Holdings S.A.R.L., Spirit Two Music, Inc.; and (6) Warner-Tamerlane Publishing Corp. and WB Music Corp.

licenses absolve Defendants of any liability for infringement, but additional equitable defenses, including implied licenses and estoppel, lead to the same result.

Further, with respect to the limited number of recordings at issue that feature audiovisual material, the WV Defendants also made licensing payments for each of those recordings. Yet after many years of failing to object to such uses, Plaintiffs have attempted to fit a square peg into a round hole by insisting that Defendants should have also obtained "synchronization" or "sync" licenses for such uses. But sync licenses are designed to cover situations where a user actually "syncs" up a musical composition with separate visual material, such as for a commercial or movie that adds a certain musical track. Here, there is no need for a separate sync license because the audiovisual aspects of the recordings were integrated from the inception of the live music recording when the composition was performed. Hence, there is nothing to add or "sync" together, and thus there was no need for the WV Defendants to obtain additional licenses or clearances beyond what they have, or to pay anything beyond what they have already paid Plaintiffs to use the compositions at issue.[2]

Presenting another fatal flaw in Plaintiffs' lawsuit, Defendant Mr. William Sagan does not belong in this case in his individual capacity at all, as Plaintiffs have no evidentiary basis whatsoever to disregard the corporate shield and maintain any claims against him personally.

Consequently, Plaintiffs simply have no viable copyright claims to pursue in this action and the Court should grant summary judgment in Defendants' favor as a matter of law.

---

[2] For purposes of this Motion only, Defendants do not dispute Plaintiffs' copyright ownership, but in the event that this Motion is not granted in its entirety, Defendants reserve the right to challenge Plaintiffs' ownership at trial and/or in opposition to any motion brought by Plaintiffs, and to establish that because the recordings at issue were used for decades without objection, Plaintiffs' claims regarding synchronization licenses are barred by affirmative defenses including implied license, equitable estoppel, waiver, laches, abandonment and forfeiture, and statute of limitations.

## II.     FACTUAL BACKGROUND

### A.     The WV Defendants' Business

The WV Defendants own the master recordings to their unique and valuable collection of live music and have registered copyrights to those master recordings with the United States Copyright Office.  Declaration of Matthew Lundberg ("Lundberg Dec.") at ¶¶ 3, 7.  The WV Defendants built this collection of audio and audiovisual recordings of live music performances between 2002 and 2015 by investing tens of millions of dollars in acquiring historic concert and other live music recordings, and the associated copyrights to those master recordings, from several notable and well-respected sources, including the archived assets from Clear Channel Communications that were formerly owned by Bill Graham's concert promotion business, as well recordings and associated intellectual property rights from King Biscuit Flower Hour, Festival Network, Thomas Bradshaw, John Brower, Plainfield Music, David Hewitt, Steve Weitzman, Dawson Sound Productions, Amazingrace, Filmsonix, Fuel 2000 Records, Daytrotter, and the Ash Grove theatre.  Statement of Material Undisputed Fact ("SMUF") 1.  In building this collection, the WV Defendants have devoted substantial resources towards preserving and protecting these recordings.  *Id*. at ¶ 9.

The WV Defendants' business allows music fans everywhere to celebrate these historic live concerts by offering access to the WV Defendants' timeless collection.  Lundberg Dec. at ¶ 8.  Toward that end, the WV Defendants offer the live music recordings at issue via on-demand streams, digital downloads, and record sales on Wolfgang's Vault, Wolfgang's, Concert Vault, Daytrotter, and the Music Vault YouTube channel (the "WV Defendants' Websites").  *Id*. at ¶¶ 8, 10-13.  Wolfgang's Vault, now named Wolfgang's, was the WV Defendants' first website established in 2003 to offer to the public for download the collection of live music recordings created by legendary concert promoter Bill Graham and his concert promotion company, which the WV Defendants acquired from Clear Channel.  *Id*. at ¶ 10.  Since 2006, the Wolfgang's website

has offered that collection of audio recordings for download and on-demand streaming, along with many other audio recordings acquired by the WV Defendants. *Id.* The Concert Vault website, which was also launched in or about 2006, offers both audio and audiovisual recordings for on-demand streaming. *Id.* at ¶ 11.

In 2007, Defendant Norton LLC acquired the majority stake in a company called Daytrotter Media, LLC ("Daytrotter Media"). Lundberg Dec. at ¶ 12. Daytrotter Media had a website called Daytrotter that offered audio recordings. *Id.* After the WV Defendants acquired the interest in Daytrotter Media, between 2008 and 2010, the WV Defendants improved their existing technology infrastructure and rewrote the Daytrotter website. *Id.* The Daytrotter website now offers audio recordings for download and on-demand streaming but is limited to recordings made during recording sessions hosted specifically for the website. *Id.*

In early 2014, the Music Vault YouTube channel was launched, which offers only audiovisual recordings for on-demand streaming. Lundberg Dec. at ¶ 13.

1. The WV Defendants Entered Joint Exploitation Agreements With UMG Recordings Inc., Warner Music, Inc., and Sony Music Entertainment that Further Validate Defendants' Copyright Ownership

In 2009, the WV Defendants entered Joint Exploitation Agreements with certain major labels, including UMG Recordings Inc. ("UMG") and Plaintiffs in this action Warner Music, Inc. and Sony Music Entertainment (who has since acquired EMI's publishing catalog), which acknowledge the WV Defendants' copyright ownership in the master recordings covered by the agreements and gave the WV Defendants the rights to exploit the compositions in the recordings at issue, including through download, streaming, and other means, with mechanical licenses. SMUF 3-4 (citing Lundberg Dec. at ¶ 4, Ex. 2 (BGA-002270) ("Warner hereby agrees that Wolfgang is authorized to exploit the Sound Recording Rights to the Covered Warner Artist Concert Recordings and the performances embodied therein...through the sale, marketing and distribution of all or any part of such performances as a Permanent Download" and "through

