UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------X
                                                            :
                                                            :
ABKCO MUSIC, INC., COLGEMS-EMI MUSIC                         :
INC., EMI ALGEE MUSIC CORP., EMI APRIL                      :
MUSIC INC., EMI BLACKWOOD MUSIC INC.,                       :
EMI CONSORTIUM MUSIC PUBLISHING,                            :
INC. d/b/a EMI FULL KEEL MUSIC, EMI                         :
CONSORTIUM SONGS, INC. d/b/a EMI                            :
LONGITUDE MUSIC, EMI FEIST CATALOG                          :
INC., EMI ROBBINS CATALOG INC., EMI                         :
UNART CATALOG INC., JOBETE MUSIC CO.,                       :
INC., SCREEN-GEMS-EMI MUSIC INC.,                           :   Case No. 15 Civ. 04025 (ER) (HBP)
STONE AGATE MUSIC, STONE DIAMOND                            :
MUSIC CORP., IMAGEM MUSIC LLC, PEER                         :   Hon. Edgardo Ramos
INTERNATIONAL CORPORATION, PSO                              :
LIMITED, PEERMUSIC LTD., PEERMUSIC III,                     :
LTD., SONGS OF PEER, LTD., SPIRIT                           :   **PLAINTIFFS/COUNTER-**
CATALOG HOLDINGS S.A.R.L., SPIRIT TWO :                     :   **DEFENDANTS' MEMORANDUM**
MUSIC, INC., WARNER-TAMERLANE                               :   **OF LAW (A) IN OPPOSITION TO**
PUBLISHING CORP. and WB MUSIC CORP.,                        :   **DEFENDANTS/COUNTER-**
                                                            :   **CLAIMANTS' MOTION FOR**
               Plaintiffs/Counterclaim-                     :   **SUMMARY JUDGMENT, AND (B)**
               Defendants,                                  :   **IN SUPPORT OF THEIR CROSS-**
                                                            :   **MOTION FOR SUMMARY**
         -against-                                          :   **JUDGMENT AND FOR A**
                                                            :   **PERMANENT INJUNCTION**
                                                            :
                                                            :
WILLIAM SAGAN, NORTON LLC, BILL                             :
GRAHAM ARCHIVES, LLC d/b/a                                  :
WOLFGANG'S VAULT, BILL GRAHAM                               :
ARCHIVES, LLC d/b/a CONCERT VAULT,                          :
BILL GRAHAM ARCHIVES, LLC d/b/a MUSIC                       :
VAULT and BILL GRAHAM ARCHIVES, LLC                         :
d/b/a DAYTROTTER,                                           :
                                                            :
               Defendants/Counterclaim-                     :
               Plaintiffs.                                  :
------------------------------------------------------------X

## TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ........................................................................................ iv

PRELIMINARY STATEMENT ................................................................................... 1

FACTUAL BACKGROUND ......................................................................................... 3

I.     Defendants purchase thousands of bootleg concert recordings that were created without the consent of the performing artists, songwriters or music publishers. ................ 3

     A.     Defendants acquire the physical archives of concert promoter Bill Graham. ............................................................................................... 3

     B.     Defendants acquire more than a dozen other collections of bootleg concert recordings. ...................................................................... 6

II.    Defendants begin to commercially exploit their bootleg concert recordings online through paid downloads and on-demand streaming. ................................ 8

III.   Defendants serve fraudulent and invalid notices of intention to obtain compulsory mechanical licenses. ...................................................................... 10

IV.   Defendants receive numerous cease and desist demands from musical composition owners. ........................................................................................ 14

PROCEDURAL HISTORY ......................................................................................... 15

I.     Defendants falsely claim to have written agreements with artists. ..................... 15

II.    Defendants conceal evidence of the scope of their infringements. ..................... 16

III.   Defendants expand their infringing conduct while this action is pending. ......... 17

SUMMARY JUDGMENT STANDARD ..................................................................... 18

ARGUMENT .............................................................................................................. 19

I.     There is no genuine dispute that Defendants have infringed Musical Works owned or controlled by Plaintiffs. ...................................................................... 19

     A.     Plaintiffs own or control the Musical Works at issue. ........................... 19

     B.     Defendants have infringed Plaintiffs' copyrights in each of the Musical Works. ...................................................................................... 20

II.     Defendants' purported licenses are invalid, insufficient and fraudulent. .........................21

        A.      Defendants do not have valid mechanical licenses. ...............................................22

                1.      Defendants have no mechanical licenses under Section 115 of
                        the Copyright Act. ..........................................................................22

                        a)      Section 115 does not permit exploitation in audiovisual
                                format. ...................................................................................23

                        b)      Defendants' NOIs were untimely and fraudulent. .........................26

                        c)      Defendants' bootleg concert recordings are not eligible
                                for mechanical licenses under Section 115. ...................................28

                                (1)     Defendants cannot show that their bootleg
                                        concert recordings were "fixed lawfully" .........................29

                                (2)     Defendants cannot show that they have the
                                        authorization of the sound recording copyright
                                        owners. ............................................................31

                                (3)     Defendants cannot show that the pre-February
                                        15, 1972 recordings were made with the consent
                                        of the owners of the underlying Musical Works. ...............33

                2.      Defendants' purported licenses from The Harry Fox Agency are
                        invalid and insufficient. ..........................................................34

        B.      Defendants' performance licenses do not authorize interactive
                streaming or digital downloads, and do not cover all of their Websites. ...............36

        C.      Defendants' agreements with record labels did not (and could not)
                grant any rights to Plaintiffs' Musical Works. .......................................................38

        D.      The statute of limitations cannot save Defendants' invalid licenses. ...................40

III.    Defendants' "implied license" and "estoppel" defenses cannot save them from
        liability. ........................................................................41

        A.      Defendants' implied license and estoppel defenses are barred by their
                unclean hands. ........................................................................41

        B.      Defendants cannot show that Plaintiffs impliedly licensed Defendants'
                massive infringement. .........................................................................42

        C.      Defendants cannot show that Plaintiffs are estopped from asserting
                copyright infringement. ..........................................................45

IV.     Defendants' infringement was willful. ............................................................47

V.      Sagan is liable for the infringing conduct of his wholly-owned companies.....................50

VI.     Plaintiffs are entitled to a permanent injunction restraining Defendants from
        continuing to infringe Plaintiffs' Musical Works. ............................................................52

        CONCLUSION...................................................................................................................55

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*24/7 Records, Inc. v. Sony Music Entm't, Inc.*,
    429 F.3d 39 (2d Cir. 2005)...................................................................................27

*A&M Records v. Napster, Inc.*,
    239 F.3d 1004 (9th Cir. 2001) ...........................................................................23

*A/S Domino Mobler v. Braverman*,
    669 F. Supp. 592 (S.D.N.Y. 1987) ................................................................ 51-52

*ABKCO Music, Inc. v. Sagan*,
    2017 U.S. Dist. LEXIS 120171 (S.D.N.Y. July 31, 2017) ..............................19, 20

*ABKCO Music, Inc. v. Stellar Records, Inc.*,
    96 F.3d 60 (2d Cir. 1996)...................................................................................25

*Agee v. Paramount Commc'ns, Inc.*,
    59 F.3d 317 (2d Cir. 1995)..................................................................................24

*Agence Fr. Presse v. Morel*,
    934 F. Supp. 2d 547 (S.D.N.Y. 2013)................................................................49

*Anderson v. Liberty Lobby*,
    477 U.S. 242 (1986)..........................................................................................18

*AP v. Meltwater U.S. Holdings, Inc.*,
    931 F. Supp. 2d 537 (S.D.N.Y. 2013)....................................................22, 40, 46

*In re Application of Cellco P'ship*,
    663 F. Supp. 2d 363 (S.D.N.Y. 2009)....................................................30, 31, 33

*Arista Records LLC v. Lime Grp.*,
    784 F. Supp. 2d 398 (S.D.N.Y. 2011)...........................................................50, 51

*Blagman v. Apple, Inc.*,
    2014 U.S. Dist. LEXIS 45401(S.D.N.Y. Mar. 31, 2014) .............................. *passim*

*Blum v. Kline*,
    1988 U.S. Dist. LEXIS 4424 (S.D.N.Y. May 17, 1988).......................................51

*Broad. Music, Inc. v. Living Room Steak House, Inc.*,
    2016 U.S. Dist. LEXIS 23676 (E.D.N.Y. Feb. 26, 2016)......................................54

*Broad. Music, Inc. v. Prana Hospitality, Inc.*,
   158 F. Supp. 3d 184 (S.D.N.Y. 2016)..............................................49, 52, 53, 54

*Capitol Records, Inc. v. Wings Digital Corp.*,
   218 F. Supp. 2d 280 (E.D.N.Y. 2002) ...............................................................51

*Capitol Records, LLC v. ReDigi Inc.*,
   934 F. Supp. 2d 640 (S.D.N.Y. 2013)...............................................................20

*Celotex Corp. v. Catrett*,
   477 U.S. 317 (1986).........................................................................................18

*Cherry River Music. Co. v. Simitar Entm't, Inc.*,
   38 F. Supp. 2d 310 (S.D.N.Y. 1999)....................................................22, 27, 28

*Childress v. Taylor*,
   945 F.2d 500 (2d Cir. 1991).............................................................................32

*Complex Sys. v. ABN AMBRO Bank N.V.*,
   979 F. Supp. 2d 456 (S.D.N.Y. 2013)...............................................................42

*Cordiano v. Metacon Gun Club, Inc.*,
   575 F.3d 199 (2d Cir. 2009).............................................................................18

*Country Rd. Music, Inc. v. MP3.com, Inc.*,
   279 F. Supp. 2d 325 (S.D.N.Y. 2003)...............................................................36

*Design Options, Inc. v. BellePointe, Inc.*,
   940 F. Supp. 86 (S.D.N.Y. 1996) ....................................................................43

*Distribuidora De Discos Karen C. por A. v. Universal Music Grp.*,
   2017 U.S. Dist. LEXIS 37222 (S.D.N.Y. Mar. 15, 2017) ....................................39

*Dollar Dry Dock Sav. Bank v. Hudson St. Dev. Assocs.*,
   1995 U.S. Dist. LEXIS 9672 (S.D.N.Y. July 11, 1995) ........................................20

*eBay, Inc. v. MercExchange, L.L.C.*,
   547 U.S. 388 (2006).........................................................................................52

*Effects Assocs., Inc. v. Cohen*,
   908 F.2d 555 (9th Cir. 1990) ...........................................................................43

*EMI Christian Music Grp. v. MP3Tunes, LLC*,
   844 F.3d 79 (2d Cir. 2016)...............................................................................51

*EMI Entm't World, Inc. v. Karen Records, Inc.*,
   603 F. Supp. 2d 759 (S.D.N.Y. 2009)...............................................................34

*EMI Entm't World, Inc. v. Karen Records, Inc.*,
    806 F. Supp. 2d 697 (S.D.N.Y. 2011).......................................................................48

*Encore Entm't v. KIDdesigns, Inc.*,
    2005 U.S. Dist. LEXIS 44386 (M.D. Tenn. Sept. 14, 2005).............................................35, 49

*Famous Music Corp. v. Seeco Records, Inc.*,
    201 F. Supp. 560 (S.D.N.Y. 1961) ...........................................................................28

*Feist Publ'ns, Inc. v. Rural Tel. Serv. Co.*,
    499 U.S. 340 (1991)..............................................................................................19

*Fitzpatrick v. Sony-BMG Music Entm't, Inc.*,
    2007 U.S. Dist. LEXIS 91446 (S.D.N.Y. Dec. 7, 2007) ...............................................45

*Forward v. Thorogood*,
    985 F.2d 604 (1st Cir. 1993)...................................................................................32

*Fox Television Stations, Inc. v. Aereokiller, LLC*,
    851 F.3d 1002 (9th Cir. 2017) ............................................................................ 22-23

*Fred Ahlert Music Corp. v. Warner/Chappell Music, Inc.*,
    155 F.3d 17 (2d Cir. 1998)......................................................................................25

*Freeplay Music, Inc. v. Cox Radio, Inc.*,
    404 F. Supp. 2d 548 (S.D.N.Y. 2005)...................................................................23, 24

*Gehling v. St. George's Univ. Sch. of Med., Ltd.*,
    1988 U.S. Dist. LEXIS 18328 (E.D.N.Y. July 8, 1988).....................................................38

*HarperCollins Publrs., LLC v. Open Rd. Integrated Media, LLP*,
    58 F. Supp. 3d 380 (S.D.N.Y 2014).........................................................................52

*Harry Fox Agency, Inc. v. Mills Music, Inc.*,
    720 F.2d 733 (2d Cir. 1983)....................................................................................34

*Island Software & Computer Serv. v. Microsoft Corp.*,
    413 F.3d 257 (2d Cir. 2005).....................................................................................47

*Jackson v. Odenat*,
    9 F. Supp. 3d 342 (S.D.N.Y. 2014) .........................................................................42

*Keane Dealer Servs., Inc. v. Harts*,
    968 F. Supp. 944 (S.D.N.Y. 1997) .......................................................................43, 46

*Knitwaves, Inc. v. Lollytogs Ltd.*,
    71 F.3d 996 (2d Cir. 1995)......................................................................................47

*Ladas v. Potpourri Press, Inc.*,
   846 F. Supp. 221 (E.D.N.Y. 1994) ....................................................43

*Leadsinger, Inc. v. BMG Music Publ'g*,
   429 F. Supp. 2d 1190 (C.D. Cal 2005), *aff'd*, 512 F.3d 522 (9th Cir. 2008)..........................25

*Leo Feist, Inc. v. Apollo Records, N.Y. Corp.*,
   300 F. Supp. 32 (S.D.N.Y. 1969), *aff'd*, 418 F.2d 1249 (2d Cir. 1969) ................................28

*Lipton v. Nature Co.*,
   71 F.3d 464 (2d Cir. 1995)...............................................................47

*Lottie Joplin Thomas Tr. v. Crown Publ'rs., Inc.*,
   456 F. Supp. 531 (S.D.N.Y. 1977) ............................................... 50-51

*McClellan v. Smith*,
   439 F.3d 137 (2d Cir. 2006)..............................................................18

*Merchant v. Lymon*,
   828 F. Supp. 1048 (S.D.N.Y. 1993)..................................................45

*Merkos Lyinyonei Chinuch, Inc. v. John Doe Nos. 1-25*,
   172 F. Supp. 2d 383 (S.D.N.Y 2001).................................................43

*Metropolitan Opera Ass'n v. Wagner-Nichols Recorder Corp.*,
   199 Misc. 786, *aff'd* 279 A.D. 632 (1st Dep't 1951)........................29

*Miller v. Universal Pictures Co.*,
   18 Misc. 2d 626 (Sup. Ct. N.Y. Cnty. 1959), *rev'd*, 11 A.D.2d 47 (1st Dep't
   1960) ..............................................................................................29

*Mint, Inc. v. Iddi Amad*,
   2011 U.S. Dist. LEXIS 49813 (S.D.N.Y. May 9, 2011)......................54

*NFL v. Primetime 24 Joint Venture*,
   131 F. Supp. 2d 458 (S.D.N.Y. 2001)...............................................48

*Palladium Music, Inc. v. Eatsleepmusic, Inc.*,
   398 F.3d 1193 (10th Cir. 2005) ..................................................27, 30

*Petrella v. MGM*,
   134 S. Ct. 1962 (2014)......................................................................40

*In re Porter*,
   498 B.R. 609 (Bankr. E.D. La. 2013) ...............................................31

*Psihoyos v. Pearson Educ., Inc.*,
   855 F. Supp. 2d 103 (S.D.N.Y. 2012)..........................................43, 45

*Quintanilla v. Texas TV, Inc.*,
    139 F.3d 494 (5th Cir. 1998) ............................................................ 32-33

*Random House, Inc. v. Rosetta Books LLC*,
    283 F.3d 490 (2d Cir. 2002)....................................................................19

*RCA Mfg. Co. v. Whiteman*,
    28 F. Supp. 787 (S.D.N.Y. 1939), *rev'd on other grounds*, 114 F.2d 86 (2d
    Cir. 1940) ...............................................................................................29

*Recht v. MGM Studio, Inc.*,
    580 F. Supp. 2d 775 (W.D. Wis. 2008) ...................................................21

