UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

-------------------------------------------------------------X

ABKCO MUSIC, INC., COLGEMS-EMI MUSIC
INC., EMI ALGEE MUSIC CORP., EMI APRIL
MUSIC INC., EMI BLACKWOOD MUSIC INC.,
EMI CONSORTIUM MUSIC PUBLISHING,
INC. d/b/a EMI FULL KEEL MUSIC, EMI
CONSORTIUM SONGS, INC. d/b/a EMI
LONGITUDE MUSIC, EMI FEIST CATALOG
INC., EMI ROBBINS CATALOG INC., EMI
UNART CATALOG INC., JOBETE MUSIC CO.,
INC., SCREEN-GEMS-EMI MUSIC INC.,
STONE AGATE MUSIC, STONE DIAMOND
MUSIC CORP., IMAGEM MUSIC LLC, PEER
INTERNATIONAL CORPORATION, PSO
LIMITED, PEERMUSIC LTD., PEERMUSIC III,
LTD., SONGS OF PEER, LTD., SPIRIT
CATALOG HOLDINGS S.A.R.L., SPIRIT TWO
MUSIC, INC., WARNER-TAMERLANE
PUBLISHING CORP. and WB MUSIC CORP.,

                        Plaintiffs/Counterclaim-
                        Defendants,

              -against-

WILLIAM SAGAN, NORTON LLC, BILL
GRAHAM ARCHIVES, LLC d/b/a
WOLFGANG'S VAULT, BILL GRAHAM
ARCHIVES, LLC d/b/a CONCERT VAULT,
BILL GRAHAM ARCHIVES, LLC d/b/a MUSIC
VAULT and BILL GRAHAM ARCHIVES, LLC
d/b/a DAYTROTTER,

                     Defendants/Counterclaim-
                     Plaintiffs.

-------------------------------------------------------------X

Case No. 15 Civ. 04025 (ER) (HBP)

Hon. Edgardo Ramos


**PLAINTIFFS/COUNTER-
DEFENDANTS' (A) RESPONSES
TO DEFENDANTS/COUNTER-
CLAIMANTS' STATEMENTS OF
FACTS (DKT. 165) AND (B)
COUNTER-STATEMENT OF
MATERIAL UNDISPUTED FACTS
IN SUPPORT OF CROSS-MOTION
FOR SUMMARY JUDGMENT AND
FOR A PERMANENT INJUNCTION**

Plaintiffs/Counter-Defendants ("Plaintiffs") respectfully submit the following (A) responses to Defendants/Counter-Claimants ("Defendants") Statement of Material Undisputed Facts ("Defs. SMUF") (Dkt. 165), and (B) Statement of Undisputed Material Facts in support of Plaintiffs' Cross-Motion for Summary Judgment and for a Permanent Injunction, pursuant to Local Rule 56.1 of the Southern District of New York.

## PLAINTIFFS' RESPONSES AND OBJECTIONS TO DEFENDANTS' STATEMENTS OF FACTS

### Defendants' Statement of Fact No. 1

The audio and audiovisual recordings at issue in this case were purchased by the WV Defendants between 2002 and 2015 through collections owned by Bill Graham's concert promotion company, Bill Graham Enterprises, Inc., King Biscuit Flower Hour, Festival Network, Thomas Bradshaw, John Brower, Plainfield Music, David Hewitt, Steve Weitzman, Dawson Sound Productions, Amazingrace, Filmsonix, Fuel 2000 Records, Daytrotter, and the Ash Grove theatre. Lundberg Dec. at ¶ 2, Ex. 1 (Recording Acquisition Spreadsheet).

### Plaintiffs' Responses and Objections to Defendants' Statement of Fact No. 1

Plaintiffs admit that Defendants purchased physical tapes that contain recordings of live concert performances, but deny that Defendants acquired any rights to the copyrights in or to any musical compositions or sound recordings contained in those tapes.  Plaintiffs refer the Court to the agreements Defendants entered with the sellers of those tapes the contents thereof. (Declaration of Tal E. Dickstein, dated September 14, 2017 ("Dickstein Decl."), Exs. 3, 15, 16, 18, 19 and 46.)

### Defendants' Statement of Fact No. 2

The WV Defendants have acquired mechanical licenses for use of the compositions at issue. Lundberg Dec. at ¶ 16, Ex. 6 (Notices of Intent "NOIs" Sent to ABKCO); *Id*. at ¶ 17, Ex. 7 (Transaction Statement for ABKCO); *Id*. at ¶ 18, Ex. 8 (Accounting Statements for ABKCO); *Id*. at ¶ 19, Ex. 9 (NOIs sent to EMI); *Id*. at ¶ 20, Ex. 10 (Transaction Statement for EMI); *Id*. at ¶ 21, Ex. 11 (Accounting Statements for EMI); *Id*. at ¶ 22, Ex. 12 (NOIs sent to Imagem); *Id*. at ¶ 23, Ex. 13 (Transaction Statement for Imagem); *Id*. at ¶ 24, Ex. 14 (Accounting Statements for Imagem); *Id*. at ¶ 25, Ex. 15 (NOIs sent to Peer); *Id*. at ¶ 26, Ex. 16 (Transaction Statement for Peer); *Id*. at ¶ 27, Ex. 17 (Accounting Statements for Peer); *Id*. at ¶ 28, Ex. 18 (NOIs sent to Spirit); *Id*. at ¶ 29, Ex. 19 (Transaction Statement for Spirit); *Id*. at ¶ 30, Ex. 20 (Accounting

Statements for Spirit); *Id*. at ¶ 31, Ex. 21 (NOIs sent to Warner); *Id*. at ¶ 32, Ex. 22 (Transaction Statement for Warner); *Id*. at ¶ 33, Ex. 23 (Accounting Statements for Warner); *Id*. at ¶ 34, Ex. 24 (Invoices from Rightsflow and MediaNet); *Id*. at ¶ 45, Ex. 28 (HFA License Application); *Id*. at ¶ 46, Ex. 29 (HFA License Numbers); *Id*. at ¶¶ 47-50; *Id*. at ¶ 50(g), Ex. 30 (Rightsflow Invoices); *Id*. at ¶ 50(h), Ex. 31 (Email from HFA to Lundberg); *Id*. at ¶¶ 51-52; *Id*. at ¶ 53, Ex. 32 (MediaNet invoices); *Id*. at ¶ 54.

