**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

-------------------------------------------------------------- X

ABKCO MUSIC, INC., COLGEMS-EMI MUSIC, INC., EMI ALGEE MUSIC CORP., EMI APRIL MUSIC INC., EMI BLACKWOOD MUSIC, INC., EMI CONSORTIUM MUSIC PUBLISHING, INC. d/b/a EMI FULL KEEL MUSIC, EMI CONSORTIUM SONGS, INC. d/b/a EMI LONGITUDE MUSIC, EMI FEIST CATALOG INC., EMI ROBBINS CATALOG INC., EMI UNART CATALOG, INC., JOBETE MUSIC CO., INC., SCREEN-GEMS-EMI MUSIC INC., STONE AGATE MUSIC, STONE DIAMOND MUSIC CORP., RODGERS & HAMMERSTEIN HOLDINGS LLC, PEER INTERNATIONAL CORPORATION, PSO LIMITED, PEERMUSIC LTD., PEERMUSIC III, LTD., SONGS OF PEER, LTD., SPIRIT CATALOG HOLDINGS S.A.R.L., TOWSER TUNES, INC., TOWSER NEWCO LTD., SPIRIT TWO MUSIC, INC., WARNER-TAMERLANE PUBLISHING CORP., and WB MUSIC CORP.,

    Plaintiffs/Counterclaim-
    Defendants,

      v.

WILLIAM SAGAN, NORTON LLC, BILL GRAHAM ARCHIVES, LLC d/b/a WOLFGANG'S VAULT, BILL GRAHAM ARCHIVES, LLC d/b/a CONCERT VAULT, BILL GRAHAM ARCHIVES, LLC d/b/a MUSIC VAULT, and BILL GRAHAM ARCHIVES, LLC d/b/a DAYTROTTER,

    Defendants/Counterclaim-
    Plaintiffs.

-------------------------------------------------------------- X

Case No. 15 Civ. 04025 (ER) (HBP)

Hon. Edgardo Ramos

**MEMORANDUM OF LAW**
**IN SUPPORT OF DEFENDANTS'**
**MOTION FOR RECONSIDERATION**

# TABLE OF CONTENTS

**Page**

MEMORANDUM OF LAW ................................................................................................. 1

I.      INTRODUCTION ................................................................................................. 1

II.     FACTUAL BACKGROUND .................................................................................. 3

        A.      The Underlying Motions ............................................................................ 3

        B.      Errors Regarding The Scope Of The Works At Issue ................................ 4

        C.      The Order Highlights Prejudice Defendants Have Suffered From The Ina-
                bility To Obtain Certain Discovery ........................................................... 4

                1.      Defendants Were Denied The Right To Take The Depositions Of
                        Artists, Yet Three Artists' Untested Statements Are Credited As
                        Undisputed Evidence ...................................................................... 4

                2.      Plaintiffs Delayed Their Obligations To Produce Information Re-
                        flecting Licensing Payments They Have Received From Defend-
                        ants ................................................................................................. 6

III.    The Court Should Reconsider The March 30, 2018 Order To Correct Clear Error
        and Prevent Manifest Injustice ............................................................................. 7

        A.      Legal Standard ......................................................................................... 7

        B.      The Court Should Reconsider The Following Issues To Prevent Clear Le-
                gal Error And Manifest Injustice .............................................................. 7

                1.      Allowing New Parties To Join And Immediately Entering Judg-
                        ment In Their Favor Violates Due Process ..................................... 7

                2.      The Order Contains Legal Error Regarding The Applicability Of
                        Section 115(a)(1) .......................................................................... 10

                        (a)     The "Fixed Lawfully" Language Does Not Apply Given
                                Defendants Did Not "Duplicate a Sound Recording" Fixed
                                "By Another" ...................................................................... 10

                3.      Even If The Substantive Requirements Of Section 115(a)(1) Did
                        Apply, There Are Triable Issues Of Fact ....................................... 11

i

(a) The Court Overlooked Evidence That Creates At Least A Triable Issue Of Fact That The Recordings Were "Fixed Lawfully" ................................................................ 11

(b) Consent Does Not Have To Be In Writing ................................... 13

4. The Court Disposing Of Defendants' Equitable Defenses And Licenses Altogether As A Matter of Law Was Manifest Error .................... 14

(a) Plaintiffs Mislead The Court About The Concept Of Fixation To Exclude Audiovisual Sound Recordings From Compulsory Licensing ................................................ 16

(b) The Court Misconstrues Defendants' Other Licenses ................. 17

5. Finding Willfulness Where A Reasonable View Of The Evidence Also Supports Innocent Infringement Creates A Triable Issue Of Fact ................................................................................................. 18

6. Holding Mr. Sagan Personally Liable For Infringement As A Matter Of Law Is Clear Legal Error ............................................................. 20

C. The Order Also Contains Evidentiary Errors That Should Be Reconsidered ....... 23

1. Cease & Desist Notices From Third Parties About Irrelevant Works Are Plainly Hearsay and Inadmissible Character Evidence .......... 23

2. Mr. Lundberg's Testimony About Test Streams Was Not Inconsistent With His Prior Testimony ........................................................ 24

3. UMG Agreement ............................................................................. 24

IV. CONCLUSION ................................................................................................ 25

# <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*Ansam Assocs., Inc. v. Cola Petroleum, Ltd.*,
    760 F.2d 442 (2d Cir. 1985)..................................................................10

*Appalseed Prods., Inc. v. MediaNet Digital, Inc.*,
    2012 WL2700383 (S.D.N.Y. July 6, 2012) ...................................17

*Arista Records, LLC v. Lime Grp., LLC*,
    784 F. Supp. 2d 398 (S.D.N.Y. 2011)................................................21, 22

*Arista Records LLC v. USENET.com, Inc.*,
    633 F. Supp. 2d 124 (S.D.N.Y. 2009)................................................22

*Asher Worldwide Enters. LLC v. Housewaresonly.com Inc.*,
    No. 12 C 568, 2013 WL 4516415 (N.D. Ill. Aug. 26, 2013).................22

*Branch v. Ogilvy & Mather, Inc.*,
    772 F. Supp. 1359 (S.D.N.Y. 1991)...................................................19

*Caminetti v. United States*,
    242 U.S. 470 (1917).........................................................................16

*Capitol Records LLC v. Redigi Inc.*,
    2014 WL 4354675 (S.D.N.Y. Sept. 2, 2014).....................................21

*Chamberlain Group v. Skylink Tech.*,
    381 F.3d 1178 (Fed. Cir. 2004)........................................................12

*D.C. Comics, Inc. v. Mini Gift Shop*,
    912 F.2d 29 (2d Cir. 1990)...............................................................19

*Dangler v. Imperial Mach., Co.*,
    11 F.2d 945 (7th Cir. 1926) .............................................................22

*F.W. Woolworth Co. v. Contemporary Arts. Inc.*,
    344 U.S. 228 (1952)..........................................................................9

*Gershwin Pub. Corp. v. Columbia Artists Mgmt., Inc.*,
    443 F. 2d 1159 (2d Cir. 1971).........................................................21

*Gunning v. Cooley*,
    281 U.S. 90 (1930)...........................................................................24

i

*Hendrickson v. eBay, Inc.*,
    165 F. Supp. 2d 1082 (C.D. Cal. 2001) ....................................................................23

*Hoover Grp., Inc. v. Custom Metalcraft, Inc.*,
    84 F.3d 1408 (Fed. Cir. 1996).................................................................................23

*Innovative Networks, Inc. v. Satellite Airlines Ticketing Centers, Inc.*,
    871 F. Supp. 709 (S.D.N.Y. 1995) ...........................................................................19

*Island Software & Computer Serv., Inc. v. Microsoft Corp.*,
    413 F.3d 257 (2d Cir. 2005).....................................................................................20

*Kolel Beth Yechiel Mechil of Tartikov, Inc. v. YLL Irrevocable Trust*,
    729 F.3d 99 (2d Cir. 2013)..........................................................................................7

*Krumme v. WestPoint Stevens Inc.*,
    143 F.3d 71 (2d Cir. 1998)...........................................................................................8

*Latin Am. Music Co., Inc. v. Spanish Broad. Sys., Inc.*,
    232 F. Supp. 3d 384 (S.D.N.Y. 2017)........................................................................19

*Lujan v. Defenders of Wildlife*,
    504 U.S. 555 (1992).....................................................................................................10

*Mickle v. Morin*,
    297 F.3d 114 (2d Cir. 2002).......................................................................................11

*Midland Funding, LLC v. Johnson*,
    137 S. Ct. 1407 (2017)..................................................................................................9

*N.A.S. Impor. Corp. v. Chenson Enter., Inc.*,
    968 F.2d 250 (2d Cir. 1992).......................................................................................10

*NAS Elecs. Inc. v. Transtech Elecs. PTE Ltd.*,
    262 F. Supp. 2d 134 (S.D.N.Y. 2003)..........................................................................8

*Nelson v. Adams USA, Inc.*,
    529 U.S. 460 (2000).......................................................................................................7

*Palmer/Kane LLC v. Gareth Stevens Publ'g*,
    No. 1:15-CV-7404-GHW, 2017 WL 3973957 (S.D.N.Y. Sept. 7, 2017)................14

