UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

ABKCO MUSIC, INC., COLGEMS-EMI MUSIC,
INC., EMI ALGEE MUSIC CORP., EMI APRIL
MUSIC INC., EMI BLACKWOOD MUSIC, INC.,
EMI CONSORTIUM MUSIC PUBLISHING, INC.
d/b/a EMI FULL KEEL MUSIC, EMI
CONSORTIUM SONGS, INC. d/b/a  EMI
LONGITUDE MUSIC, EMI FEIST CATALOG
INC., EMI ROBBINS CATALOG INC., EMI
UNART CATALOG, INC., JOBETE MUSIC CO.,
INC., SCREEN-GEMS-EMI MUSIC INC.,
STONE AGATE MUSIC, STONE DIAMOND
MUSIC CORP., RODGERS & HAMMERSTEIN
HOLDINGS LLC, PEER INTERNATIONAL
CORPORATION, PSO LIMITED, PEERMUSIC
LTD., PEERMUSIC III, LTD., SONGS OF PEER,
LTD., SPIRIT CATALOG HOLDINGS S.A.R.L.,
TOWSER TUNES, INC., TOWSER NEWCO
LTD., SPIRIT TWO MUSIC, INC., WARNER-
TAMERLANE PUBLISHING CORP., and WB
MUSIC CORP.,

        Plaintiffs-Counterclaim-Defendants,[1]

        – against –

WILLIAM SAGAN, NORTON LLC, BILL
GRAHAM ARCHIVES, LLC d/b/a
WOLFGANG'S VAULT, BILL GRAHAM
ARCHIVES, LLC d/b/a CONCERT VAULT,
BILL GRAHAM ARCHIVES, LLC d/b/a MUSIC
VAULT, and BILL GRAHAM ARCHIVES, LLC
d/b/a DAYTROTTER,

        Defendants-Counterclaim-Plaintiffs.

**OPINION AND ORDER**

15 Civ. 4025 (ER)

---

[1] During the course of this litigation, Rodgers & Hammerstein Holdings LLC acquired the musical works that had been controlled by Imagem Music LLC. Plaintiffs therefore request that Rodgers & Hammerstein Holdings LLC be substituted for Imagem Music LLC. The Court grants this request. *See* Fed. R. Civ. P. 25(c) ("if an interest is transferred" the court, on motion, may order "the transferee to be substituted in the action"). Similarly, on March 26, 2018, the Court granted Plaintiffs' request to join two subsidiaries of Plaintiff Spirit Catalog Holdings S.a.r.l: Towser Tunes, Inc. and Towser Newco Ltd. *See* Fed. R. Civ. P. 17(a)(3). The Clerk of Court is respectfully requested to update the caption as reflected above.

Ramos, D.J.:

This federal copyright infringement suit concerns a collection of live audio and audiovisual recordings of iconic songs that were recorded while being performed live in concert and thereafter acquired by Defendants William E. Sagan, Bill Graham Archives, LLC,[2] and Norton, LLC ("Defendants"), from the late Bill Graham and operators of other concert venues. The collection primarily consists of recordings made from the 1960s to the 2000s, and reads like a veritable who's who of rock, soul, and alternative music, containing the performances of The Rolling Stones, The Who, the Grateful Dead, Willie Nelson, Ray Charles, Aretha Franklin, and Carlos Santana, to name a few. The list of songwriters who penned the works embodied in those performances is no less impressive and diverse, including legends such as Hoagy Carmichael, Carol King, Mick Jagger, Keith Richards, Pete Townshend, and Green Day, among others.

In the years following Defendants' acquisitions, they have reproduced those recordings principally in digital format and made them available for mass consumption through digital download and streaming services offered for a fee through Defendants' websites.[3] Plaintiffs are a collection of six groups of music publishers[4] who claim to own, or hold exclusive licenses in,

---

[2] Bill Graham Archives, LLC, does business under the names Wolfgang's Vault, Concert Vault, Music Vault, and Daytrotter.

[3] Defendants operate Wolfgangs.com, WolfgangsVault.com, ConcertVault.com, Daytrotter.com, MusicVault.com and the Music Vault channel on YouTube. Defs.' Responses and Objections to Plaintiffs' Statement of Undisputed Facts, ("Defs.' Counter 56.1") ¶ 40.

[4] Plaintiffs are comprised of the following groups of music publishing companies: (1) ABKCO Music, Inc., (2) Colgems-EMI Music Inc., EMI Algee Music Corp., EMI April Music Inc., EMI Blackwood Music Inc., EMI Consortium Music Publishing, Inc. d/b/a EMI Full Keel Music, EMI Consortium Songs, Inc. d/b/a EMI Longitude Music, EMI Feist Catalog Inc., EMI Robbins Catalog Inc., EMI Unart Catalog Inc., Jobete Music Co., Inc., Screen-Gems- EMI Music Inc., Stone Agate Music, Stone Diamond Music Corp.; (3) Rodgers & Hammerstein Holdings; (4) Peer International Corporation, PSO Limited, Peermusic Ltd., Peermusic III, Ltd., Songs Of Peer, Ltd.; (5) Spirit Catalog Holdings S.A.R.L., Spirit Two Music, Inc.; and (6) Warner-Tamerlane Publishing Corp. and WB Music Corp.

the copyrights to approximately 200 musical compositions (the "Musical Works") reflected in Defendants' recordings.  Plaintiffs claim that Defendants' exploitation of those recordings infringes their copyrights in the Musical Works.  The principal question before the Court is whether Defendants obtained valid licenses such that their exploitation of these recordings is lawful under the Copyright Act, 17 U.S.C. § 101 *et seq.*

Before the Court are the parties' cross motions for summary judgment pursuant to Federal Rule of Civil Procedure 56 on Plaintiffs' claim of copyright infringement and their request to permanently enjoin Defendants from using the recordings at issue.  Docs. 161, 191.  For the reasons set forth below, the parties' motions for summary judgment are GRANTED in part and DENIED in part.

## I.    BACKGROUND

### A.    Statutory Scheme for Mechanical Licenses under the Copyright Act

To better contextualize the dispute between the parties, it is helpful to outline the statutory scheme covering the licensing of musical works under the Copyright Act.  As a general matter, the owner of a copyright in a nondramatic musical work (i.e., a song's words and musical composition) "has the exclusive rights" to reproduce that musical work in copies or phonorecords and to distribute those copies or phonorecords to the public.[5]  17 U.S.C. § 106(1), (3).  That exclusive right, however, is not without limitation.  To encourage creativity and prevent monopolization in the music industry, Congress created the compulsory mechanical license,[6] a narrow exception to that exclusive right, which "must be construed narrowly, lest the

---

[5] Under the Copyright Act, separate copyrights attach to a musical work and a sound recording. *See* 17 U.S.C. § 102 (a)(2), (7).

[6] The term "mechanical license" derives from the historical practice of using "such media as a phonograph record or piano roll," to mechanically reproduce the sounds embodied in a musical work.

3

exception destroy, rather than prove, the rule." *Fame Publishing Co. v. Alabama Custom Tape, Inc.*, 507 F.2d 667, 670 (5th Cir. 1975) ("[W]e should neither expand the scope of the compulsory license provision beyond what Congress intended . . . nor interpret it in such a way as to frustrate that purpose.") (citing H.R. rep. NO. 2222, 60th Cong., 2d Sess. 6 (1909)); *see also Fox Television Stations, Inc v. Aereokiller, LLC*, 851 F.3d 1002, 1011 (9th Cir. 2017). As a result, although the copyright holder in the musical composition has the exclusive right to determine "the manner in which his composition will initially be offered to the public," once that musical work has been distributed to the public, the copyright holder "must then license others who wish to present their own competing renditions." *Fame Publishing Co.*, 507 F.2d at 670. Under Section 115 of the Act, compulsory licensees are entitled to make and distribute "phonorecords" of a musical work, so long as they comply with requirements of that section. *See* 17 U.S.C. § 115; *Cherry River Music Co. v. Simitar Entm't, Inc.*, 38 F. Supp. 2d 310, 312 (S.D.N.Y. 1999). Certain of those requirements are purely procedural, such as the timely filing of a Notice of Intention to Obtain Compulsory License ("NOI"). In this respect, Section 115(b)(1) requires that "[a]ny person who wishes to obtain a compulsory license under this section shall, before or within thirty days after making, and before distributing any phonorecords of the work, serve notice of intention to do so on the copyright owner." 17 U.S.C. § 115(b)(1). At that point, the copyright owner cannot deny the license—hence the term "compulsory"— however, "[f]ailure to serve or file the notice required by clause (1) forecloses the possibility of a

---

*Cherry River Music Co. v. Simitar Entm't, Inc.*, 38 F. Supp. 2d 310, 312 (S.D.N.Y. 1999) (citations and quotation marks omitted).

compulsory license and, in the absence of a negotiated license, renders the making and distribution of phonorecords actionable as acts of infringement . . . ." *Id.* § 115(b)(2).[7]

Typically, a compulsory licensee must "exercise his rights under the compulsory license only by assembling his own musicians, singers, recording engineers and equipment . . . for the purpose of recording anew the musical work that is the subject of the compulsory license." 2 M. Nimmer & D. Nimmer, Nimmer on Copyright ("Nimmer") § 8.04 [A]; *see also* The Law of Copyright, Howard B. Abrams, ("Abrams") § 5:25; *Recording Indus. Ass'n of Am., Inc. v. Librarian of Congress*, 608 F.3d 861, 863 (D.C. Cir. 2010). In other words, the licensee cannot simply repackage and sell copies of another's sound recording. To do that, a licensee would have to comply with the additional substantive requirements of Section 115(a)(1). *See* 17 U.S.C. § 115(a)(1) (identifying the requirements for works "fixed by another"). Those requirements include that the recording be (1) "lawfully fixed,"[8] and (2) that the licensee have the authorization of the copyright holder in the sound recording, or "if the sound recording was fixed before February 15, 1972," that the sound recording was fixed "pursuant to an express license from the owner of the copyright in the musical work or pursuant to a valid compulsory license for use of such a work in a sound recording." *Id.* As discussed in more detail below, these

---

[7] In contrast to a compulsory license, a negotiated license is simply a license that is consensually entered into based on terms privately negotiated and set by the parties. *See Blagman v. Apple, Inc.*, No. 12 Civ. 5453 (ALC) (JCF), 2014 WL 1285496, at *5 (S.D.N.Y. Mar. 31, 2014).

[8] Pursuant to the Copyright Act, a work is "fixed" when it is embodied in a "tangible medium of expression . . . by or under the authority of the author, [and] is sufficiently permanent or stable to permit it to be perceived, reproduced, or otherwise communicated." 17 U.S.C. § 101. In layman's terms, the recordings here were fixed when they were first captured on film reel, VHS, cassette tape, CD, DVD, vinyl record, or similar device. For a work to be "lawfully fixed" its fixation cannot "constitute[] copyright infringement under federal law, or common law copyright infringement, unfair competition," or any other violation of state law. 2 Nimmer § 8.04[E][2] n.88.

procedural and substantive requirements are strictly enforced and form the basis of the dispute between the parties in the instant suit.

**B.    Defendants Acquire Bill Graham Archives**

Defendant William Sagan is the founder, president, CEO, and sole owner of Defendant Norton LLC.  Defendants' Responses and Objections to Plaintiffs' Statement of Material Facts, ("Defs.' Counter 56.1"), Doc. 218 ¶ 10.  Between 2002 and 2015, Defendants built their collection of audio and audiovisual recordings of live concert performances by acquiring entities possessing such recording archives, as well as acquiring collections of such recordings from various concert venues.  Plaintiffs' Responses to Defendants' Statement of Material Facts ("Pls.' Counter 56.1"), Doc. 202, ¶ 1.  These acquisitions began in July 2002, when Defendant Norton LLC acquired Bill Graham Archives LLC ("BGA"), which owned the archives of the late concert promoter Bill Graham.  Defs.' Counter 56.1 ¶ 11.  That acquisition netted Defendants 276 recordings covering approximately 90 of the Musical Works.  *See* Dickstein Decl. Ex. 11 (Columns E & F).  In documenting the sale, BGA was careful to advise Norton LLC that it was making no representations regarding BGA's rights to record or exploit the Musical Works.  The purchase agreement that conveyed the BGA collection provided that the seller was acquiring



Defs.' Counter 56.1 ¶ 17 (citing Dickstein Decl., Ex. 3 at ¶ 3.10(a)(C), ¶ 3.11(a)).  A side letter to that purchase agreement further provided that

*Id.* ¶ 18 (citing Dickstein Decl.,

Ex. 7 at *2).[9]  In purchasing those recordings, Defendants never saw any performance contracts

executed by the artists authorizing the recording of those performances, nor were they made

aware that such agreements existed.  *Id.* ¶ 19.

