UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

ABKCO MUSIC, INC., COLGEMS-EMI MUSIC, INC., EMI ALGEE MUSIC CORP., EMI APRIL MUSIC INC., EMI BLACKWOOD MUSIC, INC., EMI CONSORTIUM MUSIC PUBLISHING, INC. d/b/a EMI FULL KEEL MUSIC, EMI CONSORTIUM SONGS, INC. d/b/a EMI LONGITUDE MUSIC, EMI FEIST CATALOG INC., EMI ROBBINS CATALOG INC., EMI UNART CATALOG, INC., JOBETE MUSIC CO., INC., SCREEN-GEMS-EMI MUSIC INC., STONE AGATE MUSIC, STONE DIAMOND MUSIC CORP., RODGERS & HAMMERSTEIN HOLDINGS LLC, PEER INTERNATIONAL CORPORATION, PSO LIMITED, PEERMUSIC LTD., PEERMUSIC III, LTD., SONGS OF PEER, LTD., SPIRIT CATALOG HOLDINGS S.A.R.L., TOWSER TUNES, INC., TOWSER NEWCO LTD., SPIRIT TWO MUSIC, INC., WARNER-TAMERLANE PUBLISHING CORP., and WB MUSIC CORP.,

    Plaintiffs/Counterclaim-Defendants,

– against –

WILLIAM SAGAN, NORTON LLC, BILL GRAHAM ARCHIVES, LLC d/b/a WOLFGANG'S VAULT, BILL GRAHAM ARCHIVES, LLC d/b/a CONCERT VAULT, BILL GRAHAM ARCHIVES, LLC d/b/a MUSIC VAULT, and BILL GRAHAM ARCHIVES, LLC d/b/a DAYTROTTER,

    Defendants/Counterclaim-Plaintiffs.

**OPINION AND ORDER**

15 Civ. 4025 (ER)

Ramos, D.J.:

This case concerns whether Defendants properly licensed Plaintiffs' copyrights in approximately 200 musical compositions ("Musical Works") included in live concert recordings that Defendants made available for download and streaming on their websites. On March 30,

2018, the Court granted in part and denied in part the parties' cross-motions for summary judgment. Doc. 255; Doc. 262 ("Op."). The Court assumes familiarity with the facts and holdings contained in that Opinion.

Defendants have moved for reconsideration of nearly every aspect of the Court's Opinion. Doc. 257. Because Defendants' arguments are incorrect, newly raised, or immaterial to the Court's holdings, Defendants' motion is DENIED.

**I.     LEGAL STANDARD**

Under Local Civil Rule 6.3, reconsideration may be granted only where the Court has overlooked controlling decisions of law or factual matters that were "put before it on the underlying motion . . . and which, had they been considered, might have reasonably altered the result." *Mikol v. Barnhart*, 554 F. Supp. 2d 498, 500 (S.D.N.Y. 2008) (quoting *Greenwald v. Orb Commc'ns & Mktg., Inc.*, No. 00 Civ. 1939 (LTS) (HBP), 2003 WL 660844, at *1 (S.D.N.Y. Feb. 27, 2003)). Under such circumstances, a motion for reconsideration may be granted "to correct a clear error or prevent manifest injustice." *Kolel Beth Yechiel Mechil of Tartikov, Inc. v. YLL Irrevocable Tr.*, 729 F.3d 99, 104 (2d Cir. 2013) (quoting *Virgin Atl. Airways, Ltd. v. Nat'l Mediation Bd.*, 956 F.2d 1245, 1255 (2d Cir. 1992)). "Reconsideration of a court's previous order is an 'extraordinary remedy to be employed sparingly in the interests of finality and conservation of scarce judicial resources.'" *Parrish v. Sollecito*, 253 F. Supp. 2d 713, 715 (S.D.N.Y. 2003) (quoting *In re Health Mgmt. Sys., Inc. Sec. Litig.*, 113 F. Supp. 2d 613, 614 (S.D.N.Y. 2000)). "Where the movant fails to show that any controlling authority or facts have actually been overlooked, and merely offers substantially the same arguments he offered on the original motion or attempts to advance new facts, the motion for reconsideration must be denied." *Mikol*, 554 F. Supp. 2d at 500.

