UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------------X
                                      :

ABKCO MUSIC, INC., COLGEMS-EMI MUSIC
INC., EMI ALGEE MUSIC CORP., EMI APRIL
MUSIC INC., EMI BLACKWOOD MUSIC INC.,
EMI CONSORTIUM MUSIC PUBLISHING,
INC. d/b/a EMI FULL KEEL MUSIC, EMI
CONSORTIUM SONGS, INC. d/b/a EMI
LONGITUDE MUSIC, EMI FEIST CATALOG
INC., EMI ROBBINS CATALOG INC., EMI
UNART CATALOG INC., JOBETE MUSIC CO.,
INC., SCREEN-GEMS-EMI MUSIC INC.,
STONE AGATE MUSIC, STONE DIAMOND
MUSIC CORP., RODGERS & HAMMERSTEIN
HOLDINGS, LLC, PEER INTERNATIONAL
CORPORATION, PSO LIMITED, PEERMUSIC
LTD., PEERMUSIC III, LTD., SONGS OF PEER,
LTD., SPIRIT CATALOG HOLDINGS S.A.R.L.,
TOWSER TUNES, INC., TOWSER NEWCO
LTD., SPIRIT TWO MUSIC, INC., WARNER-
TAMERLANE PUBLISHING CORP. and WB
MUSIC CORP.,

                Plaintiffs/Judgment
                Creditors,

       -against-

WILLIAM SAGAN, NORTON LLC, BILL
GRAHAM ARCHIVES, LLC d/b/a
WOLFGANG'S VAULT, BILL GRAHAM
ARCHIVES, LLC d/b/a CONCERT VAULT,
BILL GRAHAM ARCHIVES, LLC d/b/a MUSIC
VAULT and BILL GRAHAM ARCHIVES, LLC
d/b/a DAYTROTTER,

                Defendants/Judgment
                Debtors.

------------------------------------------------------------X

~~[PROPOSED]~~ JUDGMENT

15 Civ. 04025 (ER)

RAMOS, D.J.:

      It is hereby ORDERED, JUDGED and DECREED: that pursuant to this Court's Opinion

and Order dated November 5, 2020 granting Plaintiffs' motion for attorneys' fees and costs, Plaintiffs have judgment in the amount of $52,689.12 as against the Defendants, representing the costs awarded pursuant to that Opinion and Order. *See* Docs. 390, 394.[1]

The Clerk of Court is further directed to issue a certified copy of this Judgment in a form that may be registered in other Districts without further delay and notwithstanding the pendency of the parties' cross appeals. *See* Doc. 409 (Order authorizing the registration of these judgments in other districts).

It is SO ORDERED.

Dated: March 23, 2021
            New York, New York

_____
            Edgardo Ramos, U.S.D.J.

---

[1] The November 5, 2020 Opinion and Order is also attached as Exhibit 1.

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

ABKCO MUSIC, INC., COLGEMS-EMI MUSIC,
INC., EMI ALGEE MUSIC CORP., EMI APRIL
MUSIC INC., EMI BLACKWOOD MUSIC, INC.,
EMI CONSORTIUM MUSIC PUBLISHING, INC.
d/b/a EMI FULL KEEL MUSIC, EMI CONSORTIUM
SONGS, INC. d/b/a  EMI LONGITUDE MUSIC, EMI
FEIST CATALOG INC., EMI ROBBINS CATALOG
INC., EMI UNART CATALOG, INC., JOBETE
MUSIC CO., INC., SCREEN-GEMS-EMI MUSIC
INC., STONE AGATE MUSIC, STONE DIAMOND
MUSIC CORP., RODGERS & HAMMERSTEIN
HOLDINGS LLC, PEER INTERNATIONAL
CORPORATION, PSO LIMITED, PEERMUSIC
LTD., PEERMUSIC III, LTD., SONGS OF PEER,
LTD., SPIRIT CATALOG HOLDINGS S.A.R.L.,
TOWSER TUNES, INC., TOWSER NEWCO LTD.,
SPIRIT TWO MUSIC, INC., WARNER-
TAMERLANE PUBLISHING CORP., and WB
MUSIC CORP.,

                    Plaintiffs/Counterclaim-
                    Defendants,

            – against –

WILLIAM SAGAN, NORTON LLC, BILL GRAHAM
ARCHIVES, LLC d/b/a WOLFGANG'S VAULT,
BILL GRAHAM ARCHIVES, LLC d/b/a CONCERT
VAULT, BILL GRAHAM ARCHIVES, LLC d/b/a
MUSIC VAULT, and BILL GRAHAM ARCHIVES,
LLC d/b/a DAYTROTTER,

                    Defendants/Counterclaim-
                    Plaintiffs.

**OPINION AND ORDER**

15 Civ. 4025 (ER) (SLC)

RAMOS, D.J.:

On March 12, 2020, after a nine-day trial, a jury awarded Plaintiffs a total of $189,500 in

statutory damages for infringing Plaintiffs' copyrights for 197 musical works.  Doc. 373 at 1.

The jury also found that Defendants' behavior constituted regular copyright infringement for the

30 works for which Defendants' state of mind was at issue.[1]  *Id.* at 3.  Plaintiffs now move for a new damages trial, arguing that the trial was fundamentally unfair because the jury was allegedly unable to deliberate as the COVID-19 pandemic was worsening in New York City.  Doc. 377. Plaintiffs also move for attorneys' fees and costs.  Doc. 374.

For the reasons discussed below, Plaintiffs' motion for a new trial is DENIED and Plaintiffs' motion for attorneys' fees is GRANTED.  However, this Court will reduce Plaintiffs' fee award by 60%.

## I.   BACKGROUND

### a.  Factual Background

Some familiarity with the factual background of this case is assumed, and the facts are recited in more detail in this Court's order granting in part and denying in part the parties' cross motions for summary judgment.  Doc. 262.  However, a brief summary is necessary.

Defendant William Sagan is the founder, president, CEO and sole owner of Defendant Norton LLC.  Doc. 262 at 6.  In July 2002, Sagan, through Norton LLC, purchased Bill Graham Archives LLC ("BGA"), which owned the archives of the late concert promoter Bill Graham. Defendants' Responses and Objections to Plaintiffs' Statement of Material Facts ("Defs.' Counter 56.1"), Doc 218 at ¶ 11.  This archive contained numerous audiovisual recordings of concerts by many of the twentieth century's most famous musical artists.  The BGA purchase was the first of Defendants' several major purchases of concert recordings in the subsequent years.  *Id.* at ¶ 26.