4

streaming or any form of Transmission via the Internet or any other medium now or hereafter developed that is similar to the manner Wolfgang currently streams audio-recordings from its website.")); (citing *id*. at ¶ 5, Ex. 3 (BGA-002298) (Wolfgang's exploitation rights include exploitation "through streaming or any other substantially similar form of electronic transmission via the Internet or any other medium now or hereafter developed, in a manner similar as Wolfgang currently does on its website.")); (citing *id*. at ¶ 6, Ex. 4 (BGA-002313) ("Wolfgang shall have the right to exploit the Master Recordings…through the sale, marketing and distribution of Such Master Recordings to third parties via Permanent Download.")). The agreement with UMG implicates the copyrights to the same songs performed by the band The Who that are at issue in this case through the claims of Plaintiffs Spirit Catalog Holdings S.A.R.L. and Spirit Two Music, Inc. SMUF 5. The WV Defendants relied on these agreements in conducting their business, which, as Defendants' 30(b)(6) representative testified, further contributed to the WV Defendants' good faith belief that they were acting under the proper licenses and authority. Ranahan Dec. at ¶ 5, Ex. D at 128:7-15 (Sagan Deposition Tr.) ("Subsequent to this document, Sony, Warner and Universal acknowledged the copyright ownership—our copyright ownership of these Bill Graham recordings. So that has already been adjudicated and contractually agreed to.").

### B. The WV Defendants Obtained Licenses to Exploit the Compositions at Issue Beginning in 2007

The WV Defendants have always conducted their business in good faith and with the proper rights and licenses, and have paid every penny that was due to Plaintiffs under such licenses. Lundberg Dec. at ¶ 17, Ex. 7 (Transaction Statement for ABKCO); *Id*. at ¶ 20, Ex. 10 (Transaction Statement for EMI); *Id*. at ¶ 23, Ex. 13 (Transaction Statement for Imagem); *Id*. at ¶ 26, Ex. 16 (Transaction Statement for Peer); *Id*. at ¶ 29, Ex. 19 (Transaction Statement for Spirit); *Id*. at ¶ 32, Ex. 22 (Transaction Statement for Warner); *Id*. at ¶ 34, Ex. 24 (Summary of Invoices from Rightsflow and MediaNet); *Id*. at ¶ 45, Ex. 28 (HFA License Application); *Id*. at ¶ 36; *Id*. at ¶ 37,

Ex. 25 (ASCAP Contract); *Id.* at ¶ 38, Ex. 26 (BMI Contract); *Id.* at ¶ 39, Ex. 27 (SESAC

Contract); *Id.* at ¶ 54; Ranahan Dec. at ¶ 5, Ex. D at 128:7-15 (Sagan Deposition Tr.).

1.    The WV Defendants Paid Plaintiffs Under Mechanical Licenses

The mechanical license is a product of the 1909 Copyright Act and granted the right to

make and distribute, or authorize others to make and distribute, mechanical reproductions of

musical works.  In order to prevent monopolistic behavior, Congress created a compulsory license

to allow anyone to make and distribute a mechanical reproduction of a musical work without the

consent of the copyright owner, provided that the person adhere to the provisions of the license

and pay a statutorily established royalty to the copyright owner (which the WV Defendants have

done).  A person who wishes to obtain a mechanical license need only pay the fee and send a

Notice of Intent ("NOI") to the copyright owner and file a copy of the NOI with the Copyright

Office in order to lawfully make use of a musical work under the compulsory mechanical license.

As explained further below and in the supporting Declaration of Matthew Lundberg, the

WV Defendants have properly acquired and paid Plaintiffs pursuant to mechanical licenses for use

of the compositions at issue in this case, which granted the WV Defendants' rights to reproduce

and distribute copyrighted musical compositions featured in the master recordings they lawfully

own on CDs, records, tapes, ringtones, permanent digital downloads, and, more recently,

interactive streaming.  SMUF 2.

(a)    The WV Defendants' HFA Licenses

The Harry Fox Agency ("HFA") is a third party hired by many music publishers to

administer and manage the licensing and royalties for musical compositions for which the

publishers own the copyrights.  Lundberg Dec. at ¶ 41.  The WV Defendants had their own

mechanical licensing account with the HFA beginning in 2007, when they first obtained

mechanical licenses for thousands of compositions directly from HFA.  *Id.* at ¶ 45, Ex. 28 (HFA

License Application).  The WV Defendants acquired these licenses for use of the compositions in

6

the audio and audiovisual recordings available for download on the WV Defendants' Websites directly from HFA from 2007 until 2010 and made all required royalty payments owed to HFA. Lundberg Dec. at ¶¶ 42-44; *Id*. at ¶ 45, Ex. 28 (HFA License Application); *Id*. at ¶ 46, Ex. 29 (HFA License Numbers).

> (b) The WV Defendants Hired Industry Expert Rightsflow Inc. to Manage the Licensing of the Musical Compositions at Issue

Once mechanical licenses became required for purposes of on-demand streaming, necessitating significantly more resources, the WV Defendants hired Rightsflow Inc. ("Rightsflow") in August 2010 to manage their licensing needs. Lundberg Dec. at ¶ 48. The WV Defendants hired Rightsflow based on its reputation in the industry for matching musical compositions to the proper rights holders and issuing timely royalty payments. *Id*. Each month, the WV Defendants submitted a list of newly published recordings on the WV Defendants' Websites to Rightsflow, along with a revenue statement providing the number of streams, download sales, and vinyl sales for all of the recordings available on the WV Defendants' Websites from the past month. *Id*. at ¶ 50(b)-(e). Rightsflow would then match the newly published recordings with the proper rights holders of the compositions in order to obtain licenses on the WV Defendants' behalf. *Id*. Rightsflow acquired these licenses by either: (1) obtaining licenses directly from the publisher; (2) obtaining licenses from HFA through the WV Defendants' HFA account; or (3) issuing NOIs pursuant to the statutory requirements. *Id*. at ¶ 50(c).