*Register.com, Inc. v. Verio, Inc.*,
    356 F.3d 393 (2d Cir. 2004)....................................................................53

*Reservoir Media Mgmt. v. Craze Prods.*,
    2015 U.S. Dist. LEXIS 130423 (S.D.N.Y. Sep. 28, 2015)................21, 33

*Rodgers & Hammerstein Org. v. UMG Recordings Inc.*,
    2001 U.S. Dist. LEXIS 16111 (S.D.N.Y. Sep. 25, 2001) ........................35

*Rovio Entm't, Ltd. v. Allstar Vending, Inc.*,
    97 F. Supp. 3d 536 (S.D.N.Y. 2015)........................................................53

*Salinger v. Colting*,
    607 F.3d 68 (2d Cir. 2009).......................................................................54

*Schwabenbauer v. Bd. of Educ.*,
    667 F.2d 305 (2d Cir. 1981).....................................................................18

*Semetex Corp. v. UBAF Arab Am. Bank*,
    853 F. Supp. 759 (S.D.N.Y. 1994) ..........................................................18

*Senno v. Elmsford Union Free Sch. Dist.*,
    812 F. Supp. 2d 454 (S.D.N.Y. 2011).......................................................18

*Simmons v. Stanberry*,
    810 F.3d 114 (2d Cir. 2016).....................................................................41

*Sony/ATV Publ'g, LLC v. Marcos*,
    651 F. App'x 482 (6th Cir. 2016) ............................................................34

*Stumm v. Drive Entm't, Inc.*,
    2001 U.S. Dist. LEXIS 21675 (S.D.N.Y. Dec. 27, 2001) ........................50

*Systems XIX, Inc. v. Parker*,
    30 F. Supp. 2d 1225 (N.D. Cal. 1998) .....................................................33

*T.B. Harms Co. v. JEM Records, Inc.*,
   655 F. Supp. 1575 (D.N.J. 1987) .........................................................................28

*TechnoMarine SA v. Giftports, Inc.*,
   758 F.3d 493 (2d Cir. 2014)................................................................................52

*Total Control Apparel, Inc. v. DMD Int'l Imps.*,
   LLC, 409 F. Supp. 2d 403 (S.D.N.Y. 2006) ........................................................42

*Travelers Ins. Co. v. Broadway W. St. Assocs.*,
   164 F.R.D. 154 (S.D.N.Y. 1995) .........................................................................20

*TufAmerica, Inc. v. Codigo Music LLC*,
   162 F. Supp. 3d 295 (S.D.N.Y. 2016)..................................................................30

*U2 Home Entm't, Inc. v. Lai Ying Music & Video Trading, Inc.*,
   2005 U.S. Dist. LEXIS 9853 (S.D.N.Y. May 25, 2005)......................................50

*U2 Home Entm't, Inc. v. Wei Ping Yuan*,
   245 F. App'x 28 (2d Cir. 2007) ...........................................................................47

*Ulloa v. Universal Music & Video Distrib. Corp.*,
   303 F. Supp. 2d 409 (S.D.N.Y. 2004).............................................................32, 44

*UMG Recording v. Escape Media Grp.*,
   2014 U.S. Dist. LEXIS 137491 (S.D.N.Y. Sept. 29, 2014).................................20

*UMG Recordings, Inc. v. MP3.com, Inc.*,
   92 F. Supp. 2d 349 (S.D.N.Y. 2000)....................................................................21

*Viacom, Int'l Inc. v. Fanzine Int'l, Inc.*,
   2001 U.S. Dist. LEXIS 11925 (S.D.N.Y. Aug. 15, 2001) ...................................49

*Walkovsky v. Carlton*,
   18 N.Y.2d 414 (1966) ..........................................................................................52

*Weinstein Co. v. Smokewood Entm't Grp.*,
   664 F. Sup. 2d 332 (S.D.N.Y. 2009)....................................................................42

*William Wrigley Jr. Co. v. Waters*,
   890 F.2d 594 (2d Cir. 1989).................................................................................51

*Woods v. Bourne Co.*,
   60 F.3d 978 (2d Cir. 1995)...................................................................................25

*WPIX, Inc. v. ivi, Inc.*,
   765 F. Supp. 2d 594 (S.D.N.Y. 2011)..................................................................53

*WPIX, Inc. v. IVI, Inc.*,
   691 F.3d 275 (2d Cir. 2012).............................................................................52, 54

*Yesh Music, LLC v. Amazon.com., Inc.*,
   2017 U.S. Dist. LEXIS 54417 (E.D.N.Y. Apr. 8, 2017) ........................................26

**Statutes**

17 U.S.C. § 101...............................................................................................25, 32

17 U.S.C. § 106........................................................................................................20

17 U.S.C. § 106(1)...................................................................................................21

17 U.S.C. § 106(2).............................................................................................21, 30

17 U.S.C. §§ 106(3)..........................................................................................11, 36

17 U.S.C. § 115(a)............................................................................................29, 33

17 U.S.C. § 115(a)(1)...............................................................................................28

17 U.S.C. § 115(b)(1)..............................................................................................26

17 U.S.C. § 115(b)(2)..........................................................................................2, 44

17 U.S.C. § 201(a)....................................................................................................31

17 U.S.C. § 202.................................................................................................21, 32

17 U.S.C. § 301(c)....................................................................................................33

17 U.S.C. § 502(a)....................................................................................................52

17 U.S.C. § 504(c)....................................................................................................47

17 U.S.C. § 507(b)....................................................................................................40

17 U.S.C. § 1101(a)..................................................................................................29

Cal. Penal Code § 653u............................................................................................29

N.Y. Penal Law § 275.15..........................................................................................29

**Rules and Regulations**

Fed. R. Civ. P. 25(c).................................................................................................20

37 CFR 201.18..........................................................................................................26

37 CFR § 201.18(d)(v)(E)..........................................................................................26

**Other Authorities**

Theodore Z. Wyman, Annotation, *Enforceability of Synchronization Rights and Licenses in Copyrighted Music*, 84 A.L.R. Fed. 2d 345 (2014) ..............................................23

*https://www.harryfox.com/license_music/what_is_mechanical_license.html* (last visited Aug. 25, 2017)..........................................................................................35

2 Melville B. Nimmer & David Nimmer, Nimmer on Copyright § 8.04[E][2] n.88 (2017)..........................................................................................29, 34

3 Melville B. Nimmer & David Nimmer, Nimmer on Copyright § 12.05[B][1][b] (2017)..........................................................................................41

6 Melville B. Nimmer & David Nimmer, Nimmer on Copyright § 30.03 (2017)....................1, 19

Plaintiffs/Counter-Defendants respectfully submit this memorandum of law (i) in support of their motion for summary judgment on liability, for a finding that Defendants' infringement is willful, and for a permanent injunction, and (ii) in opposition to Defendants/Counterclaimants' motion for summary judgment.

## PRELIMINARY STATEMENT

Defendants have built a business on copyright infringement.  They physically acquired thousands of bootleg concert tapes that they knew had not been authorized by either the music publisher Plaintiffs whose iconic musical compositions are embodied in those recordings,[1] or by the artists whose performances are captured in the recordings.  Defendants nevertheless digitized, remixed and mastered those recordings, and made them and the musical works embodied therein commercially available for paid download and subscription-based on-demand streaming online in both audio and audiovisual format, all without a proper license.

After they began receiving cease and desist demands from a variety of music publishers and performing artists, Defendants attempted to launder their bootleg concert tapes.  They made cosmetic efforts to obtain licenses to reproduce and distribute the musical works in those tapes (known as "mechanical" licenses) purportedly under the compulsory licensing provisions of Section 115 of the Copyright Act ("Section 115").

Defendants knew, however, that the tapes in their collection were not eligible for mechanical licenses, because (i) they were initially recorded without the consent of either the

---

[1] A musical composition, which consists of lyrics, melody, harmony, instrumentation and tempo, is protected by a copyright that is independent of the copyright in a recording of a specific performance of that composition.  *See* 6 Melville B. Nimmer & David Nimmer, Nimmer on Copyright § 30.03 ("Nimmer") ("Copyright ownership of the physical embodiment of the performance of a musical composition . . . is distinct from the ownership of the copyright in the musical composition itself . . . .").  Thus, exploitation of a sound recording requires a license from both the owner of the underlying composition (typically a music publisher, such as Plaintiffs) and from the owner of the recording (typically a record label).

performing artists or the owners of the underlying musical works (*i.e.*, Plaintiffs or their predecessors) making them ineligible for compulsory licenses under Section 115, and (ii) the plain language of Section 115 has no application to exploitation of musical works embodied in audiovisual form, as Defendants have done with the majority of Plaintiffs' musical works.

Moreover, even if Defendants' exploitations of Plaintiffs' musical works were eligible for licensing under Section 115, Defendants began exploiting the concert recordings long before they served statutorily-required notices of intention to obtain a compulsory license ("NOIs") in direct contravention to the statute's express requirements.  Under Section 115, failure to serve timely NOIs "forecloses the possibility of a compulsory license" and "renders the making and distribution of phonorecords actionable as acts of infringement . . . ."  17 U.S.C. § 115(b)(2).  To cover up the fact that their notices were untimely, Defendants intentionally misrepresented in the NOIs they sent to Plaintiffs the date on which they began exploiting the recordings.  Defendants' misdeeds, however, cannot mask a simple truth:  Defendants have not obtained appropriate licenses for their uses of Plaintiffs' musical works.

Caught red-handed, Defendants attempt to manufacture an argument that they had an "implied license" based on unsolicited payments they made to Plaintiffs.  But those payments were expressly made pursuant to Defendants' fraudulent NOIs, and pursuant to purported mechanical licenses that did not exist given that Defendants' concert tapes were ineligible for such licenses and given Defendants' failure to comply with the statutory and regulatory requirements of Section 115.  Defendants' implied license and estoppel defenses are thus unsupported by statute, regulation or case law, and are barred by Defendants' unclean hands.

Defendants are infringing Plaintiffs' musical works on a massive scale.  Yet, even after Plaintiffs commenced this action, Defendants doubled down on their infringement, adding

dozens of additional bootleg recordings of Plaintiffs' musical works to their websites, and launching a new mobile streaming platform to ramp up their exploitation of Plaintiffs' works. Defendants attempted to conceal the scope of their infringements by falsely claiming during discovery that they have no records of downloads more than three years before this lawsuit was filed, and failing to provide any discovery whatsoever as to some 600 recordings of Plaintiffs' works that were being exploited on Defendants' websites.  This, combined with Defendants' awareness that their conduct violated the Copyright Act, fully warrants a finding that Defendants' infringements are willful, and are therefore subject to enhanced statutory damages. It also warrants the imposition of a permanent injunction to prevent Defendants from continuing to willfully infringe Plaintiffs' famous musical works.

## **FACTUAL BACKGROUND**

I.   **Defendants purchase thousands of bootleg concert recordings that were created without the consent of the performing artists, songwriters or music publishers.**

A.   **Defendants acquire the physical archives of concert promoter Bill Graham.**

In the early 2000s, Defendant William Sagan, who had been involved with a music licensing company, Music Interactive (Plaintiffs' Statement of Material Undisputed Facts ("SMF") ¶ 9), began purchasing collections of bootleg concert tapes from a variety of concert promoters and venue operators.  To act as a vehicle for those acquisitions, Sagan founded Defendant Norton LLC and became its president, CEO and sole owner.  (*Id.* ¶ 10.)

Sagan's first acquisition occurred in July 2002, when Norton acquired Bill Graham Archives LLC ("BGA") from SFX Entertainment.[2]  (SMF ¶ 11.)  BGA owned the archives of the late concert promoter, Bill Graham, which included numerous concert recordings, posters and memorabilia.  The recordings in BGA's collection were primarily "soundboard tapes," meaning

---

[2] SFX itself had been acquired by ClearChannel in 2000.

they were recordings of the audio signal that was broadcast over the house speakers during live performances at the concert venue.  (*Id.* ¶ 12.)  The video footage was recorded from the signal that was being captured by fixed-position cameras and projected onto large screens at the given venue.  (*Id.* ¶ 13.)  Prior to his death in 1991, Graham had discussed donating his archives, including the concert tapes, to the Oakland Museum.  (*Id.* ¶ 14.)

Defendants conducted extensive legal due diligence in connection with their acquisition of BGA (SMF ¶ 15), and were advised by several attorneys with experience in the music industry who were "generally familiar with the types of rights that would go with audio and audiovisual works."  (*Id.*)

Defendants' purchase agreement with SFX made clear that Defendants were acquiring only physical concert recordings, without rights from either the artists whose performances are contained in the recordings, or the owners of the musical compositions embodied in the recordings.  (SMF ¶ 16.)  The BGA purchase agreement was a quitclaim transfer – providing that Defendants were acquiring ████████████████████████████████████████████ ████████████████████████████████████████████████████████ (*Id.* ¶ 17) (emphasis added), and the seller made ██████████████████████████████████ ████████████████████████████████████████████████████████████ ██████████ (*id.*).  Moreover, a side letter given to Defendants in connection with the BGA acquisition stated that ████████████████████████████████████████████████ ████████████████████████████████ (SMF ¶ 18.)

Accordingly, Defendants admitted they have no artist performance contracts that might have permitted Bill Graham or his affiliates to record the concerts, and Defendants do not know whether any such contracts ever existed.  (SMF ¶ 19.)  Defendants similarly have no knowledge

4

of the circumstances under which the Bill Graham recordings were originally made or as to whether Graham even informed the artists that their performances would be recorded.  (*Id.*)[3]

Defendants learned from a number of other sources as well that they had no rights to exploit the Bill Graham concert recordings they purchased.   An appraisal report that was included in Defendants' closing binder warned that ██████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████  (SMF ¶ 21) (emphasis added).

A document that was provided to Sagan at the time of the BGA acquisition (SMF ¶ 22) similarly stated that ████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████  (*Id.*) (emphasis added).   Another section explained ████████

████████████████████████████████████████████████

██████████████████████████  (*Id.*) (emphasis added).

Nicholas Clainos, who worked for Bill Graham's companies since the 1970s and became the president of those companies after Graham's death, testified that the ████████████████

████████████████████████████████████████████████

████████████████████████████  (SMF ¶ 23.)  Clainos explained that ████████████

████████████████████████████████████████████████

---

[3]  In contrast to the absence of any performance agreements for the concert recordings of Plaintiffs' Musical Works, when Defendants themselves record musical performances by independent artists for exploitation, ██████████████████████████████████████████
████████████████████████████████  (SMF ¶ 20.)

the right to use [the recordings]." (*Id.*)  Indeed, during a 2011 lawsuit in which Defendants were involved, Clainos submitted a declaration stating that "[w]hile Graham was alive, [Graham's company] did not generally financially exploit the archives, primarily due to concerns regarding artists' rights (e.g. if a concert was recorded, a question arises whether the Companies can exploit that recording financially without the artist's consent.)  The Companies financially exploited the archives only with the artists' consent and on a limited basis." (*Id.* ¶ 24.)

Michael Krassner, an attorney who represented SFX in connection with its sale of the Bill Graham archives to Defendants, explained to Sagan at the time that SFX "did not have any rights to exploit the audiovisual works." (SMF ¶ 25.)  Krassner discussed with Sagan's attorneys "needing to get record company and artist approval" in order to exploit the recordings (*id.*), and that "your client [*i.e.*, Sagan] needs to know that he may be buying the world['s] greatest private collection [of recordings] that no one will ever hear." (*id.*)  Krassner emphasized that Graham's companies "did not own the rights to materially exploit the audiovisual [recordings] without getting the rights from probably record companies and artists, and that was communicated to every buyer, every potential buyer[.]" (*Id.*)

### B.   Defendants acquire more than a dozen other collections of bootleg concert recordings.

Following Defendants' acquisition of BGA in 2002, and continuing to 2015, Defendants acquired at least a dozen other collections of bootleg concert tapes, which ███████ ███████ the number of recordings in their collection.  (SMF ¶ 26.)[4]  While Defendants may have invested "tens of millions of dollars in acquiring historic concert and other live music

---

[4] A spreadsheet produced by Defendants as BGA038668 showing the source of each of the concert recordings embodying one of the musical works at issue (the "Musical Works" or "Works") is attached as Exhibit 11 to the supporting Declaration of Tal E. Dickstein, dated September 14, 2017 ("Dickstein Decl.").

recordings" (Defs. Br. 3), the sheer size of their investment does not legitimize their reckless, unlawful exploitation of Plaintiffs' Musical Works.