**Plaintiffs' Responses and Objections to Defendants' Statement of Fact No. 2**

Plaintiffs deny that Defendants have valid mechanical licenses for any of the Musical Works[1] at issue in this litigation, insofar as (i) Defendants have failed to demonstrate that the concert recordings in their collection were "fixed lawfully" under Section 115 of the Copyright Act ("Section 115") with the permission of the artists whose performances are captured in those recordings and with the permission of the owners of the Musical Works contained in those recordings, (ii) Defendants cannot demonstrate that they sent Notices of Intention to Obtain Compulsory Licenses ("NOIs") prior to distributing recordings of Plaintiffs' Musical Works as required by Section 115 and the regulations promulgated thereunder, 17 U.S.C. § 115(b)(2); 37 CFR 201.18 (Dickstein Decl., Ex. 52), and (iii) mechanical licenses are not available for the recordings Defendants exploited in audiovisual format, 17 U.S.C. § 115, (Lundberg Decl., Ex. 5). Plaintiffs further refer the Court to their accompanying memorandum of law.

Plaintiffs further state that the documents cited by Defendants as "Invoices from Rightsflow and MediaNet" (Lundberg Decl., Ex. 24), "HFA License Application" (*id.*, Ex. 28), "HFA License Numbers" (*id.*, Ex. 29), "Rightsflow Invoices" (*id.*, Ex. 30), "Email from HFA to Lundberg" (*id.*, Ex. 31) and "MediaNet invoices" (*id.*, Ex 32) do not constitute or identify any licenses issued to any of the Defendants for any of the Musical Works at issue.

---

[1] Capitalized terms have the same meaning as in Plaintiffs' accompanying Memorandum of Law.

**Defendants' Statement of Fact No. 3**

        In 2009, the WV Defendants entered Joint Exploitation Agreements with Warner Music Inc., Sony Music Entertainment, and UMG Recordings Inc., which explicitly acknowledge the WV Defendants' copyright ownership in their master recordings and gave the WV Defendants the rights to exploit the compositions through the recordings at issue, including through downloads, streams and other means, with mechanical licenses. Lundberg Dec. at ¶ 4, Ex. 2 (Warner Agreement); Lundberg Dec. at ¶ 5, Ex. 3 (Sony Agreement); Lundberg Dec. at ¶ 6, Ex. 4 (UMG Agreement); Ranahan Dec. at ¶ 5, Ex. D at 128:7-15 (Sagan Deposition Tr.).

**Plaintiffs' Responses and Objections to Defendants' Statement of Fact No. 3**

        Plaintiffs deny that any of the agreements cited by Defendants granted them any rights in

either the master recordings or the musical compositions contained in the physical concert tapes

in Defendants' collection.  Indeed, those agreements *expressly exclude any rights to musical*

*compositions*.[2]  Moreover, none of the Plaintiffs, who own or control the Musical Works at issue,

are signatories to any of those agreements.  (*See* Lundberg Decl., Exs. 2, 3, and 4.)

---

[2] *See* Lundberg Decl., Ex. 2 § 3.1 ███████████████████████████
██████████████████████████████████████████████████████
██████████████████████████████████████████████████████
██████████████████████████████████████████████████████
██████████████████████████████████████████████████████
██████████████████████████████████████████████████████
██████████████████████████████████████████████████████
██████████████████████████████████████████████████████
██████████████████████████████████████████████████████
██████████████████████████████████████████████████████
██████████████████████████████████████████████████████
██████████████████████████████████████████████████████
██████████████████████████████████████████████████████
██████████████████████████████████████████████████████
████████████████████████████████████

Plaintiffs further object to the cited testimony of Defendant William Sagan ("Sagan"), which purports to characterize the terms of written agreements which speak for themselves. FRE 1002.

**Defendants' Statement of Fact No. 4**

In or about 2012, Sony Music Entertainment acquired the publishing catalogue of Plaintiffs Colgems-EMI Music Inc., EMI Algee Music Corp., EMI April Music Inc., EMI Blackwood Music Inc., EMI Consortium Music Publishing, Inc. d/b/a EMI Full Keel Music, EMI Consortium Songs, Inc. d/b/a EMI Longitude Music, EMI Feist Catalog Inc., EMI Robbins Catalog Inc., EMI Unart Catalog Inc., Jobete Music Co., Inc., Screen-Gems-Emi Music Inc., Stone Agate Music, and Stone Diamond Music Corp. Lundberg Dec. at ¶ 5.

**Plaintiffs' Responses and Objections to Defendants' Statement of Fact No. 4**

Plaintiffs deny that Sony Music Entertainment acquired the publishing catalogues of the referenced entities ("EMI Music Publishing"). (Declaration of Audrey Ashby, dated September 12, 2017 ("Ashby Decl.") ¶ 3.) EMI Music Publishing was acquired from its prior owner, Citigroup, in 2012 by a group of investors that did *not* include Sony Music Entertainment. (*Id.*) Furthermore, EMI Music Publishing's catalogue is administered by Sony/ATV Music Publishing LLC – not Sony Music Entertainment, which is a recorded music company, not a music publishing company. (*Id.*).

Plaintiffs further object to this statement as not supported by admissible evidence, S.D.N.Y. L.R. 56.1, as Defendants have not introduced any evidence that the cited declaration testimony (Lundberg Decl. ¶ 6) is based on personal knowledge of any transaction involving Sony Music Entertainment and/or EMI Music Publishing. FRE 602.

**Defendants' Statement of Fact No. 5**

The Joint Exploitation Agreement with UMG Recordings Inc. implicates the copyrights to the same songs performed by the band The Who that are at issue in this case through the claims of Plaintiffs Spirit Catalog Holdings S.A.R.L. and Spirit Two Music, Inc. Lundberg Dec. at ¶ 6.

**Plaintiffs' Responses and Objections to Defendants' Statement of Fact No. 5**

Plaintiffs deny that the cited agreement with UMG Recordings granted Defendants any rights to exploit concert recordings containing musical compositions performed by the band The Who that are owned or controlled by Plaintiffs Spirit Catalog Holdings S.A.R.L and Spirit Two Music, Inc. ("Spirit Plaintiffs")  (Lundberg Decl. ¶ 6, Ex. 4.)