*Pavlica v. Behr*,
    397 F. Supp. 2d 519 (S.D.N.Y. 2005)........................................................................14

*Promotora Hispano Americana De Musica, S.A. v. Peer Int'l Corp.*,
    No. 78 CIV. 3925 (LBS), 1987 WL 11171 (S.D.N.Y. May 12, 1987)....................10

*Psihoyos v. Pearson Educ., Inc.*,
    855 F. Supp. 2d at 129 ...............................................................................................14

*Reynolds v. United States*,
    2007 WL 3071179 (S.D.N.Y. Oct. 19, 2007) ........................................................................8

*Rodgers and Hammerstein et al. v. UMG*,
    2001 WL 1135811, *2 (S.D.N.Y. 2001) ........................................................................10, 14

*Sadhu Singh Hamdad Tr. v. Ajit Newspaper Advert., Mktg. & Commc'ns, Inc.*,
    503 F. Supp. 2d 577 (E.D.N.Y. 2007) ........................................................................7, 12

*Simpson v. Town of Warwick Police Dep't*,
    159 F. Supp. 3d 419 (S.D.N.Y. 2016), *appeal dismissed* (June 15, 2016) ........................8

*Team Air Express, Inc. v. A. Heffco Techs., Inc.*,
    2008 WL 3165892 (E.D.N.Y. Aug. 6, 2008) ........................................................................7

*Tiffany (NJ) Inc. v. eBay Inc.*,
    600 F.3d 93 (2d Cir. 2010) ........................................................................24

*Trans-Orient Marine Corp. v. Star Trading*,
    925 F.2d 566 (Ct. of App., 2nd Cir.) ........................................................................24

*U.S. Titan, Inc. v. Guangzhou Zhen Hua.*,
    182 F.R.D. 97 (S.D.N.Y. 1998), *aff'd*, 241 F.3d 135 (2d Cir. 2001) ........................7

*UMG Recordings, Inc. v. Veoh Networks Inc.*,
    2009 WL 334022 (C.D. Cal. Feb. 2, 2009), *aff'd*, 718 F.3d 1006 (9th Cir.
    2013) ........................................................................23

*Van Der Zee v. Greenidge*,
    2006 WL 44020 (S.D.N.Y. 2006) ........................................................................9

*Wechsler v. Macke Int'l Trade, Inc.*,
    486 F.3d 1286 (Fed. Cir. 2007) ........................................................................23

*Westermann Co. v. Dispatch Printing Co.*,
    249 XJ.S. 100 (1919) ........................................................................9

*Zappa v. Rykodisc, Inc.*,
    819 F. Supp. 2d 307 (S.D.N.Y. 2011) ........................................................................13

**Statutes**

17 U.S.C. § 101 ........................................................................16, 17

17 U.S.C. § 102(a) ........................................................................17

17 U.S.C. § 106 ........................................................................20

17 U.S.C. § 204 ........................................................................13

17 U.S.C. § 504(c)(2) ........................................................................18

17 U.S.C. § 1101 ..................................................................................................13

Pub. L. No. 104-39, 109 Stat. 336 (1995) ..........................................................18

**Other Authorities**

37 C.F.R. 210.16 ..................................................................................................15

74 Fed. Reg. 6832, 6832–34 (Feb. 11, 2009) ......................................................25

"Become an HFA Licensee," *available at*
  https://www.harryfox.com/license_music/become_hfa_licensee.html (last
  accessed April 5, 2018) ..................................................................................15

37 C.F.R. §§ 385.1–.17 ...................................................................................18, 25

Fed. R. Civ. P. 56(e) ...........................................................................................10

H.R. Rep. No. 94-1476, 108 (1976)......................................................................11

Harry Fox Agency, available at
  https://www.harryfox.com/license_music/become_hfa_licensee.html (last
  accessed April 5, 2018)..............................................................................14, 15

UNITED STATES COPYRIGHT OFFICE, *available at*
  https://www.copyright.gov/circs/circ73.pdf (January 2018) .........................18

"The Who at Tanglewood," *available at*
  https://www.youtube.com/watch?v=61foW5x2cmo (last accessed Apr. 7,
  2018) ..............................................................................................................12

## MEMORANDUM OF LAW

Pursuant to Local Rule 6.3, Defendants/Counterclaim-Plaintiffs Bill Graham Archives, LLC d/b/a/ Wolfgang's Vault and Norton LLC, and William E. Sagan ("Defendants") submit this Memorandum of Law in support of their Motion for Reconsideration of the Court's March 30, 2018 Opinion and Order Denying in Part and Granting in Part the Parties' Motions for Summary Judgment (the "Order"), Dkt. 255.

## I.    INTRODUCTION

For at least six reasons, reconsideration of the Court's Order is needed to prevent manifest injustice. Respectfully, allowing the Order to stand would grant a verdict to parties never in the case and disregard black-letter law, years of license payments, and triable issues of fact.

First, after Defendants highlighted Plaintiffs' lack of standing with respect to nearly one-fourth of the works at issue—45 compositions—the Court took the unprecedented step of allowing Plaintiffs to amend to add two new plaintiffs *without* regard to basic due process, and without subjecting them to any discovery. This increased the available statutory damages by $6,750,000,[1] even though the new parties were not required to file or respond to any pleadings or participate in the case at all before summary judgment was granted in their favor. The Court allowed this late amendment based on the unsupported notion that the personnel of the Spirit and Towser entities were identical. Public records show the opposite is true. Allowing these parties to be joined long after the time for amendment and discovery had passed, after summary judgment was briefed, and just four days before summary judgment was decided must be reconsidered based upon the availability of this new evidence.

Second, the Court incorrectly applied the substantive requirements of Section 115(a)(1), which are triggered only when one has "duplicat[ed] sound recordings fixed by another." This is indisputably *not* the case here. Plaintiffs have repeatedly asserted that they are not asserting rights to any *sound recordings* of original historic music that Defendants own, but rather are complaining about uses of the *compositions* in Defendants' sound recordings. Yet the additional substantive requirements that the Court ultimately applied here under Section 115(a)(1) over Defendants'

---

[1] This threatened liability is more than Defendants paid for the entire Bill Graham Archives.

objection are reserved for situations where the defendant is *duplicating* the plaintiff's *sound recordings*—which, again, is not the case here. Thus, the Court's determination of "lawfully fixed" and "express consents" under the substantive requirements of Section 115(a)(1) are at odds with the plain language of the statute. It would be clear legal error and manifestly unjust to invalidate Defendants' licenses based upon a misapplication of Section 115(a)(1).

Third, even if those requirements did apply, the Court: (1) overlooked triable issues of fact about whether the recordings were "lawfully fixed"; and (2) imposed a "written" consent requirement where none exists. In so doing, the Court discounted Defendants' evidence of consent, and drew all inferences in *Plaintiffs'* favor, including by accepting as uncontroverted evidence of non-consent written responses submitted by three artists as part of their successful effort to prevent Defendants from taking their depositions. Moreover, these artists simply claimed they could not recall if they had consented, and did not know whether their band mates did.

Fourth, despite extensive licensing evidence indisputably demonstrating that Defendants have actually paid Plaintiffs—a point that Plaintiffs committed in open court *not* to dispute—the Order not only invalidates the licenses entirely by applying improper statutory requirements, it denies the effect of those licensing payments by stripping Defendants of their right to present their primary equitable defenses. Finding that Defendants had no direct contact with Plaintiffs, the Court disposed of Defendants' implied license defense *as a matter of law*—even though it is undisputed that they had years of contact with Plaintiffs' undisputed agent, Henry Fox Agency ("HFA"). The Court also overlooked factual issues concerning whether Plaintiffs, having enjoyed the benefits of license payments for years, should be estopped from denying the existence of those licenses. Even if the Court disagrees that Defendants should benefit from these defenses, there are still at the very least triable issues of fact that should be left to the jury. And in ultimately rejecting all of Defendants' licenses, the Court made legal errors involving the applicability of Section 115 licensing to audiovisual concerts and the scope of Defendants' other licenses.

Fifth, Defendants' good-faith belief that they were complying with the law through licenses and payments weighs against the Court's finding that Defendants "willfully" infringed copyrights as a matter of law, and presents a triable issue as to whether Defendants' conduct qualifies as

innocent—which would lower the available statutory damages per work to $200. Even assuming, *arguendo*, that the Court's ruling reflected one reasonable inference from the evidence, that inference is not the only reasonable inference, and there is at least a question of fact about whether Defendants' alleged infringement was innocent, willful, or non-willful.

Finally, it is manifestly unjust for the Court to impose *personal* liability against Mr. Sagan without any evidence that he: (i) acted outside the ordinary scope of his duties as a company officer; (ii) participated in direct infringement; or (iii) otherwise engaged in conduct or directly benefitted financially from infringement that would warrant finding him vicariously liable. The Court's decision in this regard threatens a man and his family personally for upwards of $30 million in statutory damages without a shred of evidence that justifies disregarding black-letter law limiting liability for a company's members, directors, or officers. The fact that Mr. Sagan "makes decisions" for the companies is true of every CEO of every company, and presents no basis to hold Mr. Sagan personally liable for any infringing actions of the company Defendants.

For these reasons, and as further detailed below, the Court should reconsider its Order.