Contemporaneous external sources confirmed the exceedingly limited nature of the

intellectual property rights Norton was acquiring along with the BGA collection.  An appraisal

report prepared by Richard Prelinger, a prominent archivist and intellectual property consultant,

and included in Defendants' closing binder stated that: ███████████████████████

████████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████████

██████████████████████████████████████████████████████ *Id.* ¶

21; Dickstein Decl., Ex. 5, BGA Appraisal Report, at 26200.  Indeed, in his deposition

testimony, Sagan later confirmed that he was unaware if any of the copyright owners of the

Musical Works captured in those recordings ever even consented to the recording of those

concert performances.  Defs.' Counter 56.1 ¶ 27; Dickstein Decl. Ex. 2 at 132:18–25, 133:10–15.

A marketing document for the BGA archive that was provided to Sagan at the time of the

acquisition disclosed that ████████████████████████████████████████████

████████████████████████████████████████████████████████████████

---

[9] In this regard, it is important to note that although he created a world-famous archive of concert footage, Bill Graham did not appear himself exploit the recordings commercially, except on a very limited basis. The video recordings were "used in approximately 10 non-revenue generating instances as part of concert programs and to provide ambient imagery for special events or private parties."  Dickstein Decl., Ex. 5, BGA Appraisal Report, at 26177.  Certain material was also licensed to VH-1 and MTV for documentary and biographic series such as "Behind the Music," "Where Are They Now," and "VH-1 Confidential." *Id.*



*Id.*

Michael Krassner, an attorney who represented the seller in connection with the sale of BGA to Defendants, explained to Sagan at the time of the sale that

*Id.*

Finally, Nicholas Clainos, an employee of Bill Graham's companies since the 1970s and president of those companies following Graham's death, testified that the

*Id.*[10]

## C.   Defendants Expand their Collection of Live Concert Recordings

Following Defendants' acquisition of BGA in 2002, they acquired at least a dozen other collections of concert tapes, which "expanded dramatically" the number of recordings in their collection.  Defs.' Counter 56.1 ¶ 26.  All told, Defendants went on to acquire recordings from collections owned by King Biscuit Flower Hour, Festival Network, Thomas Bradshaw, John

---

[10] Defendants challenge these statement on the basis of hearsay not within any exception and lack of personal knowledge, to the extent those statements are used to determine the Graham companies' practices prior to Clainos's hire.  Defs.' Counter 56.1 ¶ 23.

Brower, Plainfield Music, David Hewitt, Steve Weitzman, Dawson Sound Productions, Amazingrace, Filmsonix, Fuel 2000 Records, Daytrotter, and the Ash Grove theatre.  Pls.' Counter 56.1 ¶ 1.

The Plainfield Music collection includes some 213 recordings covering approximately 86 Musical Works.  Dickstein Decl. Ex. 11 (Columns E & F).  However, the agreement by which Plainfield Music acquired those recordings provided that the concert promoter, ████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████  Defs.' Counter 56.1 ¶ 35.  And despite Sagan inquiring about performance agreements for this collection, the seller of those works did not possess any consents for Sagan to review, *id.*, and no such consents were produced in discovery.

Likewise, David Hewitt, from whom Defendants purchased a collection of live concert recordings that he created using recording equipment in a truck parked outside the concert venues, acknowledged that he did not have written consents from performers because it was not industry custom to acquire such consents when those performances were recorded.  Though, he also noted that such consents would have gone through a legal or business department, and not through him as the engineer.  Defs.' Counter 56.1 ¶ 33.  That collection conveyed 303 recordings to Defendants, covering 86 of the Musical Works.  Dickstein Decl. Ex. 11 (Columns E & F).  Similarly, the agreement by which Festival Network acquired a collection of concert recordings later sold to Defendants in 2009 noted that Festival Network's predecessor ████████████

████████████████████████████████████████████████████

████████  Defs.' Counter 56.1 ¶ 34.  Again, although Sagan requested copies of the

9

performance agreements for the Festival Network collection, he did not receive any consents, *id.*, and no consents were ever produced in discovery.

The sales agreement with Thomas Bradshaw, however, did purport to be made with the consent of performers.[11] The agreement stated 

Dickstein Decl., Ex. 15,

, ¶ 4(e). That agreement, however, did not attach any of the performer consents that were ostensibly entered into decades prior. Moreover, that agreement further

Dickstein Decl., Ex. 15, ¶ 4(e). There is no evidence in the record that Defendants ever acquired those consents.

More broadly, although Defendants unilaterally prepared performer revenue share agreements, which would "authorize [them] to fully utilize and exploit the [recordings] in exchange for sharing with the Artist a portion of the revenue from such activity," Sagan testified that he could not recall which artists have signed that form, *id.* ¶ 29, and no executed performer revenue share agreements were produced in discovery. To the contrary, three performing artists whom Defendants sought to depose—Keith Richards, David Byrne, and Michael Stipe—could not recall ever consenting to the recording of their performances. Defs.' Counter 56.1 ¶ 30.

Notably, even as of 2010, when Defendants applied to register copyrights in remixes of concert recordings they had acquired, the United States Copyright Office repeatedly asked Defendants to

---

[11] Bradshaw operated the Great American Music Hall, and conveyed 27 recordings (covering seven of the Musical Works) to Defendants. *See* Dickstein Decl., Ex. 11 (Columns E & F).

███████████████████████████████████████████████

███████████████████████████████████████████████

██████████████████████████████████████ In response, and not

withstanding Defendants' inability to produce a single written performer consent, ████████

████████████████████████████████████████ Lundberg

Decl., Doc. 163, Ex. D.

**D.   Defendants Begin Exploiting their Recordings**

As early as 2002, the Defendants ███████████████████████████

██████████████████████████████████████████████

████████████████████ Defs.' Counter 56.1 ¶ 53; Dickstein Decl. Ex. 2 Sagan

Dep. at 132:9–17.  In October 2003, as Sagan sought to reproduce and exploit his archive in CD

and DVD format, he informed an employee that ██████████████████████

███████████████████████████████████████████████

█████████████████████████ Dickstein Decl., Ex. 30 at 2.  During his

deposition, ████████████████████████████████████

██████████████████████████████████████████████████

█████████████████████████████████████████████

██████████████████████████████████████████████

████████████████████████████████████

████████████████████████████████████████████

██████████████████████████████████████████████

████████████████████

In 2003, Defendants established their first website, Wolfgang's Vault, now named

Wolfgang's, to provide to the public the live concert recordings obtained through Defendants' acquisition of BGA (the only collection that had been acquired up to that point).  Lundberg Decl. ¶ 10; Dickstein Decl, Ex. 11 (Column G, showing acquisition date).  But it was not until 2006 that Defendants made audio recordings in that collection, and others, available for download and on-demand streaming.  *Id.*  Defendants also launched the Concert Vault website in 2006, which offers both audio and audiovisual recordings for on-demand streaming.  Lundberg Decl. ¶ 11.  In the years that followed, Defendants continued to expand their internet-based platforms.  In 2007, Defendant Norton LLC acquired a majority stake in Daytrotter Media, LLC, thereby acquiring Daytrotter's website, which also offered audio recordings to the public.  *Id.* ¶ 12.  Daytrotter Media, LLC, which now touts itself as the source for discovering new music,[12] rewrote its website in 2010 and now only allows visitors to download or stream audio recordings from recording sessions hosted specifically for the website.  *Id.*  As such, Plaintiffs' recordings are no longer offered on that website.  In 2014, Defendants' Music Vault Youtube channel was launched and offers audiovisual recordings for on-demand streaming, including certain of the Musical Works at issue here.  *Id.* ¶¶ 13–14.

### E.   Mechanical Licensing

As Defendants tell it, they have, "at all relevant times," properly obtained mechanical licenses to ensure compliance with the Copyright Act.  Defendants' Cross-Motion for Summay Judgment ("Defs.' MSJ"), Doc. 161, at 13.  They have done so either by working directly with the Harry Fox Agency ("HFA"), a third-party licensing agent that grants mechanical licenses on behalf of music publishers, or by using licensing vendors that obtain licenses on behalf of record manufacturers and distributors.  *Id.* at 13–14; Lundberg Decl. ¶ 41.  However, Defendants first

---

[12] *See* www.daytrotter.com.

applied for a mechanical licensing account with the Harry Fox Agency on March 1, 2007, over a year *after* they began to provide downloading and on-demand streaming of audio and audiovisual recordings of the then-acquired Musical Works through the Wolfgang's and Concert Vault websites. Lundberg Decl. ¶ 42; *id.* Ex. 28, Application for HFA Mechanical Licensing Account, at 1. Defendants worked directly with HFA until 2010, when they switched to RightsFlow Inc. ("RightsFlow") to secure their necessary licenses. *Id.* at 43–44.

Defendants contend that RightsFlow obtained on their behalf the right to exploit the Musical Works in one of three ways: by either "(1) obtaining licenses directly from the publisher; (2) obtaining licenses from HFA through Defendants' HFA mechanical licensing account; or (3) issuing a . . . NOI . . . pursuant to the statutory requirements." *Id.* ¶ 50 (c). Finally, in May 2013, after RightsFlow was acquired by Google, Inc., Defendants switched to MediaNet, Inc. ("MediaNet") to manage their licensing needs and make the necessary payments to the publishers and administrators of the Musical Works. *Id.* ¶ 51. Notwithstanding "noted administrative issues occurring with HFA" that arose when Defendants changed licensing services providers from RightsFlow to MediaNet in 2013, Defs.' MSJ at 9; Lundberg Decl. ¶ 52, Defendants claim that they have fulfilled their royalty-payment obligations for all the recordings at issue and that Plaintiffs have never returned or rejected their payments, Defs.' MSJ at 9–10, 14; Pls.' Counter 56.1 ¶¶ 6–7. Defendants also contend that they have held licenses with performing rights organizations ("PROs"), which grant them the right to publicly perform, or, as in this case, provide on-demand streams for viewing of the Musical Works in question. Lundberg Decl. ¶¶ 36–39. The PROs, in turn, pay songwriters and publishers for the public use of their works. *Id.* ¶ 40. Defendants maintain that they have remitted royalties for all on-demand streaming pursuant to their licenses with the PROs and in accordance with the law and industry

13

practice. *Id.* Those licenses, however, do not authorize Defendants to reproduce or distribute any of the Musical Works. Lundberg Decl., Ex. 25, ████████████████████



[13]

In Plaintiffs' rendition, licensing gaps abound. They assert that HFA licenses cover only a limited number of the recordings at issue; specifically they argue that 180 of the approximately 200 Musical Works have at least one recording that is not covered by Defendants' HFA licenses. Defs.' Counter 56.1 ¶ 63. Plaintiffs further explain that once Defendants began sending NOIs in 2013, they served their notices months or even years after they began exploiting a given recording, and that Lundberg, Defendants' Chief Technology Officer, acknowledged that Defendants failed to abide by Section 115 when he testified that it was "common industry practice" to send NOIs *after* publishing a recording to the Defendants' websites. *Id.* ¶ 61; Dickstein Decl., Ex. 1, Lundberg Dep. 245:13–265:23. Further, Plaintiffs state that the NOIs "fraudulently misrepresented" the date on which Defendants began distributing the recordings at issue. *Id.* ¶ 62. As they explain, the NOIs stated that the date of distribution of the relevant recording was the same as the date that the NOI was filed. In actuality, and as Lundberg

---

[13] A license for public performance of a musical work, which includes on-demand streaming, is distinct from a mechanical license, which grants the licensee the right to reproduce and sell recordings of the musical work. *Compare* 17 U.S.C. §§ 115 *with id.* § 106(4); *see Country Rd. Music, Inc. v. MP3.com, Inc.*, 279 F. Supp. 2d 325, 327 (S.D.N.Y. 2003) ("'Performance' and 'reproduction' are clearly and unambiguously separate rights under the Copyright Act of 1976 . . . .") (citing 17 U.S.C. § 106 (1), (4)).

concedes, the dates listed on the NOIs were not the dates on which Defendants' own records show the recordings were first downloaded or streamed. *Id.* Although Plaintiffs admit that they have not returned any payments made to them on the Defendants' behalf, they strongly "deny that Defendants have paid all sums owed," as, they contend, "Defendants have no valid licenses that would authorize [their] exploitation" of the Musical Works at issue. Pls.' Counter 56.1 ¶ 7.

### 1. **Defendants Enter Joint Exploitation Agreements**

In 2009—three years after they began exploiting their then-current collection of live recordings—Defendants entered into Joint Exploitation Agreements with three major record labels: Warner Music, Inc., Sony Music Entertainment, and UMG Recording Inc. (collectively, the "Joint Exploitation Agreements").[14]  Generally, the agreements purport to authorize Defendants to exploit through sale and distribution certain sound recordings of concerts featuring the record labels' artists, so long as Defendants obtained mechanical licenses for those recordings. *See* Lundberg Decl. ¶¶4–6, Ex. 2, Warner Music Inc. Joint Exploitation Agreement, dated August 4, 2009, §§ 1.1, 3.3; Ex. 3, Sony Music Entertainment Joint Exploitation Agreement, dated August 4, 2009, §§ 1.1, 3.2; Ex. 4, UMG Recording, Inc., Joint Exploitation Agreement, dated August 4, 2009 §§ 1, 2.2.