## II. DISCUSSION

As noted, Defendants have challenged nearly every aspect of the Court's Opinion (as well as earlier orders). The Court will address each argument in turn.

### A. Discovery

As an initial matter, Defendants complain of certain discovery rulings issued by Magistrate Judge Pitman or this Court. Defs.' Mem. 4–6. However, Defendants never opposed summary judgment on the grounds that they "cannot present facts essential to justify [their] opposition." Fed. R. Civ. P. 56(d). Accordingly, Defendants cannot now, through a motion for reconsideration of the Court's Opinion, claim they need additional discovery or challenge discovery rulings that were issued months before they briefed the summary judgment motion.[1]

### B. Joinder of Towser Tunes, Inc. and Towser Newco Ltd.

As explained in the Opinion, at oral argument on March 26, 2018, the Court granted Plaintiffs leave to join Towser Tunes, Inc. and its subsidiary Towser Newco Ltd. as the "real part[ies] in interest" to resolve Defendants' objection in its sur-reply that the ultimate parent of those entities, Plaintiff Spirit Catalog Holdings, S.a.r.l., did not have standing to sue. Op. 19–21 (quoting Fed. R. Civ. P. 17(a)(3)). As the Court explained, there was no dispute that the Towser entities had standing to sue, and "their joinder would not prejudice Defendants as no new discovery was required, and the subsidiaries had the same officers, executives and business

---

[1] Defendants also claim that Plaintiffs, by "deny[ing] that Defendants have paid all sums owed," Pls.' Counter 56.1 ¶ 7, reneged on an earlier promise to not dispute that Defendants made payments pursuant to purported compulsory licenses, Ranahan Decl. Ex. M, at 21:6–16. There is no contradiction between these two positions. Although Defendants indisputably made certain payments pursuant to purported compulsory licenses, Plaintiffs assert (and the Court held) that those licenses are invalid, and thus those payments are insufficient to compensate Plaintiffs for what was actually infringing use of the Musical Works.

operations as Spirit." Op. 21; *see also* Fed. R. Civ. P. 21 ("On motion or on its own, the court may at any time, on just terms, add or drop a party [to correct misjoinder or nonjoinder].").

Defendants argue that joinder of the Towser entities violated due process because Defendants had not had a chance to take any discovery from them or respond to any pleading filed by them. However, before the Court joined the Towser entities, Defendants could not specify any discovery that they needed from them. Oral Arg. Tr. 10:21–11:6. Defendants now contend that they need "an investigation into actual damages or lack thereof . . . , payments made, the value of their copyrights, among other issues." Defs.' Mem. 9. However, Defendants have not explained how this discovery would in any respect differ from the discovery they have already taken from two related entities: Plaintiff Spirit Catalog Holdings, S.a.r.l., which is the Towser entities' ultimate parent; and Plaintiff Spirit Two Music, Inc., which shares offices and officers with Towser Tunes, Inc.[2] Nor is there any need for further pleadings from the Towser entities, as they are asserting the same copyright claims already pleaded. *See* Fed. R. Civ. P. 17(a)(3) ("After ratification, joinder, or substitution, the action proceeds as if it had been originally commenced by the real party in interest."); *Clorox Int'l Co. v. Int'l Trade Expo, Inc.*, No. 94 Civ. 0938 (JSM), 1995 WL 106104, at *8 (S.D.N.Y. Mar. 9, 1995) ("[E]ven if plaintiff's corporate parent were the real party in interest, all that would be necessary would be a change in the caption of this case."). Accordingly, Defendants are not prejudiced by joining these parties, and it was not clearly erroneous or manifestly unjust to do so.[3]

---

[2] Although Defendants point out that Plaintiff Spirit Catalog Holdings, S.a.r.l. does not share offices and officers with Towser Tunes, Inc., they ignore that Plaintiff Spirit Two Music, Inc. does.