At the time of the BGA purchase, however, Defendants were made aware that there were serious questions as to the intellectual property rights that attached to these purchases.  For

---

[1] This Court had previously found the infringement to be willful for the remaining 167 works.  *Id.* at 2.

example, one appraisal report in connection with the BGA purchase noted that "no significant reuse can be contemplated without securing the customary clearances from performers, publishers and possibly other parties."  *Id.* at ¶ 21.[2]  Another document provided to Sagan at the time of the purchase observed that "there are compelling issues regarding the right . . . to exploit portions of the Archives without the approval of musical artists or other third parties."  *Id.* at ¶ 22.  In his deposition, Mr. Sagan confirmed that he did not know if any of the performers depicted consented to the recording of the concerts in question.  *Id.* at ¶ 27.

Starting in 2006, Defendants made public these concert recordings and charged a fee for their digital download and streaming through their websites.  Doc. 262 at 12.  The following year, the Defendants began their attempts to gain intellectual property rights in the works by obtaining compulsory mechanical licenses.  *Id.* at 25.

A compulsory mechanical license, or "mechanical license," is a narrow exception to a copyright holder's typical "exclusive" right to reproduce a musical work and distribute copies of that work in public.  *See* 17 U.S.C. §§ 106(1), (3).  The holder of a valid mechanical license may reproduce work copyrighted by another artist.  However, they must first comply with various requirements under 17 U.S.C. § 115 ("Section 115").  Some of these requirements are procedural, such as serving a Notice of Intent to Obtain a Compulsory License ("NOI") on the copyright holder before distributing the work.  *Id.* at § 115(b)(1).  Others are substantive:  For example, unless the licensee seeks to reproduce the work by recreating it (i.e., by assembling one's own musicians and recording a cover version), that licensee must also ensure that the

---

[2] Indeed, the record shows that the works had not been widely exploited by BGA before the purchase by Sagan. *See, e.g.*, Defs' Counter 56.1 at ¶ 23 (citing the testimony of Nicholas Clainos, who was involved in concert production for Bill Graham's companies, that the "audiovisual component of the archives was not cleared, and other than us being the owners of the physical property . . . we didn't have intellectual property rights[.]").

recording both be (1) "fixed lawfully";[3] and (2) have the authorization of the copyright holder in the sound recording.  17 U.S.C. § 115(a)(1)(B).[4]  In short, it is impossible to obtain a valid mechanical license to reproduce a concert recording without the consent of the artist featured in the concert.[5]

Defendants attempted to secure mechanical licenses through several channels.  Starting in 2007, they worked through the Harry Fox Agency ("HFA"), a third-party licensing agent that grants mechanical licenses on behalf of music publishers.  Doc. 262 at 12.[6]  They also entered into Joint Exploitation Agreements with three major record labels in 2009 that purported to show that the performers consented to lawfully fix certain of the live performances at issue here.  *Id.* at 15.  Finally, in 2013, they began directly serving NOIs on Plaintiffs.  *Id.* at 14.

Plaintiffs are a collection of six groups of music publishers.  *Id.* at 2.  They claim to own or hold exclusive licenses in the copyrights to 197 of the musical works that defendants have made available to the public on their websites.  *Id.* at 2–3.  Plaintiff ABKCO first demanded that defendants cease and desist exploiting an audiovisual recording of a 1981 Rolling Stones concert

---

[3] A work is "fixed" under the Copyright Act when it is embodied in a "tangible medium of expression . . . by or under the authority of the author, [and] is sufficiently permanent or stable to permit it to be perceived, reproduced, or otherwise communicated . . . ."  17 U.S.C. § 101.  This might occur when a recording is first put on a CD, record or other medium.

[4] For works fixed before February 15, 1972, the recording must have been fixed "pursuant to an express license from the owner of the copyright in the musical work or pursuant to a valid compulsory license for use of such a work in a sound recording."   17 U.S.C. § 115(a)(1)(B)(ii).

[5] A concert recording also cannot be lawfully "fixed" under the Copyright Act if the performer did not consent to being recorded in the first instance, because fixing, transmitting or distributing such recordings is unlawful.  *See* 17 U.S.C. § 1101(a) (prohibiting the fixation, transmission or distribution of a live musical performance without the consent of the performer or performers involved).

[6] Defendants worked through HFA until 2010, after which they switched to another company, RightsFlow, Inc.  *Id.* at 13.

4

in August 2013, claiming that ABKCO never issued the proper licenses for the recording.  *Id.* at
17.  Defendants received several similar demands from artists between 2013 and 2016.  *Id.*

###### b.  Procedural History

Plaintiffs filed this case on May 27, 2015, alleging that defendants infringed their
copyrights in nearly 200 musical works by making them available for downloading and
streaming on their websites without Plaintiffs' consent.  Doc. 1.  They also alleged infringement
based on Defendants' manufacture of physical records containing certain of Plaintiffs' works.
Plaintiffs' position is that not only were Defendants' purported mechanical licenses legally
invalid, but that Defendants must also secure "synchronization licenses" to lawfully exploit the
works.  *See* Memorandum of Law in Support of Plaintiffs' Cross-Motion for Summary
Judgment, Doc. 201 at 22–26.  A synchronization license is typically used when pairing recorded
music with images.  *See* Trial Tr., Doc. 361 at 597: 9–12.

Defendants answered and asserted counterclaims seeking a declaration that their use did
not infringe Plaintiffs' rights and that they did not need synchronization licenses to exploit the
works.  Doc. 12.  They further argued that their mechanical licenses were valid, arguing that they
had complied with all substantive and procedural requirements under Section 115.  *Id.*  The
parties cross-moved for summary judgment in May and September 2017 on Plaintiff's claims for
copyright infringement and request for a permanent injunction.  Docs. 161, 191.

In its summary judgment opinion, the Court held that Defendants failed to show that they
held valid mechanical licenses in any of the works at issue.  Doc. 262 at 39.   In the decision, the
Court found that Defendants' mechanical licenses were invalid on several independent grounds,
including that: (1) audiovisual recordings are not eligible for mechanical licenses under Section
115 of the Copyright Act; (2) Defendants did not show that the balance of their recordings were

fixed or manufactured with the performers' consent; and (3) any mechanical licenses that were not filed prior to the distribution of the recordings were independently invalid. *Id.* The Court also denied several other defenses proffered by Defendants. *Id.* at 40–46. However, the Court found a triable issue regarding whether the infringement of some of the works was willful. *Id.* at 39.