Rightsflow sent NOIs on the WV Defendants' behalf to the publishers or administrators of the rights for the compositions that allowed the WV Defendants to obtain "compulsory" mechanical licenses, meaning that the WV Defendants were able to reproduce and/or distribute a the compositions without the publisher's express permission as long as the WV Defendants paid the publisher the standard royalty rates set out by Congress. Lundberg Dec. at ¶ 50(d). The accepted practice in the industry with regard to these compulsory mechanical licenses is that

licensees or third parties such as Rightsflow would send a NOI for a newly published recording to the appropriate publisher or administrator of the composition embodied within an audio or audiovisual recording within thirty days of the licensee's exploitation of the recording. *Id*.

Rightsflow would also determine the amount the WV Defendants were required to pay to the various music publishers and administrators from whom the WV Defendants licensed the compositions and would timely distribute those payments on the WV Defendants' behalf. SMUF 6. Each month, Rightsflow sent the WV Defendants a monthly invoice that included their monthly service fee plus a sum for any amount that the WV Defendants owed the apparent rights holders based on the WV Defendants' revenue statements. Lundberg Dec. at ¶ 50(f). Rightsflow managed the WV Defendants' acquisition of and any payments owed for all of the compositions on the WV Defendants' Websites. *Id*. at ¶ 47.

Defendants never received, nor were they made aware of, any objections or complaints with their licensing of the compositions at issue from any of the publishers and administrators to whom Rightsflow submitted payments on the WV Defendants' behalf. Lundberg Dec. at ¶ 50(i). Indeed, Plaintiffs readily accepted all payments sent by Rightsflow on the WV Defendants' behalf. SMUF 6. Plaintiffs have not produced *any* evidence that they have ever rejected any payments made by RightsFlow on the WV Defendants' behalf, and their witnesses could not recall any instances where they rejected any payments from Rightsflow on behalf of the WV Defendants for any reason. SMUF 6.

      (c)     The WV Defendants Later Hired Another Industry Expert, MediaNet, to Manage the Licensing of the Musical Compositions at Issue

In May 2013, after Google acquired Rightsflow, the WV Defendants selected a new service provider for their licensing of the compositions on the WV Defendants' Websites, MediaNet, Inc. ("MediaNet"). Lundberg Dec. at ¶ 51. The WV Defendants hired MediaNet for the same reason it had previously used RightsFlow—based on its reputation in the industry for matching musical

recordings to the proper rights holders of the compositions and issuing timely royalty payments. *Id*. MediaNet continues to provide this service to the WV Defendants today. *Id*.

Each month, the WV Defendants would (and still do) submit a list of newly published recordings by the WV Defendants to MediaNet, along with a revenue statement providing the number of streams, download sales, and vinyl sales for all of the recordings available on the WV Defendants' Websites in the past month. Lundberg Dec. at ¶ 51(b)-(e). MediaNet then matches the newly published recordings with the proper rights holder of the compositions in order to obtain licenses on the WV Defendants' behalf. *Id*. at ¶ 51(c). MediaNet acquires these licenses by either: (1) obtaining licenses directly from the publisher; (2) obtaining licenses from HFA through the WV Defendants' HFA account; or (3) issuing a NOI pursuant to the statutory requirements. *Id*.

MediaNet also determines the amount the WV Defendants are required to pay to the various music publishers and agencies from whom the WV Defendants license the compositions and timely distributes those payments on the WV Defendants' behalf. Lundberg Dec. at ¶ 51(e). Each month, MediaNet sends the WV Defendants a monthly invoice that includes their monthly service fee plus a sum for any amount that the WV Defendants owe the apparent rights holders based on the WV Defendants' revenue statements. *Id*. MediaNet currently manages the WV Defendants' acquisition of, and any payments owed, for all of the compositions on the WV Defendants' Websites. *Id*.

During the period in which the WV Defendants switched licensing service providers from Rightsflow to MediaNet, there were noted administrative issues occurring with HFA with many different parties that prevented MediaNet from making payments to HFA during that time. Lundberg Dec. at ¶ 52; Ranahan Dec. at ¶ 5, Ex. D at 291:9-292:24 (Sagan Deposition Tr.); Dkt. 72-1(*Digital Music News* Article) (describing HFA as an "organization roundly being blamed for the current royalty mess," in reference to the 2015 class action lawsuit against music streaming service Spotify); Dkt. 72-2 (*Techdirt* Article); Dkt. 72-3 (*Future of Music Coalition* Article). None

9

of the administrative delays with HFA impacted the validity of the WV Defendants' licenses, however, as the WV Defendants made sure to pay all amounts owed to the publishers and administrators who are parties to this litigation to date through alternative means, and to date, any licensing amount owed to Plaintiffs has been paid to Plaintiffs.  SMUF 7.  Specifically, MediaNet submitted new NOIs for compositions the WV Defendants had previously licensed through HFA directly to the publishers to ensure timely payment to these same publishers.  *Id*. at ¶ 16, Ex. 6 (NOIs Sent to ABKCO); *Id*. at ¶ 22, Ex. 12 (NOIs sent to Imagem); *Id*. at ¶ 19, Ex. 9 (NOIs sent to EMI); *Id*. at ¶ 25, Ex. 15 (NOIs sent to Peer); *Id*. at ¶ 28, Ex. 18 (NOIs sent to Spirit); *Id*. at ¶ 31, Ex. 21 (NOIs sent to Warner).  MediaNet then paid the amount that had accrued directly to each of the publishers so that these payments were up-to-date.  *Id*. at ¶ 52.

***None*** of these payments made by the WV Defendants for the uses of the compositions at issue in this case have been returned to the WV Defendants, and the WV Defendants have not received any notice of rejection of their payments.  SMUF 6.  Plaintiffs have not produced any evidence that they have ever rejected any payment from MediaNet on the WV Defendants' behalf, and their witnesses could not recall any instances where they rejected any payments from MediaNet on behalf of the WV Defendants.  SMUF 6.

In short, the WV Defendants are up-to-date with all royalties owed to all of the publishers who are parties to this litigation.  SMUF 7.