As with the Bill Graham recordings, Defendants acquired only physical audio and audiovisual recordings from these other sources.  Defendants acknowledge that the owners of the musical works contained in the concert tapes did not consent to the recordings of those performances.  (SMF ¶ 27.) ███████████████████████████████████████ ████████████████████████████████████████ (*id.* ¶ 28), Defendants once again do not have a single artist agreement permitting their predecessors to record the concert performances.

Defendants even prepared a form performer agreement, which would ███████ ██████████████████████████████████████████████████████████████ ████████████████████████████████ However, not a single performing artist has signed that form agreement.  (*Id.*)

Indeed, there is substantial evidence that artists whose performances are contained in the recordings that Defendants acquired did *not* consent to the recording of those performances.  Most notably, none of the three performing artists whom Defendants sought to depose stated that they gave permission to record their concert performances for exploitation by Defendants or their predecessors.  (SMF ¶ 30.)  Other evidence that performing artists in fact did not consent to the recording of their performances includes the following:

- Defendants' agreement with Thomas Bradshaw, who operated the Great American Music Hall, provides that ██████████████████████████████████████████████████ ██████████████████████████████████████████████████████████████ (SMF ¶ 31) (emphasis added).  There is no evidence those approvals were ever obtained.

- An exhibit to Defendants' purchase agreement with King Biscuit Entertainment and related entities lists artists who purportedly consented to the commercial release of their concert recordings – but the only performing artists at issue here that appear on that list are ████ ███████, and Defendants have produced no actual agreement with that group.  (SMF ¶ 32.)

- David Hewitt, an individual from whom Defendants purchased a collection of concert recordings, acknowledged that he had no written agreements permitting him to record those performances.  (SMF ¶ 33.)  Indeed, some performers may not have even been aware that Hewitt was recording their performance, as he recorded the concerts from a truck parked outside the concert venue (*id*).  Defendants never even asked Hewitt whether the performers were aware that he was recording their performances.  (*Id.*)

- Defendants purchased a collection of concert recordings from Festival Network in 2009, yet the 2006 agreement whereby Festival Network acquired those recordings provided that Festival Network's predecessor █████████████████████████████████████ ██████████████████████████████████████████████████████████ (SMF ¶ 34) (emphasis added).  Sagan claims he asked Festival Network for copies of any performance agreements, but he never received any.  (*Id.*)

- Defendants purchased a collection of recordings from an investment company named Plainfield Music, Inc.  (SMF ¶ 35.)  Yet, the agreement whereby Plainfield acquired those recordings from the concert promoter John Scher states that Plainfield would █████ ████████████████████████████████████████████████████████████████ ██████████████████████████████ (*Id.*) (emphasis added).  Defendants have produced no evidence that any such consents were ever obtained, and Plainfield even told Defendants that they had no agreements with performing artists.  (*Id.*)

- When Defendants applied to register copyrights in the remixes of the concert recordings they had acquired, they were repeatedly asked by the Copyright Office for written confirmation that the performing artists had authorized the recording of their performances (SMF ¶ 36), yet Defendants have produced no such written authorizations.

## II.   Defendants begin to commercially exploit their bootleg concert recordings online through paid downloads and on-demand streaming.

Despite knowing that neither the performing artists nor the owners of the underlying musical compositions had authorized the concert performances to be recorded or later exploited, Defendants devised a plan to commercially exploit their bootleg concert recordings by making both audio and audiovisual versions of those recordings available for digital download and on-demand (or "interactive") streaming.  Defendants claim that, before making their recordings available online, they "did extensive diligence on exactly what was required to publish and pay the appropriate rights holders" (SMF ¶ 37), including discussing ██████████████████ ████████████████████████████████████████████████████████████████████████

████████████████████████   Defendants have been advised by intellectual property counsel Michael Elkin since at least 2007.  (*Id.* ¶ 38).

In 2006, Defendants first made about ███ concert recordings available for interactive streaming on their website WolfgangsVault.com and for download on ConcertVault.com.  (SMF ¶ 39.)   Defendants have since launched or acquired other music websites – including Wolfgangs.com, Daytrotter.com, MusicVault.com and a Music Vault channel on YouTube (collectively, with WolfgangsVault.com and ConcertVault.com, the "Websites") – where they make their bootleg concert recordings available for paid download and on-demand streaming, in both audio and audiovisual format.  (*Id.* ¶ 40.)[5]

As Defendants acquired additional collections of bootleg concert tapes over the years, they rapidly expanded the number of recordings available on their Websites.   In 2010, Defendants were adding recordings to their Websites at a rate of about ███ songs per month, and Defendants have continued adding recordings to their websites as recently as March 2017.  (SMF ¶ 41.)  As of November 2016, Defendants had over ██████ individual songs available on their Websites.  (*Id.* ¶ 42.)  By July 2017, that number had grown to ██████.  (*Id.*)

Defendants generate revenue from their Websites in a number of ways.  In 2014 or 2015, Defendants began charging users a fee of $5-$10 per concert download.   (SMF ¶ 43.) Defendants also offer paid subscriptions, whereby approximately █████████ subscribers each pay $39 per year for unlimited interactive streaming.  (*Id.* ¶ 44.)  Defendants also sell both banner and video advertisements that appear on their Websites (*id.* ¶ 45), and, because Defendants also sell physical concert merchandize on Wolfgangs.com, that website is "one big advertisement."  (*id.* ¶ 46).

---

[5] A spreadsheet produced by Defendants as BGA038680 showing the dates when each recording at issue was published to Defendants' Websites is attached as Exhibit 43 to the Dickstein Decl.

Defendants have exploited more than ███ **_recordings_** containing Plaintiffs' Musical Works in audio or audiovisual format (SMF ¶ 47), by selling more than ███ **_downloads_** of those recordings (_id._) and streaming those recordings more than ███ **_times._** (_id._) Defendants have shown no signs of curtailing their infringing activity. This past May, Defendants launched a mobile platform that makes Defendants' entire collection of 500,000 bootleg concert recordings available for on-demand streaming to Defendants' paying subscribers on their mobile devices, touting that their collection is "still growing." (_Id._ ¶ 48.)

In order to make their bootleg concert recordings available for digital exploitation, Defendants implemented a "digital transfer and restoration plan for each tape and transferr[ed] the recordings from the tape into digital format." (SMF ¶ 49.) They then engaged in "mixing and/or mastering the files . . . creating mp3 files for download and on-demand streaming; backing up all of this work to our RAID storage system and to offline digital tapes; and publishing the mp3 files and catalog information to the WV Defendants' Websites." (_Id._)

Defendants also manufacture physical records containing certain of Plaintiffs' Works, including a vinyl album that includes the song "Moondance" by Van Morrison, and a vinyl album that includes a John Denver performance of James Taylor's "Fire and Rain." (SMF ¶ 50.)



Sagan, who owns ███ of the corporate Defendants Norton and BGA, has ███ ███████████████████ over all of the activities of those entities (SMF ¶ 51), including deciding ████████████████████████████████████████████ ██████████████████████ (_Id._)

### III.   Defendants serve fraudulent and invalid notices of intention to obtain compulsory mechanical licenses.

Defendants knew that, in order to exploit their collection of bootleg concert tapes, they had to obtain licenses from the songwriters or music publishers that own the underlying musical

works.  (SMF ¶ 52.)  Since at least 2002, Defendants 

(*Id.* ¶ 53.)  In an October 2003 email,

Sagan acknowledged that Defendants' ability to exploit their collection of concert recordings

was

(*Id.* ¶ 54.)

In a superficial effort to obtain licenses for the musical compositions embodied in their

recordings, Defendants invoked Section 115.  As discussed more fully below, *infra* 22-34, that

provision permits the exploitation of musical works in phonorecords (audio-only recordings),

*provided*, among other things, (i) the original recordings were "fixed lawfully" with the consent

of the performing artists and a license from the owners of the underlying musical works, (ii) the

prospective licensee serves NOIs on the owner of the musical works *before* distributing copies of

the recordings, and (iii) the NOIs specify the expected date of first distribution.  *See* 17 U.S.C.

§ 115.[6]  Sagan knew before this lawsuit was filed that there was a specific time frame within

which NOIs had to be sent (SMF ¶ 55), and Defendants' Matthew Lundberg had reviewed the

federal regulations governing NOIs under Section 115.  (*id.*)

Defendants engaged two vendors, RightsFlow and MediaNet, to process and transmit

NOIs at Defendants' direction.  (SMF ¶ 56.)  However, Defendants acknowledged in their

agreements with those vendors that Defendants would remain

---

[6] *See generally Blagman v. Apple, Inc.*, 2014 U.S. Dist. LEXIS 45401, at *15 (S.D.N.Y. Mar. 31, 2014 ("The Copyright Act grants the owners of copyrights in non-dramatic music compositions the exclusive rights to reproduce and distribute their copyrighted songs and to authorize others to engage in such activity.  17 U.S.C. § 106(1), (3).  These rights are often called the 'mechanical rights' and are governed by the mechanical licensing process.").

██████████████████████████████ (*id.* ¶ 57) (emphasis added) and that, if any

compositions ███████████████████████████████████████████████

████████████████████████████████████████████████████████████

██████████████████████████████████████ (*id.*)   Because

Defendants knew that they had started exploiting their collection of recordings without sending

NOIs – which violates Section 115 – Defendants asked RightsFlow to agree to indemnify them

for any copyright infringement claims, but RightsFlow refused.  (*Id.* ¶ 58.)

Defendants finally began sending NOIs to Plaintiffs and other music publishers in 2013,

years after they first began offering downloads and on-demand streams of concert recordings on

their Websites.  Defendants' NOIs were deficient in several respects.  <u>First</u>, as discussed above,

there is no evidence that the artists whose performances are captured in Defendants' bootleg

recordings, or the music publishers that own the copyrights in the underlying Musical Works,

consented to the initial recording of those performances.

<u>Second</u>, for all but five recordings of Plaintiffs' Musical Works, Defendants transmitted

NOIs months or even *years* after they began exploiting the recordings, and for more than one

hundred recordings, Defendants have not transmitted any NOIs at all.[7]  Even for the five

recordings where Defendants served a timely NOI, they were late in serving NOIs for other

recordings of the same Musical Works.  Thus, Defendants have distributed at least one recording

of each Musical Work at issue before serving an NOI, or without serving an NOI at all.

Indeed, Defendants have acknowledged that it was their *practice* to begin distributing

concert recordings before serving NOIs for the corresponding recordings.   (SMF ¶ 60.)

---

[7] A spreadsheet comparing the dates of Defendants' NOIs with the dates when Defendants first
offered the relevant recording for stream or download (as shown in documents produced by
Defendants) is attached to the Dickstein Decl. as Exhibit 52.

Although Defendants' Matthew Lundberg testified that it was a "common industry practice" to send NOIs after exploiting the relevant recordings (*id.* ¶ 61), he could not say where he gained that supposed understanding, or identify any other companies that follow that supposed "industry practice" (*id.*), which contravenes the plain language of Section 115.

<u>Third</u>, to cover up the fact that they had been distributing recordings of Plaintiffs' Musical Works long before they sought compulsory licenses, Defendants fraudulently misrepresented in their NOIs the date on which they began distributing the recordings.[8] (SMF ¶ 62). In each of their NOIs, Defendants represented that they began distributing the subject recording on the same date as the NOI itself, even though Defendants' own documents show that Defendants began exploiting those recordings months or even years earlier. (*Id.*) Defendants were unable to explain the discrepancy between the date of first distribution in their NOIs and the date of first download or stream in Defendants' own documents. (*Id.*)

Defendants also claim to have obtained mechanical licenses from The Harry Fox Agency ("HFA"), which issues compulsory Section 115 licenses for specific audio-only recordings, with slight variances from the statutory regime in the frequency and method of payment. (Defs. Br. 6-7, 14.) However, only a small fraction of the Musical Works at issue are even listed on the HFA spreadsheet that Defendants rely upon. (SMF ¶ 63.)[9] Of the nearly 200 Musical Works at issue, 180 have at least one recording that does not appear on the HFA license spreadsheet. (*Id.*) In any event, because Defendants' bootleg concert recordings are not eligible for Section 115 licenses, and Defendants otherwise failed to comply with the requirements of Section 115, they are not eligible for HFA licenses either.

---

[8] Defendants' NOIs stated that the recordings were first distributed on the same date as the NOI.

[9] The HFA spreadsheet lists "King Biscuit Records LLC" as the "Manufacturer" (*id.*), yet Defendants have not provided any evidence that they themselves received any HFA licenses.

**IV.   Defendants receive numerous cease and desist demands from musical composition owners.**

As Defendants continued expanding the concert recordings available on their Websites, they started receiving a litany of cease and desist demands putting Defendants on notice that their exploitation of bootleg concert recordings infringed the rights of songwriters and music publishers, because (i) Defendants NOIs were sent after they started distributing the applicable recordings, (ii) the performing artists and music publishers had not consented to the recording in the first place, and (iii) compulsory mechanical licenses under Section 115 are not available for audiovisual recordings.   For example:

- In August 2013 and again in August 2014, Plaintiff ABKCO Music, Inc.'s counsel wrote to Defendants demanding that they cease exploiting a video recording of a 1981 Rolling Stones concert because, among other things, ███████████████████████████████████████████████████████████████████████████████████████████████████████████ (SMF ¶ 64.)

- In March 2013, attorneys for songwriter Jean-Luc Ponty and his music publishing company demanded that Defendants cease exploiting video recordings of three of Ponty's concerts, explaining that Ponty's publishing company ███████████████████████████████████████ (SMF ¶ 65.)

- In May 2014, Defendants received an email from a music publisher demanding that they remove certain recordings from their Websites, stating ████████████████████████████████████████████████████ (SMF ¶ 66.)

- In July 2014, representatives of the songwriter Carlos Santana wrote to Defendants questioning their authority to distribute a video of one of Santana's concerts, stating ████ ████████████████████████████████████████████████ (SMF ¶ 67.)

- Beginning in August 2014 when Defendants launched their Music Vault channel on YouTube, Defendants received a "flurry" of demands that concert videos on that page be taken down because of alleged copyright infringement.   (SMF ¶ 68.)   To prevent their channel from being suspended for an excessive number of copyright claims, Defendants were forced to divide their content among sub-channels.   (*Id.*)

- In August 2014, Defendants received a letter from an attorney for the publishers for songwriters and performers Chuck Mangione and Robert Palmer, demanding that Defendants

not release recordings of Mangione's and Palmer's concerts because they 

(SMF ¶ 69.)

- In January 2015, Defendants received an email from an attorney representing songwriter Patti Smith and her publishing company, stating that they had received from Defendants ███████ ███████████████████████████████████████████████████████ (SMF ¶ 70.)

- In November 2016, Jean-Luc Ponty's representatives again demanded that Defendants cease distributing videos of Ponty's concerts, explaining once again that Ponty's publishing company had ████████████████████████████████████████████████ (SMF ¶ 71.)

In spite of this repeated notice, Defendants have continued to operate their Websites and exploit Plaintiffs' Musical Works without a proper license.

## **PROCEDURAL HISTORY**

### I.  **Defendants falsely claim to have written agreements with artists.**

Plaintiffs filed this action on May 27, 2015, claiming Defendants infringed Plaintiffs' copyrights in approximately 200 Musical Works by downloading, streaming and otherwise exploiting those works on their Websites without Plaintiffs' consent. (Dkt. 1, 43.)

Defendants answered the Complaint and asserted counterclaims seeking a declaration that their streaming, downloading and distribution of physical media does not infringe Plaintiffs' rights, and that they do not need synch licenses to exploit audiovisual works. (Dkt. 12.)[10]

In their answer, Defendants alleged that "all of the recordings which make up Defendants' collection were created (and have been exploited) with permission and proper legal consent from the various artists who controlled the copyrights in the musical compositions they

---

[10] Defendants also asserted a third-party claim against Plaintiffs' trade association, the National Music Publishers' Association ("NMPA"), and its president, David Israelite, contending that an NMPA press release announcing the filing of this action constituted defamation. The Court dismissed that claim under New York's fair reporting privilege in May 2016. (Dkt. 44.)

performed."  (Dkt. 12 at 21, 28 ¶¶ 4, 50.)  Defendants similarly represented in their Rule 26(a)(1) Initial Disclosures that they had written "[l]icense agreements, including but not limited to agreements between and among [Defendants] and . . . the artists whose musical compositions and/or recordings [Plaintiffs] now allege to control."  (SMF ¶ 72.)