Plaintiffs further object to this statement as not supported by admissible evidence, S.D.N.Y. L.R. 56.1, as Defendants' cite declaration testimony of Matthew Lundberg which purports to characterize the terms of a written agreement, which speaks for itself.  FRE 1002.

**Defendants' Statement of Fact No. 6**

Plaintiffs have not rejected or returned any payments made to Plaintiffs on the WV Defendants' behalf for use of the compositions at issue. Lundberg Dec. at ¶ 17, Ex. 7 (Transaction Statement for ABKCO); *Id*. at ¶ 20, Ex. 10 (Transaction Statement for EMI); *Id*. at ¶ 23, Ex. 13 (Transaction Statement for Imagem); *Id*. at ¶ 26, Ex. 16 (Transaction Statement for Peer); *Id*. at ¶ 29, Ex. 19 (Transaction Statement for Spirit); *Id*. at ¶ 32, Ex. 22 (Transaction Statement for Warner); *Id*. at ¶ 35; Ranahan Dec. at ¶ 2, Ex. A at 44:4-25 (Blietz Deposition Tr.); *Id*. at ¶ 3, Ex. B at 24:25-25:12 (Riggs Deposition Tr.); *Id*. at ¶ 4, Ex. C at 96:9-97-10 (Levy Deposition Tr.).

**Plaintiffs' Responses and Objections to Defendants' Statement of Fact No. 6**

Plaintiffs admit for purposes of this motion that Defendants made payments to Plaintiffs reflected in Lundberg Decl. Exs. 7, 10, 13, 16, 19 and 22.  Plaintiffs deny that those payments gave rise to either an express or implied license, as they were purportedly made pursuant to compulsory mechanical licenses, yet Defendants' NOIs misrepresented the date of first distribution of the concert recordings at issue, and Defendants are not entitled to mechanical licenses under Section 115 for the reasons in paragraph 2 above and in Plaintiffs' accompanying Memorandum of Law.

**Defendants' Statement of Fact No. 7**

The WV Defendants are up-to-date and have remitted to Plaintiffs all payments owed for the 969 audio and 206 audiovisual recordings at issue in this case. Lundberg Dec. at ¶ 16, Ex. 6

(Notices of Intent "NOIs" Sent to ABKCO); *Id*. at ¶ 17, Ex. 7 (Transaction Statement for ABKCO); *Id*. at ¶ 18, Ex. 8 (Accounting Statements for ABKCO); *Id*. at ¶ 19, Ex. 9 (NOIs sent to EMI); *Id*. at ¶ 20, Ex. 10 (Transaction Statement for EMI); *Id*. at ¶ 21, Ex. 11 (Accounting Statements for EMI); *Id*. at ¶ 22, Ex. 12 (NOIs sent to Imagem); *Id*. at ¶ 23, Ex. 13 (Transaction Statement for Imagem); *Id*. at ¶ 24, Ex. 14 (Accounting Statements for Imagem); *Id*. at ¶ 25, Ex. 15 (NOIs sent to Peer); *Id*. at ¶ 26, Ex. 16 (Transaction Statement for Peer); *Id*. at ¶ 27, Ex. 17 (Accounting Statements for Peer); *Id*. at ¶ 28, Ex. 18 (NOIs sent to Spirit); *Id*. at ¶ 29, Ex. 19 (Transaction Statement for Spirit); *Id*. at ¶ 30, Ex. 20 (Accounting Statements for Spirit); *Id*. at ¶ 31, Ex. 21 (NOIs sent to Warner); *Id*. at ¶ 32, Ex. 22 (Transaction Statement for Warner); *Id*. at ¶ 33, Ex. 23 (Accounting Statements for Warner); *Id*. at ¶ 34, Ex. 24 (Invoices from Rightsflow and MediaNet); *Id*. at ¶ 45, Ex. 28 (HFA License Application); *Id*. at ¶ 46, Ex. 29 (HFA License Numbers); *Id*. at ¶¶ 47-50; *Id*. at ¶ 50(g), Ex. 30 (Rightsflow Invoices); *Id*. at ¶ 50(h), Ex. 31 (Email from HFA to Lundberg); *Id*. at ¶¶ 51-52; *Id*. at ¶ 53, Ex. 32 (MediaNet invoices); *Id*. at ¶ 54.

**Plaintiffs' Responses and Objections to Defendants' Statement of Fact No. 7**

Plaintiffs deny that Defendants have paid all sums owed to Plaintiffs for Defendants' exploitations of the Musical Works at issue, as Defendants have no valid licenses that would authorize such exploitation for the reasons in paragraph 2 above and in Plaintiffs' accompanying Memorandum of Law.   Plaintiffs further state that the documents cited by Defendants as "Invoices from Rightsflow and MediaNet" (Lundberg Decl., Ex. 24), "HFA License Application" (*id.*, Ex. 28), "HFA License Numbers" (*id.*, Ex. 29), "Rightsflow Invoices" (*id.*, Ex. 30), "Email from HFA to Lundberg" (*id.*, Ex. 31) and "MediaNet invoices" (*id.*, Ex 32) do not identify any payments to Plaintiffs, let alone any payments with respect to the Musical Works at issue.

**Defendants' Statement of Fact No. 8**

Plaintiffs have not identified any synchronization licenses they have obtained in connection with recordings that arose originally through recordings of live concert performances. Ranahan Dec. at ¶ 2, Ex. A at 35:11-16 (Blietz Deposition Tr.); *Id*. at ¶ 3, Ex. B at 46:6-20 (Riggs Deposition Tr.);   *Id*. at ¶ 6, Ex. E (PLAINTIFFS0008473); *Id*. at ¶ 7, Ex. F (PLAINTIFFS0008476); *Id*. at ¶ 8, Ex. G (PLAINTIFFS0014456); *Id*. at ¶ 9, Ex. H (PLAINTIFFS0014461); *Id*. at ¶ 10, Ex. I (PLAINTIFFS0014464); *Id*. at ¶ 11, Ex. J (PLAINTIFFS0015650); *Id*. at ¶ 12, Ex. K (PLAINTIFFS0015654); *Id*. at ¶ 13, Ex. L (PLAINTIFFS0015668); *Id*. at ¶ 14, Ex. M (PLAINTIFFS0017665); *Id*. at ¶ 15, Ex. N (PLAINTIFFS0017665); *Id*. at ¶ 16, Ex. O (PLAINTIFFS0017881); *Id*. at ¶ 17, Ex. P (PLAINTIFFS0047470).