## II.   FACTUAL BACKGROUND

### A.   The Underlying Motions

In May 2017, Defendants moved for summary judgment on the bases that they held valid licenses, or at the very least implied licenses, and that Plaintiffs, having received the benefit of full payment under those licenses covering all sums owed for many years, were estopped from denying the licenses. ECF Nos. 161-168. In September, Plaintiffs cross-moved for summary judgment, claiming that Defendants should be liable for willful infringement. ECF Nos. 191-202.

The Court held a hearing on these motions on March 26, 2018, and issued its Order just four days later, on March 30, 2018 (Dkt. 255). Defendants provided certain demonstratives to the Court during this hearing that summarized evidence in this case.[2]

Although the Order finds both "no question" that Defendants "own all the sound recordings at issue," and that the "public interest" favors "access" to these historic recordings (Op. 53-54)— recordings that Defendants have spent enormous resources to obtain, preserve, and make

---

[2] Plaintiffs were provided advance copies and did not object. Ranahan Decl., Ex. A.

available—the Court imposed liability for willful copyright infringement against all Defendants as a matter of law up to a crippling amount of $30 million in statutory damages.

## B.   Errors Regarding The Scope Of The Works At Issue

The precise number of works at issue in a copyright lawsuit is a vital factual question, as each separate work carries a separate statutory damages award of up to $150,000 for willful infringement. At most, there appear to be 197 works at issue here.[3] Ranahan Decl. ¶ 2.



The Court's Order relies on the alleged fact that Defendants supposedly ███████████. Of course, HFA was aware of the earlier licensing, as it appears on *its* document, and ████████████████████. Lundberg Decl. ¶¶ 45-46, Exs. 28, 29, Dkt. 163 (HFA0000001-5, 10-46). The Court's Order states that "of those approximately 200 works, Defendants have exploited audiovisual recordings of at least 146 of them." Op. at 18.███████████. ECF 200.10 Dickstein Decl., Ex. 25 ("Exhibit 25"); *compare* Ex. 25 to Ex. 54.

## C.   The Order Highlights Prejudice Defendants Have Suffered From The Inability To Obtain Certain Discovery

### 1.   Defendants Were Denied The Right To Take The Depositions Of Artists, Yet Three Artists' Untested Statements Are Credited As Undisputed Evidence

From early on in this action, Defendants made clear they would seek artist depositions concerning the issue of consent, in addition to other grounds. Ranahan Decl., Ex. 1, Dkt. 82 (9/3/15

---

[3]*Compare* Dickstein Decl., Ex. 54, Dkt. 200.16 *with* Kramer Decl., Dkt. 194; Goldstein Decl., Dkt. 195; Cohan Decl., Dkt. 196; Blietz Decl., Dkt. 197; Levy Decl., Dkt. 198; Ashby Decl., Dkt. 196. Ex.54 lists the work "The Kids Are Alright", and lists the works "Drugs" and "Drugs (Electricity)" as two separate works.
[4] There were 17 works on HFA0000010 from 2006, and yet HFA, Plaintiffs' agent, *ultimately issued licenses to Defendants on those works*: (1) "Fire and Rain"; (2) "It Makes No Difference"; (3) "King Harvest"; (4) "Little Billy's Doing Fine"; (5) "Me and My Uncle"; (6) "Mony, Mony"; (7) "Moondance" (Van Morrison); (8) "My Generation"; (9) "Relax"; (10) "Shape I'm In"; (11) "Sweet Baby James"; (12) "Tattoo"; (13) "Tupelo Honey" (Van Morrison); (14) "Up on the Roof"; (15) "We Gotta Get Out of this Place"; (16) "You Can't Hurry Love"; and (17) "You've Lost that Lovin' Feeling."

Hr'g Tr.). Plaintiffs objected, insisting that because this case was *not* about the sound recordings, discovery into artist consent was irrelevant. According to Plaintiffs, all that mattered for purposes of consent was who controlled the *compositions*. Specifically, Plaintiffs argued:

> These artists did not own or control the rights **to the underlying compositions (which are the only copyrights at issue in the case)** at the time of the concert recordings at issue, and the relevant concerts all took place more than a decade ago.

Pls.' Ltr. Mot. Quash Am. Dep. Subpoena at 1, Dkt. 71.

Plaintiffs said nothing to suggest that they would be seeking to impose the additional (yet inapplicable) substantive requirements of Section 115(a)(1) about whether a sound recording was "fixed lawfully" and an artist's "express consent." Rather, they repeatedly argued that the artists' consent to the sound recordings was not at issue. *Id*; Ranahan Decl., Ex. 1, Dkt. 82 (9/3/15 Hr'g Tr.). The Court's Order thus rests on a blatant misrepresentation of what is at issue.

Magistrate Judge Pitman denied Defendants the right to take key artist depositions, ordering only written interrogatories.[5]



Ranahan Decl., Ex. C (12/7/16 Hr'g Tr. 10:11-11:12).[6] Despite Defendants' pursuit of these critical artist depositions, Judge Pitman denied reconsideration of this issue, and this Court declined to sustain Defendants' objections to that ruling.[7]

---

[5] After a lengthy hearing on the matter, Magistrate Judge Pitman initially ordered the parties to confer and agree on two artists for depositions that would help determine if more were warranted. 12/19/16 Disc. Order (M.J. Pitman), Dkt. 58. Plaintiffs refused to cooperate and did not make any artist available. See Ps.' 12/19/16 Disc. Ltr., Dkt. 59; Defs.' 12/20/16 Disc. Ltr., Dkt. 60. Magistrate Judge Pitman ultimately reversed course on compelling those depositions, and also went on to grant motions to quash deposition requests for every artist subject to the Court's jurisdiction that Defendants sought to depose. 2/17/17 Disc. Order (M.J. Pitman), Dkt. 95.

[6] Defendants' counsel also explained this at the summary judgment hearing. Bill Graham was the manager of Carlos Santana and other artists, and as a matter of course, recorded these shows.

Ranahan Decl. ¶¶ 2-3, Ex. C; 12/7/16 Hr'g Tr. 10:11-11:12.

[7] See 2/22/17 Order Denying Defs.' Mot. Recons. (M.J. Pitman), Dkt. 98; Defs.' Objs. Disc. Order, Dkt. 106; Order Overruling Defs.' Objs., Dkt. 182.

████████████████████████ Defendants were thus denied the right to pursue the basic tenets that depositions offer: the opportunity to refresh these witnesses' recollections, test their credibility, or ask them about other conduct that could support the conclusion that they provided any necessary consent. ████████████████████████████████████ ███████████████████████████████████████████████████████████████████████. Dickstein Decl., Exs. 12 at ¶ 13, 13 at ¶ 6, 14 at ¶ 13, Dkt.. 200. Yet, despite the fact that Defendants were not even permitted to investigate the artists' consent in a single deposition, the Court's Order invalidated every license that Defendants paid on over the last decade based on an improper application of Section 115(a)(1) and consideration of evidence on artist consent.

### 2.    Plaintiffs Delayed Their Obligations To Produce Information Reflecting Licensing Payments They Have Received From Defendants

On May 2, 2017, Judge Pitman ordered Plaintiffs to produce documents reflecting Defendants' payments to them. Ranahan Decl. Ex. L (5/2/17 Hr'g Tr. 97:16-98:21). While Judge Pitman initially proposed that the production be made within 14 days, Plaintiffs said they would need at least three weeks, until May 23. *Id*. But Plaintiffs flouted that order, making the remarkable claim that their obligations to comply were relieved by Defendants' summary judgment motion. The Court rejected that excuse. Ranahan Decl., Ex. M (8/8/17 Hr'g Tr. 18:20-27:25).

In response, Plaintiffs indicated during the August 8, 2017, hearing before Judge Pitman that they would not dispute on summary judgment that Defendants made the payments owed. *Id*. at 21:5-12. In light of this "stipulation," Judge Pitman set a new deadline for Plaintiffs' production of seven days following any order denying summary judgment. *Id*. Despite Plaintiffs' representation, which again delayed the production of this plainly relevant information, Plaintiffs went on to dispute—without any supporting evidence—that Defendants had paid all sums owed.[8] Plaintiffs further disputed this point at the March 26, 2018, hearing. 3/26/30 Oral Arg. Tr. 52:5-18; 67:22-68:10. Based on these statements, which contravened Plaintiffs' prior representations in open court, the Court relied on Plaintiffs' hollow and unsupported "dispute" about not receiving the sums owed. Order 15.

---

[8] Plaintiffs admit that they have not returned any payments made to and "deny that Defendants have paid all sums owed…" Pls.' Counter 56.1 ¶ 7, Dkt. 202.

III.   **THE COURT SHOULD RECONSIDER THE MARCH 30, 2018 ORDER TO CORRECT CLEAR ERROR AND PREVENT MANIFEST INJUSTICE**

   A.   **Legal Standard**

"Local Civil Rule 6.3 provides the Court with an opportunity to correct manifest errors of law or fact, hear newly discovered evidence…or prevent manifest injustice." *U.S. Titan, Inc. v. Guangzhou Zhen Hua.,* 182 F.R.D. 97, 100 (S.D.N.Y. 1998), *aff'd*, 241 F.3d 135 (2d Cir. 2001). Reconsideration may be granted if the moving party points to the "availability of new evidence, or the need to correct a clear error or, prevent manifest injustice." *Kolel Beth Yechiel Mechil of Tartikov, Inc. v. YLL Irrevocable Trust*, 729 F.3d 99, 104 (2d Cir. 2013).