None of these agreements, however, provide any written consent from the artists

---

[14] Warner Music, Inc. is the record-music arm of the larger Warner Music enterprise.  It is a distinct entity from Plaintiffs Warner-Tamerlane Publishing Corp, and WB Music Corp, which are publishing companies. *See* Pls.' MSJ at 38.  Sony Music Entertainment is likewise the recorded –music arm of Sony, and an affiliate of Plaintiff Sony/ATV Music Publishing, LLC, which, in 2012, began administering the music catalog owned by the EMI Plaintiffs. *Id.*  Defendants initially contended that Sony Music Entertainment acquired the publishing catalog of the EMI Plaintiffs noted above. Pls.' Counter 56.1 ¶ 4.  However, in their Counter 56.1, they do not dispute that it is Sony/ATV Music Publishing, LLC that administers the EMI Plaintiffs' music catalog. *See* Defs.' Counter 56.1 ¶ 86; Declaration of Audrey Ashby, dated September 12, 2017, Doc. 199 ("Ashby Decl.") ¶ 3 ("Sony Music Entertainment was not a member of the group that acquired EMI," and EMI's music publishing catalog is administered by Sony/ATV – not Sony Music Entertainment.").

themselves, nor do they purport to state that the artists consented to the recording of their

performances.  Moreover, none of the Plaintiffs in this case are signatories to any of the Joint

Exploitation Agreements, and those agreements expressly exclude any rights to the musical

compositions.  Pls.' Counter 56.1 ¶ 3.

Instead, the Warner and Sony ████████████████████████████████

██████████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████████

██████████████████████████████████████████████████████

██████████████████████████████████████████████████████████

██████ Lundberg Decl., Ex. 2, § 1.1.  In somewhat different language, ████████████

██████████████████████████████████████████████████████████████████

████████████████████████████ Lundberg Decl., Ex. 3, § 1.1. [15]

████████████████████████████████████████████████████

██████████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████████████

██████████████████████████████████████████████████████

██████████████████████████████████████████████████████

██████████████████████████████████████ Defendants have produced no

---

[15] Both agreements, however, expressly exclude audiovisual recordings of the Musical Works.  *See*
Lundberg Decl., Ex. 2, § 3.6(f) (providing that the agreement "shall not apply to audio-visual
recordings")' *id.* Ex. 3, § 10.3 (same); Pls.' Counter 56.1 ¶ 3.

Section 1 Notices.

### 2.   **Defendants Receive Cease-and-Desist Demands**

In August of 2013 and 2014, Plaintiff ABKCO Music, Inc., demanded that Defendants

cease and desist exploiting an audiovisual recording of a 1981 Rolling Stones concert because

"ABKCO has never issued synchronization licenses for the video" and without such a grant

"ABKCO's copyrights in those Compositions have been infringed and continue to be knowingly

and willfully infringed." *Id.* ¶ 64.   From 2013 to 2016, Defendants also received several similar

demands from songwriters and publishers of songs embodied in Defendants' audiovisual

recordings, alerting Defendants that they potentially lacked the necessary licenses to exploit

those audiovisual recordings. *Id.* ¶¶ 65–71.[16]

### F.   **Procedural History**

On May 27, 2015, Plaintiffs filed this action claiming Defendants infringed their

copyrights in approximately 200 Musical Works by reproducing those works in digital format

and making them available for downloading and streaming from Defendants' websites without

Plaintiffs' consent. Doc. 1, 43.  Plaintiffs also claimed infringement based on Defendants'

manufacture of physical records containing certain of Plaintiffs' Musical Works. *See* Doc. 1,

Defs.' Counter 56.1 ¶ 50.[17]  All told, Plaintiffs assert that Defendants have exploited in audio or

---

[16] Defendants assert that third-party records relied on by Plaintiffs are inadmissible hearsay that may not
be relied on for the truth of the matter asserted, and are not authenticated. Defs.' Reply at 37 (citing Fed.
R. Evid. 801).  Plaintiffs correctly point out, however, that Defendants have authenticated these records
by acknowledging their receipt and that those records are not being offered for the truth of the matter
asserted, but are offered to show that the Defendants were on notice as to their allegedly infringing
activity.  Pls.' Reply at 14 n.35.  As a result, the Court finds these records admissible in that limited
regard.  *See George v. Celotex Corp.*, 914 F.2d 26, 30 (2d Cir. 1990) ("out of court statement offered not
for the truth of the matter asserted, but merely to show that the defendant was on notice of a danger, is not
hearsay").

[17] Those physical records include a vinyl albums that include the song "Moondance" by Van Morrison,
and a John Denver performance of James Taylor's 'Fire and Rain." Pls.' Counter 56.1 ¶ 50.

audiovisual format more than 1,175 recordings of Plaintiffs' approximately 200 Musical Works.
*Id.* ¶ 47.  Of those approximately 200 works, Defendants have exploited audiovisual recordings
of at least 146 of them.  *Id.*  ¶ 79.

Defendants answered, asserting counterclaims seeking a declaration that their use of the
recordings does not infringe Plaintiffs' rights and that they do not need synchronization licenses
to exploit the audiovisual works at issue.  Doc. 12.[18]  Defendants also claimed in their answer
that "all of the recordings which make up Defendants' collection were created (and have been
exploited) with permission and proper legal consent from the various artists who controlled the
copyrights in the musical compositions they performed."  Doc. 12 at 21, 28 ¶¶ 4, 50.  Defendants
similarly represented in their Rule 26(a)(1) Initial Disclosures that they had "[l]icense
agreements, including but not limited to agreements between and among BGA (and/or its
predecessors and/or affiliates) and [PROs], [HFA], and/or any of the Plaintiffs . . . and/or the
artists whose musical compositions and/or recordings [Plaintiffs] now allege to control."  Defs.'
Counter 56.1 ¶ 72.  Notwithstanding ABKCO's cease and desist letters of August 2013 and 2014
and the commencement of this action, Defendants have added to their websites at least 36
recordings of Plaintiffs' Musical Works during the pendency of this action.  *Id.* ¶ 77; Doc. 59 at
4.  Following discovery, in May and September 2017, the parties filed cross-motions for
summary judgment on Plaintiffs' infringement claim and request for permanent injunction.
Docs. 161, 191.

On December 14, 2017, the Court held oral argument to address Defendants' motion to
strike eleven documents produced in Plaintiffs' reply submission that were intended to fill chain-

---

[18] Defendants also brought third party claims against the National Music Publishers' Association and its
president.  Doc. 12.  Those claims were dismissed in May 2016.  Doc. 44.

of-title gaps raised by Defendants.[19]  Because Defendants had raised those arguments for the first time in their opposition papers and the documents were relevant, the Court concluded that the documents were properly submitted in reply and denied Defendants' request.  Doc. 240 at 8, 11.  The Court also granted Plaintiffs leave to submit additional, recently obtained documents that Plaintiffs claimed would complete their chain of title for the Musical Works, and permitted Defendants to submit a sur-reply addressing those chain-of-title issues.  Doc. 240 at 8, 11; Doc. 234; *id.* Ex. A, Supplemental Declaration of Audrey Ashby, Exs. 202–210.

In their sur-reply, Defendants challenged the chain of title for 45 of the Musical Works created by Pete Townshend (the "Townshend Works") and administered by Plaintiff Spirit Catalog Holdings, S.a.r.l ("Spirit").  Defendants' Sur-Reply ("Defs.' Sur-Reply"), Doc. 242 at 4.  Defendants contended for the first time that Plaintiff Spirit did not own or possess an exclusive license in the Townshend Works, and that its status as "exclusive administrator" was insufficient to confer standing.  *Id.* at 5.

On February 6, 2018, Plaintiffs moved to strike the portions of Defendants' sur-reply that alleged a break in the chain of title for the Townshend Works.  Doc. 244 at 1.  They contended that the chain-of-title documentation challenged by Defendants fell outside the scope of the Court's prior order, and had been produced to Defendants not later than March 2017.  *Id.* at 2.  Alternatively, Plaintiffs advanced several theories purporting to establish Spirit's standing to sue.  First, Plaintiffs claimed that because Townshend assigned Spirit his 50% share of writer's royalties, Spirit was a beneficial owner with standing to sue.  *Id.*  Second, Plaintiffs claimed that Spirits "exclusive administration rights" entitled them to bring suit on behalf of the owner or exclusive licensee.  *Id.* at 3.  Third, Plaintiffs claimed that Spirit could bring suit on behalf of its

---

[19] Defendants concede Plaintiffs' copyright ownership for purposes of their summary judgment motion. *See* Defs.' MSJ at n.2.

wholly owned subsidiaries, Towser Tunes, Inc. and its subsidiary Towser Newco Ltd., which the

parties agreed held the exclusive license in the Townshend Works. *Id.*; Doc. 242 at 6

("Towser—not its new parent Spirit—continued to hold any and all copyrights."). Finally, and

in the alternative, Plaintiffs requested leave to join its subsidiaries pursuant to Federal Rule of

Civil Procedure 17(a)(3). Doc. 244 at 3.

On March 26, 2018, the Court heard oral argument on these issues, among others. In an

effort to reach the merits, the Court denied Plaintiffs' motion to strike and concluded that Spirit

lacked standing to sue under any of the theories advanced by Plaintiffs because neither exclusive

administration rights nor beneficial ownership in a writer's royalty share conferred to Spirit an

"exclusive right" as contemplated by the Copyright Act. *See* 17 U.S.C. § 501(b) (providing that

"the legal or beneficial owner of an exclusive right" may bring suit); *id.* § 106 (setting out the

"exclusive rights" referenced in Section 501(b)); *Russian Entm't Wholesale, Inc. v. Close–Up*

*Intern., Inc.*, 482 Fed. Appx. 602, 604 (2d Cir. 2012) ("[T]he legal or beneficial owner of an

*exclusive right* under a copyright is entitled . . . to institute an action for any infringement of that

particular right committed while he or she is the owner of it."); *Eden Toys, Inc. v. Florelee*

*Undergarment Co., Inc.*, 697 F.2d 27, 32 (2d Cir. 1982), *superseded on other grounds by* Fed. R.

Civ. P. 52(a) ("The Copyright Act authorizes only two types of claimants to sue for copyright

infringement:  [i] owners of copyrights, and [ii] persons who have been granted exclusive

licenses by owners of copyrights."); *John Wiley & Sons, Inc. v. DRK Photo*, 998 F. Supp. 2d

262, 276–77 (S.D.N.Y. 2014) ("Although the right to prosecute an accrued cause of action for

infringement is also an incident of copyright ownership, it is not an exclusive right under" the

Copyright Act.) (citations, alterations, and quotation marks omitted) *aff'd*, 882 F.3d 394 (2d Cir.

2018). Nor does "a parent company [have] standing to bring claims on behalf of its subsidiary."

*EMI Entm't World, Inc. v. Karen Records, Inc.*, No. 05 CIV. 390 LAP, 2013 WL 2480212, at *3
(S.D.N.Y. June 10, 2013); *Yong Ki Hong v. KBS Am., Inc.*, 951 F. Supp. 2d 402, 430 (E.D.N.Y.
2013) ("although the contract purports to delegate . . . authority . . . to protect [the] copyrights
from infringement, *Eden Toys* makes clear that a copyright owner cannot, by contract or
otherwise, grant a non-exclusive licensee the right to sue for copyright infringement").

The Court, however, granted Plaintiffs leave to join its subsidiaries, Towser Tunes, Inc.
and Towser Newco Ltd., which indisputably do have standing to sue, *see* Defs.' Sur-Reply at 6,
concluding that their joinder would not prejudice Defendants as no new discovery was required,
and the subsidiaries had the same officers, executives and business operations as Spirit. *See* Fed.
R. Civ. P. 17(a)(3) ("The court may not dismiss an action for failure to prosecute in the name of
the real party in interest until, after an objection, a reasonable time has been allowed for the real
party in interest to ratify, join, or be substituted into the action.").

## II.    LEGAL STANDARD

### A.    Motion for Summary Judgment

Summary judgment is appropriate where "the movant shows that there is no genuine
dispute as to any material fact." Fed. R. Civ. P. 56(a).  "An issue of fact is 'genuine' if the
evidence is such that a reasonable jury could return a verdict for the non-moving party." *Senno
v. Elmsford Union Free Sch. Dist.*, 812 F. Supp. 2d 454, 467 (S.D.N.Y. 2011) (citing *SCR Joint
Venture L.P. v. Warshawsky*, 559 F.3d 133, 137 (2d Cir. 2009)).  A fact is "material" if it might
affect the outcome of the litigation under the governing law. *Id.*  The party moving for summary
judgment is first responsible for demonstrating the absence of any genuine issue of material fact.
*Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).  If the moving party meets its burden, "the
nonmoving party must come forward with admissible evidence sufficient to raise a genuine issue

of fact for trial in order to avoid summary judgment." *Saenger v. Montefiore Med. Ctr.*, 706 F. Supp. 2d 494, 504 (S.D.N.Y. 2010) (internal quotation marks omitted) (citing *Jaramillo v. Weyerhaeuser Co.*, 536 F.3d 140, 145 (2d Cir. 2008)).