[3] In a footnote, Defendants similarly object to the substitution of Rodgers & Hammerstein Holdings LLC for Imagem Music LLC after the latter transferred its interest in certain musical works to the former. Defs.' Mem. 10 n.16. For the same reasons, it was not clearly erroneous or manifestly unjust to order "the transferee to be substituted in the action." Op. 1 n.1 (quoting Fed. R. Civ. P. 25(c)).

For the first time, Defendants now contend that Towser Newco Ltd. dissolved in 2013 and thus cannot be a Plaintiff. Defs.' Mem. 8–9. While Defendants may make any applications concerning the capacity of Towser Newco Ltd. to sue that they deem appropriate, a motion for reconsideration is not an appropriate vehicle to raise this new argument and new fact for the first time.

C.    **Applicability of § 115(a)(1)**

Next, Defendants contend that the Court erred in holding that they were required to comply with the additional substantive requirements of § 115(a)(1) of the Copyright Act that apply when seeking a compulsory license for a musical work to make phonorecords duplicating a sound recording "fixed by another."[4]  Op. 5 (quoting 17 U.S.C. § 115(a)(1) (2016)[5]).

Defendants argue that these provisions do not apply because they are not duplicating Plaintiffs' sound recordings. Defs.' Mem. 10–11. This argument totally misapprehends what this case is about. The issue is whether they properly obtained compulsory licenses to use Plaintiffs' Musical Works that are reflected in Defendants' phonorecords. Those phonorecords duplicate sound recordings that were "fixed by another" because they were originally recorded by persons other than Defendants—i.e., concert promoters or venue operators who engineered

---

[4] Those requirements are that (i) such sound recording must be "fixed lawfully"; and (ii) the licensee must have authorization from "the owner of copyright in the sound recording," or "if the sound recording was fixed before February 15, 1972," from a person who fixed the sound recording "pursuant to an express license from the owner of the copyright in the musical work or pursuant to a valid compulsory license for use of such work in a sound recording." 17 U.S.C. § 115(a)(1).

[5] On October 11, 2018, the Orrin G. Hatch–Bob Goodlatte Music Modernization Act, Pub. L. No. 115-264, 132 Stat. 3676 (2018), went into effect and amended § 115. The parties have not identified any amendments that affect this case. Because the Court's prior Opinion and the parties' briefs cite the pre-amendment version of § 115, the Court will continue to do so here for consistency and clarity.

5

the recordings. Accordingly, Defendants must comply with the requirements of § 115(a)(1) concerning sound recordings "fixed by another."

In their reply, Defendants argue that the sound recordings were not fixed by "another" because those concert promoters or venue operators, from whom Defendants acquired the recordings, were their "predecessors." Defs.' Reply 4. However, Defendants have pointed to no authority—let alone controlling authority—holding that when a person acquires a recording from another person, the latter person is not "another" for purposes of § 115(a)(1). Accordingly, reconsideration of the Court's conclusion to the contrary is not warranted.

### D. Evidence that the Recordings Were "Fixed Lawfully"

The Court held that Defendants failed to demonstrate that any of their recordings were fixed lawfully.[6] Op. 34. Defendants now contend that the Court overlooked evidence creating a triable factual issue as to whether the recordings were so fixed. Defs.' Mem. 11–13.

First, Defendants point to the ███████████████████████████████████
█████████████████████. Ranahan Summ. J. Opp'n Decl. Ex. H, at 337:14–24. However, there is no basis to conclude that Sagan had personal knowledge that those bandmembers ever consented to the recording of their concert or that his assertion is anything other than hearsay. *See* Fed. R. Evid. 602, 802. This testimony is therefore inadmissible to prove the consent of those bandmembers.

Second, Defendants submit a 1993 license agreement purporting to license numerous concert recordings from a Bill Graham entity to a third party. Ranahan Decl. Ex. N. As an initial matter, this agreement was never submitted on summary judgment and may not be

---

[6] A recording of a live musical performance is not lawfully fixed if it was recorded "without the consent of the performer or performers involved." 17 U.S.C. § 1101(a); *see* Op. 29.

considered on reconsideration. In any event, the license agreement provides no evidence that the recordings were fixed lawfully, as the agreement explicitly makes no representations as to artists' consents and requires that such consents be obtained before using the recordings. *Id.* ¶¶ 3.03, 7.03.