### c. The Trial

The jury trial commenced on March 2, 2020. Plaintiffs called twelve witnesses, including representatives from Sony, Peermusic and Warner, as well as defendant Sagan and his chief technology officer, Matthew Lundberg.

The trial coincided with the beginning of the COVID-19 pandemic in the United States. Over the course of the trial, confirmed cases of COVID-19 in the U.S. grew significantly. By March 11, 2020 there were 1,267 known cases reported in the United States. Declaration of Priy Sinha ("Sinha Decl.") Ex. A, Doc. 378-1. By March 9, Mayor Bill de Blasio had declared a state of emergency in New York City, and Governor Andrew Cuomo had begun to impose restrictions on large gatherings in New York. Sinha Dec. Ex. B, Doc. 378-2. There were 95 confirmed reported cases in New York City by the morning of March 12, the last day of the trial. *Id.*

On the morning of March 12, Juror Number 5 requested to speak with the Court about the pandemic. He stated the following:

> JUROR: We have been coming here for two weeks, all of us in this room. We have been exposing ourselves. Whether we know it or not, it's happening. And, quite frankly, this matter doesn't seem all that important compared to lives at stake, such as my mom who has lupus. She has a very compromised immune system. Sorry. Let me catch my breath here. I'm a little nervous.

> But, you know, my concern is that we have done our jobs. We have shown up every day on time. We are listening to this case. It seems like you guys did all the work before we even got here, the main work, you know, finding out, you know, the infringement or not. We are here to decide damages and money. And, quite frankly,

money, to me, is not worth the life of my mother or any of the lives of the jurors in there who also there are several who are older, and that's my concern.

I would like to know that you are doing your best to expediate this process so we can do our jobs and get this done.  I have no intention [of] being unfair.  I have listened to everything that everybody has said on both sides and, you know, I just want the chance to do my job before, you know, we all get sick, quite honestly.

Trial Tr., Doc. 371 at 1470:13–71:9.

The Court assured Juror Number 5 that it was taking adequate safety precautions, and the

following exchange ensued:

THE COURT: Yes, on that end, I also want to assure you, and although I am -- this is invisible to you and invisible to everyone who comes into the building, but we have been -- by "we," I mean the courts have been in very close contact with the CDC. We speak with them on a regular basis.  We are getting guidance from the CDC, the Centers for Disease Control.  We are following all of their recommendations.  We have not been told that it is necessary for us to shut down or take any steps in addition to what we have already taken.

JUROR: Excuse me, but –

THE COURT: You may have seen there are some signs now when you come into the –

JUROR: I'm not trying to get us shut down.  I don't want us delayed.  I want you guys to hurry up so we can do our job.

THE COURT: Yeah, this is invisible to you too.

JUROR: I'm not trying to get a hung jury.  I want to do my job.  I want to do my duty.  So does everyone in this room, and we plan on doing it fairly.

*Id.* at 1471:25–72:18.

The court then informed the Juror that it expected the case would go to the jury by that

afternoon because all parties, including Plaintiffs, Defendants and their attorneys, had an interest

in reaching a resolution.  *Id.* at 1472:19–73:7. The Court then informed counsel that it did not

believe Juror Five's comments established any basis to relieve him.  *Id.* at 1473:17–19.  No party

objected.  Later that day, after the Court gave the jury charge, it asked counsel for the parties

again for any objections to the charge.  *Id.* at 1607:12–13.  No party raised any objections

relating to the COVID-19 pandemic or its impact on the jury's deliberations.  The jury returned a

verdict the afternoon of March 12, 2020.

## II.   LEGAL STANDARDS

A motion for a new trial may be granted "for any reason for which a new trial has

heretofore been granted in an action at law in federal court."  Fed. R. Civ. P. 59(a)(1)(A).  Such a

motion ordinarily should not be granted "unless the trial court is convinced that the jury has

reached a seriously erroneous result or that the verdict is a miscarriage of justice."  *Atkins v. New

York City*, 143 F.3d 100, 102 (2d Cir. 1998) (*quoting Lightfoot v. Union Carbide Corp.*, 110 F.3d

898, 911 (2d Cir. 1997) (omitting internal notations and quotations)).  District courts have

"significant—although not limitless—latitude to exercise their inherent discretionary authority"

in deciding Rule 59(a) motions.  *Ali v. Kipp*, 891 F.3d 59, 64 (2d Cir. 2018).

Under 17 U.S.C. § 505, attorneys' fees and costs may be granted to the prevailing party

in a suit for copyright infringement.  A motion for fees and costs under § 505 is to be awarded

"only as a matter of the court's discretion."  *Fogerty v. Fantasy, Inc.*, 510 U.S. 517, 534 (1994).

Permissible factors to consider include "frivolousness, motivation, objective unreasonableness

(both in the factual and in the legal components of the case) and the need in particular

circumstances to advance considerations of compensation and deterrence."  *Id.* at 534 n.19.

(quoting *Lieb v. Topstone Industries, Inc.*, 788 F.2d 151, 156 (1986)).  In exercising their

discretion, courts should these weigh factors in a way that is "faithful to the purposes of the

Copyright Act and are applied to prevailing plaintiffs and defendants in an evenhanded manner."

*Id.*  Courts must give the factor of objective unreasonableness "substantial weight," but that

weight is not dispositive.  *See Kirtsaeng v. John Wiley & Sons, Inc.*, 136 S. Ct. 1979, 1989 (2016).

## III.    DISCUSSION

### a.   Plaintiffs' Motion for a New Trial.

Plaintiffs do not and cannot contest the fact that the damages awarded were within the statutory range permitted by the Copyright Act.  Memorandum of Law in Support of Plaintiffs' Motion for a New Damages Trial, Doc. 379 at 12.  Nor do they raise any errors of law.  Rather, they argue that the jury was unable to reasonably deliberate in light of the worsening COVID-19 pandemic, rendering the trial fundamentally unfair.  *Id.* at 3, 10.