  2. The WV Defendants Also Paid Licenses To Songwriters And Publishers Through Performance Rights Organizations

The WV Defendants have also obtained the requisite licenses for public performance, which grant the right to perform the work in, or transmit the work to, the public, by paying the required amounts to performing rights organizations ("PROs"), who in turn pay songwriters and publishers.  Lundberg Dec. at ¶ 37, Ex. 25 (ASCAP Contract); *Id*. at ¶ 38, Ex. 26 (BMI Contract); *Id*. at ¶ 39, Ex. 27 (SESAC Contract).  The WV Defendants have contracts with and make

payments to the three leading PROs: American Society of Composers, Authors and Publishers ("ASCAP"); Broadcast Music, Inc. ("BMI"); and Society of European Stage Authors and Composers ("SESAC"). *Id.* Prior to 2010, the WV Defendants remitted royalties for all on-demand streaming under the licenses they had, and still have, with the three major PROs (ASCAP, BMI and SESAC) in accordance with law and industry practice. *Id.* at ¶ 40.

C.    **This Lawsuit**

By way of this lawsuit, Plaintiffs claim that Defendants have infringed their copyrights to 209 compositions that are included among 969 audio and 206 audiovisual concert recordings, though Defendants have remitted to Plaintiffs all payments owed by law for each and every one of the 969 audio and 206 audiovisual recordings allegedly at issue in this case. SMUF 7. In fact, while attempting to sweep these payments and licenses under the rug for purposes of this lawsuit, the representatives of certain Plaintiffs do not deny that they have received these payments from the WV Defendants. SMUF 6-7 (citing Ranahan Dec. at ¶ 4, Ex. C at 96:9-97-10 (Levy Deposition Tr.)); (citing *id.* at ¶ 2, Ex. A at 44:4-25 (Blietz Deposition Tr.)); (citing *id.* at ¶ 3, Ex. B at 24:25-25:12 (Riggs Deposition Tr.)).

Nevertheless, Plaintiffs claim that Defendants lack mechanical and sync licenses on the compositions at issue, and that, as a result, the WV Defendants' offering of on-demand streaming and sales of digital downloads, CDs, DVDs, and vinyl records constitute separate acts of infringement under the Copyright Act. Dkt. 1 at 4, ¶ 9 (Complaint). Plaintiffs further make the inexplicable and belated claim that Defendants unlawfully synchronized the compositions at issue with visual images to create audiovisual works, alleging that a sync license is necessary when a copyrighted musical work is to be "synched" with a moving image. Dkt. 1 at 3-4, ¶ 6 (Complaint). Plaintiffs have not identified any synchronization licenses they have obtained in connection with recordings that arose originally through recordings of live concert performances or in any other similar circumstance as the recordings at issue here, where there was nothing to "sync" based on

the nature of the live performance recordings.  SMUF 8 (citing Ranahan Dec. at ¶ 3, Ex. B at 46:6-20 (Riggs Deposition Tr.) 

Moreover, the reports of sync license activity for the compositions at issue in this case produced by Plaintiffs repeatedly show descriptions of the types of productions for which sync licenses were obtained as "commercials," "film," "promos," and "video games." *Id*.

Plaintiffs further allege that Defendants: (1) unlawfully reproduced, transmitted, and distributed those audiovisual works through on-demand streaming; (2) unlawfully purported to license the aforementioned audiovisual works to third parties; and (3) reproduced and/or distributed audio-only recordings of the musical compositions at issue in compact disks, through digital downloads, and on vinyl disks.  Dkt. 1 at 19, ¶ 95 (Complaint).

Plaintiffs did not file their lawsuit until May 2015, well after Plaintiffs obtained licenses to the compositions and after many years of continuously receiving and accepting payments on these licenses from the WV Defendants for their lawful use of the audio and audiovisual recordings in question.  SMUF 6-7.

Additionally, despite having no evidence to support their claims, Plaintiffs have inexplicably sued Defendant William Sagan in his individual capacity.

III.  **ARGUMENT**

A.  **Legal Standard**

Summary judgment is an "appropriate remedy in copyright infringement suits."  *Rogers v. Koons*, 960 F.2d 301, 307 (2d Cir. 1992).  Summary judgment is proper where "the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue

as to any material fact and that the movant is entitled to judgment as a matter of law." *Pearson Educ., Inc. v. Arora*, 717 F. Supp. 2d 374, 376 (S.D.N.Y. 2010), aff'd, 448 F. App'x 163 (2d Cir. 2012) (citing Fed. R. Civ. P. 56(c)). Once the moving party has demonstrated that no genuine issue of material fact exists, the opposing party must set out specific facts showing genuine issue for trial. Fed. R. Civ. P. 56(c). The opposing party cannot simply deny the allegations in the pleadings or rely on conclusory allegations. Fed. R. Civ. P. 56(e); *Smith v. Mikki More, LLC*, 59 F. Supp. 3d 595, 608 (S.D.N.Y. 2014). Rather, "[t]o defeat a motion for summary judgment, the non-moving party 'must do more than simply show that there is some metaphysical doubt as to the material facts.'" *HarperCollins Publishers LLC v. Open Rd. Integrated Media, LLP*, 7 F. Supp. 3d 363, 369 (S.D.N.Y. 2014) (citing *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586 (1986)). Moreover, "[o]nly disputes over facts that might affect the outcome of the suit under the governing law will properly preclude summary judgment." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). The "standard provides that the mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment." *Id.* at 247-48.

## IV. DEFENDANTS DID NOT INFRINGE PLAINTIFFS' COPYRIGHTS

### A. The WV Defendants Had Valid Licenses for Their Use of the Compositions at Issue

A license is a defense to a claim of copyright infringement. *Keane Dealer Servs., Inc. v. Harts*, 968 F. Supp. 944, 947 (S.D.N.Y. 1997). The WV Defendants have, at all relevant times, had mechanical licenses from Plaintiffs for all of the compositions at issue in this litigation and have made all payments required under those licenses, including for all downloads and on-demand streaming services offered, and Plaintiffs have accepted those payments. SMUF 2, 6-7. The WV Defendants are thus entitled to judgment as a matter of law because there is no genuine dispute of fact that they possess the mechanical licenses necessary for use of these musical compositions.