It became clear, however, that Defendants' representations were false, as Defendants have produced no such artist agreements in discovery.  Indeed, Defendants sought to depose various performing artists on the theory that they had somehow granted an "implied" license to record their concerts at the time of their musical performances.  (*See*, *e.g.*, Dkt. 106.)  Tellingly, no evidence of any such implied licenses has materialized.  Indeed, sworn declarations from two of the artists at issue – David Byrne of the Talking Heads and Keith Richards of the Rolling Stones – explain that they did *not* grant permission to record or exploit any of their concert performances at issue.  (SMF ¶ 73.)

## II.   Defendants conceal evidence of the scope of their infringements.

Because the date when Defendants began distributing recordings of Plaintiffs' Musical Works is relevant to whether Defendants' NOIs were timely, Plaintiffs demanded as early as December 2016 that Defendants identify the dates when any recordings containing Plaintiffs' Works had been downloaded from Defendants' Websites.  (Dkt. 59 at 5 § VI.)  Incredibly, Defendants represented to the Court that they had no records of downloads prior to May 27, 2012, which is (not coincidentally) three years before the Complaint was filed.  (Dkt. 60 at 6-7 § D.)  Based on that representation, the Court denied Plaintiffs' motion to compel.  (Dkt. 61 ¶ 5.)

However, Defendants later testified that Defendants *do*, in fact, maintain records as to when each recording in their collection was downloaded from their Websites *from inception*. (SMF ¶ 74.)  After Plaintiffs alerted the Court that Defendants' representations were contradicted by the testimony of their own witness (Dkt. 102), Defendants finally updated their discovery

production with evidence of more than ▮▮▮ additional recordings containing Plaintiffs' Musical Works that had been downloaded from Defendants' Websites before Defendants began sending NOIs in 2013, thereby revealing thousands more acts of infringement.  (SMF ¶ 73.)

Moreover, although the Complaint asserted infringement of *musical works* (Dkt. 1) and Plaintiffs sought discovery as to any exploitation of those *works*, Plaintiffs initially produced discovery only as to a limited number of "non-exhaustive" *recordings* of those works listed in an exhibit to the Complaint.  (Dkt. 1 ¶¶ 65, 69, 74, 82, 89; Dkt. 43-1.)  Magistrate Judge Pitman recognized that Defendants' interpretation of Plaintiffs' pleading and discovery demands was unreasonable, and directed Defendants to provide discovery with respect to *any* recordings of Plaintiffs' Works being exploited by Defendants.  (2/14/17 Hrg. Tr. [Dkt. 102] 56:19-57:4; Dkt. 85 ¶ 3.)  When Defendants finally did so in March and April 2017, they revealed that they had been exploiting another ▮▮▮ recordings of Plaintiffs' Works (including more than ▮▮ in audiovisual format), for a total of more than ▮▮▮ infringing recordings.  (SMF ¶¶ 47, 75.)

### III. Defendants expand their infringing conduct while this action is pending.

Despite receiving the cease and desist letters discussed above and despite the filing of this action, Defendants have continued to exploit Plaintiffs' Musical Works on their Websites and by selling newly pressed vinyl records.  (SMF ¶ 76.)  Indeed, in December 2016, Plaintiffs discovered that Defendants had added hundreds of recordings of Plaintiffs' Musical Works to their Websites while this action was pending.  (Dkt. 59 at 4 § IV.)  Even Defendants' own business records show that Defendants added ▮▮▮ recordings of Plaintiffs Musical Works to their Websites after this lawsuit was filed on May 27, 2015.  (SMF ¶ 77.)  And as noted above, Defendants launched a new mobile streaming platform in May 2017, touting that their collection of bootleg recordings is "still growing."  (*Id.* ¶ 48.)  Defendants have thus recklessly "doubled down" on their already massive infringements and show no sign of relenting.

## SUMMARY JUDGMENT STANDARD

The party moving for summary judgment under Rule 56 must demonstrate the absence of any genuine issue of material fact.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).  "An issue of fact is 'genuine' if the evidence is such that a reasonable jury could return a verdict for the non-moving party."  *Senno v. Elmsford Union Free Sch. Dist.*, 812 F. Supp. 2d 454, 467 (S.D.N.Y. 2011) (citing *SCR Joint Venture L.P. v. Warshawsky*, 559 F.3d 133, 137 (2d Cir. 2009)).  A fact is "material" if it might affect the outcome of the litigation under the governing law.  *Anderson v. Liberty Lobby*, 477 U.S. 242, 248 (1986).

"When the burden of proof at trial would fall on the nonmoving party, it ordinarily is sufficient for the movant to point to a lack of evidence to go to the trier of fact on an essential element of the nonmovant's claim."  *Cordiano v. Metacon Gun Club, Inc.*, 575 F.3d 199, 204 (2d Cir. 2009) (citing *Celotex Corp.*, 477 U.S. at 322-23).  The burden then shifts to the non-moving party to come forward with admissible evidence sufficient to support each essential element of the claim or defense.  *Celotex Corp.*, 477 U.S. at 324; *see Semetex Corp. v. UBAF Arab Am. Bank*, 853 F. Supp. 759, 767 (S.D.N.Y. 1994) (citing *Celotex Corp.*, 477 U.S. at 322).  "The nonmoving party cannot defeat summary judgment by 'simply showing that there is some metaphysical doubt as to the material facts,'" *McClellan v. Smith*, 439 F.3d 137, 144 (2d Cir. 2006) (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986)), it "must set forth significant, probative evidence on which a reasonable fact-finder could decide in its favor." *Senno*, 812 F. Supp. 2d at 467-68 (citing *Anderson*, 477 U.S. at 256-57).

Where, as here, the parties have filed cross-motions for summary judgment, each party must bear its burden as a movant on its respective motion, and as a non-movant on the opposing party's motion. *Schwabenbauer v. Bd. of Educ.*, 667 F.2d 305, 314 (2d Cir. 1981).

## <u>ARGUMENT</u>

**I.     There is no genuine dispute that Defendants have infringed Musical Works owned or controlled by Plaintiffs.**

"To establish infringement, two elements must be proven: (1) ownership of a valid copyright, and (2) copying of constituent elements of the work that are original." *Feist Publ'ns, Inc. v. Rural Tel. Serv. Co.*, 499 U.S. 340, 361 (1991).   Neither element of copyright infringement is seriously disputed here.

### **A.     Plaintiffs own or control the Musical Works at issue.**

An exclusive licensee has standing to sue for copyright infringement just like an owner of the infringed work.  *See Random House, Inc. v. Rosetta Books LLC*, 283 F.3d 490, 491 (2d Cir. 2002) (citing 17 U.S.C. § 501(b)).  Plaintiffs are either the owners or exclusive licensees of each of the nearly 200 Musical Works at issue (SMF ¶ 78), which are entitled to copyright protection separate and apart from the "master" recordings in which those Musical Works may be embodied.   6 Nimmer § 30.03 ("Copyright ownership of the physical embodiment of the performance of a musical composition . . . is distinct from the ownership of the copyright in the musical composition itself . . . .").

For each of the Musical Works at issue, Plaintiffs have provided a corresponding copyright registration, which raise a *prima facie* presumption of validity.  *See ABKCO Music, Inc. v. Sagan*, 2017 U.S. Dist. LEXIS 120171, at *13 (S.D.N.Y. July 31, 2017) ("because a certificate of copyright registration is <u>prima facie</u> evidence that the copyright is valid, a plaintiff's proffer of a certificate of copyright registration is sufficient to shift the burden of proving the invalidity of the copyright to the defendant").[11]   Plaintiffs have also provided songwriter

---

[11] Indeed, as Magistrate Judge Pitman noted in ruling on Plaintiffs' motion to compel responses to requests to admit their chain of title to the Musical Works at issue, "by stating that they lack

agreements and copyright transfer documents to show their "chain of title" to the Musical

Works, which Plaintiffs have been exploiting without challenge for years or even decades.[12]

### B.     Defendants have infringed Plaintiffs' copyrights in each of the Musical Works.

Nor is there any dispute that Defendants have engaged in widespread reproduction,

distribution, public performance and creation of derivatives of Plaintiffs' Musical Works.  *See* 17

U.S.C. § 106 (copyright owners have exclusive right "(1) to reproduce the copyrighted work in

copies or phonorecords; (2) to prepare derivative works based upon the copyrighted work; (3) to

distribute copies or phonorecords of the copyrighted work to the public . . ." and "(4) in the case

of . . . musical . . . works . . . to perform the copyrighted work publicly").

Defendants have offered more than ▮▮▮▮▮▮ *on-demand streams* and transmitted more

than ▮▮▮▮ *digital downloads* of more than ▮▮▮▮ *separate recordings* of Plaintiffs Musical

Works (SMF ¶ 47), each of which constitutes an act of infringement.  *See UMG Recording v.*

*Escape Media Grp.*, 2014 U.S. Dist. LEXIS 137491, at *56 (S.D.N.Y. Sept. 29, 2014) ("Each

time [defendant] streamed one of plaintiffs' song recordings, it directly infringed upon plaintiffs'

exclusive performance rights."); *Capitol Records, LLC v. ReDigi Inc.*, 934 F. Supp. 2d 640, 648-

50 (S.D.N.Y. 2013) ("Courts have consistently held that the unauthorized duplication of digital

music files over the Internet infringes a copyright owner's exclusive right to reproduce.").

---

sufficient information to admit or deny the requests, defendants effectively admit that they do
not, at this time, possess any independent basis to challenge the authenticity or accuracy of the
registration certificates identified in [Plaintiffs'] RFAs."  *Id.* at *13-14.   Moreover, Defendants
concede Plaintiffs' copyright ownership for purposes of Defendants' motion.  (Defs. Br. n. 2.)

[12] Rodgers & Hammerstein Holdings LLC ("R&H") recently acquired the Musical Works that
had been controlled by Imagem Music LLC.   (*See* Declaration of Victoria Traube, dated
September 14, 2017.)   Plaintiffs therefore respectfully ask that R&H be substituted as Plaintiff
for Imagem Music LLC.   *See* Fed. R. Civ. P. 25(c) ("if an interest is transferred" the court, on
motion, may order "the transferee to be substituted in the action"); *Dollar Dry Dock Sav. Bank v.*
*Hudson St. Dev. Assocs.*, 1995 U.S. Dist. LEXIS 9672, at *10, 12 (S.D.N.Y. July 11, 1995);
*Travelers Ins. Co. v. Broadway W. St. Assocs.*, 164 F.R.D. 154, 164 (S.D.N.Y. 1995).

Defendants also made numerous unauthorized copies of Plaintiffs' Musical Works by digitizing, mixing, mastering and creating mp3 and backup copies of concert recordings containing those works (SMF ¶ 49) – each of which violates Plaintiffs' exclusive rights of reproduction and creation of derivative works.  *See UMG Recordings, Inc. v. MP3.com, Inc.*, 92 F. Supp. 2d 349, 350 (S.D.N.Y. 2000) (granting summary judgment against defendant who "copied [plaintiffs'] recordings onto its computer servers so as to be able to replay the recordings for its subscribers"); *Reservoir Media Mgmt. v. Craze Prods.*, 2015 U.S. Dist. LEXIS 130423, at *18 (S.D.N.Y. Sep. 28, 2015) (creating a sound recording constitutes creation of a derivative work of the underlying musical composition) (citing 17 U.S.C. § 101 and 6 William F. Patry, *Patry on Copyright* § 22:186)); *Recht v. MGM Studio, Inc.*, 580 F. Supp. 2d 775, 782 (W.D. Wis. 2008) ("creation of remastered master discs or tapes of the songs [at issue]" and "distribution of digitized versions of [the copyrighted work] to sources of mass dissemination such as websites . . . could constitute impermissible 'copying . . .'").

Finally, Defendants manufacture physical vinyl records containing at least two of Plaintiffs' Musical Works – "Moondance" and "Fire and Rain" (SMF ¶ 50) – which similarly infringes Plaintiffs' exclusive rights to reproduce and prepare derivatives of those works.  *See id.*; 17 U.S.C. § 106(1), (2).[13]

## II.    Defendants' purported licenses are invalid, insufficient and fraudulent.

Defendants seek to avoid liability for their flagrant infringement by claiming that they have licenses that authorize their commercial exploitation of Plaintiffs' Musical Works.  (Defs. Br. 4-11, 13-18.)  For a variety of reasons, however, Defendants cannot carry their burden of

---

[13] The fact that Defendants acquired physical tapes of performances of Plaintiffs' Musical Works does not give them rights to the musical compositions embodied in those recordings.  Ownership of a material object (such as an audio or video tape) in which an artistic work may be embodied is separate from ownership of the copyright in that work.  *See* 17 U.S.C. § 202.

establishing the existence of valid licenses that authorize the exploitation of Plaintiffs' Musical Works. *See AP v. Meltwater U.S. Holdings, Inc.*, 931 F. Supp. 2d 537, 561 (S.D.N.Y. 2013) ("The burden of proving that a license exists falls on the party invoking the defense.") (citing *Graham v. James*, 144 F.3d 229, 236 (2d Cir. 1998)); *Cherry River Music. Co. v. Simitar Entm't, Inc.*, 38 F. Supp. 2d 310, 317 (S.D.N.Y. 1999) ("In this case, the elements of copyright infringement – the existence of valid, registered copyrights and defendant's reproduction of the copyrighted works, the musical compositions – are conceded.  Plaintiffs therefore will prevail in this case unless [defendant] establishes an affirmative defense.").

### A.     Defendants do not have valid mechanical licenses.

Defendants argue that they have compulsory mechanical licenses pursuant to Section 115 of the Copyright Act, either based on their vendors RightsFlow and MediaNet sending NOIs to Plaintiffs on Defendants' behalf, or, alternatively, from HFA, which supposedly authorized Defendants' streaming and downloading of audio and audiovisual recordings containing Plaintiffs' Musical Works.  (Defs. Br. 5-10, 13-14.)  For a host of reasons, none of Defendants' purported mechanical licenses are valid.

### 1.     Defendants have no mechanical licenses under Section 115 of the Copyright Act.

Section 115 of the Copyright Act sets forth a procedure whereby, in the absence of a negotiated license with the copyright owner,[14] a compulsory license can be obtained to reproduce a nondramatic musical work.   "[C]ompulsory licenses represent a limited exception to the copyright holder's exclusive right to decide who shall make use of his [work], and courts should not expand the scope of the compulsory license provision beyond what Congress intended . . . nor interpret it in such a way as to frustrate that purpose."  *Fox Television Stations, Inc. v.*

---

[14] There is no dispute that Defendants have not negotiated any licenses directly with Plaintiffs.

*Aereokiller, LLC*, 851 F.3d 1002, 1011 (9th Cir. 2017) (internal quotations omitted); *see also A&M Records v. Napster, Inc.*, 239 F.3d 1004, 1028 (9th Cir. 2001) ("we narrowly construe any suggestion that compulsory royalties are appropriate in this context because Congress has arguably limited the application of compulsory royalties to specific circumstances").

a) **Section 115 does not permit exploitation in audiovisual format.**

Of the nearly 200 Musical Works at issue, Defendants have exploited audiovisual recordings of at least 146 of those Works.  (Defs. Br. 15; Lundberg Decl. [Dkt. 163], Ex. 5.) Defendants claim their exploitation of those audiovisual works – including Defendants' reproduction of those works into digital format and interactive streaming of the works online – is covered by the compulsory mechanical license provision in Section 115, and that they do not require separate synch licenses, because the audio and visual components were initially recorded simultaneously at the time of the live concerts.  (Defs. Br. 15-18.)