**Plaintiffs' Responses and Objections to Defendants' Statement of Fact No. 8**

Plaintiffs deny that they have not identified any synchronization ("synch") licenses they have obtained in connection with recordings that arose originally through recordings of live concert performances.   Plaintiffs' license reports, which Defendants themselves cite, identify *numerous* synch licenses for live performances, including the following:



Furthermore, the copy of the Spirit Plaintiffs' license report that Defendants submitted as Ranahan Decl. Ex. P is incomplete.   It omitted the tab of that spreadsheet labeled "Synch" (Dickstein Decl., Ex. 44), which identifies numerous synch licenses that the Spirit Plaintiffs have issued for live concert performances, including the following:



Defendants also did not submit the synch license reports produced by Plaintiff ABKCO Music, Inc. ("ABKCO") (Declaration of Alisa G. Coleman, dated September 14, 2017 ("Coleman Decl.") Ex. A), which identifies numerous synch licenses that ABKCO issued for live concert performances, including the following:

---

[3] Exhibit L to the Ranahan Decl. is an incomplete copy of PLAINTIFFS0015668.  A complete, text-searchable, copy is attached as Exhibit 53 to the Dickstein Decl.



## PLAINTIFFS' STATEMENTS OF UNDISPUTED MATERIAL FACTS IN SUPPORT OF THEIR MOTION FOR SUMMARY JUDGMENT

9.      Prior to 2002, Sagan was involved with a music licensing company, Music Interactive, through a proposed investment.  (Dickstein Decl., Ex. 1 (Lundberg Dep. 99:1-19.))

10.      Sagan founded Defendant Norton LLC ("Norton") to act as a vehicle for the acquisition of collections of concert recordings, and Sagan became Norton's president, CEO and sole owner.  (Dickstein Decl., Ex. 2 (Sagan Dep. 19:14-18, 17:18-22, 20:1-8, 22:13-15)).

11.      In July 2002, Norton acquired a company named Bill Graham Archives LLC ("BGA"), which owned the archives of the late concert promoter, Bill Graham, including numerous concert recordings, posters and other memorabilia.   (Dickstein Decl., Ex. 3 (BGA000001, July 29, 2002 Purchase Agreement between Norton and Bill Graham Enterprises, Inc. for all of the membership interests of BGA.)

12.      The audio recordings in BGA's collection were primarily "soundboard tapes," meaning they were recordings of the audio signal that was broadcast over the house speakers during live performances at the concert venue.  (Dickstein Decl., Ex. 4 (Krassner Dep. 23:18-24:6), Ex. 2 (Sagan Dep. 170:6-12), Ex. 5 (BGA026169 at 26180-82, Prelinger Associates appraisal report), Ex. 8 (BGA025780 at 25787, Bill Graham Archives marketing materials).)

13.      The video footage in BGA's collection was recorded from the signal that was being captured by fixed-position cameras and projected onto large screens at the given venue. (Dickstein Decl., Ex. 4 (Krassner Dep. 44:1-22, 45:17-24, 47:23-25).)

14.    Prior to his death in 1991, Graham had discussed donating his archives, including the concert tapes, to the Oakland Museum.  (Dickstein Decl., Ex. 6 (Clainos Dep. 119:4-21, 123:2-124:25).)

15.    Defendants conducted "extensive" legal due diligence in connection with their 2002 acquisition of BGA (Dickstein Decl., Ex. 2 (Sagan Dep. 103:25-104:16)), and they were advised by several attorneys with experience in the music industry who were "generally familiar with the types of rights that would go with audio and audiovisual works" (Dickstein Decl., Ex. 4 (Krassner Dep. 51:24-52:15).)

16.    Defendants' purchase agreement for BGA provided that Defendants' were acquiring only physical concert recordings, without rights from either the artists whose performances are contained in the recordings, or the owners of the musical compositions embodied in the recordings.  (Dickstein Decl., Ex. 2 (Sagan Dep. 130:10-131:13 ██████████ ███████████████████████████████████████ )

17.    The agreement whereby Defendants acquired BGA provided that Defendants were acquiring ███████████████████████████████████████ ████████████████████████████████ (Dickstein Decl., Ex. 3 (BGA000001 at ¶ 3.10(a)(C)) (emphasis added)), and the seller, a subsidiary of SFX, made ██ ███████████████████████████████████████ ███████████████████████ (id. at ¶ 3.11(a)).

18.    A side letter given to Defendants in connection with their acquisition of BGA stated that ███████████████████████████████████████ █████████████████████████ (Dickstein Decl., Ex. 7 (BGA025808 at *2).)

19.     Defendants have no artist performance contracts that might have permitted Bill Graham or his affiliates to record the subject concerts, and Sagan does not know whether any such contracts ever existed.  (Dickstein Decl., Ex. 2 (Sagan Dep. 58:2-25, 110:3-9, 138:3-141:24).)  Defendants similarly have no knowledge of the circumstances under which the Bill Graham recordings were originally made (*id.* at 115:4-116:18) or as to whether Graham even informed the artists that their performances would be recorded (*id.* at 157:15-18).

20.     When Defendants themselves record musical performances by independent artists for commercial exploitation through their Daytrotter website, ███████████████████ ████████████████████████████████████████████████████ (Dickstein Decl., Ex. 2 (Sagan Dep. 43:7-44:10; 47:11-14).)  Defendants have produced no such agreements with any of the performing artists for any of Plaintiffs' Musical Works at issue here.

21.     An appraisal report that was included in Defendants' closing binder for their acquisition of BGA states that BGA's prior owner ████████████████████████ ██████████████████████████████████████████████████████ ██████████████████████████████████████████████████████ ██████████████████████████████████████████████████████ ██████████████████████████████████████████████████████ ██████████████████████ (Dickstein Decl., Ex. 5 (BGA026169 at 26178, 26184-85).)