   B.   **The Court Should Reconsider The Following Issues To Prevent Clear Legal Error And Manifest Injustice**

      1.   **Allowing New Parties To Join And Immediately Entering Judgment In Their Favor Violates Due Process And Prejudices Defendants**

The Court agreed with Defendants that Plaintiffs had named improper parties to maintain claims for 45 works authored by Pete Townshend.[9] Nevertheless, after each side moved for and briefed summary judgment, and with no excuse for the delay in identifying these parties three years into the case, the Court granted Plaintiffs' belated[10] request for leave to amend to include two new proposed plaintiffs at the summary judgment hearing, making no adjustments to account for additional pleadings or discovery with respect to these new parties.

Defendants first should have been provided the chance to respond to any pleading filed by the new Plaintiffs, which is "fundamental to due process," and failing to provide such an opportunity qualifies as a procedural style that "has been questioned even in systems, real and imaginary, less concerned than ours with the right to due process." *Team Air Express, Inc. v. A. Heffco Techs., Inc.*, 2008 WL 3165892, at *11 (E.D.N.Y. Aug. 6, 2008). "[D]ue process does not countenance such swift passage from pleading to judgment in the pleader's favor." *Nelson v. Adams USA, Inc.*, 529 U.S. 460, 465 (2000).   "[J]udicial predictions about the outcome of

---

[9] Ownership is one of two basic elements a copyright plaintiff must prove. *Sadhu Singh Hamdad Tr. v. Ajit Newspaper Advert., Mktg. & Commc'ns, Inc.*, 503 F. Supp. 2d 577, 583 (E.D.N.Y. 2007) (noting that "plaintiff must establish that: (1) it owns a valid copyright, and (2) defendants have engaged in the unauthorized copying of that…work.") Here, Plaintiffs have not met their burden for either element.

[10] The deadline for joinder (12/15/15) and to amend pleadings (2/12/16) expired long ago.

hypothesized litigation cannot substitute for the actual opportunity to defend that due process affords every party against whom a claim is stated." Id.  Defendants must be (but were not) allowed to respond to, and prepare a defense against, each plaintiff, especially when the potential damages for those 45 works are nearly $7 million.

Not only were Defendants denied the right to due process, they were prejudiced.  Granting leave to amend to allow a new party after summary judgment is briefed is prejudicial. Reynolds v. United States, 2007 WL 3071179, at *2 (S.D.N.Y. Oct. 19, 2007).  As the Second Circuit has explained: "a proposed amendment is especially prejudicial when discovery [has] already been completed and" a motion for summary judgment "[has] already [been] filed." *Krumme v. WestPoint Stevens Inc.*, 143 F.3d 71, 88 (2d Cir. 1998).[11]

Defendants' objected, in post-summary judgment briefing and at the hearing, that they would be prejudiced by this late amendment, including because Defendants were denied the right to conduct any discovery into these new parties. *See* Defs.' 2/09/18 LTr. 3-4, Dkt. 246; 3/26/18 Oral Arg. Tr. 9:23-11:6. Yet the Court concluded that no new pleadings and "no new discovery was required," apparently based on the assumption that the "subsidiaries had the same officers, executives and business operations as Spirit." Op. 21.

Plaintiffs *presented no evidence*, however, of the parent subsidiary-relationship between Spirit Catalog Holdings S.a.r.l. and any of the Towser entities. ██████████████████ ████████████████████████████████████████████████████████████████████ ███████████████████████████████████████████████████ 3/26/18 Tr. 6:5-12. In the same January 18, 2012, █████████████████████████████ ████████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████████ ██████████████████████████████████████████████████████████████████

---

[11] *NAS Elecs. Inc. v. Transtech Elecs. PTE Ltd.*, 262 F. Supp. 2d 134, 151 (S.D.N.Y. 2003) ("If the motion were to be granted, discovery would have to be reopened"); *Simpson v. Town of Warwick Police Dep't*, 159 F. Supp. 3d 419, 433 (S.D.N.Y. 2016), *appeal dismissed* (June 15, 2016) (adding new party would require reopening discovery to allow time to prepare a defense.)
[12] *See* Defs.' Sur-reply Mem, Dkt. 242.2; Levy Decl., Ex. 167 at 4, 15, Dkt. 229-1 ("The so-called EPRP Rights and the Seller's rights have been assigned to the Subsidiary" and defining "subsidiary" as Towser Newco Limited).

██████████████████████████████████████

In any event, even if there is a parent-subsidiary relationship between the entities that once existed, ████████████████████████ a public records search indicates that the companies do not share the same officers, executives and business operations. Ranahan Decl., Exs. H, I.; Levy Decl., Ex. 167 at 40-41, ECF 229-1.[13] While non-party Spirit Music Group and Towser Tunes, Inc. may have a shared principal office in New York and a shared CEO, *Spirit Catalog Holdings S.a.r.l. and Towser Tunes, Inc. do not*. The claims for which the non-existent party, Towser Newco Ltd., purports to have standing to bring are plainly problematic.

Plaintiffs have given no indication that Towser Newco Ltd.'s rights were transferred to any Plaintiff in this action. Thus, even assuming that Towser Newco Ltd. had standing to prosecute these claims when it existed, it does not exist today. *See* Dickstein Decl. Ex. 57A, Dkt. 234-2.2 (misstating that Spirit Catalog Holdings, S.a.r.l. acquired the rights to 45 of the works at issue); Pls.' 2/6/18 Ltr., Dkt. 244 (inaccurately arguing that Spirit Catalog Holdings S.a.r.l. acquired the 45 works from Towser Newco Ltd.); Defs.' Sur-Reply Mem. at 4, ECF 242.2.

And as Defendants indicated to the Court, there was additional discovery to be done. Standing is not the only area of discovery to which copyright plaintiffs are subject. Also relevant is an investigation into actual damages or lack thereof (*even if* claiming statutory damages), payments made, the value of their copyrights, among other issues. Ranahan Decl., Ex. P ((30)(b)(6) Notice). Full discovery is typically permitted because the jury has the power to consider factors that inform what is fair and "just" when deciding what level of statutory damages to impose.[14]

Because it was too late to allow the new parties to join the case without severely prejudicing Defendants, the Court should have dismissed those claims for lack of standing. Standing "must

---

[13] █████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████████
*F.W. Woolworth Co. v. Contemporary Arts. Inc.*, 344 U.S. 228, 232 (1952) (quoting I.A. Westermann Co. v. Dispatch Printing Co., 249 XJ.S. 100, 106 (1919)); *see also N.A.S. Impor. Corp. v. Chenson Enter., Inc.*, 968 F.2d 250, 252-53 (2d Cir. 1992) (value of the copyright relevant to the jury's determination of statutory damages); *Van Der Zee v. Greenidge*, 2006 WL 44020, at *2 (S.D.N.Y. 2006) (statutory damages must bear some relation to actual damages).

be supported in the same way as any other matter on which the plaintiff bears the burden of proof, i.e., with the manner and degree of evidence required at the successive stages of the litigation"— which at "summary judgment" requires plaintiffs to "'set forth by affidavit or other evidence 'specific facts.'" *See Lujan v. Defenders of Wildlife*, 504 U.S. 555, 561 (1992) (quoting Fed. R. Civ. P. 56(e)). Plaintiffs have failed to make that "indispensable" showing (*id.*), and they have no one but themselves to blame for neglecting to include the proper party for all these years, through the entirety of discovery.[15] *Ansam Assocs., Inc. v. Cola Petroleum, Ltd.*, 760 F.2d 442, 446 (2d Cir. 1985) (affirming district court's denial of motion to amend where "permitting the amendment would have been especially prejudicial given the fact that discovery had already been completed and [the defendant] had already filed a motion for summary judgment").[16]

At the very least, the Court should have allowed Defendants to conduct complete discovery into these parties before deciding summary judgment.

### 2.   The Order Contains Legal Error Regarding The Applicability Of Section 115(a)(1)

#### (a)   The "Fixed Lawfully" Language Does Not Apply Given Defendants Did Not "Duplicate a Sound Recording" Fixed "By Another"

Second, beyond standing, the Court fundamentally erred in interpreting and applying Section 115(a)(1). While the Court correctly notes that a "licensee cannot simply repackage and sell copies of another's *sound recording*," Op. 5 (emphasis added), Plaintiffs do not allege that Defendants have copied Plaintiffs' *sound recordings*. Rather, they claim that Defendants have used *Plaintiffs' compositions* in *Defendants' sound recordings*. Thus, the "additional substantive requirements" of section of 115(a)(1) that call for analyzing whether the "duplicate" "sound

---

[15] A newly added plaintiff should also not relate back to the original complaint for purposes of the statute of limitations when they are added three years into the case. *Promotora Hispano Americana De Musica, S.A. v. Peer Int'l Corp.*, No. 78 CIV. 3925 (LBS), 1987 WL 11171, at *1 (S.D.N.Y. May 12, 1987) (holding newly added defendant shall not relate back, and the applicable limitation periods shall be measured from the date of the amended complaint.)