In deciding a motion for summary judgment, the Court must "'construe the facts in the light most favorable to the non-moving party and must resolve all ambiguities and draw all reasonable inferences against the movant.'" *Brod v. Omya, Inc.*, 653 F.3d 156, 164 (2d Cir. 2011) (quoting *Williams v. R.H. Donnelley, Corp.*, 368 F.3d 123, 126 (2d Cir. 2004)). However, in opposing a motion for summary judgment, the non-moving party may not rely on unsupported assertions, conjecture or surmise. *Goenaga v. March of Dimes Birth Defects Found.*, 51 F.3d 14, 18 (2d Cir. 1995). To defeat a motion for summary judgment, "the non-moving party must set forth significant, probative evidence on which a reasonable fact-finder could decide in its favor." *Senno*, 812 F. Supp. 2d at 467–68 (citing *Anderson v. Liberty Lobby*, 477 U.S. 242, 256–57 (1986)).

"When confronted with cross-motions for summary judgment, the Court analyzes each motion separately, 'in each case construing the evidence in the light most favorable to the non-moving party.'" *Peterson v. Kolodin*, No. 13 Civ. 793 (JSR), 2013 WL 5226114, at *1 (S.D.N.Y. Sept. 10, 2013) (quoting *Novella v. Westchester Cty.*, 661 F.3d 128, 139 (2d Cir. 2011)); *see also Morales v. Quintel Entm't, Inc.*, 249 F.3d 115, 121 (2d Cir. 2001) ("[E]ach party's motion must be examined on its own merits, and in each case all reasonable inferences must be drawn against the party whose motion is under consideration.") (citation omitted). The Court is not required to resolve the case on summary judgment merely because all parties move for summary judgment. *Morales*, 249 F.3d at 121.

**B.** **Copyright Infringement**

To establish copyright infringement, a plaintiff must demonstrate "'(1) ownership of a valid copyright, and (2) copying of constituent elements of the work that are original.'" *Kwan v. Schlein*, 634 F.3d 224, 229 (2d Cir. 2011) (quoting *Feist Publ'ns, Inc. v. Rural Tel. Serv. Co., Inc.*, 499 U.S. 340, 361 (1991)). Copyright owners and their exclusive licensees are entitled to bring an action for copyright infringement. *See* 17 U.S.C. § 501(a)–(b); *Random House, Inc. v. Rosetta Books LLC*, 283 F.3d 490, 491 (2d Cir. 2002). "A certificate of copyright registration is prima facie evidence that the copyright is valid." *Fonar Corp. v. Domenick*, 105 F.3d 99, 104 (2d Cir. 1997) (citing 17 U.S.C. § 410(c); *Folio Impressions, Inc. v. Byer Cal.*, 937 F.2d 759, 763 (2d Cir. 1991)).

Once a plaintiff establishes infringement, a defendant may proffer as a defense proof that it held a valid license to use that copyrighted work. *See Associated Press v. Meltwater U.S. Holdings, Inc.*, 931 F. Supp. 2d 537, 561 (S.D.N.Y. 2013) (citing *Graham v. James*, 144 F.3d 229, 236 (2d Cir. 1998)). A valid nonexclusive license "immunizes the licensee from a charge of copyright infringement, provided that the licensee uses the copyright as agreed with the licensor." *Davis v. Blige*, 505 F.3d 90, 100 (2d Cir. 2007) (citing *Graham v. James*, 144 F.3d 229, 236 (2d Cir. 1998) ("A copyright owner who grants a nonexclusive license to use his copyrighted material waives his right to sue the licensee for copyright infringement.")).

The party raising the defense bears the burden of proving that a valid license exists. *Associated Press*, 931 F. Supp. 2d at 561; *Infinity Broad. Corp. v. Kirkwood*, 150 F.3d 104, 107 (2d Cir. 1998) (noting that it is the "proponent" of an "affirmative defense to a claim of infringement" that bears "the burden of proof") (citing *Campbell v. Acuff–Rose Music, Inc.*, 510 U.S. 569, 590 (1994)); *Am. Geophysical Union v. Texaco, Inc.* 60 F.3d 913, 918 (2d Cir. 1994)

(stating that a party claiming fair use "typically carries the burden of proof as to all issues in the dispute").

## III.   DISCUSSION

### A.   Copyright Ownership and Copying

Here, there is no dispute that Plaintiffs have produced copyright registrations for each of the Musical Works at issue, entitling them to a prima facie presumption of validity. *Fonar Corp.*, 105 F.3d at 104 (citing 17 U.S.C. § 410(c); *Folio Impressions, Inc.*, 937 F.2d at 763); Defs' Counter 56.1 ¶ 78.  As noted, Defendants concede Plaintiffs' copyright ownership for purposes of their summary judgment motion and ultimately challenged the chain of title for the 45 Townshend Works only.  *See* Defs.' MSJ n.2; Defs.' Sur-Reply at 5.  The joinder of Plaintiff Spirit's subsidiaries, Towser Tunes, Inc. and Towser Newco Ltd., resolved that chain-of-title challenge and it is undisputed that Plaintiffs now have standing to sue for the entirety of the Musical Works.  *See* Doc. 234; *id.* Ex. A, Supplemental Declaration of Audrey Ashby, Exs. 202– 210; Ex. B, Supplemental Declaration of Tal. E. Dickstein, Ex. 57A (addressing each of the chain-of-title issues raised by Defendants).  Nor is there any dispute that Defendants have exploited, in audio or audiovisual format, more than 1,175 recordings of Plaintiffs' Musical Works, and manufactured physical records of certain of those works.  Defs.' Counter 56.1 ¶¶ 47, 50.  Accordingly, Plaintiffs have established infringement and the burden shifts to Defendants to demonstrate that they hold valid licenses authorizing the exploitation of Plaintiffs' Musical Works.  *See Associated Press*, 931 F. Supp. 2d at 561; *Infinity Broad. Corp.*, 150 F.3d at 107.

### B. Defenses

In disputing Plaintiffs' copyright infringement claim, Defendants contend that, from 2007 to the present,[20] they have held valid mechanical licenses—either in the form of compulsory licenses acquired by their licensing vendors pursuant to Section 115's notice requirements, or equivalent licenses through HFA—authorizing them to exploit the Musical Works.  Defs' MSJ at 22 (stating that in "Defendants first began acquiring mechanical licenses and paying Plaintiffs under such licenses" in 2007).  Defendants' Reply ("Defs.' Reply"), Doc. 217 at 2 ("Defendants obtained compulsory mechanical licenses pursuant to 17 U.S.C. § 115.").  Plaintiffs, on the other hand, contend that Defendants do not have valid mechanical licenses and advance several bases in support of their claim.  *First*, they assert that audiovisual works—video recordings of the works being performed live in concert—are not eligible for Section 115 compulsory mechanical licenses.  *Second*, Plaintiffs argue that none of Defendants' live concert recordings are eligible for mechanical licenses because (i) they were not "lawfully fixed" in the first instance, (ii) Defendants cannot show that they obtained the necessary authorization from the performers reflected in those recordings, and (iii) Defendants cannot show that the recordings made prior to February 15, 1972 were fixed pursuant to licenses from the owners of copyrights in the underlying Musical Works, i.e., Plaintiffs or their predecessors.  *Third*, Plaintiffs contend that Defendants issued untimely and fraudulent NOIs that provide an independent basis for finding their compulsory mechanical licenses invalid.  *Fourth*, and finally, Plaintiffs assert that Defendants' HFA licenses cannot shield them from the infringement alleged here.  Plaintiffs'

---

[20] Defendants implicitly concede that they did not have authority to exploit the works when they first made certain of them available in 2006.  However, they assert a statute of limitations defense with respect to that infringing activity, which is addressed below.

25

Cross-Motion for Summary Judgment ("Pls.' MSJ"), Doc. 191, at 22–34.  The Court addresses each of these arguments in turn.

### 1. **Audiovisual Recordings**

Relying on the text of the Copyright Act, Plaintiffs assert that Defendants' *audiovisual* recordings are ineligible for Section 115 compulsory mechanical licenses.  Pls.' MSJ at 22, 25–26.[21]  As Plaintiffs explain, "Section 115 grants a limited license to 'make and to distribute *phonorecords* of [musical] works[.]'"  Pls.' MSJ at 25 (citing 17 U.S.C. § 115) (emphasis added).  The Copyright Act, in turn, defines "phonorecords" as:

> material objects in which sounds, *other than those accompanying a motion picture or other audiovisual work*, are fixed . . ., and from which the sounds can be perceived, reproduced, or otherwise communicated, either directly or with the aid of a machine or device. The term "phonorecords" includes the material object in which the sounds are first fixed.

17 U.S.C. § 101 (emphasis added).

Notwithstanding the statute's clear language, Defendants contend that the Copyright Act's text compels the opposite result.  For support they rely on the last sentence of the definition of phonorecords, which states:  "The term 'phonorecords' includes the material object in which the sounds are first fixed."  17 U.S.C. § 101; Defs.' Reply at 12.  Defendants claim that because their live concert recordings "first fixed" the sounds in those recordings as part of an audiovisual work, the resulting "material object" qualifies as a phonorecord.  *Id.*  To conclude otherwise, Defendants contend, would fail to give effect to both sentences and result in the second sentence being "completely redundant, since 'material objects in which sounds . . . are fixed' plainly includes the material objects in which sounds are first fixed."  *Id.*

---

[21] The parties agree that Defendants have exploited 206 audiovisual recordings that cover 146 of the Musical Works.  *See* Defs.' MSJ at 15; Pls.' MSJ at 23; Lundberg Decl., Ex. 5.

The Court finds Defendants' interpretation unpersuasive.  The second sentence cannot save Defendants from the first sentence's categorical exclusion of audiovisual works.  That is because the second sentence speaks only in terms of "*the* material object in which *the sounds* are first fixed." Pursuant to its terms, then, the second sentence itself reinforces the concept that phonorecords include only sounds, and makes no mention of *audiovisual* works.  Moreover, as Plaintiffs note, Plaintiffs Reply ("Pls.' Reply"), Doc. 230 at 9, the use of the definite article "the" to reference the concepts "material objects" and "sounds" can only be read to refer to these terms as *previously* defined in the first sentence, that is to say, as expressly excluding audiovisual works.  *See Am. Bus Ass'n v. Slater*, 231 F.3d 1, 4–5 (D.C. Cir. 2000) ("[I]t is a rule of law well established that the definite article 'the' particularizes the subject which it precedes.") (citations and internal quotation marks omitted); *see also S.E.C. v. KPMG LLP*, 412 F.Supp.2d 349, 387–88 (S.D.N.Y. 2006) ("A [statute's] use of the definite article 'the,' as opposed to the indefinite 'a,' 'an,' or 'any,' indicates that Congress intended the term modified to have a singular referent.").[22]

The Court does not make this determination on a blank slate.  The Second Circuit has held that the "plain language of [Section 101 of] the Copyright Act refutes" the claim that

---

[22] Nor is the Court persuaded that the general preference of statutory construction that courts avoid redundancy merits adopting Defendants' interpretation.  As Plaintiffs explain, the more natural interpretation is that Congress intended to ensure that the Copyright Act protected as phonorecords material objects such as studio equipment on which "sounds are first fixed," just as it protected commercially available objects such as records and CDs.  Pls.' Reply at 8–9.  Where "[s]urplusage does not . . . produce ambiguity [the Court's] preference for avoiding surplusage constructions is not absolute." *Lamie v. U.S. Tr.*, 540 U.S. 526, 536 (2004); *Alliance for Open Soc'y Int'l, Inc. v. U.S. Agency for Int'l Dev.*, 430 F. Supp. 2d 222, 247 (S.D.N.Y. 2006), *aff'd*, 651 F.3d 218 (2d Cir. 2011), *aff'd sub nom. Agency for Int'l Dev. v. All. for Open Soc'y Int'l, Inc.*, 570 U.S. 205 (2013) ("[W]hen construing a statute, the general preference against surplusage is constrained by the requirement that a construction avoiding surplusage must be a reasonable one."); *see also Sabre, Inc. v. Dep't of Transp.*, 429 F.3d 1113, 1122 (D.C. Cir. 2005) ("Legislative drafters often use apparently redundant language in order to emphasize . . . .").