Third, Defendants argue that the concert producers and sound engineers who recorded the concerts—and who Defendants claim are their predecessors—are joint owners of the copyright in the sound recordings. *See In re Cellco P'ship*, 663 F. Supp. 2d 363, 369 (S.D.N.Y. 2009) ("[T]he author of a sound recording is the performer(s) whose performance is fixed, or the record producer who processes the sounds and fixes them in the final recording, or both." (citation omitted)). However, Defendants "bear[] the burden of establishing that each of the putative co-authors (1) made independently copyrightable contributions to the work; and (2) fully intended to be co-authors." *Thomson v. Larson*, 147 F.3d 195, 200 (2d Cir. 1998). Here, where there is no admissible evidence that any performers ever consented to being recorded, let alone fully intended to be co-authors with recording engineers (some of whom are unidentified), Defendants have not sustained their burden of establishing joint ownership of the copyright in the sound recordings.

Even assuming Defendants had sustained that burden, Defendants might then be able to argue that their exploitation of the post-1972 recordings was "authorized by the owner of copyright in the sound recording." 17 U.S.C. § 115(a)(1). However, this would do nothing to establish that the sound recordings were "fixed lawfully," which remains an independent requirement. *Id.* To do so, Defendants would need to show that the recordings were made with "the consent of the performer or performers involved." 17 U.S.C. § 1101(a); *see also* 3 Melville B. Nimmer & David Nimmer, *Nimmer on Copyright* § 8E.03[A][3] (2018) ("[F]ixation of their

7

work, without permission from each performer, violates the statute."). Defendants have entirely failed to create a triable issue on this score, and their joint ownership argument does not change that.

Fourth, Defendants claim that the Court added a requirement that performers' consent be "written." The Court did no such thing. Rather, ruling on summary judgment, the Court required that there be "admissible evidence sufficient to support a finding" of performer consent. *Fitzgerald v. Henderson*, 251 F.3d 345, 361 (2d Cir. 2001). Defendants adduced no admissible evidence that the performers consented, whether in writing or orally. David Hewitt's testimony that it was "common practice" for the engineer to have a recorded copy of the concert, Defs.' Counter 56.1 ¶ 33, does not support a finding that any particular performers actually consented to recording, of which Hewitt had no personal knowledge, *see* Fed. R. Evid. 602.

Fifth, as explained in the Court's Opinion, the Joint Exploitation Agreements submitted by Defendants did not purport to acknowledge that the recordings were lawfully made with performer consent. Op. 30–32. Defendants now submit four agreements with artists or their entities purporting to release claims concerning certain recordings or license recordings from Bill Graham Archives LLC. Sagan Decl. B–E. These agreements were never submitted on summary judgment and may not be considered now. Moreover, Defendants do not explain how these agreements acknowledge that the original fixation of these recordings was consensual and lawful.

In sum, Defendants have adduced no admissible evidence that the recordings at issue were lawfully fixed. The Court's holding that there was no triable issue on that question was not clearly erroneous or manifestly unjust.[7]

---

[7] In addition, Defendants suggest that Plaintiffs had the burden to show that Defendants' recordings were unauthorized. That misstates the law. It was Defendants that asserted the defense that they held valid

8

E.  **Implied License and Estoppel**

The Court held that Defendants did not have an implied license for Plaintiffs' Musical Works because there was no "meeting of the minds." Op. 42–44. While the Court noted that the parties never had communications with each other indicating a meeting of the minds, Defendants now contend that the Court should have focused on Defendants' interactions with the Harry Fox Agency ("HFA"), who Defendants claim acted as Plaintiffs' agent.[8]  Defs.' Mem. 14–16.

Defendants' argument fails. The "inherent assumption" of HFA—just like Plaintiffs— was Defendants' "compliance with the commands of Section 115." Op. 44. Indeed, HFA's communications with Defendants explicitly stated that ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮. Op. 36 ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮. Because Defendants failed to comply with § 115, including the requirement of lawful fixation, there was no meting of the minds with Plaintiffs or HFA.