Plaintiffs cite three main facts in support of their argument.  First, Plaintiffs cite the discrepancy between the length and complexity of the trial—about nine days with twelve witnesses and 326 exhibits—and the jurors' deliberation time of less than an hour.  *Id*. at 10.  Plaintiffs also note that the jury awarded them either $1,000 or $750 per work in statutory damages, which were very low amounts relative to Plaintiffs' expectations.  *Id.* at 12.  Finally, Plaintiffs point to Juror Five's concerns about the worsening COVID-19 pandemic.  *Id.* However, none of these facts adequately suggest that the trail was a "miscarriage of justice."  *Id.*

First, Plaintiffs provide no compelling reason why the length of the trial might have impacted the propriety of the jury's short deliberations.  Indeed, plaintiffs do not argue that they had insufficient time to make their case.[7]  Rather, their argument is that the jury was so eager to leave the court that they could not have possibly deliberated with sufficient care.  In support they cite *Lucas v. Am. Mtg Co.*, a Fifth Circuit case in which a jury returned a verdict within forty-five

---

[7] Nor would such an argument be persuasive.  As Defendants point out, this "appears to be the longest damages-only copyright trial on record."  Defendants' Memorandum of Law in Opposition to Plaintiff's Motion for a New Damages Trial, Doc 388 at 11.

minutes of a trial when a hurricane was imminently expected to strike near the courthouse.  *See*

630 F.2d 291, 293 (5th Cir. 1980).  However, *Lucas* differs from this case in several crucial

respects.  In *Lucas*, the presiding judge had personally encouraged the jurors to hurry home

"before you get blown away," and had originally asked that they render a verdict in fifteen

minutes.  *Id.*  Here, the Court applied no such time pressure.  Before sending the jury to

deliberate, the Court advised:

> Now that the case is in your hands, *you can stay as long as you wish*.  I'm happy to stay
> with the usual schedule of 9:30 to 2:30, but if you wish to stay longer, I'll leave that
> entirely up to you.  If any one of you decides that you need to leave at the usual time,
> then you will leave at 2:30.  But if tomorrow, for example, you decide you want to stay
> later, if it should get to that, then that is entirely up to you.

> Trial Tr., Doc. 371 at 1608:4–10. (emphasis added).

Moreover, in *Lucas*, the Fifth Circuit also held that there had been no evidentiary basis

for the jury's award.  *Lucas*, 630 F.3d at 293.  Indeed, for some of the claims at issue in *Lucas*,

the award was less than half of the amount that the defendant had stipulated to prior to trial.  *Id.*

This issue is not present here, where the jury was permitted to use its discretion to award

damages within the statutory ranges set by the Copyright Act.  *See* Trial Tr., Doc. 371 at 1591:

4–6 (informing the jury that the statute "gives you discretion to determine the amount of

statutory damages that you find to be just in light of the evidence presented").

Plaintiffs' reliance on the relatively low damages award is also misplaced.  Plaintiffs do

not persuasively draw any connection between the potential impact of the COVID-19 pandemic

and the specific damages awarded.  As Defendants point out, the jury could have just as easily

settled on a *higher* award in the same amount of deliberation time.  *See* Doc. 388 at 11.  If

anything, it would seem to require even less deliberation for the jury to award the statutory

minimum or maximum for every work, or to award the same amount of damages for each work

10

at issue.  But the jury took neither of those approaches.  Thus, there is simply no basis to find

that the jury's choice to issue a relatively low damages award was "the path of least resistance,"

as Plaintiffs claim.  Doc. 379 at 12.  *Cf. United States v. Derman*, 452 F. Supp. 3d 1259, 1266

(D. Utah 2020) (observing in another case denying a motion for a new trial due to COVID-19

concerns that "even assuming for argument's sake that jurors were motivated to rush their

deliberations because of uneasiness over the coronavirus, there is nothing to suggest that rushed

deliberations would have been prejudicial to Defendant.").

Nor do Juror Five's comments provide any basis for a new trial.  On the morning of

March 12, Juror Five explicitly told the court that "I'm not trying to get a hung jury.  I want to do

my job.  I want to do my duty.  So does everyone in this room, and we plan on doing it fairly."

Doc. 371 at 1472:16–18.  When the court subsequently observed that Juror Five's concerns were

"understandable," no party disagreed.  *Id.*  at 1473:19.  If any party had sought to exclude Juror

Five, the trial could have continued with seven jurors.  *See* Transcript of Pretrial Conference

Held February 27, 2020, Doc. 354 at 36:11–13 (noting that if up to two jurors left, the trial could

continue with up to six jurors).  The fact that no party raised objections to Juror Five's comments

or sought to exclude him underscores that his concerns were reasonable.[8]

Thus, there is no basis to find that the jury's verdict was a "miscarriage of justice."  *See*

*Atkins v. New York City*, 143 F.3d 100, 102 (2d Cir. 1998) (quotation marks and citations

omitted).

---

[8] Plaintiffs appear to concede as much in their brief, noting that "[t]he Court's desire for the trial to proceed to a verdict appeared reasonable in the moment," but that "in retrospect" the trial should have been discontinued.  Doc. 379 at 12.  To the extent the Plaintiffs here take issue with the Court's statement that "[all parties] want to get this done as efficiently and quickly as possible . . . ." Trial Tr. at 1473:2–5, this comment arose in the context of an exchange about finishing testimony and summations so that the case could *get to* the jury, not in reference to the desired length of the jury deliberations themselves.  Indeed, in the same exchange, the Court reminded Juror Five that "once it's in your hands, then it's up to the jury to determine how long they think is required for—to come to a unanimous verdict." *Id.* at 1472:23–25.  In any event, Plaintiffs do not argue here that they were given insufficient time at trial to make their case.

### b.   Plaintiffs' Motion for Attorneys' Fees.

Attorneys' fees are available to the "prevailing party" under Section 505 of the Copyright Act.  17 U.S.C. § 505.  There is no "precise rule or formula" governing the decision to grant attorneys' fees, but courts may consider factors such as "frivolousness, motivation, objective unreasonableness (both in the factual and in the legal components of the case) and the need in particular circumstances to advance considerations of compensation and deterrence."  *Fogerty v. Fantasy, Inc.*, 510 U.S. 517, 534, 534 n.19 (1994).  The objective reasonableness factor must be given "substantial weight."  *See Kirtsaeng v. John Wiley & Sons, Inc.*, 136 S. Ct. 1979, 1989 (2016).