The WV Defendants first obtained mechanical licenses for the compositions in the live concert recordings available for download on the WV Defendants' Websites from HFA in 2007. Lundberg Dec. at ¶ 45, Ex. 28 (HFA License Application). When the laws changed to require mechanical licenses for on-demand streaming in addition to downloading, the WV Defendants immediately transitioned from remitting royalties for on-demand streaming to the PROs to obtaining the necessary licenses and paying the royalties owed to the publishers and administrators who apparently owned the rights to the compositions at issue. *Id*. at ¶ 48. Between 2010 and 2013, Rightsflow provided this service to the WV Defendants and obtained all necessary licenses and paid all royalties owed—whether through HFA or directly to the publishers who are plaintiffs in this litigation. Lundberg Dec. at ¶ 50; *Id*. at ¶ 50(g), Ex. 30 (Rightsflow Invoices). The record of royalty payments made to HFA and music publishers during this period, along with emails from HFA to the WV Defendants and Rightsflow employees, establish that these licenses remained intact and paid for throughout the period during which Rightsflow managed the WV Defendants' licensing requirements. *Id*.; *Id*. at ¶ 50(h), Ex. 31 (Email from HFA to Lundberg). From 2013 on, MediaNet has provided this same service to the WV Defendants and obtained all proper licenses and made the necessary payments to the publishers and administrators. *Id*. at ¶ 51.

Plaintiffs simply cannot show copyright infringement when the WV Defendants acquired all the mechanical licenses needed for the compositions in the recordings at issue and are up-to-date on all royalties owed to the publishers through this point in time. The WV Defendants have not had any payments returned to them, nor have they been made aware of any rejection of royalty payments made by MediaNet on the WV Defendants's behalf. SMUF 6. As the WV Defendants have the required licenses and are current on their royalty payments, Plaintiffs' claim that the WV Defendants lack the required mechanical licenses fails as a matter of law.

## B. The WV Defendants Do Not Need Synchronization Licenses for Their Use of the Compositions at Issue in Audiovisual Recordings

With respect to the 206 audiovisual recordings that are at issue in this case, which represent just a fraction of the recordings at issue and which cover 146 compositions, Plaintiffs insist that Defendants should have obtained "synchronization licenses" for their use even though they have offered no support under the law that such licenses are required for the WV Defendants' use of the recordings. The WV Defendants simply were not required to obtain synchronization licenses for the audiovisual recordings at issue (in addition to the licenses that the WV Defendants already paid Plaintiffs for over many years) because all of these recordings consist of live concert performances without any added or separate audio or visual components.

Specifically, Plaintiffs claim that Defendants violated Plaintiffs' copyrights by failing to obtain synchronization licenses before they "synched" copyrighted musical compositions with moving images, such as by recording both the audio and visual components of a musical concert. Dkt. 1 at 3-4, ¶ 6 (Complaint). However, the "synchronization right" to a musical composition is part of the right of reproduction and would only "require a producer to obtain authorization from the owner of a sound recording before reproducing that recording in the soundtrack of an audiovisual work." *Agee v. Paramount Commc'ns, Inc.*, 59 F.3d 317, 322 (2d Cir. 1995). Synchronization licenses have thus been deemed necessary only when audio recordings *are added* to works "**such as motion pictures, television programs**" and "**karaoke tracks**." THEODORE Z. WYMAN, ENFORCEABILITY OF SYNCHRONIZATION RIGHTS AND LICENSES IN COPYRIGHTED MUSIC, 84 A.L.R. FED. 2D 345 (2014) (emphasis added).

When the audio and visual works are inseparable within the sound recording at issue as they are here because the audio and video performance were recorded contemporaneously, a "synchronization" license arising from the reproduction right of that performance is not implicated. A sync license is only appropriate when a musical recording is *added* to separate visual material.

*See e.g., Agee v. Paramount Communications, Inc.*, 59 F.3d 317, 323-24 (2d Cir 1995) (holding that use of the plaintiff's separately-recorded audio works in conjunction with visual images in a television program without a synchronization license violated the plaintiff's reproduction right); *see also Buffalo Broad. Co. v. Am. Soc. of Composers, Authors & Publishers*, 744 F.2d 917, 920 (2d Cir. 1984) (defining the synchronization right as "the right to reproduce the music onto the soundtrack of a film or a videotape in synchronization with the action").

In *Freeplay Music, Inc. v. Cox Radio, Inc.*, the court articulated the application of the synchronization right as distinguished from the performance right through an example:

> [P]erforming a copyrighted musical composition (say, singing Bob Dylan's song 'Blowin' in the Wind') on a radio show constitutes a *performance* of the work; **incorporating a tape of a copyrighted recording into a television commercial or the soundtrack of a movie (say, copying the recording of Mr. Dylan singing 'Blowin' in the Wind' onto the soundtrack of a commercial for a store selling kites or a fiction film about hang-gliders) constitutes a *reproduction* of the work (specifically, in the form of synchronization)**.

404 F. Supp. 2d 548, 551 (S.D.N.Y. 2005) (emphasis added). This is the same use for synchronization rights previously contemplated by the Second Circuit. *See Buffalo Broad Co.*, 744 F.2d at 921 **("When [a] producer wishes to use outside music in a film or videotape program, it must obtain from the copyright proprietor the 'synch' right in order to record the music on the soundtrack of the film or tape.**") (emphasis added); *see also Agee*, 59 F.3d 317 at 319 (holding that a synchronization right is necessary because "**incorporating a copyrighted sound recording into the soundtrack of a taped commercial television production** infringes the copyright owner's exclusive right of reproduction") (emphasis added).

This is also the same construction of the synchronization right contemplated by Congress. *See Agee*, 59 F.3d at 323-24 (2d Cir. 1995) (["T]he legislative history [of the Sound Recording Amendment of 1971] indicates that Congress intended to proscribe the unauthorized duplication of sound recordings in the soundtrack of audiovisual works."); *see also Copyright Law Revision: Hearing on H.R. 2223 before the Subcomm. on Courts, Civil Liberties, and the Admin. of Justice*

*of the H. Common on the Judiciary*, 94th Cong. 927 (1976) (Statement of American Society of Composers, Authors, and Publishers) ("**A synchronization license enables the licensee to record the copyrighted work in timed relation ('synchronization') with the visual image. Synchronization rights were originally granted to motion picture producers, and later to producers of television programs. In the early days of commercial television, programs were either produced live (for which no synchronization license was required) or on a film called a 'kinescope' (for which a synchronization license was required)**."). (emphasis added.)