Defendants' argument is both incorrect and irrelevant.  While Defendants cite authorities standing for the proposition that a synchronization license is required when a pre-existing sound recording or musical composition is added to a video recording (*id.* at 15), *none* of the authorities Defendants cite stand for the proposition that a synchronization license is *not* required where the audio and visual components are recorded at the same time.[15]

---

[15] Indeed, even the authorities Defendants attempt to rely on explain that a synch license is required not only to *add* a sound recording to a video recording, but also for certain *exploitations* of a preexisting audiovisual recording.  *See*, *e.g.*, Theodore Z. Wyman, Annotation, *Enforceability of Synchronization Rights and Licenses in Copyrighted Music*, 84 A.L.R. Fed. 2d 345, at *3 (2014) (synch licenses generally "grant the producer three separate rights:  the right to perform the work (in a movie theater, via television, and other methods), the right to distribute copies of the work (since it is fixed, along with the audiovisual work, in files, discs, tapes, or other means of compact transmission) and the synchronization right itself").

*Freeplay Music, Inc. v. Cox Radio, Inc.*, 404 F. Supp. 2d 548 (S.D.N.Y. 2005) involved a performance of the plaintiffs' compositions and sound recordings as part of a radio advertisement, which was covered by the defendants' public performance license from BMI.

Defendants also incorrectly assert that Plaintiffs have not identified any synch licenses they have issued for live concert performances.  (Defs. Br. 17-18.)  In fact, Plaintiffs have identified *numerous* synchronization licenses that they have issued for live concert recordings.  (Pls. Resps. Defs.' SMF ¶ 8) (identifying synch license for "The Who Live in Hyde Park," "Grateful Dead: Fare Thee Well Concert," "From the Vault: [Rolling Stones] Live at the Tokyo Dome 1990," "The Rolling Stones Zip Code Tour 2015," among others).[16]

Indeed, Defendants themselves have recognized the need for synchronization licenses in order to exploit audiovisual recordings.  Defendants' asset purchase agreement with Amazingrace, LLC required that ███████████████████████████████████████ ████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████ ██████████████████████████████████████████ (SMF ¶ 81) (emphasis added).  If, as Defendants now contend, they had no need for synch licenses to exploit

---

Because the use was *audio-only*, the court had no occasion to consider the question raised here – what type of license is required to reproduce, distribute and perform an *audiovisual* work. Indeed, the *Freeplay* court cautioned that "[t]his opinion addresses only the scope of the BMI [public performance] license.  Whether the Broadcasters have acquired a license to synchronize Freeplay's copyrighted works in some other manner is not before the Court . . . ." *Id.* at *552 n.3.

*Agee v. Paramount Commc'ns, Inc.*, 59 F.3d 317 (2d Cir. 1995) is also distinguishable.  Unlike the Plaintiffs here, the plaintiff in *Agee* held sound recording rights (which do not carry a general performance right) but no musical composition rights (which do carry an exclusive right of public performance).  *Id.* at 319-20.  Moreover, *Agee* involved a traditional television broadcast, not on-demand streaming and digital downloads, which, as Defendants acknowledge, require *both* a public performance license and a mechanical reproduction license.  Thus, the court in *Agee* had no occasion to consider whether a synchronization license was required to reproduce and distribute musical compositions incorporated into an audiovisual work, which is the question presented here.  *See Freeplay Music, Inc.*, 404 F. Supp. 2d at 552-53 (recognizing that "[i]n essence, the Court [in *Agee*] held that the TV stations' broadcast of the offending program constituted a *performance* of Agee's recordings, not a reproduction or distribution of them. . . . To accept Agee's theory would have granted the holders of copyrights in sound recordings a performance right that the statute specifically declined to offer.") (emphasis in original).

[16] Defendants ignore the fact that Plaintiffs' witnesses testified that a synch license *is* required where the video and audio of a live performance are recorded simultaneously.  (SMF ¶ 80.)

audiovisual concert recordings, there would have been no need to mention paying synch license fees to music publishers in that agreement.

Furthermore, it is clear that the Section 115 licenses Defendants claim to have do *not* cover audiovisual works.  Assuming the statutory requirements are fulfilled, Section 115 grants a limited license to "make and to distribute *phonorecords* of [musical] works[.]"  17 U.S.C. § 115 (emphasis added).  "Phonorecords" are defined as "material objects in which sounds, *other than those accompanying a motion picture or other audiovisual work*, are fixed . . . ."  17 U.S.C. § 101 (emphasis added); *see Woods v. Bourne Co.*, 60 F.3d 978, 986 n.3 (2d Cir. 1995) ("a phonorecord . . . is the tangible thing on which the sounds (other than sounds accompanying an audiovisual work) are fixed.").  "Audiovisual works," in turn, are defined as "works that consist of a *series of related images . . . together with accompanying sounds*, if any, regardless of the nature of the material objects, such as films or tapes, in which the works are embodied."  17 U.S.C. § 101 (emphasis added).

The Second Circuit has therefore held that Section 115 does *not* grant rights to exploit recordings in audiovisual format.  *See Fred Ahlert Music Corp. v. Warner/Chappell Music, Inc.*, 155 F.3d 17, 19 n.1 (2d Cir. 1998) ("A mechanical license allows the licensee to use a song in the manufacture and sale of phonorecords.  The Act defines phonorecords as 'material objects in which sounds, other than those accompanying a motion picture or other audiovisual work, are fixed . . .'") (quoting 17 U.S.C. § 101); *ABKCO Music, Inc. v. Stellar Records, Inc.*, 96 F.3d 60, 65 (2d Cir. 1996) (compulsory mechanical license not available for audiovisual works).[17]

---

[17] *See also Leadsinger, Inc. v. BMG Music Publ'g*, 429 F. Supp. 2d 1190, 1194 (C.D. Cal 2005), *aff'd*, 512 F.3d 522 (9th Cir. 2008) ("The plain meaning of § 115 does not permit Plaintiff to display visually images and lyrics in 'real time' with music.  A § 115 license specifically authorizes Plaintiff to make phonorecords and nothing more.  Defendants aptly categorize

Thus, as a matter of law, Defendants' purported Section 115 licenses do not cover the 146 Musical Works that Defendants have exploited in audiovisual format.   (Defs. Br. 15; Lundberg Decl. Ex. 5.)   Synchronization licenses are not available through the compulsory license process and require direct negotiation with the copyright owner.   Because Defendants have no such negotiated licenses, each of the 146 Musical Works they have exploited in audiovisual format constitutes a separate act of willful infringement.

### b)      Defendants' NOIs were untimely and fraudulent.

Defendants' purported compulsory licenses are invalid even as to the Musical Works that they did not exploit in audiovisual format, because Defendants did not comply with the requirements of Section 115.   "To obtain a compulsory license to a musical work, a person must serve an NOI on the copyright owner 'before or within thirty days after making, and ***before distributing any phonorecords of the work*** . . . .'"   *Yesh Music, LLC v. Amazon.com., Inc.*, 2017 U.S. Dist. LEXIS 54417, at *13 (E.D.N.Y. Apr. 8, 2017) (quoting 17 U.S.C. § 115(b)(1)) (emphasis added); *see also* 37 CFR 201.18 (NOIs must be served "before or within thirty days after making, and *before distributing* any phonorecords of the work") (emphasis added).   To enable the copyright owner to assess whether NOIs it receives are timely, each NOI must identify "[t]he expected date of initial distribution of phonorecords already made (if any) or expected to be made under the compulsory license."   37 CFR § 201.18(d)(v)(E).   NOIs must be "signed by the person or entity intending to obtain the compulsory license or by a duly authorized agent of such person or entity."   *Id.* at § 201.18(e).

The requirement that an NOI be served before phonorecords are distributed "is strictly enforced: '***[f]ailure to serve or file the notice required by [§ 115(b)(1)] forecloses the possibility***

---

Plaintiff's [karaoke] device as an audiovisual device, which is specifically excluded from the definition of a phonorecord.").

*of a compulsory license and, in the absence of a negotiated license, renders the making and distribution of phonorecords actionable as acts of infringement*.'"   *24/7 Records, Inc. v. Sony Music Entm't, Inc.*, 429 F.3d 39, 42-43 (2d Cir. 2005) (quoting 17 U.S.C. § 115(b)(2)) (emphasis added).   "In other words, the failure to serve the notice of intention before distributing phonorecords . . . precludes the creation of a compulsory license, and it does so both as to copies distributed prior to service and as to copies distributed thereafter."   *Cherry River Music Co. v. Simitar Entm't*, Inc., 38 F. Supp. 2d 310, 312 (S.D.N.Y. 1999); *see also Blagman v. Apple, Inc.*, 2014 U.S. Dist. LEXIS 45401, at *16 ("If the party reproducing the song does not abide by the procedures of § 115, however, no compulsory license may be granted and the party may be liable for infringement if he has not secured a negotiated license.").   There is no question that Section 115 requires "timely and sufficient notice to the owner of the copyright in the musical work." *Palladium Music, Inc. v. Eatsleepmusic, Inc.*, 398 F.3d 1193, 1199 (10th Cir. 2005).

As shown above, for all but five recordings of Plaintiffs' Musical Works, Defendants began distributing recordings of those works by downloads or on-demand streams (in both audio and video format) months or years before Defendants' vendors RightsFlow and MediaNet served NOIs for those recordings.   And even for those five recordings for which Defendants served timely NOIs, Defendants distributed other recordings of the same Musical Works without sending timely NOIs.   Moreover, before this action was commenced, Defendants concealed the fact that their NOIs were untimely by falsely stating that they first began distributing phonorecords on the same date they served the corresponding NOI.   (SMF ¶ 62.)

Though Defendants claim they were following a supposed "industry custom" in sending belated NOIs, they offer no evidence of any such "industry custom," much less show that any such custom would constitute a defense to infringement claims.   Defendants' Matthew Lundberg

was unable to identify any other music services that follow that supposed "industry custom." (SMF ¶ 61.)   But even if such custom existed, it could not, as a matter of law, excuse Defendants' failure to comply with the Copyright Act.  *See Leo Feist, Inc. v. Apollo Records, N.Y. Corp.*, 300 F. Supp. 32, 43 (S.D.N.Y. 1969), *aff'd*, 418 F.2d 1249 (2d Cir. 1969) ("it is no excuse that the defendants relied upon a custom or trade practice of awaiting completion of manufacture and distribution of a recording before filing a notice of intention to use copyrighted material"); *Cherry River Music Co. v. Simitar Entm't, Inc.*, 38 F. Supp. 2d 310, 319-20 (S.D.N.Y. 1999) (same); *cf. Famous Music Corp. v. Seeco Records, Inc.*, 201 F. Supp. 560 (S.D.N.Y. 1961) (industry custom and usage cannot justify deviation from statutory calculation of royalties).

Because Defendants failed to serve timely NOIs, their purported compulsory licenses are invalid, and their exploitations of Plaintiffs' Works constitute acts of infringement even with respect to their exploitations in audio format.  *See Blagman*, 2014 U.S. Dist. LEXIS 45401, at *16 (S.D.N.Y. Mar. 31 2014); *T.B. Harms Co. v. JEM Records, Inc.*, 655 F. Supp. 1575, 1582 (D.N.J. 1987) ("had the defendant been eligible to invoke the compulsory license provision of the Act, it took no action to properly comply with the requirements of that provision and therefore cannot rely on the provisions of § 115 as a defense to the present action").

### c)   Defendants' bootleg concert recordings are not eligible for mechanical licenses under Section 115.

Even assuming Defendants had served timely NOIs (which they did not) their bootleg concert recordings would not be eligible for compulsory mechanical licenses under the strict requirements of the statute.  Under Section 115(a)(1), "[a] person may not obtain a compulsory license for use of the [musical] work in the making of phonorecords duplicating a sound recording fixed by another, unless: (i) such sound recording was fixed lawfully; and (ii) the

making of the phonorecords was authorized by the owner of copyright in the sound recording or, if the sound recording was fixed before February 15, 1972, by any person who fixed the sound recording pursuant to an express license from the owner of the copyright in the musical work or pursuant to a valid compulsory license for use of such work in a sound recording."  17 U.S.C. § 115(a).  Defendants cannot establish any of these elements of their license defense.

> (1)    Defendants cannot show that their bootleg concert recordings were "fixed lawfully"

"A sound recording is not lawfully fixed if that fixation constitutes either copyright infringement under federal law, or common law copyright infringement, unfair competition, or other violation of state law."  2 Nimmer § 8.04[E][2] n.88.   Both the federal anti-bootlegging statute and analogous state law make it unlawful to record a musical performance without the performers' consent.  *See* 17 U.S.C. § 1101(a) ("Anyone who, without the consent of the performer or performers involved . . . fixes the sounds or sounds and images of a live musical performance in a copy or phonorecord . . . shall be subject to the remedies provided in sections 502 through 505, to the same extent as an infringer of copyright.").[18]

---

[18] *See also, e.g.*, N.Y. Penal Law § 275.15 ("A person commits the crime of manufacture or sale of an unauthorized recording of a performance in the second degree when he knowingly, and without the consent of the performer, records or fixes or causes to be recorded or fixed on a recording a performance, with the intent to sell or rent or cause to be sold or rented such recording, or with the intent to use such recording to promote the sale of any product; or when he knowingly possesses, transports or advertises, for purposes of sale, resale or rental or sells, resells, rents or offers for rental, sale or resale, any recording that the person knows has been produced in violation of this section."); *Miller v. Universal Pictures Co.*, 18 Misc. 2d 626, 632 (Sup. Ct. N.Y. Cnty. 1959) ("the owner of musical performances can prevent unauthorized reproduction on phonograph records and . . . common-law property right is not lost by a public performance or radio broadcast"), *rev'd*, 11 A.D.2d 47 (1st Dep't 1960); *Metropolitan Opera Ass'n v. Wagner-Nichols Recorder Corp.*, 199 Misc. 786, *aff'd*, 279 A.D. 632 (1st Dep't 1951) (recording live performance violates opera company's exclusive rights to their performances); *RCA Mfg. Co. v. Whiteman*, 28 F. Supp. 787, 791-92 (S.D.N.Y. 1939), *rev'd on other grounds*, 114 F.2d 86 (2d Cir. 1940) (recognizing performing artists' common law property right in their performances); Cal. Penal Code § 653u ("(a) Any person who records or masters or causes to be

It is also unlawful to record a musical performance without the consent of the owner of the musical work that is being performed – in this case, Plaintiffs or their predecessors. *See In re Application of Cellco P'ship*, 663 F. Supp. 2d 363, 369 n.6 (S.D.N.Y. 2009) ("Sound recordings are 'derivative' works of the preexisting musical composition"); *TufAmerica, Inc. v. Codigo Music LLC*, 162 F. Supp. 3d 295, 314 (S.D.N.Y. 2016) ("it is axiomatic that the 'consent of the copyright owner of a still-protected pre-existing work is necessary to render the derivative . . . work non-infringing.'") (citing *Stewart v. Abend*, 495 U.S. 207, 232 (1990) ("Congress simply intended that a derivative work author may not employ a copyrighted work without the [original] author's permission")); 17 U.S.C. § 106(2) (granting copyright owners the exclusive right to "prepare derivative works based upon the copyrighted work").[19]

Thus, in order to show that the concert recordings in their collection were "fixed lawfully," Defendants must show that they were made with the consent of both the performing artists and Plaintiffs or their predecessors. Yet, in spite of their representations during discovery, *supra* 15-16, Defendants have *no* evidence of any agreements with any artists authorizing the recording of their performances. Indeed, there is evidence to the contrary – that Defendants' recordings were created *without* the artists' consent – including the written appraisal report and marketing documents prepared by the prior owners of the Bill Graham recordings; testimony of

---

recorded or mastered on any article with the intent to sell for commercial advantage or private financial gain, the sounds of a live performance with the knowledge that the sounds thereon have been recorded or mastered without the consent of the owner of the sounds of the live performance is guilty of a public offense punishable as provided in subdivisions (d) and (e). (b) In the absence of a written agreement or operation of law to the contrary, the performer or performers of the sounds of a live performance shall be presumed to own the right to record or master those sounds.").

[19] *See also Palladium Music, Inc. v. Eatsleepmusic, Inc.*, 398 F.3d 1193, 1199 (10th Cir. 2005) ("In order for a party in Palladium's position to lawfully use preexisting, copyrighted musical works to create and sell its sound recordings, it must first secure the appropriate licensing from the copyright owners of those musical works.").

executives and attorneys for the prior owners of those recordings; and agreements executed by Defendants and their predecessors indicating that artists' consents were required in order to exploit the recordings.  *See supra* 6-8.  Nor did Plaintiffs or their predecessors grant licenses authorizing the initial recording of the bootleg concert tapes in Defendants' collection.  As a result, Defendants cannot show that their recordings were fixed lawfully.  As such, they are not eligible for Section 115 licenses.