22.     A document that was provided to Sagan at the time of the BGA acquisition (Dickstein Decl., Ex. 4 (Krassner Dep. 96:20-98:7), Ex. 2 (Sagan Dep. 167:12-169:17)) and later produced from Defendants' files, states that ███████████████████████████ ██████████████████████████████████████████████████████ █████████████████████████ (*Id.*, Ex. 8 (BGA025780 at 25798) Another

section of that document explained ███████████████████████████████████

███████████████████████████████████████████████████████████████████████

(*Id.* at BGA025788.)

23.     Nicholas Clainos, who was involved in concert production for Bill Graham's

companies since the 1970s and became the president of those companies after Graham's death,

testified that the ██████████████████████████████████████████████████████

██████████████████████████████████████████████████████ (Dickstein

Decl., Ex. 6 (Clainos Dep. 38:5-39:12).)   Clainos further testified that ████████████

███████████████████████████████████████████████████████████████████████

██████████████████████ (*Id.*)

24.     In 2011, Clainos submitted a declaration in a lawsuit in which Defendants were

involved, stating that "[w]hile Graham was alive, [Graham's company] did not generally

financially exploit the archives, primarily due to concerns regarding artist's rights (e.g., if a

concert was recorded, a question arises whether the Companies can exploit that recording

financially without the artist's consent.)  The Companies financially exploited the archives only

with the artists' consent and on a limited basis."  (Dickstein Decl., Ex. 9 (Clainos Dep. Ex. 3 ¶

20), Ex. 6 (Clainos Dep. 47:5-49:9).)

25.     Michael Krassner, an attorney who represented SFX in connection with its sale of

BGA to Defendants, explained to Sagan at the time of the sale that SFX "did not have any rights

to exploit the audiovisual works."  (Dickstein Decl., Ex. 4 (Krassner Dep. 50:7-51:8, 95:10-96:5,

112:13-16, 129:17-25).)   Krassner discussed with Sagan's attorneys "needing to get record

company and artist approval" in order to exploit the recordings (*id.* at 100:24-101:25), and that

"your client [*i.e.*, Sagan] needs to know that he may be buying the world['s] greatest private

collection [of recordings] that no one will ever hear." (*id.* at 52:17-53:4.)  Krassner also notified Sagan's attorneys that Bill Graham's companies "did not own the rights to materially exploit the audiovisual [recordings] without getting the rights from probably record companies and artists, and that was communicated to every buyer, every potential buyer[.]" (*Id.* at 118:2-7.)

26.     Following Defendants' acquisition of BGA in 2002, and continuing through 2015, Defendants acquired at least a dozen other collections of concert tapes, which ████████ ████████████ the number of recordings in their collection.  (Dickstein Decl., Ex. 2 (Sagan Dep. 54:20-25), Ex. 11 (BGA038668, chart showing the of source of Defendants' concert tapes containing Plaintiffs' Musical Works).)

27.     The owners of the musical works contained in the concert tapes Defendants acquired did not consent to the recording of those concert performances.  (Dickstein Decl., Ex. 2 (Sagan Dep. 133:10-15).)

28.     ████████████████████████████████████████ ████████████████████████████, but Defendants do not have any artist agreement permitting Defendants or their predecessors to record the concert performances at issue. (Dickstein Decl, Ex. 2 (Sagan Dep. 249:12-20).)

29.     Defendants prepared a form performing artist agreement, which would ████████ ████████████████████████████████████████████ ████████████████████████ (Dickstein Decl., Ex. 10 (Sagan Dep. Ex. 32, BGA003722 at Third "WHEREAS").)  No performing artists have signed that form agreement. (*Id.*, Ex. 2 (Sagan Dep. 281:15-282:10, 286:18-23).)

30.     None of the three performing artists whom Defendants sought to depose in this action – Keith Richards, David Byrne, and Michael Stipe – stated that they gave permission to

record their concert performances for exploitation by Defendants or their predecessors. (Dickstein Decl., Ex. 12  (Keith Richards Decl. ¶¶ 11-13, 17, 19), Ex. 14 (David Byrne Decl. ¶¶ 12, 13, 15), Ex. 13 (Michael Stipe Decl.).)

31.    Defendants' recording purchase agreement with Thomas Bradshaw, who operated the Great American Music Hall, provides that



(Dickstein Decl., Ex. 15 (BGA000050 at ¶ 4(e)) (emphasis added)). Defendants have not produced any evidence that those approvals were ever obtained.

32.    An exhibit to Defendants' purchase agreement with King Biscuit Entertainment Group, Inc. and related entities lists artists who purportedly consented to the commercial release of their concert recordings – but the only performing artists at issue in this action that appear on that list are ▮▮▮▮▮▮, and Defendants have produced no actual agreement with that group. (Dickstein Decl., Exs. 16, 16a (BGA001161 at Sched. 1.2(d)), Ex. 2 (Sagan Dep. 219:20-222:7).)

33.    David Hewitt, an individual from whom Defendants purchased a collection of concert recordings, acknowledged that he had no written agreements permitting him to record those performances.  (Dickstein Decl., Ex. 17 (Hewitt Dep. 77:10-13, 85:11-25, 87:5-13).) Hewitt acknowledged that performers may not have been aware that he was recording their performance (*id.* at 80:25-84:7), as he recorded the concerts from a truck parked outside the concert venue (*id.* at 53:18-54:20).  Defendants never asked Hewitt whether the performers were aware that he was recording their performances.  (*Id.* at 84:8-20.)

34.    The 2006 agreement whereby Festival Network acquired concert recordings that were later sold to Defendants in 2009 provided that Festival Network's predecessor

██████████████████████  (Dickstein Decl., Ex. 18 (FESTIVAL0000001 ¶ 3.13).)   Sagan

testified that he asked Festival Network for copies of any performance agreements, but he never

received any.  (Dickstein Decl., Ex. 2 (Sagan Dep. 237:8-23).)

35.    The agreement whereby Plainfield Music, Inc. acquired concert recordings from

concert promoter John Scher and his promotion company, which recordings were later sold to

Defendants, states that Plainfield would ████████████████████████████

████████████████████████████████████████████████

███████████████████████████████████████  (Dickstein

Decl., Ex. 19 (BGA000043 ¶ 4(c), recording purchase agreement between Norton and

Plainfield); Ex. 20 (BGA025478 p.14 ¶ 9(c), settlement and surrender agreement between John

Scher and Plainfield).)  Defendants have produced no evidence that any such consents were ever

obtained, and Plainfield informed Defendants that they had no agreements with performing

artists.  (Dickstein Decl., Ex. 2 (Sagan Dep. 249:12-23).)