[16] Defendants likewise object to the Court allowing another new party, Rodgers & Hammerstein Holdings LLC, to join based on a recent assignment. A new plaintiff is distinct when it comes to damages, sync license practice, payments from Defendants and other relevant items. Defendants are entitled to respond to pleadings and conduct discovery into new parties who are seeking millions in statutory damages, and the Court should reconsider its decision and cease allowing Plaintiffs to play musical chairs through this stage of this case.

recording" "fixed by another" is "fixed lawfully" does not even apply here, as Defendants were not "duplicating" any sound recording "fixed by another." Indeed, *Plaintiffs do not own the sound recordings at issue and never have*; they contend to own the musical *compositions*. H.R. Rep. 94-1476 provides a discussion about the intent behind "fixed lawfully" being:

> to make clear that a person is not entitled to a compulsory license of copyrighted musical works for the purpose of making *an unauthorized **duplication** of a **musical sound recording originally developed and produced by another***.

H.R. Rep. No. 94-1476, 108 (1976) (emphasis added).

Because the only sound recordings at issue are owned by Defendants, *not* Plaintiffs, the additional substantive requirements that concern whether a "sound recording" that was "duplicated" by a defendant was lawfully fixed are simply inapplicable. *See* 3/26/18 Tr. 27:11-25 (addressing this issue). Thus, it is not proper (and there is no need) to decide whether any sound recording duplication here was "fixed lawfully"—the grounds on which the Court invalidated all of Defendants' HFA and other compulsory licenses. The Court should reconsider its holding.

### 3.   Even If The Substantive Requirements Of Section 115(a)(1) Did Apply, There Are Triable Issues Of Fact

Third, even if the substantive requirements of Section 115(a)(1) did apply (they do not), there are at least factual issues as to whether Defendants' recordings satisfy these elements.

#### (a)   The Court Overlooked Evidence That Creates At Least A Triable Issue Of Fact That The Recordings Were "Fixed Lawfully"

It is well settled that "the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge." *Mickle v. Morin*, 297 F.3d 114, 120 (2d Cir. 2002). Respectfully, however, the Court declined to credit Defendants' evidence that could lead a reasonable juror to infer that the recordings were "fixed lawfully."

As Mr. Sagan testified, many of the recordings had been licensed by the artists to Defendants and their predecessors. Ranahan Decl., Ex. H at 337:14-339:3, Dkt. 215-2; Ranahan Decl., Ex. N. Indeed, while the Court suggests in a footnote that such exploitation was limited to what Bill Graham's companies did, that was not the case with the Tanglewood Concert (which

11

implicates 20 works at issue). Documents and testimony by Michael Krassner reflect the companies' rights in the Tanglewood Concert audiovisual recordings. Ranahan Decl., Ex. N, Schedule A; Dickstein Decl., Ex. 4, at 121:1-10; 122:4-9, 125:5-13, Dkt. 200.

The Court also improperly discounted evidence of the material contributions provided by the concert producers and sound engineers who fixed the recordings, who therefore *shared* a joint copyright interest in the initial recordings. Plaintiffs argued, and the Court agreed in footnote 26, that these concerts somehow did not rise to the level of the contributions that a record producer would make to a sound recording. Op. 34, n.26. But material contributions were made by the sound engineers when these recordings were fixed which rendered Defendants' predecessors performers on those recordings. There is ample evidence that those producers—including David Hewitt for King Biscuit, and Bill Graham—were integral to the ultimate sound captured in those recordings. Ranahan Decl., Ex. K (Remote Recording website). Bill Graham produced the concerts, spoke to the crowd in many of the recordings,[17] and directed sound engineers from his concert promotion team to operate the delicate sound boards. Dickstein Decl., Ex. 4 at 5:2-10, Dkt. 200. The bulk of the works at issue were from King Biscuit, about which the legendary sound engineer David Hewitt provided extensive testimony concerning the recordings, how he created and fixed the recordings for radio broadcast, and how artists entered the recording trucks to have the recordings made. Ranahan Decl., Ex. E (Tr. 44:10-59:19); Sagan Decl., Ex. A. This is plainly enough to present a triable issue on lawful fixation.[18]

Plaintiffs had the burden of presenting evidence that Defendants' recordings are unauthorized. *Sadhu Singh Hamdad Tr. v. Ajit Newspaper Advert., Mktg. & Commc'ns, Inc*., 503 F. Supp. 2d 577, 583 (E.D.N.Y. 2007) (plaintiff must prove "*unauthorized copying* of that … work"); *Chamberlain Group v. Skylink Tech*., 381 F.3d 1178 (Fed. Cir. 2004) (affirming summary

---

[17] *See, e.g.*, Bill Graham introduces the band in "The Who at Tanglewood," *available at* https://www.youtube.com/watch?v=61foW5x2cmo (last accessed Apr. 7, 2018).

[18] The same concerns that underlie statutes of limitations exist when considering recordings from several decades ago, as they "'are not simply technicalities'… They reflect strong public-policy determinations that 'it is unjust to fail to put [an] adversary on notice to defend within a specified period of time'… And they 'promote justice by preventing surprises through the revival of claims that have been allowed to slumber until evidence has been lost, memories have faded, and witnesses have disappeared.'" *Midland Funding, LLC v. Johnson*, 137 S. Ct. 1407, 1418 (2017).

judgment for defendant where *plaintiff failed to prove lack of authorization*). Plaintiffs did not meet that burden, and at a minimum the issue should go to the jury.

### (b)   Consent Does Not Have To Be In Writing

In considering the issue of lawful fixation, the Court also added a requirement that any consent by the performer be "written." Op. 9, 10, 11, 15, 31, 33. But that requirement has no basis in the text of the statute, which refers simply to those who act "without *the consent* of the performer or performers involved." 17 U.S.C. § 1101 (emphasis added). Plaintiffs did not even argue—let alone cite any authority holding—that consent for purposes of fixation must be written. *See* ECF Nos. 200, 201, 230, 231.[19] Nor did the Court cite any such authority, as none exists. Furthermore, other sections of the Copyright Act include writing requirements; transfer of a copyright, for example, requires a written instrument. 17 U.S.C. § 204. Had Congress intended to include a requirement that consent be written, the statute would include such language.

The record overwhelmingly shows that it was industry custom for consent to be oral. Defs.' Counter 56.1 ¶ 33. Further, the Court excluded post-facto agreements that Defendants reached with *agents of the artists* to jointly exploit the works. In assessing implied licenses—which is perhaps the closest analog to the issue of non-express artist consent—courts in this district have found knowledge and cooperation to be sufficient reasons to find a material question of fact not suitable for resolution on dispositive motion. *E.g.*, *Zappa v. Rykodisc, Inc.*, 819 F. Supp. 2d 307, 319 (S.D.N.Y. 2011). Given that no such "written" requirement exists, at the very least, a material question of fact exists as to the nature of the initial fixation of the recordings at issue.

Moreover, even though not required, Defendants *do* have written agreements with several artists who performed on the sound recordings at issue, acknowledging that the recordings were lawful and owed by Defendants. Sagan Decl., Exs. B-F (exploitation agreements with various artists); Defs.' 12/6/16 Ltr. 2, n.4, Dkt. 54. ████████████████████████████████████████████ ████████████████████████████████████████████████████████, *Id.*, Ex. E.[20] There is a

----

[19] As early as fall 2015, Plaintiffs recognized Defendants' position that artist consents could be either implied, oral, or written. *See* 9/3/15 Hr'g Tr. 8:5-11 ("… and it is an indication to us that some of the agreements that Mr. Elkin referred to with performers are either oral or implied.").

[20] ████████████████████████████████████████████████████████████████████ ████████████████████████████████████████████. Sagan Decl., Ex. E (Van Morrison Agreement);

fundamental factual issue with respect to the recordings by those artists.

### 4. The Court Disposing Of Defendants' Equitable Defenses And Licenses Altogether As A Matter of Law Was Manifest Error

Fourth, the Court manifestly erred in disposing of Defendants' equitable defenses as a matter of law. The defenses of estoppel and implied licenses often raise fact questions that belong to a jury. *Psihoyos v. Pearson Educ., Inc.*, 855 F. Supp. 2d at 129 (denying summary judgment on implied license defense where "Defendants may or may not be able to persuade a jury that the course of conduct here created an implied license" and there was "insufficient evidence in the record for the Court to resolve this question as a matter of law."); *Pavlica v. Behr*, 397 F. Supp. 2d 519, 527 (S.D.N.Y. 2005) (defenses of implied license and estoppel were questions of fact for the jury).[21]

This case is no different. The Court decided that an implied license defense could not apply here because, even though Defendants, through HFA, made payments for years to Plaintiffs for the uses at issue, Plaintiffs never had direct contact with Defendants. Op. 45-46. This ignores that HFA was indisputably Plaintiffs' agent, and thus stood in their shoes.