"audiovisual works" fall "within the grant of [a] compulsory license[]." *ABKCO Music, Inc. v. Stellar Records, Inc.*, 96 F.3d 60, 65 (2d Cir. 1996) *abrogated on other grounds by Salinger v. Colting*, 607 F.3d 68, 75 (2d Cir. 2010). In reaching that conclusion, the Court explained that "[p]honorecords are defined as objects on which 'sounds' are fixed," but that the definition does not include "objects on which sounds *and* visual representations . . . are fixed." *Id.* (emphasis in original). The Court further noted that the term "phonorecords" excludes "audiovisual works," which, by definition, "'consist of a series of related images . . . together with accompanying sounds." *Id.* (quoting 17 U.S.C. § 101). There is no dispute that Defendants' "audiovisual recordings" (a term they employ almost exclusively) meet this definition.[23] Accordingly, Defendants' license defense fails with respect to each of the 206 audiovisual recordings.[24]

## 2. Lawful Fixation

Section 115(a)(1) provides that:

> [a] person may not obtain a compulsory license for use of the [musical] work in the making of phonorecords duplicating a sound recording fixed by another, *unless*: (i) such sound recording was *fixed lawfully*; and (ii) the making of the phonorecords was

---

[23] For the reasons stated above, the Court declines Defendants' invitation to reject the holding of *ABKCO Music, Inc.*, on the basis that that the Court would have reached a different conclusion had the case concerned a "first fixed" recording. Defs.' Reply at 14.

[24] In their papers, the parties dispute whether Defendants need "synchronization" licenses to exploit their audiovisual recordings. *See* Pls.' MSJ at 23–24; Defs.' MSJ at 15. But the issue before the Court is whether Defendants had valid licenses for their audiovisual recordings that immunizes them from a charge of infringement. Because the Court concludes that mechanical licenses do not cover audiovisual recordings, it need not address whether Defendants needed synchronization licenses (which they never obtained) to exploit audiovisual recordings of the Musical Works. Defendants sought adjudication of that issue as part of their counterclaims against Plaintiffs. *See* Doc. 9 at 20–23. In Defendants' Notice of Motion for Summary Judgment and/or Summary Adjudication, however, they moved only on "Plaintiffs' claims of copyright infringement against Defendants," but did *not* seek summary judgment on their counterclaims. Doc. 161 at 1. Nor have Plaintiffs cross-moved for summary judgment on Defendants' counterclaims. *See* Doc. 191 at 2 (seeking a "grant[] [of] summary judgment on liability for Defendants' infringements of Plaintiffs' copyrights in and to each of the musical works at issue," but not moving for summary judgment on Defendants' counterclaims); Pls.' Reply at 8 ("the Court need not define the scope of a synch license in order to decide this motion").

> *authorized by the owner of copyright in the sound recording* or, if
> the sound recording was fixed before February 15, 1972, *by any*
> *person who fixed the sound recording pursuant to an express license*
> *from the owner of the copyright in the musical work or pursuant to*
> *a valid compulsory license* for use of such work in a sound
> recording.

17 U.S.C. § 115(a)(1) (emphasis added).

In order for a work to be lawfully fixed it cannot "constitute[] copyright infringement

under federal law, or common law copyright infringement, unfair competition," or any other

violation of state law. 2 Nimmer § 8.04[E][2] n.88. The parties are in agreement that Section

115(a)(1)(i) requires Defendants to have obtained the consent of the musical performers for their

recordings to be lawfully fixed. *See* Pls.' MSJ at 29 ("Defendants must show that [the concert

recordings] were made with the consent of . . . the performing artists . . . ."); Defs.' Reply at 6

("Whether a fixation is 'lawful' depends exclusively on whether the performer's consent was

obtained.") (alteration omitted). This is because it is a violation of state and federal law to record

a live musical performance "without the consent of the performer or performers involved." 17

U.S.C. § 1101(a); *see also* N.Y. Penal Law § 275.15 (criminalizing the manufacture or sale of an

unauthorized recording of a performance where, among other things, a person sells, resells, or

rents any recording "the person knows" was produced "without the consent of the performer").

The parties disagree, however, as to whether consent of the performers was properly obtained.

They also dispute whether lawful fixation requires the consent of the holder of a copyright in a

musical work. *See* Pls.' MSJ at 31, 33; Defs.' Reply at 6–8.

The Court turns to the issue of the performers' consent first, because if it is resolved in

Plaintiffs' favor, the Court need not reach the question of whether lawful fixation also requires

the consent of the holder of a copyright in the musical work.

    *i.*    *Performer Consent*

In support of their claim that their live concert recordings were lawfully fixed,

Defendants rely on the three Joint Exploitation Agreements entered into with third-party record

labels years after they began exploiting their collection of live recordings and a sales agreement

conveying to Defendants a collection of live recordings covering six of the Musical Works.

Defs.' Reply at 9.  According to Defendants, those agreements purport to show that "performers

duly consented to the[] first fixation of their live performances." *Id.*  Plaintiffs contend that these

agreements are insufficient because they are not proof of consent from the performers

themselves and because they are inadmissible hearsay that may not be considered on a motion

for summary judgment. Pls.' Reply at 3.  The Court agrees.

The Joint Exploitation Agreements, which were entered into in 2009, in most cases

decades after the recordings were fixed, are insufficient to demonstrate that the initial fixation of

those recordings was lawful because, contrary to Defendants' characterization, the agreements

do not purport to "acknowledge that the recordings were lawfully made." Defs.' Reply at 9.[25]

---

[25] The Court separately concludes that the joint exploitation and sales agreements are inadmissible for the purposes of proving that the artists gave their consent.  The agreements purport to contain out of court statements by the artists (i.e., that they consented to the fixation and exploitation of their recordings), within a document that is itself an out of court statement.  While the contract itself is admissible because it is a verbal act, Fed. R. Evid. Note to 801(c), the document may not be used to prove artist consent because the artists are not signatories to the agreement and their statements are hearsay, for which Defendants have not offered an applicable exception. *See* Fed. R. Evid. 801(c); *cf. id.* 805; (noting that "each part of the combined statements [must] conform[] with an exception to the [hearsay] rule").  Accordingly, because factual assertions must be supported by admissible evidence, the Court may not consider these documents on summary judgment for the purpose of determining that the performing artists consented to the fixation and exploitation of their performances. *See* Fed. R. Civ. P. 56(c)(2).

On March 23, 2018, Defendants requested leave to submit replacement copies of the Joint Exploitation Agreements, which, unlike the version of those Agreements addressed above, do provide schedules of the artists and performances to which those agreements apply.  Those agreements, however, still do not include the actual artist authorizations and do not purport to provide consent for the fixation of the recordings.  Moreover, those documents also contain the same hearsay issue noted above.  As such, the Court denies Defendants' request to supplement these documents into the summary judgment record as this late hour.

Rather, the Sony and Warner agreements contain representations and warranties from the third-party record labels that purport to have the consent of artists that authorize the record labels to grant Defendants the right to exploit the sound recordings in which those artists' performances are embodied. ███████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████ Neither of these agreements provide any written consent from the artists themselves or purport to say anything about whether the artists consented to the initial *fixation* of these recordings.

Defendants cannot rely on documents purporting to grant exploitation rights as proof that artists consented to the initial fixation of their performance decades prior. *See* 17 U.S.C. § 101 ("A work is 'fixed' in a tangible medium of expression when its embodiment in a copy or phonorecord, by or under the authority of the author, is sufficiently permanent or stable to permit it to be perceived . . . ."). This requirement is not pure semantics. The requirement that the recording be "fixed lawfully," which requires performer consent, is separate from the requirement that copyright holders in the performance authorize the "making of the phonorecords," i.e., that the reproduction and distribution of the recording is also authorized. *See id.* § 115(a)(1)(i)–(ii). At best, the Sony and Warner agreements purport to do the latter, and are insufficient even in that respect.

As Plaintiffs point out, Pls.' Reply at 4, the agreements do not identify the performers, or attach any written consents from those performers. There is therefore no basis on which a trier

of fact could determine which performers or recordings these Joint Exploitation Agreements

ostensibly cover.  Finally, even if those agreements were proof that the Defendants were

authorized to reproduce and distribute those works, neither the Sony nor the Warner agreement

applies to any audiovisual recordings of the Musical Works.  *See* Lundberg Decl., Ex. 2 ███████

████████████████████████████████████████████████████████████████████

███████

       The UMG agreement is even less helpful to Defendants' case.  ████████████

████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████

█████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████

██████████████████████████

       Defendants similarly rely on a sales agreement conveying to Defendants a collection of

live recordings covering six of the Musical Works. Defs.' Reply at 9.  In that agreement, the

music venue operator, the Great Music Hall, represented and warranted that ██████████████

████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████

██████████████████  Although that agreement at least purports to have contemporaneous consents

from artists to lawfully fix recordings of their performances, the agreement does not attach any

of the artist consents.  Moreover, that agreement provides that Defendants were required █



*Id.*  As Plaintiffs note, nothing in the record indicates that Defendants have complied with that

requirement.  Pls.' Reply at 3 n.8.

Moreover, Defendants' claim of artist consent is belied by contrary admissible evidence

that consent does not exist.  As an initial matter there is no dispute that Defendants have not

produced a single performance agreement or consent from any of the performing artists at issue.

Defs.' Counter 56.1 ¶ 20.  The BGA collection contained a side letter to that purchase agreement

that provided: ███████████████████████████████

███████████████████  *Id.* ¶ 18 (citing Dickstein Decl., Ex. 7 at *2).  And Defendants never

viewed any artist performance contracts authorizing the recording of those performances, nor

were they made aware that such agreements existed.  *Id.* ¶ 19.  Krassner, the attorney who

represented the seller in connection with the BGA sale, specially ████████████

*Id.* ¶ 25.

Likewise, David Hewitt, from whom Defendants purchased a collection of recordings,

acknowledged that he did not have written consents from performers because it was not industry

custom to acquire such consents when those performances were recorded.  Defs.' Counter 56.1 ¶

33.  That collection contains 303 recordings covering 86 of the Musical Works.  Dickstein Decl.

Ex. 11 (Columns E & F).  Similarly, the agreement by which Festival Network acquired a

collection of concert recordings later sold to Defendants in 2009 noted that Festival Network's

predecessor did ██████████████████████

████████████████████████ Defs.' Counter 56.1 ¶ 34.  Finally, there is undisputed evidence that the three performing artists whom Defendants sought to depose—Keith Richards, David Byrne, and Michael Stipe—could not recall ever consenting to the recording of their performances.  Defs.' Counter 56.1 ¶ 30.  As a result, Defendants have not sustained their burden of demonstrating that any of their recordings were lawfully fixed.[26]

### ii.   Pre-1972 Musical Works

Section 115 separately requires that, for "sound recordings . . . fixed before February 15, 1972," compulsory licensees must demonstrate that the making of phonorecords was authorized "by any person who fixed the sound recording pursuant to an express license from the owner of the copyright in the musical work or pursuant to a valid compulsory license for use of such work in a sound recording."  17 U.S.C. § 115(a)(1)(ii); *see also Blagman v. Apple, Inc.*, No. 12 Civ. 5453 (ALC) (JCF), 2014 WL 1285496, at *7 (S.D.N.Y. Mar. 31, 2014) ("Federal copyright law further provides that a compulsory license in the underlying composition may not issue unless, for sound recordings fixed prior to 1972, the duplicator obtains authorization from the person who fixed the sound recording, who must themselves have had authorization [from] the copyright owner of the . . . underlying composition.") (citation and quotation marks omitted); 2 Nimmer § 8.04[E][2] ("The compulsory licensee must be authorized to make that duplication by the person who fixed the sound recording, who must, in turn, have made the fixation pursuant to a consensual or compulsory license from the copyright owner of the musical work that was thus

---

[26] For precisely the same evidentiary reasons, Defendants cannot show that "the making of the phonorecords was authorized by the owner of copyright in the sound recording." 17 U.S.C. § 115(a)(1)(ii); *see also In re Cellco P'ship*, 663 F. Supp. 2d 363, 369 (S.D.N.Y. 2009) (The owner of a copyright in the sound recording "is the performer(s) whose performance is fixed, or the record producer who processes the sounds and fixes them in the final recording, or both."); *In re Porter*, 498 B.R. 609, 670 (Bankr. E.D. La. 2013) ("A sound recording is owned by the person whose performance is reflected on the recording.").

fixed."). That is because the Copyright Act does not protect "sound recording[s] fixed before February 15, 1972." 17 U.S.C.A. § 301(c); *see* 2 Nimmer § 8.04[E][2] (noting that sound recordings fixed prior to February 15, 1972 are "not subject to statutory copyright").

Defendants claim that Plaintiffs have not refuted the evidence that pre-1972 recordings were properly authorized. Defs.' Reply at 5. This argument is totally without merit. As an initial matter it is Defendants who bear the burden of proving that their licenses were valid. *See Associated Press*, 931 F. Supp. 2d at 561; *Infinity Broad. Corp.*, 150 F.3d at 107. But more importantly, there is nothing for Plaintiffs to refute: Defendants point to *no* evidence that the sound recordings were fixed pursuant to an express license or valid compulsory license from the holders of copyrights in the Musical Works, i.e., Plaintiffs or their predecessors. *See* 17.U.S.C. § 115(a)(1)(ii). As such, Defendants have failed to establish that they hold valid licenses for any of the pre-1972 recordings.