For the same reason, Defendants cannot show that Plaintiffs or HFA "'knew' that their conduct was infringing" as required to establish the first element of estoppel. Op. 46. HFA and Plaintiffs were operating under the assumption that Defendants were *not* infringing by complying with § 115. Defendants have submitted no evidence to rebut that premise.[9]

---

licenses, and "[t]he burden of proving that a license exists falls on the party invoking the defense." *Associated Press v. Meltwater U.S. Holdings, Inc.*, 931 F. Supp. 2d 537, 561 (S.D.N.Y. 2013) (citing *Graham v. James*, 144 F.3d 229, 236 (2d Cir. 1998)); *see also FameFlynet, Inc. v. Shoshanna Collection, LLC*, 282 F. Supp. 3d 618, 625 (S.D.N.Y. 2017) ("Where the dispute turns on whether a license is held by the accused infringer, the defendant bears the burden to come forward with evidence of a license." (quoting *Agence France Presse v. Morel*, 769 F. Supp. 2d 295, 302 (S.D.N.Y. 2011))).

[8] "Although HFA acts to 'streamline the procedures created by §§ 115(b) and 115(c),' the '[l]icenses issued by [HFA] do not . . . alter the basic rights and obligations of the licensee under § 115.'" Op. 36 (alteration in original) (quoting *EMI Entm't World, Inc. v. Karen Records, Inc.*, 603 F. Supp. 2d 759, 763–64 (S.D.N.Y. 2009), *amended in part on other grounds*, 681 F. Supp. 2d 470 (S.D.N.Y. 2010)).

[9] Relatedly, Defendants' contention that there is a "factual question as to whether an HFA license is negotiated or compulsory" misses the mark. Defs.' Mem. 14. However one labels the license, the fact remains that Defendants and HFA's communications expressly indicated that ▮▮▮▮▮▮▮▮▮▮

### F. Audiovisual Works

Section 115 provides for a "compulsory license to make and distribute phonorecords" of a musical work. 17 U.S.C. § 115(a)(1). "Phonorecords" are "material objects in which sounds, other than those accompanying a motion picture or other audiovisual work, are fixed." 17 U.S.C. § 101. Based on the clear exclusion of audiovisual works from the statutory definition of "phonorecords," the Court concluded that Defendants could not obtain compulsory licenses for any of the audiovisual recordings that they offered online. Op. 26–28.

Defendants claim that this was erroneous but cannot cite a single case—let alone a controlling case—supporting their contrary and counterintuitive interpretation of the statute.[10] Reconsideration of this point is denied.

### G. Willfulness

"A copyright holder seeking to prove that a copier's infringement was willful must show that the infringer 'had knowledge that its conduct represented infringement or . . . recklessly disregarded the possibility.'" *Bryant v. Media Right Prods., Inc.*, 603 F.3d 135, 143 (2d Cir. 2010) (quoting *Twin Peaks Prods., Inc. v. Publ'ns Int'l Ltd.*, 996 F.2d 1366, 1382 (2d Cir. 1993)). The Court held as a matter of law that Defendants willfully infringed with respect to all

---

▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬. Op. 36. Defendants have submitted no evidence indicating that HFA varied the key § 115 requirements at issue here, including the requirement of lawful fixation.

[10] Because "[t]he term 'phonorecords' includes the material object in which the sounds are first fixed," 17 U.S.C. § 101, the Court recognized in a footnote that phonorecords include "studio equipment on which 'sounds are first fixed,'" as well as "commercially available objects such as records and CDs." Op. 27 n.22. Misinterpreting this footnote, Defendants suggest that the Court erroneously stated that "studio equipment" that enables the recording process, such as a tape recorder or mixing board, is a phonorecord. That is clearly not the kind of "studio equipment" to which the Court was referring. Rather, the studio recording medium in which sounds are first fixed, such as a reel-to-reel tape or computer hard drive, qualifies as a phonorecord.

audiovisual recordings, pre-1972 audio recordings, and recordings covered by the UMG agreement. Op. 50.