As one might expect from a case that the parties have vigorously litigated for over five years, these factors do not uniformly weigh in a single direction.  However, for the reasons discussed below, the Court finds that Plaintiffs have shown that they are entitled to some attorneys' fees based on (1) a limited amount of unreasonable behavior by Defendants; and (2) the large number of works found to be willfully infringed in this case.  The Court's analysis on these two questions is also informed by the Copyright Act's purpose of encouraging copyright holders with meritorious claims to pursue the vindication of their rights, particularly when such claims might otherwise be prohibitively expensive to litigate.  *See Beastie Boys v. Monster Energy Co.*, 112 F.Supp.3d 31, 45 (S.D.N.Y. 2015).  However, because there are ample countervailing factors weighing against a fee award, Plaintiffs' sought award will be reduced by 60%.

### 1.   The Plaintiffs are Prevailing Parties.

Plaintiffs must first show that they are prevailing parties to merit consideration for a fee award.  A prevailing party "is one who succeeds on a significant issue in the litigation that

achieves some of the benefits the party sought in bringing suit." *Warner Bros. Inc. v. Dae Rim Trading, Inc.*, 877 F.2d 1120, 1126 (2d Cir. 1989); *see also Buckhannon Bd. & Care Home, Inc. v. W. Va. Dep't of Health & Human Res.*, 532 U.S. 598, 604 (2001) (noting that obtaining a judgment on the merits is one basis for awarding attorneys' fees). However, if a party's victory is on a "purely technical or *de minimis*" claim, they may not qualify as a prevailing party. *Screenlife Establishment v. Tower Video, Inc.*, 868 F. Supp. 47, 50 (S.D.N.Y. 1994) (citing *Tex. State Teachers Ass'n v. Garland Ind. Sch. Dist.*, 489 U.S. 782, 789 (1989)).

Defendants argue that Plaintiffs are not "prevailing parties," and are thus statutorily ineligible for a fee award, because the jury verdict fell short of their expectations. Defendants' Memorandum of Law in Opposition to Plaintiffs' Motion for Attorneys' Fees, Doc. 389 at 11. While Plaintiffs may be dissatisfied with the monetary verdict, this does not outweigh the fact that they prevailed on the merits on each count of infringement, and that the Court found infringement to be willful for most of these counts. *See* Doc. 262 at 54. In doing so, the Court found that none of Defendants' purported mechanical licenses were valid, one of the most hotly contested issues in this case. *Id.* at 39. This victory on the merits clearly meets Plaintiffs' burden of showing that they achieved at least some of the benefits they sought through litigation. *Cf. Psihoyos v. John Wiley & Sons, Inc.*, No. 11 Civ. 1416 (JPO), 2013 WL 1285153, at *2 (S.D.N.Y. Mar. 29, 2013) (finding plaintiff to be a prevailing party when infringement was found for only three of eight photographs at issue, with mixed results on willfulness).

In response, Defendants cite to *Warner Bros., Inc. v. Dae Rim Trading, Inc.*, 877 F.2d 1120, 1126 (2d Cir. 1989), to argue that one cannot be a prevailing party if their efforts to justify a substantial statutory damages award were unsuccessful. Doc. 389 at 11. However, in *Dae Rim*, the plaintiffs brought only two copyright claims, later withdrew one, and could not prove

13

that the remaining claim was willful. *Dae Rim*, 877 F. 2d at 1126.  Moreover, the damages

award was only $100, and the Plaintiff's "conceded reason" why it did not settle for $250 and a

permanent injunction several months after litigation began was to "secure a substantial award of

statutory damages and attorneys' fees as a lesson and warning to defendants and other copyright

infringers." *Id.* at 1122.  The litigation strategy in *Dae Rim* was thus blatantly and uniformly

focused on obtaining high fees in what should have been a straightforward case.  That is a far cry

from this case, where liability and an injunction were more complicated, hotly contested, and not

determined until after about three years of litigation.  Thus, defendants cannot reasonably argue

that a disappointing return in damages outweighs Plaintiffs' numerous victories on the merits.

  2.  Defendants' Position on Artist Consent to the Underlying Recordings Was
      Unreasonable.

A finding that Defendants acted objectively unreasonably during litigation weighs

heavily toward a fee award. *Matthew Bender & Co., Inc. v. West Pub. Co.*, 240 F.3d 116, 121–

22 (2d Cir. 2001).  This analysis must be grounded in the purposes of the Copyright Act, which

include preventing copyright infringement, stimulating artistic labor and compensation for that

labor, and "enriching the general public through access to creative works." *Fogerty v. Fantasy,

Inc.*, 510 U.S. 517, 526–7 (1994).  However, a finding of objective unreasonableness is not

dispositive, and "other factors might justify an award of fees despite a finding that the

nonprevailing party's position was objectively reasonable." *Matthew Bender & Co.*, 240 F.3d at

122 (citation omitted).

A party's claim or litigation strategy is not objectively unreasonably merely because it is

unsuccessful. *See Ann Howard Designs, L.P. v. Southern Frills, Inc.*, 7 F. Supp. 2d 388, 390

(S.D.N.Y. 1998) ("[A]n unsuccessful claim does not necessarily equate with an objectively

unreasonable claim.").  Rather, a claim is objectively unreasonable when it is "clearly without

merit or otherwise patently devoid of legal or factual basis . . ." *Penguin Books U.S.A., Inc. v. New Christian Church of Full Endeavor, Ltd.*, No. 96 Civ. 4126 (RWS), 2004 WL 728878 at *3 (S.D.N.Y., Apr. 6, 2004) (citing cases).  A party's "good faith decision to litigate complex or undecided issues of law is not objectively unreasonable."  *Psihoyos v. John Wiley & Sons, Inc.*, No. 11 Civ. 1416 (JPO), 2013 WL 1285153, at *3 (S.D.N.Y. Mar. 29, 2013).

Plaintiffs' brief cites a laundry list of allegedly unreasonable conduct by Defendants and their attorneys.  While Plaintiffs are correct that Defendants proffered numerous unsuccessful legal defenses, these do not rise to the level of being objectively unreasonable just because they were unsuccessful.  To take one example, Plaintiffs point to Defendants' position that their purported mechanical licenses in the works at issue were valid—a position the Court rejected on several grounds on summary judgment.  *See* Doc. 262 at 39.  One of Defendants' arguments on this point was that Section 115 of the Copyright Act, which governs mechanical licenses, applies to audiovisual works.  The court rejected this argument several times, noting that the "clear language" of the statute *excludes* audiovisual works, thus rendering such works ineligible for mechanical licenses.  Doc. 262 at 26; *see also* Doc. 272 at 10 (denying Defendants' motion for reconsideration of the summary judgment order); Doc. 326 at 3–4 (denying Defendants' petition for certification of interlocutory appeal of the summary judgment order and motion for reconsideration).