Based on the facts present in this case, this is not a context in which a synchronization license is necessary, as the WV Defendants' collection of audiovisual recordings consists entirely of music performances that were recorded live, without the addition of any separate audio or visual components. There was no musical track "synched" or added in timed relation to visual images, and therefore a sync license is not appropriate here.

Tellingly, Plaintiffs have failed to identify any synchronization licenses that they have issued for live concert performances with inseparable audio and visual components. In fact, the witnesses designated by Plaintiffs to testify to the licensing of the musical compositions at issue, including for purposes of synchronization, could neither explain why a sync license would be necessary in this context nor provide any examples when they have brought a claim for the need of such a license in a similar circumstance. SMUF 8 (citing Ranahan Dec. at ¶ 2, Ex. A at 35:11-16 (Blietz Deposition Tr.) (stating that Mr. Blietz is "not clear on" where the "combination" would come in to implicate a sync license in a live concert scenario like that at issue here)); (citing *id*. at ¶ 3, Ex. B at 46:6-20 (Riggs Deposition Tr.) █████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

████████████████████████████████. Moreover, the reports of sync license activity

for the compositions at issue in this case produced by Plaintiffs repeatedly show descriptions of the types of productions for which sync licenses were obtained as "commercials," "film," "promos," "video games," and "trailers."  SMUF 8.

Plaintiffs have failed to provide any explanation or evidence as to why sync licenses apply to the live performances of audiovisual concert recordings at issue here, and indeed, it is apparent from the case law and history of the sync license that they do not.  Thus, Defendants are entitled to summary judgment as to Plaintiffs' claim that Defendants do not have the proper sync licenses.

### C. Additional Defenses Bar Plaintiffs' Claims Because Plaintiffs Accepted The Licensing Arrangement for These Compositions Through Their Continuous Acceptance of the WV Defendants' Payments

Even if Plaintiffs were to point to some technical issue they now take with the licenses under which they accepted payments for many years before finally filing this lawsuit in 2015, the WV Defendants would still be entitled to summary judgment based on the doctrine of implied license, equitable estoppel, and/or the statute of limitations.

#### 1. Plaintiffs Granted the WV Defendants an Implied License to Exploit the Compositions in the Recordings at Issue

Plaintiffs gave the WV Defendants an implied license to exploit the recordings at issue through their conduct, including through Plaintiffs' acceptance of the WV Defendants' payments for use of the compositions for many years prior to the lawsuit being filed, and even long after the lawsuit was filed.  A nonexclusive license may be granted orally, or may be implied from conduct. *See Psihoyos v. Pearson Educ., Inc.*, 855 F. Supp. 2d 103, 119 (S.D.N.Y. 2012); *Keane Dealer Servs., Inc. v. Harts*, 968 F. Supp. 944, 947 (S.D.N.Y. 1997).  Ultimately, the question of an implied license "comes down to whether there was a 'meeting of the minds' between the parties to permit the particular usage at issue." *Psihoyos v. Pearson Educ., Inc.*, 855 F. Supp. 2d 103, 124 (S.D.N.Y. 2012) (citing *Ulloa v. Universal Music and Video Distrib. Corp.*, 303 F. Supp. 2d 409, 416 (S.D.N.Y. 2004); *see also Design Options, Inc. v. BellePointe, Inc.*, 940 F. Supp. 86, 92

(S.D.N.Y. 1996) (holding that an implied license may arise where there is objective conduct that would permit a reasonable person to conclude that an agreement had been reached).

If the course of conduct between two parties demonstrates that there was a "meeting of the minds" as to a certain practice, "then it is reasonable not to impose copyright infringement liability when a defendant engages in this practice." *Psihoyos v. Pearson Educ., Inc.*, 855 F. Supp. 2d 103, 125 (S.D.N.Y. 2012). This "meeting of the minds" may be inferred from "consent given in the form of mere permission or lack of objection." *See Keane Dealer Servs., Inc. v. Harts*, 968 F. Supp. 944, 947 (S.D.N.Y. 1997) (quoting *I.A.E., Inc. v. Shaver*, 74 F.3d 768, 775 (7th Cir. 1996)). Therefore, a copyright holder's knowledge of, and acquiescence in, the use of copyrighted material by the allegedly infringing party may constitute an implied license. *See Keane Dealer Servs., Inc. v. Hart*s, 968 F. Supp. 944, 947 (S.D.N.Y. 1997) (holding that the defendants had an implied license to use copyrighted software where the plaintiffs were aware of the defendants' allegedly infringing use of the software and still remained silent).

In addition, the act of paying for a license can result in an implied license based on the course of dealings between the parties. *See Ladas v. Potpourri Press, Inc.*, 846 F. Supp. 221, 225-26 (E.D.N.Y. 1994) (holding that the course of dealings between the parties, including the defendant's payments to the plaintiff, had given the defendant a license to distribute items created with the plaintiff's artwork); *see also Effects Assocs., Inc. v. Cohen*, 908 F.2d 555, 558-59 (9th Cir. 1990) (finding that a nonexclusive license was granted based on the parties' conduct where the defendant had paid the plaintiff for the copyrighted footage).

Here, not only do the WV Defendants have actual licenses, but the WV Defendants have obtained an implied license to exploit the compositions in the audio and audiovisual recordings at issue because the WV Defendants have made all of the necessary payments for the mechanical licenses, and Plaintiffs have knowingly acquiesced to the WV Defendants' use of them by accepting these payments. Plaintiffs have not disputed that they have received payments for the

works at issue. The WV Defendants have a longstanding course of dealing with Plaintiffs that has permitted them to believe that they have properly licensed the compositions in question. The WV Defendants first established their practices of acquiring licenses from HFA in 2007 through direct contact with HFA. *Id*. at ¶ 45, Ex. 28 (HFA License Application). The WV Defendants requested licenses for the compositions in recordings that were available for download on the WV Defendants' Websites and paid for those licenses and any royalties owed based on those licenses. *Id*. at ¶ 34, Ex. 24 (Summary of Invoices from Rightsflow and MediaNet). The WV Defendants continued receiving licenses from HFA and paying HFA for years afterward without receiving any type of complaint from either HFA or the publishers, giving the WV Defendants every right to believe that they were in good standing as long as they continued making the necessary payments. SMUF 6. That course of dealings has never changed—even when the WV Defendants hired Rightsflow in 2010 and then MediaNet in 2013 to acquire these licenses and make these payments for them through other means. The WV Defendants have always understood that, as long as the licenses are acquired and the payments are made—which they were—the WV Defendants are well within their rights to exploit the compositions in the recordings at issue.