> (2)     *Defendants cannot show that they have the authorization of the sound recording copyright owners.*

Defendants are also ineligible for Section 115 licenses because they do not have authorization of the owners of the sound recordings in their bootleg tapes.  *See Blagman*, 2014 U.S. Dist. LEXIS 45401, at * 21 ("although the claims in the Amended Complaint are tied solely to infringement of compositions, whether the [defendants] duplicated recordings without authorization from the copyright holder of the sound recording is critical to determining whether a compulsory license in the underlying composition is even available") (citing Section 115(a)).

Copyright ownership subsists initially in the author of a work.  17 U.S.C. § 201(a). "[T]he author of a sound recording is the performer(s) whose performance is fixed, or the record producer who processes the sounds and fixes them in the final recording, or both.'"  *United States v. Am. Soc'y of Composers (In re Cellco P'ship)*, 663 F. Supp. 2d 363, 369 (S.D.N.Y. 2009); *see also In re Porter*, 498 B.R. 609, 670 (Bankr. E.D. La. 2013) ("A sound recording is owned by the person whose performance is reflected on the recording.").  Although Defendants recognized the need to obtain performing artists' consents in order to exploit the recordings in their collection, Defendants have no such consents.

Nor could Defendants have acquired any sound recording copyright interests from the vendors who sold them the physical concert tapes.[20]   Unlike a record producer who arranges musicians, selects the performances, and combines and edits the various tracks, the bootleg tapes at issue here are simply soundboard recordings of live concert performances.  Defendants have offered no evidence that any of the concert promoters or venue operators who made those recordings contributed sufficient artistic expression to obtain a copyright interest in the recording.  *See Forward v. Thorogood*, 985 F.2d 604, 605-07 (1st Cir. 1993).

For similar reasons, those promoters and venue operators would not be considered "joint authors" of the sound recordings, which requires not only copyrightable contributions from each putative co-author, but also that they each act with the "intention that their contributions be merged into inseparable or interdependent parts of a unitary whole."  17 U.S.C. § 101 (definition of "joint work"); *see also Childress v. Taylor*, 945 F.2d 500, 507 (2d Cir. 1991) (joint authorship requires the "intent of both participants in the venture to regard themselves as joint authors" and that "each participant intended that all would be identified as co-authors").

Here, there is no evidence that the performing artists were even aware that their concert performances were being recorded, much less that they gave those performances with the intention of creating a joint work with the individuals who recorded the concerts.  Indeed, the three artists whom Defendants sought to depose have testified that they were generally unaware of their concerts being recorded.  (SMF ¶¶ 30, 73); *see also Ulloa v. Universal Music & Video Distrib. Corp.*, 303 F. Supp. 2d 409, 418 (S.D.N.Y. 2004) ("As Plaintiff has proffered no evidence to support an argument that Jay Z ever intended to share authorship with the Plaintiff, Defendant's motion for summary judgment on this issue is granted."); *cf. Quintanilla v. Texas*

---

[20] Ownership of a material object (such as an audio tape) in which an artistic work may be embodied is separate from ownership of the copyright in that work.  *See* 17 U.S.C. § 202.

*TV, Inc.*, 139 F.3d 494, 499 n.24 (5th Cir. 1998) (band manager "might" be entitled to joint authorship of concert recording where he decided which songs would be performed and in which order).

Nor could the creators of Defendants' bootleg concert recordings have legally acquired any copyright interest in those recordings, because they did not have the consent of the owners of the underlying musical works that were being performed (*i.e.*, Plaintiffs or their predecessors). *See In re Application of Cellco P'ship*, 663 F. Supp. 2d at 369 n.6 ("Sound recordings are 'derivative' works of the preexisting musical composition, and to obtain a copyright in a sound recording one must secure a license from the copyright owner of the underlying work."); *Reservoir Media Mgmt.*, 2015 U.S. Dist. LEXIS 130423, at *18 (S.D.N.Y. Sep. 28, 2015) (sound recording is derivative work of underlying musical composition); *Systems XIX, Inc. v. Parker*, 30 F. Supp. 2d 1225, 1230 (N.D. Cal. 1998) ("Defendants correctly maintain that to assert a claim of joint authorship over the sound recordings, Maritime must have obtained Zomba's permission to use Parker's musical compositions in the sound recordings.").

> (3) *Defendants cannot show that the pre-February 15, 1972 recordings were made with the consent of the owners of the underlying Musical Works.*

Defendants are also unable to show that the recordings in their collection made before February 15, 1972[21] were created with the consent of the owners of the underlying Musical Works (*i.e.*, Plaintiffs or their predecessors). *See Blagman*, 2014 U.S. Dist. LEXIS 45401, at *20 (S.D.N.Y. Mar. 31, 2014) ("Federal copyright law further provides that a compulsory license in

---

[21] Only recordings fixed after February 15, 1972 are eligible for federal copyright protection. *See* 17 U.S.C. § 301(c). That is why Section 115 requires that, for works created prior to that date, the recording must have been created with the permission of the owners of the underlying musical composition to be eligible for a compulsory mechanical license. *See* 17 U.S.C. § 115(a). A spreadsheet produced by Defendants as BGA038668 (column D "Date") shows the date of each concert recording at issue. (Dickstein Decl., Ex. 11.)

the underlying composition may not issue unless, for sound recordings fixed prior to 1972, the duplicator obtains authorization from the 'person who fixed the sound recording,' who must themselves have had authorization [from] the copyright owner of the of the [sic] underlying composition.") (citing 17 U.S.C. § 115(a)(1)); 2 Nimmer § 8.04[E][2] ("if the affected sound recording is not subject to statutory copyright because it was fixed before February 15, 1972, then the compulsory licensee must be authorized to make that duplication by the person who fixed the sound recording, who must, in turn, have made the fixation pursuant to a consensual or compulsory license from the copyright owner of the musical work that was thus fixed.").

In sum, none of Defendants' recordings are eligible for compulsory mechanical licenses.

## 2. Defendants' purported licenses from The Harry Fox Agency are invalid and insufficient.

Defendants' reliance on purported licenses from HFA fares no better.  (Defs. Br. 6-7, 14.)  As an initial matter, an HFA license is merely a Section 115 compulsory mechanical license with slight variations with respect to the method and frequency of royalty payments.  *See Harry Fox Agency, Inc. v. Mills Music, Inc.*, 720 F.2d 733, 737 (2d Cir. 1983) ("even where the parties have agreed to vary the exact terms of the compulsory license section [115] but did not intend to waive its protection, the licenses were protected under that section"); *EMI Entm't World, Inc. v. Karen Records, Inc.*, 603 F. Supp. 2d 759, 763-64 (S.D.N.Y. 2009) ("Licenses issued by Harry Fox do not, however, alter the basic rights and obligations of the licensee under § 115").

Thus, like the compulsory licenses under Section 115 discussed above, Defendants' purported HFA licenses are invalid because (i) Defendants cannot show that their bootleg recordings were "lawfully fixed," or that Defendants have the consent of the performing artists or owners of the Musical Works, and (ii) HFA mechanical licenses do not apply to audiovisual works.  *See Sony/ATV Publ'g, LLC v. Marcos*, 651 F. App'x 482, 485 (6th Cir. 2016) ("[T]he

HFA license is a standard compulsory license limited to distribution of phonorecords and incorporates the statutory definition of that term, which excludes 'audiovisual work[s].'") (quoting 17 U.S.C. § 101.  Indeed, the HFA email Defendants rely upon as evidence of licenses references the making of ████████████████████████████████████ ███████████████ (Lundberg Decl. Ex. 31) (emphasis added) and Defendants' application for an HFA account references ████████████████████████████████████████ (Lundberg Decl. Ex. 28) (emphasis added) – not audiovisual works.[22]

Moreover, even assuming Defendants' HFA licenses were valid and covered audiovisual works – which they do not and cannot – only a small fraction of the Musical Works at issue are even listed on the HFA spreadsheet that Defendants rely upon.  (SMF ¶ 83.)  Of the nearly 200 Musical Works at issue, 180 have at least one recording that does not appear on the HFA license spreadsheet, and are thus indisputably being infringed by Defendants.  (*Id.*)[23]  This is no surprise to Defendants, who acknowledged in an email to MediaNet shortly after this lawsuit was filed that there were ████████████████████████████████████████████ ███████████████ (SMF ¶ 84.)

----

[22] HFA's website states that it does not grant synchronization licenses for uses of audiovisual works.  *See* https://www.harryfox.com/license_music/what_is_mechanical_license.html (last visited Aug. 25, 2017) ("A mechanical license doesn't include the use of a song in a video. That use requires a synchronization license which you will need to obtain by contacting the publisher(s) directly. . . . If you are distributing a video that includes music you don't own or control, you may need a synchronization license. You will need to contact the publisher(s) directly to obtain these rights.")

[23] The HFA email Defendants rely upon (Lundberg Decl. Ex. 31) states that ████████████ ██████████████████████████████████████████████████████ (*Id.* at ¶ 3) (emphasis added); *see Rodgers & Hammerstein Org. v. UMG Recordings Inc.*, 2001 U.S. Dist. LEXIS 16111, at *19-20 (S.D.N.Y. Sep. 25, 2001) (HFA license is limited to specific recording and configuration listed in the license) (HFA license is "narrowly limited to a specific phonorecord number") (citing *Fred Ahlert Music Corp v. Warner/Chappell Music, Inc.*, 155 F.3d 17, 24 (2d Cir. 1998)); *Encore Entm't v. KIDdesigns, Inc.*, 2005 U.S. Dist. LEXIS 44386, at *23 (M.D. Tenn. Sept. 14, 2005) ("the grant to [defendant] pursuant to the HFA licenses is restricted to those specific phonorecord numbers identified in the licenses").

**B.      Defendants' performance licenses do not authorize interactive streaming or digital downloads, and do not cover all of their Websites.**

Defendants contend that they have licenses from performing rights organizations BMI, ASCAP and SESAC (Defs. Br. 10-11), but those agreements do not grant Defendants any rights to reproduce or distribute the Musical Works, and therefore do not authorize Defendants' reproduction and distribution through on-demand streams or digital downloads.  (Lundberg Decl. Ex. 25 at ASCAP0004 

; *id.* at Ex. 26 at BGA-001202 (BMI agreement

; *id.* at Ex. 27 at SESAC 0000001-2 (nothing in SESAC agreement

 Thus, ASCAP, BMI and SESAC grant only licenses for public performances, which are separate and distinct from rights of reproduction and distribution. *Compare* 17 U.S.C. §§ 106(1), (3) *with id.* § 106(4).[24]

Indeed, Defendants concede that performance licenses alone are not sufficient to authorize their on-demand streaming and downloading of the Musical Works at issue, and that mechanical licenses are also required.  (*See* Defs.' Br. at 6 (claiming that Defendants obtained

---

[24] Courts have recognized that licenses from performing rights organizations do not grant rights to reproduce or distribute phonorecords of musical works.  *See, e.g., Country Rd. Music, Inc. v. MP3.com, Inc.*, 279 F. Supp. 2d 325, 327-28 (S.D.N.Y. 2003) ("the performing rights licenses themselves, as their name implies, explicitly authorize public performance only, do not purport to grant a reproduction right in musical compositions, and, in at least one case, expressly disclaim such a grant.  Moreover, the performing rights societies themselves do not, and do not purport to have, the authority to grant such a right.").

mechanical licenses "which granted . . . Defendants' rights to reproduce and distribute copyrighted musical compositions" through "permanent digital downloads, and, more recently, interactive streaming"); (Dickstein Decl., Ex. 1 (Lundberg Dep. 182:17-183:20 ("[a] mechanical license is required to offer a download of a musical composition").)

Moreover, Defendants' performance licenses do not even apply to all of the Websites through which they have exploited Plaintiffs' Musical Works – Wolfgangs.com, WolfgangsVault.com, ConcertVault.com, Daytrotter.com, MusicVault.com and Music Vault on YouTube. (*See* Lundberg Decl., Ex. 25 at ASCAP0003, 0025 █████████████████ ████████████████ Ex. 26 at BGA001189, 001195, 001201, 001206 ████████ ███████████████████████████████████████████ ████████████████████████████ BMI even warned Defendants before this lawsuit was filed that their MusicVault website ████████████████ (SMF ¶ 85.) Nor do any of Defendants' PRO licenses apply to their recently launched mobile app, which offers their entire collection of bootleg recordings for on-demand streaming. (SMF ¶ 48.)

Indeed, representatives of ASCAP and BMI have informed Defendants that their license agreements are limited to the specific domains identified in the agreements, and do not cover other Websites operated by Defendants. (SMF ¶ 85 █████████████████ █████████████████████████████████████████████ ██████████████████████ Despite this, Defendants still have not acquired performance licenses for all of their Websites, which, in any event, would be insufficient to authorize Defendants' on-demand streaming and downloading activities.

### C. Defendants' agreements with record labels did not (and could not) grant any rights to Plaintiffs' Musical Works.

Defendants argue that the joint exploitation agreements they entered with UMG Recordings, Warner Music, Inc. and Sony Music Entertainment in 2008-2009 supposedly granted Defendants rights to exploit the Works that are owned and controlled by Plaintiffs. (Defs. Br. 4-5) (citing Lundberg Decl. Exs. 2-4).  This argument fails for at least three reasons.

First, none of the Plaintiffs who own the Musical Works at issue were parties to those agreements.  Plaintiffs Warner-Tamerlane Publishing Corp. and WB Music Corp. are music *publishing* companies and are separate from the Warner Music, Inc. *recorded music* company. And although Sony/ATV Music Publishing, LLC began administering the EMI Plaintiffs'[25] music publishing catalogue in 2012 (three years after the 2009 agreements Defendants rely upon), the Sony/ATV *publishing company* is a separate and distinct entity from the Sony Music Entertainment *record company*.   (Declaration of Audrey Ashby ¶ 3.)   Defendants offer absolutely no evidence that either of those record companies have any operations, executives or employees in common with any of the Plaintiffs, and certainly do not offer sufficient evidence to treat them as alter egos of one another.  *See Gehling v. St. George's Univ. Sch. of Med., Ltd.*, 1988 U.S. Dist. LEXIS 18328, at *13-14 (E.D.N.Y. July 8, 1988) ("Absent findings of fraud or bad faith, a corporation is entitled to the 'presumption of separateness' afforded to related corporations.") (citing *Williams v. McAllister Bros., Inc.*, 534 F.2d 19, 21 (2d Cir. 1976)).

Second, even if any of the Plaintiffs were parties to the joint exploitation agreements Defendants rely upon (which they were not), those agreements would not immunize Defendants'

---

[25] The EMI Plaintiffs are Colgems-EMI Music Inc., EMI Algee Music Corp., EMI April Music Inc., EMI Blackwood Music Inc., EMI Consortium Music Publishing, Inc. d/b/a EMI Full Keel Music, EMI Consortium Songs, Inc. d/b/a EMI Longitude Music, EMI Feist Catalog Inc., EMI Robbins Catalog Inc., EMI Unart Catalog Inc., Jobete Music Co., Inc., Screen-Gems- EMI Music Inc., Stone Agate Music and Stone Diamond Music Corp.

infringements of Plaintiffs' Musical Works, because they ████████████████████████ ████████████████[26] which are protected separately from the copyright in a sound recording. *See Distribuidora De Discos Karen C. por A. v. Universal Music Grp.*, 2017 U.S. Dist. LEXIS 37222, at *22 (S.D.N.Y. Mar. 15, 2017) ("Copyright ownership interests in recordings are distinct from those in the underlying compositions and can be transferred independently.").

Third, Defendants cite no agreements with any of the Spirit, Peer, Imagem or ABKCO Plaintiffs that might have granted Defendants rights to exploit the Musical Works owned by those Plaintiffs. Although Defendants assert that their agreement with UMG Recordings "implicates the copyrights to the same songs performed by the band The Who that are at issue in this case through the claims of [the Spirit Plaintiffs]" (Defs. Br. 5), Defendants offer no evidence to support that conclusory assertion, as their agreement with UMG Recordings makes no mention whatsoever of either of the Spirit Plaintiffs or of songs performed by The Who.