36.    In response to Defendants' applications to register copyrights in remixes of the

concert recordings they acquired, the United States Copyright Office asked Defendants for

written confirmation that the performing artists had authorized the recording of their

performances.  (Dickstein Decl., Exs. 21 and 22 (BGA019901 ¶ 4; BGA017153 at 17155).)

Defendants have not produced any such written authorizations.

37.    Defendants testified that, before making their recordings available online, they

"did extensive diligence on exactly what was required to publish and pay the appropriate rights

holders" (Dickstein Decl., Ex. 1 (Lundberg Dep. 109:17-20)), including discussing ████████

████████████████████████████████████████████████

█████████████████████████  (Dickstein Decl., Ex. 2 (Sagan Dep. 134:24-135:6)).

38.     Defendants have been advised by intellectual property attorney Michael Elkin since at least 2007.  (Dickstein Decl., Ex. 1 (Lundberg Dep. 57:15-58:12).)

39.     In 2006, Defendants first made about ███████ concert recordings available for interactive streaming on their website WolfgangsVault.com and for download on ConcertVault.com.  (Dickstein Decl., Ex. 1 (Lundberg Dep. 36:16-37:17, 64:16-21).)

40.     Defendants have launched or acquired the websites Wolfgangs.com, Daytrotter.com, MusicVault.com and a Music Vault channel on YouTube (collectively, with WolfgangsVault.com and ConcertVault.com, the "Websites") where they have made concert recordings available for paid download and on-demand streaming, in both audio and audiovisual format.  (Dickstein Decl., Ex. 2 (Sagan Dep. 312:2-314:13); Ex. 1 (Lundberg Dep. 34:7-36:11); Exs. 25-27, 43, 56)[4]

41.     In June 2010, Defendants were adding recordings to their Websites at a rate of about ███ songs per month (Dickstein Decl., Ex. 24 (BGA006091, Lundberg Dep. Ex. 25 at BGA006099), and Defendants have continued adding recordings to their websites at least as recently as March 2017 (Dickstein Decl., Ex. 1 (Lundberg Dep. 50:24-51:9)).

42.     As of November 2016, Defendants had over ███████ songs available on their Websites.  (Dickstein Decl., Ex. 1 (Lundberg Dep. 37:18-38:11).)  By July 2017, that number had grown to ██████.  (Dickstein Decl., Ex. 28 (screen shot of Wolfgangs iOS mobile app).)

43.     In 2014 or 2015, Defendants began charging users a fee of $5 to $10 per concert download.  (Dickstein Decl., Ex. 1 (Lundberg Dep. 42:1-13, 65:3-10).)

44.     Defendants also employ a paid subscription model, whereby approximately ████████ subscribers each pay $39 per year for unlimited interactive streaming.

---

[4] A spreadsheet produced by Defendants as BGA038669 showing the dates when each recording at issue was published to Defendants' Websites is attached as Exhibit 43 to the Dickstein Decl.

(Dickstein Decl., Ex. 1 (Lundberg Dep. 58:16-59:13, 67:12-68:12); Ex. 2 (Sagan Dep. 324:22-326:6, 327:19-328:13).)

45.     Defendants sell both banner and video advertisements that appear on their Websites.  (Dickstein Decl., Ex. 1 (Lundberg Dep. 59:16-62:5, 69:20-25, 73:2-4, 77:9-79:16); Ex. 2 (Sagan Dep. 314:12-315:23, 326:7-327:14).)

46.     Defendants also sell physical concert merchandize on Wolfgangs.com, which Defendants testified is "one big advertisement."  (Dickstein Decl., Ex. 1 (Lundberg Dep. 47:13-49:18).)

47.     Defendants have exploited more than ███ recordings containing Plaintiffs' Musical Works in audio or audiovisual format (Dickstein Decl. 25 (BGA040223, number of total rows)), including by selling more than ███ downloads of those recordings (*id.*, Ex. 26 (BGA038681, number of total rows) and streaming those recordings more than ██████ times (*id.*, Ex. 27 (BGA038682, sum of "Streams" Column J)).

48.     In May 2017, Defendants launched a mobile platform that makes their collection of 500,000 concert recordings available for on-demand streaming to Defendants' paying subscribers on their mobile devices, describing their collection as "still growing."  (Dickstein Decl., Ex. 28 (mobile app screenshot); Ex. 29 (May 24, 2017 email from news@wolfgangs.com).)

49.     In order to make their concert recordings available for digital exploitation, Defendants implemented a "digital transfer and restoration plan for each tape and transferr[ed] the recordings from the tape into digital format."  (Lundberg Decl. [Dkt. 163] ¶ 9.)  Defendants then engaged in "mixing and/or mastering the files . . . creating mp3 files for download and on-demand streaming; backing up all of this work to our RAID storage system and to offline digital

tapes; and publishing the mp3 files and catalog information to the WV Defendants' Websites." (*Id.*)

50.     Defendants manufacture physical records containing certain of Plaintiffs' Musical Works, including a vinyl album that includes the song "Moondance" by Van Morrison, and a vinyl album that includes a John Denver performance of James Taylor's "Fire and Rain." (Dickstein Decl., Ex. 2 (Sagan Dep. 261:14-262:21, 265:13-267:5).)

51.     Sagan owns ███ of Defendants Norton and BGA, and has ██████ ████████████ over all of the activities of those entities (Dickstein Decl., Ex. 2 (Sagan Dep. 43:1-3)), including deciding ████████████████████████████████ ████████████████████████████████ (Dickstein Decl., Ex. 1 (Lundberg Dep. 53:14-54:25)).

52.     Defendants have acknowledged that, in order to exploit their collection of concert tapes, they had to obtain licenses from the songwriters or music publishers that own the copyrights to the underlying musical works.  (Dickstein Decl., Ex. 2 (Sagan Dep. 132:5-13).)

53.     Since at least the 2002 acquisition of the Bill Graham archives, Defendants ████ ████████████████████████████████████████████████ ████████████████████████████████████████████████ (Dickstein Decl., Ex. 2 (Sagan Dep. 132:9-13).)