The Court also overlooked evidence that creates at least a factual question as to whether an HFA license is negotiated or compulsory. HFA negotiates licenses outside the statutory scheme, requires quarterly payments versus the monthly payments under Section 115, and sets different rates. The Court's Order states that Defendants provided "no evidence" that the HFA licenses are separately negotiated licenses falling outside of the compulsory requirements set forth in Section 115. But that is simply not the case. As explained in *Rodgers and Hammerstein et al. v. UMG*, a case cited previously by Defendants, the Court explained:

> ***Most music publishers, including Plaintiffs, employ the Harry Fox Agency, Inc. ("HFA") as their agent*** to receive notice of the intention to obtain a compulsory license, and to collect and distribute royalties. Acting on behalf of their clients, HFA ***waives the statutory notice requirements***, ***negotiates royalty rates at or***

---

Sagan Dep. Ex. 37; Ranahan Decl., Ex. 1 (Demonstratives).
[21] *See also Palmer/Kane LLC v. Gareth Stevens Publ'g*, No. 1:15-CV-7404-GHW, 2017 WL 3973957, at *17 (S.D.N.Y. Sept. 7, 2017) ("a jury could find for either party on … whether the Images were used pursuant to and within the scope of a valid license, whether that license was express or implied. Accordingly, the question cannot be resolved … as a matter of law").

> **below the statutory level, and substitutes a quarterly accounting**
> **and payment schedule for the monthly schedule prescribed by**
> **Section 115.**

2001 WL 1135811, *2 (S.D.N.Y. 2001) (emphasis added)

According to the Court, "Defendants take out of context" the above language, which merely stands for the proposition that "HFA acts as the publishers' agent to receive notices of the intention to obtain a compulsory license, and to collect and distribute royalties."[22] But that is the point: HFA, *acting in its authority as their agent*, has the power to "waive[] the statutory notice requirements" of Section 115 by granting licenses for uses that are otherwise ineligible for a compulsory license. As Defendants' evidence showed, ██████████████████████████████ ████████████████████████████████████████████████████████████. *See* Lundberg Decl., Ex. 29, Dkt. 163 (noting dates of first exploitation as "release date").[23]

HFA does not subject licensees to the same reporting requirements outlined in the Section 115 regulations.[24] Equating a voluntary, negotiated license with a statutorily compulsory one is not only factually inaccurate, but could have disastrous ramifications for digital service providers worldwide who have chosen the HFA licenses precisely because of these factual differences.

Defendants' witness, Matthew Lundberg, testified that he understood that he had obtained all necessary licenses for the period and paid all amounts believed to be owed. Lundberg Decl. ¶¶ 15-54, Dkt. 163. There were reasons, set forth in the record, that Defendants never were provided complete records of those licenses. Plaintiffs' counsel admitted that HFA does not provide certificates of individual licenses to licensees. 3/26/18 Tr. 93:22-94:1. There is also

---

[22] Defendants would also note that HFA expressly states on its website that it "is not authorized by its affiliated publishers to accept Notices of Intention to Obtain a Compulsory License for Making and Distributing Phonorecords (NOIs) pursuant to Section 115 of the Copyright Act on their behalf. All NOIs must be sent directly to the publisher." *See* "Become an HFA Licensee," *available at* https://www.harryfox.com/license_music/become_hfa_licensee.html (last accessed April 5, 2018). This further demonstrates the distinction between the HFA license and the Section 115 licenses; if the licenses were truly the same, this disclaimer would be erroneous.

[23] *See* July 3, 2013 Email from Nicole Malumba, HFA Digital Licensing Agent, to Defendants. Lundberg Decl. Ex. 31 at HFA0000006 ("You have advised us, in our capacity as Agent for the Publisher(s)…").

[24] *Compare* "Become an HFA Licensee," The Harry Fox Agency, available at https://www.harryfox.com/license_music/become_hfa_licensee.html (last accessed April 5, 2018) ("HFA licensees are required to report sales and/or usage and royalties within 45 days of the end of each calendar quarter."), with 37 C.F.R. 210.16 ("Monthly statements of account") and 201.17 ("Annual statements of account").

evidence and prior authority detailing the administrative errors with HFA.[25] Because a reasonable jury could conclude, based upon the available evidence, that Defendants had at least an implied, if not actual, licenses with HFA and/or others, there is a triable issue of fact as to the nature and validity of the HFA licenses, and whether Plaintiffs should be estopped from denying their existence based on a pattern of conduct between Defendants and Plaintiffs' agent, HFA.

### (a) Plaintiffs Mislead The Court About The Concept Of Fixation To Exclude Audiovisual Sound Recordings From Compulsory Licensing

The Copyright Act is clear: the term "Phonorecords" means "material objects in which sounds, other than those accompanying a motion picture or other audiovisual work, are fixed … ," *and* "the term … *includes* the material object in which the sounds are first fixed." 17 U.S.C. § 101 (emphasis added).[26] Plaintiffs argued, and the Court agreed, that the statutory definition excludes sounds that are "first fixed" on a medium that *also* records video. But that argument is fatally flawed: it ignores the statute's plain language, and the alternative interpretations that Plaintiffs proffer simply make no sense. Plaintiffs' interpretation misreads the Copyright Act, ignores the distinction between "sounds" and "material objects," and depends on the factually incorrect assumption that sounds may somehow be "fixed" on "studio equipment"—a fundamental misunderstanding of how recording technology works.

This Court adopted Plaintiffs' misleading argument "that Congress intended to ensure that the Copyright Act protected as phonorecords material objects *such as studio equipment* on which 'sounds are first fixed.'" Op. 27, n.22 (emphasis added); Pls.' Reply at 15-16, Dkt. 230 (offering "studio equipment" as *one* example of "the material object in which the sounds are first fixed"). But this interpretation of the statute simply makes no sense: "studio equipment," such as a tape recorder or a mixing board, is not a "material object[] in which sounds … are fixed," any more

---

[25] *See* Lundberg Decl. ¶ 52, Dkt. 163; Ranahan Decl. ¶ 5, Ex. D at 291:9-292:24 (Sagan Dep. Tr.), Dkt. 157; Defs.' 2/8/17 Ltr. Opp., Ex. A, Dkt. 72-1 (DigitalMusic News Article) (describing HFA as an "organization roundly being blamed for the current royalty mess," in reference to the 2015 class action lawsuit against music streaming service Spotify); Ex. B, Dkt. 72-2 (Techdirt Article); Ex. C, Dkt. 72-3 (Future of Music Coalition Article).

[26] "It is elementary that the meaning of a statute must, in the first instance, be sought in the language in which the act is framed, and if that is plain, and if the law is within the constitutional authority of the lawmaking body which passed it, the sole function of the courts is to enforce it according to its terms." *Caminetti v. United States*, 242 U.S. 470, 485 (1917).

than a camera lens is a photograph.[27] The Copyright Act concerns works that are fixed "*in*" a material object—not "by" a material object—and the equipment that *performs* or *enables* the fixation is plainly not part of the work itself. *See* 17 U.S.C. § 102(a) (copyright applies only to works "fixed in [a] tangible medium").

The Court also erred in finding that the sounds that Defendants recorded were "sounds … accompanying … [an] audiovisual work," and thus excluded under the phonorecords definition's first prong. Op. 27. That is simply incorrect: the "sounds" at issue were those created by on-stage performers in the course of *live performances*—and therefore not "sounds … accompanying a motion picture or other audiovisual work."[28] Because the sounds of such live performances do not "accompany[]" anything, they do not fall into the "audiovisual works" exception, and there is no conflict between the first and second prongs of the phonorecords definition. Finally, the Court's interpretation is wrong from a policy standpoint: while the definitional exclusion, in conjunction with § 115, properly protects filmmakers by excluding motion pictures from compulsory licensing regimes, there is no rational policy basis for a reading whose sole effect is to permit Plaintiffs to make an end run around Congress's carefully calibrated compulsory licensing framework, and let them collect windfall profits by exercising veto power over the dissemination of culturally important works that happened to have been first fixed on videotape. It was legal error to find willful copyright infringement as a matter of law regarding these audiovisual works.

### (b)    The Court Misconstrues Defendants' Other Licenses

For a digital service provider ("DSP") to properly license interactive streaming, the DSP may be required to acquire both public performance and mechanical licenses. *See Appalseed Prods., Inc. v. MediaNet Digital, Inc.*, 2012 WL2700383, at *2 (S.D.N.Y. July 6, 2012). Indeed, the deduction of public performance royalties is "Step 2" in the regulatory calculation of

---

[27] It is doubtful that Plaintiffs with their wealth of music industry experience believe, in good faith, that sounds may be "fixed" in unspecified "studio equipment," rather than in a standard recording medium such as audiotape or videotape. In any event, the sounds here were captured through studio equipment in recording trucks, through sound boards at concerts, and other qualifying devices. Ranahan Decl., Ex. E (Hewitt Dep. Tr. 44:10-59:19); Sagan Decl., Ex. A.

[28] Plaintiffs say that the first part of the statutory definition "expressly excludes material objects in which audiovisual works are fixed," but the statute says *no such thing*. It classifies *sounds*, not material objects. Pls.' Reply, Dkt. 230 at 16 n.21; 17 U.S.C. § 101.

mechanical royalties under Section 115. 37 C.F.R. § 385.12 (2).