### 3. **HFA Licenses**

From 2007 to 2010, prior to hiring RightsFlow to manage their licenses, Defendants worked directly through HFA. Lundberg Decl. ¶¶ 41–47. Defendants contend that these licenses are "negotiated licenses" that are not subject to the requirements of Section 115. Defs.' MSJ at 19; Defs.' Reply at 15. Plaintiffs disagree, claiming that the HFA licenses are Section 115 compulsory licenses and invalid for the same reasons set forth above. Pls. MSJ at 13, 34–35. The Court concludes that Defendants' HFA licenses are insufficient to establish that licenses are valid because those licenses do not alter the substantive requirements of Section 115.

Most mechanical licensees do not use Section 115's notice requirements. Rather, they acquire licenses through HFA, which is authorized to issue mechanical licenses on behalf of publishers. *See EMI Entm't World, Inc. v. Karen Records, Inc.*, 603 F. Supp. 2d 759, 763

35

(S.D.N.Y. 2009); *Rodgers & Hammerstein Org. v. UMG Recordings, Inc.*, No. 00 CIV. 9322
(JSM), 2001 WL 1135811, at *2 (S.D.N.Y. Sept. 26, 2001).  Although HFA acts to "streamline
the procedures created by §§ 115(b) and 115(c)," the "[l]icenses issued by [HFA] do not . . . alter
the basic rights and obligations of the licensee under § 115." *EMI Entm't World, Inc.*, 603 F.
Supp. 2d at 763–64; *see also Rodgers & Hammerstein Org.*, 2001 WL 1135811, at *2.[27]

That understanding is borne out by the undisputed record evidence.  Defendants'
communications with HFA confirm that the licenses HFA issued were ██████████████████

███████████████████████████████████████████████████████

██████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████  ██████ Defendants have put forward no evidence to support their contention that the HFA
licenses they obtained deviated from Section 115's substantive requirements.

Defendants' HFA licenses are therefore invalid as a matter of law:  They are
substantively invalid because, as set forth above, there is no indication that the recordings were
lawfully fixed, or that the pre-1972 recordings were fixed pursuant to express or compulsory
licenses from Plaintiffs or their predecessors.  And just as a Section 115 mechanical license does
not apply to audiovisual works, the HFA licenses do not either.  *See Sony/ATV Publ'g, LLC v.
Marcos*, 651 F. App'x 482, 485 (6th Cir. 2016) (HFA licenses are a "standard compulsory

---

[27] Defendants take out of context language in *Rodgers & Hammerstein Org.*, which states that "HFA
waives the statutory notice requirements."  2001 WL 1135811, at *2.  Understood in context, that case
stands for the proposition that HFA acts as the publishers' "agent to receive notice[s] of the intention to
obtain a compulsory license, and to collect and distribute royalties."  *Id.*  It does not stand for the
proposition that parties need not have HFA licenses prior to distributing phonorecords of a musical work.

license limited to distribution of phonorecords and incorporates the statutory definition of that

term, which excludes 'audiovisual work[s].'") (quoting 17 U.S.C. § 101). Moreover, because

Defendants concede they began exploiting certain recordings in 2006, but only obtained HFA

licenses beginning in 2007, recordings exploited prior to obtaining an HFA license are, as set

forth directly below, independently barred by Section 115's filing requirements, and any

reproduction or distribution made pursuant to those untimely licenses, constitutes infringement.

### 4.  **Untimely NOIs**

As a further independent basis for finding Defendants' mechanical licenses invalid,

Plaintiffs contend that Defendants' NOIs were not filed prior to the reproduction and distribution

of their phonorecords, and are therefore invalid pursuant to Section 115(b). Pls.' MSJ at 26. For

support they cite to a spreadsheet showing that for all but five recordings Defendants filed NOIs

months or years after they admittedly began exploiting those recordings. *See* Pls.' MSJ at 12;

Defs.' Counter 56.1 ¶ 60; Dickstein Decl. Ex. 52; Dickstein Decl. Ex. 1, Lundberg Dep. at

245:13–257:25 (stating "we always publish [songs] before we file [NOIs]").[28]  For their part,

Defendants advance two positions, one factual, the other legal. As a factual matter, Defendants

assert that they held HFA licenses prior to submitting NOIs pursuant to Section 115's notice

requirements. Defs.' Reply at 15. As a result, they explain, Plaintiffs' claim that NOIs were

filed months or years after the exploitation of the relevant recording is without basis. For

support, they point to Lundberg's declaration, which avers that Defendants have held a

---

[28] On March 23, 2016, Defendants requested leave to file a supplemental declaration on behalf of Lundberg, in which he attempts to explain away his prior sworn deposition testimony that Defendants had a practice of making recordings available on their websites prior to filing NOIs. Doc. 252. Because the proposed supplemental declaration contradicts Lundberg's prior sworn testimony, the Court denies Defendants' request. *See Trans-Orient Marine Corp. v. Star Trading & Marine, Inc.*, 925 F.2d 566, 572 (2d Cir. 1991) ("The rule is well-settled in this circuit that a party may not, in order to defeat a summary judgment motion, create a material issue of fact by submitting an affidavit disputing   prior sworn testimony.").

mechanical licensing account with HFA since 2007 and licensed musical works through HFA

until 2010.  Lundberg Decl. ¶¶ 42–44.  They also point to a spreadsheet that contains each

recording that was licensed through Defendants' HFA account along with the HFA license

number.  *Id.* Ex. 29; Defs.' Counter 56.1 ¶ 62.  Having reviewed the record evidence, the Court

concludes that there is a disputed question of fact as to whether and which NOIs were actually

submitted after the first download or streaming of a phonorecord and in the absence of an HFA

license.  Although the parties offer evidence which they claim resolves this issue, as best the

Court can tell, neither the affidavits or spreadsheets relied on by the parties on their own terms

bridge the gap between the HFA licenses and the submission of NOIs.

Second, Defendants contend that as a legal matter the incorrect date of distribution on

their NOIs is "harmless error."  *See* Defs.' Reply at 25 (citing 37 C.F.R. § 201.18(h) ("Harmless

errors in a Notice that do not materially affect the adequacy of the information required to serve

the purposes of section 115(b)(1) of title 17 of the United States Code, shall not render the

Notice invalid.").

Section 115(b)(1) expressly provides that "[a]ny person who wishes to obtain a

compulsory license under this section *shall*, before or within thirty days after making, and before

distributing any phonorecords of the work, serve notice of intention to do so on the copyright

owner." 17 U.S.C. § 115(b)(1) (emphasis added).  Section 115(b)(2) then states that "[f]ailure to

serve or file the notice required by clause (1) forecloses the possibility of a compulsory license

and, in the absence of a negotiated license, renders the making and distribution of phonorecords

actionable as acts of infringement . . . ." *Id.* § 115(b)(2).  In view of this language, and the

absence of case law to the contrary, the Court declines to read the regulation's harmless error

exception as an exemption from the mandatory filing period in Section 115(b)(1).  *See e.g.,*

*Cherry River Music Co.*, 38 F. Supp. 2d at 312 ("[T]he failure to serve the [NOI] before

distributing phonorecords . . . before the start of distribution *precludes* the creation of a

compulsory license, and it does so both as to copies distributed prior to service and as to copies

distributed thereafter.") (emphasis added). Rather, the Court construes the harmless error

exception to apply to the clerical filing formalities contained in that provision. *See* 17 U.S.C. §

115(b)(1) (providing that the NOI "shall comply, in form, content, and manner of service, with

requirements that the Register of Copyrights shall prescribe by regulation").

*   *   *

To summarize, the Court concludes that Defendants hold no valid licenses authorizing

the reproduction and distribution of the Musical Works.  Audiovisual recordings are not covered

by Section 115 mechanical licenses, and Defendants have not met their burden of establishing

that the balance of their recordings were fixed or manufactured with the consent of the artists

featured in them, nor have they demonstrated that the pre-1972 recordings were fixed pursuant to

an express or valid compulsory license from the copyright holders in the Musical Works, i.e.,

Plaintiffs or their predecessors.  Moreover, any mechanical licenses—whether procured by NOIs

or through HFA—that were not filed prior to the distribution of the related phonorecords are, as

a legal matter, invalid.  However, there remain questions of fact as to whether certain of the

NOIs were untimely filed, or covered by preexisting HFA licenses.  While that issue does not

alter the Court's analysis of infringement, as discussed below, it does raise a triable issue on

whether untimely NOIs were recklessly or willfully filed after the distribution of phonorecords.

## C.   **Additional Defenses**[29]

### 1.   **Implied License**

"[T]he existence of an implied license to use the copyright for a particular purpose precludes a finding of infringement." *Johnson v. Jones*, 149 F.3d 494, 500 (6th Cir. 1998). Because non-exclusive licenses do not transfer ownership and therefore are not subject to the writing requirement of Section 204 of the Copyright Act, *id.*, "[a] nonexclusive license may be granted orally, or may even be implied from conduct." 3 Nimmer § 10.03[A].

"'[T]he Second Circuit has not yet ruled on the precise circumstances under which an implied non-exclusive license will be found.'" *Psihoyos v. Pearson Educ., Inc.*, 855 F. Supp. 2d 103, 120 (S.D.N.Y. 2012) (quoting *Weinstein Co. v. Smokewood Entm't Grp., LLC*, 664 F. Supp. 2d 332, 344 (S.D.N.Y. 2009)).  It has, however, endorsed the view of other circuits "and cautioned that implied non-exclusive licenses should be found 'only in narrow circumstances where one party created a work at the other's request and handed it over intending that the other copy and distribute it.'" *Weinstein Co.*, 664 F. Supp. 2d at 344 (alterations and second internal quotation marks omitted) (quoting *SmithKline Beecham Consumer Healthcare, L.P. v. Watson Pharm., Inc.*, 211 F.3d 21, 25 (2d Cir. 2000) (addressing implied license on interlocutory appeal)

---

[29] Defendants half-heartedly contend that the Copyright Act's three-year statute of limitations bars Plaintiffs' claims as to any "issues" that existed with their licenses prior to May 27, 2012. Defs.' MSJ at 24; Defs.' Reply at 26–27. That is incorrect. As Plaintiffs correctly point out, *see* Pls.' MSJ at 40, the statute of limitations bars any "actions" that are not "commenced within three years after the claim accrued." 17 USC § 507(b).  The "issues" that Plaintiffs raise with Defendants' license defense, for which it bears the burden, are not the claims of "infringement" that Plaintiffs allege.  There is no dispute that Defendants have exploited each of the Musical Works within three years of the filing of the Complaint. Defs.' Counter 56.1 ¶ 87 (citing Dickstein Decl., Exs. 26 (showing dates of download in Column C), 56 (showing the month and year of streams in Columns I and J)).  Accordingly, those claims for infringement are timely and Plaintiffs may recover on them, irrespective of when "issues" with Defendants' licenses arose. *See Kwan v. Schlein*, 634 F.3d 224, 228 (2d Cir. 2011) (although "[a]n ownership claim accrues only once . . . an infringement action maybe commenced within three years of *any* infringing act, regardless of any prior acts of infringement") (citations omitted).  Defendants' reliance on *Simmons v. Stanberry*, is misplaced because that case concerned a claim of copyright ownership, not copyright infringement. 810 F.3d 114 (2d Cir. 2016).

(citing *Effects Assocs., Inc. v. Cohen*, 908 F.2d 555, 558 (9th Cir. 1990)); *see also I.A.E., Inc. v. Shaver*, 74 F.3d 768, 776 (7th Cir. 1996) (finding an implied license where: "(1) a person (the licensee) requests the creation of a work, (2) the creator (the licensor) makes that particular work and delivers it to the licensee who requested it, and (3) the licensor intends that the licensee-requestor copy and distribute his work"); *Lulirama Ltd. v. Axcess Broad. Servs., Inc.*, 128 F.3d 872, 879–81 (5th Cir. 1997) (finding implied license where licensor created song at request of defendant); *Jacob Maxwell, Inc. v. Veeck*, 110 F.3d 749, 752–53 (11th Cir. 1997) (same).

Although some courts have applied a more lenient test, those courts fall outside of this circuit or predate the Second Circuit's decision in *SmithKline. See, e.g., Field v. Google Inc.*, 412 F. Supp. 2d 1106, 1116 (D. Nev. 2006) ("Consent to use the copyrighted work need not be manifested verbally and may be inferred based on silence where the copyright holder knows of the use and encourages it."); *Keane Dealer Servs., Inc. v. Harts*, 968 F. Supp. 944, 947 (S.D.N.Y. 1997) (noting that "consent given in the form of mere permission or lack of objection is also equivalent to a nonexclusive license and is not required to be in writing") (citation omitted). Under either formulation, the touchstone of implied consent analysis is whether there was a "meeting of the minds." *Psihoyos*, 855 F. Supp. 2d at 124 (citing *Ulloa v. Universal Music and Video Distrib. Corp.*, 303 F. Supp. 2d 409, 416 (S.D.N.Y. 2004); *Design Options, Inc. v. BellePointe, Inc.*, 940 F. Supp. 86, 92 (S.D.N.Y. 1996) (requiring evidence that "both parties to the transaction, not just the defendant, intended that the defendant could use or copy the plaintiff's work without liability for copyright infringement"); *Viacom Int'l. Inc. v. Fanzine Int'l. Inc.*, No. 98 Civ. 7448 (KMW), 2000 WL 1854903, at *3 (S.D.N.Y. July 12, 2000) ("As with all copyright licenses, an implied license protects the licensee only to the extent the copyright

owners intended that their copyrighted works be used in the manner in which they were eventually used.") (quotation marks omitted).