Defendants challenge that ruling principally by citing to a single sentence in Bill Graham Archives marketing materials stating that ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮. Defendants suggest that this sentence left "open" the possibility that the recordings could be exploited without artist approval. Defs.' Mem. 19. However, the same document stated that ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮. This document's reference to ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮, in conjunction with other voluminous, undisputed evidence of willfulness, does not create a triable issue of willfulness as to the categories of recordings described above.[11] Rather, this material supports a finding that Defendants, at a minimum, recklessly disregarded the possibility of infringement.

As the Court explained, this evidence includes the following:

- The acquired collections informed Defendants that they were not necessarily acquiring intellectual property rights, warned of the significant licensing issues that Defendants would need to overcome, and made no representation regarding, or did not provide, performer contracts, Defs.' Counter 56.1 ¶¶ 17–22, 33–35;

- Defendants never obtained the consent of the copyright holders in the Musical Works;

- The HFA agreements informed Defendants ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

---

[11] Defendants also point to their efforts to secure licenses from HFA and record labels as evidence of non-willfulness. As the Court explained, this evidence creates a triable issue of willfulness as to certain recordings covered by HFA licenses and post-1972 audio recordings covered by the Sony and Warner agreements, but does not create a triable issue as to any audiovisual recordings, pre-1972 audio recordings, or recordings covered by the UMG agreement. Op. 49–50.

11

- Defendants represented in their agreement with RightsFlow ████████████████████████████████████████████

- Defendants' Joint Exploitation Agreements with Sony and Warner expressly excluded audiovisual recordings, Lundberg Decl. Ex. 2, § 3.6(f); *id.* Ex. 3, § 10.3; Defs.' Counter 56.1 ¶ 79;

- Pre-1972 recordings were not "fixed pursuant to an express license from the owner of the copyright in the musical work or pursuant to a valid compulsory license for use of such work in a sound recording," 17 U.S.C. § 115(a)(1); and

- There were no Section 1 Notices under the UMG agreement purporting to authorize the exploitation of any recordings featuring UMG artists.

*See* Op. 48–49.

Accordingly, Defendants have pointed to no overlooked evidence that could reasonably alter the Court's conclusion on the issue of willfulness.

### H. Sagan's Individual Liability

Defendants contend that the Court conflated direct and vicarious liability for purposes of assessing Sagan's individual liability. Defs.' Mem. 20–23. That is incorrect. Although the Court noted that, in light of his authority over the Defendant entities and his ownership of Norton LLC, Sagan "has the ability to supervise infringing activity and has a financial interest in that activity," which could establish his vicarious liability, Op. 51 (quoting *Capitol Records LLC v. Redigi Inc.*, No. 12 Civ. 95 (RJS), 2014 WL 4354675, at *2 (S.D.N.Y. Sept. 2, 2014)), the Court explicitly granted summary judgment to Plaintiffs for "direct infringement by individual Defendant Sagan," Op. 52; *see also* Op. 52 n.33 (granting summary judgment "on that basis [of direct liability] alone" since Plaintiffs did not plead vicarious liability).

Contrary to Defendants' contentions, undisputed evidence supports the conclusion that Sagan directly infringed as a matter of law. "[A]n individual, including a corporate officer, . . . who personally participates in [infringing] activity[] is *personally* liable for infringement."

*UMG Recording, Inc. v. Escape Media Grp., Inc.*, No. 11 Civ. 8407, 2014 WL 5089743, at *25 (S.D.N.Y. Sept. 29, 2014) (first alteration in original) (quoting *Arista Records LLC v. Lime Grp. LLC*, 784 F. Supp. 2d 398, 437 (S.D.N.Y. 2011)) (holding company co-founders directly and secondarily liable because they directed the infringements). Here, not only did Sagan have "final decision-making authority" over the Defendant entities, Dickstein Decl. Ex. 2, at 43:1–3, as well as knowledge of the licensing problems presented by the collection, Defs.' Counter 56.1 ¶¶ 17–19, 21, 27, 33–35, he actually instructed his employees with respect to "which concerts to make available for download or not" and his plans to "start digitizing tape recordings with an eye towards making them available on a public website," Dickstein Decl. Ex. 1, at 54:3–9, 55:23–56:5, 107:3–15. Because Sagan personally directed the infringing activity, and Defendants point to no evidence disputing that, Sagan is personally liable for infringement as a matter of law.[12]

## I. Evidentiary Issues

Defendants also claim that the Court made several evidentiary errors warranting reconsideration. Defs.' Mem. 23–25. Defendants are mistaken.