However, at a conference dated August 13, 2019, the court advised Plaintiffs that while Defendants "may [have] a losing argument" on this point, it's not an argument that is "so devoid of merit that it necessarily suggests bad faith."  Doc. 298 at 12:24–13:1.  The same is true of several other issues raised by Defendants following their loss on summary judgment.  *See* Doc. 262 at 40–45 (denying Defendants' implied consent defense), 45–46 (denying Defendants'

estoppel defense).  Thus, it would be unfair for the Court to now adversely weigh Defendants'

zealousness against them for the purposes of attorneys' fees, when this Court has previously

declined to impose sanctions or to direct Defendants not to file their interlocutory appeal motion

based on similar arguments.  Doc. 298 at 13:2–10.

However, the there is one factual argument urged by Defendants that the Court finds to

be objectively unreasonable and thus weighs in favor of limited attorneys' fees for Plaintiffs.

Defendants failed to proffer any admissible evidence supporting their claim that numerous artists

in this case had consented to the recording and exploitation of their concert performances in the

first place.  *See* Doc. 262 at 30–34.  The issue of artist consent was important to Plaintiffs'

claims because, if an artist did not consent to the underlying concert performance being recorded

in the first instance, there could be no valid mechanical license for that performance.[9]  Thus, the

issue of artist consent was material to Defendants' defense that they had valid mechanical

licenses.

The record shows that Defendants had reason to doubt that they had received any artist

consent to the recordings when they first purchased works from BGA.  *See* Defs.' Counter 56.1

at ¶¶ 16–19; *see also* Trial Tr., Doc. 365 at 923:21–24 (confirming that the agreement to acquire

the BGA made no representations about performer consent).  Indeed, Defendant Sagan testified

---

[9] Section 115(a)(1) provides that "[a] person may not obtain a compulsory license for use of the [musical] work in the making of phonorecords duplicating a sound recording fixed by another . . . unless (i) such recording was fixed lawfully; and (ii) the making of the phonorecords was authorized by the owner of the copyright in the sound recording or, if the sound recording was fixed before February 15, 1972, by any person who fixed the sound recording pursuant to an express license from the owner of the copyright in the musical work or pursuant to a valid compulsory license for use of such work in a sound recording."

In summary judgment briefing, the parties agreed that a work could not be "lawfully fixed" pursuant to Section 115(a)(1) if the artists did not consent to the performance being recorded.  This is because 17 U.S.C. § 1101(a) prohibits the fixation, transmission or distribution of a live musical performance "without the consent of the performer or performers involved."  Thus, a lack of consent to the underlying recording precludes a valid mechanical license.

at his deposition that he did not know if there had been artist consent for the underlying recordings.  Defs' Counter 56.1 at ¶ 27.[10]

Defendants also argued that certain Joint Exploitation Agreements entered into with third party record labels many years after the performances establish that the artists consented to the fixation of their live performances.  Defendants' Reply Brief in Support of their Motion for Summary Judgment, Doc. 217 at 9.  However, as the Court noted in its summary judgment order, not only were these agreements inadmissible, they did not constitute evidence of consent to the initial fixation because they did not refer to artists' consent to recording the underlying performances.  Doc. 262 at 30–31.  Thus, even if they had been admissible, they might only establish the consent of the record labels for additional reproduction of the works—but not the threshold question of whether those works were "lawfully fixed" in the first instance.  *Id.* at 31.

Defendants also served third-party discovery requests to artists who purportedly might recall consenting to such recordings.  However, none of them could do so.  *Id.* at 34.  In any event, even if Defendants had been able to come forward with evidence supporting their assertions of artist consent, they would still have had to grapple with several other legal questions, such as whether these purported mechanical licenses for audiovisual recordings were within the statutory definition of Section 115.  But Defendants' insistence that there had been valid artistic consent from the beginning, despite a paucity of evidence to support this position, "positioned the parties needlessly far apart on a foundational issue" and thus weighs in favor of a fee award.  *See Beastie Boys v. Monster Energy Co.*, 112 F. Supp. 3d 31, 42 (S.D.N.Y. 2015).

---

[10] While Defendant Sagan testified at trial that he would produce documents at trial showing that consent existed, he did not do so.  Trial Tr., Doc. 365 at 968:24–969:22.

3.      Most of The Works at Issue Were Found To Be Willfully Infringed.

Courts are also encouraged to consider particular goals of compensation and deterrence in the decision to grant a fee award.  *Fogerty v. Fantasy, Inc.*, 510 U.S. 517, 534 n.19 (1994).  A finding of willful infringement weighs in favor of a fee award.  *See, e.g.*, *Kepner-Tregoe, Inc. v. Vroom*, 186 F.3d 283, 289 (2d Cir. 1999).  This principle is grounded in the statutory goal of deterring copyright violations, and "[c]onsiderations of deterrence may support an award of attorneys' fees to the prevailing party where none of the other relevant factors justify denying such an award, especially when willful infringement has been found."  *Nat'l. Football League v. PrimeTime 24 Joint Venture*, 131 F. Supp. 2d 458, 484 (S.D.N.Y. 2001).  Moreover, attorneys' fees may be issued in order to deter even reckless conduct.  For instance, in *Beastie Boys v. Monster Energy Co.*, the court found that a fee award was merited when defendants' lax and reckless approach to music licensing meant that "it was likely only a matter of time before infringement occurred."  112 F. Supp. 3d at 43 (quotation marks and citation omitted).

Moreover, the existence of complex issues does not necessarily preclude the weighing of deterrence interests when the non-prevailing party acted at least recklessly.  In *Basic Books, Inc. v. Kinko's Graphics Corp.*, a case against a copy shop for reproducing and selling course packet materials to college students without authorization, the court acknowledged that the case raised some novel facts, as there had been "no judicial determination of a copyshop case before now."  758 F. Supp. 1522, 1547 (S.D.N.Y. 1991).  However, it concluded that the "fair use doctrine itself is no novelty" and that defendant had not showed that it had meaningfully "wrestled with the determinations of the excerpts in suit."  *Id.*  The same is true here.  The Court has acknowledged that this case presented some relatively new issues due to the different types of technology involved.  Doc. 298 at 12:19–23.  However, the existence of these issues does not

18

alleviate Defendants of their foundational obligation to explore and document whether the artists consented to the recording of the underlying concerts.