Moreover, the WV Defendants have never been given any reason to believe that their licensing practices would be called into question when Plaintiffs have continued to cash checks distributed to them by MediaNet on the WV Defendants' behalf long after this lawsuit was filed. SMUF 6. For almost two years following the filing of the Complaint, Plaintiffs have been quietly accepting payment from the WV Defendants for licenses that they claim the WV Defendants have failed to acquire. SMUF 6. This continued acceptance of, and failure to object to, payment from the WV Defendants for mechanical licenses constitutes consent to the WV Defendants' continued use of the compositions in question. Because there can be no dispute as to whether Plaintiffs have granted the WV Defendants an implied license to exploit the compositions at issue, the WV Defendants are entitled to judgment as a matter of law.

2.    <u>Plaintiffs are Estopped from Avoiding the Licenses</u>

Additionally and/or alternatively, the doctrine of equitable estoppel bars Plaintiffs from enforcing their copyrights in the compositions against the WV Defendants because the WV Defendants rightfully believed based on Plaintiffs' conduct that their licenses for the use of the compositions was valid and paid for, and the WV Defendants relied on this acquiescence to their own detriment.  Equitable estoppel applies "to deny a party the right to plead or prove an otherwise important fact—here, the act of infringement—because of something he has done or omitted to do." *Broadcast Music, Inc. v. Hearst/ABC Viacom Ent. Services, Inc.*, 746 F. Supp. 320, 329 (S.D.N.Y. 1990).  (internal quotation omitted).  "It is well settled that consent, whether *express* or implied from long acquiescence with knowledge of the infringement, will prevent relief in equity on the principle of estoppel." *Encyclopedia Brown Prods. v. Home Box Office, Inc.*, No. 91 CIV. 4092 (PKL), 1998 WL 734355, at *14 (S.D.N.Y. Oct. 15, 1998) (internal citation omitted).  "In order to prevail on the defense of equitable estoppel the defendant must have been misled into reasonably and justifiably believing that the plaintiff would not pursue his claims against the defendant." *Merchant v. Lymon*, 828 F. Supp. 1048, 1064 (S.D.N.Y. 1993) (citing *Glus v. Brooklyn Eastern Dist. Terminal*, 359 U.S. 231, 234 (1959).

In the context of a copyright action the plaintiff-copyright holder's rights may be destroyed if the defendant shows that "the party to be estopped had knowledge of defendant's [allegedly] infringing conduct, and either intended that his own conduct be relied upon or acted so that the party asserting the estoppel has a right to believe it was so intended.  Additionally, the defendant must be ignorant of the true facts and must rely on the plaintiff's conduct to his detriment." *Keane Dealer Servs., Inc. v. Harts*, 968 F. Supp. 944, 947 (S.D.N.Y. 1997) (quoting *Lottie Joplin Thomas Trust v. Crown Publishers, Inc.*, 456 F. Supp. 531, 535 (S.D.N.Y. 1977).

Equitable estoppel is thus "most often applied to situations involving implied consent arising from inaction over a long period of time." *Love v. Kwitny*, 706 F. Supp. 1123, 1131

(S.D.N.Y. 1989); *see Encyclopedia Brown Prods. v. Home Box Office, Inc.*, No. 91 CIV. 4092 (PKL), 1998 WL 734355, at *14 (S.D.N.Y. Oct. 15, 1998) (holding that equitable estoppel barred the copyright claim in question where the copyright holder to a television program knew the defendant-television network had intended to air the program and accepted payment of the license fee); *see also Keane Dealer Servs., Inc. v. Harts*, 968 F. Supp. 944, 947–48 (S.D.N.Y. 1997) (holding that copyright holder to software was equitably estopped from bringing his claim of copyright infringement where he was silent in the face of the alleged infringement in such a way that the defendant was entitled to rely on this silence as consent).

Here, Plaintiffs certainly knew of the WV Defendants' allegedly infringing conduct and had been profiting from that conduct since 2007, when the WV Defendants first began acquiring mechanical licenses and paying Plaintiffs under such licenses. Lundberg Dec. at ¶ 45, Ex. 28 (HFA License Application). The WV Defendants had every right to believe that they were properly obtaining and paying for the mechanical licenses for the compositions at issue based on their many years of accepted requests and payments for licenses submitted to HFA, followed by years of accepted requests and payments for licenses acquired through Rightsflow and MediaNet. SMUF 2. Plaintiffs accepted these payments going back to 2007, and after years of reaping the benefit of payments, only suddenly decided that the WV Defendants were without the proper licenses in 2015. SMUF 6.

Moreover, the WV Defendants relied on Joint Exploitation Agreements reached with the major label Plaintiffs—including certain Plaintiffs whose rights are at issue here. These agreements acknowledged the WV Defendants' copyright ownership in the master recordings and explicitly gave the WV Defendants the rights to exploit the compositions through the recordings at issue, including through downloads, streams and other means, with mechanical licenses. SMUF 3-4 (citing Lundberg Dec. at ¶ 4, Ex. 2 (BGA-002270) ("Warner hereby agrees that Wolfgang is authorized to exploit the Sound Recording Rights to the Covered Warner Artist Concert

Recordings and the performances embodied therein...through the sale, marketing and distribution of all or any part of such performances as a Permanent Download" and "through streaming or any form of Transmission via the Internet or any other medium now or hereafter developed that is similar to the manner Wolfgang currently streams audio-recordings from its website.")); SMUF 3 (citing Lundberg Dec. at ¶ 5, Ex. 3 (BGA-002298) (Wolfgang's exploitation rights include exploitation "through streaming or any other substantially similar form of electronic transmission via the Internet or any other medium now or hereafter developed, in a manner similar as Wolfgang currently does on its website."); *Id*. (citing Lundberg Dec. at ¶ 6, Ex. 4 (BGA-002313) ("Wolfgang shall have the right to exploit the Master Recordings…through the sale, marketing and distribution of Such Master Recordings to third parties via Permanent Download."). This only further contributed to the WV Defendants' good faith belief that they were acting under the proper licenses and authority. Ranahan Dec. at ¶ 5, Ex. D at 128:7-15 (Sagan Deposition Tr.).