---

[26] *See* Lundberg Decl. Ex. 2 § 3.1



**D.      The statute of limitations cannot save Defendants' invalid licenses.**

Recognizing that their purported licenses are either insufficient or invalid, Defendants argue that any "technical issues" raised by Plaintiffs with respect to Defendants' purported licenses that were "present at least three years or more from the date the Complaint was filed" are supposedly barred by the Copyright Act's statute of limitations.  (Defs. Br. 24) (citing 17 U.S.C. § 507(b)).  This bizarre argument ignores the fact that license is an affirmative defense, which Defendants bear the burden of proving, rather than Plaintiffs having the burden of proving that Defendants' purported licenses are invalid.  *See AP*, 931 F. Supp. 2d at 561.

Defendants' argument also overlooks the fact that the Copyright Act's statute of limitations does not bar a plaintiff from raising "issues with licenses," but rather "claims" that accrued more than three years before the action was commenced.  *See* 17 U.S.C. § 507(b) ("No civil action shall be maintained under the provisions of this title unless it is commenced within three years after the *claim* accrued.") (emphasis added).  Defendants do not dispute (nor could they) that they streamed, downloaded and otherwise exploited recordings of Plaintiffs' Musical Works within three years before the complaint was filed on May 27, 2015.  (SMF ¶ 87.)

Plaintiffs' infringement claims are therefore timely irrespective of whether Defendants can meet their burden of proving valid licenses (which they cannot for the reasons above).  *See Petrella v. MGM*, 134 S. Ct. 1962, 1969-70 (2014) ("It is widely recognized that the separate-accrual rule attends the copyright statute of limitations. Under that rule, when a defendant commits successive violations, the statute of limitations runs separately from each violation. Each time an infringing work is reproduced or distributed, the infringer commits a new wrong. Each wrong gives rise to a discrete 'claim' that 'accrue[s]' at the time the wrong occurs. . . . Thus, when a defendant has engaged (or is alleged to have engaged) in a series of discrete infringing acts, the copyright holder's suit ordinarily will be timely under § 507(b) with respect

40

to more recent acts of infringement (i.e., acts within the three-year window) . . . ."); 3 Nimmer § 12.05[B][1][b] (2017) ("If infringement occurred within three years prior to filing, the action will not be barred even if prior infringements by the same party as to the same work are barred because they occurred more than three years previously.").[27]  Thus, even if the first instance of Defendants' infringements occurred more than three years ago, that would not insulate Defendants from infringements that occurred within three years of the filing of the Complaint.

### III.    Defendants' "implied license" and "estoppel" defenses cannot save them from liability.

#### A.    Defendants' implied license and estoppel defenses are barred by their unclean hands.

Recognizing that they have no compulsory or negotiated licenses that cover their exploitations of Plaintiffs' Musical Works, Defendants contend that they have "implied licenses" and that Plaintiffs' infringement claims are barred by "estoppel," based on unsolicited payments Defendants began making to Plaintiffs in 2015, just a few months before Plaintiffs filed suit in May of that year.  (Defs. Br. 18-24; Lundberg Decl. Exs. 7, 10, 13, 16, 19. 22.)

Those payments were made pursuant to Defendants' purported compulsory licenses, which, as shown above, were predicated on Defendants' fraudulent misrepresentation as to when they began exploiting the concert recordings.  *Supra* 12-13.  Defendants' implied license and

---

[27] Defendants' citation to *Simmons v. Stanberry*, 810 F.3d 114 (2d Cir. 2016) (Defs. Br. 24) is inapposite.  The issue in that case was whether plaintiff was an owner of the allegedly infringed work.  That case was therefore governed by the rule that copyright ownership disputes (not infringement claims) are barred unless filed within three years of when the ownership dispute arose.  *Id.* at 116 ("Where the plaintiff's claims were rooted in her *contested assertion of an ownership interest* in the copyright, and that claim of ownership interest was time-barred because of the plaintiff's delay in suit, the plaintiff could not resuscitate the untimely claim by relying on claims against the defendants' continuing course of infringing publication after the plaintiff's ownership claim became time-barred.") (emphasis added).  Here, Plaintiffs are not asserting a claim of disputed copyright *ownership* (indeed, Defendants do not challenge Plaintiffs' ownership of the Musical Works at all) but of copyright *infringement*.  And because Defendants have indisputably exploited Plaintiffs' Musical Works within the three-year statute of limitations period, Plaintiffs' claims are timely.

estoppel defenses are therefore barred by Defendants' unclean hands. *See Jackson v. Odenat*, 9 F. Supp. 3d 342, 364 (S.D.N.Y. 2014) ("The doctrine of unclean hands is an equitable defense requiring [a party] to act 'fairly and without fraud or deceit as to the controversy in issue.'") (quoting *Dunlop-McCullen v. Local 1-S*, 149 F.3d 85, 90 (2d Cir. 1998)); *Total Control Apparel, Inc. v. DMD Int'l Imps.*, LLC, 409 F. Supp. 2d 403, 410 (S.D.N.Y. 2006) ("A Court may deny relief based on the doctrine of unclean hands 'where the party applying for such relief is guilty of conduct involving fraud, deceit, unconscionability, or bad faith relating to the matter at issue to the detriment of the other party.'") (quoting *Estate of Lennon v. Screen Creations, Ltd.*, 939 F. Supp. 287, 293 (S.D.N.Y. 1996)).  Defendants cannot now be heard to manufacture a license from their own misdeeds.

### B. Defendants cannot show that Plaintiffs impliedly licensed Defendants' massive infringement.

Even if Defendants' implied license and estoppel defenses were not barred by their unclean hands, Defendants would not be able to establish the elements of those defenses. Implied licenses are found "only in narrow circumstances," *Complex Sys. v. ABN AMBRO Bank N.V.*, 979 F. Supp. 2d 456, 477 (S.D.N.Y. 2013), usually where "'one party 'created a work at [the other's] request and handed it over, intending that [the other] copy and distribute it.'" *Weinstein Co. v. Smokewood Entm't Grp.,* 664 F. Sup. 2d 332, 334 (S.D.N.Y. 2009) (quoting *SmithKline Beecham Consumer Healthcare, L.P. v. Watson Pharms., Inc.*, 211 F.3d 21, 25 (2d Cir. 2000)).  That is obviously not the case here.  The Musical Works at issue were created by Plaintiffs' songwriters long before Defendants purchased the bootleg concert recordings from third-parties and began exploiting them online.

Moreover, no implied license will be found unless there is a "meeting of the minds" between the putative licensee and putative licensor as to the particular nature of the use.  (*See*

Defs. Br. 18 ("the question of an implied license 'comes down to whether there was a 'meeting of the minds' between the parties to permit the particular usage at issue.") (quoting *Psihoyos v. Pearson Educ., Inc.*, 855 F. Supp. 2d 103, 124 (S.D.N.Y. 2012)).  A "meeting of the minds" sufficient to create an implied license has been found "where parties have closely collaborated or engaged in joint projects." *Merkos Lyinyonei Chinuch, Inc. v. John Doe Nos. 1-25*, 172 F. Supp. 2d 383, 387 (S.D.N.Y 2001).

Defendants have never collaborated or engaged in any joint projects with Plaintiffs. Defendants simply purchased and commercially exploited bootleg tape recordings that contain hundreds of Plaintiffs' copyrighted Musical Works, without even attempting to negotiate a license from Plaintiffs.  Each of the implied license cases Defendants cite is therefore distinguishable (Defs. Br. 18-19), as they involved extensive interactions between the parties about the defendants' use of the subject work.[28]

Defendants' unsolicited payments to Plaintiffs pursuant to invalid and fraudulent NOIs are in no way evidence of a "meeting of the minds" that might give rise to an implied license.

---

[28] In *Keane Dealer Servs., Inc. v. Harts*, 968 F. Supp. 944 (S.D.N.Y. 1997), there were extensive communications between the parties about the defendants' use of the copyrighted work, and the plaintiff admitted it was aware of the nature of the defendants' use, but the court nevertheless *denied* defendant's motion for summary judgment on implied license.  *Id.* at 945-47.  In *Psihoyos v. Pearson Educ., Inc.*, 855 F. Supp. 2d 103, 124 (S.D.N.Y. 2012), the plaintiffs "deliver[ed] the works to Defendants (via the Agencies) with the intent that Defendants copy and distribute them," and the plaintiffs' agent supplied invoices to defendants approving of their practice of utilizing the works before a formal license was in place.  *Id.* at 108-109, 124.  In *Ladas v. Potpourri Press, Inc.*, 846 F. Supp. 221, 225-26 (E.D.N.Y. 1994), the plaintiff commissioned the defendant to create the allegedly infringed work for plaintiff's use, and there was an extensive course of dealing between the parties, including both written and oral agreements.  The plaintiff in *Effects Assocs., Inc. v. Cohen*, 908 F.2d 555, 558-59 (9th Cir. 1990) acknowledged that its footage was created specifically for defendants' film, and delivered its footage to the defendant for that purpose.  *Design Options, Inc. v. BellePointe, Inc.*, 940 F. Supp. 86, 92 (S.D.N.Y. 1996) *denied* the defendant's motion for summary judgment on implied license, even though the plaintiff sold copyrighted articles to defendant for resale.

As shown above, Defendants' NOIs misrepresented the date when they first began distributing the recordings at issue.  Until discovery in this action, Plaintiffs had no reason to believe that Defendants' NOIs were untimely, and thus no reason to reject Defendants' payments.  And of course, once Plaintiffs commenced this action asserting that Defendants lacked licenses necessary to exploit Plaintiffs' Musical Works, Defendants could not possibly have believed that Plaintiffs consented to such exploitation.  *See Ulloa*, 303 F. Supp. 2d at 417 ("Even assuming that Plaintiff's conduct created an implied license, Plaintiff clearly terminated any implied license prior to filing this suit and is thus still entitled to damages for copyright infringement.").

Tellingly, Defendants do not (and cannot) cite a single case where an implied license was created based on payments pursuant to fraudulent (but facially valid) NOIs.  Indeed, if the Court were to adopt Defendants' argument, it would place the burden on music publishers and songwriters to investigate the *bona fides* of every NOI they receive.  That is precisely what Congress sought to avoid when it provided in Section 115 of the Copyright Act that "[f]ailure to serve or file the [NOI] required by clause (1) forecloses the possibility of a compulsory license and, in the absence of a *negotiated* license, renders the making and distribution of phonorecords actionable as acts of infringement . . . ."  17 U.S.C. § 115(b)(2) (emphasis added).  A music user thus has two choices: (1) serve a timely NOI in compliance with Section 115, or (2) negotiate with the copyright owner for a consensual license.  Defendants did neither.

Nor could Defendants' payments to Plaintiffs possibly have created any implied license for the exploitation of audiovisual works.  Defendants' payments were expressly made in order to obtain a "Compulsory License for Making and Distributing *Phonorecords*" (*see* Lundberg Decl. Exs. 8, 11, 14, 17, 20, 23) (emphasis added), which, as shown above, do not include

audiovisual works.  Plaintiffs therefore had no reason to believe that Defendants' payments were purportedly for licenses to exploit audiovisual works.

Defendants' reliance on their joint exploitation agreements and purported HFA licenses is similarly misplaced.   (Defs. Br. 23.)   None of the Plaintiffs were parties to those joint exploitation agreements, and, in any event, they expressly *excluded rights* to musical compositions.   Defendants' purported HFA licenses similarly did not convey any rights to exploit audiovisual works, and they covered, at most, only a fraction of the Works at issue. Defendants' implied license argument therefore fails.

### C. Defendants cannot show that Plaintiffs are estopped from asserting copyright infringement.

"Estoppel is a drastic remedy and must be utilized sparingly."  *Fitzpatrick v. Sony-BMG Music Entm't, Inc.*, 2007 U.S. Dist. LEXIS 91446, at *10 (S.D.N.Y. Dec. 7, 2007).  To prevail on an estoppel defense, the defendant must show that "a) the plaintiff knew of the defendant's wrongful conduct; b) the plaintiff intended that his conduct be acted upon or acted in a way that the defendant had a right to believe it was so intended; c) the defendant was ignorant of the true facts; and d) the defendant relied on plaintiff's conduct to his detriment."  *Merchant v. Lymon*, 828 F. Supp. 1048, 1064 (S.D.N.Y. 1993) (citing *Basic Books, Inc. v. Kinko's Graphics Corp.*, 758 F. Supp. 1522, 1539-1540 (S.D.N.Y. 1991).  In the copyright context, the defense of estoppel is largely "subsumed within the 'implied license' inquiry."  *Psihoyos v. Pearson Educ., Inc.*, 855 F. Supp. 2d 103, 129 (S.D.N.Y. 2012).

Defendants cannot show that Plaintiffs were aware of the extent of Defendants' infringements or that Plaintiffs acted in a way that led Defendants to reasonably believe that

Plaintiffs would not bring claims based on those infringements.[29]  As above, Defendants falsified the date of distribution on their NOIs to make them appear valid, which Plaintiffs did not learn until discovery in this action.  The mere fact that Defendants rendered payments to Plaintiffs pursuant to those fraudulent NOIs for a few months before this lawsuit was filed does not give rise to estoppel.  *See AP v. Meltwater U.S. Holdings, Inc.*, 931 F. Supp. 2d 537, 565 (S.D.N.Y. 2013) ("Silence alone is rarely a basis for finding equitable estoppel").

Plaintiffs also had no reason to suspect that Defendants intended their payments to cover exploitation in audiovisual format, as those payments were expressly for compulsory mechanical licenses, which do not cover audiovisual works.  Nor could Defendants' joint exploitation agreements with third-party record companies have somehow led Defendants to believe that they had the right to exploit Plaintiffs' Musical Works (Defs. Br. 22-23), as those agreements *expressly exclude any rights to musical compositions*.

Defendants' reliance on *Keane Dealer Servs., Inc. v. Harts*, 968 F. Supp. 944 (S.D.N.Y. 1997) (Defs. Br. 23-24) is misplaced.  There, the plaintiff was admittedly aware of the defendants' use of the computer software at issue, and, in fact, *actively assisted* defendants in using the software.  The court therefore concluded that "[plaintiff's] silence in the face of this knowledge coupled with its willingness to assist [defendant] when the latter had questions regarding the software constitutes on which [defendant] was entitled to rely."  *Id.* at 947.  As with their implied license argument, Defendants do not cite a single case where a copyright

---

[29] There is certainly no evidence that Plaintiffs were aware of Defendants' infringing conduct and accepted payments from Defendants "since 2007."  (Defs. Br. 22.)  Defendants did not begin sending NOIs to Plaintiffs until at least 2013, did not begin sending monthly statements of account until 2014, and did not begin making actual payments pursuant to those statements until 2015.  (*See* Lundberg Decl. Exs. 6-23.)  Moreover, Defendants' purported HFA licenses covered only a small fraction of the recordings of Plaintiffs Musical Works that Defendants have exploited, and did not cover audiovisual works.

owner was estopped from suing for infringement based on payments pursuant to purported compulsory licenses that were shown to be fraudulent and invalid.

## IV.    Defendants' infringement was willful.

Section 504(c) of the Copyright Act provides that, where the defendants' infringement is willful, statutory damages may be awarded in an amount of up to $150,000 per infringement.  17 U.S.C. § 504(c).  Infringement is willful when the defendant was either (1) actually aware that its conduct was infringing, or (2) acted with "reckless disregard" for, or with "willful blindness" to, the copyright holder's rights.  *Island Software & Computer Serv. v. Microsoft Corp.*, 413 F.3d 257 (2d Cir. 2005).  Willfulness can thus be established through circumstantial evidence that gives rise to an inference of willful conduct.  *See Knitwaves, Inc. v. Lollytogs Ltd.*, 71 F.3d 996, 1010 (2d Cir. 1995) ("knowledge of infringement may be constructive rather than actual; that is, 'it need not be proven directly but may be inferred from the defendant's conduct'") (quoting *N.A.S. Import Corp. v. Chenson Enters., Inc.*, 968 F.2d 250, 252 (2d Cir. 1992)).