54.      In an October 2003 email, Sagan acknowledged that Defendants' ability to exploit their collection of concert recordings was ████████████████████ ████████████████████████████████████████████ ██████████████████████ (Dickstein Decl., Ex. 30 (BGA005246, Sagan Dep. Ex. 31).)

55.     Sagan knew before this lawsuit was filed that there was a specific time frame within which Notices of Intention to Obtain Compulsory Mechanical Licenses pursuant to Section 115 of the Copyright Act ("NOIs") had to be sent (Dickstein Decl., Ex. 2 (Sagan Dep. 270:8-272:23)), and Defendants' Matthew Lundberg had reviewed the regulations governing NOIs under Section 115.  (Dickstein Decl., Ex. 1(Lundberg Dep. 216:18-21).)

56.     Defendants engaged two vendors to process and transmit NOIs at Defendants' direction – RightsFlow and MediaNet.  (Dickstein Decl., Ex. 31 (BGA006103, Lundberg Dep. Ex. 24, August 19, 2010 agreement with RightsFlow); Ex. 32 (MN0012560, Lundberg Dep. Ex. 26, May 10, 2013 agreement with MediaNet).)

57.     Defendants acknowledged in their agreements with RightsFlow that Defendants would remain ███████████████████████████████████████████ ███████████████████████████████████████████████████████████ ███████████████████████ (Dickstein Decl., Ex. 31 (BGA006103, Lundberg Dep. Ex. 24 at ¶¶ 1(a), 7(b)(iii))) and that, if any compositions ██████████████████████████████ ███████████████████████████████████████████████████████████ ███████████████████████████████████████████████████████████ ███████████████████████ (*id.* at ¶ 9(a).)

58.     Defendants asked RightsFlow to agree to indemnify them for any copyright infringement claims, but RightsFlow refused.  (Dickstein Decl., Ex. 24 (BGA006091, Lundberg Dep. Ex. 25 at 6094-95).)

59.     For all but five recordings of Plaintiffs' Musical Works, Defendants transmitted NOIs after they began exploiting the recordings, and for more than █████████ recordings, Defendants have not transmitted any NOIs at all.  (Dickstein Decl., Ex. 52 (spreadsheet

comparing dates of NOI sent on behalf of Defendants and the dates on which Defendants first offered the relevant recording for download or interactive streaming).) Even for the five recordings where Defendants' served a timely NOI, they were late in serving NOIs for other recordings of the same Musical Works.  (*Id.*)  Thus, Defendants have reproduced or distributed at least one recording of each Musical Work at issue before serving an NOI, or without serving an NOI at all.

60.     Defendants have acknowledged that it was their practice to begin exploiting concert recordings before serving NOIs for the corresponding recordings.  (Dickstein Decl., Ex. 1 (Lundberg Dep. 183:10-184:9, 238:18-23, 245:1-246:5); Lundberg Decl. [Dkt. 163] ¶¶ 50(a)-(d).)

61.     Although Defendants' Matthew Lundberg testified that it was a "common industry practice" to send NOIs after starting to exploit the relevant recordings (Dickstein Decl., Ex. 1 (Lundberg Dep. 248:14-22); Lundberg Decl. [Dkt. 163] ¶ 50(d)), he could not say where he gained that supposed understanding, or identify any other companies that follow that supposed "industry practice" (Dickstein Decl., Ex. 1 (Lundberg Dep. 248:14-250:22)).

62.     Defendants' NOIs fraudulently misrepresented the date on which they began distributing the recordings at issue.  (Dickstein Decl., Ex. 52 (spreadsheet comparing date of NOIs with date Defendants first initiated a download or stream of the relevant recording); Ex. 1 (Lundberg Dep. 252:15-253:8).)  In each of their NOIs, Defendants represented that they began distributing the subject recording on the same date as the NOI itself, even though Defendants' own documents show that Defendants began exploiting those recordings months or even years earlier.  Defendants' Matthew Lundberg was unable to explain the discrepancy between the date

of first distribution in Defendants' NOIs and the date of first download or first stream from Defendants' internal databases.  (Dickstein Decl., Ex. 1 (Lundberg Dep. 252:21-265:23).)

63.     Of the nearly 200 Musical Works at issue, 180 have at least one recording that does not appear on the HFA spreadsheet Defendants rely upon, HFA0000010.  (Dickstein Decl., Ex. 54.)

64.     In August 2013 and again in August 2014, Plaintiff ABKCO Music, Inc.'s counsel wrote to Defendants demanding that they cease exploiting a video recording of a 1981 Rolling Stones concert because, among other things, ████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████ (Dickstein Decl., Exs. 36-39 (BGA001224, BGA001262, BGA001353, BGA005568).)

65.     In March 2013, attorneys for songwriter Jean-Luc Ponty and his music publishing company demanded that Defendants cease exploiting video recordings of three of Ponty's concerts, explaining that Ponty's publishing company ████████████████████████

████████████████████████████████████████████████████████████████

(Dickstein Decl., Ex. 33 (Lundberg Dep. Ex. 38 at MN0008944).)

66.     In May 2014, Defendants received an email from a music publisher demanding that they remove certain recordings from their Websites, stating ████████████████

████████████████████████████████████████████████████████████████

████████████████████ (Dickstein Decl., Ex. 34 (BGA005369 at 5370).)

67.     In July 2014, representatives of the songwriter and performing artist Carlos Santana wrote to Defendants questioning their authority to distribute a video recording of one of

Santana's concerts, stating ████████████████████████████████████
████████████████████████ (Dickstein Decl., Ex. 35 (BGA001286).)

68.     Beginning in August 2014 when Defendants launched their Music Vault channel on YouTube, Defendants received a "flurry" of demands that concert videos on that page be taken down because of alleged copyright infringement.  (Dickstein Decl., Ex. 1 (Lundberg Dep. 276:14-279:25).)  To prevent their Music Vault channel on YouTube from being suspended for an excessive number of copyright claims, Defendants were forced to divide their content among sub-channels.  (*Id.*)

69.     In August 2014, Defendants received a letter from an attorney for the publishers for songwriters and performing artists Chuck Mangione and Robert Palmer, demanding that Defendants not release recordings of Mangione's and Palmer's concerts because they ████ ████████████████████████████████████████████████████ ████████████████████████████████████████████████████ ████████████████████████████████ (Dickstein Decl., Ex. 40 (MN0012657, Lundberg Dep. Ex. 36); *Id.* (MN0012660, Lundberg Dep. Ex. 36A).)