The Court's analysis of the significance of the Defendants' various license agreements with PROs is incorrect. The Court drew an unsupportable dichotomy between public performance and mechanical licensing, stating that a "public performance of a musical work, [] includes on-demand streaming," while "a mechanical license [] grants the licensee the right to reproduce and sell recordings of the musical work. Op. 14 n.13. The footnote suggested that mechanical licensing does not apply to interactive or non-interactive streaming. That is incorrect.[29]

Understanding that both rights may be required, Defendants entered into agreements with the major performing rights organizations ("PROs"). *See* Lundberg Decl., Ex. 25, Dkt. 163 ("ASCAP Agreement"); Lundberg Decl., Ex. 26, Dkt. 163 ("BMI Agreement"); Lundberg Decl., Ex. 27, Dkt. 163 ("SESAC Agreement"). The significance of the various PRO agreements is *not* that those agreements address mechanical rights—which, as the Court notes, they do not—but rather that Defendants made conscientious, good-faith efforts to properly license their uses of Plaintiffs' musical works.

The Court also accepted and relied upon Plaintiffs' unsupported factual "dispute" as to the statutory amounts owed (Op. 15), despite Plaintiffs' stipulation for summary judgment that all payments owed under the compulsory licensing scheme were received. Plaintiffs should not be permitted to skirt discovery orders and break promises, only to have the Court rely on those unsupported representations to invalidate Defendants' licenses as a matter of law. *Supra* at 6.

### 5.   Finding Willfulness Where A Reasonable View Of The Evidence Also Supports Innocent Infringement Creates A Triable Issue Of Fact

Fifth, there is at least a triable issue of fact as to willfulness. Damages for willful infringement may reach up to $150,000 per work, while innocent infringement comes with a floor as low as $200 per work. 17 U.S.C. § 504(c)(2). "A finding of innocent infringement primarily is

---

[29] *See* Digital Performance Right in Sound Recordings Act, Pub. L. No. 104-39, 109 Stat. 336 (1995) (extending mechanical license to "digital phonorecord deliveries," defined as "each individual delivery of a phonorecord by digital transmission of a sound recording...*regardless of whether the digital transmission is also a public performance* of the sound recording or any non-dramatic musical work embodied therein.") (emphasis added); "Circular 73: Compulsory License for Making and Distributing Phonorecords," UNITED STATES COPYRIGHT OFFICE, *available at* https://www.copyright.gov/circs/circ73.pdf (January 2018).

a factual determination." *Innovative Networks, Inc. v. Satellite Airlines Ticketing Centers, Inc.*, 871 F. Supp. 709, 721 (S.D.N.Y. 1995); *D.C. Comics, Inc. v. Mini Gift Shop*, 912 F.2d 29, 35 (2d Cir. 1990) ("the district court's conclusion that their infringement was innocent is primarily a factual determination"). And a defendant may show that it was "innocent" by showing a subjective good-faith belief that its conduct was lawful. *Latin Am. Music Co., Inc. v. Spanish Broad. Sys., Inc.*, 232 F. Supp. 384, 393 (S.D.N.Y. 2017).

In *Branch v. Ogilvy & Mather, Inc.*, 772 F. Supp. 1359, 1364-65 (S.D.N.Y. 1991), the court noted that even if a defendant continues to infringe after having been notified of its allegedly illegal actions, the infringement is not necessarily willful. The plaintiff there maintained that she had sustained her burden of proving willful infringement, but the court agreed that innocent infringement, and the lower statutory damages floor, applied where the defendant contended that it had a good-faith belief that its actions did not constitute copyright infringement. *Id.* at 1365.

Even assuming, *arguendo*, that the Court could not grant summary judgment to *Defendants* on the validity of their licenses, and could impose liability by rejecting their equitable defenses as a matter of law, factual issues would still preclude a finding of *willfulness* as a matter of law. Because Defendants believed in good faith that they had proper licenses—indeed, paying all amounts owed under the statutes that they believed applied—the jury should have available the lower floor for innocent infringement.

Even if a jury could infer from certain pre-acquisition communications that more licenses were required, the same materials also support the opposite conclusion. For example, the Court notes ██████████████████████████████████████████████████████████ ████████████████." Op. at 8. But that phrase instead notes that "there are compelling issues regarding the right to exploit *without* such approval." Dickstein Decl., Ex. 5, Dkt. 200. That language, which was actually promoting the sale of materials, can be read to leave *open* the door to ways of monetizing the recordings *without* approval by any musical artists.

The remaining "evidence" supporting willfulness comes from language in agreements stating the obvious proposition that while intellectual property rights are transferred, those rights are in some respects limited and must be cleared. Op. 47-50. This language cannot and does not

compel a finding of willfulness when Defendants went to great lengths to clear those rights, and to pay what they thought was owed. Mr. Lundberg, who oversaw the licensing for Defendants, believed that they were complying with the law governing licensing, and described his 13-year history with the company and the extensive steps Defendants took in a good-faith attempt to pay all required licensing payments. Lundberg Decl., Dkt. 163. Before exploiting the works, Defendants obtained relevant licenses from PROs and HFA, and fully paid all statutory and negotiated amounts owed. *Id.* Consequently, the evidence presents at least a factual question for the jury about whether any of Defendants' alleged infringement was innocent as opposed to willful.

### 6.   Holding Mr. Sagan Personally Liable For Infringement As A Matter Of Law Is Clear Legal Error

Sixth, the Court's Order improperly conflates direct infringement and vicarious liability, misapplies the standard for vicarious liability (which is not at issue), and neglects basic tenets of corporate law to hold Mr. Sagan liable for *direct* infringement. No evidence supports this holding. Instead, the Order relies on evidence concerning Mr. Sagan's title and decision-making authority—classic factors in *vicarious* liability analysis. But even if vicarious liability were an available claim—it is not—there is insufficient proof to hold Mr. Sagan, as an officer and member of a limited liability company, vicariously liable for the company defendants' alleged acts.

To establish a claim of *direct* copyright infringement, the plaintiff must prove "that … the defendant infringed the plaintiff's copyright by violating one of the exclusive rights that 17 U.S.C. § 106 bestows upon the copyright owner." *Island Software & Computer Serv., Inc. v. Microsoft Corp.*, 413 F.3d 257, 260 (2d Cir. 2005).

There is no evidence in the record—and the Order cites none—that Mr. Sagan personally copied, distributed, or publicly performed any of the works at issue. Whether he founded, owned, or was a member of a limited liability company, acquired copies of existing recordings, or "document[ed] … licensing issues," none of these directly infringes any of the § 106 exclusive rights. Op. 51. Nor does merely exercising "final decision-making authority" in the management of a company's day-to-day activities—the ordinary responsibility of any CEO. *Id.* While Plaintiffs' Complaint *alleges* that Sagan "'***participated in*** … the acts' identified in the Complaint," Op. 52, n.33 (emphasis added), there is zero evidence that Sagan's purported participation included any

act of *direct* infringement. And more than allegations are required at summary judgment.

Instead of applying the proper standard for direct infringement, the Order quotes *dictum* from an unpublished case for the proposition that "a corporate officer, who has the ability to supervise infringing activity and has a financial interest in that activity, or who personally participates in that activity is *personally* liable for infringement." Order 50, quoting *Capitol Records LLC v. Redigi Inc.*, 2014 WL 4354675, at *2 (S.D.N.Y. Sept. 2, 2014). That dictum merely paraphrases the standard for *vicarious liability*, under which "one may be vicariously liable if he has the *right and ability* to supervise the infringing activity and also has a *direct financial interest* in such activities." *Gershwin Pub. Corp. v. Columbia Artists Mgmt., Inc.*, 443 F. 2d 1159, 1162 (2d Cir. 1971) (emphasis added). *Redigi* did not analyze the circumstances under which a company's officer could be liable for *direct* infringement; rather, it merely held that plaintiff's generalized allegations (that the corporate defendant "engaged in various infringing activities and that these activities were undertaken at the behest of or with the approval of the Individual Defendants, who were [its] co-owners") met the Rule 12 plausibility standard. 2014 WL 4354675, at *3 (S.D.N.Y. Sept. 2, 2014). *Redigi* cannot help plaintiffs that, as here, have failed to adduce sufficient evidence to support such claims on summary judgment.

*Arista Records, LLC v. Lime Grp., LLC*—cited in *Redigi*—likewise involved claims of indirect rather than direct infringement. 784 F. Supp. 2d 398, 434 (S.D.N.Y. 2011) (denying defendants' motion for summary judgment on vicarious liability of company and its sole director). Here, *all* of the purported evidence that the Order cites is relevant only to *vicarious* liability, as it concerns only Mr. Sagan's purported "[right and] ability to supervise infringing activity" and "[direct] financial interest in that activity." *See Gershwin*, 443 F. 2d at 1162. Moreover, that evidence is insufficient as a matter of law to *prove* vicarious liability: among other things, there is no evidence that Mr. Sagan has any *direct* financial interest in the allegedly infringing activity. Indeed, as Plaintiffs were aware well before they moved for summary judgment, Mr. Sagan does not take any salary or draw from any of the Defendant LLCs. *See* Ranahan Dec. ¶ 15 & Ex. O (Jan. 9, 2017 Email); Sagan Decl. ¶ 2. At a minimum, therefore, there is a factual question as to whether Mr. Sagan has a direct financial interest in the allegedly infringing activity.