Defendants contend that Plaintiffs granted them an implied license by accepting their payments for several years and failing to object to their exploitation of the recordings at issue. *See* Defs.' MSJ at 18–20.  They assert that this "longstanding course of dealing with Plaintiffs has permitted them to believe that they have properly licensed the compositions in question." *Id.* at 20.  Plaintiffs counter that Defendants' implied-license defense is barred by their unclean hands, and that, in any event, Defendants fail to demonstrate that Plaintiffs granted them an implied license. *See* Pls.' MSJ at 41–45.  The Court concludes it need not reach the unclean hands issue, because Defendants cannot meet their burden under either version of the implied license test.

Under the more rigid formulation endorsed by the Second Circuit, Defendants falter at the gate, as they do not even contend—and there is no admissible evidence to support—that they "'created [their] [recordings] at the [Plaintiffs'] request.'" *Weinstein Co.*, 664 F. Supp. 2d at 344 (quoting *SmithKline Beecham Consumer Healthcare, L.P.*, 211 F.3d at 25).

Even under the more lenient test, Defendants cannot show that there was a meeting of the minds.  Defendants assert that the meeting of the minds is manifest from their royalty payments and Plaintiffs' acceptance of those payments. *See* Defs.' MSJ at 19.  For support, they rely on *Keane Dealer Servs., Inc.*, for the proposition that a meeting of the minds can be inferred from "lack of objection."  968 F. Supp. at 947.  On that basis, they conclude that "knowledge of, and acquiescence in, the use of copyrighted material . . . may constitute an implied license." *See* Defs.' MSJ at 19.  That case has no persuasive force under these circumstances.

As Plaintiffs note, the parties in that case had extensive communications with each other and plaintiff admitted that it was aware of the nature of defendant's use of the software at issue. 968 F. Supp. at 946. Indeed, the software, "an automated trading system[] [that] traded a proprietary account . . . against incoming retail order flow," had but one clear use. *Id.* Here, aside from Plaintiff ABKCO's cease and desist letters in August of 2013 and 2014, Defs.' Counter 56.1 ¶ 64, there is no evidence that the parties communicated with each other and no evidence that Plaintiffs understood the nature of the use that they were licensing. This lack of understanding is in large part due to the nature of the *compulsory* licensing scheme. That is to say, copyright holders in musical works have no say in whether to grant these licenses. Instead, when a licensee manifests their intention to manufacture "phonorecords" pursuant to Section 115, Plaintiffs are entitled to rely on the compulsory licensees' compliance with the requirements of that provision.[30]

Under these circumstances, prudential concerns also counsel against imputing intent to compulsory licensors who accept payments made pursuant to ostensibly valid NOIs and HFA licenses. As Plaintiffs persuasively argue, by conditioning the availability of the compulsory license on the timely filing of the NOI, Congress sought to impose strict liability on manufacturers who fail to comply with the terms of Section 115. Pls.' MSJ at 44 (citing 17 U.S.C. § 115(b)(2) ("Failure to serve or file the [NOI] required by clause (1) forecloses the possibility of a compulsory license and, in the absence of a negotiated license, renders the

---

[30] The terms of the agreements entered into with HFA, RightsFlow, and MediaNet all indicate that the statutory requirements of Section 115 control the availability of the compulsory licenses Defendants obtained. *See* Lundberg Decl. ¶ 50(h), Ex. 31 (HFA licenses) at 1–2; Dickstein Decl. Ex. 31 (RightsFlow Agreement) ¶¶ 1(a), 7(b)(iii); Ex. 32 (MediaNet Agreement) ¶¶ 1.16, 4(a).

making and distribution of phonorecords actionable as acts of infringement . . . .")).[31]  Finding an implied license whenever a licensee remits payments under Section 115 would require songwriters to "investigate the *bona fides* of every NOI they receive," or risk granting an implied license for otherwise unlawful use.  *Id.*

Defendants' payments were expressly conditioned on the lawful fixation of phonorecords (but not audiovisual works) and the filing of NOIs prior to the date of distribution.  Where, as here, a licensee fails to meet the substantive and procedural requirements of that provision, they cannot claim that there was a meeting of the minds as to how those licenses would be used.  The inherent assumption was compliance with the commands of Section 115.  Defendants' failure to satisfy those conditions defeats their claim that a meeting of the minds existed between the parties.  *Cf. Graham v. James*, 144 F.3d 229, 237 (2d Cir. 1998) (noting that "'if the nature of a licensee's violation consists of a failure to satisfy a condition to the license . . . , it follows that the rights depend[e]nt upon satisfaction of such condition have not been effectively licensed, and therefore, any use by the licensee is without authority from the licensor and may therefore, constitute an infringement of copyright'") (citing 3 Nimmer § 10.15[A]).  Indeed, "no court has found an implied license where the nature of the use is contested."  *SHL Imaging, Inc. v. Artisan House, Inc.*, 117 F. Supp. 2d 301, 317 (S.D.N.Y. 2000).

The objective facts concerning the course of conduct between the parties do not support a finding that an implied license existed.  There is no evidence that Defendants intended audiovisual recordings of their Musical Works to be exploited under the guise of Section 115

---

[31] Prior to the 1972 Copyright Act, manufacturers who "faile[d] to serve a notice of intention to use," were liable only for the statutory royalty rate plus a minimal award of damages of "not more than 6 cents per record."  S. REP. 94-473.  This limitation on liability, however, was "strongly criticized as inadequate either to compensate the copyright owner or to deter infringement."  *Id.*  Section 115(b)(2) of the 1972 Act was therefore intended to deter non-compliance with Section 115's notice provision by making violators strictly liable for copyright infringement.

compulsory mechanical licenses. Nor is there any indication that Plaintiffs intended recordings that were not fixed or exploited with the appropriate consents to be laundered into lawful reproductions by reason of the compulsory license regime. Accordingly, Defendants' implied license defense fails.

### 2. Estoppel

For substantially the same reasons, Defendants have not established a basis for estoppel. To prevail on an estoppel defense in the copyright context, a defendant must show that:

> (1) plaintiff had knowledge of the defendant's infringing conduct;
> (2) plaintiff either (a) intended that defendant rely on plaintiff's acts or omissions suggesting authorization, or (b) acted or failed to act in such a manner that defendant had a right to believe it was intended to rely on plaintiff's conduct; (3) defendant was ignorant of the true facts; *and* (4) defendant relied on plaintiff's conduct to its detriment.

*SimplexGrinnell LP v. Integrated Sys. & Power, Inc.*, 642 F. Supp. 2d 167, 194 (S.D.N.Y.2009) (citation and quotation marks omitted) (emphasis added). "Courts have warned that '[e]stoppel is a drastic remedy and must be utilized sparingly. Clearly, a successful application of this remedy requires the party asserting estoppel to use due care and not fail to inquire as to its rights where that would be the prudent course of conduct.'" *Psihoyos*, 855 F. Supp. 2d at 129 (quoting *Keane*, 968 F. Supp. at 948).

Defendants rely on two bases to support their claim of estoppel. First, they argue that Plaintiffs "knew" of Defendants "allegedly infringing conduct" and profited "from that conduct since 2007," when Defendants acquired an account with HFA and began paying Plaintiffs under HFA licenses. Defs.' MSJ at 22. Defendants assert that those continued payments are proof of their detrimental reliance. *Id.* at 23. Second, Defendants contend that the Joint Exploitation Agreements are proof of their "good faith belief that they were acting under the proper licenses and authority." *Id.* at 22.

45

Defendants' sole proof of knowledge is the fact that they made payments to Plaintiffs pursuant to mechanical licenses. *See id.* at 22 (citing Defs.' 561. ¶ 6); Lundberg Dec. Exs. 7 (Transaction Statement for ABKCO), 10 (Transaction Statement for EMI), 13 (Transaction Statement for Imagem), 16 (Transaction Statement for Peer), 19 (Transaction Statement for Spirit), Ex. 22 (Transaction Statement for Warner); Defs.' Reply at 24 (citing Defs.' 561. ¶ 7; Lundberg Decl. Ex. 21 (NOIs sent by MediaNet to Warner)).  But just as Defendants could not show that there was a "meeting of the minds" in the implied license context, they cannot show that Plaintiffs "knew" that their conduct was infringing.  The transaction statements relied on by Defendants are summaries of the checks cashed by Plaintiffs and are not proof that Plaintiffs knew Defendants' conduct was infringing.  Nor are NOIs or HFA licenses that explicitly state that Defendants seek licenses for "phonorecords" as "authorized pursuant to 17 U.S.C. § 115." Lundberg Decl. Ex. 21 (NOIs sent by MediaNet to Warner); *see id.* Ex. 31 at 1–2 (HFA informing Defendants that they were receiving ███████████████████████████████ ████████████████████████████████████████████  As a result, Defendants cannot prove the first element of their equitable estoppel defense, and it must therefore fail.[32]

---

[32] The Court separately notes that Defendants' estoppel claim fails because they were not ignorant of the facts at issue.  As discussed above in detail, when Defendants acquired their collection they were well aware of the myriad licensing and authorization issues they faced with respect to performing artists and the holders of copyrights in the compositions. Indeed, the record is clear that Defendants were repeatedly and specifically told that the sales agreements did *not* convey the intellectual property rights that Defendants now claim entitlement to exploit.  The Joint Exploitation Agreements that they entered into— three years after they began exploiting some portion of the Musical Works—did not purport to resolve a number of those issues.  On their terms, those agreements said nothing about whether the recordings were *fixed* with the consent of the performing artist.  *See* Lundberg Decl., Exs. 2, 3, 4.  Likewise, Defendants cannot credibly claim ignorance with respect to any of the audiovisual works, as the Sony and Warner agreements expressly excluded audiovisual recordings, *see* Lundberg Decl., Ex. 2, § 3.6(f), *id.* Ex. 3, § 10.3; Defs.' 56.1 ¶ 79, and the definition of phonorecords expressly excludes audiovisual works, *see* 17 U.S.C. §§ 101, 115.  In addition, there is no reasonable basis to conclude that Defendants were ignorant to the fact that sound recordings fixed prior to 1972 were required to be fixed pursuant to a license from the holder of the copyright in the musical work.  That is an unambiguous requirement of Section 115.

### D.    **Willful Infringement**

The Copyright Act permits a court to "increase the award of statutory damages to a sum of not more than $150,000" where a defendants infringement is willful.  17 U.S.C. § 504(c)(2).  "A copyright holder seeking to prove that a copier's infringement was willful must show that the infringer 'had knowledge that its conduct represented infringement or . . . recklessly disregarded the possibility.'"  *Bryant v. Media Right Prods., Inc.*, 603 F.3d 135, 143 (2d Cir. 2010) (quoting *Twin Peaks Prods., Inc. v. Publ'ns. Int'l Ltd.*, 996 F.2d 1366, 1382 (2d Cir. 1993).  The Second Circuit's "decisions clearly recognize that, even in the absence of evidence establishing the infringer's actual knowledge of infringement, a plaintiff can still prove willfulness by proffering circumstantial evidence that gives rise to an inference of willful conduct."  *Island Software & Computer Serv., Inc. v. Microsoft Corp.*, 413 F.3d 257, 264 (2d Cir. 2005).  "Although courts are generally reluctant to dispose of a case . . . when mental state is at issue, it is permissible to do so where there are sufficient undisputed material facts on the record to make the question appropriate for summary judgment."  *Lipton v. Nature Co.*, 71 F.3d 464, 472 (2d Cir. 1995).

Plaintiffs contend that, at a minimum, there is undisputed evidence that Defendants acted with reckless disregard thereby entitling them to a finding of willfulness on all of Defendants' infringement.  Pls.' MSJ at 47.  In contrast, Defendants assert that they hold a reasonable, good-faith belief that their conduct does not constitute copyright infringement and that they took the necessary steps to obtain valid licenses.  Defs.' MSJ at 36.  Defendants rely on the fact that they enlisted licensing vendors to aid in transmitting their NOIs to Plaintiffs to support their claim

---

*See* 17 U.S.C. § 115(a)(1)(ii).  "Reliance is not justifiable if the party invoking estoppel 'had the means by which with reasonable diligence he could acquire the knowledge so that it would be negligence on his part to remain ignorant by not using those means."  *Associated Press v. Meltwater U.S. Holdings, Inc.*, 931 F. Supp. 2d 537, 565 (S.D.N.Y. 2013) (quoting *In re Becker*, 407 F.3d 89, 99 (2d Cir. 2005)).  Thus, Defendants reliance is not justifiable.

that they reasonably relied on these professional companies. *Id.* at 36–37. Defendants also assert that Plaintiffs cannot rely on the cease-and-desist demands from third parties as they are hearsay. Defs.' Reply at 37; *see supra* n.18.