First, Defendants contend that cease-and-desist letters that they received from third parties constituted hearsay. However, "[c]ease-and-desist letters are not hearsay when offered to show bad faith and willful infringement." *John Wiley & Sons, Inc. v. Book Dog Books, LLC*, 327 F. Supp. 3d 606, 629 (S.D.N.Y. 2018). Here, the letters warned that Defendants potentially lacked necessary licenses and could be infringing, and they were admissible for the limited

---

[12] Because Sagan "authorized the [infringing] use," he may also be liable for "contributory infringement." *Softel, Inc. v. Dragon Med. & Sci. Commc'ns, Inc.*, 118 F.3d 955, 971 (2d Cir. 1997) (alteration in original) (quoting *Sony Corp. of Am. v. Universal City Studios, Inc.*, 464 U.S. 417, 437 (1984)). Nonetheless, Sagan may be held liable under either direct or secondary theories for his personal direction of infringement. *See UMG Recording*, 2014 WL 5089743, at *25.

purpose to show that "Defendants were on notice as to their allegedly infringing activity." Op. 17 & n.16.[13]

Second, Defendants contend that the Court should not have excluded a supplemental declaration from Matthew Lundberg explaining that a spreadsheet indicating the date that songs were first streamed in many cases actually indicated simply the date the song was streamed internally as a test rather than to the public. The date that songs were made publicly available was relevant to the issue of whether Defendants timely filed a Notice of Intention to Obtain Compulsory License ("NOI") before exploiting the work. The Court excluded Lundberg's supplemental declaration on the basis that it impermissibly created a material issue of fact by contradicting his prior sworn testimony that Defendants always published songs online before filing NOIs. Op. 37 n.28 (citing *Trans-Orient Marine Corp. v. Star Trading & Marine, Inc.*, 925 F.2d 566, 572 (2d Cir. 1991)). Regardless of whether the Court considered or excluded this declaration, which purported to create additional factual issues surrounding the dates, it would not affect the Court's holding, because other record evidence already led the Court to conclude that "there is a disputed question of fact as to whether and which NOIs were actually submitted after the first download or streaming of a phonorecord and in the absence of an HFA license." Op. 38. Given that there is already a disputed issue on NOI timeliness, considering Lundberg's supplemental declaration would not have reasonably altered the result, so reconsideration of this issue is unwarranted.

---

[13] Nor are the third-party cease-and-desist letters improper character evidence. "Rule 404(b) does not preclude [the] letters because 'evidence of [other] bad actions may be admissible to show "motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake, or lack of accident." On this basis . . . [c]ourts . . . consider the alleged infringer's receipt of and response to cease-and-desist letters . . . .'" *John Wiley*, 327 F. Supp. 3d at 630 (second and third alterations in original) (quoting *Gucci Am., Inc. v. Guess?, Inc.*, 858 F. Supp. 2d 250, 253 (S.D.N.Y. 2012)).

Third, Defendants appear to challenge the Court's decision to exclude replacement copies of the Joint Exploitation Agreements that included schedules of covered artists and performances. The Court did not admit these supplemental submissions because they did not include artist authorizations and did not purport to provide artist consent for fixation of the recordings, which in any event would be hearsay. Op. 30 n.25. Defendants provide no explanation why this decision was erroneous. Defendants further argue that the Court misinterpreted the UMG agreement in concluding that ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓ Defendants do not explain how the plain text of the UMG agreement leads to any other conclusion or how the Court's interpretation was erroneous, much less clearly erroneous.

## III. CONCLUSION

For the reasons set forth above, Defendants' motion for reconsideration is DENIED. The parties are directed to appear before the Court for a status conference on **April 18, 2019, at 4:00 p.m.** The Clerk of the Court is respectfully directed to terminate the motion, Doc. 257.

It is SO ORDERED.

Dated: March 25, 2019
New York, New York

                                                Edgardo Ramos, U.S.D.J.