Here, the Court found that there was "voluminous, undisputed record evidence demonstrating that Defendants were on notice that the recordings they acquired lacked the consents and authorizations necessary to exploit them, both from performing artists and the copyright holders in the songs." Doc. 262 at 48. In support, the Court heavily weighed the fact that Defendants had been warned that they were not acquiring intellectual property rights and that significant licensing issues could arise. *Id.* The Court found that there was no good faith basis for Defendants to have relied on two of the Joint Exploitation Agreements, and that its conduct was "at a minimum, reckless" with respect to the third. *Id.* at 49.

These circumstances constitute a situation where some attorneys' fees are justified in the interest of deterrence. The Court is mindful that attorneys' fees should not be used to punish a losing party for simply choosing to litigate claims that are ultimately not meritorious. *See Psihoyos v. John Wiley & Sons, Inc.*, No. 11 Civ. 1416 (JPO), 2013 WL 1285153, at *3 (S.D.N.Y. Mar. 29, 2013) ("A party's good faith decision to litigate complex or undecided issues of law is not objectively unreasonable"). On the other hand, when a party has not made "significant inquiry into the legality of their activities" in the first instance, as was the case regarding proof of artist consent for many of the works at issue here, attorneys' fees may deter future misconduct. *See Beastie Boys*, 112 F. Supp. 3d at 44 (quoting *adidas Sportschuhfabriken Adi Dassler Stiftung & Co., K.G. v. New Generation*, No. 88 Civ. 5519 (PKL), 1990 WL 180679, at *1 (S.D.N.Y. May 29, 1990)).

It would also further other goals of the Copyright Act to permit some recovery to Plaintiffs. A significant purpose of the Copyright Act is to "encourage the origination of creative

works by attaching enforceable rights to them." *Crown Awards, Inc. v. Discount Trophy & Co., Inc.*, 564 F. Supp. 2d 290, 295 (S.D.N.Y. 2008) (*quoting Matthew Bender & Co., Inc. v. West Pub. Co.*, 240 F.3d 116, 122 (2d Cir. 2001) (citation omitted). Thus, fee awards exist as much to incentivize the vindication of valid intellectual property rights as they do to disincentivize the unlawful exploitation of those rights. *See Beastie Boys*, 112 F. Supp. 3d at 45 ("Without the prospect of a fee award, plaintiffs facing mounting legal fees might be forced into a nuisance settlement or deterred altogether from enforcing [their] rights.") (quotation marks and citations omitted). While the Court declines to make a finding as to whether either party's settlement demands were reasonable, the point remains that Plaintiffs vigorously litigated their claims through a motion for summary judgment, a motion for reconsideration, and a motion for an interlocutory appeal.[11] It is appropriate to provide them with at least some award for this persistence, and to avoid the possibility that other plaintiffs with meritorious claims will be chilled from bringing suits to vindicate their rights.

### 4.    Countervailing Equitable Considerations Against a Fee Award.

While the Court will award attorneys' fees in this matter, it will reduce the award by 60%. Defendants have raised numerous considerations grounded in fairness and compensation that bear on a just outcome here. Specifically, Defendants raise the relative financial strength of the parties and the disparity between the fee award sought and the damages awarded at trial. *See* Doc. 389 at 14–20.

---

[11] Each party accuses the other of failing to negotiate a settlement in good faith. *Compare* Slotnick Decl., Doc. 375, at ¶ 5 "Defendants refused to make a settlement offer . . . ." *with* Ranahan Decl., Doc. 389-1, at ¶ 4 "Plaintiffs did not make any demand below the maximum statutory damages sought in the Complaint throughout the entire duration of this litigation." It suffices to say that these talks were contentious and neither party believed it was in their interest to settle; however the record does not present sufficient information for the Court to determine whether one party or the other acted unreasonably throughout settlement discussions.

I.      The Relative Financial Strength of The Parties.

Courts may consider financial disparities between the parties in their fee award analysis. *See Leibovitz v. Paramount Pictures Corp.*, 2000 WL 1010830, No. 94 Civ. 9144 (LAP), at *2 (S.D.N.Y. July 21, 2000); *see also Barclays Capital, Inc. v. Theflyonthewall.com*, No. 06 Civ. 4908 (DLC), 2010 WL 2640095, at *6 (S.D.N.Y. June 30, 2010) (collecting cases).  Defendants argue that an award of the roughly $6 million sought by Plaintiffs would leave Defendants in "financial ruin."  Doc. 389 at 4.  In support, Defendants cite the fact that Defendant Sagan has recently had to cut staff due to the economic downturn wrought by the COVID-19 pandemic.  *Id.* at 4 n.3. Defendants also note that Mr. Sagan's business has always been unprofitable and that his current financial situation is "precarious."  *Id.* at 4.  Plaintiffs, on the other hand, are multi-million dollar companies that derive significant revenue from their extensive collection of musical works.  *Id.* at 4–5 (citing trial testimony regarding the assets and profits of several of the Plaintiffs).

While the record does not precisely disclose Defendant Sagan's net worth, the Court is satisfied that there are meaningful financial disparities between the parties, given the size of Plaintiffs' businesses.  Moreover, while the Court found that Defendants' mechanical licenses were not valid, this does not change the fact that Defendants have already made some payments to Plaintiffs pursuant to their purported royalty obligations.  *See* Trial Tr., Doc. 369 at 1447:7–48:15.  Thus, the Court will account for the financial disparities between the parties in reducing the fee award.

II.      The Disparity Between Fees Sought and Damages Won at Trial.

Courts determining attorneys' fees should "bear[] in mind that a reasonable paying client wishes to spend the minimum amount necessary."  *Mango v. BuzzFeed, Inc.*, 397 F. Supp. 3d

368, 374 (S.D.N.Y. 2019). Defendants thus argue that Plaintiff's "limited" success at trial, as measured by damages awarded, weighs in favor of a reduced fee award. Doc. 389 at 20. Their logic is essentially that a reasonable paying client would not want to pay much more in attorneys' fees than they are able to recover at trial. This position is not without support. In *Mango*, a court in this District reduced the prevailing party's attorneys' fees based in part on the assumption that a "reasonable, paying client seeking to spend the minimum amount would likely balk" at paying several times more in legal fees than they received in damages awarded. 397 F. Supp. 3d at 377. Similarly, in *Childress v. Taylor*, the court excluded most hours ascertainable to the damages trial when Plaintiffs' recovery fell several times short of the amount billed. 835 F. Supp. 739, 743 (S.D.N.Y. 1993).