The WV Defendants were entirely unaware that certain of the Plaintiffs, who willingly entered into agreements with Plaintiffs to gain the benefits of these agreements, were then planning to dispute the licenses under which they knew the WV Defendants were remitting payments. Given the continued acceptance of payments by Plaintiffs, the WV Defendants simply continued requesting licenses and making payments pursuant to those licenses. Lundberg Dec. at ¶ 17, Ex. 7 (Transaction Statement for ABKCO); *Id*. at ¶ 20, Ex. 10 (Transaction Statement for EMI); *Id*. at ¶ 23, Ex. 13 (Transaction Statement for Imagem); *Id*. at ¶ 26, Ex. 16 (Transaction Statement for Peer); *Id*. at ¶ 29, Ex. 19 (Transaction Statement for Spirit); *Id*. at ¶ 32, Ex. 22 (Transaction Statement for Warner). This is therefore the exact type of detrimental reliance that equitable estoppel is intended to address. *See Keane Dealer Servs., Inc. v. Harts*, 968 F. Supp. 944, 947–48 (S.D.N.Y. 1997) (holding that the plaintiff was estopped from asserting his copyright infringement claim where the defendants "introduced undisputed evidence that had they known they were violating a copyright they could have easily negotiated a license agreement with the

plaintiff or created a program of their own").

Accordingly, Plaintiffs are equitably estopped from bringing any infringement action here, and Defendants are entitled to judgment as a matter of law.

 3.  The Statute Of Limitations Bars Plaintiffs from Avoiding the License

In addition, to the extent any technical issues with the licenses are now being raised by Plaintiffs in an effort to avoid the licenses and the equitable results flowing from the payments they accepted for years, the statute of limitations for copyright claims would bar any such complaints for issues from licenses that were present at least three years or more from the date the Complaint was filed on May 27, 2015.  The Copyright Act sets a statute of limitations for copyright claims as of three years prior to the alleged infringement. 17 USC § 507(b).  Therefore any copyright claims arising from issues Plaintiffs now complain about that were present with respect to the licenses as of May 27, 2012 should be barred by the statute of limitations. *See Simmons v. Stanberry*, 810 F.3d 114, 115 (2d Cir. 2016) (finding that copyright claim was time-barred where the plaintiff was aware of the alleged dispute over the right to use a musical beat but waited more than three years to file suit).

## V.  INDIVIDUAL DEFENDANT WILLIAM SAGAN IS ENTITLED TO SUMMARY JUDGMENT ON ALL CLAIMS AGAINST HIM

There is no basis to maintain any claims individually against Defendant Mr. Sagan.  Mr. Sagan is protected by the corporate shield doctrine, and Plaintiffs have no evidentiary basis to maintain their claims against Mr. Sagan in his individual capacity.  *See William Wrigley Jr. Co. v. Waters*, 890 F.2d 594, 600 (2d Cir. 1989) ("[T]he corporate veil will be pierced only when it can be demonstrated that the '[corporate] form has been used to achieve fraud, or when the corporation has been so dominated by an individual…and its separate identity so disregarded, that it primarily transacted the dominator's business rather than its own and can be called the other's alter ego.'") (quoting *Gartner v. Snyder*, 607 F.2d 582, 586 (2d Cir. 1979)); *A/S Domino Mobler v. Braverman*, 669 F. Supp. 592, 594 (S.D.N.Y. 1987) ("The essential inquiry on a claim to pierce the corporate

24

veil is whether the corporate form has been abused; i.e., whether the shareholder used his control of the corporation to further his own, rather than the corporation's, business, or whether the shareholder used the corporate vehicle to achieve a fraud."); *Walkovszky v. Carlton*, 18 N.Y.2d 414, 418 (1966) (holding a stockholder is personally liable for the acts of the corporation when "the corporation is a 'dummy' for its individual stockholders who are in reality carrying on the business in their personal capacities for purely personal rather than corporate ends").

There is no evidence to hold Mr. Sagan individually liable to Plaintiffs unless Plaintiffs have some evidentiary basis to impose alter ego liability. They do not. In fact, Plaintiffs do not even allege the elements of alter ego or present any other specific basis to name Mr. Sagan personally in this lawsuit. Therefore, to the extent this Court does not dismiss the claims against all Defendants on any other basis, judgment should be entered in favor of Mr. Sagan for the claims against Mr. Sagan individually.

## VI.    <u>CONCLUSION</u>

For the foregoing reasons, Defendants respectfully request that the Court grant their Motion for Summary Judgment and/or Summary Adjudication on Plaintiffs' claims for copyright infringement.


Dated: May 18, 2017                                       WINSTON & STRAWN LLP


                                                          By: */s/ Michael Elkin*
                                                              WINSTON & STRAWN LLP

                                                              Michael S. Elkin
                                                              Thomas Patrick Lane
                                                              Erin R. Ranahan
                                                              200 Park Avenue
                                                              New York, New York 10166-4193
                                                              Phone: 212.294.6700
                                                              Fax: 212.294.4700
                                                              E-Mail:  melkin@winston.com

E-Mail:  tlane@winston.com
E-Mail:  eranahan@winston.com

*Attorneys for Defendants William Sagan, Norton LLC, Bill Graham Archives, LLC, d/b/a Wolfgang's Vault, Bill Graham Archives, LLC, d/b/a Concert Vault, Bill Graham Archives, LLC d/b/a Music Vault and Bill Graham Archives, LLC d/b/a Daytrotter*