Courts may resolve the issue of willfulness on summary judgment if "there are sufficient undisputed material facts on the record to make the question appropriate for summary judgment."  *Lipton v. Nature Co.*, 71 F.3d 464, 472 (2d Cir. 1995); *see, e.g.*, *U2 Home Entm't, Inc. v. Wei Ping Yuan*, 245 F. App'x 28, 29 (2d Cir. 2007) (affirming grant of summary judgment on willfulness).

Here, there is *overwhelming* evidence that Defendants acted, at a minimum, with reckless disregard to Plaintiffs' rights in the Musical Works.  As shown above, Defendants purchased collections of bootleg concert recordings through quitclaim transfers with clear warnings that those recordings had not been authorized by either the owners of the musical compositions embodied in the recordings or the performing artists.  Defendants were warned that there were ███████████████████ as to whether the concert tapes they acquired could be exploited without the

approval of musical artists and other parties (SMF ¶ 22), and that ████████████████████

████████████████████████████████████████████████████████████

████████████████████ (*id.*).   Though they knew that they could not exploit the bootleg

recordings without approvals from those rights holders, including Plaintiffs, Defendants

nevertheless digitized, remixed and re-mastered those bootleg concert tapes, and began

exploiting ████████████████ those recordings online.

Defendants have acknowledged that the success of their music Websites is ████

████████████████████████████████████████████████████████████

████████████████████ (SMF ¶ 54) and they applied to register copyrights in their

own re-mixes of the bootleg recordings they acquired (*id.*).   Defendants are thus well aware of

the protections afforded copyright owners, and that they were obligated to obtain licenses to

exploit Plaintiffs' Musical Works.   *See EMI Entm't World, Inc. v. Karen Records, Inc.*, 806 F.

Supp. 2d 697, 703 (S.D.N.Y. 2011) ("courts in this district have inferred willful infringement

from a defendant's ownership of copyrights and experience in an industry heavily regulated by

copyright law").   Defendants have also been advised by copyright counsel since the inception of

their business, and cannot claim ignorance of the law.   *See NFL v. Primetime 24 Joint Venture*,

131 F. Supp. 2d 458, 480 (S.D.N.Y. 2001) (finding willfulness where defendant "is a

sophisticated corporation and was represented by experienced copyright counsel").

Perhaps most egregiously, Defendants ***fraudulently misrepresented*** the date of first

distribution in the NOIs they sent to Plaintiffs in order to cover up the fact that they had begun

exploiting recordings long before sending NOIs in violation of the Copyright Act.   Indeed,

Defendants expressly agreed in 2010 that they would remain ████████████████████████

████████████████████████████████████████████████████████████

███████████████████████████████████ (SMF ¶ 57).  Defendants claimed to be following an "industry practice" of sending belated NOIs, but could not identify a single company that follows that supposed practice.  *See Encore Entm't v. KIDdesigns, Inc.*, 2005 U.S. Dist. LEXIS 44386, at *42 (M.D. Tenn. Sept. 14, 2005) (defendants' reliance on "dubious industry practice to justify its actions" weighed in favor of a finding of willfulness).  Defendants have no explanation for this duplicitous conduct, which practically screams willful infringement.

As Defendants' Websites grew in size and popularity, they began receiving numerous cease and desist demands on the very same grounds as Plaintiffs have raised here – *i.e.*, that Defendants lack consents from performing artists and music publishers; have no rights to exploit audiovisual works; and improperly sent NOIs after they had already begun exploiting the recordings.  But rather than admit their wrongdoing and attempt to negotiate licenses with copyright owners, Defendants doubled down on their infringements.  They refused to remove any recordings containing Plaintiffs' Musical Works from their Websites, and, while this lawsuit was pending, uploaded *dozens more* recordings of those Works to their Websites, and launched a new mobile platform that offers on-demand streaming of all of the bootleg recordings in Defendants' collection.  *See Broad. Music, Inc. v. Prana Hospitality, Inc.*, 158 F. Supp. 3d 184, 197 (S.D.N.Y. 2016) (willfulness "is often found where a defendant continued the infringing behavior after receiving notice of the license requirement or directions to cease and desist").[30]

---

[30] *See also Viacom, Int'l Inc. v. Fanzine Int'l, Inc.*, 2001 U.S. Dist. LEXIS 11925, at *4 (S.D.N.Y. Aug. 15, 2001) (finding willful infringement where defendant "continued to engage in infringing activities despite having been placed on notice of [plaintiff's] objections."); *Agence Fr. Presse v. Morel*, 934 F. Supp. 2d 547, 570 (S.D.N.Y. 2013) ("In evaluating the infringer's state of mind, courts have looked to factors including . . . . 'whether the infringer had received warnings of the infringements'") (quoting *Marshall v. Marshall*, 2012 U.S. Dist. LEXIS 45700, at *91 (E.D.N.Y. Mar. 30, 2012)).

Defendants even sought to conceal their infringements during discovery by falsely representing that they had no data showing dates of download more than three years before the lawsuit was filed, and by initially failing to provide discovery concerning some ▮ recordings of Plaintiffs' Musical Works based on a reading of the Complaint and Plaintiffs' discovery request that Magistrate Judge Pitman found to be unreasonable. *See U2 Home Entm't, Inc. v. Lai Ying Music & Video Trading, Inc.*, 2005 U.S. Dist. LEXIS 9853, at *26 (S.D.N.Y. May 25, 2005) (granting summary judgment on willfulness where defendants, among other things, produced "unacceptably inadequate document production.").

In sum, there is overwhelming evidence that Defendants knew they were infringing Plaintiffs' Musical Works on a massive scale, or, at a minimum, acted with reckless disregard to Plaintiffs' rights, yet proceeded full steam ahead. This warrants a finding of willfulness.

## V. Sagan is liable for the infringing conduct of his wholly-owned companies.

"It is well established that '[a]ll persons and corporations who participate in, exercise control over or benefit from an infringement are jointly and severally liable as copyright infringers.'" *Arista Records LLC v. Lime Grp.*, 784 F. Supp. 2d 398, 437-38 (S.D.N.Y. 2011) (quoting *Musical Prods., Inc. v. Roma's Record Corp.*, 2007 U.S. Dist. LEXIS 16064, at *1 (E.D.N.Y. Mar. 7, 2007)). "[A]n individual, including a corporate officer, who has the ability to supervise infringing activity and has a financial interest in that activity, or who personally participates in that activity is personally liable for infringement." *Stumm v. Drive Entm't, Inc.*, 2001 U.S. Dist. LEXIS 21675, at *15 (S.D.N.Y. Dec. 27, 2001) (quoting *Blum v. Kline*, 1988 U.S. Dist. LEXIS 4424, at *2 (S.D.N.Y. May 17, 1988)). "[E]ven lack of participation in the infringement will not insulate a corporate officer from liability where he had 'the right and ability to supervise the infringing activity and also had a direct financial interest in such activities.'" *Lottie Joplin Thomas Tr. v. Crown Publ'rs., Inc.*, 456 F. Supp. 531, 537 (S.D.N.Y.

1977) (quoting *L&L White Metal Casting Corp. v. Cornell Metal Specialties Corp.*, 353 F. Supp.

1170, 1175 (E.D.N.Y.1972).

     Sagan is the ▮▮▮▮ owner of the corporate Defendants, and has ▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮ for all of their activities, including the authority to decide ▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮ (SMF ¶ 51.) Sagan thus exercised control over the corporate Defendants,

and had a financial interest in their infringing music streaming and downloading activities.

There is no genuine dispute that Sagan is liable for the corporate Defendants' infringement. *See*,

*e.g.*, *Arista Records LLC*, 784 F. Supp. 2d at 437-38 (granting summary judgment holding CEO

liable for copyright infringement, where CEO was 100% owner of corporate defendant and

testified that he "ran" and was the "ultimate decisionmaker" for corporate defendant); *EMI*

*Christian Music Grp. v. MP3Tunes, LLC*, 844 F.3d 79 (2d Cir. 2016) (affirming liability finding

against CEO and founder who was ultimate corporate decision maker).[31]

     The cases Defendants cite (Defs. Br. 24-25) are inapposite, as none of them even

involved copyright claims. Rather, they involved attempts to pierce a corporate veil where the

wrongful act was committed by the defendant corporation, not its individual officers or owners.

*See William Wrigley Jr. Co. v. Waters*, 890 F.2d 594, 601-602 (2d Cir. 1989) (remanding to

district court issue of whether to pierce corporate veil on breach of contract claims, where

contract was signed in name of corporation, and noting that individual might be liable if he

engaged in wrongdoing); *A/S Domino Mobler v. Braverman*, 669 F. Supp. 592, 594 (S.D.N.Y.

---

[31] *See also Capitol Records, Inc. v. Wings Digital Corp.*, 218 F. Supp. 2d 280, 282, 284-85 (E.D.N.Y. 2002) (CEO and corporate owner individually liable for contributory and vicarious infringement committed by corporation, where individual defendant was "responsible for the daily management, operation and financial control of the corporation"); *Blum v. Kline*, 1988 U.S. Dist. LEXIS 4424, at *2 (S.D.N.Y. May 17, 1988) (corporate president liable for infringement where he "owns all of [the corporation's] shares and is responsible for [its] daily activities").

1987) (declining to pierce corporate veil where "there is no evidence that any fraud was committed by [Defendant]"); *Walkovsky v. Carlton*, 18 N.Y.2d 414 (1966) (declining to pierce corporate veil to hold corporate owner liable for car crash in which he was not involved).

## VI. Plaintiffs are entitled to a permanent injunction restraining Defendants from continuing to infringe Plaintiffs' Musical Works.

Courts are empowered to grant injunctions "on such terms as it may deem reasonable to prevent or restrain infringement of a copyright."  17 U.S.C. § 502(a).  "The decision whether to grant or deny injunctive relief rests within the equitable discretion of the district courts."  *eBay, Inc. v. MercExchange, L.L.C.*, 547 U.S. 388, 394 (2006).  In determining whether an injunction is appropriate, courts consider (1) whether the plaintiff will suffer an irreparable injury absent an injunction; (2) whether remedies at law, such as monetary damages, are adequate; (3) the balance of hardships; and (4) whether an injunction would serve the public interest.  *See Broad. Music, Inc. v. Prana Hosp., Inc.*, 158 F. Supp. 3d 184, 195 (S.D.N.Y. 2016).

Here, all four factors weigh in favor of an injunction.  The first two – irreparable harm and the adequacy of legal remedies – are often considered together.  *See*, *e.g.*, *WPIX, Inc. v. IVI, Inc.*, 691 F.3d 275, 285 (2d Cir. 2012).  Thus, "courts have consistently found that '[h]arm can be irreparable, and adequate remedies at law lacking, where . . . , absent an injunction, the defendant is likely to continue infringing the copyright[.]'"  *HarperCollins Publrs., LLC  v. Open Rd. Integrated Media, LLP*, 58 F. Supp. 3d 380, 386-87 (S.D.N.Y 2014) (quoting *Broad. Music, Inc. v. PAMDH Enters.*, 2014 U.S. Dist. LEXIS 84409, at *13 (S.D.N.Y June 19, 2014)); *see TechnoMarine SA v. Giftports, Inc.*, 758 F.3d 493, 504 (2d Cir. 2014) ("The critical question for a district court in deciding whether to issue a permanent injunction . . . is whether there is a reasonable likelihood that the wrong will be repeated.") (quoting *SEC v. Manor Nursing Ctrs., Inc.*, 458 F.2d 1082, 1100 (2d Cir. 1972)).

Defendants have no intention of ceasing their infringing conduct absent an injunction. They ignored a litany of cease and desist demands before this lawsuit was filed, and dramatically expanded the scope of their infringements even while this case was pending.   Under these circumstances, courts in this circuit have not hesitated to grant injunctive relief.  *See*, *e.g.*, *Rovio Entm't, Ltd. v. Allstar Vending, Inc.*, 97 F. Supp. 3d 536, 547 (S.D.N.Y. 2015) (granting permanent injunction where "[defendant's] past behavior suggest that [it] might continue to engage in infringing activities . . . demonstrating the danger that monetary damages will fail to fully provide [plaintiff] with relief"); *Broad. Music, Inc. v. Prana Hospitality, Inc.*, 158 F. Supp. 3d 184, 195 (S.D.N.Y. 2016) (granting injunction where "Defendants have adduced no evidence to suggest that they have stopped or will stop infringing plaintiffs' copyrights in the future").

Moreover, because Plaintiffs license many of their Works for use in live concert recordings (Pls. Resps. to Defs. SMF ¶ 8), Defendants' unauthorized service threatens to harm Plaintiffs' relationships with their existing licensees, and to undermine their negotiating leverage with prospective licensees, in ways that are difficult to quantify.  (Declaration of Alisa Coleman, dated September 14, 2017 ¶ 4); *WPIX, Inc. v. ivi, Inc.*, 765 F. Supp. 2d 594, 618 (S.D.N.Y. 2011) (allowing viewers to access programming from unsanctioned sources would inevitably damage plaintiffs' ability to profit from sanctioned sources; such losses are notoriously difficult to prove and "nearly impossible to quantify"); *Register.com, Inc. v. Verio, Inc.*, 356 F.3d 393, 404 (2d Cir. 2004) (irreparable harm found where damage to business relationships could not be quantified).

The balance of equities also lies firmly with the Plaintiffs.   Absent an injunction, Plaintiffs would be forced to file a succession of lawsuits each time Defendants infringe their Musical Works – which is occurring on a daily basis.  *See Prana Hosp.*, 158 F. Supp. 3d at 196

("Requiring plaintiffs to commence litigation for each future violation would pose a considerable hardship"); *Broad. Music, Inc. v. Living Room Steak House, Inc.*, 2016 U.S. Dist. LEXIS 23676, at *21 (E.D.N.Y. Feb. 26, 2016) ("Plaintiffs' burden of time and cost of litigating every future violation outweighs the burdens on the Defendants to obtain a license or to not infringe altogether").

Conversely, Defendants have known for more than a decade that their exploitation of bootleg concert recordings without the permission of the performing artists or music publishers is unlawful, and they "cannot be heard to complain if an injunction against continuing infringement destroys the business." *Mint, Inc. v. Iddi Amad*, 2011 U.S. Dist. LEXIS 49813, at *10-11 (S.D.N.Y. May 9, 2011) (quoting *Windsurfing, Int'l, Inc. v. AMF, Inc.*, 782 F.2d 995, 1003 n.12 (Fed. Cir. 1986)); *see WPIX, Inc.*, 691 F.3d 275, 287 (2d Cir. 2012) ("It is axiomatic that an infringer of copyright cannot complain about the loss of ability to offer its infringing product."); *Prana Hosp., Inc.*, 158 F. Supp. 3d at 196 ("the Court cannot detect any hardship that an injunction obliging defendants to comply with their legal duties would impose on them.")

Finally, "the public has a compelling interest in protecting copyright owners' marketable rights to their work and the economic incentive to continue creating . . . ." *WPIX*, 691 F.3d at 287; *see Salinger v. Colting*, 607 F.3d 68, 82 (2d Cir. 2009) (copyright law achieves its object of "promot[ing] the store of knowledge available to the public . . . by providing individuals a financial incentive to contribute to the store of knowledge"). This is especially so where Defendants are exploiting some of the most beloved and valuable musical works of all time, without the permission of the performing artists or music publishers who own those works. Allowing Defendants' infringing conduct to continue would distort the incentives that copyright law is designed to protect.

## CONCLUSION

For all of the above reasons, Plaintiffs respectfully ask that the Court (i) grant Plaintiffs' motion for summary judgment finding Defendants liable for willful infringement of each of Plaintiffs' copyrighted Musical Works, (ii) permanently enjoin Defendants from further infringing Plaintiffs' Musical Works, and (iii) deny Defendants' motion for summary judgment.

Dated:   New York, New York
         September 14, 2017

                              LOEB & LOEB LLP


                              By:  *s/ Barry I. Slotnick*
                                  Barry I. Slotnick
                                  bslotnick@loeb.com
                                  Christian D. Carbone
                                  ccarbone@loeb.com
                                  Tal E. Dickstein
                                  tdickstein@loeb.com
                                  Sarah Schacter
                                  sschacter@loeb.com
                                  345 Park Avenue
                                  New York, NY 10154
                                  Telephone:
                                  212.407.4000

                                  *Attorneys for Plaintiffs/Counterclaim-Defendants*

13434370

55