70.     In January 2015, Defendants received an email from an attorney representing songwriter Patti Smith and her publishing company, stating that they had received from Defendants ████████████████████████████████████████████████ ████████████████████████████████████████████████ ████████████████████████████████████████████ (Dickstein Decl., Ex. 41 (MN0008932, Lundberg Dep. Ex. 23).)

71.     In November 2016, Jean-Luc Ponty's representatives demanded that Defendants cease distributing videos of Ponty's concerts, explaining that Ponty's publishing company had

████████████████████████████████████████████████

██████████████████████████████████████ (Dickstein Decl., Ex. 42 (MN0009216

at 19.))

72.     Defendants represented in their Rule 26(a)(1) Initial Disclosures that they had

written "[l]icense agreements, including but not limited to agreements between and among

[Defendants] and . . . the artists whose musical compositions and/or recordings [Plaintiffs] now

allege to control."  (Dickstein Decl., Ex. 55 at 8)

73.     Sworn declarations from two of the artists that Defendants sought to depose –

David Byrne of the Talking Heads and Keith Richards of the Rolling Stones – have explained

that they did *not* grant permission to record or exploit any of their concert performances at issue.

(Dickstein Decl., Exs. 12 and 14.)

74.     Despite their earlier representations that Defendants do not maintain records as to

when each recording in their collection was downloaded from their Websites, Defendants'

Matthew Lundberg later testified that Defendants *do*, in fact, maintain records of dates of

download from inception.  (Dickstein Decl., Ex. 1 (Lundberg Dep. 72-73.))

75.     Defendants later updated their discovery production with evidence of more than

███████  additional downloads of recordings containing Plaintiffs' Musical Works before

Defendants began sending NOIs in 2013, thereby revealing many more infringements.

(Dickstein Decl., Ex. 26 (BGA038681, Column A "Batch").)

76.     Even after this action was filed, Defendants have continued to exploit Plaintiffs'

Musical Works on their Websites and by selling newly pressed vinyl records.  (Dickstein Decl.,

Ex. 2 (Sagan Dep. 261:14-262:21, 265:13-267:5).)

77.     Defendants' own business records show that Defendants added ████████ recordings of Plaintiffs Musical Works to their Websites after this lawsuit was filed on May 27, 2015.  (Dickstein Decl., Ex. 43 (BGA038680, Column H, "Publish Date").

78.     Plaintiffs own copyrights in and to each of the Musical Works at issue.  (*See* Declaration of Michael Kramer (Plaintiff ABKCO), Declaration of Timothy Cohan (Peer Plaintiffs), Declaration of Audrey Ashby (EMI Plaintiffs), Declaration of Arthur Levy (Spirit Plaintiffs), Declaration of Jeremy Blietz (Warner Plaintiffs), Declarations of Glenn Goldstein and Victoria Traube (IMAGEM / Rodgers & Hammerstein Holdings LLC)

79.     Of the nearly 200 Musical Works at issue, Defendants have exploited audiovisual recordings of at least 146 of those Works.  (Defs. Br. 15; Lundberg Decl., Ex. 5; Dickstein Decl., Ex. 25 (BGA040223, Column J).)

80.     Plaintiffs' witnesses testified that a synchronization license *is* required where the video and audio of a live performance are recorded simultaneously.  (Dickstein Decl., Ex. 45 (Blietz Dep. 34:10-35:6).)

81.     Defendants' 2011 asset purchase agreement with Amazingrace, LLC required that



(Dickstein Decl., Ex. 46 (BGA038611 at ¶ 4(b)).)

82.     A spreadsheet produced by Defendants as shows the date of each concert recording at issue.  (Dickstein Decl., Ex. 43 (BGA038680, column D "Date").)

83.     Of the nearly 200 Musical Works at issue, 180 have at least one recording that does not appear on the HFA spreadsheet Defendants rely upon, HFA0000010.  (Dickstein Decl., Ex. 54.)

84.     Defendants acknowledged in an email to MediaNet shortly after this lawsuit was filed that there were ███████████████████████████████████████████

███████████████████████  (Dickstein Decl., Ex. 47 (MN0008388, Lundberg Dep. Ex. 32); Ex. 1 (Lundberg Dep. 272:22-274:18)) (emphasis in original).

85.     Representatives of ASCAP and BMI have informed Defendants that their license agreements are limited to the specific domain names identified in the agreements, and do not cover other Websites operated by Defendants.  (Dickstein Decl., Ex. 48 (BMI000007) (warning Defendants before this lawsuit was filed that their MusicVault website ██████████████

███████; Ex. 49 (ASCAP0085) ████████████████████████████████

████████████; Ex. 50 (BMI 000011-12) █████████████████████████████████;
Ex. 51 (BMI000053) ████████████████████████████████████)

86.     The music publishing company Sony/ATV Music Publishing, LLC, which began administering the EMI Plaintiffs' music publishing catalogue in 2012, is a separate and distinct entity from the record company Sony Music Entertainment.  (Ashby Decl. ¶ 3.)

87.     Defendants streamed, downloaded and otherwise exploited recordings of Plaintiffs' Musical Works within three years before the complaint was filed on May 27, 2015 (Dickstein Decl., Ex. 26 (BGA038681, showing dates of download in Column C); Ex. 56 (BGA038670, showing the month and year of streams in Columns I and J.)

Dated: New York, New York
      September 14, 2017

                             LOEB & LOEB LLP

                             By:  *s/ Barry I. Slotnick*
                                 Barry I. Slotnick
                                 bslotnick@loeb.com
                                 Christian D. Carbone
                                 ccarbone@loeb.com
                                 Tal E. Dickstein
                                 tdickstein@loeb.com
                                 Sarah Schacter
                                 sschacter@loeb.com
                                 345 Park Avenue
                                 New York, NY 10154
                                 Telephone:
                                 212.407.4000

                               *Attorneys for Plaintiffs/Counterclaim-Defendants*

14582998