The cases on which the Court relies are readily distinguishable. In each of them the undisputed facts showed that the individual defendants went well beyond their ordinary roles as company officers or executives—and in none of them were the officers held personally liable for direct infringement based merely on their title, job responsibilities, membership, or ownership status. As noted, *Redigi* merely assessed the adequacy of the plaintiff's complaint. 2014 WL 4354675 at *2-3 (S.D.N.Y. Sept. 2, 2014). In *Lime Grp.*, the court held the company's chairman and sole director liable for inducing infringement, based on extensive evidence that he had knowingly and intentionally taken affirmative steps to encourage infringement. 784 F. Supp. 2d at 438-39. And in *Arista Records LLC v. USENET.com, Inc.*, a company's CEO was liable because he "was personally and intimately involved in many of the activities that form the basis of Defendants' copyright liability"—including taking steps intended "to foster infringement"—and was "the driving force behind, and personally involved in," numerous acts of evidentiary spoliation. 633 F. Supp. 2d 124, 131-4 (S.D.N.Y. 2009). There is no such evidence here.

Finally, the Court improperly disregarded corporate formalities, relying on nothing more than the fact that Mr. Sagan is a company member and officer. It is black-letter law that holding an officer, shareholder, or member liable for the acts of a company requires something more than merely finding that the *company* is liable; either the corporation or the officer or both, must have an improper purpose. "Thus, for personal liability for corporate [copyright] infringement to extend to corporate officers, a special showing must be made that they acted willfully and knowingly and personally participated in the infringing activities or used the corporation to carry out their own deliberate infringement." *Asher Worldwide Enters. LLC v. Housewaresonly.com Inc.*, No. 12 C 568, 2013 WL 4516415, at *3 (N.D. Ill. Aug. 26, 2013) (copyright case).[30]

Just as in the closely analogous patent law context, "acts of a corporate officer that are within the scope of the officer's responsibility are not always sufficient grounds for penetrating the corporate protection and imposing personal liability, … [t]he policy considerations that underlie the corporate structure yield to personal liability for corporate acts only in limited

---

[30] *Dangler v. Imperial Mach., Co.*, 11 F.2d 945, 947 (7th Cir. 1926) (holding that "in the absence of some special showing, the managing officers of a corporation are not liable for the [patent] infringements of such corporation, though committed under their general direction").

circumstances." *Hoover Grp., Inc. v. Custom Metalcraft, Inc.*, 84 F.3d 1408, 1411 (Fed. Cir. 1996) (reversing a finding that "president, chief executive officer, and principal shareholder" was personally liable). "Under the district court's logic, a person that incorporates him or herself to conduct business can never escape personal liability" for the company's infringement.[31]

Given Plaintiffs' lack of evidence and failure to plead any relevant legal claim, and in light of the applicable black-letter corporate law, Defendants respectfully submit that there is no basis to hold Mr. Sagan liable in his personal capacity—and certainly not as a matter of law.

### C.    The Order Also Contains Evidentiary Errors That Should Be Reconsidered

There are also several evidentiary rulings allowing evidence that is improper, excluding evidence based upon an incorrect premise, and construing evidence against Defendants instead of in their favor, where multiple inferences that could be drawn therefrom.

### 1.    Cease & Desist Notices From Third Parties About Irrelevant Works Are Plainly Hearsay and Inadmissible Character Evidence

The Court also relied on third-party cease and desist notices received by Defendants as providing "notice" of infringement, while acknowledging that they are plainly hearsay that cannot be used for the truth of the matter asserted. Op. 17. But it would be impossible to view these emails as providing "notice" to Defendants unless they were given credibility as true. If these allegations are specious, they provide notice of nothing. Moreover, treating the cease and desist letters as evidence of notice at all is improper under well-established copyright law, because to qualify as notice evidence, the notice must be specific to the works at issue. *E.g.*, *Tiffany (NJ) Inc. v. eBay Inc.*, 600 F.3d 93, 107 (2d Cir. 2010); *Hendrickson v. eBay, Inc.*, 165 F. Supp. 2d 1082, 1088-90 (C.D. Cal. 2001) (generalized notice of copyright infringements cannot establish knowledge of infringement). Moreover, they are improper character evidence. These notices should be excluded for any purpose. 3/26/18 Tr. 55:21-56:7.

---

[31] *Wechsler v. Macke Int'l Trade, Inc.*, 486 F.3d 1286, 1292 (Fed. Cir. 2007) ("a corporate officer could negligently believe that a patent was invalid and/or not infringed" and "[t]his might support a finding of willful infringement by the corporation, but not a finding of personal liability for the officer"); *UMG Recordings, Inc. v. Veoh Networks Inc.*, 2009 WL 334022, *3 (C.D. Cal. Feb. 2, 2009) ("membership on a Board of Directors necessarily…entails making …'decisions.' To allow for derivative copyright liability merely because of such membership could invite expansion of potential shareholder liability for corporate conduct, without meaningful limitation"), *aff'd*, 718 F.3d 1006 (9th Cir. 2013).

### 2.   Mr. Lundberg's Testimony About Test Streams Was Not Inconsistent With His Prior Testimony

The Court excluded a clarifying statement by Mr. Lundberg on the basis that it "disput[ed] his own prior sworn testimony." The Court's finding overlooked that, as Defendants' counsel has explained, the testimony Plaintiffs cite to support its position *does not* contradict Mr. Lundberg's prior testimony. 3/26/18 Tr. 84:24-87:10. Mr. Lundberg previously testified that a column on one of many spreadsheets produced in this case represented when a recording was "made available," to "stream" through Defendants' websites, and later clarified that it was initially made available for internal test streams. Dickstein Decl., Ex. 1, Dkt. 200 (Tr. 238:18-23, 245:1-7). There is nothing inconsistent. In the case cited by the Court, the defendant submitted a sworn post-trial statement that conflicted with its sworn trial testimony about whether termination of an agreement was accepted.[32] Here, no sworn statements are inaccurate, and trial has yet to occur. And if there were credibility issues, "the credibility of witnesses and the weight to be given to their testimony are for the jury." *Gunning v. Cooley*, 281 U.S. 90, 97 (1930).

### 3.   UMG Agreement

████████████████████████████████████████████

████████████████████████████████████████████

███████████████████████████████████. Defendants believed that these recordings were controlled by a third-party record company that resolved its disputes with Defendants, and ███████████████████████████████████████

██████████████████████. Lundberg Supp. Decl. Ex. 2. Although Defendants included the UMG Agreement with its motion for summary judgment, and all schedules to the UMG Agreement were produced to Plaintiffs long ago, the Court denied Defendants' pre-hearing request to admit the schedules given the "late hour" of Defendants' request. Op. 30, n. 25.[34]

Determining which artists were represented by UMG requires reference to these schedules, which the Court uses against Defendants, finding ████████████████████████████████

---

[32] The Court cited *Trans-Orient Marine Corp. v. Star Trading*, 925 F.2d 566, 572 (2nd Cir. 191)
[33] There is also additional evidence supporting at least a fact question regarding Tanglewood. *See* Ranahan Decl., Ex. N, Schedule A; Dickstein Decl., Ex. 4, at 121:1-10; 122:4-9, 125:5-13, Dkt. 200.
[34] Lundberg Supp. Decl., Ex. 2 at Schedule A, Schedule C, Dkt. 112.



. ¶ 4.

Plaintiffs never mentioned ████████████████████████████████

███████████████████████████████████████████████████████████

██████████████████████████████████████████. 3/26/18 Tr. 46:4-13.

███████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

██████████████. Sagan Decl. ¶ 4. Indeed, over the past decade, *UMG* has paid *Defendants*

royalties, and has not made any complaints to Defendants. *Id.*

It is manifestly unjust for the Court to use a term from a 2008 agreement, with a third party

not even taking issue with compliance, and make an argument Plaintiffs never asked about or

raised until the hearing to impose "willful infringement" on 33 works, thereby increasing available

statutory damages by $4 million. At the very least there is a triable issue of fact about innocence

if consent was understood, and what notice meant, under the UMG Agreement.[35]

## IV.    **CONCLUSION**

For the foregoing reasons, Defendants respectfully request that the Court reconsider its

Order.

---

[35] The Court also overlooked that the 2008 execution date of the UMG Agreement predates the regulatory change that extended compulsory licensing to interactive streaming. 74 Fed. Reg. 6832, 6832-34 (Feb. 11, 2009); 74 Fed. Reg. 4510, 4514-15 (Jan. 26, 2009) (codified at 37 C.F.R. §§ 385.1–.17); Lundberg Supp. Decl. Ex. 2. Thus, the agreement contemplated a legal framework wherein no compulsory license existed, delineating various terms on permanent downloads and interactive streaming. The extension of statutory licensing to interactive streaming nullified the need to address interactive streaming and digital permanent downloads.

Dated: April 9, 2018

WINSTON & STRAWN LLP

By: */s/ Michael Elkin*
    WINSTON & STRAWN LLP

Michael S. Elkin
Thomas Patrick Lane
Erin R. Ranahan
200 Park Avenue
New York, New York 10166-4193
Phone: 212.294.6700
Fax: 212.294.4700
E-Mail: melkin@winston.com
E-Mail: tlane@winston.com
E-Mail: eranahan@winston.com

*Attorney for Defendants William Sagan,
Norton, LLC, Bill Graham Archives,
LLC d/b/a Wolfgang's Vault, Bill Gra-
ham Archives, LLC d/b/a Concert Vault,
Bill Graham Archives, LLC d/b/a Music
Vault, and Bill Graham Archives, LLC
d/b/a Daytrotter*