As an initial matter, the Court agrees with Plaintiffs that there is voluminous, undisputed record evidence demonstrating that Defendants were on notice that the recordings they acquired lacked the consents and authorizations necessary to exploit them, both from performing artists and the copyright holders in the songs. The collections, which were at least in part conveyed through quit-claim transfer, Defs.' Counter 56.1 ¶ 17, informed Defendants that they were not acquiring intellectual property rights, *id.*, warned of the significant licensing issues that Defendants would need to overcome, *id.* ¶¶ 18–22, and either made "no representation . . . regarding original performance contracts," *id.*, or simply never provided Defendants with any performer contracts, *id.* ¶ 33–35. Moreover, there is no factual assertion in the record that Defendants ever obtained the consent of the copyright holders in the Musical Works.

There is also ample evidence that during the course of Defendants' exploitation, they were made aware of the statutory provision with which they were obligated to comply. Indeed, in invoking their licensing vendors as a show of good faith, Defendants fail to acknowledge that both the HFA and RightsFlow agreements stressed that Defendants were bound by the requirements of Section 115. Emails from HFA expressly informed Defendants that they were being issued ███████████████████████████████████████████████████████████████ ███████████████████████████████████████████████████████ ████████████████████████████████████████████████████████ █████████████████████████████████████████████ And Defendants represented and warranted in their agreement with RightsFlow that Defendants would remain

████████████████████████████████████████████

████████████████████████████████████ Defs.' Counter 56.1 ¶ 57.

Having been put on notice as to their obligations, Defendants obtained Joint Exploitation

Agreements to ensure they had consent from artists to exploit those agreements.  The Sony and

Warner agreements expressly excluded audiovisual recordings, *see* Lundberg Decl., Ex. 2, §

3.6(f), *id.* Ex. 3, § 10.3; Defs.' 56.1 ¶ 79, and so there is no good faith basis to conclude that

those audiovisual recordings were authorized by the performers.  Likewise, although Section 115

may give rise to reasonable disagreement as to certain of its terms, two things cannot reasonably

be disputed:  that phonorecords do not include audiovisual works, and that sound recordings

fixed prior to 1972 must have been "fixed pursuant to an express license from the owner of the

copyright in the musical work or pursuant to a valid compulsory license for use of such work in a

sound recording."  17.U.S.C. § 115(a)(1)(ii).  In this latter respect, Defendants have made a

business of exploiting vintage concert recordings.  No less than 122 of the 1,175 recordings at

issue were fixed before 1972.  Dickstein Decl. Ex. 23.  There is also no reasonable argument

that, in the absence of a Section 1 Notice under the UMG agreement, that the UMG recording

alone was sufficient to authorize any exploitation of sound recordings featuring UMG artists.

Taken together, the record evidence establishes that Defendants' conduct was, at a minimum,

reckless with respect to their audiovisual recordings, the pre-1972 recordings, and recording

featuring UMG artists.

There is, however, contrary admissible evidence that precludes a finding of willful

infringement based on the untimely filing of the NOIs and the post-1972 sound recordings.

Lundberg testified that, based on his communications with licensing vendors, he understood it

was industry custom to file NOIs after the date of distribution.  Defs.' Counter 56.1 ¶ 33.  That

creates a genuine dispute of fact as to whether the untimely filing of NOIs was willful.  There are

also genuine disputes of fact as to whether licenses obtained directly from HFA covered the

distribution of recordings prior to Defendants' filing of NOIs directly with Plaintiffs.  Likewise,

although the Court concludes that the Joint Exploitation Agreements are insufficient to show

lawful fixation and, in any event, inadmissible hearsay for the purposes of proving artist consent,

the Sony and Warner agreements are sufficient to create a triable issue as to whether the post-

1972 sound recordings ostensibly covered under those agreements were exploited with reckless

intent.  There is at least a reasonable argument that Defendants believed the Sony and Warner

agreements authorized the exploitation of recordings featuring those record companies' artists.

Accordingly, summary judgment is granted to Plaintiffs on their claim of willful

infringement as to all audiovisual recordings, pre-1972 audio recordings, and all recordings

covered by the UMG agreement, and denied in all other respects.

### E.   Liability for Sagan in his Individual Capacity

"It is well established that all persons and corporations who participate in, exercise

control over or benefit from an infringement are jointly and severally liable as copyright

infringers and that an individual, including a corporate officer, who has the ability to supervise

infringing activity and has a financial interest in that activity, or who personally participates in

that activity is personally liable for infringement." *Capitol Records LLC v. Redigi Inc.*, No. 12-

CV-95 RJS, 2014 WL 4354675, at *2 (S.D.N.Y. Sept. 2, 2014) (citing *Arista Records LLC v.

Lime Grp. LLC*, 784 F.Supp.2d 398, 437 (S.D.N.Y.2011)) (punctuation marks omitted).

The Court has already ruled that Defendants are liable for copyright infringement.

The undisputed record evidence establishes that Sagan is personally liable for direct

infringement.  Sagan is the founder, president, CEO, and sole owner of Defendant Norton LLC.

Defs.' Counter 56.1 ¶ 10.  He was deeply involved in the acquisition of the recordings at issue

and the agreements that conveyed those recordings clearly disclaimed intellectual property rights

and in many instances documented the licensing issues the collections presented.  Defs.' Counter

56.1 ¶¶ 17–19, 21, 27, 33–35.  On several occasions Sagan pressed sellers for artist consents,

only to turn up empty handed.  *Id.* ¶ 34–35.  At his deposition, Sagan confirmed that he had

"final decision-making authority" over the Defendant entities.  *Id.* ¶ 55; Dickstein Decl., Ex. 2,

Sagan Dep. at 43:1–3.  Moreover, Lundberg, the Chief Technology Officer for Wolfgang's

Vault, stated in his deposition that it was Sagan who instructed him as to "which concerts to

make available for download or not," who "manage[d] [the companies] original agreements,"

and made plans "to start digitizing tape recordings with an eye towards making them available

on a public website."  *Id.* at 54:3–9, 55:23–56:5

     As the sole owner of Norton, and based on Sagan's testimony and that of his Chief

Technology Officer, the record evidence establishes that Sagan "has the ability to supervise

infringing activity and has a financial interest in that activity."  *Capitol Records LLC*, 2014 WL

4354675, at *2.  Sagan's acknowledgement that he had "final decision-making authority" and the

testimony from Lundberg regarding Sagan's direction and management of Defendants'

operations is sufficient to establish that Sagan personally participated in the infringing activity.

*See Id.*; *see also Arista Records LLC*, 784 F. Supp. 2d at 437–38 (granting summary judgment on

claim that CEO was personally liable for copyright infringement, where CEO was "100%

shareholder" of corporate defendant and testified that he "ran" and was the "ultimate

decisionmaker" for corporate defendant); *Capitol Records LLC.*, 2014 WL 4354675, at *2

(concluding at motion to dismiss stage that allegation that corporate officer who controlled

operations, personally conceived of business model, was "ultimate decision maker[] concerning

the development and implementation of the infringing activity," and "directed and approved"

key aspects of infringing activity, could be held directly liable for infringement) (alterations

omitted); *Arista Records LLC v. USENET.com, Inc.*, 633 F. Supp. 2d 124, 158-59 (S.D.N.Y.

2009) (granting summary judgment on claim that "sole shareholder" was "personally responsible

for a major share of Defendants' infringing activities" and the "moving force behind the entire

business"). Accordingly, summary judgment is granted to Plaintiffs on their claim of direct

infringement by individual Defendant Sagan.[33]

### F.   Injunctive Relief

"A plaintiff seeking a permanent injunction must satisfy a four-factor test before a court

may grant such relief. A plaintiff must demonstrate: (1) that it has suffered an irreparable injury;

(2) that remedies available at law, such as monetary damages, are inadequate to compensate for

that injury; (3) that, considering the balance of hardships between the plaintiff and defendant, a

remedy in equity is warranted; and (4) that the public interest would not be disserved by a

permanent injunction." *Monsanto Co. v. Geertson Seed Farms*, 561 U.S. 139, 156–57 (2010)

(quoting *eBay Inc. v. MercExchange, L.L. C.*, 547 U.S. 388, 391 (2006)) (alterations and

quotation marks omitted). A permanent injunction is an extraordinary remedy that may be

granted in the exercise of a court's sound discretion. *See Winter v. Nat. Res. Def. Council, Inc.*,

555 U.S. 7, 24 (2008).

---

[33] Defendants' sole argument in response to Plaintiffs' claim that Sagan is personally liable for infringement, is that Plaintiffs did not allege vicarious liability in their complaint and are barred from asserting it now. Defs.' Reply at 27–33. Although Defendants cast Plaintiffs claim as one for vicarious liability (and spill much ink arguing it), Plaintiffs never frame it as such, and Defendants concede that Plaintiffs' Complaint alleged direct infringement by the "Defendants," among whom Sagan is clearly named. They further concede that the Complaint alleges that Sagan "authorized, ratified, *participated in* and benefitted from each of the acts" identified in the Complaint. *Id.* at 28 n.22 (citing Doc. 141, Supp. Compl.) (emphasis added). Although the Court agrees that Plaintiffs did not plead vicarious liability, they have pleaded direct liability and their motion is granted on that basis alone.

Plaintiffs argue that they are entitled to this extraordinary remedy because, absent the injunction, Defendants will continue their infringing conduct and hamper Plaintiffs' "negotiating leverage with prospective licensees." Pls.' MSJ at 53. Plaintiffs also suggest that their damages would be too difficult to quantify. *Id.*; Pls.' Reply at 15 (citing Declaration of Alisa Coleman, COO of ABKCO, Doc. 192, ¶ 4). The Court is unpersuaded by these arguments.

While there is no question that Plaintiffs have been harmed by Defendants, that harm is not irreparable because they can be compensated. *See Tom Doherty Assocs., Inc. v. Saban Entm't, Inc.*, 60 F.3d 27, 37 (2d Cir. 1995) ("Irreparable harm is an injury . . . for which a monetary award cannot be adequate compensation.") (citation and internal quotation marks omitted); *Roach v. Morse*, 440 F.3d 53, 56 (2d Cir. 2006) (identifying irreparable harm as essential to claim for permanent injunction)

Plaintiffs have argued throughout their summary judgment submissions that there are ways in which Defendants could have lawfully licensed these works; either through the mechanical licensing regime, negotiated licenses, or through synchronization licenses for their audiovisual recordings. *See* Pls.' MSJ at 23–24 (asserting that Plaintiffs "have identified numerous synchronization licenses that they have issued for live concert recordings"); Pls.' 56.1 ¶ 8 (same); *see also* Docs. 1, 43. Indeed, in filing its cease-and-desist letters, Plaintiff ABKCO informed Defendants that they needed synchronization licenses to exploit certain audiovisual recordings. Pls.' 56.1 ¶ 64. Plaintiff ABKCO cannot now be heard to argue that calculating the fees for such licenses would be too difficult to do. *See* Pls.' Reply at 15; Declaration of Alisa Coleman, COO of ABKCO, Doc. 192, ¶ 4. That's what experts are for.

Finally, the Court finds that the balance of hardships and consideration of the public interest does not tip in Plaintiffs' favor. Setting aside any copyright ownership issues, there is no

question that Defendants own the recordings at issue.  Although that is insufficient to entitle

them to exploit these recordings without the proper licenses, these licensing hurdles are not

insurmountable.  Defendants provide recordings of iconic songs and entertainers in a platform

that makes them accessible to the general public.  Licensing issues notwithstanding, the Court

finds that the public's interest in having access to these recordings counsels against the

imposition of a permanent injunction.  Plaintiffs request for a permanent injunction is therefore

denied.

## IV.    CONCLUSION

For the reasons set forth above, the parties' motions for summary judgment are

GRANTED in part and DENIED in part as follows:

- Plaintiffs' claim of copyright infringement is GRANTED against all Defendants and as to all infringement within the statute of limitations; Defendants' motion on Plaintiffs' claim of copyright infringement is DENIED in all respects.

- Plaintiffs' claim for willful infringement is GRANTED with respect to the audiovisual recordings, pre-1972 recordings, and recordings ostensibly covered by the UMG agreement, and DENIED in all other respects; Defendants' motion on Plaintiffs' claim of willful infringement is DENIED in all respects.

- Plaintiffs' request for a permanent injunction is DENIED; and Defendants' motion is GRANTED.

- Defendants' request to supplement the record, Doc. 252, is GRANTED only with respect to the HFA spreadsheet, Ex. 1, and DENIED in all other respects.

The Clerk of the Court is respectfully directed to terminate the motions, Docs. 161, 191, 252.

SO ORDERED.

Dated:    March 30, 2018
          New York, New York

Edgardo Ramos, U.S.D.J.