The disparity here is even more extreme than in these cases—as Defendants point out, Plaintiffs pursued damages of over 100 times what they were awarded. Doc. 389 at 23. Moreover, there were certain aspects of Plaintiffs' litigation strategy that did not significantly contribute to the damages award. For example, all twelve witnesses at the lengthy trial were called by Plaintiffs, and the Court found on summary judgment that it was unnecessary to rule on whether synchronization licenses were required to determine liability. *See* Doc. 262 at 28 n.24. Thus, the Court finds that consideration of this factor in a fee reduction is warranted here. However, this determination is not intended to disparage Plaintiffs' counsel's performance at trial or during other stages of the case. Indeed, just as in *Beastie Boys v. Monster Energy Co.*, where the Court similarly awarded attorneys' fees but reduced them based on several factors, the "case was litigated aggressively by estimable lawyers on both sides" and the fee determination does "not bespeak any criticism of counsel for either side." 112 F. Supp. 3d at 49. Moreover, the Court is also mindful that Defendants' aggressive litigation regarding the motion for

reconsideration and certification for the interlocutory appeal also contributed to the high fee

amount billed here.

>5.   <u>The Reduced Award.</u>

The Court has considerable discretion to determine an appropriate fee award.  *Black v.*

*Nunwood, Inc.*, No. 13 Civ. 7207 (GW), 2015 WL 1958917, at *4 (S.D.N.Y. Apr. 30, 2015)

(citing *Hensley v. Eckerhart*, 461 U.S. 424, 437, (1983)).  If the Court finds that a fee reduction

is warranted, it may impose the reduction by deducting a certain percentage across the board

when doing so on an hour-by-hour basis would be unwieldy.  *See Ass'n of Holocaust Victims for*

*Restitution of Artwork & Masterpieces v. Bank Austria Creditanstalt AG*, No. 04 Civ. 3600

(SWK), 2005 WL 3099592, at *7 (S.D.N.Y. Nov. 17, 2005).

The Court must first calculate a lodestar, or "presumptively reasonable" fee.  *Arbor Hill*

*Concerned Citizens Neighborhood Ass'n v. Cty. of Albany*, 522 F.3d 182, 183 (2d Cir. 2008).  In

assessing the fee's reasonableness, a court may consider numerous factors, including:

>(1) the time and labor required; (2) the novelty and difficulty of the questions; (3) the
>level of skill required to perform the legal service properly; (4) the preclusion of
>employment by the attorney due to acceptance of the case; (5) the attorney's customary
>hourly rate; (6) whether the fee is fixed or contingent; (7) the time limitations imposed by
>the client or the circumstances; (8) the amount involved in the case and the results
>obtained; (9) the experience, reputation, and ability of the attorneys; (10) the
>"undesirability" of the case; (11) the nature and length of the professional relationship
>with the client; and (12) awards in similar cases.

*Id.* at 186 n. 3 (citation omitted).

Plaintiffs request $6,050,565.50 in attorneys' fees and $52,689.12 in costs.  Slotnick

Decl. at ¶¶ 41, 44.  They estimate that this already carries a 30% discount based on reduced rates

for Plaintiffs and the omission of non-core members of the litigation team.  *Id.* at ¶ 2.  Plaintiffs

attach a 187-page spreadsheet documenting their hours spent.  *Id.* at Exhibit I, Doc. 375-9.

Defendants do not take issue with the hourly rates reported.[12]  They do, however, argue that some of the entries are unrecoverable because they are too vague.  *See, e.g.,* Doc. 389 at 24 (citing several vague entries such as "Trial prep tasks").  While a few of these entries could indeed be clearer, these are the exception, not the rule.  Rather, many of the entries are meticulous.  *See, e.g.*, Doc. 375-9 at 119 ("Research legislative history of Section 115 of the Copyright Act and Caselaw discussing standing, direct liability, and the legal standard for a motion for reconsideration . . .").  Nor do the other minor line-level concerns raised by Defendants merit reducing the lodestar beyond the considerations already discussed.  Thus, the Court will impose its fee reduction from the cited amount of $6,050,565 rather than deducing further from the proposed lodestar.  *Cf. Beastie Boys v. Monster Energy Co.*, 112 F. Supp. 3d 31, 55 (S.D.N.Y. 2015) (a significant fee reduction was not warranted when vague entries were "few and far between").

The Court will, however, reduce this fee award by 60%.  This blanket fee reduction is consistent with the foregoing factors discussed in Section III.b.1–4, *supra*, and with other reductions awarded in cases in this District.  *See, e.g.*, *Beastie Boys*, 112 F. Supp. 3d at 57–59 (reducing fees by a total of 50% to account for Latham Act claims for which the court found fee shifting unwarranted, as well as for some fees the court found were greater than necessary); *Amanze v. Adeyemi*, 18 Civ. 8808 (NRB), 2019 WL 6014138, at *3–4 (S.D.N.Y. Nov. 13, 2019) (reducing fee award by 40% in light of Plaintiffs' limited financial circumstances and with consideration of the minimum necessary amount to litigate the case effectively).

---

[12] The Court independently finds that they are reasonable.  *See Beastie Boys*, 112 F. Supp. 3d at 56 (approving of similar hourly rates for attorneys in a Copyright Act suit in this District and collecting cases in support of these rates' reasonableness).

The Court acknowledges that the reduction imposed here is substantial.  However, the Court believes that the reduction is warranted given that the net amount of fees awarded—$ 2,420,226.00—is still large.  *Cf. Beastie Boys*, 112 F. Supp. 31 at 58 (50% post-fee reduction amounted to an award of $667,849.14 after an eight-day trial).  Such a hefty fee award surely constitutes adequate deterrence for would-be infringers, but is intended to remain true to the principle that such awards should not result in financial ruination for Defendants.  *See Barclays Capital Inc. v. Theflyonthewall.com*, 06 Civ. 4908 (DLC), 2010 WL 2640095, at *7 (S.D.N.Y June 30, 2010).

## IV.    Conclusion

For the foregoing reasons, Plaintiffs' Motion for a new trial is DENIED.  Plaintiffs' motion for attorneys' fees and costs is GRANTED, but the attorneys' fees are subject to a 60% reduction.  The Clerk of Court is respectfully directed to terminate docket numbers 374 and 377.

It is SO ORDERED.

Dated:  November 5, 2020
New York, New York

_____

Edgardo Ramos, U.S.D.J.